1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2

3

4     UNITED STATES OF AMERICA,        )
                                       )
5                    Plaintiff,        )   Criminal Action
                                       )
6                                      )   No. 12-10238-FDS
      vs.                              )
7                                      )
      EDWARD LABORIO and JONATHAN      )
8     FRAIMAN,                         )
                      Defendants.
9

10

11    BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV

12

13                        <u>JURY TRIAL DAY 1</u>

14

15

16         John Joseph Moakley United States Courthouse
                       Courtroom No. 2
17                     One Courthouse Way
                       Boston, MA 02210
18

19                     NOVEMBER 30, 2015
                         9:03 a.m.
20

21

22

23                     Valerie A. O'Hara
                      Official Court Reporter
24     John Joseph Moakley United States Courthouse
                 One Courthouse Way, Room 3204
25                     Boston, MA 02210
                  E-mail: vaohara@gmail.com

APPEARANCES:

For The United States:

       United States Attorney's Office, by
VASSILI THOMADAKIS, ASSISTANT UNITED STATES ATTORNEY, and
ERIC P. CHRISTOFFERSON, ASSISTANT UNITED STATES ATTORNEY,
1 Courthouse Way, Suite 9200, Boston, Massachusetts 02110;

For the Defendant:

    Donoghue, Barrett & Singal, by WILLIAM F. SINNOTT, ESQ.
and ELIZABETH MCEVOY, ATTORNEY, Suite 1320, One Beacon Street,
Boston, Massachusetts 02108-3106.

<u>PROCEEDINGS</u>

1

2        THE CLERK:  All rise.  Court is now in session in the

3   matter of the United States vs. Jonathan Fraiman,

4   Criminal Matter Number 12-10238.

5        Counsel, would you please identify yourself for the

6   record.

7        MR. THOMADAKIS:  Good morning, your Honor,

8   Vasili Thomadakis on behalf of the United States.

9        THE COURT:  Good morning.

09:03AM 10        MR. CHRISTOFFERSON:  Eric Christofferson also for the

11  United States.

12        MR. SINNOTT:  William Sinnott for the Defendant

13  Jonathan Fraiman.

14        MS. McEVOY:  Elizabeth McEvoy also on behalf of the

15  Defendant Jonathan Fraiman.

16        THE COURT:  Good morning, all.  Please be seated.  I'm

17  a little disconcerted by the size of these notebooks, which are

18  greater than eight and a half but less than eleven inches tall,

19  but, in any event, I have pending four motions in limine.  I

09:03AM 20  want to take up the one first, I guess technically it's not a

21  motion in limine, it's the one concerning the production of

22  potentially privileged e-mails.

23        As I understand the facts, there is a witness

24  represented by the defense to be an important witness named

25  Matthew Lazar.  At some point, he provided documents to the

1   government that included e-mails.  Either the government never

2   looked at them or counsel never looked at them until a few days

3   ago and realized that there were e-mails to an attorney.

4         There are, as I understand it, 291 such e-mails that

5   are potentially privileged.  They may constitute Jencks

6   material, at least according to the government's filing, at

7   least one of them would clearly qualify as Jencks if it's not

8   privileged, and potentially, of course, there may be Brady or

9   Giglio or other types of information in there.

09:04AM 10        As I understand it, Lazar is now represented by

11   counsel, at least for this limited purpose, and he is scheduled

12   to testify on Wednesday.  The government is seeking an order

13   basically requiring, an order from me that requires the

14   government to review the e-mails to see if they're privileged.

15         I guess let me tell you my starting point.  I'm not

16   sure that's quite right.  It seems to me that the first

17   question is are the documents privileged?  If it's a

18   communication from a client to an attorney, they're

19   presumptively privileged.

09:05AM 20        Were the documents disclosed outside of that

21   attorney-client relationship?  And I think the answer to that

22   is yes, at a time when Lazar was not represented by counsel,

23   and so the question was the privilege waived by that production

24   or was that privilege inadvertent?

25         And, obviously, I don't quite the circumstances of how

1    these were provided to the government or what was said to whom,

2    and that may affect the analysis, but since Lazar is

3    represented by counsel, although he was not at the time, it

4    seems to me my starting point based on the evidence in front of

5    me, it looks like a waiver has occurred and that I should issue

6    an order to show cause on a fairly tight timetable to Mr. Lazar

7    to show cause why the privilege has not been waived in

8    particular, why the disclosure was not inadvertent, and we can

9    see how that goes, but I'm just not -- it's Lazar's privilege.

09:07AM 10    The government, I guess, doesn't -- isn't the one who

11    decides whether they're privileged or not.  Anyway, that's my

12    starting point, I guess, to try to jump start this discussion.

13    Mr. Thomadakis.

14    MR. THOMADAKIS:  Thank you, your Honor.  Just a couple

15    of things in the factual narrative.  It was a bit of an

16    unorthodox motion, and so I think it probably wasn't as clear

17    as it could have been.  We're not seeking an order to direct us

18    to see whether the documents are privileged, just to order us

19    to review them and to produce them if they're producible under

09:07AM 20    Jencks.

21    THE COURT:  In other words, once you decide -- if you

22    look at them and you think they're privileged, if you're going

23    to read them --

24    MR. THOMADAKIS:  Well, I guess the question really

25    comes down to the waiver issue, as your Honor has identified,

1    and in terms of kind of a more general factual background, what

2    occurred was that after -- after the indictment, we got a

3    number of e-mails from Mr. Lazar, which in preparation for the

4    trial, I reviewed several or a bunch were turned over to the

5    defense, but I came across ones that were obviously to a lawyer

6    kind of in the context of after Mr. Lazar left Envit when he

7    was trying to hammer out a separation agreement, and it was

8    clearly, I didn't read it carefully, but there was clearly a

9    narrative in there of what had occurred at Envit.

09:08AM 10    Now, in the same time period, he provides narratives

11    to other people, which have been turned over to his clients and

12    so on and so forth, so it may well be cumulative, but at the

13    end of the day, I don't know, there may be something in there

14    that has not been disclosed, so ordinarily I think that would

15    be automatically produced as Jencks, and there are

16    other -- then I just did a search for basically other

17    attorney's names and came up with this number, and when we were

18    meeting with Mr. Lazar on October 17th, I had identified the

19    issue, and I spoke to him about it.

09:08AM 20    Obviously, he was not really qualified.  He's not an

21    attorney, so he really didn't understand exactly what I was

22    talking about, and then subsequently a couple -- I mean, we

23    impressed upon him that it was probably best for him to consult

24    with an attorney on this issue, and then on the date stated in

25    the motion, which was I think a few weeks later in the first

1   week of November, thereabouts, I received a call from

2   Dennis Concilla, C-o-n-c-i-l-l-a, who had also on a limited

3   basis represented Mr. Lazar back during the investigation

4   period in the summer of 2014, was no longer representing him

5   until this issue came up and then said, again, for this limited

6   purpose, I'll represent him, and we sent him in the e-mails in

7   the hopes that he might be able to review it and to kind of

8   avoid this whole issue if he just said, fine, it's waived, turn

9   them over if they're producible, but it being close to

09:09AM 10   Thanksgiving, it seems that he didn't have the chance to look

11   them over forcing our hand to file the motion, so I think

12   that's kind of the factual backdrop.  I agree with your Honor's

13   proposed resolution.

14        THE COURT:  In other words, it would force

15   Lazar/Concilla to make a decision, either it's waived or it's

16   not; if it's not waived, show me.

17        MR. THOMADAKIS:  Right.

18        THE COURT:  If it is waived, let's get these documents

19   in the hands of Mr. Sinnott, and I should say obviously given

09:10AM 20   the timing of all this, if we need to recall Mr. Lazar or, you

21   know, the cross-examination may be deferred, we can play with

22   the schedule.  Unfortunately, we have two weeks to play with,

23   if necessary.

24        I'm less concerned about that and less concerned about

25   dumping information on Mr. Sinnott and Ms. McEvoy in the middle

1    of trial.  It's just one of the things that happens, but we

2    need to make that decision soon, quickly.

3        MR. THOMADAKIS:  Absolutely, your Honor, and what I

4    will additionally do when we have a recess or at one o'clock, I

5    will reach back out to Mr. Concilla and tell him that this is

6    coming, if something is coming, and, in any event, impress upon

7    him again the timing issue, which, I mean, I've tried to tell

8    him.

9        Again, it was right before the holiday, but he's now

09:11AM 10   had them over for a week, 291 e-mails.  They can be scrolled

11   through pretty quickly, I think, so I'm hoping that we will be

12   able to resolve this maybe even today if he has had a chance to

13   look over them.  I can't imagine given, you know, that they're

14   probably cumulative of what we have that there isn't some kind

15   of waiver.

16       THE COURT:  If they're not, if there's some issue

17   there, you know, we'll take it as it comes.  Let Mr. Sinnott

18   voice a complaint if he has one, and we'll take it from there,

19   and we can always grant a continuance, if need be.

09:11AM 20       It also seems to me this is governed by Rule 502, the

21   Federal Rules of Evidence, which discusses basically as a

22   framework for evaluating waiver of attorney-client privilege.

23   The normal rule is that the client and the attorney are one in

24   the same, and something done by an attorney that hurts the

25   client, the client is stuck with that and something the client

1    does without an attorney, the attorney is stuck with that.

2           Mr. Sinnott, let me hear from you.

3           MR. SINNOTT:  I think the Court has a good grasp of

4    the relative positions of the parties.  And, you know, let me

5    just reiterate, I think the government is acting -- from an

6    abundance of caution is acting with the same high level of

7    ethics and professionalism that we would expect, and I think

8    that's commendable.

9           What I do want to emphasize though is that the timing

09:13AM 10   is putting us in a very difficult position.  I mean, it would

11   appear that the government has had these documents for months.

12   It would appear that the defendant and then his rehired

13   attorney, because I believe this was the attorney that

14   represented him back then, have slept on their rights.

15          THE COURT:  And that may be true.

16          MR. SINNOTT:  And what I think is most concerning is

17   we don't know if this is just Jencks that we're talking about.

18   There may be exculpatory information in there, and we're almost

19   at the point of giving opening statements and starting the

09:13AM 20   evidence here, and that puts us, us, the defendant, at a severe

21   handicap and disadvantage as we move forward.

22          THE COURT:  Right.

23          MR. SINNOTT:  And, you know, if my Brother says that

24   these 291 e-mails can be reviewed pretty quickly, I'll take

25   that at face value, but 291 e-mails is a lot of e-mails, and

1    there's the potential that there are things in there that might

2    shape how the government presents its case in opening and its

3    strategy in general.

4         THE COURT:  Yes.  As I'm sure you know, the Jencks

5    Act, crazy though it may be, gives you no rights until the

6    witness has testified on direct, so if it is merely Jencks, I

7    probably have no ability to compel anything, but the remedy

8    normally is a continuance.

9         In any event, I will do my best to be fair and

09:14AM 10    reasonable.  This could go in a lot of different directions if

11    I decide that the privilege has not been waived, that's

12    probably the end of it.  If it is waived, you're going to get a

13    dump of these e-mails.  If there is Brady material in there, if

14    you need a continuance, if they identify something that in

15    fairness requires you to additional time, we'll look at that.

16    I don't know what else to say.

17         MR. SINNOTT:  No, and I appreciate the fact that the

18    Court is receptive to our statement that time is of the

19    essence, and we would hope, I know that the Court has a number

09:15AM 20    of other decisions to make, but the Court can make this

21    decision in prompt fashion because we don't know if this is

22    just Jencks.

23         THE COURT:  I think as a practical matter, I think

24    this will be hard to accomplish in its entirety today, so what

25    I propose to do is issue a show cause order that requires them

1    to respond by the close of business tomorrow and perhaps to

2    have a hearing first thing Wednesday morning, if necessary, and

3    I think that's about as fast as we could under the

4    circumstances probably move, so that's what I would propose.

5          Lazar you expect to testify on Wednesday?

6          MR. THOMADAKIS:  I don't think we'll be through the

7    other witnesses Wednesday, most likely Thursday.

8          THE COURT:  Okay.

9          MR. THOMADAKIS:  Again, your Honor, if there's a break

09:16AM 10   between this proceeding and jury selection, I'll e-mail

11   Mr. Concilla and tell him straight away.

12          THE COURT:  That that's coming down the pike.

13          MR. SINNOTT:  Thank you, your Honor.

14          THE COURT:  Okay.  So I'll deem that -- just to clear

15   the docket, I'll say Number 136 is granted in part and denied

16   in part for the reasons stated on the record, and I will get

17   that order as soon as we can do so.

18          The defense has filed three motions in limine.  Let me

19   take up two of them quickly.  Number 132 is defense motion

09:16AM 20   requesting an instruction to the jury concerning unindicted

21   co-conspirators, essentially that the government has not

22   indicated that they know the name of any conspirator other than

23   Laborio.

24          I don't see any reason for the instruction at this

25   time.  I may -- it's really an instruction as to the state of

1    the evidence, which I don't know what it is at this point.

2    It's certainly possible that at the end of the day it would be

3    appropriate to instruct the jury in their final instructions

4    that a conspiracy instruction requires at least or a conspiracy

5    requires at least one other person, and I would at least

6    consider an instruction to the effect that there's no evidence

7    of any conspirators other than Laborio or Fraiman, but that's

8    an evidentiary question that I will have to see how it plays

9    out.

09:17AM 10         It's possible, of course, that there's evidence of

11   other conspirators whose names are unknown to the government,

12   for example, so I'm going to deny that without prejudice to its

13   renewal.

14         Number 133 is a motion to admit evidence of other acts

15   by Laborio.  It's essentially, as the government notes, a

16   reverse 404(b) instruction.  It seems to me that its purpose is

17   to show that Laborio had a propensity to commit fraud, which

18   while it may be certainly true, I think is not an appropriate

19   matter for this trial, and even if under some theory it's

09:18AM 20   admissible, in any event, I think Rule 403 would govern in that

21   this would inevitably lead to mini trials or side issues

22   concerning other criminal or civil charges, so I'm going to

23   deny that motion as well.

24         Number 131 is a motion to preclude government

25   witnesses from testifying as to the origin of funds invested

1    and the effect of their losses.  If I'm seeing this clearly,

2    this falls into three subsets.  It seems to me that anything

3    that a victim or an alleged victim told the defendant or which

4    he reasonably should have been aware is okay.

5        It bears directly on his intent and knowledge, so, for

6    example, if there were evidence a witness were to say this is

7    my children's college education fund, I want you to invest it

8    prudently and nothing risky, it seems to me that that evidence

9    could come in.

09:19AM 10       The other two buckets are what if the victim didn't

11   say so, in other words, the defendant knows that he is taking

12   money from an alleged victim but does not know where the money

13   came from or what the victim intended for the money, and the

14   third category is what is the impact beyond the dollar loss?

15       Mr. Sinnott, again, I think we can all agree that

16   category 1 is admissible.  I think we're talking about really

17   categories 2 and 3.

18       MR. SINNOTT:  In fact, we've agreed to e-mails that

19   involve the first category, but as the defense motion makes

09:20AM 20   plain, the second and third categories, you know, those go

21   beyond the loss that needs to be proven.

22       Those are inflammatory, those are extraneous to the

23   government's proof, and the risk of prejudice to Mr. Fraiman is

24   profound, and they're not relevant to what really is the key

25   issue in this case, which is whether there was an agreement

between the defendant Fraiman and Mr. Laborio, so while

acknowledging and accepting that the first category is properly

in evidence, I've got to just for the record and as we did in

our briefs say that the second and third category just

transcend any evidentiary burden.  They transcend any probative

value.

        The prejudice, and I cited Rosalee Musgrave's

statements.  Those statements are not germane to proof.  Those

statements, on the other hand, as to the effect that they had

putting her mother on Medicaid, her mother had Alzheimer's and

putting her in a nursing home, that would just not be fair to

the defendant.

        THE COURT:  Does it make any difference that the

defendant, if I understand it correctly, was a fiduciary, and,

therefore, had certain higher obligations than he might have

under other circumstances?  In other words, like an obligation

to invest in accordance with the wishes of the client or

perhaps an obligation to inquire, I don't know if that's true

or not, but does that make a difference?

        MR. SINNOTT:  Well, it hasn't been to my recollection

alleged in the indictment, and if it's not alleged in the

indictment as that being one of the requirements or obligations

of Mr. Fraiman, then I don't see how it's probative to proving

the indictment.

        THE COURT:  Okay.  Mr. Thomadakis.

1        MR. THOMADAKIS:  On the last point, your Honor, I

2   don't think that everything that's probative of proving the

3   charges in the indictment would necessarily be alleged in the

4   indictment.  I mean, this is generally a scheme to defraud, and

5   he clearly just on the basis of that e-mail alone that we

6   attached to our motion was in this particular instance

7   affirmatively stating he's acting as their fiduciary.  Of

8   course, that goes to his intent, his fraudulent intent, and his

9   knowledge.

09:23AM 10        I think that there are a couple of examples here,

11   which were in the defendant's motion, so, for instance, the

12   statement by Mr. Rentschler about he intended to, you know, use

13   the money to buy himself a car.  If he didn't communicate that,

14   then I would agree that that's probably something that could be

15   excluded or should be excluded, although his statement that

16   Mr. Fraiman bragged about the car that he bought I think would

17   be admissible for a motive, and, again, intent.

18        The Musgraves, I think the particular, I think it's

19   fairly well set out because you have that e-mail where he's

09:23AM 20   basically being told exactly what that money is for, and so

21   it's not as if it's a mystery, and it's part and parcel of the

22   testimony of Mrs. Musgrave, yeah, that's what that money was

23   for, yes, he was informed of it, and this is what happened when

24   we never got any of it back or the promised dividends or

25   whatever else she may testify to, and so I think it's very hard

1   to separate those two issues in her testimony.  At most, it

2   would be on a question-by-question basis.  I don't think it's

3   really something that's amenable to kind of an advanced motion

4   in limine for a category, I mean, with particular focus on that

5   testimony.

6         But I do think that with that particular example given

7   that the straightforward evidence of his being informed of what

8   that money was for, that it's kind of part of the story that

9   the money was lost, and, yes, that's what it was for, and it's

09:24AM 10   tough to separate the two.

11         THE COURT:  All right.  I think I heard you say as to

12   what I've called Category Number 2 where the victim didn't

13   indicate the source or purpose of the funds, the amount, of

14   course, is obviously relevant, that you agree that or you don't

15   intend to elicit that information.  In other words, I intended

16   to use this money -- he doesn't know, the defendant, according

17   to the victim, didn't know that he intended to buy a car or

18   retire on the money or, you know, whatever.

19         MR. THOMADAKIS:  Well, again, also it's a little

09:25AM 20   tough.  As to the purpose, that's true, "I intended to take my

21   wife on a trip around the world on our 50th anniversary but I

22   never told him that," I don't think that that's particularly

23   relevant.  "I liquidated my retirement funds, and he was

24   advising me," well, I think that probably is relevant, and I

25   think there will be testimony in that regard.

1       THE COURT:  Meaning that the defendant knew that it

2   was his retirement fund?

3       MR. THOMADAKIS:  Right.

4       THE COURT:  Or reasonably should have known?

5       MR. THOMADAKIS:  Or reasonably should have known based

6   on his dealings with the individual.

7       THE COURT:  Okay.

8       MR. SINNOTT:  I think, your Honor, that's a different

9   story.  That calls for a lot of conjecture, and I think that

09:25AM 10   gives the government too much of an opportunity to ask a

11   question that we will have to forcibly object to, and, you

12   know, I'm requesting that the Court make a clear directive as

13   to what can be asked and what cannot be asked.

14       We've conceded that matters that were discussed

15   between the parties is fair game.  All other matters as to

16   effect, whether the defendant should have known --

17       THE COURT:  Well, it's a little tricky.

18       MR. SINNOTT:  Go to sidebar.

19       THE COURT:  For example, liquidation of an IRA or

09:26AM 20   transfer of an IRA, the R stands for retirement, you know, the

21   defendant, might have reasonably been expected to know it was

22   retirement money, so it is kind of context dependent.  Here's

23   how I'm going to leave it.

24       The defense is correct that the potential for

25   inflammatory testimony is relatively high.  It's a fact

1    dependent question.  It seems to me that anything that the

2    victims said to the defendant or that he reasonably should have

3    been aware, and that's very fact dependent context is

4    admissible.  It bears directly on his intent and knowledge.

5        The impact beyond the dollar loss I think needs to be

6    viewed through the same lens.  It's perhaps less relevant, but

7    I'm going to limit the testimony under any circumstances, but

8    I'm not going to exclude conclude it in its entirety.

9        We'll take it on a question-by-question basis.  I want

09:27AM 10    to hear the evidence, hear the context, and I'll take it up at

11    sidebar.  I do urge the government to be cautious and prudent.

