1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2

3

4    UNITED STATES OF AMERICA,        )
                                      )
5                    Plaintiff,       )  Criminal Action
                                      )
6                                     )  No. 12-10238-FDS
     vs.                              )
7                                     )
     EDWARD LABORIO and JONATHAN      )
8    FRAIMAN,                         )
                     Defendants.
9

10

11   BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV

12

13                       JURY TRIAL DAY 2

14

15

16            John Joseph Moakley United States Courthouse
                        Courtroom No. 2
17                       One Courthouse Way
                        Boston, MA 02210

18

19                      DECEMBER 1, 2015
                           8:32 a.m.

20

21

22

23                      Valerie A. O'Hara
                      Official Court Reporter
24        John Joseph Moakley United States Courthouse
                 One Courthouse Way, Room 3204
25                     Boston, MA 02210
                 E-mail: vaohara@gmail.com

APPEARANCES:

For The United States:

     United States Attorney's Office, by
VASSILI THOMADAKIS, ASSISTANT UNITED STATES ATTORNEY, and
ERIC P. CHRISTOFFERSON, ASSISTANT UNITED STATES ATTORNEY,
1 Courthouse Way, Suite 9200, Boston, Massachusetts 02110;

For the Defendant:

     Donoghue, Barrett & Singal, by WILLIAM F. SINNOTT, ESQ.
and ELIZABETH MCEVOY, ATTORNEY, Suite 1320, One Beacon Street,
Boston, Massachusetts 02108-3106.

1

<u>I N D E X</u>

2   OPENING STATEMENT BY MR. CHRISTOFFERSON:        2-9

3   OPENING STATEMENT BY MR. SINNOTT:               2-20

4   <u>Testimony of:          Direct  Cross  Redirect  Recross</u>

5   ERIC SAMUELSON
      by Mr. Christofferson 2- 27          2-114
6     by Mr. Sinnott               2-82         2-115

7   MARCI SOLIGO
      by Mr. Thomadakis     2-118

8

9

10

<u>E X H I B I T S</u>

11

    <u>No.     Description                          In Evd.</u>

12
    Nos. 37-2, 65, 69, 70 and 72 through 97        2-33
13
    183                                            2-70
14
    161                                            2-117
15

16

17

18

19

20

21

22

23

24

25

<u>PROCEEDINGS</u>

1

2    THE CLERK:  All rise.  Court is now back in session in

3    the matter of the United States vs. Edward Laborio and

4    Jonathan Fraiman, Criminal Matter 12-10238.

5        Counsel, would you please identify yourself for the

6    record.

7        MR. THOMADAKIS:  Good morning, your Honor,

8    Vasili Thomadakis for the United States.

9        MR. CHRISTOFFERSON:  Good morning, your Honor,

10   Eric Christofferson for the United States.

11       THE COURT:  Good morning.

12       MR. SINNOTT:  Good morning, your Honor,

13   William Sinnott for the Defendant Jonathan Fraiman.

14       MS. McEVOY:  Good morning, your Honor,

15   Elizabeth McEvoy also for the Defendant Jonathan Fraiman.

16       THE COURT:  All right.  Please be seated.  We already

17   have a potential issue with a juror.  The juror in seat 8,

18   Cecelia Brooks, she was the woman who is a contract employee

19   who's doing something with Fidelity apparently asked to speak

08:33AM 20 to the deputy clerk this morning and reported that she assumed

21   that she would be paid for her jury service and found out that

22   she'll only be paid for three days, and she said that's going

23   to work a financial hardship and can she get out of jury duty?

24       I have not spoken with her or done anything, and I

25   just learned that piece of information.  I guess what I would

1  propose to do is to speak to her, tell her that her employer,

2  the only obligation is to pay her for three days, on the other

3  hand, the employer can't take any retaliatory act against her

4  and see what she says. Does anyone have a better plan or a

5  different plan?

6        MR. SINNOTT: No, your Honor. I would imagine this is

7  something that the Court has seen in the past, and I think

8  that's an acceptable protocol.

9        MR. THOMADAKIS: No further suggestions.

08:34AM 10        THE COURT: Okay. I guess I'll have to feel it out.

11  I mean, I think if she's genuinely upset --

12        THE CLERK: She did say I'll stay if I have to, I'll

13  make it work, but it would be a financial hardship.

14        THE COURT: Okay. So we'll just take it a step at a

15  time. Hopefully, again, getting out at one, she'll be able to

16  at least mitigate this somewhat, but we'll find that out, on

17  the other hand, is there anything we need to talk about? Has

18  there been any progress on the attorney-client privilege front,

19  Mr. Thomadakis?

08:34AM 20        MR. THOMADAKIS: I would call it, I would classify it

21  as it good progress. It's been resolved.

22        THE COURT: That's good.

23        MR. THOMADAKIS: I spoke to Mr. Concilla yesterday

24  afternoon. He orally told me that Mr. Lazar is not going to

25  press the privilege issue for the ones that have been produced,

1    so, in effect waiving the issue.  I reviewed them, identified

2    69 that were subject to production.

3            THE COURT:  All as *Jencks* as opposed to Brady or

4    Giglio?

5            MR. THOMADAKIS:  Correct, from my perusal.

6            THE COURT:  Yes.

7            MR. THOMADAKIS:  That's what it looked like to me.

8            THE COURT:  Yes.

9            MR. THOMADAKIS:  Mr. Flynn processed them and we

08:35AM 10    e-mailed them over to Mr. Sinnott last night.

11            THE COURT:  All right.  Happy reading, Mr. Sinnott?

12            MR. SINNOTT:  I haven't had a chance.

13            THE COURT:  Ms. McEvoy, I probably should address that

14    to you.

15            MR. SINNOTT:  We both have given it some attention.

16    Obviously, we'll study it more carefully tonight.  My heart did

17    skip when Mr. Thomadakis said that things had been resolved, I

18    thought the case was about to be dismissed and we suddenly had

19    two weeks available to us, but I appreciate the government's

08:35AM 20    efforts on this, and I appreciate the fact that

21    Attorney Concilla responded ultimately.

22            THE COURT:  All right.  So the numbers, again, 291

23    e-mails of which you determined how many were Jencks?

24            MR. THOMADAKIS:  69.

25            THE COURT:  69.

 1          MR. THOMADAKIS:  Potentially.

 2          THE COURT:  Yes, at least determined that they were

 3   sufficiently potentially Jencks to be turned over.

 4          MR. THOMADAKIS:  I will say a couple more things about

 5   that.  Some of them were, I think even on a quick perusal,

 6   Ms. McEvoy saw the same, they were duplicative of things that

 7   had already been produced to some degree, and within the 69 out

 8   of the 291, I mean, within that universe of 291, there were --

 9   let's put it this way, the 69 e-mails are sometimes threats, so

08:36AM 10   there's 80 e-mails within them, and the other seven were also

11   amongst the 291.  I didn't produce those for the sake of

12   efficiency.

13          THE COURT:  All right.  If there's anything further

14   that needs to be done on that front.

15          MR. SINNOTT:  Nothing, your Honor.

16          THE COURT:  All right.  Otherwise, where are we?

17   Anything to talk about?

18          MR. THOMADAKIS:  Not from the government's

19   perspective.

08:36AM 20          THE COURT:  Okay.

21          MR. SINNOTT:  Nothing, your Honor.

22          THE COURT:  The case hasn't been dismissed, so I think

23   you're stuck at least for the day, Mr. Sinnott.

24          MR. SINNOTT:  I'm going to leave on that note, not

25   come back.

1          THE COURT:  Ms. McEvoy, are you ready to handle the

2    first cross-examination?

3          MS. McEVOY:  Absolutely.

4          THE COURT:  All right.  We'll recess then and start as

5    soon as we have everyone lined up.

6          THE CLERK:  All rise.

7          (A recess was taken.)

8          THE CLERK:  All rise for the jury.

9          (JURORS ENTERED THE COURTROOM.)

09:00AM 10          THE CLERK:  Court is now back in session on the matter

11    of the United States vs. Edward Laborio and Jonathan Fraiman,

12    Criminal Matter 12-10238.

13          Will counsel please identify themselves for the

14    record.

15          MR. THOMADAKIS:  Good morning, your Honor,

16    Vasili Thomadakis on behalf of the United States.

17          MR. CHRISTOFFERSON:  Good morning, your Honor,

18    Eric Christofferson on behalf of the United States.

19          MR. SINNOTT:  Good morning, your Honor, good morning

09:01AM 20    ladies and gentlemen, my name is Bill Sinnott, I represent the

21    Defendant Jonathan Fraiman.

22          MS. McEVOY:  Good morning, your Honor, my name is

23    Elizabeth McEvoy, also for the defendant.

24          THE COURT:  Good morning.  Ladies and gentlemen, thank

25    you for your cooperation and showing up on time so we can start

1    on time.  Two quick things before we start with the opening

2    statements, I forgot to introduce the people who are in the

3    corner over here.  Jurors are curious about that.  I have two

4    law clerks who are recent law graduates who are with me for a

5    year, typically, as well as between one and three interns who

6    are law students who are interning with me for a semester.

7         The second thing I wanted to say is we just had the

8    electronics in this courtroom upgraded.  You probably know that

9    means that they're not going to work the way they're supposed

09:02AM 10    to.  That always happens with an upgrade, so this is the first

11    trial we've had with brand new equipment.  Please let me know

12    if your screens go blank.  We've had some problems with the

13    back row of the screens or if the audio isn't working and you

14    can't hear people.

15         All right.  With that, are we ready,

16    Mr. Christofferson?

17                       OPENING STATEMENT

18         MR. CHRISTOFFERSON:  Thank you, your Honor.  For a

19    year and a half, Edward Laborio and his right-hand man, the

09:02AM 20    defendant, Jonathan Fraiman, squeezed investors out of millions

21    of dollars.  They did this by pitching phony investments in

22    their company, Envit Capital, which they claimed ran a wildly

23    successful hedge fund that was generating huge returns for its

24    investors.

25         They said the hedge fund was using smart strategies to

1    make money, and they said to investors that they would receive

2    regular payments if they invested, but it was all a shame, a

3    fraud.  The so-called hedge fund, it didn't even exist.  They

4    weren't investing the money like they said, and they never paid

5    investors a dime, but the whole time the two men pocketed large

6    sums for themselves.

7         The defendant, Jonathan Fraiman, was a licensed

8    investment advisor who was supposed to look out for his

9    client's best interests.  Instead, he pushed what would

09:03AM 10   generate money for him, not what was good for them, and he did

11   this, as you will hear, even after he was specifically warned

12   not to do it.

13        He continued to trick clients into thinking he was

14   watching out for their best interests, but it was just

15   self-interest behind the slick salesmanship.  The defendant

16   made hundreds of thousands of dollars in those 18 months, but

17   he was never satisfied.

18        Even after government agencies started investigating

19   did the defendant and Mr. Laborio stop?  No.  They just changed

09:04AM 20   the name of the company from Envit Capital to Aetius, and they

21   kept selling, kept deceiving.  Aetius is the next great thing,

22   they said.  But it wasn't the next great thing, it was the

23   exact same thing, same guys, same scam.

24        What's more?  When the Defendant Jonathan Fraiman was

25   confronted by regulators or the government about Envit and his

1  role there, he lied, and in the end, Mr. Fraiman and

2  Edward Laborio defrauded investors out of millions of dollars.

3  When they did this, they committed a crime, and that is why we

4  are here, ladies and gentlemen.

5  The Defendant Jonathan Fraiman and Edward Laborio were

6  charged in an indictment last year with one count of

7  conspiracy, one count of mail fraud.  Now as for Mr. Laborio,

8  as I believe you heard Judge Saylor say yesterday, he passed

9  away earlier this year, therefore, what you'll be deciding at

09:05AM 10  the end of this case is whether the United States has proven

11  beyond a reasonable doubt that Jonathan Fraiman is guilty of

12  the crimes charged.  That said, you'll certainly hear about

13  Mr. Laborio, Mr. Fraiman's co-conspirator, throughout the

14  trial.

15  Now, Mr. Thomadakis and I will be presenting the case

16  through a number of documents and live witnesses, but since

17  each witness can only testify about what he or she actually

18  knows, the evidence will come to you in bits and pieces over

19  the course of the trial, but the evidence is going to show you

09:06AM 20  what happened and how it happened, and in the end what the

21  evidence will show you is that the Defendant Jonathan Fraiman

22  both conspired to defraud investors and, in fact, defrauded

23  them.

24  Edward Laborio founded the company called Envit

25  Capital in Boston before he recruited and then hired

1    Jonathan Fraiman to help him sell investments in Envit.  What

2    was Envit's business supposed to be?  Well, they claim it was a

3    company that ran a hedge fund.  That's sort of a company that

4    pools a bunch of money from institutions, like pension funds,

5    but also from wealthy people, individual people, sometimes

6    called accredited investors to make investments in stocks and

7    other things in the hopes of generating big returns.

8          In its promotional materials, Envit claimed it was

9    doing precisely that, making big returns for its investors by

09:07AM 10   investing in things like stocks and real estate, but there was

11   no hedge fund.  It existed only on paper, and in the words of

12   its most successful salesman, the Defendant Jonathan Fraiman.

13         At the beginning of 2008, Envit had only a few

14   employees, and the operation was pretty simple.  Laborio was

15   looking for employers who could convince people to give Envit

16   money in exchange for shares, common stock of Envit Capital,

17   which was the parent company of this alleged hedge fund.  He

18   found his ideal man in Jonathan Fraiman.

19         The defendant quickly distinguished himself both

09:07AM 20   because he had a professional license that others didn't, a

21   professional financial license, but also because he was a

22   clever salesman.

23         One of the first things that the defendant did was to

24   put together a two-page document that summarized the so-called

25   hedge fund that Envit was touting.  Among other things, the

1  document falsely advertised to investors that the imaginary

2  Envit hedge fund was generating returns of over 43 percent,

3  much, much higher than the overall stock market itself.  You'll

4  see that the document also falsely described the types of

5  things that the hedge fund was investing in.

6           Fraiman's real skill the evidence will show was on the

7  phone.  He was aggressive, he was the consummate closer.  In

8  fact, so that Fraiman could concentrate on closing deals, they

9  hired a number of cold callers and cycled through them.  They

09:08AM 10  created a boiler room.  They gave these cold callers the names

11  and phone numbers of investors, potential investors, something

12  that was called a lead or leads that they had purchased.

13           These cold callers would then call these individuals

14  to try to find out whether they might invest in Envit, and if

15  they found somebody, they would pass it along to a closer, like

16  Jonathan Fraiman, the defendant, and the defendant was far and

17  away the most successful at closing deals.

18           In fact, during his run at Envit, the defendant

19  brought in close to $2 million by himself.  Now, over time, the

09:09AM 20  details of these investments in Envit, the things that they

21  refer to as private placements of stock that the defendant

22  pitched evolved.  As sales of the original pitch started to dry

23  up, they came up with something that was called preferred stock

24  in Envit.

25           The selling point of this preferred stock was that it

1    came with a dividend, a fixed payment based on the amount of

2    money that the individual investor owned in terms of stock,

3    kind of like interest on a loan.  The defendant was promising

4    that money equal to 8 and a half to 10 percent of what the

5    investor had given them would be paid back to them, would be

6    paid out to them regularly.

7         The money to pay these dividends had been set aside,

8    they said.  It was guaranteed, the defendant said, and you'll

9    hear that the selling point really did its job, a guaranteed

09:10AM 10   return of eight and a half or ten percent regardless of how

11   well the stock itself was doing.  It's a darn good return for

12   your money, and the investors to whom the defendant made these

13   promises were hooked.

14        The evidence will show that the defendant knew that

15   there was no prospect of these dividends being paid.  There

16   were no dividends, no payouts.  Mr. Fraiman got his money, to

17   be sure, but his investors got nothing.

18        When the investors started asking questions, the

19   defendant gave them false assurances that the dividends were on

09:10AM 20   their way, that they would be coming soon, that Fraiman and

21   Laborio never paid a dividend to anyone, ever.

22        Now, another part of the plot, the evidence will show,

23   is their creation of something called Envit Private Wealth

24   Management, which the Defendant Jonathan Fraiman was in charge

25   of.  The defendant used his status as a licensed investor to

1    market himself and Envit to get people to agree to let him

2    manage their money, like professionals at Ameriprise or Charles

3    Schwab would do when they try to figure out what mix of stocks

4    or bonds or mutual funds is right for a particular investor.

5        As an investment advisor, the defendant was duty-bound

6    to place his clients' interests above his own, but instead of

7    doing that and figuring out what investments were right for his

8    clients, Fraiman simply continued to push what was good for

9    him, investments in Envit, a company running a fake hedge fund.

09:12AM 10    It was investments in Envit for which Jonathan Fraiman made his

11    money, for he got a percentage of every dollar that came

12    through the door.

13        The defendant did this even after he was specifically

14    warned not to do it.  You'll hear from an investment

15    professional with many years of experience in the financial

16    industry, including in the areas of investment advising and

17    stock brokers.  Laborio and Fraiman were considering hiring

18    this man to work at Envit, but he never worked there.

19        In fact, he sent Mr. Laborio and Mr. Fraiman an e-mail

09:12AM 20    where he pointed out, first, that the company didn't even have

21    any revenues, and, second, detailing the number of bad

22    practices that he saw that they were engaging in, including

23    telling clients to use their retirement money to purchase stock

24    in Envit, the company that the investment advisor, the

25    defendant himself, was working for, but the defendant didn't

1  stop.  He kept doing precisely that.  He was a salesman.  He

2  was a good one.  In inducing one couple, Dallas Musgrave and

3  his wife Rosalee from Texas to invest in Envit, the defendant

4  repeatedly reminded them that he owed them a fiduciary duty,

5  assuring them that he would put their financial interests above

6  his own, promising them a safe guaranteed 10 percent dividend

7  he got them to part with $200,000 of their money, and the

8  defendant's false assurances about this safe investment even

9  convinced the Musgraves to invest an additional $145,000 of

09:13AM 10  Mrs. Musgrave's 94 year-old mother.  The dividend never came,

11  and the money was gone.

12         Now, you'll hear from another Envit employee who was

13  an investment advisor recruited in the fall of 2008 to work

14  under Mr. Fraiman.  Mr. Fraiman and Mr. Laborio instructed him

15  to solicit investments in Envit from the people whose money he

16  was managing by promising that guaranteed dividend, but when

17  that guy began questioning what was really happening and

18  realized that a dividend was never going to be paid, he quit.

19         Another employee will describe how it became clear to

09:14AM 20  him after a while that something was wrong at Envit, that Envit

21  was not what it appeared to be, and he quit, too.

22         The Defendant Jonathan Fraiman, he never slowed down.

23  He was able to convince investors to make multiple investments

24  in Envit over the course of time.  He was such a skilled

25  salesman that he tricked one investor, Eric Samuelson, into

1   making six different investments into Envit for a total of

2   $640,000.  Mr. Samuelson never saw a dime of his money again.