12    Again, there is a high potential for inflammatory testimony

13    here, but I don't think I can rule on this in the abstract

14    except to the extent that if the defendant was absolutely

15    unaware of the source or intended purpose of the funds and had

16    no reasonable basis from which to so conclude, that that's

17    almost certainly out of bounds, so we'll handle it that way.

18        I'll grant the motion, deny it in part, and we'll take

19    it on a question-by-question basis.  Mr. Sinnott.

09:28AM 20        MR. SINNOTT:  And, your Honor, can I request that

21    prior to that testimony being offered that the parties sidebar

22    with the Court and an offer is made as to what that questioning

23    and answer would be?

24        THE COURT:  Yes.  Rather than issuing an order, I'll

25    ask the government to sometimes it works best to have the

1  question and then the objection, sometimes it's best to have

2  you come to sidebar and say we're getting into the following

3  subject area, here's what I expect the testimony will be, but,

4  yes, I certainly don't want the jury to hear the testimony and

5  then have me try to strike it.  I want to rule in advance one

6  way or the other.

7       MR. SINNOTT:  Thank you, your Honor.

8       THE COURT:  Knowing what the anticipated answer will

9  be, okay.  As always, if you have a case one way or the other

09:29AM 10  that's directly on point, I find those to be helpful, as long

11  as it's not my own decision.  It's not very persuasive if it's

12  me.

13       MR. SINNOTT:  I would agree.  Judge, after your ruling

14  or I hope preliminary ruling on the other acts --

15       THE COURT:  Yes.

16       MR. SINNOTT:  -- you didn't ask for a response.  I

17  would just like to make a couple of points.

18       THE COURT:  Yes.

19       MR. SINNOTT:  I know the Court is concerned about a

09:29AM 20  mini trial.  I would suggest to the Court we're talking about

21  documents being introduced, we're not talking about argument on

22  those documents, we're talking about other routine vanilla

23  documents being introduced, and I know that the real concern of

24  the Court based on what you've said is whether there's special

25  relevance, and I would submit that there is special relevance,

1    and let me talk first about the Florida scheme, and as we

2    stated in our motion in limine, this is a very particularized

3    subset of evidence that we're talking about because what

4    happened is that in the midst of the alleged conspiratorial

5    time period in Florida using Envit, Laborio came up with his

6    own deal to take kickbacks from a pension fund that was

7    investing in Envit stock.

8         As the pleadings make clear and as the government's

9    own 302s provided in discovery make clear, not only did Laborio

09:31AM 10   not inform Mr. Fraiman, but Mr. Laborio had an agreement with

11   another Envit employee, Guaro Coen that they wouldn't tell

12   anyone.

13        Now, this has special relevance because if he would

14   not enter into an agreement with Mr. Fraiman for that kickback

15   scheme in the middle of this conspiratorial period in Florida

16   involving Envit funds, it makes it less likely that he would

17   engage in an agreement with Mr. Fraiman in the scheme that's

18   alleged in the indictment.

19        I think it's very particularized, I think it shows

09:31AM 20   that he was playing his own game, and I think that evidence of

21   him playing his own game and its routine vanilla paper evidence

22   that we would be introducing is probative of the issue of an

23   agreement.

24        THE COURT:  All right.  But you're talking about now

25   facts as opposed to charges, other criminal or civil charges,

1    right.  Let me hear the government's response.  Mr. Thomadakis.

2        MR. THOMADAKIS:  Well, there's a couple of things

3    here.  First of all, just because the evidence that the defense

4    would seek to introduce is on paper doesn't mean that if it

5    created some unfair inferences, we wouldn't have to attempt to

6    rebut it with our own evidence, which is exactly the fear of

7    the mini trial side show.

8        Secondly, I think from the information filed in

9    Florida as well as the published opinion from the Eleventh

09:32AM 10   Circuit talking about the same undercover operation, one could

11   even look at the undercover operation that occurred here in

12   Boston, same thing.  It's a different thing.  The kickbacks was

13   basically the pension fund would be giving money to Laborio for

14   a completely baseless reason over purchasing or pay more than

15   the shares were worth in exchange for a kickback, so really

16   it's defrauding the investors of the pension fund as opposed to

17   the gravamen of this indictment, which is that the investors in

18   Envit were defrauded by Mr. Laborio and Mr. Fraiman, so it's a

19   completely different type of scheme, and that would require

09:33AM 20   some explanation.  It's an undercover operation, this is the

21   pension fund, this is what went on there.

22       Mr. Sinnott refers to information that's even outside

23   of the charges in Florida and even in the plea agreement that,

24   you know, there was some other employee, supposedly Envit

25   employee who supposedly introduced him to the people who were

1    engaged in the scam.  That comes from Laborio 302s, I don't

2    know how those come into evidence either, but as we noted in a

3    footnote in our brief, once we opened that Pandora's box,

4    there's a lot of things in Mr. Laborio's 302s that I presume

5    Mr. Fraiman does not want in evidence at this trial.

6         So, again, I think to your Honor's initial point, it

7    seems to me that introducing evidence that Mr. Laborio engaged

8    in other criminal activities doesn't really make it in my view

9    any less likely that he engaged in this particular one that

09:34AM 10  involved Mr. Fraiman.

11         What it shows, what it would show, I think, is that

12   Mr. Laborio, or at least what the defense would make it show,

13   is that Mr. Laborio is a serial fraudster, and, therefore, he

14   was the one that was perpetrating the fraud here, which we

15   don't deny.  It's a conspiracy, he was perpetrating the fraud,

16   but we allege that so was Mr. Fraiman.

17         And so I think it's pretty clearly, once one pulls the

18   curtain on it, propensity evidence, and, secondly, the

19   prospect, it can't just be cabined by a document being put into

09:35AM 20  evidence.

21         I think inevitably it goes in directions that will

22   result in a distraction from the matter at hand, which is

23   Mr. Fraiman's criminal intent at the end of the day and

24   agreement to pursue the conspiratorial, the purposes of a

25   conspiracy with Mr. Laborio, and that's strictly discussing the

1    Florida issue.

2          We haven't gotten to the post, you know, post charges

3    issue of Mr. Laborio, what he did with the SEC, as to

4    Mr. Fraiman, and Mr. Laborio being a fugitive, which I take it

5    is not the focus of the argument of the defense here, it's the

6    Florida case, but again, that, too, carries the risk of

7    substantial 403 prejudice.

8          THE COURT:  Mr. Sinnott.

9          MR. SINNOTT:  Your Honor, the government's argument

09:35AM 10   really boils down to, it's not relevant because we say it's not

11   relevant.  The argument that they're making is really that the

12   jury cannot hear these facts that indisputably, and I'm not

13   talking about putting in the 302s, I'm talking about putting in

14   the pleadings that demonstrate that this was Laborio flying on

15   his own, flying solo in this case, and that is highly

16   probative.

17         If he was the right-hand man that the government's

18   witnesses and the government's case alleges that he was to

19   Edward Laborio, doesn't it make sense that in the middle of

09:36AM 20   this conspiratorial period that he would have been involved in

21   this scheme?

22         There is a prejudice to the defendant of looking the

23   other way, as the government would have the Court do, on

24   something that is highly probative of whether an agreement was

25   ever reached between Edward Laborio and Jonathan Fraiman.  It

1    goes to the heart of the conspiratorial agreement, and it's not

2    going to be a mini trial, but it is highly probative and

3    relevant to the jury's consideration of that particular issue.

4         MR. THOMADAKIS:  One last note, your Honor.

5    Propensity evidence is always probative, it's always relevant.

6    The point of 404(b) is not to say that it's not relevant, the

7    point is that the rules have been crafted such that it's just

8    not what comes in in terms of evidence to point out that just

9    because person X did this on this occasion, he did the same on

09:37AM 10   another occasion, just because he ran solo in one crime, then

11   he couldn't have been conspiring with Mr. Fraiman in another

12   crime.

13        Relevance is not the issue, is it relevant to

14   something else, and I would submit that it's really not because

15   that is what it is, he has a protensity to commit frauds on his

16   own, therefore, he didn't conclude Mr. Fraiman in this one.

17        If there's evidence in this one that Mr. Laborio was

18   perpetrating a fraud within the context of a scheme alleged

19   without including Mr. Fraiman, we fully agree that that would

09:38AM 20   be relevant and probative and certainly could be elicited by

21   the defense.

22        THE COURT:  All right.  Mr. Sinnott, I'm going to

23   leave it like this.  I remain highly dubious, but I will deny

24   your motion without prejudice.  Let me see how this unfolds.  I

25   will need to be convinced, to put it mildly, and, again, it

1    would be helpful if you can muster a case that supports your

2    position.

3            MR. SINNOTT:  And, your Honor, at the risk of

4    eliciting further skepticism from the Court, I do want to talk

5    about what my Brother referred to as the "serial fraudster

6    impact," and I think this applies to the Massachusetts docket

7    as well as the Florida docket, the defendant's pattern in both

8    of those cases, and, in fact, this Court was witness to this

9    is --

09:39AM 10           THE COURT:  Defendant meaning Laborio?

11           MR. SINNOTT:  Defendant Laborio, I'm sorry, the

12    co-conspirator, deceased Defendant Laborio, a pattern of deceit

13    in dealing with the courts, continuance after continuance

14    giving enough so that it looks like he's accepting

15    responsibility for what he does, strings it along and then

16    ultimately he disappears, ultimately he does not accept

17    responsibility.

18           The Court is going to hear evidence that this is

19    exactly how Ed Laborio conducted Envit Capital.  He would send

09:40AM 20   Fraiman, Kenney, Munno, other individuals, some of whom you'll

21    hear from, out there with instructions on what to do, and then

22    when the problems started to happen, he'd be tough to find or

23    he'd get with the witnesses and say, "All right, I'll take care

24    of it, we're going to put money in your account by next week,"

25    and nothing would happen.

1        That was his history with Mr. Fraiman as well.  He'd

2    put him off, he'll say, "I'll take care of it, I'll take care

3    of it," and then ultimately he would obfuscate any

4    responsibility.  This pattern of deceit, of delaying, of

5    playing this game of moving a step ahead and never accepting

6    responsibility is what we're trying to show and what we think

7    is probative as to whether there was that conspiratorial

8    agreement, that pattern that playing his own game, of deceit,

9    of manipulation is relevant to this case because that's what

09:41AM 10    you're going to be hearing about on cross-examination, that

11    pattern of deceit that the government may not bring out but

12    that Fraiman was as much a victim as others, including their

13    witnesses that are going to testify, so there is a special

14    relevance to that, and we would ask that the Court at least

15    leave the door open for the opportunity for us to present that

16    evidence, and I won't obviously mention it in my opening

17    statement, but we think it's highly relevant, and we think that

18    keeping that evidence out is of great prejudice to the

19    defendant.

09:41AM 20        THE COURT:  All right.

21        MR. SINNOTT:  The government itself concedes that on

22    the SEC evidence, the docket and other evidence, that they're

23    going to be offering information, so they think it's relevant.

24    They just, you know, they make an evidentiary argument we're

25    offering it because it's an admission.

1       Well, is it relevant or isn't it, and from our

2   perspective, it's a public record, so, you know, it's not a

3   matter of admissibility, it's a matter of the relevance that it

4   brings to whether or not my client had a conspiratorial

5   agreement with Edward Laborio.

6       THE COURT:  Mr. Thomadakis.

7       MR. THOMADAKIS:  Very briefly, your Honor, on the SEC

8   issue, as stated in our brief, there are aspects of the SEC's

9   investigation, part of which was going on while Mr. Fraiman was

09:42AM 10   still soliciting investments in Envit, which, I think, are

11   plainly relevant as to his intent and knowledge, and the other

12   part that we intend to put into evidence is his own statements

13   about the events in 2008 and 2009 that he provided to the SEC

14   in sworn testimony.

15       Beyond that, we're not intending to introduce as

16   affirmatively as part of our case in chief anything having to

17   do with the SEC charging people, how they resolved it, anything

18   like that.

19       THE COURT:  All right.  Again, I'm going to stand by

09:43AM 20   my ruling, which is to say I will leave the door ajar to, I

21   guess, reconsider this issue in the right factual context, but

22   obviously the Defendant Fraiman can argue, present evidence,

23   testify, if he so chooses, that he, too, was a victim of

24   Laborio, that he was defrauded, that he was strung along and so

25   forth, lied to.

1          I think all of that is obviously fair game, but the

2     argument that Laborio did that to others as well looks and

3     smells to me, at least, as I see it from this vantage point as

4     propensity evidence, and I will certainly need to be convinced

5     that any of that can come in, so we'll leave it that way.

6          All right.  I think the jurors can be ready in about

7     five minutes or so.  Unless someone has anything else you want

8     to raise before that process begins, we'll take a recess and

9     let you use the facilities and so on.

09:44AM 10          Mr. Thomadakis.

11          MR. THOMADAKIS:  Thank you, your Honor.  I just wanted

12     to thank the Court and the Court's clerks, I know that these

13     motions, given the time period, were filed and had to be

14     considered over the holiday weekend, so I wanted to express our

15     gratitude.

16          THE COURT:  Thank you.

17          MR. SINNOTT:  I share that sentiment; however, there's

18     one item that I would like to raise.

19          THE COURT:  Yes.

09:44AM 20          MR. SINNOTT:  I noticed in an earlier proceeding when

21     the case was called, the caption announced was United States

22     vs. Jonathan Fraiman.  To my knowledge, Edward Laborio is still

23     named in this indictment, and there's been no formal action to

24     remove him from this indictment, so I would ask that in

25     announcing this case to the jury that his name, which is the

first name in this caption, be included.

THE COURT:  What's the government's view on that?

MR. THOMADAKIS:  The Court's indulgence.  That's fine, your Honor.

THE COURT:  All right.  We will handle it that way. Obviously, the jury is going to be told pretty early on that Laborio is deceased and that we don't try people after they've died, so...  All right.  Let's take a brief recess unless there's anything else, and we'll reconvene in probably in about five minutes.

THE CLERK:  All rise.

(A recess was taken.)

THE CLERK:  All rise.  Edward Laborio and Jonathan Fraiman, Criminal Matter 12-10238.

THE COURT:  Good morning, everyone.  Will counsel please identify yourselves.

MR. THOMADAKIS:  Good morning, your Honor, Vassili Thomadakis on behalf of the United States.

MR. CHRISTOFFERSON:  Eric Christofferson also on behalf of the United States.

THE COURT:  Good morning.

MR. SINNOTT:  Good morning, your Honor, good morning, ladies and gentlemen, my name is Bill Sinnott.  I represent the defendant, Jonathan Fraiman.

MS. McEVOY:  Good morning, Elizabeth McEvoy, also

1    representing the defendant, Jonathan Fraiman.

2         THE COURT:  Good morning, everyone.  Please be seated.

3    My name is Dennis Saylor.  I'm the Judge assigned to preside

4    over this session of the United States District Court for the

5    District of Massachusetts.  It's a pleasure to welcome you on

6    behalf of the Court as potential members of the jury.

7         I understand that you've seen a video this morning

8    that explains something of the process that we're going to go

9    through and what is expected of you if you're selected to

10:08AM 10   serve.  I'm going to add some words of explanation of my own.

11   I apologize if I repeat some things that may have been on the

12   video or that you may already know.

13        Let me start off by telling you what kind of a case

14   this is.  This is a criminal case.  There is one defendant,

15   Jonathan Fraiman, who's here in the courtroom with his counsel.

16   He is charged with two crimes, mail fraud and conspiracy to

17   commit mail and wire fraud.

18        Those of you who are chosen as jurors will be told

19   later what the exact charge is and what the government has to

10:08AM 20   prove beyond a reasonable doubt in order for you to convict the

21   defendant.

22        Many of you are probably nervous about the possible

23   commitment of time that may be required of you if you are

24   selected, so let me talk about that next.  The lawyers expect

25   that this case is going to take two weeks to try.  It is

1   possible that it will spill over into the beginning of the

2   third week, but I'm going to do my best to get this case to the

3   jury in about two weeks, and so I expect that the jury will

4   begin deliberating by Friday, December 11th.

5          Our trial day will be from nine in the morning until

6   one in the afternoon with two very short breaks.  I will

7   explain to you later why we do that and what we expect from

8   you.

9          Now, you've already probably heard quite a bit about

10:09AM 10   the importance of jury service, but I want to add some thoughts

11   of my own.  The jury system goes back at least 800 years to

12   England at the time of the middle ages.  Although much,

13   obviously, has changed in the world since then, the basic idea

14   is essentially the same.

15          No person can be convicted of a serious crime except

16   upon the unanimous vote of a jury made up of ordinary citizens.

17   The founders of our nation believed that the right to a jury

18   was so important that they put it in the Constitution, in the

19   Bill of Rights.

10:10AM 20          Juries have always been composed of ordinary citizens

21   taken from all walks of life, each of whom brings their own

22   individual perspective and life experience to the table.  You

23   don't have to have any particular education or experience.

24          What is truly important is that you take your

25   responsibilities seriously and that you exercise your authority

1    to the best of your ability.

2           The quality of justice in the United States depends

3    upon the good judgment and common sense of ordinary citizens.

4    It is a great system.  It is not a perfect system.  Nothing

5    created by human beings will ever be perfect, but it's a great

6    system nonetheless.

7           Trial by jury is not necessarily the most efficient

8    way to decide whether someone should be convicted of a crime.

9    There are things about it that are old-fashioned, but there are

10:10AM 10  things more important in our world than efficiency, and

11   protection of our rights is one of those things.

12          We enjoy a great many rights and freedoms in this

13   country.  Probably all of us take them for granted from time to

14   time.  Sometimes we have to be reminded what those rights are

15   and why they're important.

16          The jury is one of the most basic protectors of our

17   freedom.  It is fundamental to our system of justice.  It is

18   both an obligation of citizenship and a privilege to serve, and

19   if you are selected to serve, I hope that you will exercise

10:11AM 20  your duties responsibly and solemnly and in accordance with the

21   law.  You should not, however, assume that your service will

22   necessarily be burdensome.  Many jurors find that it is one of

23   the most interesting and rewarding experiences of their lives.

24          All right.  Let me talk next about how we're going to

25   select a jury.  The parties in this case have a right to a jury

that is fair and impartial, one that is not biased or
privileged one way or the other.  In order to try to obtain a
fair jury, we have a selection process that we go through.

The process will begin with me giving you a little bit
more information about the case so you know something about it.
I'll ask the lawyers to reintroduce themselves and the
defendant to see whether any of you know them or have a
connection with any of them.

I'll list the potential witnesses, again, to see if
any of you know them or have a connection with them, and I'll
ask some questions on other topics.

The purpose of these questions is to determine whether
or not any of you should be excused for what we call cause.
Once we've gone through that whole process and we've eliminated
people who cannot or should not serve on the jury for one
reason or another, we'll call a group of people up here into
the jury box.

By law, the lawyers will have an opportunity to
challenge a small number of those prospective jurors.  Those
are what we call peremptory challenges.  That's where the
lawyers don't have to give a reason, and when the lawyers are
satisfied with the jury or they've run out of challenges, the
people who remain will be the jury.

We're going to impanel 14 jurors, 2 of those will
serve as alternates.  That way if something happens to one or

two of the jurors, we don't have to start the trial all over
again, but only 12 jurors will be allowed to deliberate and
vote.  That means that if we have not lost anyone by the time
we get to that point, we'll have to take two of the people off
the jury but the extra two jurors will not be taken off until
the end when the time has come for the jury to deliberate.

        If you're not chosen to sit on the jury, you should
not think it reflects upon you personally, upon your ability to
be a good juror or a good citizen.  This is not a scientific
process, and you should not be in the least bit concerned if
you're not selected to serve.

        I do want to add one thing, which I probably should
have mentioned earlier.  It's probably on your mind.  No matter
how this case proceeds, I will make sure that the 14 people who
are selected to serve are able to complete their holiday plans.
I don't think we're going to get even close to that, but you
should be assured about that, that if you have plans over the
Christmas holidays or otherwise that you'll be able to keep
those plans.

        All right.  Now I'm going to start by asking you all a
few questions.  Your answers must be under oath, in other
words, you must swear that your answers are true.  It's very
important that you give truthful responses, so I'll ask the
deputy clerk, Ms. Pezzarossi, to please swear in the jury pool.

        (Prospective jurors were sworn.)

1          THE CLERK:  Thank you.  You may be seated.

2          THE COURT:  All right.  Again, I'm going to ask you

3     some questions.  When I ask a question, if your answer is yes

4     or you think your answer is yes, please raise your hand.  Get

5     it up so I can see it.