3           Now, dividends and investment advice were not the only

4   false selling points that Mr. Laborio and Mr. Fraiman used,

5   like their bogus claim that Envit had actually purchased an

6   Irish meat company called Rib World that they claimed was about

7   to make a huge splash in the United States market and a big

8   increase in Envit's portfolio.  They didn't purchase an Irish

9   meat company.

09:15AM 10          Now, May and June of 2009 marked the beginning of the

11  end of Envit but not the scheme.  An industry regulator stepped

12  in and suspended trading of Envit's public shares on the open

13  market, and shortly thereafter Charles Schwab, whom Envit had

14  hired to keep track of the stock that they were selling to

15  investors, Charles Schwab terminated its relationship with

16  Envit, and it sent notices to all the investors, the people who

17  had been duped, that it was terminating that relationship.

18          These developments, as you might imagine, prompted

19  some anxious and angry phone calls from Envit investors.

09:16AM 20  Rather than come clean, the defendant repeatedly assured the

21  investors that all was well, the company was in even better

22  shape now, their investments were safe.

23          Of course, that wasn't true, but now the Envit brand

24  had been tainted, and Fraiman and Laborio wanted to keep the

25  money coming in, so what did they do?  Overnight, all of a

1    sudden, the company that they were selling was no longer Envit,

2    it was Aetius.  Aetius, they said was different, a great new

3    opportunity.

4          Well, it was a new name, but it wasn't new.  It was

5    just business as usual, the same office, the same people, the

6    same pitch, the same scheme, and the money continued to roll

7    in.  To Mr. Fraiman and Mr. Laborio, that was a good thing

8    because they needed the money to pay for the attorneys that

9    they had hired to deal with the government regulator that was

09:17AM 10   looking into Envit.

11          Ladies and gentlemen, the evidence will show you that

12   the defendant knew that this was all a sham.  Not only did he

13   give false information to investors, when he was confronted

14   about his role at Envit, he did the same thing.

15          You'll hear that in March of 2009, an industry

16   regulator called Mr. Fraiman to ask him about Envit and his

17   role there, and despite being the most prolific salesman at

18   Envit, he said he had never sold or even offered shares in

19   Envit.

09:17AM 20          Later on when he spoke to government agencies, the

21   fabrications continued.  The defendant said he never promised a

22   dividend to anyone, but you'll hear from multiple investors

23   that he did exactly that.  He said he never told anyone that

24   Envit had purchased Rib World, that meat company, but you'll

25   hear that he did.  He also claimed that he knew nothing of

1    Envit's advisory board or whether one even existed, and, yet,

2    the defendant himself offered a spot on that advisory board to

3    his biggest investor as he was trying to raid more money from

4    the man.

5         During the trial, you'll also hear from and about

6    other people who worked at Envit.  These will include other

7    salespeople as well as administrative staff.  Their testimony,

8    along with the rest of the evidence, will show you that while

9    Laborio was in charge, it was the defendant, Jonathan Fraiman,

09:18AM 10    who stood out from the others there alongside him.  The

11    defendant was different.

12         It was the Defendant Jonathan Fraiman who made the

13    most money.  It was the Defendant Jonathan Fraiman who made the

14    most sales.  It was the Defendant Jonathan Fraiman who teamed

15    up with Mr. Laborio to close the big sales.  It was the

16    Defendant Jonathan Fraiman who went down to Texas with

17    Mr. Laborio in an attempt to buy the client list of a retiring

18    investment advisor.

19         It was the Defendant Jonathan Fraiman who was the

09:19AM 20    licensed investment advisor.  It was the Defendant

21    Jonathan Fraiman who was put in charge of the investment

22    advisor operation at Envit, a position that helped them sell so

23    much Envit stock and take so much money.  It was the Defendant

24    Jonathan Fraiman who lied when confronted about his role at the

25    company, and it was the Defendant Jonathan Fraiman who stayed

1 right by Mr. Laborio's side to the end when the company finally

2 closed.

3         Ladies and gentlemen, the evidence will show that the

4 Defendant Jonathan Fraiman and Edward Laborio together took

5 millions of dollars from investors by convincing them to invest

6 in an illusion, an illusion cloaked in an impressive sounding

7 jargon like dividends and hedge fund and wrapped in the promise

8 of big, financial returns.  It was a conspiracy, it was a

9 fraud, and it was a crime.

09:20AM 10         At the conclusion of this case, my colleague,

11 Mr. Thomadakis and I will have the opportunity to address you

12 again, and at that point after you've heard from all the

13 witnesses and seen all of the evidence, we will ask that you

14 return a verdict finding the Defendant Jonathan Fraiman guilty

15 as charged.  Thank you.

16         THE COURT:  Thank you, Mr. Christofferson.

17 Mr. Sinnott.

18                 OPENING STATEMENT

19         MR. SINNOTT:  Thank you, your Honor.  Good morning,

09:21AM 20 folks.  My name is again is Bill Sinnott.  I'm an attorney with

21 the law firm of Donahue, Barrett & Signal here in the City of

22 Boston, and with me is Attorney Elizabeth McEvoy, and the two

23 of us have the great privilege of representing

24 Jonathan Fraiman.  Thank you, Jon.

25         I was relieved when the opening statements were put

1    over till this morning, and you probably were as well at the

2    end of jury selection yesterday.  It's a long morning, it's

3    exhausting for everyone involved, but the primary reason I'm

4    glad that we're here today is you're here fresh, you're here

5    alert, you're here in a position to ask questions in your mind

6    as to everything you hear.

7         You're beyond your turkey tryptophan hangover, you're

8    beyond your staying up late to watch the Patriots lose in

9    overtime, all of those things are behind us, and we can focus

09:22AM 10    on this case.

11         The defendant deserves it, his family, who's in from

12    Alaska deserves it, the government deserves it, and the system

13    demands it, and that's why it's so important that you ask the

14    questions.  If you listen to the evidence as it comes in rather

15    than my Brother attorney, Mr. Christofferson's broad

16    pronouncements, right-hand man, they decided this, they did

17    that, you're going to find out that that's just not the case.

18    You're going to find out that this is a different trial than

19    the one that the government would have you believe.

09:22AM 20         I'm a country music fan, I'm probably one of four in

21    the City of Boston, but there's something about country music I

22    like, it's reassuring, there's songs about values, there's

23    songs about real life, and one of my favorite song is a song

24    that come out a few years ago called *Where Were You When the*

25    *World Stopped Turning?*  It's by a country singer named

1    Alan Jackson, and the song is about September 11th, 2001, and

2    the theme of that song is where were you when the world stopped

3    turning, and Jackson goes on to describe a bunch of scenarios,

4    were you dropping your kids off at school, were you working in

5    a studio in L.A., and then the effect that that day had on all

6    of us whose world stopped turning.

7         For my client, the world stopped turning on

8    August 27th, 2014.  On that day, he was asleep on his couch in

9    his apartment in San Diego, and you'll hear evidence to this

09:24AM 10   extent, holding his baby in his arms, three-month old baby on

11   the couch, and at six o'clock in the morning, six agents from

12   the Federal Bureau of Investigation, armed agents, came into

13   his apartment, woke him up, arrested him.  I should say, they

14   woke him up by pounding on his door and he answered the door.

15   His girlfriend was crying, his baby was crying, and my client's

16   one concern was that he not be handcuffed in front of his baby,

17   a concern that was not honored by the FBI agents, but they have

18   a job to do, and this isn't about that.

19        My client was placed in custody and this cycle began,

09:25AM 20   and the cycle is where we are today, but if we don't go back, I

21   can't tell you where we're going, and I can't tell you what you

22   should be looking for as we proceed through this case.

23        It wasn't supposed to be this way.  My client

24   graduated from Homer High School, and if you haven't heard of

25   Homer High School it's because it's in Alaska and then went to

1    the University of Massachusetts at Amherst.  He came from a

2    very tight-knit family.  He worshipped his older brother.  He

3    wanted to be like him, a big success in the hedge fund

4    business.

5        So after UMass, my client embarked on a series of

6    low-level, support-type jobs in the financial services

7    industry, but he always distinguished himself because he was

8    the hardest working guy wherever he went.  He'd showed up

9    before everybody else, he left after everybody else, he took it

09:26AM 10   very, very seriously even in those low-level support jobs.

11       Then he went to a firm in Early 2007 called AXA in

12   Wellesley, and, once again, he worked hard, and he worked hard

13   to get to his licenses to become a broker, a Series 7, his

14   Series 66, and working on his own time, he got those licenses.

15       And then within just a few months being licensed as a

16   baby broker, he sees an ad on Craigslist, and the ad on

17   Craigslist is for a hedge fund trainee position, so he

18   responds, he sends his resume' in, he's cautiously optimistic,

19   he's excited, and he's called in for an interview, and the

09:27AM 20   interview is with an individual named Edward Laborio.

21       Edward Laborio meets Mr. Fraiman at a beautiful office

22   suite in Boston, well appointed, well decorated, tasteful,

23   opulent.  It's not his, but my client doesn't know that, and

24   unbeknownst to my client, this meeting is a very bad thing.

25   Now, it seems to go very well.  Laborio is confident, he's

1    charismatic, he talks about his previous jobs, he's in control,

2    he's got a great presentation, a great pitch.  He shows

3    Mr. Fraiman a private placement memorandum, which you'll see in

4    the course of the evidence being presented, and it will just

5    knock your socks off.

6         This 2007 memorandum contains that figure that my

7    Brother attorney just showed you, that 43 percent figure, and

8    my client, the baby broker, who had been licensed for all of

9    seven or eight months at that point says this is exciting, this

09:28AM 10   is important, this is a great place to go, and he's shown a

11   brochure, and that brochure lists all of the advisors for Envit

12   Capital.

13        It describes in the brochure the fact that their legal

14   counsel is Bingham McCutchen, a very reputable law firm.  Other

15   information appears in there establishes its bona fides, and my

16   client is smitten, and my client decides this is a place to go.

17        So he leaves a promising career at AXA in Wellesley,

18   and he starts working for Laborio in Boston.  Unfortunately,

19   that presentation that my client witnessed from Edward Laborio

09:29AM 20   which would be used to convince a number of victims in this

21   case to part with their hard earned-money, Laborio would use

22   that presentation to convince a number of young men to come to

23   work for him in the hard sell, hard living, hard partying,

24   boiler room environment in Boston and in Boca Raton, Florida,

25   but that presentation was a sham.

1          That guru Laborio was a con artist, and that dream

2     come true for my client turned into a nightmare.  It turned

3     into a nightmare because no one was Edward Laborio's right-hand

4     man, and the evidence will show you that.  No one knew what

5     Edward Laborio was doing with his money, and nothing the

6     government will show you is going to dispute that fact.  No one

7     knew on what basis Edward Laborio came up with these numbers or

8     these decisions, and my client, fresh from getting his

9     brokerage license, was unfortunately fair game.

09:31AM 10          Now, in the course of this trial, you're going to hear

11    from government witnesses, government witnesses on whom this

12    indictment relies, on whose information this indictment was

13    built, and you're going to hear if they tell the truth that

14    those witnesses were doing the same things that the government

15    says were bad for Jonathan Fraiman.

16          You're going to hear that those government witnesses,

17    a couple of who are testifying under immunity, were doing the

18    same things as Jonathan Fraiman, and the government does not

19    claim that anything they were doing was illegal, and the

09:32AM 20    individual that my Brother referenced in Ohio, Matthew Lazar is

21    his name, what Mr. Christofferson didn't tell you he's a

22    disgraced broker.  He had a history of regulatory violations

23    before he was hired at Envit and after he was hired at Envit,

24    and what my Brother didn't tell you is that Lazar was making

25    guarantees to customers, and my client told him don't do it,

1    there are no guarantees, and you'll see evidence of that.

2         So the government can talk about right-hand men eight

3    years, seven years, six years after the facts in this case, the

4    events in this case.  They can spin a new yarn, they can

5    repackage the story, but that doesn't make it true.  And maybe

6    you'll hear about bad brokerage practices on the part of my

7    client and others, but you're going to find out that he

8    addressed those with the SEC.

9         He gave up his license to be a broker, but those bad

09:33AM 10   brokerage practices, if that was the case, are not a crime, and

11   the government is going to be asking you to leapfrog from

12   regulatory violations to a criminal conspiracy.

13        And it's easy for the government to do that.  They

14   present their case to the grand jury and to you, but you are

15   the safeguard on whether that's a legitimate process in this

16   case on whether that indictment rings true.  It's you who will

17   decide whether that nightmare ends with this trial or whether

18   it continues, so please ask those tough questions.  Be alert.

19   Pay attention to everything that's said.  It's going to be an

09:34AM 20   exhausting process, but it's a process that my client, the

21   government and our system of justice need and demand, and I

22   know that because you're sitting here, it's a job that you're

23   willing to do, and we need you to do that.

24        So as you address the evidence in this case, I want

25   you to look at some of those questions.  Some of those

1    questions are:

2         What was this witness doing that wasn't the same that

3    Mr. Fraiman was doing?

4         What is this witness trying to get out of cooperating

5    with the government?

6         Does this make sense that this witness is someone that

7    the government would rely, put their hopes and aspirations for

8    this indictment on?  Ask those questions.

9         And at the conclusion of this case, I'm confident that

09:35AM 10   you are going to find that Mr. Fraiman did not conspire to

11   commit a crime and that he's innocent of the offenses charged

12   in this case.  Thank you very much.

13        THE COURT:  All right, thank you, Mr. Sinnott.

14        All right.  Mr. Christofferson.

15        MR. CHRISTOFFERSON:  Your Honor, the United States

16   calls Eric Samuelson.

17        ERIC SAMUELSON, having been duly sworn by the Clerk,

18   testified as follows:

19                      DIRECT EXAMINATION

09:37AM 20   BY MR. CHRISTOFFERSON:

21   Q.   I think I've finally squared myself away here.  Good

22   morning, sir.

23   A.   Good morning.

24   Q.   Would you please state your full name and spell your last

25   name for the court reporter.

1  A.   Eric R. Samuelson, S a-m-u-e-l-s-o-n.

2  Q.   And where do you live, sir?

3  A.   Urbana, Ohio.

4  Q.   How old are you, sir?

5  A.   Sixty-five.

6  Q.   What do you do for a living?

7  A.   I'm a general contractor, an engineer.

8  Q.   For what company?

9  A.   A.G. Samuelson Company.

09:38AM 10  Q.   A.G. Samuelson Company?

11  A.   Yes, sir.

12  Q.   Is that a family company?

13  A.   Yes.

14  Q.   Who founded that company?

15  A.   My grandfather, A.G. Samuelson.

16        THE COURT:  Could I get you to either move the mic

17  back a little bit or yourself back.  You don't want to be too

18  close or too far away.  Thanks.  Okay.  Go ahead.

19  Q.   I'm sorry.  You're saying your grandfather founded it?

09:38AM 20  A.   Yes, A.G. Samuelson.

21  Q.   When was that?

22  A.   1917.

23  Q.   How long have you been with the company?

24  A.   Forty-three years.

25  Q.   And what's your position within that company?

1   A.   I'm the president.

2   Q.   And, just briefly, what type of contracting does it do?

3   A.   We do heavy industrial construction, heavy machinery

4   moving, heavy foundation installations, factory additions.

5   Q.   And what's your educational background, briefly, sir?

6   A.   Engineering degree from Purdue University and an M.B.A.

7   from Ball State University.

8   Q.   Mr. Samuelson, do you recall at some point being

9   approached about potentially investing in something called

09:39AM 10   Envit Capital?

11   A.   Yes.

12   Q.   And when was the first time you heard of Envit Capital?

13   A.   It was in late 2007.

14   Q.   And how did you hear about it?

15   A.   I heard it from Mr. Edward Laborio contacted me.

16   Q.   How did he contact you?

17   A.   He contacted me by telephone.

18   Q.   And what do you remember about that telephone call?

19   A.   I remember he said that he had an investment he'd like me

09:39AM 20   to look at, and he told me that he had been involved in Chicago

21   Investment Group in Boston and that he knew of some of my other

22   investments.

23   Q.   So let me ask you a couple questions about that.  You

24   mentioned Chicago Investment Group.  What was that?

25   A.   It was an investment company out of Chicago, and I had

1    worked with people from that office in Chicago and made some

2    investments with them previous to this time.

3    Q.   Had you ever spoken with Mr. Laborio before?

4    A.   No.

5    Q.   Did you even know who he was?

6    A.   No.

7    Q.   You mentioned that he talked about some of your other

8    investments; is that right?

9    A.   Yes.

09:40AM 10    Q.   What specifically do you remember?

11    A.   He spoke of one particular investment called Zynex.

12    Q.   What was that?

13    A.   Well, its spelled Z-y-n-e-x.  It's a company that still

14    exists today.  It's a company that manufactures advanced

15    medical devices.

16    Q.   How successful was that investment for you?

17    A.   It was very successful.

18    Q.   How much did you make, approximately?

19    A.   About two and a half million dollars.

09:40AM 20    Q.   And at that time when you're speaking with Mr. Laborio,

21    what did you understand he was asking you to invest in?

22    A.   He was asking me to invest in a company that was called

23    Envit, and it was a company that he described as a company that

24    would be a diversified investment company that would invest in

25    many different things that it already was doing actually

1   because it was formed in 2006.

2   Q.   At that point in late 2007, did you invest any money in

3   Envit?

4   A.   Yes.

5   Q.   In 2007?

6   A.   No, not in 2007, no.

7   Q.   Eventually did you invest?

8   A.   Yes.

9   Q.   When did you later get in contact with Envit Capital,

09:41AM 10   anyone from Envit Capital?

11   A.   After Laborio, I received a call from Edward Laborio again

12   with Jonathan Fraiman, and they talked to me about the

13   opportunities that were still available with the investment.

14   Q.   In Envit?

15   A.   That I had already received a prospectus from

16   Edward Laborio, so I knew about it.  I had read the prospectus,

17   the memorandum or the proposal.

18   Q.   Who was on this call?

19   A.   Jonathan Fraiman and Edward Laborio.

09:42AM 20   Q.   Together?

21   A.   Yes.

22   Q.   Do you remember approximately when this call was, just

23   approximately?

24   A.   It was in 2008.

25   Q.   Okay.  We'll look at some documents in a bit.

1    A.    Okay.

2    Q.    But when you spoke with him, Mr. Fraiman and Mr. Laborio

3    in 2013, did you, excuse me, in 2008, excuse me, 2008?

4    A.    Yes.

5    Q.    In 2008, did you also speak with him again about -- with

6    the two men about Chicago Investment Group and the Zynex

7    investment that you had previously made?

8    A.    Well, after I had read a prospectus, I seemed pretty

9    interested, and they told me that this investment,

09:43AM 10   Mr. Samuelson, is going to be much better than Zynex.

11   Q.    And how much had you made in Zynex?

12   A.    Two and a half million dollars.

13   Q.    And what effect, if any, did their reference to Zynex and

14   the Chicago Investment Group have on your interest in

15   investing?