6          If you raise your hand, I'm going to ask you to come

7     over here to the sidebar one-by-one where I'll have a chance to

8     talk to you and find out what the issue is and maybe explore it

9     a little bit with you.  I might excuse you or I might not.

10:15AM 10          For some of my questions, more than one of you are

11    going to raise your hand, so I'll ask you to line up right here

12    at the entrance to the enclosure, and I'll take you one at a

13    time.

14          When you come over here to sidebar, I'll be standing

15    here, the lawyers will be present, and I want you to stand

16    sideways like this so you're looking at me and I can see you

17    and hear you and the lawyers can hear you as well.  The first

18    thing we'll do is to find out what your name and jury number is

19    so we can identify you.

10:15AM 20          Please do not be shy.  Do not hesitate to your raise

21    your hand if you're not sure what to do.  The time to ask

22    questions or to raise issues is now, not partway through the

23    trial, and I will not be upset with you if you raise your hand

24    because you're not sure what to do.

25          All right.  As I indicated, this is a criminal case.

1    There is one defendant, Jonathan Fraiman.  There were two

2    defendants who were charged in this case.  The other defendant

3    was a man named Edward Laborio who has since died, so we have

4    one defendant in this case.

5         The government alleges in essence that the defendant,

6    Mr. Fraiman, participated in a scheme to defraud that involved

7    inducing people to invest in a fund, or one or more funds, by

8    making false representations to the investors.

9         Again, let me ask counsel to reintroduce themselves

10   and the defendant.  Mr. Thomadakis.

11        MR. THOMADAKIS:  Thank you, your Honor.  Good morning,

12   ladies and gentlemen, my name is Vassili Thomadakis, and I'm an

13   assistant United States attorney representing the government in

14   this case.

15        MR. CHRISTOFFERSON:  Good morning, ladies and

16   gentlemen, my name is Eric Christofferson, and I'm also a

17   assistant U.S. attorney in this matter, and let me also

18   introduce to you Daniel Flynn, who's a paralegal in our office

19   who will be sitting us during the trial.

20        THE COURT:  Thank you.  Mr. Sinnott.

21        MR. SINNOTT:  Good morning, folks.  My name is

22   Bill Sinnott.  I'm an attorney at the law firm of Donoghue,

23   Barrett & Singal, and I represent Jonathan Fraiman, the

24   defendant in this case.  Jonathan, could you stand up, please.

25        THE DEFENDANT:  Nice to meet you guys.

1          MS. McEVOY:  Good morning, I'm Elizabeth McEvoy, also

2     with the firm of Donoghue, Barrett & Singal.  I along with

3     Mr. Sinnott represent Jonathan Fraiman.

4          THE COURT:  All right.  Thank you.  Again,

5     Vassili Thomadakis and Eric Christofferson are the assistant

6     United States attorneys.  They are the prosecutors in this

7     case.  They represent the government.  William Sinnott and

8     Elizabeth McEvoy represent the defendant, Mr. Fraiman.

9          Do any of you know or are you related to or acquainted

10:17AM 10     with Mr. Fraiman?  I see no hands.

11          To your knowledge, does any member of your family or

12     any close friends know Mr. Fraiman?  I see no hands.

13          Do any of you know or are you related to or acquainted

14     with any of the lawyers in this case?  All right.  I see a

15     hand.  Would you please come up.

16          (SIDEBAR CONFERENCE WAS HELD AS FOLLOWS:)

17          THE JUROR:  My name is Margaret Priestley.

18          THE COURT:  Juror Number 23.  Why don't you identify

19     who you are.

12:39PM 20          THE JUROR:  I'm Margaret Priestley.

21          THE COURT:  Where do you work?

22          THE JUROR:  For Judge Wolf.

23          THE COURT:  And you're his judicial assistant?

24          THE JUROR:  I am for 29 years.

25          THE COURT:  What we call a secretary?

1          THE JUROR:  Yes, I still do.

2          THE COURT:  I guess let me ask counsel whether you

3     think she should be excused for cause or not?  Does anyone have

4     a view?

5          MR. SINNOTT:  The defense is fine.

6          MR. CHRISTOFFERSON:  Same with the government, your

7     Honor.

8          THE COURT:  All right.  I suppose one issue is if I

9     take you away from my colleague for two weeks, he's going to

12:39PM 10    have to understand that.

11          THE JUROR:  Right.

12          THE COURT:  Ms. Priestley, any reason because of the

13    position you hold -- obviously, you're an employee of this

14    court, and you obviously possess some knowledge as to how this

15    process works that others may not.  Is there any reason you

16    could not be a fair and impartial juror in the trial of this

17    case?

18          THE JUROR:  I think I could not be a fair and

19    impartial juror in this case because I know Mr. Sinnott very

12:39PM 20    well and respect him and worked with him for many years through

21    the Ward Fellowship, and I also know his partner, Mr. Singal

22    very well.

23          THE COURT:  All right.  If you are going to express a

24    bias, I'm not going to try to talk you out of it, in

25    particular, I won't try to dissuade you about Mr. Sinnott's

1   good character.

2           MR. SINNOTT:  This could be a long conversation.

3           THE COURT:  Exactly.  We don't have time to get into

4   it, so I'm going to let you go and get you back to Judge Wolf.

5           THE JUROR:  Thank you very much.

6           (SIDEBAR CONFERENCE WAS CONCLUDED.)

7           THE COURT:  All right.  Have you or any member of your

8   family or any of your close friends ever worked for the

9   United States Attorney's Offices or had any dealings with them?

12:39PM 10   I see no hands.

11          Have you -- I'm sorry, there's a hand.  Why the don't

12   you come up.

13          (SIDEBAR CONFERENCE WAS HELD AS FOLLOWS:)

14          THE COURT:  Hi, what's your name?

15          THE JUROR:  My name is John Krawczyk.

16          THE COURT:  There you are, Number 44.  Yes, sir.

17          THE JUROR:  Just several years ago I was an expert

18   witness in a trial.

19          THE COURT:  Keep your voice down.

12:39PM 20          THE JUROR:  I'm sorry.  I was an expert witness in a

21   trial, that hazardous waste trial that was brought by both the

22   Commonwealth and the Town of Dartmouth.

23          THE COURT:  Okay.  And did it involve the U.S.

24   government as opposed to the state government?

25          THE JUROR:  No, I'm sorry, it was a state government.

1        THE COURT:  You're a consulting engineer.  Are you an

2    environmental engineer?

3        THE JUROR:  Civil engineer, yes.

4        THE COURT:  And do you serve as an expert in other

5    types of cases?

6        THE JUROR:  That was the only time I was.

7        THE COURT:  Okay.  Is there any reason based on that

8    experience why you could not be a fair and impartial juror in

9    the trial of this case?

12:39PM 10        THE JUROR:  No, I don't think so.

11        THE COURT:  Any follow-up?

12        MR. THOMADAKIS:  I'm sorry, who called you as a

13    witness, was it the government?

14        THE JUROR:  It was the Commonwealth.  I'm sorry.

15        THE COURT:  That's okay, no problem.

16        MR. SINNOTT:  Your Honor, I don't know if the Court

17    wants to take advantage of his marital status is not listed.

18        THE COURT:  I'll deal with that for only people who

19    are actually impaneled to save time.

12:39PM 20        MR. SINNOTT:  Very good.

21        THE COURT:  Thank you.  Sir.  Counsel.

22        THE JUROR:  Good morning, your Honor.

23        THE COURT:  What's your name?

24        THE JUROR:  My name is Leo Paquette.

25        THE COURT:  Number 18.  Yes, sir.

1         THE JUROR:  If I understood your question correctly,

2  you were asking if anybody I was related to had experience with

3  the court, federal court?

4         THE COURT:  Close enough.

5         THE JUROR:  My brother-in-law is a trial attorney, and

6  I know that he's done cases in federal court.

7         THE COURT:  Okay.  That's fine.  What kind of practice

8  is he in?

9         THE JUROR:  He runs a business out of Charlestown.

12:39PM 10  These days he's doing mostly real estate.

11         THE COURT:  Okay.

12         THE JUROR:  But he's been on a number of other trials

13  and things of that nature.

14         THE COURT:  And is there anything about your

15  connection with your brother-in-law that would interfere with

16  your ability to be a fair and impartial juror in the trial of

17  this case?

18         THE JUROR:  I don't think so, I'm just trying to

19  follow your instruction.

12:39PM 20         THE COURT:  That's fine.  I'm going to ask other

21  questions about connections to the legal system, lawyers and so

22  forth.  If you've already told me what you have to say, you

23  don't have to raise your hand.

24         THE JUROR:  Understood.

25         THE COURT:  If there's something new that matches

1    up -- question.  I'm sorry.

2         MR. THOMADAKIS:  Just a quick question.  Has your

3    brother-in-law ever expressed to you dealings with the

4    prosecutor's office that he's worked on the other side of?

5         THE JUROR:  Not that I can think.  He's pretty

6    tight-lipped about all of his cases.

7         MR. THOMADAKIS:  Thank you.

8         (SIDEBAR CONFERENCE WAS CONCLUDED.)

9         THE COURT:  Thank you.  All right.  Ladies and

12:39PM 10   gentlemen, have you or any member of your family or any of your

11   close friends ever worked for Mr. Sinnott or Ms. McEvoy or

12   their law office, Donoghue, Barrett & Singal or had any

13   dealings with that law office?  All right.  I see no hands.

14        To your knowledge, did any member of your family or

15   any close friend know Edward Laborio or had any dealings with

16   him?  I see no hands.

17        To your knowledge, did you or any member of your

18   family or any close friend have any dealings with Envit

19   Capital, E-n-v-i-t, or any other business or company called

12:39PM 20   Envit, and I apologize if I'm mispronouncing, Aetius Group?

21   All right.  I see no hands.

22        All right.  I'm going to read a list of people who may

23   be called as witnesses in this case.  Not all of these people

24   are actually going to be called as witnesses, but I ask the

25   lawyers for all the names that might come up at the trial

1    because I'm going to ask whether or not you know any of these

2    people or have any connections with them so it is a bit of a

3    long list, but please bear with me and listen closely whether

4    you think you have a connection of any kind to any of these

5    people.

6              Eric Samuelson of Urbana, Ohio; Marcie Soligo, who

7    works for the FBI in San Diego, California; Richard Denerstein

8    of Lake Worth, Florida; Jonathan Genovese of Miami, Florida;

9    Paul Lane of Rockville, M.D., Dallas Musgrave of Lubbock,

12:39PM 10   Texas; Rosalee Musgrave also of Lubbock, Texas; Judith Henkel

11   of McKinney, Texas; George Allen Nugen of Lewis Center, Ohio;

12   Evan Munno of Stoneham, Massachusetts; Rudolph Matkovic of

13   Seven Hills, Ohio; Ryan Sherman of Margate, Florida;

14   Albert Rentschler of Lake Geneva, Wisconsin; Kathryn Murphy of

15   Tampa, Florida; Anna Murillo of Miami; Sheila D'Entremont, who

16   works for the Securities and Exchange Commission in Boston;

17   Enrique Lapadula of Miami, Florida; Master Mays of Deerfield

18   Beach, Florida; James Pingree of the FBI in Boston;

19   Francis Philip Sears, III, of Hamilton, Massachusetts;

12:39PM 20   Robert Anderson of McLean, Virginia; Ericka Briscoe of

21   Healdsburg, California; Charles Brockway of Santa Barbara,

22   California; Andrew McKillop of Okeechobee, Florida;

23   Richard Brenneman of Minier, Illinois; John Atkins of

24   Little Rock; Arkansas; Peter Elikann, who's a lawyer in Boston;

25   Lauren Martino, of Scituate, Massachusetts; Craig Redding of

1    Port St. Lucie, Florida; Daniel Lancer of Melbourne, Florida;

2    Seth Weinstein of Boca Raton, Florida; Thomas Adams of

3    Boca Raton, Florida; Daniel Kenney of Boston;

4    Christopher Gianakura of the FBI; Guaro Coen, Santa Fe Springs,

5    California; and Joseph Storer of Columbus, Ohio.

6          Do any of you know, are you related to or acquainted

7    with any of those people?  I see no hands.

8          To your knowledge, does any member of your family know

9    or is any member of your family related to or acquainted with

12:39PM 10   any of those people?  Okay.  I see a hand.

11          (THE FOLLOWING OCCURRED AT SIDEBAR:)

12          THE JUROR:  Good morning.

13          THE COURT:  Hi, what's your name?

14          THE JUROR:  Elizabeth Moran.

15          THE COURT:  Number 27.  Yes, ma'am.

16          THE JUROR:  My brother is the deputy director of the

17   SEC in Boston, John Dugan, D-u-g-a-n.  It's my brother.

18          THE COURT:  And are you close to him?

19          THE JUROR:  Uh-hum.

12:39PM 20   THE COURT:  You have to answer yes or no for the

21   record.

22          THE JUROR:  Yes.

23          THE COURT:  Thanks.  And do you talk to him about his

24   work?

25          THE JUROR:  No.

1          THE COURT:  This case involves, to simplify, a form of

2    securities fraud, something that the SEC was involved in, an

3    alleged form of fraud.  Obviously, we don't have any evidence

4    yet.  Do you think you could be a fair and impartial witness in

5    the trial of this case based on your connection with your

6    brother and what he does for a living?

7          THE JUROR:  Yes.

8          THE COURT:  Is there any doubt in your mind about

9    that?

12:39PM 10          THE JUROR:  No.

11          THE COURT:  You're confident you can be fair to both

12    sides?

13          THE JUROR:  Yes.

14          THE COURT:  Any follow-up, Mr. Thomadakis?

15          MR. THOMADAKIS:  No, your Honor.

16          THE COURT:  Mr. Sinnott.

17          MR. SINNOTT:  Yes, very briefly.  What do you

18    understand that your brother's role is for the agency?

19          THE JUROR:  He's the deputy director.

12:39PM 20          MR. SINNOTT:  What does he do?

21          THE JUROR:  He oversees securities and fraud, so

22    Bernie Madoff, stuff like that.

23          THE COURT:  Fortunately that's not this case.

24          MR. SINNOTT:  Does he ever discuss it with you?

25          THE JUROR:  No.

1          MR. SINNOTT:  Thank you.

2          THE COURT:  Thank you.

3          (SIDEBAR CONFERENCE WAS CONCLUDED)

4          THE COURT:  Ladies and gentlemen, do any of you have

5     any special disability or physical problem that would make

6     serving as a member of the jury difficult or impossible or that

7     might interfere with your service as a juror?  Okay.  Let me

8     see you one-by-one.

9          (SIDEBAR CONFERENCE WAS HELD AS FOLLOWS:)

12:39PM 10          THE JUROR:  How are you doing?

11          THE COURT:  What's your name?

12          THE JUROR:  David Canole, C-a-n-o-l-e.

13          MR. THOMADAKIS:  12, I think, your Honor.

14          THE COURT:  12.

15          THE JUROR:  Keep talking loud because I can't hear a

16     dam.  I don't wear hearing aids, construction worker, music

17     that I used to listen to.  I heard very little of what guys

18     were just talking.

19          THE COURT:  You've had trouble hearing my questions?

12:39PM 20          THE JUROR:  Yes.

21          THE COURT:  Okay.  We do have hearing devices, but do

22     you think even with that that you'd have a problem?

23          THE JUROR:  I mean, it's just so dead in here, I just

24     can't hear anything, I don't know if I'd be a good "what did

25     they say," "what did they say"?

1          THE COURT:  All right.  I think maybe the thing to do

2    is to let you go, and so you'll have to report back downstairs

3    but I'll let go from this jury.

4          THE JUROR:  Thank you very much.

5          THE COURT:  Next.  Hi, what is your name?

6          THE JUROR:  It's Mary Scheer.

7          THE COURT:  16.

8          THE JUROR:  I have colitis, which is like an ulcer so

9    I throw up and have diarrhea.

12:39PM 10          THE COURT:  Okay.  Our trial schedule is 9 to 1.  We

11    would never sit for longer than an hour and a half, it would

12    being 9 to 10:30, 9 to 10:30, take a break, 10:30 to 12:00, and

13    then 12 to 1, and we could interrupt the trial, you know, for

14    any medical issue.  Would that be -- do you think you could

15    handle that?  Do you think that would be a problem for you?

16          THE JUROR:  As long as -- I can't predict when it's

17    going to be, but if I needed to leave, if I could, that would

18    be fine.

19          THE COURT:  Okay.  The way I would let it work is if

12:39PM 20    you raise your hand, I don't know that would be instantaneous,

21    but we could just suspend the proceeding, take a quick break if

22    you needed to for any medical reason.  Do you think with that

23    you could handle it?

24          THE JUROR:  Yes.

25          THE COURT:  Any questions, Mr. Thomadakis?

1          MR. THOMADAKIS:  No.

2          THE COURT:  Mr. Sinnott.

3          MR. SINNOTT:  Nothing, your Honor.

4          THE COURT:  Thank you, Michelle.

5          Next.  Hi.

6          THE JUROR:  I'm Joan Lenane, L-e-n-a-n-e.

7          THE COURT:  Number 42.

8          THE JUROR:  So you said physical, I live in

9    Provincetown, and I would need to leave at 3:30 in order to be

12:39PM 10   here and going through traffic, and that's not something I'm

11   going to be able to do, and I have family responsibilities at

12   home so I cannot be there on a daily basis.

13         THE COURT:  Can I ask you to step aside and let me

14   talk to the lawyers for a second.

15         THE JUROR:  Certainly.

16         THE COURT:  This is an issue, you know, with people

17   who live far away, Provincetown, Nantucket, we let them go.

18   42, I could keep her for a while and see if we need her.

19   What's counsel's view?

12:39PM 20         MR. THOMADAKIS:  Whatever, we defer to the Court on

21   this.

22         MR. SINNOTT:  I'd ask that we keep her.  We may not

23   reach her.  Keep her for the time being.

24         THE COURT:  Okay.  Ms. Lenane, I am very sympathetic.

25   What I'm going to do since you're juror 42, which means you're

1    three names from the end.  You're probably not going to be

2    picked anyway, and what I'll do if I get to that point is I

3    revisit this.  I might let you go there, but I think I'm going

4    to keep you a while just to make sure we keep our numbers.  It

5    might come to you and someone from Nantucket.  You might have

6    the easier commute.  I'm just teasing you.  Anyway, have a

7    seat, and we'll see how we do.

8                (SIDEBAR CONFERENCE WAS CONCLUDED.)

9                THE COURT:  All right.  Ladies and gentlemen, as I

12:39PM 10   indicated, this case is likely to take two weeks to try.  It's

11   possible it may run over into a third week.  Again, two weeks

12   would take us up to Friday, December 11th.

13                Our normal trial day will be from 9:00 to 1:00.  It's

14   possible we may have an afternoon session if we need to stay on

15   track.  I won't do that without asking the jury in advance, but

16   it's at least possible, once the jury gets the case, when it

17   begins to deliberate, if necessary, we'll go to a 5:00 until it

18   reaches a verdict, and, again, as I indicated I will make every

19   reasonable effort to protect everyone's holiday plans, everyone

12:39PM 20   who serves.

21                Now, do any of you have any unusual hardship caused by

22   the daily trial schedule or the length of the trial?  All

23   right.  I'll see you one-by-one.

24                (THE FOLLOWING OCCURRED AT SIDEBAR:)

25                THE COURT:  What's your name?

        1           THE JUROR:  Valerie C-i-n- --

        2           THE COURT:  39.  Okay.

        3           THE JUROR:  I am the vice-president of a company out

        4   in Natick, Massachusetts, and we are undergoing an acquisition

        5   which is expected to close around December 15th, so if I am

        6   scheduled to be in trial until at least the 11th, this is an

        7   extreme hardship on me right now.

        8           THE COURT:  Okay.

        9           THE JUROR:  A month later I would say totally fine but

12:39PM 10  right now is just very difficult.

        11          THE COURT:  Okay.  You are a lawyer, is that right?

        12          THE JUROR:  I'm vice-president of risk and compliance

        13  at my company.  I am a lawyer in the State of Massachusetts.

        14          THE COURT:  Do you have any criminal experience?

        15          THE JUROR:  No.

        16          THE COURT:  Your spouse is a lawyer?

        17          THE JUROR:  He is.  He's estate planning.

        18          THE COURT:  All right.  What I'm going to do is this.

        19  You're very far down the list making it not very likely we're

12:39PM 20  going to reach you.

        21          THE JUROR:  Okay.

        22          THE COURT:  I'm going to leave you on the list for

        23  now.  I think the chances of being called are very small, but I

        24  can't guarantee it, so what I will do is if we get to you, I'll

        25  revisit this question.  I will see what everyone's hardships

1   are and make the best choice I can.