16   A.    Well, since I had checked with my people from Chicago

17   investments and they knew of Edward Laborio, they didn't really

18   ever know him, but they acknowledged that he was someone that

19   they knew from Chicago Investments Group, and that gave him

09:43AM 20   credibility along with the fact that the prospectus seemed very

21   interesting.

22          MR. CHRISTOFFERSON:  Your Honor, at this point the

23   government would be introducing a series of exhibits that the

24   defense has agreed upon, and for purposes of reading them into

25   the record, I'd like to do that now, if that's all right now.

1          THE COURT:  You mean offering them?

2          MR. CHRISTOFFERSON:  Yes, excuse me, offering them.

3          THE COURT:  What exhibits?

4          MR. CHRISTOFFERSON:  Exhibit 37-2, Exhibit 65,

5    Exhibit 69 and 70 and Exhibits 72 through 97.

6          THE COURT:  All right.  No objection, Mr. Sinnott?

7          MR. SINNOTT:  No, your Honor.

8          THE COURT:  All right.  They may be admitted 37-2, 65,

9    69, 70 and 72 through 97.

09:44AM 10          MR. CHRISTOFFERSON:  Thank you, your Honor.

11          (Exhibit Nos. 37-2, 65, 69, 70 and 72 through 97 was

12    admitted into evidence.)

13    Q.   Now, I'd first like to -- Mr. Samuelson, I should have

14    mentioned this.  There are also hard copies of all of these

15    documents in front of you in those folders.  They're labeled.

16    You should feel free to look at those copies or on the screen

17    as I'm going to be showing you the documents on the screen as

18    well, okay, But whatever you prefer to look at is fine.

19    A.   Okay, thank you.

09:45AM 20    Q.   I'm showing you first what's been marked as Exhibit 70.

21    Do you recognize this document?

22    A.   Yes.

23    Q.   And what is it?

24    A.   After we spoke on the telephone, I received this letter

25    from Mr. Fraiman, and he was following up and sent me another

1  copy of the prospectus.

2  Q.   All right.  What's the date on this letter?

3  A.   It's March 13, 2008.

4  Q.   And do you see the first sentence there says, "It was a

5  pleasure speaking with you today."  Do you see that?

6  A.   Yes.

7  Q.   Does that refresh your recollection as to the approximate

8  date of the phone call you had with Mr. Fraiman and

9  Mr. Laborio?

09:45AM 10  A.   Yes, yes.

11  Q.   Okay.  And you mentioned that it says it enclosed the

12  requested prospectus.  I wanted to ask you one other thing on

13  this letter before we get to the prospectus.  It says, our

14  prime broker is Goldman Sachs, one of the largest securities

15  firms in the nation.  Do you see that?

16  A.   Yes.

17  Q.   Did you make note of that when you read this letter?

18  A.   Yes, that was one of the things I looked at in order to

19  make my decision, yes.

09:46AM 20  Q.   And why was that?

21  A.   Well, it's a credible broker, and in order to have a

22  company that operates correctly, you need a good broker and

23  other professional to help you, and that was one of them.

24  Q.   Okay.  I'd now like to take a look at Exhibit 65.  Do you

25  see this document, sir?

1   A.   Yes.

2   Q.   And what is this document?

3   A.   That is the memorandum or the prospectus, as I called

4   them, that I received from Jonathan Fraiman.

5   Q.   And what do you mean by prospectus?

6   A.   Well, a prospectus would be a word that's used to describe

7   a proposal that someone gives you to look at to determine

8   whether or not you want to invest in the company or they call

9   them memorandums also.

09:47AM 10   Q.   And you see there's a date up here, October 20th, 2007?

11   A.   Yes.

12   Q.   And the document itself, sir, is it a relatively long

13   document?

14   A.   Yes.

15   Q.   And we won't, I assure you, be reading every page of this

16   document this morning, we would be here for quite a long time,

17   but I did want to ask you about a couple of pages, if that's

18   okay?

19   A.   Okay.

09:47AM 20   Q.   And again, feel free to use the hard copy if that's

21   easier, but, in particular, what I wanted to do is go to

22   page 7, and there's a section that says, "Executive Summary."

23   Do you see that?

24   A.   Yes.

25   Q.   And in particular there are a few paragraphs there, and

1   you see it says, "Our company, we raise, invest and manage

2   privately equity funds, hedge funds and alternative investment

3   vehicles"?

4   A.   Yes.

5   Q.   Did you read this section of the document when you got it?

6   A.   Yes.

7   Q.   Was it consistent with what you understood this company to

8   be about?

9   A.   Yes.

09:48AM 10   Q.   Based on your conversations?

11   A.   Yes.

12   Q.   There are a number of other paragraphs here, one, for

13   example, says, "Envit intends to be listed on the NASDAQ

14   over-the-counter bulletin board or subsequently any

15   publicly-traded exchange that the Board of Directors deems

16   appropriate."  What was your understanding about whether Envit

17   Capital at this point was a private company vs. a public

18   company that is publicly traded?

19   A.   Well, at this point I assumed it was a private company

09:49AM 20   that would be listed later publicly.

21   Q.   Do you recall at some point having discussions with

22   Mr. Fraiman and Mr. Laborio about the company going public?

23   A.   Yes.

24   Q.   Now, the last piece of this page I wanted to ask about was

25   the last paragraph, "We plan to grow our assets under

1   management significantly to an estimated $1 billion dollars or

2   a 96.8 percent compounded annual growth rate."  Was that

3   something that you noted when you read this document?

4   A.    Yes, I did.

5   Q.    Why?

6   A.    Well, because it sounds like a great company to invest in

7   if they're going to grow their assets that significantly, and,

8   plus, the company had been in business since 2006, so some of

9   this action had already been taking place.  It was my

09:50AM 10   understanding that was true.

11   Q.    Now, if we go to one other page of this document, page 18

12   at the bottom.  Do you see it's labeled, "Management"?

13   A.    Yes.

14   Q.    And under key personnel, who is listed there?

15   A.    Edward Laborio.

16   Q.    And was this something you took note of when you invested?

17   A.    Yes.

18   Q.    Why is that?

19   A.    Well, his expertise was going to be involved in this

09:50AM 20   company personally, which was, I think, a great thing because

21   most of the investments you get into that are like this, you

22   don't have that type of situation where the people that are

23   trying to the money are also in charge and going to be the ones

24   that are going to go through and manage the money that you give

25   them personally, with those kind of credentials, that is.

1   Q.   Let me ask you about the second part of this page,

2   "Advisory Board."  Do you see that?

3   A.   Yes.

4   Q.   And it reads:  "The company has created an advisor board

5   of talented individuals who can help the company grow its

6   business."  Did you take note of this list and description of

7   people when you read the document?

8   A.   Yes.

9   Q.   Why?

09:51AM 10  A.   Well, when I read it, I thought this is another great

11  board of people to have as advisors, and I read about their

12  diversification.  In other words, one person was involved with

13  one type of business, another person another one, et cetera,

14  all the way through all five of them.  I think that the fact

15  that he had these people on board with him made it even more

16  lucrative for me to invest in this company.

17  Q.   Did you believe that this advisory board actually had

18  activities, was meeting, that sort of thing?

19  A.   Oh, yeah, sure.

09:52AM 20  Q.   Now, I believe you already mentioned this, Mr. Samuelson,

21  but at some point after reviewing this prospectus, did you

22  decide to actually make an investment in Envit?

23  A.   Yes.

24  Q.   And how much did you invest at first?

25  A.   $50,000.

1    Q.   I want to show you what has been marked as Exhibit 69.

2    A.   Yes.

3    Q.   Do you see this?

4    A.   Yes.

5    Q.   And what is that?

6    A.   That's the $50,000 investment I made with Envit Capital.

7    Q.   On what date?

8    A.   On 4-7-08.

9    Q.   Was this $50,000 the only investment you made in Envit

09:53AM 10   Capital?

11   A.   No.

12   Q.   How much did you invest in total?

13   A.   In Envit Capital itself?

14   Q.   In Envit Capital and then later Aetius, which we'll get

15   to.

16   A.   $640,000.

17   Q.   So, if we go to the next page, there's another check.  How

18   much is that one?

19   A.   That's $150,000.

09:53AM 20   Q.   On what date?

21   A.   5-22-08.

22   Q.   And the next?

23   A.   That's $100,000 on 10-16-08.

24   Q.   And the next?

25   A.   It's $150,000 on March 31st, 2009.

1  Q.   The next check?

2  A.   $100,000 on 6-4-09.

3  Q.   The next check?

4  A.   $50,000 on 6-17-09.

5  Q.   And the last check?

6  A.   The last check to Aetius Group for $40,000 on 8-31-09.

7  Q.   Now, Mr. Samuelson, in preparation for your testimony

8  today, did you see a chart that was constructed summarizing

9  these investments?

09:54AM 10  A.   Yes.

11       MR. CHRISTOFFERSON:  May I approach, your Honor?

12       THE COURT:  Yes.

13  Q.   Let me put this also up on the screen.  Is this the chart

14  that you looked at in preparing for today?

15  A.   Yes.

16  Q.   And does this chart accurately record the information we

17  were just looking at in terms of your investments over time?

18  A.   Yes.

19  Q.   So I want to look at each one of these investments, and

09:55AM 20  we'll start with the first one.  With respect to the $50,000 on

21  April 7th, why did you decide to make this initial investment

22  in Envit Capital?

23  A.   Well, after reading the memorandum or the prospectus and

24  looking at the fact that the company had been in existence for

25  two years already and looking at the people that were going to

1    be involved to manage it, I decided it was a great investment

2    opportunity because they were going to work on diversified type

3    investments and also to manage them personally.

4    Q.    Who was your primary contact at Envit over the course of

5    your investment relationship with the company?

6    A.    Jonathan Fraiman.

7    Q.    With respect to this first investment, I'd like to look at

8    Exhibit 74.  Do you recognize this document, sir?

9    A.    Yes.

09:56AM 10    Q.    And what is it?

11    A.    It's a letter from Jonathan Fraiman that confirms that I'm

12    going to make a purchase of Envit Capital of $50,000, and it

13    instructed me who to make the check payable to and where to

14    send it.

15    Q.    And do you see when you're talking about where to send it,

16    it says mailing address, Envit Capital in Boston?

17    A.    Yes.

18    Q.    And how did you send your check?

19    A.    FedEx.

09:57AM 20    Q.    And, again, there's another copy of that check we were

21    looking at before; is that right?

22    A.    Yes.

23    Q.    Now, in order to make this investment official, did you

24    sign any documentation?

25    A.    Yes.

1   Q.   I'm going to show you Exhibit 75.  What is this document?

2   A.   That's a document, it's a subscription agreement that

3   should be signed along with the investment when you send it to

4   the source of the investment.

5   Q.   And what investment does it relate to?

6   A.   It invests the $50,000 investment that I made with Envit

7   Capital on April 7th.

8   Q.   That first investment?

9   A.   That's correct.

09:58AM 10   Q.   Whose signature is on this last page?

11   A.   That's Eric Samuelson's signature.  That's me.

12   Q.   I'd like to show you Exhibit 76.  And do you recognize

13   this document?

14   A.   Yes.

15   Q.   What is it?

16   A.   It's a document that is supposed to be filled out by an

17   investor prior to making these type of investments that

18   indicates that you are qualified to make the investments.

19   Q.   Is this a form that you had filled out in the past with

09:58AM 20   respect to your other investment you were referring to?

21   A.   Yes.

22   Q.   And is that your signature?

23   A.   Yes, it is.

24   Q.   And if we just go to the last page, you mentioned earlier

25   that you sent your check via FedEx.  How did you generally

1   correspond with Envit over the course of your relationship with

2   them?

3   A.   Every transaction was FedEx'd to Envit.

4   Q.   And was that something that they would arrange for you?

5   Did you have to pay for the FedEx shipment?  How did that work?

6   A.   They always sent me prepaid FedEx envelopes that I used to

7   send back to them.

8   Q.   Okay.  I'd like to now just go back to your chart to

9   orient ourselves.  That was the first investment in April; is

09:59AM 10   that right?

11   A.   Yes.

12   Q.   And when was the second investment?

13   A.   It was on May 22nd for $150,000.

14   Q.   What were the circumstances behind you investing another

15   $150,000 about a month later?

16   A.   Well, Jonathan Fraiman called me and encouraged me to make

17   a larger investment, and, frankly, I was ready to based on my

18   first premise, my first information, and so I increased my

19   investment to $150,000 and $200,000.

10:00AM 20   Q.   Now, we looked a minute ago, Mr. Samuelson, in the

21   prospectus that we were looking at --

22   A.   Yes.

23   Q.   -- of an advisory board at Envit.  Do you recall that?

24   A.   Yes.

25   Q.   At some point, did you have discussions with Mr. Fraiman

1  and Mr. Laborio about becoming a member of Envit's advisory

2  board?

3  A.    Yes.

4  Q.    What do you recall about that?

5  A.    I recall after the initial $200,000 investment, which they

6  appreciated, they advised me to become a member of the advisory

7  board.

8  Q.    And let's take a look at Exhibit 79.  Do you recognize

9  this document?

10:01AM 10  A.    Yes.

11  Q.    What is it?

12  A.    It's an advisory board statement of understanding that

13  described the function of the advisory board and also that it

14  was a signup document that I signed to become a member of the

15  advisory board.

16  Q.    And let's take a look at the last page.  Whose signature

17  is that?

18  A.    That's my signature.

19  Q.    And why did you decide to become a member of the Envit

10:02AM 20  Advisory Board?

21  A.    What I thought with my added expertise that I felt I had

22  along with the five other gentlemen that I had read about in

23  the first subscription or the first memorandum that I would

24  like to be involved with those other five people to help advise

25  the company on its functioning and its investments, and it was,

1    frankly, I felt like a great compliment to include me with

2    those people, and that means there's only, you know, there's

3    only ten members, so, therefore, five, and I was the sixth.

4    Q.   Do you see here under general statement of the purpose of

5    the board, it says is "to offer advice and recommendations to

6    the investment manager on various matters included but not

7    limited to investment strategies and the like"?

8    A.   Yes.

9    Q.   Did you ever offer advice and recommendations to Envit?

10:03AM 10   A.   No.

11   Q.   Do you see here under, "Duties," it says, "The members of

12   the advisory board are expected to meet at least once annually

13   and to be available to consult with and to assist the

14   investment manager on an ongoing basis, either in person or

15   telephone."  Do you see that?

16   A.   Yes.

17   Q.   Did you ever attend any board meetings?

18   A.   No.

19   Q.   Were you ever invited to any board meetings?

10:03AM 20   A.   No.

21   Q.   Did you ever participate in any conference calls with the

22   advisory board?

23   A.   No.

24   Q.   Were you ever invited to participate in any conference

25   calls of the advisory board?

1   A.   No.

2   Q.   Did you ever have anything to do with the Envit Advisory

3   Board after you signed this document?

4   A.   No.

5   Q.   What was your understanding, if any, about what effect

6   your membership on this board might have on your continuing

7   investments in Envit?

8   A.   Well, I think, Number 1, I could track where my

9   investments were being invested, and I could tell the status of

10:04AM 10   the company itself.

11   Q.   Were you able to track?

12   A.   As of this right now, I mean, as of the end of the first

13   $200,000 investment, and, plus, I felt that I could make a

14   difference in advising them to determine which investments to

15   participate in.

16   Q.   Did you have an understanding about whether you might be

17   able to purchase shares at a discount, for example?

18   A.   Yes.

19   Q.   And why did you have that understanding?

10:05AM 20   A.   Because it was mentioned in this document and also in

21   other documents that I read about the advisory board and other

22   documents.

23   Q.   What effect, if any, did this membership on the advisory

24   board have on your continuing interest in investing more in the

25   company?

1   A.   It had a great influence.

2   Q.   Why?

3   A.   Because then I could determine where my money was going to

4   be invested in a greater manner.

5   Q.   Did that come to fruition?

6   A.   No.

7   Q.   So going back to your chart, I'd like to look at your next

8   investment?

9   A.   Yes.

10:06AM 10   Q.   When was that?

11   A.   It was October 16th, 2008 for $100,000.

12   Q.   And what I'd like to do is look at Exhibit 82.  Do you

13   have that in front of you?

14   A.   Yes.

15   Q.   It's a letter?

16   A.   Yes.

17   Q.   Do you recognize that?

18   A.   Yes.

19   Q.   And it says, "With reference to your recent telephone

10:06AM 20   conversation with Jonathan Fraiman, it is with great pleasure

21   that we confirm our proposal to you for the purchase of

22   $100,000 into the Envit Capital Multi-Strategy Mixed Investment

23   Fund I Limited Partnership."  Do you see that?

24   A.   Yes.

25   Q.   Who's the author of this letter?

1    A.    Jonathan Fraiman.

2    Q.    Did you have a conversation with Mr. Fraiman about this

3    investment?

4    A.    Yes.

5    Q.    And what do you remember about that?

6    A.    I remember that we talked about the fact that there's

7    going to be a lot of different types of investments that are

8    going to be made, and that was the original idea.  This was

9    another one that they were going to invest more money into that

10:07AM 10    they already were managing, and after looking into some of the

11    other information, I thought this was a good investment here,

12    plus I had just been made a member of the advisory board so I'd

13    be able to help them determine where they invested it.

14    Q.    And you mentioned you got some other information about

15    this specific investment; is that right?

16    A.    Yes.

17    Q.    So let's take a look quickly at Exhibit 80.  Do you

18    recognize this?

19    A.    Yes.

10:08AM 20    Q.    And I know you've got the hard copy there in front of you,

21    but just to understand the length, it's a pretty hefty

22    document?

23    A.    Yes, it is.

24    Q.    And even longer than the other prospectus we were looking

25    at, Exhibit 80?

1   A.   It's the longest one that I invested with so far.

2   Q.   And did you also read this document in addition to

3   speaking with Mr. Fraiman prior to investing?

4   A.   I read it over briefly.  I skimmed it and I looked at the

5   important parts.

6   Q.   Was that the only document you got with respect to this

7   particular investment?

8   A.   No.

9   Q.   Let's take a look at the next document.  Exhibit 81.

10:08AM 10   A.   Yes.

11   Q.   Do you recognize this document?

12   A.   Yes.

13   Q.   And this is a two-page document; is that right?

14   A.   Yes.

15   Q.   And if you look at the top, is this a document that you

16   also received in connection with this investment?

17   A.   Yes, this was another couple pages that were part of this.

18   Q.   Did you read this document?

19   A.   Yes.

10:09AM 20   Q.   And it says, "Envit Capital is a money management firm

21   created to take advantage of Edward Laborio's proven track

22   record in providing positive absolute returns, model

23   development risk management and trading," and it goes on; is

24   that right?

25   A.   Yes.

1   Q.   And then at the bottom, there's a box down here.  Do you

2   see this?

3   A.   Yes.

4   Q.   It says, "Total rate of return, Envit Capital, 43.7

5   percent."  Do you see that?

6   A.   Right.

7   Q.   And this is in relation to the year 2007; do you see that?

8   A.   Yes, I would assume from January 1st to December 31st,

9   2007.

10:10AM 10   Q.   Did you take note of this information?