2            THE JUROR:  Sure, that's fine.  Thank you.

3            THE COURT:  Thank you.

4            Next.  Hi, what's your name?

5            THE JUROR:  Bonnie Marsan.

6            THE COURT:  8.

7            THE JUROR:  Yes.  I'm a manager in a small business.

8   I do management and accounting, and for me to be out more than

9   a couple days would be an extreme hardship to my company.

12:39PM 10           THE COURT:  Okay.  What's the business?

11           THE JUROR:  It's a landscaping business.

12           THE COURT:  Okay.  And how many employees at this time

13  of year?

14           THE JUROR:  25.

15           THE COURT:  And you're from Haverhill; is that right?

16           THE JUROR:  Yes.

17           THE COURT:  Is it in that area?

18           THE JUROR:  It's in Swampscott.

19           THE COURT:  Swampscott.  And if we broke at one, that

12:39PM 20  means you could be in Swampscott by let's say 2:00 or 2:30,

21  which would at least give you a chance to do things.  Would

22  that help minimize this at all?

23           THE JUROR:  For me to be out that length of time would

24  be difficult, a couple days I could do, but a couple weeks

25  would be very difficult.

1          THE COURT:  Okay.  Let me do this.  Can you step out

2     of earshot and let me talk to the lawyers for a second.

3          Counsel, I'm sure I'm telling you what you already,

4     know but people who express a hardship often, you know, are

5     problem jurors, they don't show up, you know, create other

6     issues.  Sometimes what I do with people who I think are

7     borderline, I don't think it's a real hardship or assuming a

8     hardship, I should say, is I will take them out of turn and

9     drop them to the end of the list, which makes it less likely

12:39PM 10     they'll be picked, obviously, but, you know, I'm not charging

11     them altogether, so that's an option on the table.  I could

12     either say no, I will put them at the bottom of the list or I

13     could discharge them.  What's counsel's view?

14          MR. THOMADAKIS:  We don't object to her being dropped

15     down the list.

16          MR. SINNOTT:  I'm not so concerned with her as the

17     growing line.  Dropping her down the list is probably a prudent

18     move.

19          THE COURT:  All right.  Here's what I'm going to do.

12:39PM 20     I'm going to drop you to the end of the list.  That makes it

21     much less likely you'll be picked, but I want to make sure that

22     we have 14 people, and if we get to you, I'll see if there are

23     going to be other people with the same kind of hardship.  I'll

24     see what the situation is and make the best decision I can.

25          THE JUROR:  Thank you.

 1          THE COURT:  Next.  Hi.

 2          THE JUROR:  Hi.  Elizabeth Whittemore.

 3          THE COURT:  Number 7.  Yes.

 4          THE JUROR:  I have two issues.  One is this week and

 5   one is next week.  I have a mandatory business meeting all day

 6   Thursday and Friday this week.  I just changed jobs, and I

 7   didn't know when I changed jobs, you know, when I said I could

 8   do jury duty, I had not accepted the job, and the second is I

 9   have a 94-year-old uncle for whom I'm the primary caregiver.

12:39PM 10   His wife just died, and I go to see him every other week.  He's

11   a paraplegic, and he can't communicate by phone.

12          THE COURT:  It's a care situation, I assume?

13          THE JUROR:  I am his only family member, he has no

14   children, and my brother is in Brazil.

15          THE COURT:  All right.  So when did you start the new

16   job?

17          THE JUROR:  September 8th.  I'm scheduled to fly out

18   on Thursday morning at 7:15 in the morning and return on

19   Friday.

12:39PM 20          THE COURT:  Okay.  What kind of meeting is it?

21          THE JUROR:  It's a mandatory all company meeting for

22   health care associates, healthcare consulting job.

23          THE COURT:  Okay.  Let me talk to the lawyers if you'd

24   step away for a second.  All right, counsel.

25          MR. CHRISTOFFERSON:  Your Honor, I think your general

1  approach has been taken, which is to potentially drop people

2  and weigh the hardships at the end and try to make the best

3  situations we can.  What she said is a little different, she's

4  saying it's a mandatory meeting.  I don't know if she's saying

5  she's going to get fired if she doesn't show up.

6  THE COURT:  I didn't hear her say that.

7  MR. CHRISTOFFERSON:  Neither did I, but, you know, I

8  would think pushing her to the bottom of the list might make

9  some sense, but the bottom of the list is growing.

12:39PM 10  MR. SINNOTT:  I think she should be excused.  If I

11  told Bruce Singal that I was going to be gone for a couple days

12  in Atlanta, he might fire me.

13  THE COURT:  He might be happy.

14  MR. SINNOTT:  I didn't say he wouldn't be.

15  THE COURT:  All right.  Here's what I'm going to do.

16  I'm going to drop you to the end of the list, which means I'm

17  greatly reducing the chances that you'll be picked, but I'm not

18  going to let you go until -- I want to make sure we have 14

19  people, and if we have other people in similar situations, I'm

12:39PM 20  going to do the best I can.  I'm greatly minimizing the chances

21  you'll be picked.  Thanks.

22  Next.  What's your name?

23  THE JUROR:  Barry Waldbaum.

24  THE COURT:  17.  Yes, sir.

25  THE JUROR:  Hi.  I'm in the process of getting

divorced, and I did not find my paper until Tuesday next week.

I have a business trip planned to South Carolina tomorrow. The

tickets have already been purchased.

THE COURT: Okay. You work for --

THE JUROR: Microsoft.

THE COURT: -- Microsoft. And is it a trip that can

be -- I know obviously it will be in convenient, that is,

movable in the sense it could be done if it had to be?

THE JUROR: If it did have to be done. I do also have

a meeting, my sister is flying up on Friday to meet with me and

my lawyer. My sister is also a lawyer to help get the process

moving with my divorce, which is moving very slow.

THE COURT: On something like that, we do, one of the

advantages of breaking every day at one, it gives people's

afternoons free so they can schedule meetings and sort of keep

their lives going.

THE JUROR: I understand. My wife can only meet with

us at noon, and I'm picking my sister up at the airport to take

her right there.

THE COURT: Let me talk to the lawyers. I'm a little

less impressed with this one, but Mr. Thomadakis what do you

think?

MR. THOMADAKIS: I agree that the stated reasons do

not qualify too well at that level as the previous reasons do.

I think your Honor's general observation about unhappy jurors

1  particularly with this gentleman may apply, and I think that

2  may factor into it, but for the reasons on paper are not as

3  obviously inconvenient as the other ones.

4  THE COURT:  Mr. Sinnott.

5  MR. SINNOTT:  I hate to agree with Vassili on

6  anything, but I think this is an unhappy juror.  It just

7  radiates discomfort being here, and going back to what you said

8  earlier, I think this is one we may have to --

9  THE COURT:  Let him go, is that what you're

12:39PM 10  suggesting?

11  MR. THOMADAKIS:  Yes.

12  MR. SINNOTT:  Yes.

13  THE COURT:  All right.  I'm going to let you go.

14  THE JUROR:  Thank you, sir.

15  THE COURT:  You still have to report downstairs.

16  THE JUROR:  Okay.

17  THE COURT:  Next.  Hi.  What's your name?

18  THE JUROR:  Ann Flanagan.

19  THE COURT:  35.

12:39PM 20  THE JUROR:  My son and daughter-in-law are getting a

21  divorce, and I take care of my grandson Monday through

22  Thursday.  He's not regularly involved with his son, so I take

23  care of him.

24  THE COURT:  From 4:30 p.m. to 7?

25  THE JUROR:  To ten, nine at night.

1          THE COURT:  Okay.

2          THE JUROR:  She has no other family around here.

3          THE COURT:  And you live in Haverhill?

4          THE JUROR:  In Haverhill, and she lives in Haverhill.

5          THE COURT:  Well, one advantage of getting out at one

6    is you ought to make it back there in time.  The one wrinkle

7    might be if the jury deliberates, you might have to cover an

8    hour or two, but I think --

9          THE JUROR:  I'm her ride to and from work.  She

12:39PM 10   doesn't have a license.

11         THE COURT:  When does she need to go to work?

12         THE JUROR:  She goes to work at five.

13         THE COURT:  At five?

14         THE JUROR:  At five, 5 p.m.

15         THE COURT:  This is your daughter-in-law?

16         THE JUROR:  Daughter-in-law, yes.

17         THE COURT:  Okay.  What I'm going to do this.  You're

18   Juror Number 35, which means you're pretty far down the list.

19   We need 14 people.  I'm going to leave you on for now.  I may

12:39PM 20   re-examine this if we get to you.  I have some other people in

21   kind of similar situations where it's a, you know, significant

22   inconvenience and it may be a hardship.  I'll have to examine

23   it once we get to that point if we need to.

24         THE JUROR:  Okay.

25         THE COURT:  I'll ask you to take your seat again,

```
 1    listen to the rest of my questions.  We'll do the best we can.
 2    Next.
 3              THE JUROR:  Matthew --
 4              THE COURT:  All right.
 5              THE JUROR:  -- M-a-r-i-n-i.
 6              THE COURT:  Number 3.
 7              THE JUROR:  Unfortunately, I leave for Charleston on
 8    the 12th of December for a trip I've already booked and taken
 9    care of financially, and the dates wouldn't work.
12:39PM 10              THE COURT:  Charleston, South Carolina?
11              THE JUROR:  And the Bahamas from the Monday to the
12    Saturday, so I'm gone from the 12th to the 18th.
13              THE COURT:  All right.  Well, fortunately for you I'm
14    one of the Judges that will respect, they're replanned and
15    prepaid, thank you.
16              THE JUROR:  Thank you.  Merry Christmas.
17              THE COURT:  Next.  Hi, what's your name?
18              THE JUROR:  Mary Scheer.
19              THE COURT:  16, yes.
12:39PM 20              THE JUROR:  I have to have a ride, I can't drive that
21    far by myself, so it took two hours and 15 minutes.  My
22    daughter is sitting in a parking garage somewhere, so if it
23    goes every day, somebody has to drive me.
24              THE COURT:  And you live in Brewster; is that right?
25              THE JUROR:  Correct.
```

1          THE COURT:  All right.  Let me talk to the lawyers for

2     a second.

3          MR. THOMADAKIS:  I think at this point we'd let her

4     go.

5          THE COURT:  Okay.  All right.  I think in light of the

6     fact you live in Brewster and everything else taken together,

7     your medical condition and transportation issues, I think I'm

8     going to let you go.  Your daughter is sitting in a garage.

9          THE JUROR:  My children, one of them would have to

12:39PM 10     take me every day.

11          THE COURT:  Let's get her out of the garage again.

12          THE JUROR:  Thank you.  I'm sorry.

13          THE COURT:  Next.

14          THE JUROR:  Leo Paquette.

15          THE COURT:  Yes, Number 18.

16          THE JUROR:  Again, I hope I'm not wasting your time.

17     I thought I needed to let you know I'm working a number of jobs

18     that span 12 time zones.  I don't know if this constitutes as a

19     hardship, but there are two in particular I have to get within

12:39PM 20     the next two weeks.  One, it's contraband, the other one is in

21     Paraguay.  Whether or not I serve on this jury, I have to do

22     this work.

23          The difference to me is simply these are 12 hour a day

24     projects.  If I'm here 18 hour days for two weeks, and if

25     that's what I need to do, that's what I will do, but I want to

1   let you know I don't have an option.  I come from a very large

2   company but I'm the only one with the expertise to do the

3   network analysis and generate the reports.

4         THE COURT:  And these are projects both being worked

5   on over the next two weeks?

6         THE JUROR:  Yes, I have two eight projects, but these

7   two dates can't slip without contract.

8         THE COURT:  All right.  Can I get you to step away for

9   a second?

12:39PM 10         THE JUROR:  Yes, absolutely.

11         THE COURT:  Okay.  Mr. Thomadakis.

12         MR. THOMADAKIS:  I'd be inclined to drop him down the

13   list.

14         MR. SINNOTT:  I would almost be inclined to drop him

15   altogether.  I'm a little concerned if he is working as many

16   hours as he says he is, he may be not as attentive with a white

17   collar is the most popular question, which is this one, so I

18   probably would be inclined to drop him, if not, drop him down

19   the list.

12:39PM 20         MR. SINNOTT:  I'm still concerned about our numbers.

21   I would concur in dropping down the list.

22         THE COURT:  Okay.  I think I'll drop him for now.

23   Mr. Paquette.

24         THE JUROR:  Yes, sir.

25         THE COURT:  Here's what I'm going to do.  I'm going to

1    drop you to the bottom of the list.  That means as a practical

2    matter, you're much less -- I want to make sure we get 14

3    people, and if we get to the bottom of the list and you're on

4    it, I will -- I have a number of people with hardships, and

5    I'll make the best decision I can.

6            THE JUROR:  Perfectly acceptable, thank you very much,

7    your Honor.

8            THE COURT:  Next.  Hi.  Your name?

9            THE JUROR:  Charles Kontoules.

12:39PM 10         THE COURT:  31.  Yes, sir.

11           THE JUROR:  I'm supposed to have surgery on my knee.

12   I don't have the date scheduled, however, the doctor was

13   talking about the second or third week in December, so I

14   thought if it were a trial only a few days, I didn't get the

15   diagnosis until after I had received the summons.

16           THE COURT:  Okay.

17           THE JUROR:  So it's the length of time.  If it goes

18   into three weeks, I'll be farther along before I can have the

19   surgery done.

12:39PM 20         THE COURT:  Okay.  The third week of December is the

21   one beginning the 14th?

22           THE CLERK:  The 14th.

23           THE COURT:  I think you could, with some confidence,

24   book surgery for the middle of the end of that week, and if

25   something happened, that's one of the reasons we have

1    alternates.

2        THE JUROR:  Well, it wouldn't be the end of the week.

3    He only does the week, if it does run into three weeks, then it

4    could be a problem.  There's no physical reason I can't be

5    here, it's just the time issue.

6        THE COURT:  Okay.  And are you in pain or discomfort

7    such that it would distract you?

8        THE JUROR:  Only if I'm walking for any distance does

9    it cause me any discomfort.

12:39PM 10        THE COURT:  Let me, can I get you to step aside and

11    talk to the lawyers?

12        THE JUROR:  Sure.

13        THE COURT:  Counsel.

14        MR. THOMADAKIS:  Your Honor, I'm all sympathetic.  It

15    doesn't sound like to me it's the kind of procedure that must

16    be done at this juncture, so I would keep him where he is,

17    again, cognizant of the people we've moved down the list for

18    other issues.

19        MR. SINNOTT:  I have a different view.  He's got

12:39PM 20    surgery.  It's supposed to be for that Tuesday, and I would,

21    hate even if the deliberations started the day before, I would

22    hate to have that on his mind.  I think it's a very legitimate.

23        THE COURT:  I think it's a good point.  If he had

24    booked surgery that couldn't move, if deliberations were

25    backing up against it, I think we'd have to remove him and put

1    in an alternate.

2        MR. THOMADAKIS:  I guess, would it be worth exploring

3    the possibility of his doing surgery the following Tuesday or

4    whether he's inquired of the doctor?  I recognize that the

5    doctor may not be there because it's Christmas week.

6        THE COURT:  Mr. Kontoules, do you know what your

7    options are here?  In other words, if this rolled back into the

8    following week, that is the fourth week of December, which is

9    the week before Christmas --

12:39PM 10        THE JUROR:  I'm not sure if the doctor works that

11    week.  I don't know.  The longer it takes to have the surgery,

12    of course, it will be further for my recovery.

13        THE COURT:  Understood.

14        THE JUROR:  I don't know if he works that week.

15        THE COURT:  Here's what I'm going to do.  You're

16    fairly far down the list.  I'm going to leave you on for now.

17    If we do reach you, I may re-examine this again, and I have a

18    number of people with varying degrees of hardship, of which you

19    are one, but for the time being, I'm going to leave you on, and

12:39PM 20    I will revisit it, if necessary.

21        THE JUROR:  Okay.  Thanks.

22        THE COURT:  You can stay here for the rest of the

23    questions.

24        (SIDEBAR CONFERENCE WAS CONCLUDED.)

25        THE COURT:  Ladies and gentlemen, I'm going to ask you

a series of questions that basically ask whether you have some
connection to law enforcement officers or the law enforcement
system.  I expect that more than one of you are going to raise
your hand.  What I'm going to ask as a follow-up, what is the
relationship and would that relationship interfere with your
ability to be a fair and impartial juror in this case?

        What matters most, of course, is whether you can be
fair, fair to both sides, and what I'm concerned about is
prejudice or bias.  Sometimes people have strong feelings about
law enforcement that might affect their ability to be fair to
both sides.

        An individual police officer might or might not tell
the truth in a particular case.  That's for the jury to decide,
but some people might generally favor law enforcement.  They
might have trouble believing that a law enforcement officer
might lie.  Others might dislike law enforcement and have
trouble believing a law enforcement agent is telling the truth.

        In other words, some people may have preconceived
ideas of law enforcement that would affect their view of the
evidence instead of listening carefully and evaluating the case
on the merits.  This case has to stand on its own.

        You don't have to erase your experience from your
mind, of course, but you do have to be fair to both sides and
to decide the case, evaluate each witness, each piece of
evidence, the whole case on its own merits, and it would be

1    unfair and wrong if the jurors who decided the case were

2    prejudiced one way or the other.

3           So with that as an introduction, let me ask the

4    following question:  Have you or any member of your immediate

5    family or any close friend ever been employed by the FBI, that

6    is, the FBI or the Securities and Exchange Commission, the SEC?

7    All right.  I see a hand.

8           (SIDEBAR CONFERENCE WAS HELD AS FOLLOWS:)

9           THE JUROR:  I already spoke to you.

12:39PM 10           THE COURT:  Ladies and gentlemen, have you or any --

11    and just for the record what's your juror number?

12           THE JUROR:  27.

13           THE COURT:  Have you or any member of your family ever

14    been employed by a different law enforcement agency, federal,

15    state or local, and that includes local police departments?

16    All right.  I'll see you one-by-one.

17           THE JUROR:  Hi.  My name is Earl Quinn.

18           THE COURT:  40.  Yes, sir.

19           THE JUROR:  My brother-in-law worked for the treasury

12:39PM 20    department in the Secret Service and currently works as a

21    civilian for NCIS.  He's very discrete.  I never talk to him

22    about any of this stuff.

23           THE COURT:  I've seen the TV show about his life.  Is

24    there anything about that connection or relationship that would

25    affect your ability to be a fair and impartial juror in this

case?

THE JUROR:  No, he never talks about it, I just know that he works for them.

THE COURT:  All right.  Thank you.

Next.  Hi, what's your name?

THE JUROR:  Neal Harrington.

THE COURT:  Number 36.  Yes, sir.

THE JUROR:  My brother is a police officer.

THE COURT:  Whereabouts?

THE JUROR:  Weymouth.

THE COURT:  Is he a patrolman?

THE JUROR:  Yes.

THE COURT:  Are you close to your brother?

THE JUROR:  Yes.

THE COURT:  Is there anything about that connection or relationship that would affect your ability to be a fair and impartial juror in the trial of this case?

THE JUROR:  No.

THE COURT:  Are you confident you can be fair to both sides?

THE JUROR:  Yes.

THE COURT:  Any follow-up?

MR. THOMADAKIS:  Not from the government, your Honor.

MR. SINNOTT:  No, your Honor.

THE COURT:  Okay.  Next.  What's your name?

         1          THE JUROR:  Chad Crocker.

         2          THE COURT:  Parker?

         3          THE JUROR:  Crocker.

         4          THE COURT:  Number 34.  Yes, sir.

         5          THE JUROR:  I have friends who are police officers.

         6          THE COURT:  Good friends?

         7          THE JUROR:  Yes.

         8          THE COURT:  Local?

         9          THE JUROR:  Local police department, yeah.

12:39PM  10          THE COURT:  Is there anything about those connections

        11   or relationships that would affect your ability to be a fair

        12   and impartial juror in the trial of this case?

        13          THE JUROR:  No.

        14          THE COURT:  Are you confident you can be fair to both

        15   sides?

        16          THE JUROR:  Yes.

        17          THE COURT:  Any follow-up?

        18          MR. THOMADAKIS:  No, sir.

        19          MR. SINNOTT:  I'm sorry, I get it.

12:39PM  20          THE JUROR:  Local police department, Barnstable and

        21   police department.

        22          MR. SINNOTT:  Okay.  Thank you.

        23          THE COURT:  Next.  Hi.

        24          THE JUROR:  Good morning.  Deborah Kiely.

        25          THE COURT:  You're Number 30.

1          THE JUROR:  My sister-in-law, she works for the

2     Supreme Court Justice.  It's not going to cause me any

3     difference.