11   A.   Yes.

12   Q.   And why?  Why did you take note of it?

13   A.   Well, the rate of return looked fantastic, and I

14   determined that that was a great history of how the capital

15   fund had been doing, and so, therefore, it made sense to

16   continue with the management people that were involved with

17   running that fund, and so therefore I thought positively about

18   the investment based on this document.

19   Q.   And did it have an effect, this document, on your interest

10:10AM 20   in investing that $100,000 we were just looking at?

21   A.   Yes.

22   Q.   The second page of this document I want to look at

23   briefly, and this copy, this particular copy is not in color,

24   so I want to quickly look at a color copy of this same exhibit,

25   which is 37.2.  Don't worry about getting out of order, we'll

1  get those back in the folder when you're done.  I know there's

2  a lot of documents up there.

3          This is a color copy of that same document; do you see

4  that?

5  A.   Yes.

6  Q.   And just a couple things, first up top here there's

7  another graph on the returns; is that right?

8  A.   Yes.

9  Q.   And it's sort of broken down by months.  Do you see that?

10:11AM 10  A.   Yes.

11  Q.   And then down the bottom here is a pie chart?

12  A.   Yes.

13  Q.   Do you see that?

14  A.   Yes.

15  Q.   What was your understanding of what this was?

16  A.   Well, this was the investments they were making within

17  that fund itself historically since I would assume the first

18  part of 2007.

19  Q.   When you see like "domestic equity," what does that mean?

10:12AM 20  A.   Domestic equity means United States stocks.

21  Q.   And how about commodities, for example?

22  A.   Well, commodities would be, you know, like wheat, gold,

23  corn, however, they didn't invest anything in that, but the

24  cash was the money they had left over to invest later, I

25  assume.

1    Q.   And then real estate at 20 percent?

2    A.   Yeah, real estate would be, you know, like maybe, you

3    know, a shopping center.

4    Q.   Based on this chart, how much did you think, for example,

5    Mr. Laborio might have been investing in commodities?

6    A.   Zero.

7    Q.   All right.  I want to look at one more letter relating to

8    this first investment, excuse me, third investment.  It's

9    Exhibit 83.

10:13AM 10   A.   Yes.

11   Q.   Do you see this document?

12   A.   Yes, I do.

13   Q.   Is this another letter from Mr. Fraiman?

14   A.   Yes.

15   Q.   And I wanted to ask you a couple questions about it.

16   First of all, do you see down here it's talking about AC/DC

17   tickets?

18   A.   Yes.

19   Q.   What was that all about?

10:13AM 20   A.   I had mentioned to Mr. Fraiman that I was going to go to

21   the AC/DC concert, and he said, "Oh, I'll get those tickets for

22   you."  I said, "Okay."

23   Q.   Are you a big fan of AC/DC?

24   A.   Yes.

25   Q.   Is that something you discussed with Mr. Fraiman?

1    A.    Yes.

2    Q.    Now, do you see also, and let me blow this up a little bit

3    bigger, the middle paragraph here.  It says, "Along with our

4    CPA, Acquavella, Chiarelli, Shuster, Berkower & Company we will

5    work to obtain the highest return for your 400,000 shares of

6    ECGP."  Do you see that?

7    A.    Yes.

8    Q.    Was that something you took note of, that reference to the

9    CPA?

10:14AM 10   A.    Well, it gave me -- yes, yes.

11         MR. CHRISTOFFERSON:  Your Honor, at this point I'd

12   like to read a stipulation the parties have agreed to.

13         THE COURT:  All right.

14         MR. CHRISTOFFERSON:  The parties stipulate as follows:

15   "None of the following entities did any work or performed any

16   services on behalf of the Envit Capital Multi-strategy Mixed

17   Investment Fund Limited Partnership:  Acquavella, Chiarelli,

18   Shuster, Berkower & Company, LLP, Michael J. Liccar & Company,

19   P.C, Bank of America or Citibank."

10:14AM 20        THE COURT:  Ladies and gentlemen, a stipulation is

21   kind of a fancy word that basically means the parties have

22   agreed to a particular fact, so you should accept that fact as

23   true.  Go ahead.

24   Q.    And, again --

25         MR. CHRISTOFFERSON:  Thank you, your Honor.

1    Q.   Mr. Samuelson, this letter, including this reference to

2    this CPA firm was written by whom?

3    A.   Jonathan Fraiman.

4    Q.   And the last thing about this document I want to ask

5    quickly, do you see here there's a reference to a prepaid FedEx

6    envelope?

7    A.   Yes.

8    Q.   And how did you submit your check relating to this

9    investment?

10:15AM 10   A.   With that prepaid FedEx envelope.

11   Q.   Now, if I could, I'd like to go to another document before

12   we move onto your next investment, which is Exhibit 85.

13   A.   Yes.

14   Q.   Do you see this document?

15   A.   Yes.

16   Q.   And what is it?

17   A.   It's a document that shows that I now have an account with

18   Charles Schwab & Company, which I did applied for and received,

19   and this is the document showing my status of my Envit

10:16AM 20   investment.

21   Q.   And when you say status, what did it show?

22   A.   Well, it said that the value was $200,000.

23   Q.   And how much had you invested at this point?

24   A.   $300,000.

25   Q.   What was your understanding of where that other $100,000

1   was?

2   A.   I just assumed that they hadn't put in the last $100,000

3   into the account yet.

4   Q.   And the date on this was what?

5   A.   December 31st, 2008.

6   Q.   All right.  To remind us where we are, I just want to look

7   back at your chart one more time.  So I'd like to move onto the

8   March 31st, 2009, $150,000 investment.  Do you see that?

9   A.   Yes.

10:17AM 10   Q.   And with respect to this investment, what do you recall

11   about the circumstances behind this next $150,000?

12   A.   Well, Number 1, I was curious as to what the status was of

13   my other investments, and in the meantime, I had communication

14   with Mr. Fraiman about another investment.

15   Q.   And let's take a look at Exhibit 86, if we could.  Do you

16   see this document?

17   A.   Yes.

18   Q.   Do you recognize it?

19   A.   Yes.

10:18AM 20   Q.   And what is it?

21   A.   It's another memorandum or prospectus to make another

22   investment with Envit Capital.

23   Q.   And, again, is it a fairly lengthy document?

24   A.   Yes.

25   Q.   Now, I want to ask you just a couple of questions I just

1    read on this page here.  Do you see where it says, "This is a

2    self-underwritten, direct purchase program offered by the

3    company on a best efforts basis of a private placement in

4    public equity or P.I.P.E. by Envit Capital Group publicly

5    trading under the symbol ECGP."  Do you see that?

6    A.    Yes.

7    Q.    You mentioned a little bit earlier in your testimony that

8    at some point you recall having discussions with Mr. Laborio

9    and Mr. Fraiman about Envit becoming a publicly-traded company

10:19AM 10    as opposed to a private company.  Is that right?

11    A.    Yes.

12    Q.    What do you recall about in general your understanding of

13    it becoming a public company?

14    A.    Well, I know that we were -- we talked about the number of

15    shareholders that were told to me to be 500, and most public --

16    when you go public, you usually have to have at least 300

17    shareholders, so we had enough to go public.  We, meaning that

18    I'm on the board of advisors because at this point I was we

19    rather than them, and, therefore, I was happy to see that we

10:19AM 20    were going to be public.

21    Q.    Just to be clear, with respect to the shares that you

22    owned in Envit, were you ever able to trade those or sell them

23    on the open market?

24    A.    No.

25    Q.    If we go to just one page on this document, I think it's

1    marked page 10.  First of all, do you see up there, there are

2    some service providers that are listed including that

3    Acquavella firm that we were looking at before?

4    A.    Yes.

5    Q.    As well as the Michael J. Liccar just referenced in that

6    stipulation.  Do you recall that?

7    A.    Yes.

8    Q.    And do you see the bottom here under description of the

9    company, it says, "We estimate with current acquisitions

10:20AM 10  negotiated strategic placement of newly hired investment

11   advisors to have $1 billion under management by the end of

12   2009."  Do you see that?

13   A.    Yes.

14   Q.    Did you take note of that?

15   A.    Yes.

16   Q.    Why?

17   A.    Well, because I was wondering, you know, what was going on

18   with the company, and they were telling me they were hiring

19   more people and were going to have more offices all over the

10:21AM 20  United States, and this was in -- this made sense that this was

21   going to happen because they were going to have all these new

22   advisors working for them underneath Envit or underneath ECGP

23   really.

24   Q.    Did that play a role?

25   A.    So that looked very good to me.

1    Q.   Did that play a role in your decision to make this
2    investment?
3    A.   Yes, and the fact that you had these other credible people
4    that were involved, which is a similar list from the first
5    investment.
6    Q.   And you see how it's talking about investment advisors
7    there?
8    A.   Uh-hum.
9    Q.   At the top of the paragraph, I should have looked at that
10   first, it says, "Envit has two main subsidiaries."  The first
11   main subsidiary is Envit Capital Private Wealth Management,
12   right?
13   A.   Yes.
14   Q.   And that's the thing that's talking about the $1 billion
15   under management?
16   A.   Yes.
17   Q.   If we go to Exhibit 87, first just with respect to the
18   author of this letter, who is that?
19   A.   Jonathan Fraiman.
20   Q.   And what's his title listed there?
21   A.   Director.
22   Q.   Of what?
23   A.   Of Envit Capital Private Wealth Management, LLC.
24   Q.   And what's right under that, what does it say?
25   A.   It says he's a registered investment advisor.

1    Q.   And you see that there were the addresses in Boston.  Do

2    you see that?

3    A.   Yes.

4    Q.   At some point, did you have an understanding of where

5    Mr. Fraiman may have moved to in terms of the office?

6    A.   I knew that he was in Florida at an office, and I'm not

7    sure if that was his permanent office.

8    Q.   In any event, when you spoke to Mr. Fraiman over the

9    course of these 18 months, generally where were you in terms of

10:23AM 10   where you were when you spoke to him on the phone?

11   A.   I was in my office in Springfield, Ohio.

12   Q.   In Ohio?

13   A.   Right.

14   Q.   In any event, let's just looks at the top of this

15   document.  There's some handwriting next to the date.  Do you

16   see that?

17   A.   Yes.

18   Q.   Whose handwriting is that?

19   A.   That's mine.

10:23AM 20   Q.   And what does it say?

21   A.   It says, "Wrong date on letter by Fraiman."

22   Q.   And what have you written?

23   A.   I just changed it to the correct year, 2009.

24   Q.   How do you know it was 2009?

25   A.   Well, because he was asking me to invest in a company at

1    that time.

2    Q.   You knew it wasn't 2008; is that what you were saying?

3    A.   Yes, I did, right.

4    Q.   And how much did you agree to invest at this point?

5    A.   $150,000.

6    Q.   I want to show you a couple of things on this letter, ask

7    you a couple of additional things.  Do you see it says,

8    "Furthermore, we will be combining the $150,000 with the

9    $112,000, which is what you have on deposit with the company."

10:24AM 10   Do you know what that figure is talking about?

11   A.   I understood the $150,000, but the $112,000 wasn't

12   correct.

13   Q.   How much had you --

14   A.   That should have been 300,000.

15   Q.   And then later on in the letter, it says, "Furthermore,

16   the company will be issuing you 1 million shares of ECGP common

17   stock for services rendered which will be delivered with your

18   other share certificates."  Do you see that?

19   A.   Yes.

10:25AM 20   Q.   What was that about, sir?

21   A.   Well, that was a conversation between Fraiman, me and

22   Edward Laborio about the fact that they really appreciated all

23   my efforts, my investments, the fact that I was on the advisory

24   board and as a thank you, they were going to issue me 1 million

25   shares of ECGP free.

1    Q.   So a couple questions.  It says, "services rendered."

2    What services did you render to Envit?

3    A.   I think mostly just writing checks.

4    Q.   And these 1 million shares, was that something that played

5    a part in these free shares that they were offering?  Did that

6    play a part in you continuing to invest in Envit?

7    A.   Definitely, yes.

8    Q.   Did you ever receive those shares, sir?

9    A.   No.

10:26AM 10   Q.   With respect to the other share certificates that are

11   mentioned, did you ever receive those?

12   A.   No.

13   Q.   You mentioned that you mostly had conversations with

14   Mr. Fraiman on the phone; is that right?

15   A.   Yes.

16   Q.   Did you ever meet with him personally?

17   A.   Yes.

18   Q.   When was that?

19   A.   That was --

10:26AM 20   Q.   Approximately, if you remember.

21   A.   Well, it was in I think April, 2009.

22   Q.   Where did you meet him?

23   A.   We met in Del Ray Beach, Florida at a restaurant on A1A.

24   Q.   And why in Del Ray Beach, Florida?

25   A.   Because I was there on vacation.

1    Q.   Do you see Mr. Fraiman here in the courtroom today?

2    A.   Yes.

3    Q.   Could you please identify him by an article of clothing

4    he's wearing?

5    A.   Well, he's got a striped tie on and a black suit.

6         MR. CHRISTOFFERSON:  Your Honor, may the record

7    reflect the witness has identified the defendant?

8         THE COURT:  Yes.

9    Q.   Now, at some point, sir, did you have conversations with

10:27AM 10   Mr. Fraiman about an entity called Rib World?

11   A.   Yes.

12   Q.   What do you recall about that?

13   A.   I remember that he called me and told me there's a great

14   opportunity with a company that they've already purchased part

15   of and now they're going to purchase the rest of it, and

16   there's an opportunity to get involved with providing the funds

17   to help our company by Rib World, the total company.

18   Q.   At the time that he told you this, had you received those

19   million shares or those other share certificates we were just

10:27AM 20   talking about?

21   A.   No.

22   Q.   Were you asking Mr. Fraiman about that?

23   A.   Yes.

24   Q.   And, in any event, he mentions this new opportunity.  It

25   was called Rib World; is that right?

1    A.   Yes.

2    Q.   And you said that -- just to make sure I understood it

3    correctly that they had, I think you testified they had

4    purchased part of it but were purchasing the remainder of it?

5    A.   Yes.

6    Q.   And what was he asking you to do?

7    A.   He's asking me to invest in the issuance of -- it was

8    issuance to raise money in order to purchase Rib World for

9    Envit, in other words, invest money in Envit and then they were

10:28AM 10   going to take that money and buy the rest of Rib World.

11   Q.   Now, did you ultimately invest in Rib World itself?

12   A.   No.

13   Q.   But did you ultimately make some additional investments

14   based on what they were telling you?

15   A.   Yes.

16   Q.   And if we go back to your chart, how much did you invest

17   based on that decision?

18   A.   $150,000.

19   Q.   So why did you invest -- why did you invest in

10:29AM 20   Envit Capital as opposed to this Rib World company itself?

21   A.   Well, because the way it was described in the it's called

22   a memorandum, again, is that we needed the money in order to

23   buy Rib World, and we were going to -- Envit was going to own

24   Rib World, so to buy Rib World wouldn't make any sense because

25   Envit is going to buy it anyway.

1    Q.    So where did you put your money?

2    A.    I put my money in Envit.

3    Q.    At the time that you put the money in Envit, what was your

4    understanding based on your discussions with Mr. Fraiman about

5    whether Envit already owned Rib World?

6    A.    The issuance of the -- I mean, the memorandum had been out

7    for a while, and they were closing it out, and there were many

8    people that already invested, and, in fact, they were about

9    ready to buy Rib World with the money that they had already

10:30AM 10    collected, so, therefore, I sure as heck better get in now so

11    I'll be part of that great investment, and as I was making the

12    investment, they bought Rib World prior to me even sending in

13    my check.

14    Q.    And it looks here, there's two dates on your chart,

15    June 4th and June 17th.  Do you see that?

16    A.    Yes.

17    Q.    And did you send your $150,000 in two checks, is that what

18    we saw earlier?

19    A.    Yes.

10:30AM 20    Q.    And why was that?

21    A.    Well, because I had to sell some other investments to come

22    up with the rest of the money.

23    Q.    I'd like to take a look at Exhibit 89.

24         THE COURT:  Actually if you're changing to a new

25    exhibit, why don't we take our 10:30 break.

1     MR. CHRISTOFFERSON:  It sounds fine.

2     THE COURT:  Ladies and gentlemen, again, this is a

3  break to give you a chance to use the facilities.  We'll take

4  another break about noon.  As quickly as we can accomplish that

5  and get you back here, the faster the trial will go, so as

6  close as we can make it to 10 minutes will be good.

7     THE CLERK:  All rise.

8     (JURORS EXITED THE COURTROOM.)

9     (A recess was taken.)

10:42AM 10     THE CLERK:  All rise for the jury.

11     (JURORS ENTERED THE COURTROOM.)

12     THE COURT:  Mr. Christofferson.

13     MR. CHRISTOFFERSON:  Thank you, your Honor.

14  Q.   Good morning, again, Mr. Samuelson.

15  A.   Good morning.

16  Q.   Before the break, we were discussing the $150,000

17  investment that you made in June of 2009.  Do you recall that?

18  A.   Yes.

19  Q.   And specifically we were talking about this issue with

10:44AM 20  Rib World.  Do you recall that?

21  A.   Yes.

22  Q.   I'd like to show you, if I could, Exhibit 89.  See if I

23  can blow that up.  Do you recognize this?

24  A.   Yes.

25  Q.   First of all -- well, what is this?

1    A.   This is a document that Jonathan Fraiman e-mailed me

2    describing the fact that he was going to -- that he sent me

3    along with sending me the memorandum for the option to buy into

4    Envit Capital, which was going to purchase Rib World.

5    Q.   And we'll get to that part in a moment, but you mentioned

6    this is an e-mail.  Is that your e-mail address?

7    A.   Yes, it is.

8    Q.   In the 'to' line?

9    A.   Yes.

10:44AM 10   Q.   And what's the date?

11   A.   May 28th, 2009.

12   Q.   And who is this from?

13   A.   Jonathan Fraiman.

14   Q.   And it says, you mentioned it attached the memorandum

15   outlining the purchase of the second largest rib company in all

16   of the U.K.  Do you remember before you were talking about I

17   think you had a phone call first.  Was that phone call with

18   Mr. Fraiman?

19   A.   Yes.

10:45AM 20   Q.   It says, "I'll follow up with you shortly."  Then it says,

21   "Also there's a link attached, and note the shares that should

22   trade shortly on the Amex, including yours, are being offered

23   at $10 a piece."  Do you see that?

24   A.   Yes, that was very interesting.

25   Q.   Why?

1  A.   Because that made me worth $14 million.

2  Q.   How do you figure?

3  A.   Well, because I had a million shares from -- that was

4  given as a gift, and then I had 400,000 shares besides that, so

5  that's $14 million.

6  Q.   Now, you mentioned the attachments, so let's go to that

7  next.  Is this the document you were referring to?

8  A.   Yes.

9  Q.   And specifically do you see up the top there's a little

10:46AM 10  label up there?