4          THE COURT:  Who does she work for?

5          THE JUROR:  I forget the Judge's name, the one she

6     just retired.

7          THE COURT:  The Massachusetts?

8          THE JUROR:  Yes.

9          THE COURT:  SJC.  What did your sister-in-law do?

12:39PM 10          THE JUROR:  She was the admin., administrative.

11          THE COURT:  And I think you answered, is there

12     anything about that connection or relationship that would

13     affect your ability to be a fair and impartial juror in the

14     trial of this case?

15          THE JUROR:  No, not at all.

16          THE COURT:  Are you confident you can be fair to both

17     sides?

18          THE JUROR:  Yes.

19          THE COURT:  Okay.  Thank you.  Next.

12:39PM 20          Welcome back.  35.

21          THE JUROR:  Yes, my brother was on the Lawrence Police

22     Department.  He was on the Lawrence Police Department for 30

23     years.  He just retired.

24          THE COURT:  Was he a patrolman?

25          THE JUROR:  Yes.

1    THE COURT:  And are you close to your brother?

2    THE JUROR:  Uh-hum.

3    THE COURT:  You have to answer yes or no.

4    THE JUROR:  Yes.

5    THE COURT:  And is there anything about that

6  relationship or connection that would affect your ability to be

7  a fair and impartial juror in the trial of this case?

8    THE JUROR:  No.

9    THE COURT:  You're confident you can be fair to both

12:39PM 10  sides?

11    THE JUROR:  I think so.

12    THE COURT:  Any doubt at all?  You just said I think

13  so.  I want to make sure you don't have any doubt.

14    THE JUROR:  Maybe I do.

15    THE COURT:  You do have some doubt?

16    THE JUROR:  Maybe I do.  I -- just because he was a

17  police officer for that long, I would just value him being a

18  police officer.

19    THE COURT:  Your brother is not going to be a witness?

12:39PM 20  THE JUROR:  No, he isn't.

21    THE COURT:  And if someone from the FBI testified,

22  would that affect the way you judge that witness and listen to

23  his testimony, in other words, how you feel about your brother?

24    THE JUROR:  No, it wouldn't, it wouldn't, no.

25    THE COURT:  I'm just trying to figure out, and I

1   appreciate you being honest with me.  It's very important,

2   obviously, that you be honest, what your concern is or about

3   what your doubt is whether you could be fair.  Again, I'm not

4   going to try to talk you out of anything, I just want to make

5   sure I understand.

6           THE JUROR:  Well, I think I could fair.  Yes, I could.

7           THE COURT:  And my question is are you confident you

8   can be fair?

9           THE JUROR:  Yes.

12:39PM 10       THE COURT:  Okay.  To both sides?

11          THE JUROR:  Uh-hum, yes.

12          THE COURT:  And decide this case on its own merits or

13  lack of merits, evaluate every witness independently whether

14  you think they're telling the truth or not and render a fair

15  and just verdict?

16          THE JUROR:  Yes, I could.

17          THE COURT:  Mr. Thomadakis.

18          MR. THOMADAKIS:  Nothing from the government.

19          THE COURT:  Mr. Sinnott.

12:39PM 20       MR. SINNOTT:  Nothing.

21          THE JUROR:  Jared Linder.

22          THE COURT:  Number 41.  Yes, sir.

23          THE JUROR:  My uncle was a detective for the St. Lucie

24  Department in Florida, and /former NSA.

25          THE COURT:  And NSA, National Security Agency?

1          THE JUROR:  Yes, and for the record I'm also a senior

2     security analyst for an investment manager hedge fund.  I focus

3     on fraud identity theft and tax.

4          THE COURT:  What does your spouse do?

5          THE JUROR:  She's an anti-trust lawyer for a bank.

6          THE COURT:  What's the bank?

7          THE JUROR:  State Street Bank.

8          THE COURT:  Okay.  This case involves allegations of,

9     again, fraud, investment type fraud, that is,

12:39PM 10    misrepresentations made to potential investors.  Are

11    you -- just let me cut to the quick.  Are you confident you

12    could be a fair and impartial juror in this case?

13         THE JUROR:  Absolutely not.  The company I work for

14    culture is predicated on transparency, to have any bad

15    publicity being a criminal case.

16         THE COURT:  Well, I'm not going to try to talk you out

17    of it if you can't be fair, so I'm going to let you go.  Thank

18    you.

19         THE JUROR:  Thank you.

12:39PM 20         THE COURT:  Next.  Hi, your name again, please?

21         THE JUROR:  Charles Kontoules.

22         THE COURT:  31.  Yes, sir.

23         THE JUROR:  I have a first cousin who is a retired

24    Marblehead police officer.  He was a lieutenant, and I have

25    another cousin who's not local but he was in the Secret

1   Service.

2          THE COURT:  Okay.  And are you close to either cousin?

3          THE JUROR:  Not really, no.

4          THE COURT:  And regardless of whatever relationship

5   you have with these individuals, are you confident you could be

6   fair to both sides?

7          THE JUROR:  Yes.

8          THE COURT:  And be a fair and impartial juror and

9   decide the case according to its own evidence?

12:39PM 10          THE JUROR:  Yes.

11          THE COURT:  Any follow-up?

12          MR. THOMADAKIS:  Not from the government.

13          MR. SINNOTT:  What kind of cases did your brother do

14   for the Secret Service?

15          THE JUROR:  Not brother, cousin.

16          MR. SINNOTT:  Cousin?

17          THE JUROR:  I know he was on the Presidential detail

18   for President Nixon, that's all I know.

19          THE COURT:  He's a very young man?

12:39PM 20          THE JUROR:  Not quite.

21          THE COURT:  Next.  Hi, your name?

22          THE JUROR:  Genevieve Hiller.

23          THE COURT:  15.  Yes, sir.

24          THE JUROR:  Two good friend who were retired New York

25   City police officers.

1          THE COURT:  What kind of work do they do for the

2   New York Police Department?

3          THE JUROR:  They were just police officers.

4          THE COURT:  Just patrolmen?

5          THE JUROR:  Yes.

6          THE COURT:  And is there anything about that

7   connection or relationship that would make it difficult for you

8   to be a fair and impartial juror in the trial of this case?

9          THE JUROR:  No.

12:39PM 10          THE COURT:  Are you confident you can be fair to both

11  sides?

12          THE JUROR:  Uh-hum.

13          THE COURT:  You have to answer yes.

14          THE JUROR:  Yes, sorry.

15          MR. THOMADAKIS:  May I ask at sidebar?

16          THE COURT:  Yes, would you step aside.

17          MR. THOMADAKIS:  One of the witnesses I understand to

18  be a New York auxiliary police officer.  Could we ask the

19  specific question.

12:39PM 20          THE COURT:  One of the witnesses I guess is an

21  auxiliary New York police officer, whatever that means.  Would

22  that affect your, again, view of the evidence in this case?

23          THE JUROR:  No.

24          THE COURT:  And are you prepared to evaluate his

25  testimony for good or for bad based on its own merits and not

1   based on any preconception?

2              THE JUROR:  Yes.

3              THE COURT:  Okay.  Thank you.  Next.  Your name?

4              THE JUROR:  Ann Geller.

5              THE COURT:  32.

6              THE JUROR:  I think it's pretty distant, my

7   boyfriend's brother-in-law is a detective for the Boston

8   Police.

9              THE COURT:  Boyfriend's brother-in-law?

12:39PM 10              THE JUROR:  I thought I'd bring it up just in case.

11              THE COURT:  And the real question, again, is there

12   anything about that fact that would affect your ability to be a

13   fair and impartial juror in the trial of this case?

14              THE JUROR:  I don't think so.

15              THE COURT:  Are you confident you can be fair to both

16   sides?

17              THE JUROR:  Yes.

18              THE COURT:  Okay.  Thank you.

19              THE JUROR:  Hi.  My name is Margaret Brown.

12:39PM 20              THE COURT:  Number 43.

21              THE JUROR:  And my niece was a police officer.  She's

22   on disability.  She's been on disability for 20 years, and her

23   husband is a detective in New Bedford.

24              THE COURT:  And was she also in New Bedford?

25              THE JUROR:  No, she was in Falmouth originally.

1          THE COURT:  Okay.  And is there anything about that

2    connection or relationship that would affect your ability to be

3    a fair and impartial juror in the trial of this case?

4          THE JUROR:  No, your Honor.

5          THE COURT:  You're confident you can be fair to both

6    sides?

7          THE JUROR:  Yes.

8          THE COURT:  Thank you.

9          (SIDEBAR CONFERENCE WAS CONCLUDED.)

12:39PM 10          THE COURT:  Thank you, ladies and gentlemen.  I

11   appreciate your patience.  Have any of you or any of your

12   family members or close friends ever been employed by a public

13   defender's office, or a probation office or a prison?  Okay.

14   I'll see you.

15          (SIDEBAR CONFERENCE WAS HELD AS FOLLOWS:)

16          THE JUROR:  Hi again.

17          THE COURT:  I'm sorry, your name?

18          THE JUROR:  Valerie Cinkovic.

19          THE COURT:  39, yes.

12:39PM 20          THE JUROR:  So my husband, he did clerk, not clerk but

21   intern for the public defender's office in Boston during law

22   school, then I've had a few friends who have worked for the

23   District Attorney's Office.

24          THE COURT:  Okay.  Anything about those connections or

25   relationships that would affect your ability to be a fair and

1  impartial juror in the trial of this case?

2          THE JUROR:  I don't think so.

3          THE COURT:  Are you confident you can be fair to both

4  sides?

5          THE JUROR:  I believe so.

6          THE COURT:  I need to make sure there's no doubt.  I'm

7  sure you appreciate as a lawyer you have to decide the case on

8  its own merits or lack of merits and according to the evidence

9  and according to the law and not because of any preconceptions.

12:39PM 10  You're confident you can do so?

11          THE JUROR:  Yes.

12          THE COURT:  Thank you.  Next.

13          THE JUROR:  Hello, they didn't give me a juror number.

14          THE COURT:  What's your name?

15          THE JUROR:  Swanson.

16          THE CLERK:  Number 4.

17          THE COURT:  Number 4.  Yes, sir.

18          THE JUROR:  I was a prosecutor in the late '90s for

19  about eight months.

12:39PM 20          THE COURT:  Does that mean you are a lawyer or were a

21  lawyer?

22          THE JUROR:  I was a lawyer, yes.

23          THE COURT:  Where were you a prosecutor?

24          THE JUROR:  Lee County, Florida, Fort Myers.

25          THE COURT:  Yes.  And you're now unemployed; is that

1    right?

2              THE JUROR:  I'm now unemployed.

3              THE COURT:  What was your last job?

4              THE JUROR:  I worked at Arthur Andersen.  I haven't

5    worked in about 10 years.

6              THE COURT:  Okay.  And is there anything about your

7    background or connection to the law enforcement system that

8    would make it difficult for you to be a fair and impartial

9    juror that would interfere with your jury service?

12:39PM 10              THE JUROR:  I don't think so.  I think when it comes

11    to law enforcement, I see it both ways.

12              THE COURT:  Are you confident you can be fair to both

13    sides?

14              THE JUROR:  Yes, I think so.

15              THE COURT:  Any follow-up?

16              MR. THOMADAKIS:  Sir, may I ask the circumstances of

17    your leaving the prosecutor's office.

18              THE JUROR:  I did have some problems leaving the

19    prosecutor's office.

12:39PM 20              MR. THOMADAKIS:  Yes, sir.

21              THE JUROR:  It was just kind of an under performer.

22    It was kind of a tough job.

23              THE COURT:  You started to say you had some problems?

24              THE JUROR:  I did have some problems with the bar

25    about 10 years ago.

1        THE COURT:  What were the problems?

2        THE JUROR:  Possession of marijuana with intent to

3    deliver.

4        THE COURT:  And were you disbarred as a result of

5    that?

6        THE JUROR:  I was disbarred as a result of that.

7        THE COURT:  By Massachusetts or Florida?

8        THE JUROR:  By Michigan and Florida.

9        THE COURT:  Mr. Sinnott.

12:39PM 10    MR. SINNOTT:  Nothing, your Honor.

11        THE COURT:  Okay.  Can I get you to step away for a

12    second?

13        THE JUROR:  Oh, sure.

14        THE COURT:  Should I leave things where they are?

15        MR. SINNOTT:  I'm fine with you leaving him.

16        MR. THOMADAKIS:  Given the issues expressed with

17    regard to both disbarment, criminal history and leaving the

18    prosecutor's office in somewhat nebulous circumstances, I would

19    suggest that we have enough information to strike him for

12:39PM 20    cause.

21        THE COURT:  I don't think I can strike him for cause.

22    I think I would be the slightest bit surprised if either one of

23    you exercised your peremptory challenge, but I don't think I

24    have enough to strike him for cause.  Thank you, Mr. Swanson.

25    You may have a seat.

1      Next.

2      THE JUROR:  Elizabeth Whittemore, juror 7.  I worked

3  at the Lawrence House of Corrections as a clinical social

4  worker doing suicide evaluations of inmates in the '80s.

5      THE COURT:  That must have been tough duty?

6      THE JUROR:  It was tough duty.

7      THE COURT:  And is there anything -- are you a

8  licensed social worker?

9      THE JUROR:  It is my background and I don't work in

12:39PM 10  social worker anymore, I have a public health degree now.

11      THE COURT:  Is there anything about that connection or

12  relationship that would affect you to be a fair and impartial

13  juror in the trial of this case?

14      THE JUROR:  No.

15      THE COURT:  Thank you.  Next.

16      THE JUROR:  Good morning.  William Fiore, 23.

17      THE COURT:  23?

18      THE CLERK:  45.

19      THE JUROR:  I apologize, I went by the wrong number.

12:39PM 20  My former neighbor was a member of ICE.  He was a director of

21  Massachusetts, retired.  He now works for Sheriff Cousins in

22  the Essex County Jail, and he also works as a guard for the

23  Judge here as well as in Portland.  That's the only connection

24  I have with that.

25      THE COURT:  And is there anything about that

1  relationship or connection that would affect your ability to be

2  a fair and impartial juror in this case?

3          THE JUROR:  No, I wanted to make it known.

4          THE COURT:  I understand.  Are you confident you can

5  be fair to both sides?

6          THE JUROR:  Yes, I can.

7          (SIDEBAR CONFERENCE WAS CONCLUDED.)

8          THE COURT:  Thank you.  Ladies and gentlemen, do any

9  of you have feelings or beliefs about law enforcement agents

12:39PM 10  whether those feelings or positive or negative that might

11  interfere with or affect your ability to serve as a fair and

12  impartial juror in this case?  I see no hands.

13          Do any of you believe that law enforcement agents or

14  other government agents are more likely or less likely to tell

15  the truth just because they're law enforcement officers or

16  other government agencies?  I see no hands.

17          Have you or any member of your family or anyone close

18  to you been employed by or had dealings with the financial

19  industry regulatory agency known as FINRA or the national

12:39PM 20  association of security dealers known as NASD?  Okay.  I see a

21  couple hands.

22          (SIDEBAR CONFERENCE WAS HELD AS FOLLOWS:)

23          THE JUROR:  Can you repeat?

24          THE COURT:  FINRA, F-I-N-R-A, financial Industry

25  Regulatory Authority or National Association of Securities

1    dealers, I think the NASD became FBI.  It's a private body that

2    in part regulates securities dealers.

3              THE JUROR:  Hi.

4              THE COURT:  Your name?

5              THE JUROR:  Cecelia Brooks.

6              THE COURT:  Number 13, yes.

7              THE JUROR:  So I'm not quite sure, I work for Fidelity

8    and the organizations I support work with FINRA, obviously.

9              THE COURT:  What do you do for Fidelity?

12:39PM 10             THE JUROR:  I'm a contractor through their company

11   Veritude.  They own a company called Veritude, and I support

12   internally the administration.

13             THE COURT:  So you're not involved in actual

14   purchasing or recommending stocks?

15             THE JUROR:  Not directly, correct.

16             THE COURT:  And is your spouse involved in the

17   Veritude industry?

18             THE JUROR:  No.

19             THE COURT:  Okay.  Is there anything about your

12:39PM 20   connection to this industry or your experience that would

21   affect your ability to be a fair and impartial juror?

22             THE JUROR:  I don't think so, but I thought I better

23   tell you.

24             THE COURT:  No, I understand.  You're comfortable you

25   can be fair to both sides?

1          THE JUROR:  Yes.

2          MR. SINNOTT:  What does your company do for Fidelity?

3          THE JUROR:  It's a company that basically does

4    temporary help.

5          MR. SINNOTT:  Okay.  Thank you.

6          THE COURT:  Okay.  Thanks.

7          Mr. Swanson.

8          THE JUROR:  I did an internship with National

9    Association of Security Dealers in law school.  It was three

12:39PM 10   months.

11         THE COURT:  When was that?

12         THE JUROR:  It was 1997, I believe.

13         THE COURT:  Is there anything about that connection or

14   relationship that would affect your ability to be a fair and

15   impartial juror in the trial of this case?

16         THE JUROR:  No, I don't believe so.

17         THE COURT:  You're confident you can be fair to both

18   sides?

19         MR. SINNOTT:  No questions.

12:39PM 20   MR. THOMADAKIS:  No questions.

21         THE COURT:  Thank you.

22         (SIDEBAR CONFERENCE WAS CONCLUDED.)

23         THE COURT:  Ladies and gentlemen, have you or any

24   member of your family or anyone close to you ever worked for a

25   company engaged in financial services such as a broker-dealer,

1    an investment advisor, a financial planning firm or a hedge

2    fund, and, again, if you've already raised your hand and talked

3    about it, you don't need to come up and tell me about it again.

4              (SIDEBAR CONFERENCE WAS HELD AS FOLLOWS:)

5              THE COURT:  All right.

6              THE JUROR:  Hello.

7              THE COURT:  What's your name?

8              THE JUROR:  Veronica Criniti.

9              THE COURT:  37.  Yes.

12:39PM 10        THE JUROR:  So in college I did an internship with

11   accent people but that's my only touch.

12             MR. THOMADAKIS:  I'm sorry, for who?

13             THE JUROR:  AXA, they're still around.

14             THE COURT:  Is there anything about that relationship

15   or connection that would affect your ability to be a fair and

16   impartial juror in the trial of this case?

17             THE JUROR:  I don't believe so.

18             THE COURT:  Your spouse is a lawyer; is that right?

19             THE JUROR:  That's correct.

12:39PM 20        THE COURT:  What does she do?

21             THE JUROR:  She's a lawyer for a publicly-traded

22   company.

23             THE COURT:  Any follow-up?

24             MR. THOMADAKIS:  What period of time were you at AXA?

25             THE JUROR:  2005 and 6.

1          THE COURT:  Okay.  Here in Boston?

2          THE JUROR:  No, it was out of Roanoke, Virginia.

3          MR. SINNOTT:  Thank you.

4          THE COURT:  Did you say AXA?

5          THE JUROR:  AXA.

6          THE COURT:  A-X-A?

7          THE JUROR:  Yes.

8          THE COURT:  Thank you.

9          MR. SINNOTT:  Your Honor.

12:39PM 10          THE COURT:  I'm sorry, just a moment.

11          MR. SINNOTT:  The defendant worked for AXA before he

12   worked for Envit that could prompt a question in that 2007 time

13   frame so I'm concerned there might be some resonance with that

14   name as leaving that company to go work for somebody else.

15          THE COURT:  Do you want to ask a more specific

16   question?

17          MR. THOMADAKIS:  Not from the government, your Honor.

18   It was not the same time period I don't think and a different

19   place, but if Mr. Sinnott --

12:39PM 20          THE COURT:  Is there something else you want me to

21   ask?

22          MR. SINNOTT:  No, I'm fine with it.  I just wanted to

23   make the Court aware of that.

24          THE COURT:  Thank you.

25          THE JUROR:  Earl Quinn again, I think I was 40.

1          THE COURT:  40, yes, sir.

2          THE JUROR:  I worked '93, '94 for the Shareholders

3     Group in their mail house data integrity, then I transferred to

4     Putnam Investments, worked there about a year in the mid-'90's,

5     working again on data integrity, schoolteacher now.  Anything

6     else?

7          THE COURT:  Was there anything about that experience

8     that would affect your ability to be a fair and impartial juror

9     in the trial of this case?

12:39PM 10          THE JUROR:  No.

11          THE COURT:  Okay.  Thank you.  Next.

12          THE JUROR:  John Krawczyk.

13          THE COURT:  Number 44.

14          THE JUROR:  I don't know that it relates specifically

15     to your question, but I want to let you know, for several years

16     I was on the 401k committee of the company that I was with, and

17     in that capacity, we were evaluating investments recommended

18     adopted from our portfolio.