11  A.   Yes.

12  Q.   What does that say?

13  A.   It says, "Rib World."

14  Q.   And, again, is this a document --

15         THE COURT:  I'm sorry, this is Exhibit 90?

16         MR. CHRISTOFFERSON:  Exhibit 90, your Honor, yes.

17         THE COURT:  Go ahead.

18  Q.   This document, this is something that you read?

19  A.   Yes.

10:46AM 20  Q.   And, again, is it a document that's at least over 30

21  pages?

22  A.   Yes, it is.

23  Q.   And, again, I won't attempt to look through the whole

24  thing, but I would like to look at what's been marked as page

25  16.  And it says, "Rib World is comprised of the two separate

1    distinct business lines, meats and sauces in retail and food

2    services."  Was this part of the prospectus that you read, this

3    description and the following description of this company,

4    Rib World?

5    A.    Yes.

6    Q.    And, again, did you understand that Envit had purchased

7    Rib World by the time that you made your investments on

8    June 4th and June 17th?

9    A.    By the time I had written my check and sent it in, I was

10:47AM 10   told they had purchased the total company.

11   Q.    Told by whom?

12   A.    Envit Capital bought Rib World.  Oh, I was told by

13   Jonathan Fraiman --

14   Q.    Now --

15   A.    -- and that I was lucky to get into the deal.

16   Q.    You mentioned that you invested $150,000 but you did so in

17   two checks; is that right?

18   A.    Yes.

19   Q.    I want to look at Exhibit 92.  Do you recognize this?

10:48AM 20   A.    Yes.

21   Q.    What is it?

22   A.    That was a note I sent to Jonathan in the packet with the

23   check.

24   Q.    Could you read that quickly, please, for the jury.

25   A.    "Here's the $100,000, which is part of the $150,000.  I

1  note that there's no paperwork to sign for this deal.  Please

2  send if required.  I need prospectus and agree it looks good

3  for U.S. entry.  Hope U.S. accepts products.  Please

4  communicate when receiving this."

5  Q.   You say there's no paperwork to sign for this deal.  We

6  had previously looked at an example of a subscription

7  agreement.  Do you recall that?

8  A.   That's right.

9  Q.   Was that what you were referring to?

10:49AM 10  A.   Yes.

11  Q.   Did you ever receive certificates of shares relating to

12  this investment of $150,000?

13  A.   No.

14  Q.   Let's look at one more document relating to this

15  investment, Exhibit 93, and, I'm sorry, that's not there quite

16  yet.  Let me ask you, Mr. Samuelson, at this point, we'll go

17  back to your chalk, your chart, at this point through June of

18  2009, how much had you invested in Envit Capital?

19  A.   $600,000.

10:50AM 20  Q.   At this point after you -- when you were investing this

21  last $150,000 in June, how did you think your investments were

22  going at this time?

23  A.   I thought right then they were going great when I made the

24  June 17th.

25  Q.   Why?  Why did you think that?

1   A.   Well, because I had a million shares of ECGP and another

2   400,000 shares of ECGP, in my mind, that was.

3   Q.   I'd like to turn now to Exhibit 183.

4        MR. CHRISTOFFERSON:  I'm sorry, your Honor.  I

5   neglected to include this in my list at the outset, but it is

6   an agreed upon exhibit.

7        THE COURT:  Exhibit 183?

8        MR. CHRISTOFFERSON:  Exhibit 183, my apologies to the

9   Court.

10:51AM 10       THE COURT:  Any objection?

11       MR. SINNOTT:  No objection, your Honor.

12       THE COURT:  It may be admitted, 183.

13       (Exhibit No. 183 was admitted into evidence.)

14  Q.   So, I publish this now, Exhibit 183.  It should be on the

15  screen there in front of you.  Do you see that, Mr. Samuelson?

16  A.   Yes.

17  Q.   And what is this document?

18  A.   This is a letter from Charles Schwab telling me that the

19  account that I have now is not going to exist anymore because

10:51AM 20  their relationship with Envit is ending.

21  Q.   Maybe if we look at that first paragraph, "Dear Investor,"

22  could you just read that first paragraph?

23  A.   "Dear Investor, we are writing to inform you that

24  effective on August 14th, 2009, which is the effective date,

25  the investment manager designation and any authorizations that

1   Envit Capital Private Wealth Management, LLC (Envit) holds on

2   your Charles Schwab & Company, Incorporated brokerage accounts

3   will end.  This change is the result of Schwab terminating its

4   investment manager service agreement with Envit."

5   Q.   And the date of this letter is what?

6   A.   June 25th, 2009.

7   Q.   Is that approximately a week after you made your or

8   concluded your $150,000 investment in June?

9   A.   Yes.

10:52AM 10   Q.   Mr. Samuelson, what was your reaction when you received

11   this letter?

12   A.   When I received that letter, I thought now this is a

13   strange situation because I haven't got my shares in any

14   account at all, I haven't got any certificates, and all of a

15   sudden then the brokerage where it's supposed to be stored is

16   going to terminate its agreement with Envit, so it put about 12

17   red flags in my mind that something is not right here.

18   Q.   Did you attempt to contact Mr. Fraiman at this point?

19   A.   Yes.

10:53AM 20   Q.   How many times did you try to contact him?

21   A.   Between I'm saying I tried to contact him at least 30, 40

22   times, 30 times.

23   Q.   Did you eventually reach him?

24   A.   Yes.

25   Q.   Do you remember approximately when that was that you

1  finally reached him on the phone?

2  A.    It was in I think the middle of July.

3  Q.    Of 2009?

4  A.    Yes.

5  Q.    What do you remember about that phone call, sir?

6  A.    Well, Mr. Fraiman was visibly upset and --

7  Q.    Let me stop you there.  When you say visibly, this was a

8  telephone --

9  A.    Well, he seemed to be upset on the telephone and he was

10:54AM 10  very adamant about the fact that Mr. Laborio had gone off the

11  deep end and he was taking the money and investing it wildly in

12  investments that were not part of the original deal and just

13  was very upset with him, and he was distancing himself from him

14  and he couldn't get ahold of him.  He was having trouble

15  communicating with him, and --

16  Q.    How did that make you feel?

17  A.    That made me feel like this -- frankly, it made me feel

18  like I was not going to make this mound of money I thought I

19  was going to make, and I was also going to lose my $600,000,

10:55AM 20  that's what I thought.

21  Q.    Did you speak to Mr. Fraiman again later that month?

22  A.    Yes.

23  Q.    And what do you recall about that second conversation?

24  A.    I recall it was the same sort of distinct emotional

25  outburst from him saying that he was distancing himself from

1    Mr. Laborio, he was going to go to work with somebody else, he

2    was going to work for another company, and he was going to

3    start over and do his own thing with another company, another

4    organization.

5    Q.    I'd like to look at Exhibit 93, and we'll look at the

6    second page first.  Do you recognize this document?

7    A.    Yes.

8    Q.    First, who is this document from?  It's a letter.  Who's

9    it from?

10:56AM 10   A.    It's from the SEC.

11   Q.    And what date?

12   A.    July 30th, 2009.

13   Q.    And is this something that you received?

14   A.    Yes.

15   Q.    And could you read the first sentence of the first

16   paragraph?

17   A.    "The staff of the Boston Regional Office of the

18   United States Securities and Exchange Commission is conducting

19   a nonpublic investigation into the above-captioned matter to

10:56AM 20   determine whether any violations of federal securities laws

21   have occurred.  I would like to speak with you as part of this

22   investigation.  Please contact me at..."

23   Q.    Okay.  Sir, first of all, do you know what the Securities

24   and Exchange Commission is?

25   A.    Yes.

1    Q.    What is it?

2    A.    It's a governing body that controls the buying and selling

3    of securities.

4    Q.    How did you feel when you got this document, sir?

5    A.    I felt worse about my investment.

6    Q.    Did you speak to Mr. Fraiman about this?

7    A.    Yes.

8    Q.    And if you go to the first page of this document 93, what

9    is this?

10:57AM 10    A.    Well, after I had spoken to him, he seemed very upset with

11    the fact that this document had come to me and he wanted me to

12    send him a copy of it, so I did, and --

13    Q.    Is that your handwriting front of this?

14    A.    Yes.

15    Q.    Was this a fax?

16    A.    Yes.

17    Q.    What does your handwriting say?

18    A.    "Jonathan, here is the notice from the SEC. Keep doing

19    what you're doing. Eric."

10:57AM 20    Q.    So I want to ask you two things. First, the date that you

21    sent this, and maybe I can blow it up a little better. What's

22    the date?

23    A.    The 4th of August.

24    Q.    Sorry, what year?

25    A.    2009.

1  Q.   Getting back to what you said, keep doing what you're

2  doing, what did you mean by that?

3  A.   Well, since he talked to me about the fact that he was

4  going to go do his own thing with a different company, I said,

5  well, Jonathan, keep doing what you're doing, get away from the

6  situation you're in now and go ahead and become your own person

7  with another company.  That's what I meant.

8  Q.   You mentioned that you -- I think you said a number of red

9  flags were raised for you, then you spoke to Mr. Fraiman about

10:58AM 10  Mr. Laborio and what had happened, right?

11  A.   Right.

12  Q.   Did you still trust Mr. Fraiman at this point?

13  A.   Well, I'm going to say my trust diminished, but I still

14  trusted him.

15  Q.   Why?

16  A.   Because he and I had conversed quite a few times, and we

17  became acquaintances or friends on the phone, and he was very

18  convincing in the fact that he was going on his own and doing

19  his own thing and also the fact that, you know, to tell you the

10:59AM 20  truth, he was my last lifeline into finding out about my

21  investment, too, so I wanted to keep in touch with him just to

22  see, you know, where is my investment where I was still hoping

23  that there would be some return of my investment or some answer

24  to what happened to my investment, and he was my only lifeline,

25  so I wanted to keep in touch with him.

1   Q.   We saw this, you sent this letter on August 4th, 2009.  I

2   want to go back to your charts of the investment, your last

3   investment, the check we saw earlier, that was August 31st?

4   A.   Yes.

5   Q.   For how much?

6   A.   $40,000.

7   Q.   In what entity?

8   A.   Aetius Group.

9   Q.   How did that come about?

11:00AM 10   A.   Well, Jonathan sent me information about he's with a

11   different broker and a different situation, and he said, "This

12   is a great opportunity for you to make some quick money because

13   this is a no-brainer, this is something that's going to be a

14   quick turnover, and you can make a substantial amount of money

15   on this deal here, and I feel bad about what happened with you

16   with Envit and Mr. Laborio."  He also, you know, was apologetic

17   about what happened to me with, like I said, all these

18   investments previous.

19   Q.   What relationship did you understand -- based on your

11:00AM 20   conversations with Mr. Fraiman, what relationship did Aetius

21   have with Envit?

22   A.   None.

23   Q.   What relationship did you understand Aetius had with

24   Mr. Laborio based on your conversations with Mr. Fraiman?

25   A.   None.

1    Q.    Would you have invested in Aetius if you had known

2    Mr. Laborio was involved in Aetius?

3    A.    Definitely not.

4    Q.    Why not?

5    A.    Because I lost all trust in Mr. Laborio, all trust.

6    Q.    So let's look at, I think you mentioned he sent you some

7    information.  Let's look at Exhibit 94.  Do you recognize this

8    document?

9    A.    Yes.

11:01AM 10    Q.    What is it?

11    A.    It's the memorandum or proposal for Aetius that I received

12    from Mr. Fraiman.

13    Q.    And at the top there's some writing?

14    A.    Right.

15    Q.    Is that your writing?

16    A.    Yes.

17    Q.    What does it say?

18    A.    It says I received it on August 9th, 2009.

19    Q.    And if we look at what's marked as the eighth page,

11:02AM 20    there's an executive summary there?

21    A.    Yes.

22    Q.    Do you see that?

23    A.    Yes.

24    Q.    And under, "Our Company," it says, "The business is of an

25    asset manager named Aetius or Aetius Asset Management, LLC,

1   which manages funds and receives fees for managing such funds;"

2   is that right?

3   A.   Yes.

4   Q.   Was that consistent with what Mr. Fraiman had described to

5   you in terms of what this business was or supposed to be?

6   A.   He told me it was a similar type operation, however, he

7   really didn't tell me much about it.  He just said it was a

8   good deal, and then I read this to really get the information

9   on the investment.

11:02AM 10   Q.   Now, did you read through this document when you got it?

11   A.   Most of it.

12   Q.   Was there any mention of Mr. Laborio in this document?

13   A.   No.

14   Q.   Do you recall when we looked at the original prospectus

15   the beginning of your testimony, Exhibit 65, do you recall

16   there was a description of Mr. Laborio and his role at Envit?

17   A.   Yes.

18   Q.   And that that was something you had taken into account?

19   A.   Definitely, yes.

11:03AM 20   Q.   If Mr. Laborio were mentioned in the Aetius as being

21   involved in Aetius, would you have invested?

22   A.   No.

23   Q.   You said that you ultimately made an investment in Aetius;

24   is that right?

25   A.   Yes.

1  Q.  We can go to Exhibit 95.  First of all, do you see this

2  document?

3  A.  Yes.

4  Q.  Titled "FedEx instructions"?

5  A.  Yes.

6  Q.  And what's the date?

7  A.  August 18th, 2009.

8  Q.  And what was this document?

9  A.  This is a document to send the investment back to the

11:04AM 10  Aetius Group at that address.

11  Q.  And what was the address listed for the Aetius Group?

12  A.  It was 2234 North Federal Highway, Boca Raton, Florida.

13  Q.  Did you, in fact, send your payment and related documents

14  through FedEx?

15  A.  Yes.

16  Q.  And if we look at Exhibit 97, do you recognize this?

17  A.  Yes, yes.

18  Q.  And what is this?

19  A.  This is a confirmation from the Aetius Group telling me to

11:04AM 20  pay them and who to make it payable to and send it.

21  Q.  And, again, the address listed under "pay by check" is in

22  what state?

23  A.  Florida.

24  Q.  Mr. Samuelson, how did you decide on the $40,000 figure?

25  A.  Well, originally I was going to go 25,000 or actually

1    Mr. Fraiman wanted me to invest $100,000, and I said no, I said

2    I'll invest 25,000, and then I upped it to 40,000.

3    Q.   Did you ever receive stock certificates for your Aetius

4    investment?

5    A.   No.

6    Q.   Did you ever speak with Mr. Fraiman again following your

7    investment in Aetius?

8    A.   Yes.

9    Q.   What do you remember about conversations with him after

11:05AM 10   you invested in Aetius?

11   A.   Well, of course, I was questioning him about that stock

12   when I didn't get the stock, and he said it will be coming

13   right away, your money will be -- I think he said your money

14   will be coming, and also he said that he has discovered that

15   there's some money I think he said in escrow or being frozen

16   under Mr. Laborio's name anywhere from a million to a million

17   and a half dollars and I should be getting some of that money

18   back.

19   Q.   During this conversation, did he talk to you about any

11:06AM 20   involvement that Mr. Laborio had with Aetius?

21   A.   No.

22   Q.   Did your Aetius money ever get returned to you?

23   A.   No.

24   Q.   Did Mr. -- well, let me ask you this.  How much of your

25   Envit or Aetius stock were you ever able to sell?

1  A.   None.

2  Q.   How much of your $640,000 that you invested did you ever

3  get back?

4  A.   None.

5  Q.   At some point did Mr. Fraiman ask to work with you again,

6  have you as an investor?

7  A.   Yes.

8  Q.   Did you?

9  A.   No.

11:07AM 10  Q.   Why not?

11  A.   I said, "You're done, I have no trust in you anymore."

12  Q.   When did that trust end?

13  A.   I can't remember.  It was like 2011, I think.

14  Q.   What I mean is when was the trust -- as far as when you

15  spoke to him?

16  A.   Well, the trust ended after I never got any Aetius stock

17  within a month after that point after my investment.

18       MR. CHRISTOFFERSON:  One moment, your Honor.  Nothing

19  further at this time, your Honor.  Thank you.

11:08AM 20       THE COURT:  Mr. Sinnott.

21       MR. SINNOTT:  If I might have a minute to get my

22  materials up to the lectern.

23       THE COURT:  All right.

24       MR. SINNOTT:  Thank you, your Honor, I appreciate your

25  indulgence of the time.

<u>CROSS-EXAMINATION</u>

BY MR. SINNOTT:

Q.   Good morning, sir.

A.   Good morning.

Q.   Welcome to Boston.

A.   Thank you.

Q.   You have a great voice.  Were you ever in FM radio?

A.   No, I was in the Purdue Glee Club.

        THE COURT:  Not a tenor, I take it?

        THE WITNESS:  Baritone.

Q.   Sir, your contact with Envit was via Mr. Laborio; is that

correct?

A.   My first, yes.

Q.   And that was in 2007?

A.   Yes, sir.

Q.   All right.  Do you remember when it was in 2007, sir?

A.   I think it was like in the fall of 2007.

Q.   All right.  And did you speak by phone or by e-mail?  How

did you communicate?

A.   Telephone.

Q.   And what did Laborio say to you when he first pitched

Envit?

A.   He said I have a great opportunity for you to invest in

because I know you've done these kind of investments before

because I'm familiar with the fact that you work with Chicago

1    Investment Group in Chicago, and I work with Chicago Investment

2    Group also and that I know -- he says, he knows that I had

3    some, you know, investments similar to this with them including

4    one that was Zynex, he particularly mentioned Zynex.

5    Q.   All right.  Sir, you had made two and a half million

6    dollars on that particular investment?

7    A.   Yes.

8    Q.   Now, you said that you checked with people at CIG; is that

9    correct?

11:11AM 10    A.   Yes.

11    Q.   Who were the people that you checked with?

12    A.   I talked to Howard Jahre and Devin Corman, who were my

13    contacts there.

14    Q.   Was Coleman Flaherty one of your contacts there?

15    A.   No.  Who?

16    Q.   Coleman Flaherty?

17    A.   No.

18    Q.   And he told you that he was okay?

19    A.   Well, he verified he worked for Chicago Investment Groups.

11:12AM 20    Q.   They didn't tell you he had been fired?

21    A.   No.

22    Q.   Are you aware now he was fired from Chicago Investment

23    Group?

24    A.   No.

25    Q.   Would that have changed your willingness to interact with

1    Mr. Laborio?

2    A.   Well, I don't know.  I know that he had experience other

3    than Chicago Investment Group, so, I mean, you know, I'm just

4    telling you I'm conjecturing now because I might have, I might

5    have, but I didn't know it, so...

6    Q.   And you knew he had other experience because you had seen

7    it in the prospectuses, correct?

8    A.   Yes.

9    Q.   And, sir, let me direct your attention, if I could, to

11:12AM 10   Exhibit 65, which you have before you.

11   A.   Yes.

12   Q.   And, sir, you've identified Exhibit 65 as being sent to

13   you by Jonathan Fraiman, correct?

14   A.   I'm not getting that on my screen.

15   Q.   I haven't put it on the screen, sir, yet, I just want you

16   to identify that document.  Perhaps this will help, Exhibit 65,

17   "Preliminary Private Placement Memorandum"?

18   A.   Yes, sir, that's the document I received in order to make

19   my first investment, yes, sir.