19          THE COURT:  Okay.  Is there anything about that

12:39PM 20     experience or connection that would affect your ability to be a

21     fair and impartial juror in the trial of this case?

22          THE JUROR:  I don't think so.

23          THE COURT:  Okay.  Are you confident you can be fair

24     to both sides?

25          THE JUROR:  You know, this is one thing just because

1    we evaluated portfolio performance and, you know, Morningstar

2    reports and all of that, I think I can.

3            THE COURT:  I'm not trying to talk you out of

4    anything.

5            THE JUROR:  No, I understand.

6            THE COURT:  You don't have to erase your life

7    experience.  We want everyone's life experience, but you do

8    have to be fair.  You know, we don't want people who are

9    completely ignorant of the world, but on the other hand, we do

12:39PM 10   want people to listen to the evidence and decide this case on

11   its own facts and the own merits or lack of merits.  That's the

12   question that if you can be --

13           THE JUROR:  Well, I like to think I can do that.

14           THE COURT:  Okay.  Well, I need to be sure that you're

15   confident you can do that?

16           THE JUROR:  You know, it's kind of a gray area with

17   me.  I feel uncomfortable saying that I can be, you know, with

18   absolute 100 percent confidence.  I mean, I just don't know

19   what will come up and just having evaluated these kind of

12:39PM 20   things for so long, I have serious ideas and what expectations

21   are and all of that when it comes to investments and hedge

22   funds and things like that, and, again, I don't know all the

23   particulars.  Those are the kind of things that are running

24   through my mind.

25           THE COURT:  Okay.  I guess at the risk of repeating

myself, you are who you are. Your life is led up to this

point, and you have the experience that you have, but you have

to be fair. You can't, you know, you can't put a thumb on the

scale. You know, it's fair to say based on my experience I

don't believe this witness, but you can't say -- you can't be

biased, you can't be biased. You have to keep an open mind.

You have to listen to the evidence.

Let me do this. Can you step aside for a second, let

me talk to the lawyers.

12:39PM 10    THE JUROR: Sure.

THE COURT: What do you think, he's Number 44?

MR. SINNOTT: Your Honor, for cause, the witness'

equivocation and that particular, being particular in the

evaluations, I think he's being honest, but I don't think he

can be fair.

THE COURT: Okay. I think that's the prudent thing to

do. Mr. Krawczyk. All right. I think the prudent thing, and

you probably won't be picked anyway because you're at the end

of the list, so I'll let you go.

12:39PM 20    THE JUROR: Okay. Thank you.

THE COURT: Next. 34?

THE JUROR: 34.

THE COURT: Mr. Crocker, yes, sir.

THE JUROR: I have two close friends that worked, one

worked for Fidelity, another works for Columbia Instrument in

1   Dallas, Texas.

2           THE COURT:  And what does the friend for Fidelity do?

3           THE JUROR:  Mutual funds.  They both work in mutual

4   funds.

5           THE COURT:  Doing what?

6           THE JUROR:  They are regional managers, so they deal

7   with a team of people who sell and acquire business.

8           THE COURT:  And is there anything about those

9   connections that would affect your ability to be a fair and

12:39PM 10  impartial juror in the trial of this case?

11          THE JUROR:  No.

12          THE COURT:  You're confident you can be fair to both

13  sides?

14          THE JUROR:  Yes.

15          THE COURT:  Okay.  Thank you.  Next.  Hi.  Your name?

16          THE JUROR:  My name is Jonathan Leivent.

17          THE COURT:  Number 6.  Yes, sir.

18          THE JUROR:  My wife worked for American Express

19  Financial Advisors and then also worked for her cousin who is

12:39PM 20  an -- runs an asset management firm.

21          THE COURT:  Okay.  What kind of work did your wife do?

22          THE JUROR:  Well, for American Express Financial

23  Advisors, she was a financial advisor.

24          THE COURT:  Okay.

25          THE JUROR:  For her cousin, she did balance sheet

1    analysis for corporations.

2              THE COURT:  Okay.  In connection with investments?

3              THE JUROR:  In connection with investments.

4              THE COURT:  She's out of that business.  It looks like

5    she's a homemaker now?

6              THE JUROR:  Yes, she is.

7              THE COURT:  When did she last do it, balance sheet

8    work?

9              THE JUROR:  She last worked part time for her cousin

12:39PM 10   about five years ago, and she was at American Express, 2001,

11   2002.

12             THE COURT:  Okay.  Is there anything about that

13   connection or relationship that would make it difficult for you

14   to be a fair juror in the trial of this case or affect your

15   ability to serve?

16             THE JUROR:  I have a low opinion on financial

17   advisors, but I don't have -- I don't think anything else.

18             THE COURT:  Surely it's not all of them because you

19   married one.

12:39PM 20             THE JUROR:  She left that position.  She in turn also

21   had a low opinion on financial advisors.  She thought they were

22   supposed to help people with their investments, and she felt

23   that mostly they were in sales.

24             THE COURT:  I'm not trying to talk you in or out of

25   anything, I just want to make sure you understand what I'm

1  looking for here.  You're not required to erase your life

2  experience.  You are entitled to be skeptical of anyone and

3  everything, if you choose, but you do have to be completely

4  fair.  In other words, if someone took the stand and said, you

5  know, in the financial advisor, you're not entitled to say,

6  well, I'm not going to believe what this guy says, he's a

7  salesman, and if the defendant was a financial advisor, you

8  can't put the thumb on the scale and say I'm more likely to

9  convict him because he a financial advisor.

12:39PM 10      In other words, you have to be open-minded and fair

11  and decide the case according to the law.  Are you completely

12  confident you can do that or do you think you might have a bias

13  one way or the other?

14      THE JUROR:  I don't think I could be completely

15  confident.

16      THE COURT:  Okay.  I mean 100 percent confident.  You

17  know, all of us have -- we're into all kinds of things in our

18  lives, and, you know, a car salesman in a dealership, for

19  example, whether it's talking to people, but if someone were on

12:39PM 20  trial with a car dealer, treat them as you would want to be

21  treated and listen to the evidence because not every fact

22  situation is the same, and if, you know, I have to rely on your

23  judgment and your honesty.  If you are confident you can be

24  fair, say so, and if you have doubts, say so.

25      THE JUROR:  I am confident I can be fair.

1          THE COURT:  Mr. Sinnott.

2          MR. SINNOTT:  No, I would like to speak to the Court.

3          THE COURT:  Step aside.  Yes.

4          MR. SINNOTT:  Your Honor, financial advisor, this

5    individual's opening remark is that he has a low opinion of

6    financial advisors and that his wife has a low opinion of

7    financial advisors.  If this were a police officer and a jury

8    said I have a low opinion of police officers, it would be

9    pretty clear that that juror would be stricken for cause.  I'd

12:39PM 10   ask that the same be done here.

11         MR. THOMADAKIS:  Your Honor, for his follow-up, he

12   said with confidence he could be fair and impartial.  I think

13   the reason you struck the previous juror was he had some

14   equivocation in that regard here.  Once your Honor explained

15   the situation to him, he said he could be fair and impartial,

16   therefore, I don't think he should be stricken for cause.

17         THE COURT:  I mean, that's the issue, Mr. Sinnott.

18   You know, we say things sometimes flippantly, and, you know,

19   once forced to focus on them a little more carefully perhaps

12:39PM 20   take different positions.

21         MR. SINNOTT:  I think the problem with the same like

22   that's why I used the police analogy is that it is obviously a

23   deep-seeded family issue.  His wife left the company in part it

24   seems because of a low opinion of financial advisors.  The

25   other statement that he made about they're supposed to be doing

1    things to a client, instead, they are making most often, you

2    know, it's just too much a point of existing bias.  I think to

3    back up with your questions about being able to be fair because

4    I think he probably realized how it sounded to express those

5    deep-seeded views, but they're there.

6              THE COURT:  Here's what I'm going to do, the prudent

7    thing, I certainly have my doubts, is to let him go, so I'm

8    going to let him go.

9              Mr. Leivent.  All right.  Just to be on the safe side,

12:39PM 10    while I think I credit your explanation, I'm going to let you

11    go just because the defendant is a financial advisor.

12    Thank you.

13              Next.

14              THE JUROR:  Hi.

15              THE COURT:  What's your name?

16              THE JUROR:  Jane Elliott.

17              THE COURT:  Number 9.  Yes.

18              THE JUROR:  My husband has been a financial planner

19    for about 18 years.  He recently left and is working at Great

12:39PM 20    West Financial as a retirement educator.

21              THE COURT:  Is there anything about that connection

22    that would affect your ability to be a fair and impartial juror

23    in the trial of this case?

24              THE JUROR:  No.

25              THE COURT:  Are you confident you can be fair to both

1    sides?

2              THE JUROR:  Uh-hum.

3              THE COURT:  You have to answer yes or no.

4              THE JUROR:  Yes.

5              THE COURT:  Mr. Thomadakis.

6              MR. THOMADAKIS:  Nothing.

7              THE JUROR:  My brother-in-law works for SEFA, it's a

8    lobbyist for the investment community.

9              THE COURT:  The same question, anything that would

12:39PM 10  affect your ability to be fair?

11             THE JUROR:  No.  Another thing, both my grandmothers

12   had been involved in a financial planning mishap and they lost

13   money.

14             THE COURT:  Were they victims of a crime?

15             THE JUROR:  Yes.

16             THE COURT:  Okay.

17             THE JUROR:  I mean, yes.

18             THE COURT:  Faulty advice, the man went to jail, that

19   would be a crime.

12:39PM 20             THE JUROR:  Yes, sorry.

21             THE COURT:  So that, you know, might strike closer to

22   the core here.  Again, as I said, you don't have to erase your

23   life experience, you are who you are, but you do have to be

24   scrupulously fair to both sides.  Is there anything about that

25   experience that would affect your ability to be a fair and

1   impartial juror in the trial of this case?

2           THE JUROR:  No.

3           THE COURT:  Again, you're prepared to judge this case

4   on its own merits and according to the evidence?

5           THE JUROR:  Yes.

6           MR. SINNOTT:  Ms. Elliott, did the people that

7   deprived your grandmothers or stole money from your

8   grandmothers, were they prosecuted?

9           THE JUROR:  Yes, I believe so.  They went to prison.

12:39PM 10       MR. SINNOTT:  Do you know who prosecuted them.

11          THE JUROR:  Oh, God, no.  It was 25 years ago?

12          MR. CHRISTOFFERSON:  Massachusetts?

13          THE JUROR:  New Hampshire.

14          THE COURT:  Okay.  Thank you.  Next.  Your name?

15          THE JUROR:  David Rhee.

16          THE COURT:  Number 10.  Yes, sir.

17          THE JUROR:  My brother worked for the investment

18  division at CIGNA Healthcare for two years, I think in 2003 to

19  2005.

12:39PM 20       THE COURT:  Okay.  And is there anything about that

21  connection or relationship that would affect your ability to be

22  a fair and impartial juror in the trial of this case?

23          THE JUROR:  I believe so.

24          THE COURT:  Are you confident you can be fair to both

25  sides?

 1          THE JUROR:  Yes.

 2          THE COURT:  Any follow-up?

 3          MR. THOMADAKIS:  No.

 4          THE COURT:  Next.  What's your name?

 5          THE JUROR:  David Tran, T-r-a-n.

 6          THE COURT:  Number 14.  Yes, sir.

 7          THE JUROR:  I used to work for an online brokerage

 8    company.  Does that count?

 9          THE COURT:  Sure.  What was the company?

12:39PM 10          THE JUROR:  Brown & Company.  I think they sold it to

11    E-Trade.

12          THE COURT:  Okay.  What kind of work did you do?

13          THE JUROR:  IT, so I managed all the services that

14    does all the trading.

15          THE COURT:  Is there anything about that relationship

16    or connection that would affect your ability to be a fair and

17    impartial juror in this case?

18          THE JUROR:  I don't think so.

19          THE COURT:  Are you confident you can be fair to both

12:39PM 20    sides?

21          THE JUROR:  I'll try to.

22          THE COURT:  I need you to be completely confident.

23    You know, everyone is entitled to a fair trial, and I need to

24    make sure everyone is confident they can be fair.  Are you

25    confident?

1          THE JUROR:  I guess, yeah.  No one is completely

2     confident in themselves, right.

3          THE COURT:  Well, just so I understand you what you

4     are saying --

5          THE JUROR:  Yes, I do.

6          THE COURT:  -- you don't have to erase your life

7     experience, you are who you are, but you have to listen to all

8     the evidence, make the best decision you can in good faith, not

9     with any preconception or bias but just because that's what you

12:39PM 10   think the evidence requires and according to the law as I

11    instruct you.  Do you think you'll have any problem with that?

12          THE JUROR:  No.

13          THE COURT:  Any follow-up?

14          MR. THOMADAKIS:  No.

15          MR. SINNOTT:  Nothing, your Honor.

16          THE COURT:  Thank you.  Next.

17          I'm sorry, your name.

18          THE JUROR:  Anna Geller.

19          THE COURT:  32.  Yes.

12:39PM 20         THE JUROR:  My brother had an internship for State

21    Street, and family friend works for Blumberg.

22          THE COURT:  And is there anything about those

23    connections or relationships that would affect your ability to

24    be a fair and impartial juror?

25          THE JUROR:  Yes.

1          THE COURT:  You're confident you can be fair to both

2    sides?  You have to answer yes for the record.

3          THE JUROR:  Yes.  Thank you.

4          THE COURT:  Next.  15.

5          THE JUROR:  Yes, I have two friends that work for

6    financial institutions.

7          THE COURT:  Are they good friends?

8          THE JUROR:  Yes, I see them socially often.  One is a

9    broker and one does IT.

12:40PM 10          THE COURT:  Where do they work?

11          THE JUROR:  Fidelity and Wells Fargo and IT for

12    Fidelity.

13          THE COURT:  Is there anything about those connections

14    that would affect your ability to be a fair and impartial juror

15    in the trial?

16          THE JUROR:  No.

17          THE COURT:  Are you confident you can be fair to both

18    sides?

19          THE JUROR:  Yes.

12:40PM 20          THE COURT:  Okay.  Thank you.

21          (SIDEBAR CONFERENCE WAS CONCLUDED.)

22          THE COURT:  All right.  Ladies and gentlemen, I'm

23    going to ask one more round of questions, then I'm going to

24    give you a break to stretch your legs and to use the

25    facilities, so bear with me, if you would.  Have you or any

member of your family ever been a victim of a civil or a
criminal fraud involving investment or financial services?  I
know some of you have said some things to me, but you don't
need to repeat it if you've already told me.  Yes, I see a
hand.  Okay.

                    (THE FOLLOWING OCCURRED AT SIDEBAR:)

            THE COURT:  I'm sorry.

            THE JUROR:  Leo Paquette.

            THE COURT:  18.

12:40PM     THE JUROR:  Bankruptcy, Nortel.  I was a former
employee, and I lost my life savings, house went into
foreclosure.

            THE COURT:  Okay.  Meaning you had company stock; is
that right?

            THE JUROR:  Oh, yeah, yeah.

            THE COURT:  And when did that happen?

            THE JUROR:  It would have been more than 10 years ago
now.

            THE COURT:  Okay.  And is there anything about that
12:40PM  experience that would affect your ability to be a fair and
impartial juror in the trial of this case?

            THE JUROR:  I don't think so.  I mean, it was
mismanagement of the company, and, yeah, there was some bad
information that came out, but it was the company's mismanaging
that caused it all.

1          THE COURT:  And just to be clear, you don't have to

2     erase your life experience, you are who you are, and you

3     experience what you experience, but you have to be fair to both

4     sides and to listen to the evidence and decide the case on its

5     own merits.  Are you confident you can do so?

6          THE JUROR:  I apologize.

7          THE COURT:  No doubt you can be confident to fair both

8     sides?  Only you can tell me.

9          THE JUROR:  I'm an engineer, it's a matter of weighing

12:40PM 10    the facts.

11         THE COURT:  You listen to the facts, make your best

12    judgment.  If you want to think about it as an engineer problem,

13    you tend to be careful with the facts.  Are you confident you

14    can be fair to both sides?

15         THE JUROR:  Yes.

16         THE COURT:  Mr. Thomadakis.

17         MR. THOMADAKIS:  No.

18         MR. SINNOTT:  Nothing.

19         THE JUROR:  Thank you, sir.

12:40PM 20    (SIDEBAR CONFERENCE WAS CONCLUDED.)

21         THE COURT:  All right.  One final question before our

22    break, other than what you may have already told me, have you

23    or any member of your immediate family or any close friend ever

24    been involved in a criminal case, either as a defendant, a

25    victim or as a witness?  Okay.  I'll see you.

1          (THE FOLLOWING OCCURRED AT SIDEBAR:)

2          THE COURT:  Welcome back.

3          THE JUROR:  My wife's uncle was William Sweeney.  He

4   was the guy that broke the code of silence in Charlestown and

5   became a federal witness, witness protection program.  He was a

6   bad guy towards the end of his life, good guy for most of his

7   life.  They shot him up a bunch of times, and the second time

8   he was a quadriplegic so he turned evidence, got shipped away

9   and came back to us in a box a couple years later under a

12:40PM 10  different name.

11          THE COURT:  And the same question, anything about that

12  experience that would affect your ability?

13          THE JUROR:  No, I'm just trying to answer your

14  questions, your Honor.

15          THE COURT:  I appreciate it.  Thank you, sir.  Is that

16  the fellow who was shot at the 99?  I can't remember.

17          MR. SINNOTT:  No, I don't think so.

18          THE COURT:  Next.

19          THE JUROR:  I don't know if you need me up here again.

12:40PM 20  THE COURT:  Mr. Swanson.

21          THE JUROR:  Yes.  I already told you about that case.

22          THE COURT:  Yes.

23          THE JUROR:  It was possession, marijuana with intent

24  to deliver.  I was convicted.

25          THE COURT:  Did you do prison time?

1        THE JUROR:  No, probation.

2        THE COURT:  Okay.  When did that happen, ballpark?

3        THE JUROR:  June of 2004.

4        THE COURT:  Okay.  And do you feel you were treated

5    fairly by the criminal justice system?

6        THE JUROR:  Yeah, itself, yeah.  I agreed with the law

7    but the system itself was fair.

8        THE COURT:  Okay.  Any follow-up?

9        MR. THOMADAKIS:  No, your Honor.

12:40PM 10        MR. SINNOTT:  Nothing, your Honor.

11        THE COURT:  Thank you, Mr. Swanson.  Next.

12        THE JUROR:  Elizabeth Whittemore.

13        THE COURT:  Number 7.

14        THE JUROR:  Yes, I was a witness in a criminal case.

15    It was around fraudulent behavior for a charity fundraising,

16    AIDS ride from Boston-New York.  I actually was a witness

17    against the people that had fraudulently taken money from the

18    organization, Cambridge District, 2000's.

19        THE COURT:  And the same question I think I've already

12:40PM 20    asked you multiple times, anything about that experience that

21    would affect your ability to be a fair and impartial?

22        THE JUROR:  No, I don't think so.

23        MR. SINNOTT:  What was your role as a witness?

24        THE JUROR:  To go through the facts as to what

25    happened, how money came in, how it came out, all of the --

1          MR. SINNOTT:  What was the scheme?

2          THE JUROR:  It was basically around taking money and

3     using it other than what they had said they were going to use

4     it for.

5          MR. SINNOTT:  Thank you.

6          THE COURT:  Okay.  Thank you.  Next.  Hi.  What's your

7     name?

8          THE JUROR:  Michelle McPherson.

9          THE COURT:  Number 20.  Yes.

12:40PM 10          THE JUROR:  I don't know if this means anything, but

11     my mother was a witness to a hit and run accident involving a

12     friend of hers, and she was a witness in the case.

13          THE COURT:  Okay.  Do you thinks your mother as a

14     witness was treated fairly by the criminal justice system?

15          THE JUROR:  Yes.

16          THE COURT:  And what about the victim, do you think

17     she was treated fairly?

18          THE JUROR:  I would say.  I wasn't in the courtroom so

19     I don't really know.

12:40PM 20          THE COURT:  Okay.  That's fine.  Is there anything

21     about that experience that would affect your ability to be a

22     fair and impartial juror in the trial of this case?

23          THE JUROR:  I don't think so.

24          MR. SINNOTT:  Nothing.

25          (SIDEBAR CONFERENCE WAS CONCLUDED.)