11:13AM 20   Q.   All right, sir.  Sir, if you'd look at the front cover

21   right up at the top there, what's the date on that private

22   placement memorandum?

23   A.   It says they want -- the date is October 20th, 2007.

24   Q.   All right.  And, sir, at some point Mr. Laborio, you say,

25   had contacted you along with Jonathan Fraiman and started the

1    process of that first investment; is that correct?

2    A.   Well, they both contacted me, let's put it that way.  I'm

3    not sure if they were -- I can't remember if they were both on

4    the first investment.  They were both talking to me because I

5    know Jonathan called me -- yeah, that's right.  I'm sorry, on

6    the first investment, they both talked to me, and then

7    Jonathan Fraiman was there.  That's when I got introduced to

8    Jonathan Fraiman, and then Jonathan Fraiman sent me the

9    memorandum.

11:14AM 10    Q.   All right.  Sir.  And sir, having seen the date of that as

11    October 20th, 2007, it's fair to state, is it not, that that

12    document preceded Jonathan Fraiman's arrival at Envit?

13         MR. CHRISTOFFERSON:  Objection.

14         THE COURT:  I think you'll have to establish he has a

15    reason to know those dates.

16    Q.   Well, sir, isn't it true that Mr. Laborio identified

17    Fraiman as being a new guy at Envit?

18    A.   Well, he introduced him to me for the first time.  He

19    didn't -- he never told me he was a new guy.

11:15AM 20    Q.   Didn't you --

21    A.   He was just my -- a person that was going to work with me,

22    I guess, rather than -- he was my new guy.

23    Q.   You didn't tell the government previously that he had

24    identified him as someone that had recently been hired by

25    Envit?

1    A.    No.

2    Q.    All right.  But fair to say, sir, that you met

3    Jonathan Fraiman -- strike that -- that you began dealing with

4    Jonathan Fraiman because Edward Laborio introduced you?

5    A.    Correct.

6    Q.    And sir, if you had known that Jonathan Fraiman had only

7    been a broker or had only his Series 7 license since April of

8    2007, would that have affected your willingness to make these

9    investments?

11:16AM 10    A.    Not necessarily.

11    Q.    And you didn't ask about how long he had been a broker,

12    did you?

13    A.    No.

14    Q.    And Laborio didn't tell you how long he had been a broker?

15    A.    No.

16    Q.    And, sir, you're a civil engineer; is that correct?

17    A.    I'm an industrial engineer.  My degree is industrial

18    engineer but I practice as a civil.

19    Q.    And you deal in heavy equipment?

11:17AM 20    A.    Yes.

21    Q.    And you build things?

22    A.    Right.

23    Q.    And it's a job with considerable responsibility; is that

24    correct?

25    A.    Yes.

1    Q.    And in the engineering field, is it fair to say that

2    typically you serve an apprenticeship of sorts?

3    A.    I would say in any profession you do.

4    Q.    Well, you should at least, correct?

5    A.    Yes.

6    Q.    So, 43 years ago when you started at your grandfather's

7    company, you weren't building buildings as a brand new

8    engineer, were you?

9    A.    Well, I was working for my father, and he put me on a

11:17AM 10    project, my first project I moved a cement kiln 400 feet long,

11    17 feet in diameter to Odessa, Texas, so I would say that was a

12    pretty good job to do.

13    Q.    Sure.

14    A.    I would say in having my father as my boss, I was in there

15    right away.

16    Q.    And you had learned at the feet of your boss, correct?

17    A.    I learned the industry, you know, growing up.  I had been

18    there working there in high school and junior high, and, you

19    know, so I was pretty ready.

11:18AM 20    Q.    And you would admit, you would agree with me, would you

21    not, Mr. Samuelson that that type of mentorship in a

22    responsible position such as yours where lives may depend upon

23    how good a job you do is important, is it not?

24    A.    Yes, sir.

25    Q.    All right.  But you're not aware as to how long

1  Edward Laborio and Jonathan Fraiman had been associated, are

2  you?

3  A.   No.  No, I'm not.

4  Q.   And you're not privy to what Jonathan Fraiman was being

5  told by Edward Laborio, are you?

6  A.   No.

7  Q.   Now, sir, if you bear with me, I'll have this back on the

8  screen in a moment, but I'd like to direct your attention to a

9  couple of items in that 2007 prospectus, as you identified it,

11:19AM 10  and directing your attention, sir, to page 18, "Management"?

11  A.   Yes.

12  Q.   And you see, and I've highlighted the name Edward Laborio,

13  that Mr. Laborio was the chairman of the board, founder and CEO

14  of Envit Capital, the chairman of the board and CEO the Laborio

15  Bradford and Glenham Holdings Corporation.  Now, sir, you

16  you're an experienced investor, are you not?

17  A.   Yes.

18  Q.   And did you conduct research to see if those entities

19  actually existed?

11:20AM 20  A.   No.

21  Q.   You took them at face value?

22  A.   Yes.

23  Q.   And would you agree with me that other customers looking

24  at a document such as this 2007 document would take it at face

25  value?

1    A.    I would think maybe some may.  I don't know.

2    Q.    But you're an experienced investor?

3    A.    Yes.

4    Q.    And you thought it looked impressive, it looked credible?

5    A.    Yes.

6    Q.    And, sir, you made reference to how persuasive the

7    advisory board and the individuals on it were to you, and I

8    think you made reference to these five individuals,

9    John Redford, Ron Steger, David Arnold, John Gallen and

11:20AM 10    Paul Mann, and you recall seeing those in this document?

11    A.    Yes.

12    Q.    And, sir, did you ever check these individuals out?

13    A.    No.

14    Q.    But you accepted it at face value?

15    A.    Yes.

16    Q.    And, sir, on the following page, page 19, where the

17    document says, "Prime broker and custodian, Goldman Sachs," you

18    found that to be impressive, didn't you?

19    A.    Yes.

11:21AM 20    Q.    Because they're a very credible company?

21    A.    Yes.

22    Q.    And someone looking at this document would say that's a

23    good reference for this operation, correct?

24    A.    Yes.

25    Q.    And, sir, where it says legal counsel, "Bingham McCutchen,

1    150 Federal Street, Boston, Massachusetts," were you familiar

2    with Bingham McCutchen?

3    A.    No.

4    Q.    And the auditor, Acquavella, Chiarelli, Shuster, Berkower,

5    were you familiar with them?

6    A.    No.

7    Q.    But they sound impressive, don't they?

8    A.    Yes.

9    Q.    And they look credible?

11:21AM 10    A.    Yes.

11    Q.    And they gave this 2007 document all the indications of

12    being legitimate and persuasive, did they not?

13    A.    Yes.

14    Q.    In fact, they helped persuade you to invest?

15    A.    It was one of the things that swayed me, yes.

16    Q.    Now, sir, how long have you been involved in investments?

17    A.    Forty years.

18    Q.    So, for pretty much your entire professional life?

19    A.    Yes.

11:22AM 20    Q.    You've also invested?

21    A.    Yes.

22    Q.    And you're considered to be a qualified investor, correct?

23    A.    Yes.

24    Q.    In fact, is it fair to say that the $640,000 that you lost

25    in Laborio's operations was a fraction of your investments?

1   A.   I would say it's a major fraction.

2   Q.   Well, approximately 15 percent, would that be?

3   A.   I'd say 25 percent.

4   Q.   25 percent?

5   A.   Yes.

6   Q.   So, do you recall previously telling the government that

7   it was 15 percent?

8   A.   No.

9   Q.   You don't, okay.  But you say that that --

11:23AM 10   A.   What I meant was 25 percent of those type of investments,

11   in other words, those private equity type, you know,

12   investment, 25 percent of those and then I don't remember

13   telling them 15 percent.  It might have been because it's 15

14   percent of my total investments because my company, my company

15   is a major investment.

16   Q.   So at the time of -- let me direct your attention to

17   August of 2009.  Aside from the Laborio investments, how much

18   other money did you have invested?

19   A.   Are you talking about with other people?

11:24AM 20   Q.   Yes, sir.

21   A.   Maybe a million and a half.

22   Q.   A million and a half.  So how would --

23   A.   It depends on what type of investments you're talking

24   about.

25   Q.   Well, let's step back.  For investments that are

1   comparable to the Laborio investments, how much other money did

2   you have invested in those types of investments?

3   A.   I'd be guessing.  I'm going to say, I'm just guessing a

4   million and a half.  I'd have to go back and figure it out.

5   Q.   All right.  So when you said 25 percent of those types of

6   investments on $640,000 --

7   A.   Yes.

8   Q.   -- wouldn't that be over two and a half million dollars

9   worth of investments?

11:24AM 10   A.   It could be.

11   Q.   But the numbers don't add up?

12   A.   Well, I mean, you've got to give me a chance to go back

13   and look at all my investments to figure out what they are at

14   that time and what they were.  I don't have that information.

15   I don't know.

16   Q.   You don't recall telling the government, and, sir, I'm not

17   belittling or minimizing the $640,000, that's an enormous sum

18   of money, I'm just trying to get how many investments you were

19   involved in, and one of those ways that I'm asking you about it

11:25AM 20   is how much money you had invested in similar and in dissimilar

21   type of investments?

22   A.   I would say in similar investments, maybe a million and a

23   half to two million other ones besides this one.

24   Q.   And in dissimilar ones?

25   A.   Dissimilar ones, does that include my company that I own,

1   my construction company?

2   Q.   No, sir, I'm talking about things other than what you've

3   invested in your company.

4   A.   I'm going to say another million and a half in regular

5   equities.

6   Q.   All right.  But you've been involved in investments for,

7   you know, 40 years or so; is that correct?

8   A.   Yes.

9   Q.   All right.  And you've made money?

11:26AM 10   A.   Yes.

11   Q.   And you've lost money?

12   A.   Yes.

13   Q.   And you've dealt with a lot of investment advisors; is

14   that correct?

15   A.   Yes.

16   Q.   A lot of brokers?

17   A.   Yes.

18   Q.   And is it fair to say that things like purchasing AC/DC

19   tickets for you is how brokers operate?

11:26AM 20   A.   Yes.

21   Q.   All right.  So just because a broker offers to purchase

22   AC/DC tickets for you doesn't mean you're on the highway to

23   hell as far as your investments are concerned, does it?

24   A.   No, no.

25   Q.   I'm sorry, sir, I couldn't resist.

1          THE COURT:  Mr. Sinnott.

2          MR. CHRISTOFFERSON:  That was one for the record, your

3     Honor.

4     Q.   But that's the norm, correct?

5     A.   Yes.

6     Q.   It's a hard sell occupation, isn't it?

7     A.   Well, I think something like that, I think it's more

8     showing respect for your clients.

9     Q.   Sure.

11:27AM 10   A.   Rather than some way to get you to buy something.

11    Q.   There's nothing wrong with that?

12    A.   No.

13    Q.   All right.  And Mr. Fraiman coming down to Del Ray Beach

14    to meet you while you were on vacation, that was also a sign of

15    respect for you, correct?

16    A.   A sign of respect and also a sign that he wanted to try to

17    sell me some more investments, I mean.

18    Q.   But you understood, I would imagine, that Fraiman trying

19    to sell you investments was certainly important to him and by

11:28AM 20   extension to his boss, correct?

21    A.   Yes.

22    Q.   But the manner in which investments are pitched to you is

23    also important, isn't it?

24    A.   Yes, the information I'm given in order to make a

25    decision, yes.

1    Q.   And, sir, let me ask you if I could just back up for a

2    moment and ask you how have you prepared for your testimony

3    today?

4    A.   Well, it began when I was -- just today?

5    Q.   For this court appearance.

6    A.   For this court appearance?

7    Q.   Yes, sir.

8    A.   I had meetings with the FBI prior to this court

9    appearance.

11:28AM 10    Q.   And did you also have telephone conversations?

11    A.   Yes.

12    Q.   All right.  And was there a particular agent that you

13    dealt with?

14    A.   Yes.

15    Q.   And who was that?

16    A.   That was Vassili Thomadakis.

17    Q.   As an FBI agent?

18    A.   Well, that's the one I dealt with and also with, you know,

19    I tell you the truth, I'm a little bit gray on their names.

11:29AM 20    Q.   Sure.

21    A.   It's not like I had a personal relationship with them.

22    Q.   I think Mr. Thomadakis thinks he just got promoted.

23    A.   I'm making him one, sorry.

24    Q.   Your memory is not perfect?

25    A.   No.

1    Q.    And there are -- there's a lot of distance between events

2    in 2007, 8 and 9 and the present; is that a fair statement?

3    A.    Can you say that one more time?

4    Q.    Sure.  A lot of time has gone by since you dealt with

5    Laborio and Jonathan Fraiman?

6    A.    Yes.

7    Q.    And memories fade?

8    A.    Yes.

9    Q.    But you had conversations with Mr. Thomadakis on how many

11:30AM 10    occasions over the phone?

11    A.    Well, we began with a subpoena that asked me to send

12    documents to them that described these investments that I had

13    good files on, so I looked up my own old files and categorized

14    them and sent them to him.

15    Q.    When was that, sir?

16    A.    That was in 2014.

17    Q.    At some point did you say to these folks what took you so

18    long?

19    A.    Well, not really, I never thought about that, I just said,

11:30AM 20    well, I lost the money and I've got other things to do.

21    Q.    Were you aware --

22    A.    Although it was on my mind, believe me, it wasn't like I

23    thought about it every minute.

24    Q.    And that was a long wait, wasn't it?

25    A.    Yes.

1    Q.   Were you aware that Mr. Fraiman had settled his case with

2    the SEC?

3            MR. CHRISTOFFERSON:  Objection, your Honor.

4            THE COURT:  Sustained.

5    Q.   Were you in contact with the SEC, sir?

6    A.   I called them back after they sent me a letter asking me

7    to call them back.

8    Q.   Did they provide you any updates as to the progress of

9    their case?

11:31AM 10          MR. CHRISTOFFERSON:  Objection, your Honor.

11           THE COURT:  Sustained.

12   Q.   So, sir, how many conversations total did you have with

13   Mr. Thomadakis?

14   A.   I'm going to say five.

15   Q.   Five.  And were all of those over the phone?

16   A.   No.

17   Q.   Some of those were in person?

18   A.   Yes.

19   Q.   How many of those were in person?

11:31AM 20   A.   Three.

21   Q.   Okay.  And did you have any conversations with

22   Mr. Christofferson?

23   A.   Yes.

24   Q.   And how many conversations did you have with him?

25   A.   Three.

1   Q.   And how many of those were in person?

2   A.   All three.

3   Q.   All three.  And did you have conversations with other

4   individuals, special agents?

5   A.   Well, we all met together three times.

6   Q.   All right.  And over the telephone did you have

7   conversations with special agents?

8   A.   Yes.

9   Q.   All right.  And do you recall the names of those agents?

11:32AM 10   A.   Well, they're the same ones, and I'm a little bit gray on

11   the names.

12   Q.   Okay.  Marinelli?

13   A.   But they're here, they're here in the courtroom.

14   Q.   Marinelli?

15   A.   Yes.

16   Q.   Gianakura?

17   A.   No.

18   Q.   And how many meetings did you have with the FBI agents?

19   A.   Three.

11:32AM 20   Q.   Three.  All right.  So you had at least half a dozen

21   in-person meetings and how many telephone conversations?

22          MR. CHRISTOFFERSON:  Objection, your Honor.

23          THE COURT:  Sustained.

24   A.   No, we had three meetings total, and they were all there

25   at those three meetings.  I already told you that once, yeah.

1   Q.   I'm sorry.

2   A.   They were all, three times, yes, sir.

3   Q.   At these three meetings, how did the meetings go?

4   A.   Well, the information that I sent them originally, we went

5   over that and went over the checks that I wrote, which was the

6   beginning point like, in other words, the checks that you can

7   see on this list right here.  That was sort of the point of

8   chronological order, and then we backed up from there, I did,

9   backed up from there and got my documentation all categorized

11:33AM 10   for those investments, then we discussed the investments.

11   Q.   Did the agents give you or the prosecutors tell you about

12   things that they thought you had gotten wrong?

13   A.   They mentioned some of the dates I had were

14   chronologically out of order.

15   Q.   And you would rework those dates as a result, correct?

16   A.   I'd look at the documents and figure they were right

17   because that's what we looked at.  There was documentation that

18   showed that it was not right because of the checks, you know,

19   the dates on the checks are definitely true.

11:34AM 20   Q.   Okay.  But also some other things like the chronology that

21   you created, it turned out that you had a date that was off by

22   a month or more?

23   A.   There was some letters that were sent from

24   Jonathan Fraiman that had the wrong date on them.

25   Q.   Yes, you pointed that out, but there was some other

1  mistakes?

2  A.   And the dates really were based on the reason I made the

3  investments more than, in other words, there was certain

4  reasons I made investments, and I got that a little bit out of

5  whack as far as why I made the investment, so, therefore, you

6  know, there were five, in other words, I said that they, in my

7  mind, that the first two here, April 7th and May 22nd was one

8  investment.

9       That was Number 1, where the FBI thought that was

11:35AM 10  Number 1 and Number 2, so then when I talked about Number 3,

11  they thought that Number 3 was the October 16th, but, in

12  reality, I call that Number 2, so in reality our basic problem

13  was that we -- I considered, you know, the first investment

14  $200,000, and they considered the first investment 50,000 so

15  that's how we got kind of out of sequence.

16  Q.   But there was more than that, wasn't there, as far as the

17  corrections that the agents and the prosecutors gave to you?

18       MR. CHRISTOFFERSON:  Objection.

19       THE COURT:  Overruled.

11:36AM 20  A.   No.

21  Q.   Sir, let me direct your attention to a statement that you

22  made with law enforcement agents on October 27th of this year.

23  Did you tell the agents that you had requested a copy from

24  Fraiman of Envit's filing and financial statements?

25  A.   I'm not sure of that document.  Can I look at it?

1   Q.   I've just got a summary provided by the government, but --

2   A.   I'm not sure.

3   Q.   Tell me if you recall telling the government -- let me see

4   if I can put it in context on that date that at some point you

5   requested of Fraiman a copy of Envit's 10-K filing and

6   financial statements, but Mr. Fraiman responded along the lines

7   that providing such documents was not his area of

8   responsibility.  Do you remember saying that?

9   A.   I really don't remember that, seriously.

11:37AM 10   Q.   Is the reason you don't remember that because within the

11   past couple of days, you changed your mind on that and you said

12   now that I think about it, I never asked him for any filing

13   documents?

14   A.   I just asked him, I wanted to know where my shares were

15   first.  I mean, where are my shares?  Where is my stock?  Until

16   I get my stock, I don't know why it makes any difference if he

17   gives me a 10-K, I was more concerned about where my stock was.

18   Q.   I understand that, sir, and certainly I would be as well,

19   any of us would be, but you would agree with me that the

11:38AM 20   details of conversations and particularly for a defendant in a

21   criminal case where the stakes are so high are really

22   important?