1          THE COURT:  Okay.  Thank you.  All right.  Ladies and

2    gentlemen, as promised, I'm going to give you a chance to

3    stretch your legs and use the facilities.  We can't do anything

4    unless all of you are present and seated, so I want this to be

5    as quick and orderly as we can under the circumstances.  There

6    are restrooms down the hall.  Those of you who smoke may be

7    tempted to go out and sneak a cigarette.  You can't do that.  I

8    don't want you to go anywhere but this floor and the restroom

9    and this courtroom, and we have to count you when you come back

12:40PM 10   so, again, your appreciation.

11          I would greatly appreciate if you would cooperate and

12   be orderly, and we'll resume as soon as all of you are back in

13   the courtroom, about 5 or 10 minutes.

14          THE CLERK:  All rise.

15          (JURORS EXITED THE COURTROOM.)

16          (SIDEBAR CONFERENCE WAS HELD AS FOLLOWS:)

17          THE COURT:  I have some generalized questions and

18   then, you know, whatever objections or other questions people

19   want me to ask, but that ought to go further, and I'll get into

12:40PM 20   the exercise of the peremptory challenges.

21          MR. SINNOTT:  Your Honor, can I just ask something,

22   and perhaps madam clerk can help us with this.  I think she's

23   smarter than any of the rest of us.  Would we get a betting

24   order with everybody dropped down the list?

25          THE COURT:  If nothing changes, the 14 people would be

1    jurors Number 1, 2, 4, 5, 9, 10, 11, 13, 14, 15, 19, 20, 21,

2    22.  Those are the first 14 people in the box.  Then Number 24

3    would be the first up followed by 25 through 40 in order.

4    Okay.

5          MR. THOMADAKIS:  Thank you.  Given the time, should we

6    take it that we're not likely to do opening?

7          THE COURT:  Correct.

8          (A recess was taken.)

9          THE CLERK:  All rise.

10          (JURORS ENTERED THE COURTROOM.)

11          THE COURT:  Thank you.  You may be seated.  Court is

12    now back in session.

13          THE COURT:  Thank you for your cooperation.  I have a

14    few more questions.  You may hear testimony during the course

15    of this trial from a witness who has been given immunity from

16    the government or immunized by the government.  Basically

17    everyone has a Fifth Amendment right not to incriminate

18    themselves.  A witness who has been given immunity from

19    prosecution can't be prosecuted.  That's what immunity means,

20    and, therefore, can be required to testify.

21          There's nothing illegal or improper about such an

22    arrangement, but you're free to assess an immunized witness'

23    testimony as you would with any witness taking into account

24    whatever motives they may have and whatever credibility or lack

25    of credibility they may have.

1     Do any of you hava beliefs about immunized witnesses

2     that would prevent you from evaluating and fairly and

3     impartially judging that witness' testimony?  I see no hands.

4     Have any of you learned anything about the case before

5     you came to court today?  I see no hands.

6     The defendant has a constitutional right not to

7     testify in this case.  No inference of guilt or anything else

8     may be drawn from the fact that he does not testify.  For you

9     to draw an inference would be wrong, indeed, it would violate

12:40PM 10   your oath as a juror.

11    Do any of you who have trouble accepting that

12    basically principle concerning the defendant's right not to

13    testify and might hold it against the defendant if he does not

14    testify?  I see no hands.

15    The fact that the defendant has been charged with a

16    crime is not evidence that he is guilty of that crime.  He is

17    not presumed to be guilty; to the contrary, he is presumed

18    innocent, and the government has to prove his guilt beyond a

19    reasonable doubt.

12:40PM 20   Are there any of you who have trouble accepting that

21    basic principle concerning the presumption of innocence and the

22    burden of proof?  I see no hands.

23    You must decide this case solely based on the evidence

24    presented in this courtroom and according to the law as I

25    instruct you.  Are there any of you who would have difficulty

1    accepting that principle and might decide the case on something

2    other than the evidence presented in court?  I see no hands.

3         Do any of you have any feelings about the government,

4    whether those feelings are positive or negative, that might

5    interfere with or affect your ability to serve as a fair and

6    impartial juror in the trial of this case?  I see no hands.

7         Do any of have any feelings or beliefs about

8    prosecutors, about criminal defense lawyers, Judges or the

9    criminal justice system, again, whether positive or negative,

12:40PM 10   that might interfere with or affect your ability to serve as a

11   fair and impartial juror in the trial of this case?  I see no

12   hands.

13        Do any of have any political or religious or ethical

14   beliefs that might affect your ability to be a fair and

15   impartial juror in the trial of this case?  I don't want know

16   your politics or your religion.  Would your politics or your

17   religion interfere or affect your ability to follow the law as

18   I instruct you?  I see no hands.

19        Are you aware of any beliefs or feelings that prevent

12:40PM 20   you from completely and honestly applying the law as I give it

21   to you the end of the case to the facts as I find them?  I see

22   no hands.

23        Do any of you know any reason that has not been

24   mentioned why you cannot sit as a fair and impartial juror in

25   the trial of this case?  I see no hands.

1          Finally, is there anything that I have not asked about

2     that you would like to raise with me before we go any further?

3     All right.  I see no hands.

4          Let me see counsel at sidebar.

5          (THE FOLLOWING OCCURRED AT SIDEBAR:)

6          THE COURT:  Anything else from the government?

7          MR. THOMADAKIS:  Just one thing, your Honor, I noticed

8     Number 25 didn't list his employment or his spouse's

9     employment.

12:40PM 10          THE COURT:  What I'm going to do is put people in the

11     box, and I'm going to fill in the blanks, so to speak, ask

12     whether they're married, their occupation, if they're retired

13     and what their last occupation was, and I'll ask about jury

14     service.

15          MR. SINNOTT:  Nothing else, thank you.

16          (SIDEBAR CONFERENCE WAS CONCLUDED)

17          THE COURT:  All right.  Now, what we're going to do is

18     Ms. Pezzarossi is going to read out the names of 14 people.

19     I'll ask the first jurors name who's called to sit in seat 14,

12:40PM 20     and the eighth juror will sit behind juror 1.  We'll have the

21     next 7 in the back row.

22          THE CLERK:  Bang Wong, please come to seat Number 1;

23     Sarah Reul, seat Number 2; Carl Swanson, seat Number 3; I'm

24     going to butcher this, Hope Desruisseaux --

25          THE JUROR:  Desruisseaux.

1          THE CLERK:  Thank you -- Jane Elliott, seat Number 5;

2    David Rhee, seat Number 6; Robert Levesque, seat Number 7; seat

3    Number 8, Cecelia Brooks; seat Number 9, Damien Tran; seat

4    Number 10, Genevieve Hiller; seat Number 11, Debora LaPlante;

5    seat Number 12, Michelle McPherson; seat Number 13, Robert

6    Silva; and seat Number 14, Anushiya Wigneswaran, sorry.

7          THE COURT:  All right.  I'm going to ask some

8    questions to the 14 prospective jurors who are seated.  I'm

9    going to try to fill in some of the blanks here if there are

12:40PM 10    any blanks.  I'm going to ask some of you are you married

11    because if you are married, the lawyers have a right to know

12    what your spouse does for a living.  So let me go down the

13    list.  Mr. Swanson, are you married?

14          THE JUROR:  No, I'm not, sir.

15          THE COURT:  Mr. Levesque, are you married?

16          THE JUROR:  No.

17          THE COURT:  Ms. LaPlante, are you married?

18          THE JUROR:  No.

19          THE COURT:  Mr. Silva, you're retired, is that right?

12:40PM 20    You're retired; is that correct?

21          THE JUROR:  Yes.

22          THE COURT:  And you were a firefighter?

23          THE JUROR:  Retired firefighter.

24          THE COURT:  Your spouse is also retired?

25          THE JUROR:  Yes.

1          THE COURT:  What did she do?

2          THE JUROR:  She worked in a rope company.

3          THE COURT:  Okay.  All right.  I think that's it.

4     Then let me ask all 14 of you, have any of you ever served on a

5     jury, grand jury or regular jury, and, if so, would you please

6     raise your hand.

7          Okay.  I'm going to go down the line, and if you could

8     please tell me what kind of case it was, where it was and how

9     long ago it was.

12:40PM 10          Yes.

11          THE JUROR:  Eleven years ago in Lowell.  It was a

12    civil case.  I don't remember much more of it.  I was dismissed

13    from the case.

14          THE COURT:  Oh, okay.  Yes.

15          THE JUROR:  It was in Lawrence, it was a breaking and

16    entering, battery as a result.  I wasn't on the case, I was an

17    alternate so I didn't deliberate.

18          THE COURT:  Yes.

19          THE JUROR:  It was a criminal case, it was 30 years

12:40PM 20    ago.  I don't recall the location, and it was assault and

21    battery.

22          THE COURT:  Okay.  Good.  I'll give the lawyers a few

23    moments, and then I'll see them at sidebar.

24          (THE FOLLOWING OCCURRED AT SIDEBAR:)

25          THE COURT:  All right.  Counsel.  All right.  This is

1    round 1.  The government will go first.  We'll exercise

2    challenges one-by-one.  The government has 7 challenges, the

3    defense has 11 and the last two jurors regardless of their seat

4    location will be alternates.  There are no backstrikes.  The

5    government --

6              MR. THOMADAKIS:  Just to be clear, your Honor, so no

7    backstrikes not within the round but after the round is over?

8              THE COURT:  In other words, if we strike 7 jurors, you

9    can't strike the remaining 7.  This is your one chance to do

12:40PM 10   that.

11             MR. THOMADAKIS:  I would strike juror Number 4, 4 in

12   seat 3, Mr. Swanson.

13             THE COURT:  I've never been more surprised in my life.

14   Defense.

15             MR. SINNOTT:  We would strike juror in seat 1,

16   Ms. Bang Wong.

17             THE COURT:  Juror 1, seat 1.

18             The government.

19             MR. THOMADAKIS:  Juror Number 14 in seat 9.

12:40PM 20            THE COURT:  Juror 14 in seat 9, Mr. Tran.

21             Defense.

22             MR. SINNOTT:  We would strike Ms. Elliott in seat 5.

23             THE COURT:  Juror 9, seat 5.

24             The government.

25             MR. THOMADAKIS:  The Court's indulgence.  No further

1    strikes.

2            THE COURT:  Defense.

3            MR. SINNOTT:  We would strike Genevieve Hiller in seat

4    10.

5            THE COURT:  Juror 15 in seat 10.

6            Defense.

7            MR. SINNOTT:  We are content.

8            THE COURT:  So the government has used 3 peremptory

9    challenges, they have 4.

12:40PM 10            MR. THOMADAKIS:  2, your Honor.

11            THE COURT:  I'm sorry, 2, they have 5 remaining, and

12    the defense has used 3, and they have 8 remaining.  All right.

13    We'll replace those five jurors.

14            (SIDEBAR CONFERENCE WAS CONCLUDED.)

15            THE CLERK:  From take your card and go downstairs to

16    the office.  Mr. Swanson, Ms. Wong, Mr. Tran, Ms. Elliott and

17    Ms. Hiller.

18            Can I have Megan Hovsepian, seat Number 1;

19    Joseph Vadala, seat Number 3; Paul Hoffman, seat Number 5;

12:40PM 20    Elizabeth Moran, seat Number 9; Timothy Correia, seat

21    Number 10.

22            THE COURT:  I think Ms. Moran, I think you're in 9; is

23    that right?

24            THE CLERK:  Yes, seat Number 9.

25            THE COURT:  All right.  Again, let me ask you some

1    questions.  Ms. Hovsepian, you're home now; is that correct?

2              THE JUROR:  Yes.

3              THE COURT:  What was your last employment?

4              THE JUROR:  I was a stay-at-home mom for 28 years.

5    Before that I worked in personnel in a hospital setting.

6              THE COURT:  Okay.  What does your spouse do?

7              THE JUROR:  He's a CEO of a software company.

8              THE COURT:  Mr. Vadala in seat 3, what do you do for a

9    living?

12:40PM 10            THE JUROR:  I work for Dunkin' Donuts.

11             THE COURT:  Are you married?

12             THE JUROR:  Yes.  She is not working anymore.

13             THE COURT:  What was her last job?

14             THE JUROR:  She worked at Dunkin' Donuts.

15             THE COURT:  Mr. Hoffman, are you married?

16             THE JUROR:  No.

17             THE COURT:  The five new jurors, have any of you

18   served on a jury, state or federal, civil or criminal?  What

19   kind of case and where was it?

12:40PM 20            THE JUROR:  It was a child abuse case in Boston.

21             THE COURT:  How long ago?

22             THE JUROR:  Twelve years ago.

23             THE COURT:  Twelve years ago.  Okay.  I'll give the

24   lawyers a few moments.

25             MR. SINNOTT:  Your Honor, may I approach?

1          THE COURT:  Yes.

2          (THE FOLLOWING OCCURRED AT SIDEBAR:)

3          THE COURT:  I'm sorry, what's the issue?

4          MR. SINNOTT:  I'm sorry, your Honor, I think you

5     answered it.  I'll withdraw that.

6          THE COURT:  What Mr. Vadala does, he works for Dunkin'

7     Donuts.

8          MR. SINNOTT:  And his spouse?

9          THE COURT:  Is currently unemployed but did work for

12:40PM 10    Dunkin' Donuts.

11          (SIDEBAR CONFERENCE WAS CONCLUDED.)

12          THE COURT:  I hope none of you did what I did last

13    night and stayed up and watched that football experience which

14    was a bad experience all the way around.  It didn't make me

15    very fresh when the alarm went off.

16          Counsel.

17          (THE FOLLOWING OCCURRED AT SIDEBAR:)

18          THE COURT:  All right.  This is round 2 in which the

19    defense goes first.  Mr. Sinnott.

12:40PM 20          MR. SINNOTT:  Your Honor, we move to strike

21    Ms. Hovsepian in seat Number 1.

22          THE COURT:  Juror --

23          THE CLERK:  -- 24.

24          THE COURT:  Seat 1.  The government.

25          MR. THOMADAKIS:  We move to strike juror in seat

1    Number 3, juror 25.

2              THE COURT:  Seat 3, juror 25.

3              Defense.

4              MR. SINNOTT:  We would move to strike Mr. Hoffman in

5    seat Number 5.

6              THE COURT:  Juror Number 26, seat 5.

7              MR. THOMADAKIS:  No further strikes.

8              MR. SINNOTT:  Seat Number 9, Ms. Moran.

9              THE COURT:  Juror 27 in seat 9.  Defense.

12:40PM 10         MR. SINNOTT:  Nothing further on this panel.

11             THE COURT:  The government used 3, they have 7, 4

12   remaining.  I did watch that football game, you can tell.  The

13   defense has used 6, so they have 5 remaining.  All right.

14             (SIDEBAR CONFERENCE WAS CONCLUDED.)

15             THE CLERK:  Ms. Moran, Paul Hoffman, Joseph Vadala,

16   Megan Hovsepian.

17             Seat Number 1, Donna McMenamin; seat Number 3,

18   Deborah Kiely; seat Number 5, Charles Kontoules; seat Number 9,

19   Anna Geller.

12:40PM 20         THE COURT:  All right.  The four newly seated jurors.

21   Mr. Kontoules, you're not working, you're home, is that right?

22             THE JUROR:  I'm an at home dad.

23             THE COURT:  What did you do before that?

24             THE JUROR:  I was a teacher.

25             THE COURT:  And, Ms. Geller, are you married?

1          THE JUROR:  No.

2          THE COURT:  And the four newly seated jurors, have any

3     of you served on a jury before?

4          THE JUROR:  Yes, civil case between a dentist and a

5     golf course, 10 years ago.

6          THE COURT:  Mr. Kontoules.

7          THE JUROR:  It was about 18 years ago, and it was a

8     drunk driving case, and it was in Peabody.

9          THE COURT:  Peabody.  Okay.  Thank you.  All right.

12:40PM 10     Counsel.

11          (THE FOLLOWING OCCURRED AT SIDEBAR:)

12          THE COURT:  All right.  This is round 3.  The

13     government goes first.  Mr. Kontoules in seat 5, juror 31 is

14     the fellow with the question regarding his surgery.  It's not

15     clear we need to keep him on for a number of reasons.  I

16     suppose if all nine challenges are exercised, it would be 9

17     plus 4, 13.  Well, we'd get into the people who have moved down

18     the list.  In any event, let's see how this goes.

19     Mr. Thomadakis.

12:40PM 20          MR. THOMADAKIS:  We would strike juror in seat

21     Number 1, juror Number 29, Ms. McMenamin.

22          THE COURT:  Juror 29 in seat 1.

23          Defense.

24          MR. SINNOTT:  We are satisfied with this panel.

25          THE COURT:  All right.  The government.

1          MR. THOMADAKIS:  The Court's indulgence.

2          THE COURT:  Yes.

3          MR. THOMADAKIS:  We'll strike Mr. Kontoules.

4          THE COURT:  All right.  Anything else from the

5     government?

6          MR. THOMADAKIS:  No, your Honor.

7          THE COURT:  So the government has used 5 and has 2

8     remaining.  The defense has used 6 and has 5 remaining, and I

9     think does that get up to 12?  We have two seats left; is that

12:40PM 10    right?  These two will be the alternates.  Whoever winds up in

11    these two seats will be the alternates.

12          (SIDEBAR CONFERENCE WAS CONCLUDED)

13          THE CLERK:  Mr. Kontoules and Donna McMenamin.

14          Johnny Naranjo-Vera, please take seat Number 1;

15    Chad Crocker, please fill seat Number 4.

16          THE COURT:  All right.  Mr. Crocker, are you married?

17          THE JUROR:  No.

18          THE COURT:  And the two new jurors, have either of you

19    served on a juror before?  No, okay.  Counsel.

12:40PM 20          (THE FOLLOWING OCCURRED AT SIDEBAR:)

21          THE COURT:  This is round 4.  Defense goes first.

22          MR. SINNOTT:  We're satisfied.

23          MR. THOMADAKIS:  We would strike Number 5,

24    John Crocker.

25          THE COURT:  All right.

1          MR. THOMADAKIS:  Seat Number 5.

2          THE COURT:  Juror 34.  Anything else?

3          MR. THOMADAKIS:  No, your Honor.

4          THE COURT:  All right.  So the government has one

5     strike remaining.  Next up is Ms. Flanagan, and the government

6     would go first in round 5.  Do you want to discuss her now or

7     do you want me to put her in the box?

8          MR. THOMADAKIS:  What we would say about her given

9     that we're pretty far down the list, again, and the

12:40PM 10   inconvenience she listed, we suggested that issue be revisited

11    at this time.

12         THE COURT:  Well --

13         MR. THOMADAKIS:  She was the woman.

14         THE COURT:  She's got the grandson that drives her

15    around.  I think it's really the issue on the day of the

16    deliberation, but, I mean, I guess I don't know what

17    Mr. Harrington looks like.

18         MR. THOMADAKIS:  That was the woman I don't think she

19    had any inconvenience issues.

12:40PM 20        THE COURT:  Mr. Sinnott, if you could consent to

21    strike Ms. Flanagan?

22         MR. SINNOTT:  I'll consider doing it, yes.

23         (SIDEBAR CONFERENCE WAS CONCLUDED.)

24         THE COURT:  Ms. Flanagan, can I see you.

25         (SIDEBAR CONFERENCE WAS HELD AS FOLLOWS:)

1          THE COURT:  Hi.  Because it looks like we're going to

2   be all right even though the number is getting thin, I'm going

3   to let you go.

4          THE JUROR:  Thank you.

5          THE COURT:  We'll put Mr. Harrington in the box then.

6          MR. THOMADAKIS:  Shall we stay here, your Honor?

7          THE COURT:  It's up to you, you can stay here, if you

8   want to consult with your client.

9          MR. SINNOTT:  Thank you, Judge.

12:40PM 10          (SIDEBAR CONFERENCE WAS CONCLUDED.)

11          THE CLERK:  Jack Crocker, Mr. Neal Harrington, please

12   fill the seat, please.

13          THE COURT:  Mr. Harrington, have you ever served on a

14   jury before?

15          THE JUROR:  Yes.

16          THE COURT:  What kind of case?

17          THE JUROR:  A civil case about 20 years ago.

18          THE COURT:  Whereabouts?

19          THE JUROR:  Quincy -- I'm sorry, Dedham.

12:40PM 20          THE COURT:  Dedham.  Okay.  Let me talk to the

21   lawyers.

22          (SIDEBAR CONFERENCE WAS HELD AS FOLLOWS:)

23          THE COURT:  So this is round 5.  So it would be the

24   government would go first.

25          MR. THOMADAKIS:  The government is satisfied.

1        MR. SINNOTT:  We're satisfied.

2        THE COURT:  Okay.  All right.  So this will be

3   Naranjo-Vera in seat 1 and Harrington in seat 5.  I'm going to

4   swear the jury, give them preliminary instructions and then

5   we'll be done.