23         MR. CHRISTOFFERSON:  Objection, your Honor.

24         THE COURT:  Well, it's argumentative.  Rephrase.

25   Q.   The details are important, correct?

1    A.    Yes.

2    Q.    All right.  And you want to be as precise as possible,

3    correct, sir?

4    A.    Yeah, I'd like to be, yes.

5    Q.    And, sir, do you also remember in that October 27th

6    conversation telling the law enforcement officers and

7    prosecutors that you might have spoken in the context of Aetius

8    or Aetius or Aetius or however you pronounce it that at some

9    point you dealt with a Jason Miles regarding your $40,000

11:39AM 10    investment?

11    A.    I don't remember that, no.

12    Q.    You don't remember that?

13    A.    No.

14    Q.    All right.  So if the government said that --

15          MR. CHRISTOFFERSON:  Objection, your Honor.

16          THE COURT:  Sustained.

17    Q.    You don't remember saying that though?  Do you remember

18    saying on another occasion that you dealt with nobody else but

19    Fraiman when it came to Aetius?

11:39AM 20    A.    That's true except for his assistant who sent me

21    documents.

22    Q.    All right.

23    A.    He called her, he referred to her as his assistant.

24    Q.    Did you ever deal with a Jason Miles?

25    A.    No.

1  Q.  Any idea where that name would come from?

2        MR. CHRISTOFFERSON:  Objection.

3  A.  No, I don't.

4        THE COURT:  Hold on.

5  A.  No.

6        THE COURT:  I'll allow it, I'll let the answer stand.

7  Go ahead.

8  Q.  Thank you, sir.  Now, sir, you and Mr. Fraiman had a

9  relationship, correct?

11:40AM 10  A.  Yes.

11  Q.  And over time that relationship got stronger?

12  A.  I would say that we became interested in each other's

13  lives a bit on the surface rather than, no, I'm not considering

14  a true friendship more of an acquaintance, telephone

15  acquaintance.

16  Q.  But my Brother -- and, by the way, sir, that's just a

17  legal term of art, we're not really brothers.

18        MR. CHRISTOFFERSON:  Thank you.

19  Q.  I don't want Mr. Christofferson to think I'm assuming

11:41AM 20  something or you, too, but let me show you Exhibit 93.

21  Mr. Christofferson asked you about this, and he showed you this

22  after you had testified that you and John Fraiman spoke by

23  phone, you had a tough time getting ahold of him; is that

24  right, sir?

25  A.  That's correct.

1  Q.   Did he tell you he had been on vacation for a portion of

2  that time?

3  A.   I don't remember that.

4  Q.   Did he tell you that Laborio was all over the place?

5  A.   Yeah, he did, yeah, the first, after I finally got ahold

6  of him.  Getting ahold of him I thought was great, now I can

7  figure out how my investments are going, I have a link to my

8  investment.

9  Q.   But as far as Laborio told you and what he told you,

11:42AM 10  Laborio was in Boston, Laborio was in Florida, Laborio was in

11  casinos, Laborio was traveling.  Do you recall discussing the

12  whereabouts of Edward Michael Laborio?

13  A.   No, not where he was, no.

14  Q.   But that he was a tough guy to get ahold of?

15  A.   He said he's been trying to get ahold of him, and he said

16  he was going off the deep end and took the money and made wild

17  investments with it.  He was very concerned about it.  He was

18  trying to distance himself from him.

19  Q.   And you had no reason to doubt what Mr. Fraiman was

11:43AM 20  telling you then, did you?

21  A.   No.

22  Q.   And you have no reason to doubt that today, do you?

23  A.   No.

24  Q.   And, sir, on a number of occasions, you've referred to

25  "they" when you're talking about what was told to you about the

1    progress of your investments.  Do you recall that, sir?

2    A.    I don't remember what I exactly wrote.

3    Q.    All right, sir.  But in the context of this exhibit,

4    Number 93, you recall this July 30th conversation between you

5    and Fraiman, and you told Fraiman about this contact that you

6    had had from the Securities and Exchange Commission, correct?

7    A.    Yes.

8    Q.    Because you cared about him, correct?

9    A.    Yeah, I said, "Hey, what's going on here?"  I wanted to

11:44AM 10   know what's going on with the Securities and Exchange

11   Commission, I get this notice, "What's going on here,

12   Jonathan?"

13   Q.    And you wanted to know what was going on because you had a

14   lot of money invested in Envit, correct?

15   A.    That's true.

16   Q.    But you also cared about this young man that you had come

17   to know during the course of these investments; is that

18   correct?

19   A.    I think I was concerned about his career choice and

11:45AM 20   wondering if he was going to -- what he was going to do.  As

21   far as being close to him, I wouldn't say that was true.

22   Q.    All right, sir.  But you wrote this very --

23   A.    I really wanted to know, how does this affect my

24   investment?

25   Q.    Sure, of course.  But, you know, you've testified that

1    your note here, "Keep doing what you're doing --"

2    A.   Yes.

3    Q.   -- was telling him to get away from the company.  Do you

4    recall?

5    A.   Well, earlier in July, he told me that he had broken away

6    from Laborio, he wanted to distance himself from Laborio, he

7    was going to go work for somebody else, he was going to start

8    his own business somewhere else with another company or

9    somewhere or another, and I knew that because we talked about

11:46AM 10    it a few times, two times.

11    Q.   Sure.

12    A.   And when I said that, I meant keep doing what you're doing

13    means go ahead and do your own thing, go ahead and be a broker

14    with some other company.  That's what I meant.

15    Q.   And stay away from Ed Laborio?

16    A.   Yes.

17    Q.   Because Ed Laborio as far as you could tell was toxic,

18    correct?

19    A.   Well, that's what Jonathan told me and then the fact that

11:46AM 20    I hadn't had any information given to me, so I thought, well,

21    all this, all these investments were gone.

22    Q.   All right, sir.  Let me show you another exhibit.  By the

23    way, sir, you testified as to the advisory board and how you

24    thought that was a compliment to you, correct?

25    A.   Yes.

1  Q.   Because you were going to be on the board with those five

2  individuals we talked about before?

3  A.   Yes, sir.

4  Q.   And, sir, showing you Exhibit 79, which was dated

5  July 24th, 2008, this is styled as a statement of

6  understanding; is that correct?

7  A.   Yes.

8  Q.   And, sir, directing your attention to the 'to' line that's

9  directed to you, Eric Samuelson, correct?

11:48AM 10  A.   Yes.

11  Q.   And it's from whom?

12  A.   Edward Laborio.

13  Q.   Is Jonathan Fraiman mentioned anywhere in this document?

14  A.   No, not that I can remember.

15  Q.   In fact, didn't Fraiman tell you that the advisory board

16  wasn't his deal, it was Laborio's?

17  A.   I don't remember him telling me that it was that at all

18  because I assumed it was anyway, so, I knew it was Laborio's

19  idea to have the advisory board.  I'm not sure if Fraiman had

11:48AM 20  anything to do with it.  I don't know.

21  Q.   All right.  And --

22  A.   He never told me that though.

23  Q.   Okay.  But based on your perception and your experience in

24  investments and your life's experience --

25  A.   Yes.

1    Q.   -- you perceived that Edward Laborio was the boss,

2    correct?

3    A.   Yes, I did, but I thought that since Jonathan Fraiman was

4    called director, I thought that made him a pretty high, gave

5    him a pretty high position in the company and that gave him

6    more credibility to make decisions in my opinion when I saw

7    that.  He didn't say I'm a broker, I'm a clerk, he said he was

8    a director, which gives you credibility in my opinion.

9    Q.   Of course.  You also knew that Edward Laborio had used

11:49AM 10  names and titles, advisory board members, consultants in his

11   literature as well, didn't you?

12   A.   Yes.

13   Q.   So it would not come as a surprise to you that Laborio

14   would throw around titles to his employees, would it?

15   A.   I don't know.  I really don't know.  I know the advisory

16   board was not necessarily running the company, they were there

17   in case you needed them once a year.  They weren't there

18   working every day, it's just who was working every day, was it

19   the advisory board, no, was it Laborio, yes.

11:50AM 20  Q.   It turns out that the titles -- strike that.  The names of

21   those advisory board members were pretty meaningless, weren't

22   they?

23   A.   Well, as far as being on the advisory board, I would say

24   that they would be a check and balances for the company if the

25   meetings were periodically scheduled.

1    Q.   But you now know that it was a sham, wasn't it?

2    A.   No, I don't know that, no.

3    Q.   You don't know that?

4    A.   No.

5    Q.   So you think that Laborio's prospectus and his private

6    placement memorandum were truthful?

7    A.   I don't know that they aren't.  All I know is I want to

8    know where my $640,000 is.

9    Q.   Sure.

11:51AM 10   A.   Nobody ever told me they were not real.

11    Q.   Okay.  Fair enough.  Sir, I'm showing you Exhibit 81,

12    which has been referred to as the two-pager.

13    A.   Yes, sir.

14    Q.   Do you recognize this?

15    A.   Yes.

16    Q.   And, sir, with respect to the block that

17    Mr. Christofferson referred you to, the 43.7 percent, do you

18    see that?  I'm sorry.

19    A.   Yes, I know what you mean though.  I know where you're

11:52AM 20   going there, there it is.

21    Q.   Do you see that, sir?

22    A.   Yes, sir.

23    Q.   You don't know where that name came from, do you?

24    A.   No.

25    Q.   And is it fair to say that based on your contact with

1  Jonathan Fraiman that Fraiman didn't know where those numbers

2  came from?

3        MR. CHRISTOFFERSON:  Objection.

4  A.   I don't know if he did or not.

5        THE COURT:  Hold on.  I'm going to sustain the

6  objection and strike the answer.

7        MR. CHRISTOFFERSON:  Thank you.

8  Q.   Sir, I direct your attention to Exhibit 69.  Do you see

9  that check?

11:52AM 10  A.   Yes.

11  Q.   And, sir, let me direct your attention to the endorsement

12  on the back of the check.  Do you see that?

13  A.   Yes.

14  Q.   And do you recognize that signature?

15  A.   Well, I really have never seen that signature that close

16  up that you blew it up there, but it looks like the first name

17  is Edward though.

18  Q.   All right.  Does the second name look like Laborio?

19  A.   I think so, yeah, I'd say yes, Edward Laborio.

11:53AM 20  Q.   And, sir, showing you the check dated 5-22-08, do you

21  recognize that?

22  A.   Yes, it's a little blurry.

23  Q.   All right.  Pardon me.

24  A.   That's all right.  There you go.

25  Q.   And, sir, once again showing you the endorsement on the

1  back, does that appear to be the same signature as you saw in

2  the previous one?

3  A.   Yes.

4  Q.   And, sir, showing you your October 16th, 2008 check, if I

5  could show you the endorsement, can you see what that says?

6  A.   Well, it just says for deposit only.  There's no

7  endorsement that I can see.

8  Q.   There's no name?

9  A.   No.

11:54AM 10  Q.   Jonathan Fraiman's name is not on there, is it?

11  A.   No, it is not.

12  Q.   And, sir, on this cashier's check from March 31st, 2009,

13  do you recognize that check as well?

14  A.   Yes.

15  Q.   And is Jonathan Fraiman's endorsement on that check

16  either?

17  A.   No, it is not.

18  Q.   And, sir, this check from June 7th or 4, sir, can you

19  tell?

11:55AM 20  A.   It's June 4th.

21  Q.   June 4th, 2009?

22  A.   Yes.

23  Q.   That's your check for $100,000, correct?

24  A.   Yes.

25  Q.   And is Jonathan Fraiman's name on the back of that check?

1    A.    No.

2    Q.    And, sir, the same question for this June 17th, 2009

3    check, is Jonathan Fraiman's name on there?

4    A.    No, it is not.

5    Q.    And, sir, this check, August 31st of '09, the Aetius

6    check, is Jonathan Fraiman's endorsement on there?

7    A.    No.

8    Q.    Sir, is it fair to say you don't know where your

9    investment money went?

11:56AM 10   A.    That's correct.

11   Q.    You do know that on at least a couple of those occasions,

12   Edward Laborio took that money, correct?

13   A.    No, I don't know that.

14   Q.    Well, you saw his signature on the back of your checks.

15   Would you assume that?

16   A.    Well, I would assume that he put it into the Envit Capital

17   account.

18   Q.    All right.  So, sir, you've testified that you made money,

19   you lost money in investments.  Have you made more than you

11:57AM 20   lost?

21   A.    Yes.

22   Q.    What's the most that you ever lost in one deal?

23   A.    $640,000.

24   Q.    This was it?

25   A.    That's correct.

1  Q.   Okay.  And outside of Envit, what was the biggest loss

2  that you had had?

3  A.   $507,000.

4  Q.   Okay.  When was that, sir?

5  A.   That was probably five years ago.

6  Q.   All right.  And who was the broker in that case?

7       MR. CHRISTOFFERSON:  Objection, your Honor.

8       THE COURT:  Sustained.

9  Q.   Were you happy at the loss of that money?

11:57AM 10       MR. CHRISTOFFERSON:  Objection.

11  A.   No.

12       THE COURT:  I don't see how other losses are relevant.

13  Sustained.

14  Q.   All right.  Sir, I appreciate your being here, I

15  appreciate your answering our questions.  Is it fair to say

16  that you don't know what Edward Laborio told Jonathan Fraiman

17  during the course of your contact with Envit and Aetius?

18  A.   No, I don't know.

19  Q.   Thank you very much, sir.

11:58AM 20       THE COURT:  Why don't we take our 12:00 break.

21       MR. CHRISTOFFERSON:  I'm sorry to interrupt.  I

22  probably have two more questions.

23       THE COURT:  We'll see if we can get it done.

24       MR. CHRISTOFFERSON:  If that makes sense.

25       THE COURT:  Yes, of course.

<u>REDIRECT EXAMINATION</u>

BY MR. CHRISTOFFERSON:

Q.   Mr. Samuelson, I have a couple quick questions.  It
shouldn't take more than a minute.  Mr. Sinnott just asked you
about Mr. Laborio throwing titles around.  Do you recall those
questions?

A.   Yes.

Q.   I'm going to show you Exhibit 89.  Who is this e-mail
from?

11:59AM A.   Jonathan Fraiman.

Q.   And if we look at the signature block in that e-mail, what
is he writing to you that he is?

A.   That he's the director of Envit Capital Private Wealth
Management, LLC.

Q.   And also what?

A.   And also a registered investment advisor.

Q.   Mr. Sinnott also asked you about the prospectus.  He asked
you about the prospectus and whether you took it at face value.
Do you recall that?

11:59AM A.   You mean the first one?

Q.   Yes, that first prospectus, he asked you some questions
about you took the representations in there at face value.  Do
you recall that?

A.   Yes.

Q.   And he asked you whether other customers who are looking

1    at it would take it at face value.  Do you recall that?

2    A.    Yes.

3    Q.    Are you a registered investment advisor?

4    A.    No.

5    Q.    Was Mr. Fraiman a registered investment advisor?

6    A.    I don't know.

7    Q.    What does it say on his e-mail here?

8    A.    It says he is.

9          MR. CHRISTOFFERSON:  No further questions, your Honor.

12:00PM 10          THE COURT:  Recross.

11          MR. SINNOTT:  Very briefly, your Honor, thank you.

12                    RECROSS-EXAMINATION

13   BY MR. SINNOTT:

14   Q.    Sir, what's a director?

15   A.    I would say a director is someone that directs the every

16   day operation of a company or an entity.  It can also be

17   someone that's one of the people on a Board of Directors that

18   has a number of directors, which I have been on many of those,

19   but the director, I'm not sure, the director title is something

12:01PM 20   that I think shows, you know, a high visibility within that

21   company that he is called the director.

22   Q.    And, sir, you're a boss, correct?

23   A.    Yes.

24   Q.    And you would agree with me that sometimes the best you

25   can do for an employee is give them a title, correct?

1    A.    That's true.

2    Q.    And sometimes even if a title doesn't mean anything, the

3    status that comes with it is important to that individual,

4    correct?

5    A.    Yes.

6    Q.    And it's important to that individual because others see

7    it and think it means something, correct?

8    A.    Yes.

9    Q.    All right.  And, sir, my Brother asked you about that

12:02PM 10    prospectus and the face value of that 2007 document and how

11    you're not a registered investment advisor.  Do you recall

12    that?

13    A.    Yes.

14    Q.    But, sir, you've been investing for 40 years or more,

15    correct?

16    A.    Yes.

17    Q.    So would it be fair to say in those 40 years of investing,

18    you garnered more investment experience than a broker nine

19    months out from getting his Series 7?

12:02PM 20          MR. CHRISTOFFERSON:  Objection.

21          THE COURT:  Sustained.

22          MR. SINNOTT:  No further questions, your Honor, thank

23    you.

24          THE COURT:  Thank you.  We'll take our break.

25          THE CLERK:  All rise.

1          (JURORS EXITED THE COURTROOM.)

2          THE WITNESS:  I'm excused?

3          THE COURT:  You're excused.

4          (A recess was taken.)

5          THE CLERK:  All rise for the jury.

6          (JURORS ENTERED THE COURTROOM.)

7          THE COURT:  Mr. Thomadakis.

8          MR. THOMADAKIS:  Thank you, your Honor.  The

9    government calls Marci Soligo.

12:13PM 10          Your Honor, before we get started, the government has

11   marked for identification under the letter A the transcript of

12   Exhibit 161, which is agreed upon, which is a recording, and

13   we're formally offering Exhibit 161 into evidence.

14          THE COURT:  Okay.  All right.  No objection?

15          MR. SINNOTT:  No objection, your Honor.

16          THE COURT:  Exhibit 161 is admitted.

17          (Exhibit No. 161 was admitted into evidence.)

18          THE COURT:  Let me explain to the jury, it sounds like

19   we're about to play a recording.  The recording itself is the

12:14PM 20   evidence.  It sounds like you're going to get a transcript to

21   help you follow along.  Sometimes the transcripts are accurate.

22   The recording itself is the evidence, and if you hear something

23   different, that's the evidence, not the transcript.  It's

24   designed to aid you.

25          MR. THOMADAKIS:  To that end, we've placed the

1   transcript as well, 81, in the binder for the jury.  Do we have

2   permission to hand those out?

3               THE COURT:  Yes.

4               MR. THOMADAKIS:  While Mr. Christofferson is doing

5   that.

6               MARCI SOLIGO, having been duly sworn by the Clerk,

7   testified as follows:

8                           <u>DIRECT EXAMINATION</u>

9   BY MR. THOMADAKIS:

12:14PM 10  Q.   Could you please state and spell your name.

11  A.   Marci Soligo, M-a-r-c-i S-o-l-i-g-o.

12  Q.   What do you do for work?

13  A.   I'm an FBI agent.

14  Q.   And how long have you been doing that?

15  A.   Almost 12 years.

16  Q.   What office of the FBI do you work in?

17  A.   I work in San Diego.

18  Q.   Could you please briefly walk us through your educational

19  and professional background prior to becoming an FRI special

12:15PM 20  agent.

21  A.   Sure, I have a bachelor's in education, secondary

22  education, I have a master's degree in American history, and I

23  have a law degree as well.