6        (SIDEBAR CONFERENCE WAS CONCLUDED.)

7        THE COURT:  All right.  Ladies and gentlemen, you

8   people are going to be the jury in this case.  Thank you for

9   your patience and cooperation.  I need you to do something else

12:40PM 10  now, which is to stand up and be sworn as the jury in this

11  case.

12        (Jurors were sworn.)

13        THE COURT:  All right.  Thank you.  Those of you who

14  are left, thank you for your patience and cooperation.  I know

15  some of you were sweating a little bit, but it looks like it

16  worked out, so thank you and you are hereby discharged.

17        All right.  Ladies and gentlemen, again, thank you for

18  your cooperation and patience.  What I'm going to do now is

19  take a few minutes to talk about your duties as jurors, to give

12:40PM 20  you some preliminary jury instructions and then let go for

21  today.  Part of what I'm going to do is give you some

22  preliminary instructions on the law.  At the end of the case,

23  I'm going to give you complete instructions.  They're going to

24  be detailed.  You're going to have them in writing, each one of

25  you is going to have a copy to take with you into the jury

1    room.

2           The reason I'm giving you some instructions now

3    instead of waiting to the end of the trial is to give you a

4    little bit of a framework for considering the evidence and to

5    help you understand it.

6           I don't want you to think that these preliminary

7    instructions are the only ones that matter or that they're more

8    important than the ones that come later.  You must have apply

9    the instructions I give you at the end of the trial as a whole,

12:40PM 10    and those will be complete.  They'll have definitions and other

11   detail like that that you may need.

12           All right.  Let me talk about your duties.  It is your

13   duty as the jury to decide from the evidence what the facts

14   are.  You and you alone are the judges of the facts.  You will

15   hear the evidence, decide what the facts are and then apply

16   those facts to the law as I give it to you.  In doing so, you

17   must follow the law as I explain it whether you agree with it

18   or not.

19           Sometimes jurors are curious about what I think,

12:40PM 20    whether I think, for example, that the defendant is guilty or

21   not or whether I think a particular witness is believable.  My

22   opinion if I have one, and I certainly don't have one now is

23   not relevant.  It's your role, not mine, to decide those

24   issues, and you should not interpret anything I might say or do

25   during the trial as indicating what I think of a witness or

1    what I think your verdict ought to be.

2         Again, this is a criminal case.  The defendant has

3    been charged with two crimes, mail fraud and conspiracy to

4    commit mail and wire fraud.  The charges against the defendant

5    are contained in a document called an indictment.  The

6    indictment is simply a description of the charges against him.

7    It's not evidence of anything.

8         Mr. Fraiman has pleaded not guilty to both charges.

9    He is presumed innocent.  The government has to prove his guilt

12:41PM 10    beyond a reasonable doubt.  The defendant does not have to

11    prove his innocence.  He does not have to put on any evidence.

12    He does not have to testify.  Those are rights that are

13    guaranteed by the United States Constitution.

14         At the end of the trial, you'll be asked to render a

15    verdict of guilty or not guilty as to both counts.  Your

16    verdict as to each count must be unanimous.  That is, you may

17    convict the defendant only if every one of you agrees that he's

18    guilty beyond a reasonable doubt as to that count.

19         Every crime has what we call elements, they're the

12:42PM 20    things the government has to prove beyond a reasonable doubt to

21    find the defendant guilty of that crime.  Again, I'll instruct

22    you on the elements of crime at the end of the case with

23    detailed instructions, but I'm going to give you a brief

24    overview now.  I'm going to start with Count 2, which will be

25    easier to understand Count 1 if I explain Count 2 first.

1          Count 2 charges the defendant with a crime of mail

2    fraud.  In order to prove mail fraud, the government must prove

3    that there was a scheme to defraud substantially as charged in

4    the indictment.  It has to be a scheme to defraud or to obtain

5    money or property by means of false or fraudulent pretenses,

6    representations or promises.

7          The scheme has to involve a false statement,

8    misrepresentation or concealment about one or more material

9    facts.  The defendant has to act intentionally.  He must act

12:43PM 10   knowingly and willfully participate in the scheme with the

11   specific intent to defraud.  You can't commit crimes by

12   accident or mistake or neglect, you can only do so

13   intentionally, and, fourth, the scheme must involve the use of

14   mails or a private or interstate carrier such as

15   Federal Express on or about the date alleged in furtherance of

16   the scheme.

17          Count 1 charges the defendant with conspiracy to

18   commit mail and wire fraud.  To be convicted of that crime, you

19   must be convinced first, that the government has proved first

12:43PM 20   that there was an agreement as specified in the indictment

21   between at least two people to commit mail or wire fraud;

22   secondly, that the defendant knowingly and intentionally joined

23   that conspiracy; and, third, that one of the conspirators

24   committed an overt act, they did something in furtherance of

25   the conspiracy.

1          Wire fraud is similar to mail fraud except it involves

2     the use of interstate wires such as telephone lines and things

3     of that nature rather than mail.

4          Again, that's a very brief sketch of what the charges

5     are.  At the end of the case, I'm going to give you a more

6     detailed and precise description of the charges against the

7     defendant, and those are the charges you will use in order to

8     determine the case.

9          All right.  I've mentioned the word "evidence."  The

12:44PM 10   evidence in this case is probably going to include the

11    testimony of witnesses, documents, and it may include objects

12    or things other than documents, and it may include any facts on

13    which the parties might have agreed.

14         The evidence consists of all the testimony, both on

15    direct and cross-examination, and all the exhibits regardless

16    of who introduced them.  There are rules that control what you

17    may consider as evidence.  If a lawyer asks a question or

18    offers something as evidence and the lawyer on the other side

19    thinks that's not permitted, the lawyer may object.  When one

12:45PM 20   lawyer objects, I have to make a ruling.  Sometimes I have to

21    do that without consulting the lawyers, sometimes I consult

22    with them at sidebar.  Very rarely, I'll have to send the jury

23    out of the room while I decide.

24         The purpose, obviously, is so I can make a decision.

25    We don't keep things from you to frustrate you, but sometimes

1    we have to discuss things outside of your earshot.  I'll do

2    what I can to keep all that to a minimum.  Certain things are

3    not evidence.  Statements and arguments by the lawyers are not

4    evidence.  The lawyers are not the witnesses.

5           A question by a lawyer standing alone is not evidence.

6    Again, the lawyer is not the witness, it's the question and the

7    answer taken today that make up the evidence.

8           Objections are not evidence.  Lawyers have a duty to

9    object if they think something is improper.  If I sustain an

12:45PM 10   objection, if I keep something out, you must ignore the

11   question or ignore the exhibit, and you shouldn't guess about

12   what the answer might have been or what that exhibit might have

13   said.

14          I hope this doesn't happen, but if I have to tell you

15   to disregard something, that means it's not evidence, and you

16   may not consider it.  Anything you might see or hear about this

17   case outside the courtroom is not evidence.  You must decide

18   the case based on what you see and hear in court.

19          Sometimes a particular item of evidence might come in

12:46PM 20   for a limited purpose only.  That means you can use it only for

21   one purpose or a particular purpose and not for any other.  If

22   that happens, I'll instruct you and tell you what you can and

23   can't consider the evidence for.

24          In deciding what the facts are, you may have to decide

25   what testimony you believe and what testimony you do not

1    believe.  You may believe everything a witness says or only

2    part of it or none of it.  It is entirely up to you.

3            Now, many people watch television shows or movies

4    about courts or lawyers or the criminal justice system, and

5    sometimes people are affected by that when they serve as

6    jurors.  Television shows and movies can create false

7    expectations about real life, for example, how a trial is going

8    to proceed or what the evidence might look like.

9            You must decide this case on the evidence before you

12:47PM 10   and the law as I give it to you.  Do not decide this case even

11   in part based on something you saw on something on TV or in a

12   movie.  That's improper or unfair.

13           Let me turn next to the subject of how you are to

14   conduct yourselves during the trial.  To ensure that the trial

15   is fair, we have rules that the jury has to obey.  The first

16   rule is not to talk among yourselves about the case until the

17   end of the case when you go to the jury room to decide on your

18   verdict.

19           You should feel free to get to know one another, but

12:47PM 20   you should talk about the weather or your families, I was about

21   to say the Patriots, maybe the Celtics.  You can talk about

22   anything other than the case, and it's particularly important

23   that jurors not begin to pair up and begin to have side

24   conversations, just two people to talk about the case.

25           Because what happens, whether you intend it or not,

1   you're going to influence one another, and you're going to

2   start to make up your mind, and you're going to start to take

3   positions, and it's very important that you wait and not

4   discuss the case, even a piece of it, either individually or

5   collectively.

6        A related rule is don't make up your mind about what

7   the verdict should be until after you've gone to the jury room

8   to decide the case and you and your fellow jurors have had an

9   opportunity to discuss the case.

12:48PM 10        It may be that the very last question and the very

11   last answer are the most important thing in the whole case, so

12   keep an open mind until the end.  Withhold judgment, listen to

13   everything, and then decide.

14        Next, don't talk with anyone about this case until the

15   trial has ended and you've been discharged as jurors.  Now,

16   when I say don't talk with anyone else, that includes your

17   family, your friends, your roommates.  It's the most natural

18   thing in the world when you get home from court every day,

19   including today, for your friends and family members to say,

12:49PM 20   Well, what kind of case is it?  What do you think?  Do you

21   think the guy is guilty?  That reminds me of a case I read

22   about in Indiana and so on, and, again, whether they intend it

23   not, they are going to influence you and they are going to

24   influence your judgment.

25        They are not here, they're not listening to the

1    evidence, they're not hearing my instructions, so it's

2    important that you not have those discussions with them.

3    Obviously, you can tell them you're a juror, you can tell them

4    what kind of a case it is, but you have to wait.  You can say

5    the Judge said I can't say anything about the case until the

6    case is over, and once it's over, you're free to discuss the

7    case as you see fit.

8         Next, and this is a relatively new instruction, don't

9    discuss this case on any social network.  Don't use Facebook or

12:49PM 10   Twitter or anything at all to discuss this case.  This is an

11   increasing problem for the courts across the country.  There

12   are lots of people, as you know, who put everything on

13   Facebook, for example, and if you do that, we're going to have

14   to declare a mistrial and we're going to have to start all over

15   again so, please, please, don't do it.

16        Next, don't let anyone talk to you about the case.  If

17   no one approaches the case and said they want to talk about the

18   case, please report that to me immediately.

19        Next, during the trial, you should not speak to any of

12:50PM 20   the parties or lawyers or witnesses involved in the case, not

21   even to be polite, not even to say hello.  It's important not

22   only that you do justice but you give the appearance of doing

23   justice, and if someone sees you talking to someone else, even

24   if you're just waiting for the elevator, it might arouse

25   suspicion if somebody said I saw one of the jurors talking

1    about to a witness, that means I have to hold a hearing and I

2    have to look into it and see what happened, so don't do it.

3         If someone, a lawyer or a party or a witness, doesn't

4    talk to you, they're not being rude, they're following my

5    instructions as well.  They are trying avoid you as well.

6         Next, I don't know if there's going to be any news

7    stories or articles about this case or anything on the radio or

8    TV or the Internet, but please don't read it, don't listen to

9    it.  If you're interested, if there's a newspaper article, for

12:51PM 10    example, have someone set it aside for you, you can read it

11    when the case is over or you can do whatever Internet searches

12    you want after the case is over.

13         Next, please don't do any research on your own.  Don't

14    consult reference materials, don't do your own investigation,

15    and please, please, please do not look things up on the

16    Internet.  If you think some piece of information is missing,

17    you're not allowed to find that information out on your own.

18         You have to decide this case solely on the evidence

19    presented in court, nothing else, and, again, if you're curious

12:51PM 20    about something, you can look it up later after the case is

21    over.

22         Next, please be respectful of the court, please don't

23    bring food or drink into the courtroom, please don't chew gum

24    during the trial, and please try to dress appropriately.  If

25    during the trial you have a problem of some kind, please raise

1    your hand, we'll try to take care of it.  Sometimes lawyers

2    step between the witness and the jury, sometimes they mumble,

3    sometimes people can't hear, they can't see, they need a glass

4    of water, a Kleenex, they need a quick bathroom break, I'll try

5    to take care of you as best I can, but please just raise your

6    hand, and we'll do the best we can.

7         If you need to communicate with me and we're not in

8    court, please give a signed note to the court security officer

9    to give to me.  Again, these rules are important.  They are

12:52PM 10  designed to ensure that the trial is fair, and I instruct you

11   to follow the rules.

12        All right.  I'm going to permit you to take notes in

13   this case.  The clerk will give you pencil and pads for you to

14   use.  They'll be a number on the cover of the notebook which

15   will be your juror seat number.  I want to give you a couple of

16   warnings about taking notes.  Please don't allow note-taking to

17   distract you from listening carefully to the testimony.  It's

18   very important that you observe the witnesses and listen to

19   them.  Some people like to take lots of notes, some people

12:53PM 20  taken none at all, some take only a few.  It's entirely up to

21   you, but remember the main thing you're here to do is to listen

22   to the witnesses.

23        Please remember that not everything you write down or

24   that someone else writes down is necessarily what was said.

25   Don't assume simply because something is in someone's notes

1    that it necessarily took place in court.

2         One of the things that's very common is people will

3    write down the question and not the answer because they get

4    lost along the way, and they don't remember what the answer is,

5    so notes are an aid to recollection, that's all they are, and

6    just because it's written down doesn't mean it came out that

7    way during the testimony.

8         You should take your notebook to the jury room at

9    every recess.  You cannot take your notes home.  I will have

12:54PM 10   the clerk collect them at the end of each day and place them in

11   the vault.  They'll be returned to you the next morning when

12   the case is over.  Your notes will be destroyed and no one but

13   you will ever look at them.

14        Now, as you can see, we have a court reporter who's

15   creating a record of everything that happens in this trial.

16   Sometimes jurors think that they'll have a transcript of the

17   trial when they go back to the jury room.  That is not true.

18   You will not be given a transcript.  There are a number of

19   reasons for that, but one of the main reasons is just a

12:54PM 20   practical one.  There's not time enough time to prepare one.

21   The court reporter has a difficult job.  It's time consuming to

22   take a raw record, which is what she's creating, and turn it

23   into a final transcript, so you will not have a transcript,

24   and, therefore, you should listen very carefully to the

25   witnesses and take whatever notes you think you might need to

help you remember.

All right. The first step in the trial is going to be the opening statements. We'll do that first thing tomorrow. The government in its opening will tell you the evidence it expects to introduce. Again, the opening statement is not evidence. Its purposes is to help you understand the evidence. The lawyers are not the witnesses.

After the government opens, the defense may, if it chooses, make an opening statement. The government will then put on its evidence. Obviously, the defendant will have the right to cross-examine the government's witnesses, and at the close of the government's evidence, the defense may present evidence if they choose. A defendant again is not required to put on evidence. The defendant is presumed innocent, and the government must prove his guilt beyond a reasonable doubt.

After all the evidence is in, both sides will be given time for final arguments. Again, closing arguments are not evidence. They are statements by lawyers to help you understand the evidence and to reach what the lawyers think is the correct verdict. I.

Will then give you your instructions on the law. You'll then leave the courtroom together to make your decision. You will never have to reveal your deliberation or explain your verdict to anyone.

Now, as I indicated, our normal trial day will be from

1  nine in the morning until one in the afternoon, and you might

2  wonder why we do it that way rather than going all day long.

3  Well, what Judges have found over the years the cases don't

4  really move much faster if we try to go all day.  There are

5  lots of reasons for that.  One reason is that I have other work

6  to do, sometimes on this case, sometimes on other cases, and

7  what happens is the jurors wind up sitting around while I

8  attend to other business, and nobody likes that.

9            It's much easier on parents of school-aged children,

12:56PM 10  it's easier for people with jobs that they can check in with in

11  the afternoon and to keep things going at work, and jurors get

12  tired when we go all day, so do the lawyers.  Lawyers know

13  that, and they tend to put on unimportant witnesses at the end

14  of the day and the trial actually winds up being a little bit

15  longer sometimes.  Cases tend to drag in the afternoon.

16            So we're going to go from 9 to 1 every day, but to

17  make sure that works properly, we have to be disciplined and

18  keep to a tight schedule.  I want to begin every day at 9:00

19  sharp, and that means I want you here early enough to make sure

12:57PM 20  that we start on time.  I know some of you live a ways away,

21  it's a struggle to get here, and I appreciate that, but I do

22  want to start every day at 9:00.

23            We'll take two breaks, one at about 10:30, one at

24  about noon.  It's a chance to stretch your legs, and it will be

25  five minutes long, and we'll go to about 1:00.  When the time

1    comes for you to deliberate, if necessary, you'll meet all day

2    until you reach a decision.  It may not take you that long, but

3    you should plan for that possibility when the day comes.

4         If it looks like we're falling behind, I might require

5    an afternoon session or I might ask that we start earlier or go

6    later.  I won't do that without checking with all of you to

7    make sure it's not a hardship, but it's possible we may need to

8    do that.

9         I'm sorry to say that it's almost December.  That

12:58PM 10   means it might snow, and that can be an issue, as you know.

11   What I'm going to do unless I instruct you otherwise is we're

12   going to follow what the Boston schools do.  If they are closed

13   for the day, we're going to be closed; if they start an hour

14   later, we're going to start an hour later.  I hope it doesn't

15   come to that, and I may modify that, but that will be our plan

16   going forward, and let's hope we don't have any snow over the

17   next two weeks.

18         All right.  I have one last instruction before I let

19   you go.  Under our Constitution, all people are equal before

12:59PM 20   the law.  Everyone accused of a crime is entitled to a fair

21   trial.  If the government has met its burden of proof, you

22   should not hesitate to convict, but you should not hesitate to

23   acquit if you think the government has not.

24         Under all circumstances, you must be screening

25   scrupulously open-minded, honest and fair.  That is your duty

 1    as jurors and your duty as citizens of the United States.

 2    Thank you again for your patience and cooperation, particularly

 3    in light of the length of the trial.  I very much appreciate

 4    it.  I'm going to let you go for the day.

 5         Ms. Pezzarossi will show you to the jury room where

 6    you're to report tomorrow morning, and if it doesn't snow,

 7    we'll start at 9:00 sharp tomorrow morning.

 8         THE CLERK:  All rise for the jury.

 9         (JURORS EXITED THE COURTROOM.)

01:00PM 10    THE COURT:  All right.  Please be seated.  I did issue

 11    the order concerning the show cause order on the

 12    attorney-client privilege.  We'll see whether that happens,

 13    and, again, it makes sense for you to telephone the attorney

 14    and make sure that he's aware of it.

 15         MR. THOMADAKIS:  Your Honor, I sent him an e-mail at

 16    the first break, and I'll follow up with a copy of the order.

 17         THE COURT:  And my working assumption is that we'll

 18    deal with that first thing Wednesday morning unless we have a

 19    different plan.  I do want to meet with counsel every morning

01:01PM 20    at 8:30 just to go over, you know, any anticipated issues.  I

 21    may ask you to come in earlier if it looks like it's longer

 22    than that, but I assume we can start tomorrow at 8:30 with

 23    government's opening and your opening, Mr. Sinnott.

 24         MR. SINNOTT:  Yes, your Honor.

 25         THE COURT:  And you've told the defense the lineup of

1   witnesses anticipated?

2           MR. THOMADAKIS:  Yes, your Honor.

3           THE COURT:  Okay.  Anything else we need to take up

4   before tomorrow?

5           MR. THOMADAKIS:  Not from the government, your Honor.

6           MR. SINNOTT:  No, your Honor, thank you for your

7   attention and patience.

8           THE COURT:  Thank you, all, for your cooperation and

9   professionalism, and I will see you at 8:30.

10          (Whereupon, the hearing was adjourned at

11  1:05 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3     UNITED STATES DISTRICT COURT )

4     DISTRICT OF MASSACHUSETTS ) ss.

5     CITY OF BOSTON )

6

7              I do hereby certify that the foregoing transcript,

8     Pages 1 through 136 inclusive, was recorded by me

9     stenographically at the time and place aforesaid in Criminal

10    Action No. 12-10238-FDS, UNITED STATES OF AMERICA vs.

11    EDWARD LABORIO and JONATHAN FRAIMAN and thereafter by me

12    reduced to typewriting and is a true and accurate record of the

13    proceedings.

14             Dated this 15th day of February, 2016.

15

16                        s/s Valerie A. O'Hara

17             _____

18                        VALERIE A. O'HARA

19                        OFFICIAL COURT REPORTER

20

21

22

23

24

25