24  Q.   Actually, could you move that mic. a little closer to you.

25  Thank you.  Your professional background before joining the

1  FBI?

2  A.    I was a high school teacher for eight years, and I

3  practiced law for a couple of years, and then I now work at the

4  FBI.

5  Q.    Generally what types of crimes or activities do you

6  investigate?

7  A.    I investigate white collar frauds.

8  Q.    Which includes what type of --

9  A.    I have investigated healthcare fraud, securities fraud,

12:16PM 10  insider trading, bankruptcy fraud, wire fraud, mail fraud.

11          THE COURT:  The mic. just a tiny bit closer again.

12  You'll know if you are too close.  Go ahead.

13  Q.    And part of your duties, what kind of duties go into your

14  day-to-day responsibilities, Special Agent Soligo?

15  A.    While investigating frauds, I mean, a lot of that is --

16  some of it includes arrests like in this case, sometimes not.

17  Q.    So you execute arrest warrants as part of your duties as

18  an FBI agent?

19  A.    I do.

12:16PM 20  Q.    How many arrests have you participated in during the

21  course of your career at the FBI, approximately?

22  A.    Approximately 70.

23  Q.    And were you involved in the arrest of the defendant,

24  Jonathan Fraiman?

25  A.    I was.

1    Q.    When did that arrest occur?

2    A.    It was August 27th, 2014.

3    Q.    How did you come to be involved in that arrest?

4    A.    I was assigned a lead from my boss on my squad, and that's

5    how I received the information that there was an arrest warrant

6    for Mr. Fraiman.

7    Q.    What does a lead mean?

8    A.    A lead is a system that we use at the FBI.  It's sometimes

9    not efficient, might not be efficient for an agent from Boston

12:17PM 10    to travel all the way to San Diego to make an arrest in their

11    case, so the office sends a lead to our office, and we execute

12    that arrest warrant for them.

13    Q.    And what did you know about Mr. Fraiman and any alleged

14    conduct he had committed prior to getting that lead?

15    A.    I didn't know anything about Mr. Fraiman prior to getting

16    that lead.

17    Q.    So you weren't involved in the investigation of his

18    activities?

19    A.    No.

12:18PM 20    Q.    What was your role with respect to the arrest?

21    A.    I was the team leader on the arrest.

22    Q.    What does that mean to be a team leader?

23    A.    The team leader, I assemble a team of people to take with

24    me to the arrest.  I'm responsible for making the arrest plan,

25    I am responsible for getting all the approvals that go with

1  that, making sure, you know, a lot of times you'll do like a

2  site survey to find out, you know, you need to locate the

3  person you're going to arrest, you need to find out where they

4  are, take a look at the -- in most cases, you would take a look

5  before you go and just generally ensure the safety of the

6  officers that are with you.

7  Q.   On this particular arrest, how many agents total were

8  there?

9  A.   Six.

12:18PM 10  Q.   And how unusual was it to execute an arrest warrant with

11  that number of FBI agents?

12  A.   That is very routine.

13  Q.   What time did you arrive at Mr. Fraiman's street address,

14  approximately, on August 27th, 2014?

15  A.   Approximately 6 a.m.

16  Q.   How unusual was it to execute an arrest warrant at that

17  time of the morning?

18  A.   That is a normal time that we would execute an arrest

19  warrant.

12:19PM 20  Q.   Were you able to arrest Mr. Fraiman on that day, in fact?

21  A.   Yes.

22  Q.   And how would you characterize overall that arrest in your

23  mind?

24  A.   I would say it was a fairly routine morning.

25  Q.   What, if anything, sticks out in your mind about that

1    arrest?

2    A.    One of the things that -- after we entered Mr. Fraiman's

3    apartment, there was some confusion.  Mr. Fraiman had an

4    infant, and there was some confusion about where the infant

5    was, and so that was something not in the usual routine of

6    making the arrest, so we located the infant, gave the infant to

7    his girlfriend and carried on.

8    Q.    Anything else that just kind of sticks out in your mind as

9    being unusual at all about the arrest?

12:20PM 10    A.    One of the other things that is fairly clear in my mind

11    about the morning is that we -- when you're transporting

12    someone to your office, obviously, you want them to have

13    appropriate clothing, so we allowed his girlfriend to go and

14    get some clothes so that we could get him dressed to transport

15    him to our office and then onto the federal prison, and one of

16    the first shirts that was chosen was an extremely -- it was

17    very pink, very pink shirt, and so we decided that might not be

18    the best choice for the morning and went with a different

19    shirt.

12:20PM 20    Q.    Okay.  Other than these kind of strange characteristics of

21    the arrest, anything else that was unusual about it?

22    A.    No.

23    Q.    And, by the way, when you went in there, what kind of

24    equipment did the agents have with them?

25    A.    Our standard equipment that we would take with us on an

arrest, we had our body armor, we have our weapons, we have our

handcuffs, our handcuff keys.

Q.   That's standard?

A.   What we would normally take, what you would normally wear

where you are making an arrest.

Q.   Okay.  How often do you execute arrests without any

weapons or any of that stuff?

A.   We don't do that.

Q.   All right.  And what -- so how long, approximately, how

12:21PM 10 long were you in the apartment, Mr. Fraiman's apartment for?

A.   I would say approximately 15 minutes or less than 15

minutes.

Q.   And where did you go after that?

A.   We took Mr. Fraiman to our vehicle, we drove him to our

office, the FBI office in San Diego, and that's where we went.

Q.   For the transport to the office, was Mr. Fraiman

handcuffed?

A.   Yes.

Q.   Why?

12:22PM 20 A.   That's our policy, and it's for officer safety reasons.

Q.   And what occurred once you arrived at the FBI office?

A.   Mr. Fraiman, we have an area where we can pull the car

into the building.  We let Mr. Fraiman out of the car, we took

him into the booking area, which is just the booking area is

comprised of a couple of interview rooms, I think actually

there's three interview rooms, a bathroom and a booking area
where the computer is where you take someone's fingerprints,
and that's what we did, we booked Mr. Fraiman that morning.
Q.    Okay.  And how would you characterize overall your
interactions with Mr. Fraiman at the FBI office?
A.    I think the interactions were very cordial.  Mr. Fraiman
asked if he could have a cup of coffee.  We gave him a cup of
coffee.  It was very cordial and professional.
Q.    Now, at some point while you were at the FBI office, did
you inform Mr. Fraiman that there were FBI agents in Boston who
wanted to interview him?
A.    I did.
Q.    What did you say in that regard?
A.    I can't tell you verbatim what I said, but I can tell you
that what I would normally have said in this type of instance
when I am not the investigating agent on the case is I would
have said something to the effect that, you know, I don't know
much about the case, and if you want to know more, there are
agents who can tell you more about the case, and, you know,
they'd be willing to speak with you if you would like to speak
with them.
Q.    And do you recall whether Mr. Fraiman indicated that he
was willing to speak with folks in Boston?
A.    He did.
Q.    What did you do at that point?

1   A.   At that point our building was new at the time, and we

2   were having -- we didn't have a speaker phone in one of our

3   interview rooms, so Mr. Fraiman -- we were sitting in one room

4   that didn't have a speaker phone.  I advised Mr. Fraiman of his

5   rights, and we have a form that we read, it's called an FD-395,

6   so I read Mr. Fraiman the FD-395, and he indicated that he

7   would waive his rights and talk with the agents in Boston.

8   Q.   All right.  You mentioned his rights.  These are what is

9   colloquially called his Miranda rights?

12:24PM 10   A.   Correct.

11   Q.   And what are the rights on the form that you advised

12   Mr. Fraiman of?

13   A.   In essence, you have the right to remain silent, anything

14   that you say can be used against you in a court, you have a

15   right to have an attorney present while you're answering

16   questions, if you can't afford an attorney, we will provide one

17   for you, if you -- let's see what else is on there, if you

18   don't want to -- if you start answering questions and you want

19   to stop at any time, you can.

12:24PM 20   Q.   How many times did you inform Mr. Fraiman of his rights?

21   A.   Twice.

22   Q.   And what did he do after you had informed him of the

23   rights?

24   A.   He signed the form.

25   Q.   Meaning what?

1    A.   Meaning that he was willing to waive his right then and

2    speak to the agents in Boston.

3    Q.   Okay.  What occurred after that?

4    A.   We moved to a different room that had a same area, just

5    walked about, I don't know, five feet around the corner to a

6    different room with a speaker phone, and we called the case

7    agents here and put them together to talk.

8    Q.   And you said before that your role as an FBI agent was you

9    had no role in investigating the question, the events at issue

12:25PM 10   with regard to the arrest warrant; is that right?

11   A.   That's right.

12   Q.   But the folks in Boston had?

13   A.   Correct.

14   Q.   What is a case agent?

15   A.   The case agent is who is responsible for that

16   investigation, and sometimes there are two, which we would have

17   co-case agents.

18   Q.   And was there, in fact, an interview conducted of

19   Mr. Fraiman?

12:26PM 20   A.   It was.

21   Q.   Was that interview recorded?

22   A.   Yes.

23   Q.   Have you listened to that recording since?

24   A.   I have.

25   Q.   When was the last time?

1    A.    July of this year is the last time I listened to it.

2    Q.    Okay.  And also in front of you is what has been marked

3    for identification as Transcript A.  Do you see that?

4    A.    I do.

5    Q.    And what is that document?

6    A.    It looks like it's a transcript of the interview

7    recording, yeah, of the interview.

8    Q.    Have you previously reviewed a transcript with those bait

9    stamps in the bottom right-hand corner, for instance?

12:26PM 10    A.    Yes.

11    Q.    When was that?

12    A.    Yesterday.

13    Q.    And does it accurately reflect the substance of the

14    interview of Mr. Fraiman as you recall it?

15    A.    It does.

16    Q.    A couple questions about this transcript, Special Agent

17    Soligo.  On the first page, I see some participants identified

18    with initials and names that follow.  Do you see that?

19    A.    Yes, I do.

12:27PM 20    Q.    I'd like to ask you just, obviously, Marci Soligo is you,

21    and Jonathan Fraiman is the defendant.  Who is David Adams?

22    A.    David Adams is another agent that's on my squad.

23    Q.    Another San Diego agent?

24    A.    Correct.

25    Q.    Was he there for the interview?

1    A.    He was there for part of the interview.

2    Q.    Who is Chris Gianakura?

3    A.    Chris Gianakura is the agent.

4    Q.    Who is Jamie Marinelli?

5    A.    He was one of the co-case agents here in Boston.

6    Q.    Those are the two folks in Boston that you established

7    contact with?

8    A.    Correct.

9    Q.    And who is John Ireland?

12:27PM 10    A.    John Ireland is another special agent in San Diego on the

11    arrest team.

12    Q.    Okay.  And I'd like to now play what has been admitted

13    into evidence as Exhibit 161, Mr. Flynn, if you could scroll

14    ahead to approximately the I think 28 second mark is the

15    closest we're going to get, so we're starting at the 28 second

16    mark, please.

17          (Audio played.)

18          MR. THOMADAKIS:  If we could pause there at the 1.

19    Q.    I saw in this transcript at one point there was or maybe

12:30PM 20    it's not at the point we read, but if we see in parentheses the

21    letters "UI," do you understand what that means?

22    A.    I do, it means unintelligible.

23    Q.    In the clip we just heard, having heard this first part of

24    the recording, do you recall what Exhibit 161 is, this

25    recording we've been listening to?

1    A.    I'm sorry, ask that again.

2    Q.    And what have we just been listening to?

3    A.    Oh, Exhibit 161, the recording of the interview.

4    Q.    161 is the recording of the arrest interview.  We heard a

5    female voice at the outset talking about Mr. Fraiman having

6    signed the waiver form that you discussed before.  Whose voice

7    was that?

8    A.    That's mine.

9    Q.    And then at the end, we heard a question being posed by

12:31PM 10    someone from the other end of the line.  Who is that?

11    A.    Chris Gianakura.

12    Q.    All right.  And the person whose voice we just heard at

13    the end with the "yes" was who right after Mr. Gianakura spoke?

14    A.    Oh, that's Mr. Fraiman.

15    Q.    All right.  Now, I want to skip a little bit ahead to the

16    331 mark.  We will pick up there, but at this point where we

17    are about to pick up on the transcript, this is page, the page

18    Bates marked at the bottom ELJF 00010991, give everyone a

19    chance to get there, the fourth page in.  We'll pick up from

12:32PM 20    there.  At this point where we are about to pick up, what

21    individual was Mr. Fraiman being asked about?

22    A.    Edward Laborio.

23          MR. THOMADAKIS:  Okay.  So if we could start there,

24    please, Mr. Flynn.

25          (Audio played)

1    Q.   We paused it at the eight minute mark on this recording.

2    Special Agent Soligo, did you just hear Special Agent Gianakura

3    on this recording asking about a two-pager regarding the hedge

4    fund?

5    A.   Yes.

6    Q.   And at this point in the interview, did you have any

7    documents to show Mr. Fraiman?

8    A.   I didn't.

9    Q.   Did that change during the interview?

12:37PM 10   A.   Yes.

11   Q.   How?

12   A.   As they were referring to the documents, I don't remember

13   who initiated the conversation, but I thought it might be

14   better if we had the document to look at and asked if they

15   wanted to fax it to us.

16   Q.   But at this point there's no documents to show

17   Mr. Fraiman?

18   A.   Correct.

19        (Audio played)

12:41PM 20   Q.   We paused at the 1136 mark, and I apologize if you start

21   getting crank faxes to the FBI office based on playing this

22   recording out loud, but just where we paused, the conversation

23   immediately preceding your receiving of the fax number, what

24   document, again, were Mr. Fraiman and Special Agent Gianakura

25   discussing?

1    A.    Well, it's called the Envit Strategy Mixed Investment

2    Fund.  That's how it's titled.

3    Q.    So your understanding was it was still the two-pager from

4    the beginning of the conversation?

5    A.    Right.

6    Q.    And so why were you providing a fax number to

7    Special Agent Gianakura?

8    A.    So he could fax us those two pages so that we could have

9    it for the interview.

12:42PM 10        MR. THOMADAKIS:  Mr. Flynn, if we could resume,

11   please.

12        (Audio played)

13   Q.    We've paused at the 1959 mark of this recording, Special

14   Agent Soligo.  So before that there was a two-page document

15   regarding the hedge fund?

16   A.    Yes.

17   Q.    What occurred in this part of the interview?

18   A.    We received the fax of the actual document.

19   Q.    In front of you is Exhibit 81.  It's in the jury's binder

12:50PM 20   and Mr. Flynn is going to try some fancy foot work and see if

21   he can get both on the screen.  This Exhibit 81, which is in

22   evidence, is that the document that was faxed over?

23   A.    Yes.

24   Q.    The two-pager regarding the hedge fund?

25   A.    Yes.

1        MR. THOMADAKIS:  All right.  Mr. Flynn, if you would,

2   please resume playing.

3             (Audio played)

4   Q.   We paused at the 23 minute mark.  Just a couple questions

5   about terms that we see in the transcript.  I saw a reference

6   to something called a lead stock.  Do you have a basic

7   understanding based on your experience of what that is a

8   reference to?

9   A.   It's a real estate investment trust.  It's basically a

10  company that owns or that owns income producing real estate.

11  Q.   Okay.  And then Special Agent Gianakura mentioned more

12  towards the bottom of the page a fund or an ETF that would be

13  going under equities.  Do you know what the reference to an ETF

14  is?

15  A.   ETF stands for exchanged traded fund.

16  Q.   Do you have a basic understanding of what that is?

17  A.   The exchanged traded funds, they're funds that are traded

18  like stocks.

19            MR. THOMADAKIS:  Your Honor, the next clip is

20  approximately nine minutes.

21            THE COURT:  Let's run three minutes over and then

22  break.

23            MR. THOMADAKIS:  Thank you.

24            (Audio played)

25            MR. THOMADAKIS:  We've paused at the 3202 mark.

12:54PM 10

12:55PM 20

1    That's where I propose we finish for the day, your Honor.

2         THE COURT:  Ladies and gentlemen, you can leave your

3    notebooks with the transcripts on the chair.  You don't have to

4    take that with you, and please remember my caution not to

5    discuss the case with each other or anyone else, and I will see

6    you tomorrow morning at 9:00 a.m. sharp.

7         THE CLERK:  All rise for the jury.

8         (JURORS EXITED THE COURTROOM.)

9         THE COURT:  All right.  Just to follow up --

01:06PM 10         MR. THOMADAKIS:  Does Special Agent Soligo need to be

11    here?

12         THE COURT:  I don't think she needs to be here unless

13    there's something to affect her testimony.  The juror that we

14    discussed, I met with her with Ms. Pezzarossi present.  She

15    indicated that she was a contract employee basically paid by

16    the hour.  She didn't realize she wasn't going to be paid for

17    this.  She, to make matters worse, she did a day of state court

18    jury duty in April, and if I have my understanding right, it's

19    the three-day pay requirement is a requirement of state law, so

01:06PM 20    she's only been paid for two days.  She was not happy.  She

21    said I wished I had a chance to discuss, raise this with the

22    clerk beforehand.  On the other hand, I thought she did have

23    kind of a soldier's attitude.  She said I'm going to do my best

24    to try to, you know, fill in some hours after 1:00, and I

25    thought that she said something to the effect she'll do her

1    duty, she'll do her obligation, and she won't let it affect her

2    conduct, she just wished that she had known that beforehand.

3         So I think I'm inclined to let it stay where it is.  I

4    did have the impression that she was, other than unhappiness

5    about losing money, did not have a bad attitude and was not

6    going to, you know, take it out on any of us, and she did

7    expressly say that she was and she seemed very sincere to me

8    that she understood her obligations and was going to do her

9    duty, so I propose to leave that where it is.

01:07PM 10         Otherwise, I don't know if there's anything more on

11   that topic or anything else we should talk about before 8:30

12   tomorrow morning?

13         MR. THOMADAKIS:  Nothing from the government, your

14   Honor.

15         MR. SINNOTT:  Nothing from the defense, your Honor.

16         THE COURT:  Okay.  Thank you, and I'll see you

17   tomorrow morning.

18         THE CLERK:  All rise.

19         (Whereupon, the hearing was adjourned at

20   1:07 p.m.)

21

22

23

24

25

1                     C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT )

4    DISTRICT OF MASSACHUSETTS ) ss.

5    CITY OF BOSTON )

6

7            I do hereby certify that the foregoing transcript,

8    Pages 1 through 135 inclusive, was recorded by me

9    stenographically at the time and place aforesaid in Criminal

10   Action No. 12-10238-FDS, UNITED STATES OF AMERICA vs.

11   EDWARD LABORIO and JONATHAN FRAIMAN and thereafter by me

12   reduced to typewriting and is a true and accurate record of the

13   proceedings.

14           Dated this 10th day of February, 2016.

15

16                     s/s Valerie A. O'Hara

17           _____

18             VALERIE A. O'HARA

19             OFFICIAL COURT REPORTER

20

21

22

23

24

25