<pre>
 1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
 2

 3

 4     UNITED STATES OF AMERICA,        )
                                        )
 5                       Plaintiff,     )  Criminal Action
                                        )
 6                                      )  No. 12-10238-FDS
       vs.                              )
 7                                      )
       EDWARD LABORIO and JONATHAN      )
 8     FRAIMAN,                         )
                         Defendants.
 9


10
       BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV
11

12
                          JURY TRIAL DAY 4
13

14

15
              John Joseph Moakley United States Courthouse
16                       Courtroom No. 2
                       One Courthouse Way
17                     Boston, MA 02210

18
                       DECEMBER 3, 2015
19                        8:30 a.m.

20

21

22

23                     Valerie A. O'Hara
                     Official Court Reporter
24        John Joseph Moakley United States Courthouse
                 One Courthouse Way, Room 3204
25                     Boston, MA 02210
                   E-mail: vaohara@gmail.com
</pre>

APPEARANCES:

For The United States:

United States Attorney's Office, by
VASSILI THOMADAKIS, ASSISTANT UNITED STATES ATTORNEY, and
ERIC P. CHRISTOFFERSON, ASSISTANT UNITED STATES ATTORNEY,
1 Courthouse Way, Suite 9200, Boston, Massachusetts 02110;

For the Defendant:

Donoghue, Barrett & Singal, by WILLIAM F. SINNOTT, ESQ.
and ELIZABETH MCEVOY, ATTORNEY, Suite 1320, One Beacon Street,
Boston, Massachusetts 02108-3106.

I N D E X

| Testimony of: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| JONATHAN GENOVESE, RESUMED | | | | |
| by Mr. Thomadakis | 4-12 | | 4-66 | |
| by Mr. Sinnott | | 4-23 | | 4-71 |
| DALLAS MUSGRAVE | | | | |
| by Mr. Christofferson | 4-74 | | 4-132 | |
| by Mr. Sinnott | | 4-119 | | 4-134 |
| ROSALEE JEAN MUSGRAVE | | | | |
| by Mr. Christofferson | 4-135 | | 4-148 | |
| by Mr. Sinnott | | 4-142 | | 4-149 |
| MATTHEW LAZAR | | | | |
| by Mr. Thomadakis | 4-150 | | | |


E X H I B I T S

| No.    Description | In Evd. |
|---|---|
| 13 through 35, 184, 186 | 4-77 |
| 98 through 127 | 4-150 |
| 396, 397, 398 and 399 | 4-127 |

<u>PROCEEDINGS</u>

1

2      THE CLERK:  Court is now in session in the matter of

3  the United States vs. Edward Laborio and Jonathan Fraiman,

4  Criminal Matter 12-10238.

5      Counsel, would you please identify yourself for the

6  record.

7      MR. THOMADAKIS:  Good morning, your Honor,

8  Vassili Thomadakis on behalf of the United States.

9      THE COURT:  Good morning.

10      MR. CHRISTOFFERSON:  Eric Christofferson for the

11  United States.

12      MR. SINNOTT:  William Sinnott for the defendant

13  Jonathan Fraiman.

14      MS. McEVOY:  Elizabeth McEvoy for the defendant

15  Jonathan Fraiman.

16      THE COURT:  Anything we need to start before the trial

17  day starts?

18      MR. THOMADAKIS:  Nothing from the government.

19      MR. SINNOTT:  Just one item, your Honor.  We

08:33AM 20  anticipate that after the witness Genovese testifies that the

21  Musgraves will testify, and as the Court will recall, this was

22  an item brought up as part of the motions in limine as to what

23  they could testify to.

24      THE COURT:  Yes.

25      MR. SINNOTT:  Since that motion, Mrs. Musgrave has

1    recalled that she did, according to the government's

2    information, discuss with Mr. Fraiman and Mr. Laborio that her

3    mother and that she -- something about her mother and that she

4    was the trustee for her mother's trust.

5          She told Mr. Fraiman and Mr. Laborio that the money

6    was meant ultimately to go to Mrs. Musgrave's adopted children

7    but also that the money was needed for her mother's living and

8    medical expenses, and I think consistent with the Court's

9    instruction, those statements would be appropriate in that they

08:34AM 10   were communicated according to Mrs. Musgrave to Laborio and/or

11   Fraiman.

12         What I would note -- and because this is just such

13   potentially prejudicial information is that much of the other

14   information that was discussed, you know, as a result of her

15   mother's dwindling savings due to the cost of nursing home and

16   nursing care and for the loss of money invested with Envit,

17   Musgrave had to apply for Medicaid on behalf of her mother

18   eventually, the aftereffects, I would submit, are still -- we

19   would submit off limits, and I would assume the government

08:35AM 20   isn't going to be asking questions about the Musgraves'

21   understanding of what was going to happen unless that was

22   related to something that was communicated to them by my

23   client, for example, Mrs. Musgrave says she never understood

24   that the investment was risky, she came from the meeting with

25   Laborio and Fraiman understanding that it was a solid company.

1          I mean, obviously what they said is appropriate, but I

2     would just ask that the Court be sensitized, and I know the

3     government is to the fact that everything that has been

4     communicated to the government by the Musgraves is not fair

5     game for testimony.

6          THE COURT:  Well, let's start the aftereffects of the

7     loss.  What does the government expect to do there?

8          MR. CHRISTOFFERSON:  Yes, your Honor, I think there

9     are two separate issues there.  With respect to the

08:36AM 10     aftereffects, and I'm glad we're talking about it because

11     certainly it was my intent to at least come up to sidebar to

12     make sure we were on the same page since it was a subject of a

13     motion in limine.

14          My understanding, and certainly the Court will correct

15     me if I'm wrong, is that, again, with respect to information

16     that was conveyed to Mr. Fraiman and Mr. Laborio, there's also

17     an e-mail that sort of backs up this communication that the

18     information -- that money was going to be used for Ms. Ohm's,

19     who is Ms. Musgrave's mother, her living expenses, that that

08:37AM 20     information certainly would be fair game.

21          I think there was an open question as to whether she

22     would be able to testify that as a result of the money being

23     lost that her living and care expenses being diminished, that

24     she was then forced into a Medicaid facility, and I think that

25     would be fair game.

1           I think there are certain things that would not be

2    fair game, and let me just be candid with the Court.  I

3    certainly don't intend to go into this.  One of the children,

4    Mrs. Musgrave's adopted children, apparently had traumatic

5    brain injury in like the year 2000, and so some of this money

6    was very meaningful in that respect to go for his care.

7           She never communicated that fact to Mr. Fraiman or

8    Mr. Laborio, certainly have instructed her that that would not

9    be an appropriate line of questioning for me and testimony from

08:38AM 10   her, so we don't intend to go into that.

11          Also, Mrs. Musgrave, I think in her mind logically

12   because her mother in her mind went downhill after she went to

13   this Medicaid facility and ultimately passed away, she links

14   that all in her mind.  We certainly don't intend to go that far

15   and talk about her mother's death, but I think the fact that

16   she was then, because she lost this money, one of the effects

17   was that she had to go into a Medicaid facility, which was

18   different from otherwise what she was living in at the time,

19   that that particular fact would be fair game.

08:38AM 20          MR. SINNOTT:  We would object strenuously to that,

21   your Honor.  That's highly prejudicial, and I appreciate that

22   the government recognizes that these other items about the

23   effect are off limits.  For the very same reason, that

24   information should be off limits as well.

25          MR. CHRISTOFFERSON:  I think it's reasonably

1   foreseeable if this money, if they were communicating to her

2   about was being used for living expenses, if it was gone, what

3   the result would be.

4        MR. SINNOTT:  I don't know if that's an appropriate

5   test, and I think the prejudicial effect of that outweighs the

6   miniscule probative impact that that would have.

7        THE COURT:  I think we're talking essentially about a

8   single fact, if I understand the government correctly, which is

9   that as a result of the loss, one of the consequences was that

08:39AM 10   her mother had to go into a Medicaid facility which was a

11   different choice than she otherwise would have made and to stop

12   there and go no further, nothing about the traumatic brain

13   injury or the rest of it.

14        MR. CHRISTOFFERSON:  That's correct, your Honor, and I

15   certainly, with the Court's permission, would be happy to lead

16   a little bit to ensure that that didn't go any further, but it

17   would be up to the Court as to how to proceed with that fact.

18        MR. SINNOTT:  Respectfully, your Honor, how is that

19   probative of the crimes at issue here?  I'm asking the

08:40AM 20   government.

21        THE COURT:  All right.  Mr. Christofferson, I'll let

22   you respond to that question.

23        MR. CHRISTOFFERSON:  Well, it's certainly the fact of

24   the -- if they were on notice that money they were taking, and

25   it's alleged here that they took it knowingly to defraud

1    people, that this money, not only is it money in the abstract

2    that is taken out of their bank account and they no longer have

3    it, but the real world effect for Mr. Fraiman to be a fiduciary

4    and to have had this fiduciary, the duty to keep his client's

5    best interests in mind, if that money that was supposed to have

6    been used for trust and also to take care of this woman's

7    living expenses was then gone, well, the natural consequence of

8    that, which is clearly reasonably foreseeable, is there's going

9    to be an effect on the woman's living arrangements.  We think

08:40AM 10    that is probative of Mr. Fraiman's intent.

11         MR. SINNOTT:  Well, I beg to differ, your Honor.  If

12    that makes it admissible, then all of the other things that the

13    government has admitted can't be introduced would be reasonably

14    foreseeable.  It's just not probative.

15         THE COURT:  All right.  Here's what I'm going to do.

16    I think maybe in an excess of caution or prudence, I'm going to

17    draw the line at leading up to the loss of the money and not

18    get into the consequences.

19         Having said that, with Mr. Christofferson, the defense

08:41AM 20    solicited information that basically was that he was wealthy,

21    that he had made lots of money in other investments, and an

22    implication of that would be the loss to him wasn't as hard as

23    it might have been, and if I get any whiff of that here, I

24    think that may open the door, in other words, any suggestion

25    that direct or indirect that the Musgraves could somehow afford

1   this or that it wasn't that big a deal, that may be an issue,

2   so we'll handle it that way.

3        MR. CHRISTOFFERSON:  Thank you, your Honor.

4        THE COURT:  Again, I think it's probably relevant, but

5   the relevance is marginal, and it's really a Rule 403 issue, I

6   think, so we'll handle it that way.

7        MR. SINNOTT:  Thank you, your Honor.

8        THE COURT:  A separate issue before I forget.  In

9   drafting up the jury instructions, one of my law clerks noted

08:42AM 10   that the government had requested an attempt instruction.  I

11   don't think attempt is charged.  Was it an intent to request a

12   lesser included offense instruction or something?  It may have

13   been a mistake.  Anyway, just flag that and see if you can let

14   me know because I would like that.  I didn't see language.

15   Sometimes it's did and attempted to do, and I didn't see that

16   language in the indictment.

17        MR. CHRISTOFFERSON:  I believe it is in there, your

18   Honor, in the indictment.

19        THE COURT:  We don't need to solve this problem now, I

08:43AM 20   just wanted to flag it.

21        MR. SINNOTT:  Respectfully, we haven't focused on that

22   yet.

23        MR. CHRISTOFFERSON:  It's on page 10 of the

24   indictment, your Honor.

25        THE COURT:  Page 10, I'll take a look at that.

1    MR. CHRISTOFFERSON:  "Having devised and intending to

2    devise a scheme, an artifice to defraud, and for obtaining

3    money and property by means of materially false and fraudulent

4    pretenses, representations and promises for the purposes of

5    executing such scheme and artifice and attempting to do so."

6    THE COURT:  Okay.

7    MR. THOMADAKIS:  We also note that the mail fraud

8    statute itself inherent in it is attempt language as well,

9    which is where that language came from.

08:43AM 10    THE COURT:  All right.  We'll take a look at it, and,

11    Mr. Sinnott, give it some thought or delegate to Ms. McEvoy the

12    thought.

13    All right.  We'll resume at 9:00 unless there's

14    anything else.

15    MR. CHRISTOFFERSON:  Thank you, your Honor.

16    MR. SINNOTT:  Thank you, your Honor.

17    THE CLERK:  All rise.

18    (A recess was taken.)

19    THE CLERK:  All rise for the jury.

09:03AM 20    (JURORS ENTERED THE COURTROOM.)

21    THE CLERK:  Thank you.  You may be seated.  Court is

22    now back in session.

23    THE COURT:  Good morning, everyone.  Again, thank you

24    for your cooperation.  Mr. Thomadakis.

25    MR. THOMADAKIS:  Thank you, your Honor.  The

1      government asks Mr. Genovese to take the stand again.

2             THE COURT:  Mr. Genovese, you understand that you're

3      still under oath?

4             THE WITNESS:  Yes, sir.

5             THE COURT:  Counsel.

6             MR. THOMADAKIS:  Thank you, your Honor.

7                      JONATHAN GENOVESE, RESUMED

8                      DIRECT EXAMINATION, CONTINUED

9      BY MR. THOMADAKIS:

09:03AM 10     Q.   Good morning, Mr. Genovese.

11     A.   Good morning.

12     Q.   When we left off yesterday, we were looking at Exhibit 8,

13     which is one of the scripts, as you described them, that

14     circulated at Envit; is that right?

15     A.   Yes.

16     Q.   And, again, what is the nature of what we were looking at

17     on this page?

18     A.   This is a rebuttal.  Hypothetically, if a potential

19     investor was to say something along the lines, I have to speak

09:04AM 20     to my wife, this is an example of a rebuttal that was in the

21     scripts that were passed out to us.

22     Q.   Okay.  So these things about, you know, why do you

23     need -- what exactly are you going to say to your wife,

24     honestly, would it excite her as much as buying a fur coat or a

25     piece of jewelry, does she call you when you're at the

1    supermarket, et cetera, and there's more pages of these

2    different kinds of rebuttal; is that right --

3    A.    Correct.

4    Q.    -- in the script?  So on the next page, for instance,

5    Bates stamp, I'm sorry, on the previous page of that, 1900, if

6    someone -- this would be a response if a potential investor

7    said what?

8    A.    I'll watch the stock.

9    Q.    Meaning watching the stock price of the publicly traded

09:05AM 10   ECGP?

11   A.    That's correct, yes.

12   Q.    It said, "I only get paid if my ideas work out, so when

13   you tell me, I'll watch the stock, it's like telling --" well,

14   it's supposed to be -- "Michael Jordan to play basketball with

15   his feet, let's stop fooling around and make some real money

16   today."

17          MR. THOMADAKIS:  And if we could go, please, Mr. Flynn

18   to 1899, the previous page, the bottom paragraph.

19   Q.    What is that type of rebuttal for?

09:05AM 20   A.    I'll call you back.

21   Q.    Meaning what?  The potential investor is saying what?

22   A.    That he'll call back.

23          MR. THOMADAKIS:  And, finally if we could go to 1902,

24   please, the top paragraph.  Thank you.

25   Q.    This is just a general rebuttal to what kind of response?

A.   If someone wasn't comfortable investing in the product

that was being presented to them.

Q.   Okay.  It's basically saying this is -- what a great

investment this is; is that right?

A.   Correct.

Q.   Mr. Genovese, you mentioned before, I think we talked a

little bit yesterday about compensation and how you and other

closers stood to get a 10 percent bonus for every dollar you

brought in to Envit?

A.   Correct.

Q.   And how did that work in terms of these P.I.P.E.

investments, same deal?

A.   Yes.

Q.   And what did you say yesterday approximately was how much

you made over your 10, 11 months there?

A.   Somewhere a little bit below $30,000 with the salary and

the bonus structure.

Q.   And who was the -- who was most successful in terms of

bringing in money and, therefore, making money while you were

there?

A.   Jonathan Fraiman.

Q.   Was it close?

A.   Close to?

Q.   To the next person who was bringing in the money?

A.   I'm not sure where the next person was.

1  Q.   Okay.  How did you know?  How do you know that he was the

2  most successful?

3  A.   We had a board, as I described, when you walk into the

4  office, there was the main floor, there was a white board

5  there, and, again, it wasn't an overly huge office.  If someone

6  was to raise money, you would know about it.

7  Q.   One point of clarification about something you testified

8  about yesterday.  You mentioned that Envit -- we talked about

9  the purchase of registered investment advisory firms by Envit?

09:07AM 10  A.   Correct.

11  Q.   And you talked about Clary Asset Management?

12  A.   Correct.

13  Q.   Do you also recall any other such purposes of registered

14  investment advisory businesses?

15  A.   I do.  They had also purchased a registered investment

16  advisor in Ohio.  A gentlemen by the name of Matt Lazar was in

17  charge of that.

18  Q.   And did you have any dealings with Mr. Lazar yourself?

19  A.   I did not, no.

09:08AM 20  Q.   Now, at some point, sir, did you move somewhere while

21  still working at Envit?

22  A.   I did, yes.

23  Q.   Where was that?

24  A.   Florida.

25  Q.   And when approximately did that occur?

1    A.    This came about in the fall of 2008.

2    Q.    How did it come about?

3    A.    The office in Boston had kind of whittled down.  People

4    had been let go.  It was kind of to me like what the heck is

5    going on, and Edward Laborio had an office.  He had started

6    building an office down in Boca Raton, Florida, so there was an

7    office up and running there, and he had the idea of moving

8    everyone in the Boston office down to that location.

9    Q.    And was that prompted by some specific business idea that

09:09AM 10   he had in terms of Envit?

11   A.    Yeah.  He had talked about running a broker-dealer, just

12   never came to fruition in Boston.  He had told us that it would

13   be easier for him to get that part of the business up and

14   running down in Florida.

15   Q.    How did that strike you, this issue about having a

16   problem, establishing it here and it would be easier down in

17   Florida?

18   A.    It was definitely a red flag for me.

19   Q.    Why is that?

09:09AM 20   A.    I just didn't really, again, I've never, you know, ran a

21   company or opened a broker-dealer myself, but it was just kind

22   of confusing to me why he was having an issue doing this in

23   Boston.

24   Q.    And you mentioned that prior to you going down to Florida,

25   it seemed like to you the office had been whittled down?

1    A.    That's correct.

2    Q.    What do you mean by that?

3    A.    People had been let go.

4    Q.    What was -- at the height during your tenure there in the

5    Boston office, how many employees would you, say including cold

6    callers, were in the office?

7    A.    Around 20 people.

8    Q.    Okay.  And at some point before you went to Florida, how

9    had that changed?

09:10AM 10    A.    There was five, six.

11    Q.    And what did that -- did that indicate to you anything

12    about how business was going at Envit?

13    A.    It definitely made me think, yes.

14    Q.    And what did you think?

15    A.    That during that time period, you know, the markets had

16    taken a massive hit, so I was kind of confused with what was

17    going on with the hedge fund that was being operated.  There

18    wasn't much talk about that at that point, and then it seemed

19    that, you know, all the talk about the hedge funds kind of

09:11AM 20    turned to, well, we're going to open up a broker-dealer down in

21    Florida.

22    Q.    So the hedge fund which was what you initially came in to

23    pitch, that kind of talk had died down by the fall of 2008 as

24    far as you saw?

25    A.    Yes.

Q.   And who else -- when you went to Florida, were there other employees that went down around the same time as you?

A.   Yes.

Q.   Who was that?

A.   Daniel Kenney, Matthew Clary.

Q.   And was there still a Boston office operating when you went down to Florida?

A.   I believe they closed the main office that we were in, and I know that Jonathan Fraiman was then in a region office like I had talked about earlier.

Q.   All right.  And you mentioned yesterday that you worked at Envit up until about February of 2009; is that right?

A.   That's correct.

Q.   So for those months when were you in Florida -- first of all, what did you understand you were going down to Florida to do?

A.   To work at a broker-dealer that Ed was going to get up and running.

Q.   And did that ever come to fruition?

A.   While I was there, no.

Q.   And so what were you doing while you were in Florida?

A.   We were cold calling, getting leads.  There was some pitching of Envit going on as well, too.

Q.   The same thing that you had basically been doing in Boston?

1    A.    Yes.

2    Q.    What was your view of Envit's Florida operation while you

3    were down there?

4    A.    It wasn't a very good one.

5    Q.    Why?

6    A.    Just some of the people who Edward Laborio had started to

7    bring in and hire, there was some young kids there.  There were

8    also some older people who I just didn't personally think too

9    highly of.

09:13AM 10    Q.    Why was that?

11    A.    Just because of what they talked about, what they did in

12    the past.

13    Q.    What had they done in the past?

14    A.    Some of them had worked for now defunct broker-dealers.

15    Q.    Any particular that you recall?

16    A.    One of them was Stratton Oakmont.

17    Q.    What's Stratton Oakmont?

18    A.    Stratton Oakmont is one of the largest defunct

19    broker-dealers, currently portrayed in *The Wolf of Wall Street*.

09:13AM 20    Q.    And more generally during this time period, fall of '08

21    into February of '09, what other sort of things caused you

22    concern about Envit and its operations?

23    A.    Just the lack of clarity where the company was going.  I

24    was seeing less and less of Ed, wasn't really in the office,

25    so, again, the whole, you know, if he's operating a hedge fund,

1  why is he never here?  Then it was just a major lack of clarity

2  the direction of the company.

3  Q.   And you mentioned just now if he's operating a hedge fund.

4  We talked about yesterday that when you started, Mr. Laborio

5  told you about the success rate of this Envit hedge fund.  Do

6  you recall that?

7  A.   Correct.

8  Q.   And as time went on while you were there, did your

9  thinking change about how the possibility of that

09:14AM 10  success -- well, strike that.  As time went on, what did you

11  think about whether those rates were possible given his absence

12  from the office?

13  A.   It was hard to believe.

14  Q.   Why?

15  A.   Because he wasn't there.  When I think of a portfolio

16  manager running a hedge fund, I think of him in the office, I

17  think of him trading.  I don't think of him coming in and out,

18  not really talking to his employees and letting them know

19  what's going on with the operation.

09:14AM 20  Q.   And did these concerns that you started to have about

21  Envit, did they just come at the very end of your tenure there

22  or previous to that?

23  A.   It was a slow process.  I mean, before I went down to

24  Florida, I questioned the move, but, you know, Ed was very good

25  at, you know, when he was there and you did talk to him, he was

1    very good at making you believe that what he was doing was

2    right and good and that, you know, we were going to go to

3    Florida, things were going to get better because, again, as

4    before when we were in Boston and about to leave for Florida,

5    things had really died down and there wasn't really much going

6    on.

7    Q.   So notwithstanding Mr. Laborio's being good at telling you

8    things and making you believe, what you saw painted a different

9    picture for you; is that right?

09:15AM 10   A.   Once we got down to Florida, yes.

11   Q.   Did you have concerns, even before you went to Florida --

12   A.   Yes.

13   Q.   -- did you start to have concerns?  And as you spent more

14   time and particularly down in Florida, did these concerns go

15   away?

16   A.   No.

17   Q.   What happened with these concerns?

18   A.   As we got down to Florida or when we got down to Florida,

19   it was pretty much the same as what was going on in Boston, and

09:16AM 20   he was trying to hire people, and I'm not sure if I could say

21   trying to make things happen, but nothing was happening while I

22   was there, and as I had stated, one of my reasons going down

23   there was because he was going to open up a broker-dealer, and

24   it never came to fruition.  It was always it's about to happen,

25   it's about to happen, and it never did.

1    Q.   All right.  What were the circumstances of your leaving

2    the company in February of 2009?

3    A.   Can you repeat, please.

4    Q.   What were the circumstances of your leaving Envit in

5    February?

6    A.   As in how I left?

7    Q.   What prompted the decision and how did it happen?

8    A.   I just had enough.  I couldn't see myself having a future

9    there.  I wasn't sure if the company itself had a future, and I

09:16AM 10   really questioned Ed's leadership at that point.

11   Q.   And the concerns that you've stated which started to

12   accumulate, what role did those play in your departing Envit?

13   A.   A big role.  At that point, I just had to trust my gut, if

14   you will, and just say that it was time to cut myself loose of

15   the whole situation.

16   Q.   I guess, you know, you said that you had had some concerns

17   even from Boston and then you'd go down to Florida and you were

18   there a few months in Florida?

19   A.   Uh-hum.

09:17AM 20   Q.   What ultimately was it, why didn't you quit before, what

21   ultimately was it in February of 2009 that got you out of

22   there?

23   A.   I just had enough.  It was just things kept on

24   compounding, and Ed wasn't delivering on what he said he was

25   going to do.

```
 1    Q.   All right.

 2         MR. THOMADAKIS:  The Court's indulgence.  No further

 3    questions.

 4         THE COURT:  Cross-examination.

 5         MR. SINNOTT:  Thank you, your Honor.

 6                        CROSS-EXAMINATION

 7    BY MR. SINNOTT:

 8         MR. SINNOTT:  Good morning, ladies and gentlemen.

 9    Q.   Good morning, sir.

10    A.   Good morning.

11    Q.   Mr. Genovese, thank you for being here today.  As my

12    Brother pointed out, your testimony today as with your

13    testimony before the grand jury is because you've been

14    immunized; is that correct?

15    A.   That's correct, yes.

16    Q.   And according to the letter that my Brother entered into

17    evidence, you're protected from any crimes that you might have

18    committed; is that correct?

19    A.   Correct.

20    Q.   But you are obliged to tell the truth?

21    A.   Correct.

22    Q.   And you understand that?

23    A.   Yes.

24    Q.   All right, sir.  Now, sir, when were you first contacted

25    by law enforcement or the United States Attorney's Office
```

1    leading up to your appearance here and your appearance before

2    the grand jury?

3    A.    Some time in either May or June of 2014.

4    Q.    All right, sir.  How did that contact take place?

5    A.    I received a letter under my door.  I was currently

6    residing in Miami, Florida, and they had slid it under the

7    door.

8    Q.    All right, sir.  And that letter told you what?

9    A.    That I was being asked to testify in front of the grand

09:20AM 10    jury.

11    Q.    Okay.  And what's the next thing that happened as part of

12    that investigation?  Did you contact the government or did they

13    contact you?

14    A.    I had actually contacted the government.

15    Q.    All right.  And who did you speak with?

16    A.    I do not recall.

17    Q.    Do you know if it was an FBI agent or the United States

18    Attorney's Office?

19    A.    Again, it could have been the FBI, but I'm not sure.

09:21AM 20    Q.    All right.  And when, roughly speaking, did that take

21    place?

22    A.    Right around the same time, when I received the letter.

23    Q.    All right.  And the person that you spoke with, did they

24    describe why they had contacted you?

25    A.    It was very vague.  It was recommending Envit, I believe

1    it was Envit, and it also pertained to Edward Laborio and

2    Jonathan Fraiman.

3    Q.    Okay.  At that time you were just speaking over the phone,

4    correct?

5    A.    Correct.

6    Q.    All right.  And do you recall them saying anything else

7    about why they were contacting you?

8    A.    Can you repeat, please?

9    Q.    Sure.  Did they say anything else as to the reasons why

09:21AM 10   they were contacting you?

11   A.    Not that I recall, no.

12   Q.    All right.  So you gave them some information over the

13   phone; is that correct?

14   A.    Correct.

15   Q.    All right.  And did you -- was that the only time you

16   spoke with them over the phone or did you subsequently have a

17   more extensive conversation with the government?

18   A.    Well, there was a couple of phone calls, and then there

19   was a longer phone call.

09:22AM 20   Q.    All right.  And the longer phone call was an interview of

21   some length, was it not?

22   A.    We had talked, yes.

23   Q.    All right.  And you spoke with several people, it was a

24   conference call type phone conversation?

25   A.    Yes.

1    Q.   And the conversations leading up to that that you

2    referenced, what was the subject matter of those conversations?

3    A.   Was just trying to get clarity on why they had contacted

4    me, what they had actually wanted from me as I'm not familiar

5    with this whole process.

6    Q.   So what did they tell you in response to those questions?

7    A.   Just that they wanted information from me, if I recall

8    correctly.

9    Q.   All right, sir.  Did they say what they wanted information

09:23AM 10   specifically on?

11   A.   Regarding Envit Capital.

12   Q.   All right.  So you had at some point a lengthier

13   conversation with the government with several individuals, and,

14   sir, do you recall when that was?

15   A.   Maybe a week or two after I had initially received the

16   letter.

17   Q.   All right, sir.  So do you know the date?

18   A.   I do not, sir, no.

19   Q.   Would it refresh your memory if I were to say June 30th,

09:23AM 20   2014?

21   A.   Okay.

22   Q.   Does that sound right?

23   A.   It does, somewhere in the ballpark.

24   Q.   And you had a lengthy conversation with several persons,

25   correct, sir?

1    A.    Correct.

2    Q.    And do you recall that during the course of that

3    conversation one of the agents asked you when was the last time

4    you saw Ed Laborio?

5    A.    Yes.

6    Q.    And you told them that you had run into him at 2011 at

7    Copley, correct?

8    A.    Yes.

9    Q.    And do you recall that same agent asking how you would

09:24AM 10    contact him?

11    A.    How I would contact who?

12    Q.    Ed Laborio.

13    A.    How I would contact Ed Laborio?

14    Q.    Yes, if you had to reach him, how would you contact

15    Ed Laborio, do you remember that question?

16    A.    I do not, no.

17    Q.    And do you remember telling that same agent as part of

18    this -- his questioning -- strike that.  Do you remember having

19    a conversation with the agent about how you could Google Ed or

09:25AM 20    you could speak to Dan Kenney?

21           MR. THOMADAKIS:  Objection.  Relevance.

22           THE COURT:  Sustained.

23    Q.    How did you interpret the agent's questions asking you

24    about the last time you had seen Laborio?

25           MR. THOMADAKIS:  Objection.

1       THE COURT:  Sustained.

2  Q.   Sir, at some point did the fugitive status of

3  Edward Laborio come up in this conversation?

4       MR. THOMADAKIS:  Objection.

5       THE COURT:  Let me see counsel at sidebar.

6       (THE FOLLOWING OCCURRED AT SIDEBAR:)

7       THE COURT:  Where are we going with this?

8       MR. SINNOTT:  This witness was approached six years

9  after his contact with the police in this case, and I wanted to

09:26AM 10  explore the fact that Laborio's absence was one of the factors

11  that allowed him to come forward and made him feel that it was

12  appropriate to speak about these events after, and I think it's

13  relevant to the witness's willingness to testify, the witness's

14  perception about the ability to tell the truth after all of

15  these years as to whether Laborio was still in the picture.

16       MR. THOMADAKIS:  First of all, there's no hint of that

17  prior to that that he was scared.  I think what this is, what

18  we talked on the motion in limine, it's an attempt to show

19  Laborio's other bad acts, the propensity of it.  As the Court

09:27AM 20  said it should not be allowed I don't think.

21       MR. SINNOTT:  Well, with this witness and with other

22  witnesses, your Honor, there are questions about when was the

23  last time you saw him.  For the government to pretend that this

24  was not an attempt to elicit information on his whereabouts --

25       MR. THOMADAKIS:  No one is pretending that, but that's

1    not the subject of his testimony.

2         THE COURT:  Hold on.  Laborio's fugitive status I

3    didn't understand to be part of the other bad acts.  I think we

4    told the jury he died, but I'm not sure whether we discussed

5    they could be told he was a fugitive before he died, right, if

6    I understand your questioning, it's you want to say, well, you

7    were willing to cooperate with the government because you

8    thought Laborio was a fugitive, was that the thrust of it?

9         MR. SINNOTT:  Yes, that would be the thrust of it.

09:28AM 10        THE COURT:  I mean, one of the problems I'm having is

11   you're asking him what he said to the agents and what the

12   agents said to him, which is more or less hearsay, but

13   Mr. Thomadakis?

14        MR. THOMADAKIS:  On the fugitive status?

15        THE COURT:  Yes.

16        MR. THOMADAKIS:  I think that if that is going to be

17   the approach, there has to be foundation first of whether he

18   was scared beforehand of something rather than lead with the

19   fact that he's a fugitive, did that allow you to go forward?

09:28AM 20        THE COURT:  Is it the government's position that his

21   fugitive status is out of bounds?

22        MR. THOMADAKIS:  Correct, in a blanket kind of

23   categorization was that what occurred after the SEC charges,

24   and I think in this particular case, the information, the fact

25   that he didn't answer to it and the fact that he fled before he

settled the SEC charges, I would consider all of that to not be

relevant.

THE COURT:  He fled before my Rule 11 hearing.

MR. THOMADAKIS:  Right, by responding and entering the

plea here, and he didn't settle with the SEC, unlike the

defendant.

MR. SINNOTT:  I think counsel is getting way ahead of

the questions that I'm asking, which I think are germane to the

witness's capacity and willingness to testify, and I think if

the FBI told the witness or asked a witness questions that

would imply that Laborio was a fugitive, then I think that

those are directly relevant to their ability, their willingness

to testify.

THE COURT:  That I'm having trouble.  What difference

would the FBI's questions make?  In other words, you might be

able to say, I mean, let's say it was Whitey Bulger, well, I

was willing to come forward once I learned that he was in

custody or that he wasn't a threat to me, you know, that fear

was removed.

MR. SINNOTT:  Right.

THE COURT:  If you lay a foundation that he was not

willing to do it, and, you know, then found out he was a

fugitive, and that made him willing, I'd probably let you go

down there, and it's not clear to me that the mere fact that he

was a fugitive when he died, it's not clear that that's unfair

1    or prejudicial or 404(b) or reverse 404(b).  The details I

2    think are unnecessary.

3            MR. THOMADAKIS:  Even if that second issue, as your

4    Honor just said, without a foundation, in other words, we're

5    okay with that.  Another issue we have, if he says at any point

6    were you fearful of violence and what caused you not to be

7    fearful asking me this or that.

8            MR. SINNOTT:  Your Honor, this is the government's

9    witness.

09:30AM 10        THE COURT:  But still you're entitled to explore his

11   motivations for testifying, but I think you're coming into it

12   in kind of a backwards way.  Why don't you lay a foundation

13   that he had some reason not to cooperate, you know, let's take

14   it a step at a time, was he willing to cooperate between 2009

15   and 2014, or was it just that he had never been contacted?  It

16   might be that all of this is irrelevant.  He might say I was

17   always willing to cooperate, no one ever contacted me.

18           MR. SINNOTT:  All right.

19           THE COURT:  Thomadakis was asleep at the switch, maybe

09:31AM 20   that's his answer.

21           MR. THOMADAKIS:  It's not uncommon.

22           THE COURT:  Okay.  So let's try it that way.

23           (THE FOLLOWING SIDEBAR WAS CONCLUDED:)

24           THE COURT:  Thank you, ladies and gentlemen.  Let's

25   put another question to the witness.

1           MR. SINNOTT:  Thank you, your Honor.

2    Q.   If I could back up a little bit, Mr. Genovese.  So, you

3    had a telephone interview with the federal authorities; is that

4    correct?

5    A.   Correct.

6    Q.   And this was June 30th of 2014, correct?

7    A.   Correct.

8    Q.   Now, the last contact that you had with Envit was in

9    approximately February of 2009; is that correct?

09:32AM 10   A.   Correct.

11   Q.   So, sir, in excess of five years had elapsed since you had

12   been an Envit employee; is that right?

13   A.   Correct.

14   Q.   And even though you kept in touch with Envit employees,

15   it's fair to say that your involvement as an employee had ended

16   over five years previously?

17   A.   Correct.

18   Q.   So the agents contacted you in May or June of 2014 and

19   said we want to talk, correct?

09:32AM 20   A.   Well, I had actually contacted them initially after I had

21   received the letter wanting to know what was going on, why was

22   I receiving this, so there were a couple of back and forth

23   phone calls and then it eventually led to this conversation

24   call that you're referring to.

25   Q.   Right.  But the initial contact was you getting a letter

1    from them slipped under your door?

2    A.    Correct.

3    Q.    And, sir, did you ask the agents why you were doing this

4    five years after the fact?

5    A.    I believe -- I can't be clear exactly what I said, so.

6    Q.    Did that thought occur to you?

7    A.    Yes.

8    Q.    All right.  And at some point did the agents answer that

9    question for you that was in your mind?

09:33AM 10    A.    I don't recall.

11    Q.    Now, sir, let me just see if I can establish a timeline

12    here.  So on June 30th of 2014, you had a telephone

13    conversation with the Government and you had already received

14    your grand jury subpoena; is that correct?

15    A.    Correct.

16    Q.    And then on July 31st, you testified before the grand

17    jury, correct?

18    A.    Correct.

19    Q.    But on July 30th, you received an immunity letter; is that

09:34AM 20    correct?

21    A.    Correct.

22    Q.    Even though you had already testified -- you had already

23    spoken at length to the agents; is that right?

24    A.    Correct.

25    Q.    Why did you seek immunity?

1    A.   I had contacted my attorney after the conversation to get

2    more clarity.  Again, this is all a first for me.  I had

3    contacted my attorney to get clarity and then he had

4    contacted --

5              MR. THOMADAKIS:  Objection.

6              THE COURT:  Just don't get into the substance of what

7    you and your attorney conversed about.

8              THE WITNESS:  Of course.

9    A.   I had contacted my attorney and then Ed contacted the U.S.

09:34AM 10   government.

11   Q.   And, sir, did you ever at any time articulate to the

12   United States Government, to the representatives, that you had

13   done something wrong?

14   A.   Not that I recall, no.

15   Q.   That you had done something illegal?

16   A.   Not that I recall, no.

17   Q.   That there was something that you were concerned about

18   being prosecuted for?

19   A.   Not that I recall, no.

09:35AM 20   Q.   And, sir, is it fair to say that despite the fact that you

21   had already given a lengthy interview to the government,

22   despite the fact that you had felt like you had nothing to

23   worry about as far as prosecutable offenses that the government

24   said sure, we'll give you immunity?

25   A.   That did not happen.

1          MR. THOMADAKIS:  Objection.

2          THE COURT:  Sustained.  The answer will be struck.

3     Q.   All right, sir.  Let me just review a few things that you

4     testified to during direct.  Your first meeting with

5     Edward Laborio, if I could direct your attention to that, and

6     that was in approximately April of 2008; is that right?

7     A.   Correct.

8     Q.   And you answered an online ad?

9     A.   Correct.

09:36AM 10    Q.   And as a result of that online ad, you went and met

11    Laborio at an office in Boston, correct?

12    A.   Correct.

13    Q.   And was that the Envit headquarters that you met him at?

14    A.   At the current time, yes.

15    Q.   Okay.  And describe what you saw when you walked into the

16    headquarters.

17    A.   When I walked in, it was a small office.  There were maybe

18    two or three offices up against the wall.  Ed's office was to

19    the right, and when I walked in, I just went straight into his

09:37AM 20    office.

21    Q.   All right.  Was there a receptionist?

22    A.   No.

23    Q.   So you walked straight in, and what happened after you

24    walked into his office?

25    A.   We sat down and talked.

1    Q.   Okay.  And what did he tell you?

2    A.   Talked about his background, I talked about mine.  He

3    talked about the company, how he had founded it, how he was

4    running this hedge fund, how it had been profitable and how the

5    job was to be in business development and garner assets for the

6    funds and the company.

7    Q.   All right.  And did you discuss your licensing status?

8    A.   Not that I recall, no.

9    Q.   The fact that you had a Series 7 and a Series 66, was it?

09:37AM 10    A.   63.

11    Q.   63 was not brought up?

12    A.   It might have been on my resume', but since they weren't a

13    broker-dealer or an R.A., it wasn't relevant to this job.

14    Q.   All right.  Was that something that at some point became a

15    point of discussion with Edward Laborio?

16    A.   Can you clarify more, please?

17    Q.   Sure.  Whether at that interview or at a later point in

18    time did Edward Laborio discuss with you you had a Series 7

19    license?

09:38AM 20    A.   Yes.

21    Q.   And describe the context in which that was brought up.

22    A.   As I stated earlier, Ed had talked about operating a

23    broker-dealer.  Knowing that I had a Series 7 license, I could

24    just jump right in, if you will.  There wouldn't have been any

25    lag time for me to get licensed and to operate under that

1    broker-dealer.

2    Q.    Now, did he bring that up or did you?

3    A.    I do not recall.

4    Q.    And do you recall if Laborio conveyed to you any interest

5    in taking advantage of that?

6    A.    Taking advantage how so?

7    Q.    Of the fact that you had that Series 7 license and that

8    gave you certain options?

9    A.    Options how so?

09:39AM 10   Q.    Well, you just talked about, you know, the broker-dealer

11   aspirations that Laborio had and that the discussion was in the

12   context of those aspirations?

13   A.    Uh-hum.

14   Q.    So did Laborio see that as being advantageous to him and

15   to his plans?

16   A.    Most likely, yes.

17   Q.    All right.  Now, sir, as of April of 2008 -- no, strike

18   that.  When did you acquire your Series 7?

19   A.    As I stated yesterday, I believe it was some time around

09:39AM 20   the end of 2006.

21   Q.    All right, sir.  So December of 2006?

22   A.    It sounds about right, yeah.

23   Q.    And so at the time that you met with and started at Envit,

24   you had it for approximately a year and a half?

25   A.    It sounds about right, yes.

```
 1    Q.   Were you an expert on brokerage at that point?

 2    A.   No.

 3    Q.   When you passed that Series 7 exam, what did that qualify

 4    you to do?

 5    A.   It allowed me to sell various types of securities.

 6    Q.   All right, sir.  But you would never consider yourself to

 7    be an expert, correct?

 8    A.   No.

 9    Q.   And, sir, you described the company and the operations at

10    the company, the Envit offices in Boston and in Florida, and

11    I'd like to ask you, at one point, you talked about the boiler

12    room atmosphere.  Do you recall that?

13    A.   I did not use those words.

14    Q.   How did you describe it, sir, the atmosphere?

15    A.   I don't believe we talked about the atmosphere.

16    Q.   All right.  Well, let me ask you.  In Boston first you've

17    described that there were several individuals when you started,

18    and Daniel Kenney one of them?

19    A.   Yes.

20    Q.   Jonathan Fraiman another?

21    A.   Yes.

22    Q.   Evan Munno another?

23    A.   Yes.

24    Q.   And a Tim Murphy was it?

25    A.   Tim Murphy, yes.
```

1    Q.    And anyone else?

2    A.    Kyle St. Martin was there when I started there, too.

3    Q.    Anyone else?

4    A.    A couple other people whose names I forget.

5    Q.    Okay.  And these individuals were doing I believe you

6    testified cold calling and closing; is that correct?

7    A.    Correct.

8    Q.    All right.  Now, you described the qualification process

9    where cold callers would attempt to ascertain the investment

09:42AM 10   experience or the relative wealth, the lack of wealth of the

11   persons being called; is that correct?

12   A.    Yes.

13   Q.    And there's nothing wrong with that process, is there?

14   A.    No.

15   Q.    That's legal, correct, sir?

16         MR. THOMADAKIS:  Objection.

17         THE COURT:  Yes.  You can't give a legal opinion, so

18   sustained.

19   Q.    But by reckoning and based on your experience not only

09:42AM 20   then but now, there was nothing inappropriate based on common

21   industry standards with respect to this calling process, was

22   there?

23   A.    No.

24   Q.    Sir, describe how Edward Laborio came across to you during

25   these early days before you went to Florida.

A.    At first, he appeared as someone who had been successful
in the business previous to founding Envit Capital.  He had
gone off on his own, started his own company.  From the
information he told me, he had been successful at doing so, and
as I stated yesterday, seemed like he, you know, had the
ability to grow the company.

Q.    He was likable?

A.    At first.

Q.    At first.  He was charismatic; would that be a fair
statement?

A.    Yes.

Q.    And he had an aura of success; would that be a fair
statement?

A.    Yes.

Q.    And was that as far as you could ascertain, was that
perception of yours shared by others in the shop?

        MR. THOMADAKIS:  Objection.

        THE COURT:  Sustained.

Q.    Did you discuss Laborio with other members of the
organization?

A.    Yes.

Q.    And you discussed him because he was the central figure in
that organization, wasn't he?

A.    Yes.

Q.    And I believe you testified at one point there was Ed and

1    there was everybody else; is that right, sir?

2          MR. THOMADAKIS:  Objection.

3          THE COURT:  The question is whether he testified about

4    that.  I'll allow it.

5    A.   Can you repeat, please.

6    Q.   Sure.  Did you testify at one point that there was Ed and

7    there was everybody else?  Do you remember that statement?

8    A.   I do not recall that exact statement, no, sir.

9    Q.   But would that be a fair summary of your perception at the

09:45AM 10   time?

11   A.   My perception, yes.

12   Q.   All right, sir.  And this initially likable charismatic

13   guy Edward Laborio who exuded success was the source of all of

14   the information that you obtained with respect to what your

15   role was in that company, correct?

16   A.   Yes.

17   Q.   And Ed was the one that provided scripts?

18   A.   Yes.

19   Q.   Ed was the one that provided statistics and information

09:45AM 20   about his past success, correct?

21   A.   Yes.

22   Q.   Ed was the one who talked about how successful the company

23   was going to be in the future, correct?

24   A.   Yes.

25   Q.   And you believed in it, didn't you?

1    A.   At first, yes.

2    Q.   Yes.  And you believed in Laborio, did you not?

3    A.   At first, yes.

4    Q.   And were you a licensed broker at the time but you didn't

5    ascertain the red flags that you saw later on during your first

6    few months with Envit, did you?

7    A.   Can you clarify, please?

8    Q.   Sure, sir.  You were a licensed broker when you started

9    there?

09:46AM 10   A.   Uh-hum.

11   Q.   And directing your attention to your first few months

12   before you went to Florida where you became disillusioned, you

13   didn't see the red flags then, did you?

14   A.   At first, no.

15   Q.   Because Laborio put out a very persuasive presentation,

16   didn't he?

17   A.   Yes.

18   Q.   Laborio looked like the real deal, didn't he?

19   A.   At first to me, yes.

09:47AM 20   Q.   Did you ever go to his house in Florida?

21   A.   In Florida, no.

22   Q.   But he had told you that he had a house in Florida; is

23   that correct?

24   A.   That's correct, yes.

25   Q.   And, sir, you were excited when you started at Envit, were

1    you not?

2    A.    Yes.

3    Q.    And what was exciting about going to Envit?

4    A.    Ground floor opportunity.  It seemed like a young and

5    growing company based off the information that Ed told me, and,

6    again, it just seemed to be a growing company.

7    Q.    And was part of that attraction of being with a ground

8    floor company the fact that you could make a name for yourself?

9    A.    I wouldn't put it like that, no.

09:48AM 10    Q.    That you could make money?

11    A.    The opportunity was -- the way that the job was presented

12    to me is that there was an opportunity to make money.

13    Q.    And ultimately one of the reasons that you left Envit, the

14    red flags notwithstanding in Florida, was the fact that you

15    felt like you weren't going to make any more money; is that

16    correct?

17    A.    It wasn't so much money driven as it was just the overall

18    direction of the company, and I guess you could say those two

19    go hand-in-hand.  If you don't think the company is going to go

09:48AM 20    anywhere, how could you possibly make money there?

21    Q.    But you recall testifying previously to a factor in your

22    leaving was that you weren't going to make any money there?

23    A.    I do not recall saying that.

24    Q.    All right, sir.  But this was an attractive environment

25    for a young broker, correct?

1    A.    Correct.

2    Q.    There seemed to be a lot of upside to it on a career

3    level?

4    A.    Correct.

5    Q.    And you described how Evan Munno was Laborio's right-hand

6    man?

7    A.    Correct.

8    Q.    And what were Munno's functions in his capacity as

9    right-hand man?

09:49AM 10   A.    Head of business development.  He was the one who oversaw

11   all the new hires and oversaw I guess you could say all aspects

12   of sales.

13   Q.    All right.  And based on your observations, did Laborio

14   let him into the research that was being done?

15          MR. THOMADAKIS:  Objection.

16          THE COURT:  I'll allow him to testify as to what he

17   saw.

18   A.    Can you repeat the question, please?

19   Q.    Sir, based on your observations of Munno and Laborio, did

09:50AM 20   Laborio allow Munno to see his research?

21   A.    Whose research?

22   Q.    Laborio's?

23   A.    Not that I saw, no.

24   Q.    Did Munno participate based on what you saw in investment

25   decisions?

1    A.   Not that I saw, no.

2    Q.   So, based on what you saw at Envit Capital, sir, would it

3    be fair to say that this was a one-man leadership?

4    A.   Yes.

5    Q.   That there was Laborio and everybody else was a distant

6    second player, correct?

7    A.   How I felt and how everyone else felt, I can't really --

8    Q.   I'm just asking how you felt.

9    A.   Did I feel like a distant player?

09:51AM 10    Q.   Yes, sir.

11    A.   Without a doubt, yes.

12    Q.   And based on your observations of Munno, even in his

13    capacity as head of business development, did you feel that

14    based on your observations that Laborio had given him

15    responsible duties?

16    A.   Had given him responsible duties?

17    Q.   Yes.

18    A.   Yes.

19    Q.   And what were those duties that he gave him?

09:51AM 20    A.   Again, he was head of business development.  From what I

21    saw and experienced when I was cold calling, he would take the

22    leads, he would send out prospectuses to other people.

23    Q.   Would he deliver the scripts that Laborio had drafted?

24    A.   Sometimes, yes.

25    Q.   All right.  Would he do hiring of new personnel?

```
 1    A.   I believe he might have.

 2    Q.   Well, didn't he interview you?

 3    A.   We had a phone conversation.

 4    Q.   Okay.  That was part of the hiring process?

 5    A.   Yeah.

 6    Q.   Now, you testified that that changed at some point and you

 7    say Munno left, correct?

 8    A.   He was let go by Ed, yes.

 9    Q.   And that took place after you and Munno had gone down to

10    Florida; is that right?

11    A.   Munno never went to Florida, so and I never watched Munno.

12    Q.   So when Munno left, he was in Boston and you were in

13    Boston?

14    A.   Correct.

15    Q.   All right.  And when approximately did that occur?

16    A.   I can't give an accurate time.

17    Q.   Was it late 2008?

18    A.   No, because we were still in Boston, late 2008 we were in

19    Florida, so...

20    Q.   Was it shortly before you went to Florida?

21    A.   It was like a month or two before that.

22    Q.   All right.  And you testified that after Munno left, John

23    became the second guy was the expression I believe you used.

24    Do you recall?

25    A.   That is correct, that's what it seemed, yeah.
```

09:52AM 10

09:53AM 20

1   Q.   And you used different terminology to describe Munno and

2   Fraiman, correct?

3   A.   Yes.

4   Q.   Right-hand man vs. second guy, correct?  And I believe

5   right after you described him as second guy, you indicated that

6   Fraiman was the most successful salesman there, correct?

7   A.   Correct.

8   Q.   And is it fair to say that from what you could see,

9   Fraiman believed in this operation as well?

09:54AM 10          MR. THOMADAKIS:  Objection.

11          THE COURT:  Sustained.

12   Q.   Did you have conversations with Fraiman during your time

13   working there?

14   A.   We worked together, yes.

15   Q.   Did you talk about your relative enthusiasm for the job?

16          MR. THOMADAKIS:  Objection.  Perhaps the next

17   question.

18          THE COURT:  I'll allow that.  It calls for a yes or no

19   answer.

09:54AM 20   A.   Can you repeat the question, please?

21   Q.   Sure.  In the course of your conversations with Fraiman,

22   did you speak about your enthusiasm for the job that each of

23   you had?

24   A.   Yes.

25   Q.   And what did Fraiman tell you?

```
 1              MR. THOMADAKIS:  Objection.
 2              THE COURT:  Sustained.
 3    Q.   What did you tell Fraiman?
 4    A.   My enthusiasm had declined ever since I had gotten there.
 5    Q.   All right.  But for some time it was at a pretty high
 6    level, was it not?
 7    A.   At the beginning, yes.
 8    Q.   Because Laborio had brought you into this aura of success
 9    and his aspirations for the future, and you believed him,
10    didn't you?
11    A.   Yes.
12    Q.   And, sir, would it be fair to state that Fraiman worked
13    hard at this job?
14    A.   Are you asking my opinion?
15    Q.   No, I'm asking you based on your observations, did he work
16    hard at this job?
17    A.   Yes.
18    Q.   He spent a lot of time there?
19    A.   Yes.
20    Q.   He took his, as far as you could see, tasks very
21    seriously?
22    A.   Yes.
23    Q.   So being the top salesman there, you're not saying that in
24    a negative sense, are you?
25    A.   No.
```

1    Q.   Because he made numbers better than anybody else, correct?

2    A.   Correct.

3    Q.   All right.  Now, you indicated that at some point you

4    became a closer, correct?

5    A.   Correct.

6    Q.   And that was a short time after you got there, two weeks?

7    A.   I'd say two, three weeks, yeah.

8    Q.   All right.  And were you excited about that?

9    A.   Yes.

09:56AM 10   Q.   And you saw that as a good opportunity?

11   A.   Yes.

12   Q.   And is it fair to say despite the title on the screen shot

13   that we saw for Fraiman that he was still a closer, correct?

14   A.   At the beginning, yes.

15   Q.   So you were peers, you were fellow closers at one point,

16   correct?

17   A.   Correct.

18   Q.   And, sir, you testified that there was a Board of

19   Directors at Envit, correct?

09:57AM 20   A.   Pursuant to the website, yes.

21   Q.   Yes.  That one was identified on the prospectus that was

22   shown to you?

23   A.   Excuse me.

24   Q.   I'm sorry, the screen shot that was shown, it described a

25   Board of Directors?

1   A.   The screen shot from the website, yes.

2   Q.   And you had no reason to doubt that at the time, did you?

3   A.   No.

4   Q.   Even though you had never met any of the directors,

5   correct?

6   A.   Correct.

7   Q.   But this is what Laborio was claiming, correct?

8   A.   Correct.

9   Q.   So you took it at face value?

09:58AM 10   A.   At first, yes.

11   Q.   And, sir, you described the scripts that were handed out,

12   and Mr. Thomadakis directed your attention to certain portions

13   of those, you know, for example, the one where the rebuttal is,

14   "I have to talk to my wife."  Do you recall that?

15   A.   I do, yes.

16   Q.   And would you agree with me that those rebuttals might be

17   viewed as insulting?

18   A.   Yes.

19   Q.   But you used them, didn't you?

09:59AM 20   A.   Not that I recall, no.  They were presented to us.  Do I

21   personally recall saying those lines verbatim, no.

22   Q.   All right.  But you didn't have any conscientious

23   objection to using those lines, did you?

24   A.   Can you repeat, please?

25   Q.   Well, let me withdraw that.  If a customer had said, gees,

1    I got to talk to my wife, which apparently you don't recall

2    happening, but if that had happened, would your response have

3    been to go to the rebuttal and say, "Look, if you're at the

4    supermarket," would you have used that rebuttal?

5    A.    Perhaps.

6    Q.    Because that's how this business operates, isn't it?

7    A.    What business?

8    Q.    The cold calling business, the qualification business, the

9    business of soliciting investors?  Isn't that part of the

10:00AM 10   process is young men and young women get on the phone and they

11   call people, correct?

12   A.    I wouldn't fully agree with that, no.

13   Q.    Well, how would you describe the process?

14   A.    The process of qualifying isn't just by young men and

15   women.  I mean, a lot of older people are in the brokerage

16   business, too.  I mean, there's various ways of prospecting, so

17   saying just this way isn't the way that I view it.  I view it

18   that there are other ways as well, too.

19   Q.    But at Envit Capital, this was the way it was done,

10:00AM 20   correct?

21   A.    This is the way it was being passed down to us via the

22   scripts, yes.

23   Q.    I didn't mean to insult you with the young people thing.

24   I consider anybody under 60 to be young, but I'm just speaking

25   about in the Envit Capital environment, that was a young work

1    force, was it not?

2    A.   Correct.

3    Q.   A lot of folks like yourself?

4    A.   Correct.

5    Q.   A lot of folks trying to break into the business?

6    A.   Correct.

7    Q.   A lot of folks trying to make some money?

8    A.   Correct.

9    Q.   And a lot of folks that believed in Edward Laborio?

10:01AM 10    A.   Correct.

11    Q.   And, sir, I believe you talked about the process whereby

12    money from investments would be wired in by the investors or

13    checks would be mailed; do you recall that?

14    A.   Can you repeat that?  You said money from --

15    Q.   Yes.  I believe during your direct testimony, you

16    testified after Mr. Thomadakis asked you to walk us through a

17    call and what the results of that call would be, you indicated

18    that if the result of that call was yes, that checks or wire

19    transfers would typically follow, correct?

10:01AM 20    A.   Correct.

21    Q.   And I believe you testified that the only ones who handled

22    checks when they came in were Laborio and occasionally Munno;

23    is that correct?

24    A.   That's what I recall, yes.

25    Q.   You never handled checks?

1    A.    No.

2    Q.    You never saw Jonathan Fraiman handle checks?

3    A.    No.

4    Q.    And would it be fair to state that Laborio handled a much

5    higher proportion of checks than Evan Munno did when he was

6    there?

7    A.    I can't answer that.

8    Q.    Fair enough, thank you.  And, sir, you were asked about

9    some of the numbers that appeared including in the hedge fund

10:02AM 10    literature and a figure of, you know, 40 or 43 percent.  Do you

11    recall that particular number as standing out?

12    A.    Ballpark, yes.

13    Q.    And you indicated that that number came from

14    Edward Laborio, correct?

15    A.    Correct.

16    Q.    And, in fact, all of the numbers, the rates of success for

17    2007, 2006, all of those figures came from Laborio, correct?

18    A.    Correct.

19    Q.    And did you have any reason to disbelieve these numbers?

10:03AM 20    A.    At first, no.

21    Q.    And you talked about your compensation of being a base

22    salary and then a 10 percent share of any business that you

23    brought in, correct?

24    A.    Correct.

25    Q.    And I believe you testified that that was the norm

1    throughout Envit as far as you knew, correct?

2    A.    From what I knew, yes.

3    Q.    And that's the norm in the industry, isn't it?

4    A.    I can't answer that.

5    Q.    Have you worked in other similar operations?

6    A.    Like Envit, no.

7    Q.    You haven't sold stock or hedge funds in any other

8    capacity?

9    A.    I have.  Those were at registered broker-dealers though.

10:04AM 10   Q.    And what did you get for a percentage?

11   A.    It varies.

12   Q.    Is 10 percent out of line?

13   A.    That's actually low.

14   Q.    That's low?

15   A.    Depending on products.  It varies.  This is a very -- this

16   is a hard question to answer.

17   Q.    No, I appreciate your candor, thank you.  And I believe

18   you were asked whether anyone at Envit discussed -- I don't

19   believe the word was "strategy" but discussed, you know, the

10:04AM 20   next steps in the operation, and I believe you testified that

21   it was only Ed and Evan; is that correct?

22   A.    Can you repeat, please?

23   Q.    Sure.  Discussions about where the company was going?

24   A.    Uh-hum.

25   Q.    Were those from Ed and Evan?

```
 1   A.   Mostly Ed.  I wouldn't include Evan in that.
 2   Q.   Okay.  Did Evan sometimes say, "Hey, I've got to pass on
 3   something that Laborio told me"?
 4   A.   Yeah.
 5   Q.   Okay.  So if Evan was talking about strategy, ostensibly,
 6   it was in the context of conveying Laborio's strategy?
 7   A.   Yes.
 8   Q.   Thank you.  And you talked about I believe beginning in
 9   the mid-summer of 2008 fixed rates of return being pitched to
10   investors.  Do you recall that?
11   A.   Correct.
12   Q.   And I believe you said that this came about as a result of
13   Eric Samuelson coming on board as a customer, correct?
14   A.   Yes.
15   Q.   And the fixed rates, I believe you described as being an
16   amount that was set aside to be paid to the investor on a
17   regular basis, correct?
18   A.   That's one way to put it, yes.
19   Q.   Regardless of whether the investment rose or fell in
20   value, correct?
21   A.   Correct.
22   Q.   But if it rose in value, the investor would get more
23   money, correct?
24   A.   No.
25   Q.   He would not?
```

1   A.    No.

2   Q.    So it was strictly an annuity type of arrangement where

3   the customer would get that rate regardless?

4   A.    Fixed rate of return, yeah, that's the way I understood

5   it.

6   Q.    And what was the fixed rate that was being pitched?

7   A.    I believe as we viewed yesterday, it was somewhere eight,

8   eight and a half percent.

9   Q.    Okay.  And did you have any reason to believe that

10:07AM 10   investors would not get their fixed rate of return?

11   A.    No.

12   Q.    All right.  And would it be fair to say that's because you

13   believed Laborio?

14   A.    Correct.

15   Q.    And, sir, you talked about Laborio doing a reverse merger

16   and making Envit part of a shell company.  Do you recall that

17   testimony yesterday?

18   A.    I do, yes.

19   Q.    And I think you started to explain that, and your

10:07AM 20   explanations have been very clear, so I thank you for that, but

21   could you tell us what a reverse merger is?

22   A.    Again, in the simplest of ways, it's when a company buys a

23   then defunct company that's on an exchange and they then back

24   into the shell company allowing them to trade under that shell.

25   Q.    All right.  And is that an accepted practice in the

industry?

A.   It's not my area of expertise so I can't answer that.

Q.   All right.  But at the time that it happened, did you see anything wrong with it?

A.   No.

Q.   And you were fully aware of it?

A.   Fully aware of?

Q.   The reverse merger?

A.   Yeah, Ed had told us that that's how we were going public.

Q.   And you testified that investors were told that there was -- at one point that there was $40 million in assets under management at Envit.  Do you recall that?

A.   Those figures varied.

Q.   Okay.  But you didn't dispute those figures, did you?

A.   No.

Q.   Well, let me ask you this.  Did you ever receive the fixed rate amount or the 43 percent amount or the assets under management amount and go to Laborio and say, hey, this is nonsense, you know, give me the truth, did you ever do that?

A.   Ed was very hard to approach regarding those matters.

Q.   So the answer is no?

A.   No.

Q.   And the answer I take it is because it would have been an exercise in futility; is that correct?

A.   I'm not clear.

1   Q.   You wouldn't have gotten a truthful answer from Ed by your

2   perception, would you?

3   A.   I don't know what kind of answer I would have gotten.

4   Q.   But you didn't go to him and ask him those questions, did

5   you?

6   A.   No.

7   Q.   And were you intimidated by Laborio?

8   A.   A little bit, yes.

9   Q.   And at any point while you were at Envit, did you speak to

10:10AM 10   security or law enforcement authorities about some of the

11   things that you say later on were red flags?

12   A.   While I was at Envit?

13   Q.   Yes, sir.

14   A.   Did I speak to law enforcement people?

15   Q.   Yes.

16   A.   While I was there, no.

17   Q.   And did you speak to securities regulators, FINRA or the

18   State of Florida folks?

19   A.   No.

10:10AM 20   Q.   And was part of your reluctance the fact that Laborio was

21   your boss?

22   A.   I'm not clear.

23   Q.   Well, you've talked about red flags?

24   A.   Uh-hum.

25   Q.   And from what I can ascertain, even though you saw

1    practices as red flags, and by red flags, I'm assuming you mean

2    something that was a sign of trouble; is that right?

3    A.    When I use the word red flag, I mean it's just my personal

4    interpretation of -- it's just that.  You know, it's what just

5    led me to start asking questions to myself and, you know, kind

6    of question what was going on.  It wasn't something that I dug

7    into enough where I felt the need to contact the people that

8    you just aforementioned.

9    Q.    All right.  But you would agree that you were intimidated

10:11AM 10    in some respects by Laborio?

11    A.    Correct.

12    Q.    Was that based on your observations a sentiment that was

13    shared among other Envit employees?

14         MR. THOMADAKIS:  Objection.

15         THE COURT:  Sustained.

16    Q.    Now, sir, let me get back to what we were talking about at

17    the beginning of this conversation.  When you finally spoke

18    with the agents after they had slipped this notice under your

19    door and you had an exchange of phone conversations and then

10:12AM 20    ultimately had a conference call, I asked you about some

21    questions that or a couple of questions that one of the agents

22    had asked, when was the last time you saw Laborio and how would

23    you contact him.  Do you remember me asking you those

24    questions?

25    A.    Earlier, yes.

1    Q.   Did the agents tell you -- strike that.

2         MR. THOMADAKIS:  Objection.

3    Q.   Strike that.  You testified that you were intimidated by

4    Laborio.  Did anything the agents told you during that

5    conversation make you feel less intimidated by Laborio?

6         MR. THOMADAKIS:  Objection.

7         THE COURT:  Sustained.

8    Q.   Did you feel like you were free to talk to the agents?

9    A.   Yes.

10:13AM 10   Q.   Beyond the immunity letter that you had subsequently

11   gotten, and why did you feel like you were free to talk to the

12   agents?

13   A.   Because I had nothing to hide.

14   Q.   You had nothing to hide.  Were there other factors in work

15   in why you would feel free to talk to him?

16   A.   Because I was willing to answer questions about Ed.

17   Q.   Were you aware of where Ed was?

18        MR. THOMADAKIS:  Objection.

19        THE COURT:  I'll allow that.

10:13AM 20   A.   No.

21   Q.   Were you asked where he was?

22        MR. THOMADAKIS:  Objection.

23        THE COURT:  Sustained.

24   Q.   All right, sir.  Just a few more things that I'd like to

25   ask you.  Do you recall using the expression "need to know

1   basis"?

2   A.   Using how so?

3   Q.   In speaking to the agents during that phone conference

4   telling the agents information was shared on a need-to-know

5   basis?

6   A.   I don't recall that.

7   Q.   All right.  You didn't recall -- strike that.  All right.

8   How would you describe Ed's willingness to share information?

9   A.   Very close to the belt.  It was tough to get information

10:14AM 10   from him.  As I stated earlier, as time went on and, you know,

11   as the waters became more murky, if you will, regarding the

12   direction of the company, you're looking for answers when

13   you're working for a small company.  It was tough to get

14   information from him.

15   Q.   All right.  And when you say close to the belt, you meant

16   it was difficult to get information from him?

17   A.   Yes.

18   Q.   Except for information he wanted you to have?

19   A.   Yes.

10:15AM 20   Q.   But you never spoke with Ed about your misgivings about

21   the company, correct?

22   A.   No.

23   Q.   Now, sir, do you recall speaking with Evan Munno about a

24   family member investing in the company?

25           MR. THOMADAKIS:  Objection.

1          THE COURT:  I'll allow it.  It calls for a yes or no.

2    I'll allow it.

3    A.   Family member?

4    Q.   Of Munno's, yes.

5    A.   No.

6    Q.   So did you don't recall Munno telling you --

7          MR. THOMADAKIS:  Objection.

8          THE COURT:  Sustained.

9    Q.   Did you ever have a family member invest in the company?

10:16AM 10   A.   No.

11   Q.   Did you ever have any friends invest in the company?

12   A.   No.

13   Q.   Would you agree with me that having a family member or

14   close friend invest in the company would be a sign of faith in

15   the company?

16         MR. THOMADAKIS:  Objection.

17         THE COURT:  Sustained.

18   Q.   Sir, in your conversations with the United States Attorney

19   and the FBI agents, did they ever tell you that you were a

10:16AM 20   conspirator in this case?

21         MR. THOMADAKIS:  Objection.

22         THE COURT:  Sustained.

23   Q.   Did they ever characterize what your role was as far as

24   this investigation was concerned?

25         MR. THOMADAKIS:  Objection.

1          THE COURT:  Sustained.

2     Q.   Did the government ever say to you that you had something

3     to worry about in this case?

4          MR. THOMADAKIS:  Objection.

5          THE COURT:  Sustained.

6     Q.   All right, sir, but it's fair to say that you thought you

7     needed to get an immunity letter?

8     A.   Can you repeat, please.

9     Q.   Sure.  You thought that it was in your interest to have

10:17AM 10    the government give you immunity from prosecution?

11    A.   The letter was a result of my attorney speaking with the

12    government.

13    Q.   So it wasn't something you wanted?

14    A.   I rely on the expertise of my attorney.

15    Q.   Well, what was the concern that you had, if you had a

16    concern, for relying on that expertise?  Did you have something

17    that you thought you had to hide?

18         MR. THOMADAKIS:  Objection.  It's the grounds in terms

19    of going to --

10:18AM 20         THE COURT:  Well, it's a multi-part question, so why

21    don't you rephrase.  Let me hear it again.

22         MR. SINNOTT:  I'd be happy to, thank you, your Honor.

23    Q.   Sir, you agreed to seek an immunity letter, correct?

24    A.   Can you repeat, please.

25    Q.   You agreed that your attorney should seek an immunity

1    letter?

2              MR. THOMADAKIS:  Objection.

3              THE COURT:  Overruled.

4    A.   I agreed with my attorney, is that what you're asking?

5    Q.   Yes, sir.

6              MR. THOMADAKIS:  Objection.

7              THE COURT:  I'll allow that.  Overruled.

8    A.   Again, I was relying on the expertise of my lawyer.

9    Q.   But you don't think you did anything wrong, correct?

10:19AM 10   A.   No.

11   Q.   You were part of this Laborio operation, correct?

12   A.   Correct.

13   Q.   You took the information that he gave you at face value?

14   A.   Correct.

15   Q.   You conveyed information that he gave you to potential

16   investors, correct?

17   A.   Correct.

18   Q.   And in some cases, you successfully got money from

19   investors for the company, correct?

10:19AM 20   A.   At first, yes.

21   Q.   Did any of those investors get money?

22   A.   Did they get money?

23   Q.   Yes, did they get any returns, any dividends, any positive

24   outcome from their investments?

25   A.   Not that I know, no.

1    Q.   And you've testified that you didn't go to regulatory

2    authorities, correct?

3    A.   When exactly?

4    Q.   During your employment at Envit?

5    A.   No.

6    Q.   All right.  And after your employment with Envit?

7    A.   No.

8    Q.   And, sir, looking back at your time at Envit, do you feel

9    like you were used by Edward Laborio?

10:20AM 10    A.   Yes.

11    Q.   Do you feel like you were naive?

12    A.   Yes.

13    Q.   Do you have regrets about it?

14    A.   Absolutely.

15    Q.   But you're not being prosecuted, are you, sir?

16         MR. THOMADAKIS:  Objection.

17         THE COURT:  Sustained.

18         MR. SINNOTT:  May I have just a moment, your Honor?

19         THE COURT:  Yes.

10:21AM 20         MR. SINNOTT:  Your Honor, I have nothing further,

21    thank you, Mr. Genovese.

22         THE COURT:  Redirect.

23         MR. THOMADAKIS:  Thank you, your Honor.

24

25

REDIRECT EXAMINATION

BY MR. THOMADAKIS:

Q.   Good morning, again, Mr. Genovese.  At the beginning of the cross-examination, Mr. Sinnott asked you a question about whether there was something inappropriate in general with respect to the calling process as he described it.  Do you recall that question?

A.   Yes.

Q.   And you said that there wasn't?

A.   To the process that was used at Envit?

Q.   Right.

A.   Regarding what's commonly used, I believe.

Q.   What was your answer to that question?

A.   No.

Q.   Whether a particular call was inappropriate or not, would that depend in large part in what was said during that call?

A.   Yes.

Q.   There was some talk about Evan Munno.  Do you recall that --

A.   Yes.

Q.   -- on cross-examination?  How did Evan Munno's tenure at Envit end?

A.   It was kind of a blow-up.  Ed wasn't even in the office when he had gotten let go.  Evan was on the floor.  They had gotten into some sort of argument, about what, I don't recall,

1    and Ed Laborio had security literally come up and escort Evan

2    out of the building.

3    Q.    What impression did that leave on you?

4    A.    Strange, very weird.

5    Q.    Why?

6    A.    Apparently they were friends before they even got into

7    business together.  It seemed like very strange behavior.

8    Q.    Was that something that also gave you concern?

9    A.    Yes.

10:23AM 10    Q.    There were some questions about your relationship,

11    vis-a-vis Mr. Laborio and other relationship's relationship via

12    Mr. Laborio, and I believe there was a question as to whether

13    you considered yourself to be somewhat distant from

14    Mr. Laborio?  Is that a yes?  Do you recall that?

15    A.    Yes.

16    Q.    Did you consider yourself to be more distant from

17    Edward Laborio than you saw Mr. Fraiman as being to

18    Mr. Laborio?

19    A.    Yes.

10:24AM 20    Q.    And why was that?

21    A.    As John had become the top salesman and had started

22    working with the private wealth group, he was consulting with

23    Ed a lot more than I really had need or reason to.

24    Q.    And the private wealth group being the advisory business

25    you described on direct?

1   A.   I'm sorry, yes.

2   Q.   I'm sorry.

3   A.   Yes.

4   Q.   How much did you travel with Mr. Laborio to pitch

5   potential investors?

6   A.   Never.

7   Q.   What was your involvement in running the investment

8   advisory business at Envit?

9   A.   None.

10:25AM 10   Q.   Were you close enough with Mr. Laborio that you would have

11   had him in your wedding had you been planning a wedding at the

12   time you were at Envit?

13   A.   No.

14        MR. THOMADAKIS:   And I'd like to ask you if we could

15   pull up Exhibit 171, please.

16   Q.   Do you see the forwarded message there is from someone

17   called Rich to Ed Laborio and Jonathan Fraiman?

18   A.   From Rich to Ed Laborio, Jonathan Fraiman, yes.

19   Q.   Did you ever meet a man called Richard Denerstein?

10:25AM 20   A.   It does not ring a bell, no.

21        THE COURT:   I think we're outside the scope of cross,

22   are we not?

23        MR. THOMADAKIS:   I mean, broadly the conversation was

24   about relationships with Ed Laborio.

25        MR. SINNOTT:   Objection, your Honor.

1          MR. THOMADAKIS:  I'll move on, your Honor.

2          THE COURT:  All right.

3     Q.   You said you never -- there was some talk about the fixed

4     rate of return.  Do you recall that on cross-examination?

5     A.   Yes.

6     Q.   And the questions were regarding that it started some time

7     in the summer of 2008, this pitching of a fixed rate of return?

8     A.   Correct.

9     Q.   And to your knowledge, Envit offerings with a fixed rate

10:26AM 10    of return were not pitched before that time; is that right?

11    A.   Correct.

12    Q.   And your testimony was when you heard about this fixed

13    rate of return for the first time, you had no reason to doubt

14    it?

15    A.   Correct.

16    Q.   As time went on, how many investors that you knew of got

17    back this fixed rate of return?

18    A.   None.

19    Q.   And was that a cause of concern for you?

10:27AM 20    A.   Without a doubt, yes.

21    Q.   Why?

22    A.   Because if you're telling an investor that -- if you're

23    showing them a product and you're telling them the details

24    about that product, then the company backing the product isn't

25    going to stick by their word, which we were told, it's a huge

1    red flag.

2    Q.   And as a huge red flag, was that one of the contributing

3    factors to you quitting the company?

4    A.   Correct.

5    Q.   And I think you mentioned you quit in February of 2009?

6    A.   Correct.

7    Q.   How much did you pitch something called the Aetius to

8    investors?

9    A.   It doesn't ring a bell.

10:27AM 10    Q.   Mr. Genovese, there was some questioning on

11    cross-examination about you and your misgivings and how you

12    never really addressed them to Mr. Laborio; is that right?

13    A.   Correct.

14    Q.   And what did you do instead as these misgivings

15    accumulated?

16    A.   Just kind of kept them inside and kind of was just

17    becoming more observant of my surroundings and what was going

18    on.

19    Q.   And ultimately what did you do?

10:28AM 20    A.   I left the company.

21    Q.   There were several questions on cross-examination about,

22    you know, whether you kind of believed the numbers, the big

23    numbers that Mr. Laborio was talking about and the projections

24    for the company.  Do you recall those questions?

25    A.   I do, yes.

1    Q.   What was your response?

2    A.   That at first I did believe those numbers.

3    Q.   And then what happened when it wasn't at first as time

4    went on?

5    A.   As my perception of the company and Ed went on, I started

6    to question pretty much everything he had been telling us and

7    really just trying to be more aware of what was really going

8    on.

9    Q.   And, again, ultimately as you begin to ask more of those

10:29AM 10   questions, what did that prompt you to do with regard to Envit?

11   A.   Leave the company.

12        MR. THOMADAKIS:  No further questions, your Honor.

13        THE COURT:  Recross.

14        MR. SINNOTT:  Just briefly, your Honor, thank you.

15                        RECROSS-EXAMINATION

16   BY MR. SINNOTT:

17   Q.   Sir, Mr. Thomadakis asked you if you had ever traveled

18   with Edward Laborio.  Do you recall that?

19   A.   Correct.

10:29AM 20   Q.   But you would agree that it wasn't just John Fraiman that

21   traveled with Edward Laborio, correct?

22   A.   From what I recall he wasn't the only one, yes.

23   Q.   Daniel Kenney traveled with Edward Laborio?

24   A.   I believe so, yes.

25   Q.   And do you remember the context in which Daniel Kenney

1    traveled with Edward Laborio?

2    A.   I believe they might have gone out to California.  Again,

3    I believe it was California.

4    Q.   Was that on the National Lampoon project?

5    A.   Correct, yes.

6    Q.   Tell us about that.

7    A.   There was Ed was trying to raise money for National

8    Lampoon.  He had known the CEO of National Lampoons.  They had

9    worked out some deal, some kind of I guess Ed wanted to create

10:30AM 10   some sort of financing vehicle for National Lampoons, and I

11   don't know, you know, what the background to it was, but I know

12   that Ed did put something together.

13   Q.   Right.  You had some knowledge about that deal at the

14   time, didn't you?

15   A.   I did, yes.

16   Q.   All right.

17          MR. SINNOTT:  May I approach the witness, your Honor?

18          MR. THOMADAKIS:  Your Honor, I think this is beyond

19   the scope of cross.

10:30AM 20          THE COURT:  If we're beyond travel, it is.  Show the

21   prosecution the document, Mr. Sinnott.

22          MR. THOMADAKIS:  Your Honor, I know the document, I

23   do, I just think it's beyond the scope if it doesn't have to do

24   with the travel issue.

25          THE COURT:  I think on redirect the issue was whether

1    he had ever traveled.

2           MR. SINNOTT:  That's fine, thank you, your Honor.

3    I'll withdraw the request.

4    Q.   Now, sir, you talked about how over time you had

5    misgivings about the company, and at some point, sir, did you

6    tell the government that after you had left Envit, you spoke to

7    Mr. Fraiman about what was going on at Envit, and Fraiman had

8    expressed --

9           MR. THOMADAKIS:  Objection.

10:31AM 10          THE COURT:  Sustained.

11   Q.   Sir, you weren't the only one that expressed concern over

12   the company, were you?

13          MR. THOMADAKIS:  Objection.

14          THE COURT:  Sustained.

15   Q.   Now, sir, I know that your testimony is that you're

16   testifying today that while you were at the company, you kept

17   your concerns about the company inside but you left the company

18   because your perception changed over time; is that correct?

19   A.   Correct.

10:32AM 20   Q.   But there were a variety of factors that accounted for why

21   you left the company, correct?

22   A.   Correct.

23   Q.   So this wasn't a decision made on conscience, was it?

24   A.   Can you repeat?

25   Q.   This decision to leave was not strictly a decision made on

 1  conscience or disgust with anything illegal at Envit, was it?

 2          MR. THOMADAKIS:  Objection.

 3          THE COURT:  I'll allow it.

 4  A.   It was a series of events over time that ultimately made

 5  me leave.

 6  Q.   Thank you, sir.

 7          THE COURT:  Anything else, Mr. Sinnott?

 8          MR. SINNOTT:  No.

 9          THE COURT:  Thank you.  You may step down, and we'll

10:33AM 10  take our break.

11          THE CLERK:  All rise.

12          (JURORS EXITED THE COURTROOM.)

13          (A recess was taken.)

14          THE CLERK:  All rise for the jury.

15          (JURORS ENTERED THE COURTROOM.)

16          THE CLERK:  Thank you.  You may be seated.  Court is

17  now back in session.

18          THE COURT:  Mr. Christofferson.

19          MR. CHRISTOFFERSON:  Yes, your Honor, the

10:52AM 20  United States calls Dallas Musgrave to the stand.

21          DALLAS MUSGRAVE, having been duly sworn by the Clerk,

22  testified as follows:

23                      DIRECT EXAMINATION

24  BY MR. CHRISTOFFERSON:

25  Q.   Good morning, sir.

```
 1    A.    Good morning.

 2    Q.    Would you please state your name and spell it for the

 3    court reporter.

 4    A.    My name is Dallas Musgrave, M-u-s-g-r-a-v-e.

 5    Q.    Where do you live, sir?

 6    A.    I live in Lubbock, Texas.

 7    Q.    How old are you, sir?

 8    A.    Seventy-six.

 9    Q.    Are you married?

10    A.    Yes.

11    Q.    To whom?

12    A.    Rosalee.

13    Q.    Are you currently working?

14    A.    Yes.

15    Q.    How are you employed?

16    A.    I'm sorry, what?

17    Q.    What do you do for a living?

18    A.    I work for Rip Griffin Travel Centers.

19    Q.    What is Rip Griffin Travel Centers?

20    A.    We have what we used to call truck stops, but it's a

21    travel center where there's a restaurant, you can buy fuel, buy

22    groceries, have a gift shop in them, like Pilots on the road or

23    Love's, that kind of thing.

24    Q.    What do you do for that company?

25    A.    I'm the vice-president of operations.
```

Q.    How long have you worked there?

A.    Thirty-three years.

Q.    Mr. Musgrave, do you recall ever meeting or speaking with
a person by the name of Jonathan Fraiman?

A.    Yes.

Q.    When do you recall meeting or speaking with Mr. Fraiman
for the first time?

A.    It was in I think July of 2008.

Q.    And what do you recall about that?  First of all, was it
on the phone or in person?

A.    Jonathan called me from a hotel that he was staying at and
indicated that he was a part of a group that had bought Clary
Asset Management which used to represent me and wanted to talk
to me representing my interests.

Q.    When you say Clary Asset Management had represented you,
what do you mean?

A.    Clary Asset Management was an investment advisor financial
services group.

Q.    And did you have investments that they were helping you
with; is that what it was?

A.    Yeah, I had prior to this time, yes.

Q.    Did you know Mr. Fraiman before he reached out to you?

A.    No.

Q.    What company did he say he worked for?

A.    Well, initially, he told me it was Clary Asset Management

1    was being bought, but he told me he worked for Envit Capital

2    Corporation.

3            MR. CHRISTOFFERSON:  Your Honor, at this time by

4    agreement, the government would offer Exhibits 13 through 35,

5    184 and 186.

6            THE COURT:  Any objection?

7            MR. SINNOTT:  No objection, your Honor.

8            THE COURT:  They may be admitted 13 through 35, 184,

9    186.

10:55AM 10            (Exhibit Nos. 13 through 35, 184, 186 were admitted

11    into evidence.)

12    Q.   Now, Mr. Musgrave, you'll see there's a number of them,

13    which is great.  You also have it on the screen there in case

14    that's easier to read, so whichever you prefer.  I will be

15    highlighting some portions as we walk through some of these,

16    okay?

17    A.   Okay.

18    Q.   You can tip the top of that screen a little bit if that

19    helps.  I want to make sure the jury can see you.

10:55AM 20    Q.   All right.  Could we have Exhibit 13, please, Mr. Flynn.

21    Do you have Exhibit 13 there in front of you, Mr. Musgrave?

22    A.   Yes.

23    Q.   And if we could go first to the second page, and,

24    Mr. Flynn, if we could blow up that first e-mail in time.

25    A.   Correct.

         1    Q.   Do you recognize who this is from, Mr. Musgrave?

         2    A.   From Jonathan Fraiman.

         3    Q.   And do you recognize that e-mail address?

         4    A.   Yes.

         5    Q.   And who is this to?

         6    A.   It's to me.

         7    Q.   And do you see there the date is Tuesday, July 29th, 2008?

         8    A.   Yes.

         9    Q.   It says, "Please make a note of our scheduled appointment

10:56AM 10    at 8 a.m. on Thursday, the 31st of July."  Do you see that?

        11    A.   Correct, yeah.

        12    Q.   You mentioned that he had called you.  Did you plan to

        13    meet with him?

        14    A.   Yes.

        15    Q.   And did you, in fact, meet with him?

        16    A.   Yes, I did meet with him.

        17    Q.   Where?

        18    A.   At the Towneplace Suites.

        19    Q.   A hotel?

10:56AM 20    A.   Correct.

        21    Q.   And that was in what city and state?

        22    A.   That was in Lubbock, Texas.

        23    Q.   And during that meeting, what did Mr. Fraiman discuss with

        24    you?

        25    A.   He discussed trying to manage whatever portfolio I had as

1    a representative of Clary Asset Management and also to consider

2    an investment in Envit Capital.

3    Q.   And what did he tell you Envit Capital was?

4    A.   He told me it was a rather new company that had purchased

5    some advisory services, basically I think small companies that

6    they were going to be developing.  They were going to be buying

7    more of that same type.

8    Q.   Now, you mentioned that the first -- one of the things you

9    talked about was him helping you with investments generally; is

10   that right?

11   A.   Correct.

12   Q.   Is that kind of like what Clary Asset Management did

13   before that?

14   A.   Yes.

15   Q.   As an investment advisor?

16   A.   Yes.

17   Q.   To help you manage money?

18   A.   Yes.

19   Q.   And with respect to the investment in Envit, what do you

20   recall specifically he said at this meeting about Envit and

21   that investment?

22   A.   Well, he indicated it was an opportunity for me to invest

23   in a company that he felt was going to be going places, and it

24   would be paying a 10 percent dividend, would be buying

25   preferred shares that pay a 10 percent dividend and eventually

1    also the stock would become more valuable so that there would

2    be some growth involved.

3    Q.    Now, with respect to that dividend that you were talking

4    about, what did you understand based on what Mr. Fraiman told

5    you that it was?

6    A.    Well, with a preferred stock normally, a dividend is the

7    first monies paid.  It's not necessarily guaranteed, but we

8    were told that we'd be getting a 10 percent dividend paid

9    quarterly.

10:59AM 10   Q.    When you say you didn't understand that it was guaranteed,

11   did you have an understanding that it might not be paid?

12   A.    No, I had no thoughts about that at all.

13   Q.    Did you think it was going to be paid?

14   A.    Certainly.

15   Q.    And let's go back to the e-mail, please, if we could, and

16   go to the first page.  There's an e-mail that starts at the

17   bottom of the page, "Thursday, July 31st"?

18   A.    Right.

19   Q.    From Mr. Fraiman.  Later that morning; is that right?

10:59AM 20   A.    Correct.

21   Q.    And do you see it says, "I appreciate the time you allowed

22   me to introduce myself and my firm to you this morning.  I

23   would be delighted to take you and your wife out to dinner

24   tonight or tomorrow if you are available to discuss coming back

25   to Charles Schwab with zero fees and establishing a position of

1   Class A preferred shares which pay a 10 percent dividend

2   through 2011."  Do you see that?

3   A.   I see that.

4   Q.   First of all, do you know what the reference to

5   Charles Schwab is here?

6   A.   Well, we had had an account with Charles Schwab through

7   Clary Asset Management, and that was moving, it would be moving

8   the funds back there.

9   Q.   And you see it says, "The shares -- " which, first of all,

11:00AM 10   those preferred shares, are those the Envit shares?

11   A.   Yes.

12   Q.   And it says "-- which pay a 10 percent dividend;" is that

13   right?

14   A.   Correct.

15   Q.   And it says "through 2011"?

16   A.   Yes.

17   Q.   How often did you understand you would be receiving a

18   payment if you invested?

19   A.   Quarterly.

11:00AM 20   Q.   Quarterly.  And it says there, there's a reference to

21   inviting you to dinner, you and your wife.  Do you see that?

22   A.   Yes.

23   Q.   Did you go out to dinner?

24   A.   Yes.

25   Q.   And who was there at the dinner?

1    A.    My wife Rosalee, Jonathan and me.

2    Q.    And what do you recall about the dinner?

3    A.    I don't really recall the dinner, it was just to get

4    acquainted, particularly with my wife.

5    Q.    Did you discuss the investments again?

6    A.    Yeah, we briefly talked about them.

7         MR. CHRISTOFFERSON:  Could we go to the top of that

8    e-mail, Mr. Flynn, please, the top e-mail.

9    Q.    And this one is dated July 31st, 2008, and do you see that

11:01AM 10  it says, "Dear Dallas, I had a wonderful dinner with the two of

11   you.  Thank you for taking the time out of your schedule to

12   meet with me and to discuss this opportunity.  I will be

13   getting you out an account transfer form for your LPL account

14   to move this to Schwab Institutional.  Once we have completed

15   this (and any other accounts you'd like held there) we can sell

16   some positions to move the $200,000 into the fixed 10 percent

17   dividend through 2011."  Do you see that?

18   A.    Yes.

19   Q.    First of all, there's $200,000.  What is that?

11:02AM 20  A.    That's something my wife and I had agreed to invest in

21   Envit Capital.

22   Q.    And you see it says, "A fixed 10 percent dividend"?

23   A.    Yes.

24   Q.    What did you understand fixed 10 percent dividend to mean?

25   A.    The dividend would be paid.

1   Q.   And you say that you decided to invest the $200,000.   Is

2   that right?

3   A.   Yes.

4   Q.   How important to you was this fixed 10 percent dividend in

5   deciding to invest?

6   A.   It was really important.  My wife is more conservative

7   than I, probably as most wives are, but we needed something at

8   the time that I guess the economy was kind of tanking a little

9   bit, and we wanted something stable, 10 percent dividend would

11:02AM 10   be stable in our minds.

11           MR. CHRISTOFFERSON:  All right.  Could we go to the

12   next exhibit, Exhibit 15, Mr. Flynn, and in particular, if we

13   could go to page 3.

14   Q.   There's an e-mail from you, Mr. Musgrave, to Mr. Fraiman

15   dated August 1st, 2008.  Do you see that?

16   A.   Yes.

17   Q.   And you say here, "I'm not very quick, but what do we do

18   with the rest of the transfer from LPL, just leave it as it is

19   in the Schwab account, and who is going to advise us on how to

11:03AM 20   invest that money or will I have a contact at Charles Schwab

21   that I can use?"  Do you see that?

22   A.   Yes.

23   Q.   And so what were you asking Mr. Fraiman here?

24   A.   Well, he had indicated earlier that he would manage the

25   portfolio as a member of Clary Asset Management, and when I

1    transferred the funds over, it kind of left some of them in

2    limbo.

3    Q.   So let's back out of that and go to the next e-mail above

4    it, the next e-mail in time.  Do you see this response,

5    Mr. Musgrave --

6    A.   Yes.

7    Q.   -- from Mr. Fraiman?  First of all, do you see his

8    signature block down at the bottom?

9    A.   Yes.

11:04AM 10    Q.   And do you see it says, "Director, Private Wealth

11    Management, Envit Capital"?

12    A.   Yes.

13    Q.   And what is the address there, city and state?

14    A.   Boston, Massachusetts.

15    Q.   Boston, Massachusetts?

16    A.   99 Summer Street.

17    Q.   All right.  And if you look at the e-mail, it says,

18    "Dear Dallas, after we transfer your account over to

19    Charles Schwab, I will manage the portfolio for you along with

11:04AM 20    Stan Weinstein and a dedicated support team at Schwab

21    Institutional which I will make available to you."  Do you see

22    that?

23    A.   Yes.

24    Q.   So who do you understand was going to be advising you?

25    A.   Jonathan.

1   Q.   Do you know who Stan Weinstein is?

2   A.   No.  It was a name he gave me that I don't know whether he

3   was on the board or what.

4   Q.   Did you ever speak to Mr. Weinstein?

5   A.   I'm sorry, what?

6   Q.   Did you ever speak to someone named Stan Weinstein?

7   A.   No.

8   Q.   Did Mr. Weinstein ever advise you on money?

9   A.   No.

11:05AM 10   Q.   One moment.  If we go to the preceding page of Exhibit 15,

11   there's an e-mail from Mr. Fraiman to you August 1st, 2008 at

12   9:49 a.m.?

13   A.   Okay.

14   Q.   And do you see that it says the third and the final

15   sentence, "I will get you someone to speak with at Schwab,

16   however, I am the investment investor and will be your point of

17   contact.  Schwab is just the custodian for your funds."  Do you

18   see that?

19   A.   Yes.

11:06AM 20   Q.   Was that consistent with what Mr. Fraiman had been telling

21   you about his role with your money?

22   A.   Yes.

23   Q.   That he was your investment advisor?

24   A.   I believe so.

25   Q.   And if we could look at the e-mail above that.  Do you see

1    that, Mr. Musgrave, an e-mail to you from you to Mr. Fraiman a

2    little later that morning?

3    A.    Correct.

4    Q.    And you write, "I realize you are the point of contact,

5    however, this is all rather rapid fire, and it shouldn't be an

6    encumbrance to offer a reference.  Caution has not been my

7    style in the past, and I've had considerable losses heaped on

8    me.  This is not an indictment or plain distrust of you, just

9    what most people would consider good judgment.  I really want

11:06AM 10    to place this money in something that will be good for my wife

11    downstream and lead to a better comfort level for her."  Do you

12    see that?

13    A.    Yes.

14    Q.    What were you communicating to Mr. Fraiman?

15    A.    Well, I'm trying to exercise a little caution.

16    Q.    Why?

17    A.    Before I give him a bunch of money.

18    Q.    Why were you exercising caution?

19    A.    Well, I had been bit before, probably been bit since, but

11:07AM 20    it's not -- I don't know, it's a hard world, and you don't know

21    who to trust and who you can't trust, so I just wanted a

22    reference from him so that we, my wife and I, would feel

23    comfortable giving him money.

24         MR. CHRISTOFFERSON:  Mr. Flynn, could we go to

25    Exhibit 14, please.

1    Q.   We're looking at Exhibit 14, Mr. Musgrave, and do you see,

2    first of all, the date of this?

3    A.   Yes.

4    Q.   What's the date?

5    A.   August 1, 2008.

6    Q.   And do you see the letterhead?

7    A.   Yes, Clary Asset Management.

8    Q.   And was that the entity that had previously helped you

9    with investments?

11:08AM 10    A.   Yes.

11    Q.   And if we could look at the signature block.  Whose name

12    appears there?

13    A.   Jonathan Fraiman.

14    Q.   And what is his title?

15    A.   It says "Principal, Clary Asset Management."

16    Q.   And you mentioned before, did you understand that

17    Mr. Fraiman was a principal with Clary Asset Management?

18    A.   I knew he was an advisor.  I didn't know about principal.

19    Q.   Okay.  But, in any event, do you see that he sent this

11:08AM 20    letter to you, right?

21    A.   Correct.

22    Q.   And could we go back up to the first paragraph, and it's

23    addressed to you and your wife; is that correct?

24    A.   Correct.

25    Q.   And it says, "Thank you for taking the time to meet with

1    me earlier this week.  As your investment advisor, I look

2    forward to developing strategies that can help you achieve your

3    most important financial goals."  Do you see that?

4    A.   Correct, yes.

5    Q.   Did Mr. Fraiman help you develop strategies to help you

6    achieve your most important financial goals?

7    A.   Well, I wouldn't say that.  He invested some of the

8    monies.

9    Q.   And what was most of your money invested in through him?

11:09AM 10   A.   Most of my money was invested in Envit Capital.

11        MR. CHRISTOFFERSON:  If we could go to Exhibit 16,

12   Mr. Flynn.  And let's first blow up the e-mail on the bottom,

13   if we could.

14   Q.   Do you see this e-mail from you, Mr. Musgrave, to

15   Mr. Fraiman dated August 7th?

16   A.   Yes.

17   Q.   And you write, "Maybe the last of dumb ideas for now,

18   Alberta has an account for her two grandsons, the total of

19   which is somewhere around 58,000."  Who's Alberta?

11:09AM 20   A.   Alberta is my mother-in-law, my wife's mother.

21   Q.   And you say, "She has an account."  What kind of account

22   was that?

23   A.   She had a trust fund.

24   Q.   And do you see it says, "Is it possible to add to this to

25   get it to $100,000, then buy Envit Preferred for their

1    account?"  Then it says, "Their investment status might

2    preclude it or it may not fit the conservative nature of the

3    trust.  It might also be perceived as a crap shoot but had to

4    ask."  What was this all about, Mr. Musgrave?

5    A.   Well, I was asking if it made sense to do it.  We wanted

6    to invest money for them also, but I don't know anything about

7    trusts or what, you know, how conservative they are, what

8    they're all about.

9    Q.   And why were you asking about or referencing the

11:10AM 10   conservative nature of the trust, why was that relevant?

11   A.   Well, it was relevant because everyone but me is

12   conservative in our family, so...

13   Q.   What were you asking of Mr. Fraiman?

14   A.   I was asking him to check it out and make sure that we

15   weren't violating any laws or doing anything untoward.

16   Q.   Were you also asking for his advice about whether it was a

17   good idea?

18   A.   I was always asking for his advice.

19   Q.   Could we look at the top, the reply e-mail, which is later

11:11AM 20   that day.  Do you see that he writes, "Dear Dallas, as your

21   advisor and fiduciary, I would certainly recommend moving all

22   accounts over to Schwab to make life easier on all of you.  I

23   have put the preferred shares into another client's trust so to

24   answer your question, yes, we can accommodate Alberta's

25   grandchildren without a problem."  Do you see that?

1    A.    Yes.

2    Q.    First of all, do you see where it says, "As your advisor,"

3    we've talked about that, and then it says, "fiduciary."  Do you

4    see that?

5    A.    Yes.

6    Q.    What's your understanding of that?

7    A.    Well, a fiduciary is supposed to have your best interests

8    at heart all the time.

9    Q.    And did Mr. Fraiman -- did you have a conversation where

11:12AM 10   Mr. Fraiman talked about, for example, whether the Envit shares

11   were suitable for a trust or whether that was a good idea or

12   legal or whatever, any of the questions that you were asking

13   him, did you have a conversation where he answered those?

14   A.    No.

15   Q.    And then it says, "We usually sell $250,000 units of the

16   preferred offering, however, due to the fact that you and your

17   wife are contributing $200,000, we are more than happy to add

18   the Class A preferred shares into their account."  Do you see

19   that?

11:12AM 20   A.    Yes.

21   Q.    What did you understand he was telling you there?

22   A.    He was going to do us a favor and waive the minimum they

23   supposedly had.

24         MR. CHRISTOFFERSON:  All right.  We can take that

25   down, Mr. Flynn, thank you.

1    A.    I guess --

2    Q.    So, I'm sorry.

3    A.    Go ahead.

4    Q.    Mr. Musgrave, did there come a time where you met with

5    Jonathan Fraiman and Edward Laborio together?

6    A.    Yes.

7    Q.    And when was that, approximately?

8    A.    It was in 2008.  It may have still been in August, I don't

9    know, around the same time frame.

11:13AM 10    Q.    And where did that meeting take place?

11    A.    It was at the Pyramid Plaza in Lubbock, Texas.

12    Q.    Who was with you?

13    A.    My wife Rosalee.

14    Q.    You said the Pyramid Plaza, did they have an office in the

15    Pyramid Plaza?

16    A.    He said they had an office there.

17          THE COURT:  He said, who said that?  You said he said

18    that.  Who said that?

19          THE WITNESS:  Jonathan Fraiman said they have an

11:14AM 20    office there.

21    Q.    Did you understand they had a permanent office in Texas?

22    A.    I had no idea, they had an office.

23    Q.    Did they talk about having traveled down there to meet

24    with you?

25    A.    Yeah, they traveled down there.

1    Q.    Now, what occurred during that meeting?

2    A.    We signed some agreements to purchase the $200,000 worth

3    of shares and had a discussion with them about my wife was

4    brought up to speed, if you will, on what's going to happen

5    with these shares, and we were told by Edward Laborio that the

6    money was set aside for the dividends that were to be paid.  It

7    was mentioned more than once.

8    Q.    Was there any question in your mind as to whether the

9    dividend was going to be paid?

11:15AM 10   A.    Well, there's always a question, that's why we asked, but

11   when he said it had been set aside, the money had been set

12   aside, no, I had no questions about it.

13        MR. CHRISTOFFERSON:  Mr. Flynn, could we look at

14   Exhibit 17, please, and if could you go to the top, blow up the

15   date.

16   Q.    Do you see this says Saturday, August 23rd, 2008?  Do you

17   see that?

18   A.    Yes.

19   Q.    From Mr. Fraiman to you, and who's copied there?

11:15AM 20   A.    He copied Edward Laborio.

21        MR. CHRISTOFFERSON:  Okay.  If we could blow up the

22   body of the e-mail itself.  Actually before we do that, could

23   we go to the bottom e-mail first.

24   Q.    Do you see this e-mail first, Mr. Musgrave, from you to

25   Jonathan Fraiman earlier that day, right?

1   A.   Yes.

2   Q.   And do you see it says, "I did not read the agreement

3   until last night.  We've never signed one for the intent to buy

4   stock."  And then there's some questions about the ability to

5   convert the stock?

6   A.   Yes.

7   Q.   Do you see that?  Then he responds to that above; is that

8   right?

9   A.   Yes.

11:16AM 10   Q.   All right.  So let's now let's take a look at that e-mail.

11   And do you see it says in the middle, "Once you remit payment

12   for your $300,000 Series A cumulative redeemable preferred

13   units --" first of all, what did you understand that to be in

14   reference to, the 300,000 Series A cumulative redeemable

15   preferred units?

16   A.   That was the shares we had signed an agreement to

17   purchase.

18   Q.   And then do you see down there in the middle of the next

19   sentence or the same sentence, it says, "And, furthermore,

11:16AM 20   you/they will be issuing your 10 percent dividend on a

21   quarterly basis?"

22   A.   Yes.

23   Q.   Is that what your understanding was in terms of how that

24   dividend would be paid?

25   A.   Yes.

1    Q.   Is there any reference in this e-mail that it might not be

2    paid?

3    A.   No.

4    Q.   And the 300,000 units, you and your wife invested $200,000

5    of your money; is that right?

6    A.   Correct.

7    Q.   And then $100,000 of where did the other $100,000 come

8    from?

9    A.   From my mother-in-law's trust for the two boys.

11:17AM 10        MR. CHRISTOFFERSON:   Could we go to Exhibit 30,

11   please.

12   Q.   Do you recognize this document, Mr. Musgrave?

13   A.   Yes.

14   Q.   Investor subscription agreement?

15   A.   Yes, sir.

16   Q.   And you see it says, "To Dallas D. Musgrave and Rosalee J.

17   Musgrave"?

18   A.   Correct.

19   Q.   Is that you and your wife?

11:17AM 20   A.   Yes.

21        MR. CHRISTOFFERSON:   Could we look at the last page.

22   Q.   Do you see the signatures there?

23   A.   Yes.

24   Q.   First of all, is that your signature and your wife's

25   signature?

1   A.   Yes, it is.

2   Q.   And what's the date?

3   A.   8-22-08.

4   Q.   All right.  And then at the bottom, who signed it?

5   A.   Ed Laborio.

6   Q.   Okay.  Could we go to the second, I'm sorry, the fifth

7   page of the document, Mr. Flynn.  Do you see this number 8, it

8   says "Acknowledgements of subscriber"?

9   A.   Yes.

11:18AM 10   Q.   And it says, "The subscriber understands that," and then

11   there's a number of items underneath it with blanks, for

12   example, "my or combined with my spouse net worth exceeds $1

13   million."  Do you see that?

14   A.   Yes.

15   Q.   And do you see this is blank?

16   A.   Yes.

17   Q.   Did you ever discuss with Mr. Fraiman whether this Envit

18   investment was suitable for you?

19   A.   Not in that regard, no.

11:19AM 20   Q.   All right.  Now, you mentioned that at this point you had

21   invested $300,000, is that right --

22   A.   Yes.

23   Q.   -- including the money on behalf of your mother-in-law?

24   A.   Yes.

25   Q.   Did you eventually invest even more money in the Envit

1    Preferred shares with the dividend from your mother-in-law's

2    account?

3    A.    I'm sorry, ask that again.

4    Q.    Sure.  In addition to the first $100,000 that you invested

5    of your mother-in-law's money that you invested in Envit, was

6    there an additional amount that you invested?

7    A.    There was an additional $45,000 that was invested I think

8    it was at a little later time.

9         MR. CHRISTOFFERSON:  All right.  Let's go to

11:19AM 10    Exhibit 29, if we could, Mr. Flynn, and, again, if you could

11    blow up the body of the letter, Mr. Flynn.  Thank you.

12    Q.    Do you see this is a letter addressed to "Envit Capital,

13    Attention:  Jonathan Fraiman in Boston"?

14    A.    Yes.

15    Q.    And what is this?  Do you recognize it?

16    A.    It was a letter of authorization from my wife and me to

17    transfer $200,000 from our account held at Schwab.

18    Q.    And in addition to the e-mails that we've seen, we've seen

19    a number of e-mails that you used to communicate with

11:20AM 20    Mr. Fraiman.  Did you also correspond through the mails?  How

21    did you, for example, send your subscription agreement back?

22    A.    I believe we handed it to them when we had the meeting.

23    Q.    Okay.  How about this letter?  Do you know how you sent

24    that letter?

25    A.    No, I don't remember how I sent that back.

1          MR. CHRISTOFFERSON:  If we could go to 186, please,

2     and specifically page 3.  Could we blow that up, please.

3     Q.   Do you see here, Mr. Musgrave, this document says

4     "Beneficiary, Envit Capital, amount, $100,000"?

5     A.   Yes.

6     Q.   Sending bank is Charles Schwab, and the originator is

7     "Alberta M. Ohm, Designated Bene Plan."  Do you see that?

8     A.   Yes.

9     Q.   Who's Alberta Ohm?

11:21AM 10  A.   She's my mother-in-law.

11          MR. CHRISTOFFERSON:  Could we go to the next page,

12    Mr. Flynn, and blow that up, too.

13    Q.   Do you see this says, "Beneficiary, Envit Capital, amount,

14    $200,000, sending bank, Charles Schwab, originator, Dallas

15    D. Musgrave and Rosalee J. Musg;" is that right?

16    A.   Right.

17    Q.   And, again, that's you and your wife?

18    A.   Yes.

19          MR. CHRISTOFFERSON:  And, finally, the next page,

11:21AM 20  Mr. Flynn, if we could blow that up.

21    Q.   You mentioned that you had invested another $45,000 at a

22    later date on behalf of your mother-in-law; is that right?

23    A.   That's correct.

24    Q.   And do you see the date there is October 30th, 2008?

25    A.   Yes.

1    Q.    And it says, "Originator, Rosalee J. Musgrave, TTEE,

2    Alberta M.," do you see that?

3    A.    Yes.

4    Q.    Who is the trustee of your mother-in-law's trust?

5    A.    My wife Rosalee.

6            MR. CHRISTOFFERSON:  Could we now go to Exhibit 18,

7    please, Mr. Flynn.  All right.  If you could blow up on the

8    bottom, there's an e-mail from Mr. Musgrave to Mr. Fraiman

9    dated September 4th and then the rest of the e-mail.

11:22AM 10    Q.    Do you see this e-mail from you to Mr. Fraiman?

11    A.    Yes.

12    Q.    It says, "Forwarding Scotia Update, high yield

13    opportunity."  Then it says, "Just FYI, I like the Scotia

14    Growth Program.  GMG is a line with John Mauldin."  Why were

15    you sending Mr. Fraiman this e-mail, and what was this about?

16    A.    Well, I was reading John Mauldin's reports at the time,

17    and Scotia Growth seemed to be a conservative fund to get

18    invested in, a tactical fund I guess you might call it.  It was

19    just an idea for him to look at.

11:23AM 20    Q.    In terms of what you might invest in?

21    A.    For investing, right.

22            MR. CHRISTOFFERSON:  Can we go to the response above

23    that from Mr. Fraiman, please.

24    Q.    In this response from Mr. Fraiman, do you see it says,

25    "Dear Dallas, I like the Scotia Growth as well, however, I

1    couldn't make a recommendation at this point as I need to

2    review the prospectus and strategy in more depth."  Do you see

3    that?

4    A.   Yes.

5    Q.   And then it says, "I will get back to you early next week

6    on my thoughts for all your holdings."  Do you see that?

7    A.   Yes.

8    Q.   Do you remember him getting back to you on his thoughts

9    for all your holdings or this Scotia update that you were

11:24AM 10    sending him?

11   A.   Well, I don't remember that particular date, but he did

12   get back to me and advise on investing some of my monies, yes.

13   Q.   How about the Scotia Growth?

14   A.   We never got into that.

15        MR. CHRISTOFFERSON:  All right.  If we could go to

16   Exhibit 184, please.  If we could go to the second page and

17   blow up that e-mail.

18   Q.   Do you see it says an e-mail from you, Mr. Musgrave, to

19   Mr. Fraiman, September 11th, 2008.  Do you see that?

11:25AM 20   A.   Yes.

21   Q.   It says, First, "Rosalee is curious as to if and when

22   she'll receive checks so she can draw on her mother's Schwab

23   account.  She pays her mother's rent with it."  Do you see

24   that?

25   A.   Yes.

1   Q.   What was that about?

2   A.   Well, her mother was in a not a nursing home but a -- I

3   don't know what you call them, it's a nursing home, but she had

4   her own apartment and took care of herself.  We paid her rent

5   for her.

6   Q.   Is that something that you and your wife had discussed

7   with Mr. Fraiman and Mr. Laborio?

8   A.   I don't remember if I did or not.

9   Q.   In any event, are you talking to him here when you say

11:25AM 10   "mother's rent," is that what you're referring to?

11   A.   Yes.

12   Q.   Now, if we could go to the first page and the top e-mail

13   from Mr. Fraiman to Mr. Musgrave, September 15th, 2008.  First

14   he's talking about a 2-for-1 common stock split.  Do you

15   remember what that was about?

16   A.   Well, no, I remember that exactly except that the

17   preferred shares were supposedly going to be converted to

18   common, and a 2-for-1 split would occur at some point in time.

19   Q.   But then the second sentence, you see it says, "However,

11:26AM 20   you have 10 percent Class A units which are not affected by

21   market price or split ratios until you convert."  Do you see

22   that?

23   A.   Right.

24   Q.   And then, "Furthermore, as a fiduciary, I'll never make

25   changes in your account without direct authority from you."  Do

1    you see that?

2    A.   Yes.

3    Q.   So this is the second time we've seen a reference to

4    Mr. Fraiman being your fiduciary; is that right?

5    A.   Correct.

6          MR. CHRISTOFFERSON:  Could we go to Exhibit 19,

7    please.  If we could look at the bottom e-mail from

8    Mr. Musgrave to Mr. Fraiman.

9    Q.   You see it's dated October 15th, 2008, and do you see this

11:27AM 10   is to Mr. Fraiman, Mr. Musgrave, and then you say, "Also had a

11   brilliant idea" in the middle.  "Maybe get out of some of

12   Alberta's dogs such as ADM and buy her some of the 50 cent

13   ECGP."  Do you see that?

14   A.   Yes.

15   Q.   What were you talking about there?

16   A.   Well, Envit Capital had fallen in value, and based on

17   conversations that I've had, you know, supposedly it was only

18   temporary, it was going to go back up.

19   Q.   Conversations with whom?

11:27AM 20   A.   Conversations with Jonathan Fraiman.

21   Q.   And we saw that this additional $45,000 investment on

22   behalf of your mother-in-law happened in October, late October;

23   is that right?

24   A.   I believe so.

25   Q.   Do you see where it says, it goes on to say, "It has to go

1  up, and she deserves to benefit from that.  Just a thought, but

2  we've got to keep her solvent, and there is no better upside

3  play than that one."  What did you mean by that?

4  A.   Well, according to what I was being told by Jonathan that

5  it was a viable corporation and that was the best play I could

6  make with my money.

7       MR. CHRISTOFFERSON:  Okay.  Let's back out of that

8  section.  Could we look at Mr. Fraiman's response, the next

9  e-mail above.  Yes, in the middle.  Thank you.

11:28AM 10  Q.   And do you see Mr. Fraiman is responding to you, "Dallas,

11  Go Texas Tech. I agree with you and would put her in one stock

12  and one good fund.  Maybe ECGP at 50 cents.  It's trading at

13  $1.01 right now."  Do you see that?

14  A.   Yes.

15  Q.   And then it says, "We are doing some marketing with the

16  best stock promoter in the business and believe we'll get back

17  to five dollars, maybe more."  Did you have conversations with

18  Mr. Fraiman about stock promotion and that sort of thing that

19  they were using?

11:29AM 20  A.   I don't know what they were promoting, but I know we

21  discussed this kind of, yes.

22  Q.   And then it says, "I can purchase more shares at 50 cents

23  with a 10 percent dividend if you like."  Do you see that?

24  A.   Yes.

25  Q.   Now, let's look at your response at the top.  "Rosalee and

1    I are fine, Alberta needs some help.  Tell me what to do,

2    sell??? and buy ECGP when it drops or what do we replace her

3    dogs with?  I will tell Rosalee what you are going to do, and

4    she can e-mail her blessing to make it legal.  Specifically

5    what do we want to do and when?  Is time not of the essence?

6    If the preferred shares of 50 cents are still available, maybe

7    that's the way to go.  Alberta needs stability and some income

8    in her portfolio, and this would give her both."

9         When you said Alberta needs stability and some income,

11:30AM 10   what were you talking about?

11   A.   She needs money in order to be able to pay her rent.

12   Q.   What was the stability?  What did you think was stable

13   about this investment?

14   A.   Well, the 10 percent dividend was supposedly stable.

15        MR. CHRISTOFFERSON:  Can we go to Exhibit 33, please,

16   Mr. Flynn.  Could we blow up this e-mail.

17   Q.   You made a reference to your wife sort of blessing this.

18   Do you see this e-mail is from Rosalee Musgrave?  Do you see

19   that?

11:31AM 20   A.   Yes.

21   Q.   Is that your wife?

22   A.   Yes.

23   Q.   To Mr. Fraiman copying you?

24   A.   Yes.

25   Q.   "Hi, Jonathan, as trustee of the Alberta Ohm accounts, I'm

1    giving Dallas Musgrave, my spouse, full authority to buy and

2    sell as he deems appropriate to benefit the status of the

3    Alberta Ohm accounts.  Of course, Jonathan, we will depend on

4    your expert judgment to guide us through this process."  Do you

5    see that?

6    A.    Yes.

7    Q.    Sir, did you depend on Mr. Fraiman's expert judgment?

8    A.    Yes, we did.

9    Q.    And did you purchase even more shares of Envit at this

10   point for your mother-in-law's trust?

11   A.    $45,000, I believe.

12         Could we blow up this e-mail.  Could we go to

13   Exhibit 20, please, and could we blow up the top e-mail.

14   Q.    Do you see this e-mail for November 21st from Mr. Fraiman

15   to you, Mr. Musgrave?

16   A.    Yes.

17   Q.    And there's some discussion of some bank stocks; is that

18   right?

19   A.    Yes.

20   Q.    And then at the very end, it says, "I wish I had something

21   more encouraging on a Friday.  ECGP is still growing, and we

22   plan on issuing a dividend very shortly according to the Board

23   of Directors and Ed."  Did you see that?

24   A.    Yes.

25   Q.    What did you understand that to mean when he communicated

1   that to you?

2   A.   That hopefully we'd be getting a dividend payment very

3   shortly.

4   Q.   Did you speak with him in addition about the timing of the

5   dividend?

6   A.   Did I what?

7   Q.   Did you ever talk to him on the phone about the dividend

8   and when it's going to be paid?

9   A.   No, it was supposed to have been quarterly is all we knew.

11:32AM 10   Q.   All right.  Did you ever ask him about the timing of the

11   dividend?

12   A.   We asked him several times, I believe.

13   Q.   And what did he say when you asked him?

14   A.   We never could get a date or a time, it was always based

15   on the Board of Directors and Ed Laborio.

16   Q.   Okay.  Now, did Mr. Fraiman talk to you about that he had

17   spoken with the Board of Directors?  Did you understand he had

18   spoken to the Board of Directors?

19   A.   I didn't think about it.  Probably.  I didn't discuss it,

11:33AM 20   no.

21        MR. CHRISTOFFERSON:  Let's go to Exhibit 21, if we

22   could.

23   Q.   Do you see this e-mail from Mr. Fraiman to you on

24   January 30th of 2009?

25   A.   Yes.

1    Q.   Had you received a dividend up until this point,

2    Mr. Musgrave?

3    A.   No.

4    Q.   And do you see at the bottom, the last sentence of the

5    last paragraph, "At this time Envit Capital has zero exposure

6    to any toxic assets or subprime losses and has only been

7    involved in purchasing several large investment firms which we

8    believe will produce the revenue we need to expand and grow."

9    Do you see that?

11:34AM 10   A.   Yes.

11   Q.   Did Mr. Fraiman tell you that they had been purchasing

12   investment firms?

13   A.   Yes, he had been telling me that.

14   Q.   What did he tell you?

15   A.   I don't remember exactly what he told me.  That's where

16   their money was going was purchasing investment companies.

17   Q.   Did you believe that was true when he told you?

18   A.   Yes, I did.

19   Q.   Had you seen the stock that you had purchased, had you

11:34AM 20   seen any evidence that you had received it yet?

21   A.   I don't remember when we got copies of the stock

22   certificates, if that's what you're asking.

23        MR. CHRISTOFFERSON:  Let's go to Exhibit 22, if we

24   could, and could we look first at Mr. Musgrave's e-mail at the

25   bottom.

Q.   Do you see the date here is February 23rd, 2009?

A.   Yes.

Q.   "Do you have some news to share on why the stock is plunging?  Did the earnings come out?  Are you growing or are you running out of cash?  Some update would be nice.  It looks to me like our investment is in jeopardy."  Do you see that?

A.   Yes.

Q.   You say, "Some update would be nice."  Were you -- had you previously been looking for information?

A.   I was always looking for information, some positive information.

Q.   And when you say, "It looks like our investment is in jeopardy," what were you communicating?

A.   Well, pretty evident, you know, we didn't know if we were going to get our money back or not.

Q.   And how about the dividend, had you received it?

A.   We never have received the dividend.

          MR. CHRISTOFFERSON:  Could we back out of that and look at the top e-mail, the response from Mr. Fraiman.

Q.   And you see there, Mr. Musgrave, it says, "Dallas, we have zero debt and plenty of cash.  The company is in no danger of failing right now or in the future."  Do you see that?

A.   Yes.

Q.   And then later it says, "Furthermore, we will be moving from the pink sheets to the NASDAQ OTC hopefully within the

1   next six months, which should give the stock a much higher

2   price, more liquidity and added volume.  This is a growth

3   stock, as we are rapidly expanding and purchasing other

4   advisory businesses to bring in more revenue for the company."

5   Do you see that?

6   A.   Yes.

7   Q.   First of all, do you know what the pink sheets are?

8   A.   Yes, they're generally how you sell stock when you can't

9   qualify for the NASDAQ or the big board, New York Stock

11:37AM 10   Exchange.

11   Q.   And, again, there's a reference here to purchasing other

12   advisory businesses.  Was that similar to what we were talking

13   about before and what he had been telling you?

14   A.   Yes.

15   Q.   And you see at the bottom, "I'm relocating to our Florida

16   offices this Friday," and, again, the date is February 23rd,

17   Monday?

18   A.   Yes.

19   Q.   Do you recall at some point he informing you he was moving

11:37AM 20   to Florida?

21   A.   Yes.

22   Q.   And then the last sentence says, "Furthermore, I know

23   there's a scheduled conference call coming up to address

24   concerns moving forward."  Do you see that?

25   A.   Yes.

1    Q.    Did you ever participate in a conference call?

2    A.    No.

3    Q.    Were you ever invited to a conference call?

4    A.    No.

5          MR. CHRISTOFFERSON:  Can we go to Exhibit 23, please,

6    and if we could blow up Mr. Musgrave's e-mail at the bottom of

7    the page.

8    Q.    Do you see here, Mr. Musgrave, it says e-mail from you to

9    Mr. Fraiman, March 26th, "I noticed today there's a conference

11:38AM 10   call for May 8th to provide financials for the last three

11   years."  Did you participate in a conference call on May 8th?

12   A.    No.

13   Q.    And then it says, it says that more information will be

14   forthcoming on the website.  "Two things, I hope the results

15   don't destroy the valuation of Envit; and, secondly, there's a

16   log-in to get to Envit, but I can't access it."  Were you able

17   to access information on Envit's website?

18   A.    No.

19   Q.    Then it says at the bottom, "Still scared to death."  Why

11:38AM 20   were you scared to death?

21   A.    Because I had $345,000 riding on it.

22   Q.    Was that a lot of money for you?

23   A.    It's a lot of money.  It should be a lot of money for

24   anybody.

25          MR. CHRISTOFFERSON:  Let's go to Exhibit 24.  Could we

1    blow up the bottom e-mail.  We don't need so much there, the

2    notice part.  Thank you.

3    Q.   Do you see, Mr. Musgrave, it's an e-mail from you to

4    Mr. Fraiman, and then you first say, "If Envit is okay and

5    going to be okay, shouldn't I be buying some of the stock at 10

6    cents?"  And then at the bottom, you write, "Sorry to be a

7    cynic, but I really don't have $200,000 to lose, not including

8    the $145 Alberta has invested.  If you're going to be taking a

9    chapter, then I need to get out when I can.  Help me, Jonathan,

11:39AM 10   please make me understand.  You are my financial advisor."  Do

11   you see that?

12   A.   Yes.

13   Q.   What were you requesting of Mr. Fraiman?

14   A.   A little candor from him, honesty about what's really

15   happening with Envit.

16   Q.   Did you feel like you were getting candor?

17   A.   No.

18   Q.   And it says, "You are my financial advisor."  Why did you

19   say that?

11:40AM 20   A.   Because he was my financial advisor.

21   Q.   Had you or your mother's trust received any dividends at

22   this point?

23   A.   No.

24        MR. CHRISTOFFERSON:  Could we go to the response,

25   please.

1   Q.   Do you see this response from Mr. Fraiman to you later

2   that day?

3   A.   Yes.

4   Q.   "Dallas, please don't worry.  Envit is in even better

5   shape than when you invested originally, and we are buying up

6   defunct assets at an alarming rate."  Did you have an

7   understanding what defunct assets were?

8   A.   No, I didn't know what they were.  It was just his way of

9   responding.

11:41AM 10   Q.   It says, "I will call you tomorrow and give you some

11   updates."  Do you recall getting a phone call with updates on

12   Envit?

13   A.   I don't remember, no.

14   Q.   Based on what Mr. Fraiman was telling you, what did you

15   understand about the state of Envit's business at this point in

16   March, 2009, March 31st?

17   A.   Basically he's saying Envit is in good shape.

18       MR. CHRISTOFFERSON:  Could we look at Exhibit 28,

19   please.

11:41AM 20   Q.   I just wanted to ask you a quick question about this

21   e-mail.

22       MR. CHRISTOFFERSON:  Could we blow up the top e-mail.

23   Q.   Do you see it's an e-mail from Mr. Fraiman to Dallas

24   Musgrave copying Ericka Briscoe at Envit Capital.com?  Do you

25   see that?

1    A.    Yes.

2    Q.    Did you ever speak to Ericka Briscoe at Envit?

3    A.    I don't know.  I spoke to a couple ladies at Envit.

4    Q.    Anyway, do you see this?  It says, "Dallas, I have my

5    assistant, Ericka, looking into the conversion as well, and

6    we'll have an answer shortly should you need any assistance on

7    our end."  Do you see that?

8    A.    Yes.

9    Q.    Were you aware whether Mr. Fraiman's assistant was Ericka?

11:42AM 10    A.    I just believed it was if he said it was.  I don't know.

11    Q.    Thank you.

12          MR. CHRISTOFFERSON:  We can now go to Exhibit 25,

13    please.

14    Q.    I just have a couple more documents to show you,

15    Mr. Musgrave, and we'll be finished.

16    A.    All right.

17    Q.    This is an e-mail of June 11th, 2009 from you to

18    Mr. Fraiman.  Do you see that?

19    A.    Yes.

11:43AM 20    Q.    "ECGP."  You say, "Guess I should have been reading *Yahoo*

21    *Finance* all this time.  They had an article describing the

22    suspension by the SEC."  What was that about?

23    A.    It was about Envit Capital being suspended by the SEC.

24    Q.    When you say suspended, you mean the trading?

25    A.    The tradings, yes.

1    Q.    What was your state of mind, sir, when you were sending

2    this e-mail?

3    A.    Probably a little bit of a let-down.

4    Q.    Is that an understatement?

5    A.    Yeah, probably.

6    Q.    "Not exactly complicated, and it did state the date it

7    would resume trading.  Then it hit a low of one cent before

8    moving up but now hasn't traded for three days.  Something

9    fishy going on, but I have no choice but to wait it out and

11:43AM 10    take whatever comes, good or bad."  What did you mean by that?

11    A.    Well, I had $345,000 invested, we did, and there was

12    nothing I could do about getting it back, either the market

13    would carry it back or not.

14    Q.    You say, "I wish the candor level was better but it won't

15    be."  What did you mean by that?

16    A.    Could no longer trust him.

17    Q.    "I also wish you had a certified financial planner on

18    board.  Think I've been filled with lots of stories, and that

19    is not right."  Do you see that?

11:44AM 20    A.    Yes.

21    Q.    Did you believe at this point you had been filled with

22    stories?

23    A.    Yes, I had.

24    Q.    And then on the next paragraph, "I'll keep looking for

25    information on what is going on.  No story has broken about the

1    Rib World so don't know where that is or if it is."  What was

2    Rib World?

3    A.   Rib World was supposedly a company in Ireland, I believe,

4    that Envit had an interest in or they had an investment in

5    Envit.  I don't know whether it was a two-way street or what,

6    but they were aligned with them somehow.

7    Q.   And you write, "it's hell being so naive but here I am.

8    Would still like to get down there to see the offices -- "

9    first of all, what did you mean by down there?

11:45AM 10    A.   To Boca Raton, Florida.

11    Q.   "-- but not for a while.  Like to see what my $345,000 has

12    bought you."  What do you mean by that?

13    A.   Would be nice to know where my money went.

14    Q.   Then you close, "Disappointed but not dead yet."  What did

15    you mean by that?

16    A.   Well, hopefully I wasn't dead yet.

17    Q.   And so here you are?

18    A.   Here I am.

19    Q.   Sir, do you remember where you got the information about

11:45AM 20    Rib World that you were referencing in this e-mail?

21    A.   Do I what now?

22    Q.   Do you remember how you got information about Rib World

23    that you were referring to in this e-mail?

24    A.   It was verbally, if I remember, from Jonathan Fraiman.

25    Q.   The last document I'd like to take a look at is

1    Exhibit 26, and do you see at the top here, this is an e-mail

2    from you to Mr. Laborio on the next day, do you see that,

3    June 12th?

4    A.   Yes.

5         MR. CHRISTOFFERSON:  And if we could blow up maybe the

6    first paragraph there.

7    Q.   Do you see here it says, In August of 2008, Rosalee and I

8    met with you to invest in your company via Preferred Shares

9    paying a $10 percent dividend quarterly.  At least, this is

11:46AM 10    what we understood we were investing in.  At that meeting you

11    stated that the dividend money was set aside to assure it would

12    be paid.  Who was at that meeting in addition to you and your

13    wife and Mr. Laborio?

14    A.   Jonathan Fraiman.

15    Q.   Who was your investment advisor?

16    A.   Jonathan Fraiman.

17    Q.   "That evidently wasn't true, as we still have seen no

18    dividends and cannot find out if one exists or even if the

19    preferred shares have the value that we were told."  Then it

11:47AM 20    says, "Jon Fraiman can give no response to when or if the

21    dividends will be paid."  Had you been asking Mr. Fraiman about

22    when the dividends would be paid?

23    A.   Yes.

24    Q.   Fair to say you asked him a lot?

25    A.   I probably did ask him a lot, yes.

1  Q.   And you see there you say, "It's the business ethics that

2  bother me."  Were you concerned about the business ethics at

3  Envit?

4  A.   I was at that point in time, yes.

5       MR. CHRISTOFFERSON:  Can we back out of there,

6  Mr. Flynn, and look at the next paragraph.

7  Q.   Now, you see here it says, "I'm not sure what to think

8  your company is all about.  Jon told me when I first met him he

9  had 100,000 shares or so of Envit.  The last time I talked to

11:47AM 10 him, that figure was 1 million or so, declaring that he had a

11  great interest in the success of Envit."  Do you see that?

12  A.   Yes.

13  Q.   What was that in reference to?

14  A.   Well, just at some point in time when I talked to Jonathan

15  over this time frame, he had indicated that he had 1 million

16  shares, and I was questioning whether Envit was viable or not.

17  Q.   So was he comparing what he had versus what you had?

18  A.   He was telling me basically that if the company didn't

19  succeed, then these 1 million shares are worth nothing, so it's

11:48AM 20 in his best interest that the company did succeed.

21  Q.   Did he talk about how he got those shares?

22  A.   No.

23  Q.   Now, do you see at the bottom of this paragraph, you write

24  some other things here, but at the bottom, you say, "Further,

25  Jon said Envit had purchased a broker in Nashville when, in

1    fact, it was 20 percent according to any reports I can find."

2    What do you recall about what Mr. Fraiman told you there?

3    A.   I don't remember exactly.  I know that they had purchased

4    some of a broker supposedly in Nashville.

5    Q.   But he told you that they had purchased the entire thing;

6    is that what you're saying here?

7    A.   That's what it says in this letter.

8    Q.   Do you see here also the next sentence, "He also stated

9    that Envit had purchased 100 percent of Rib World."  Did he

11:49AM 10   tell you that?

11   A.   Yes.

12        MR. CHRISTOFFERSON:  All right.  You can back out of

13   there, Mr. Flynn.  Just the very last paragraph above the

14   signature starting with "Ed."

15   Q.   "Ed, I don't know if you will respond to this but hope you

16   do.  Yahoo's blog does not speak well of Envit.  Perhaps you

17   can.  I also sent an e-mail to Jon yesterday but have no

18   response, but, again, prefer hearing from you on the state of

19   your company."  Do you see that?

11:50AM 20   A.   Yes.

21   Q.   Mr. Musgrave, at any point, did you ever receive a

22   dividend payment from Envit?

23   A.   No.

24   Q.   At any point, did your mother-in-law's trust ever receive

25   a dividend payment from Envit?

```
 1   A.   No.

 2   Q.   At any point, did you receive any of your money back from

 3   Envit?

 4   A.   No.

 5   Q.   How much money did you lose in your investment in Envit?

 6   A.   $345,000 in the family.

 7   Q.   And who was your contact with Envit?

 8   A.   Jonathan Fraiman.

 9   Q.   Who was your investment advisor?

11:50AM 10   A.   Jonathan Fraiman.

11            MR. CHRISTOFFERSON:  I have nothing further at this

12   time, your Honor.

13            THE COURT:  Cross-examination.

14            MR. SINNOTT:  Your Honor, can we approach on a

15   scheduling issue very briefly?

16            (THE FOLLOWING OCCURRED AT SIDEBAR:)

17            MR. SINNOTT:  Your Honor, I very brief need to find

18   out, and I just gave it to them this morning, but I gave

19   counsel four exhibits, see if they'd agreed on them.  I would

11:51AM 20   be offering a couple through this witness and a couple through

21   his wife, and hearing from them, I didn't know if you wanted to

22   let the jurors go 10 minutes early so we're not holding them

23   up.

24            THE COURT:  Can we get the Musgraves off and on today?

25            MR. CHRISTOFFERSON:  I hope so.
```

```
 1              THE COURT:  Okay.

 2              (SIDEBAR CONFERENCE WAS CONCLUDED)

 3              THE COURT:  All right.  Ladies and gentlemen, one of

 4    the things we're going to try to do is to get this witness and

 5    his wife, who's following him, on and off the stand today, and

 6    it makes sense to take our break now, and if we can make that

 7    break as quick as we can to make sure we get things done, that

 8    would be good so we'll take a short recess.

 9              THE CLERK:  All rise.

10              (JURORS EXITED THE COURTROOM.)

11              (A recess was taken.)

12              THE CLERK:  All rise for the jury.

13              (JURORS ENTERED THE COURTROOM.)

14              THE CLERK:  Thank you.  You may be seated.  Court is

15    now back in session.

16              THE COURT:  Mr. Sinnott.

17              MR. SINNOTT:  Thank you, your Honor.

18                         CROSS-EXAMINATION

19    BY MR. SINNOTT:

20    Q.   Good afternoon, sir.

21    A.   Hi.

22    Q.   Welcome to Boston.  I'm sorry the circumstances couldn't

23    be better?

24    A.   That's okay, the weather could, too.

25              THE COURT:  It could be worse.
```

1          THE WITNESS:  Yes, I know.  Been there.

2     Q.   Mr. Musgrave, you described during your testimony that the

3     only time that I believe you had met Mr. Laborio was when he

4     and Fraiman met you for you to sign some documents?

5     A.   Correct.

6     Q.   And I believe you were asked previously whether you talked

7     to Laborio on subsequent occasions; is that right, sir?

8     A.   Have I talked to him subsequently to that?

9     Q.   Subsequently to that meeting with him?

12:05PM 10     A.   I had talk to him after that meeting, if that's what

11     you're asking.

12     Q.   Yes, sir.

13     A.   Yes.

14     Q.   And was that strictly by e-mail or was it by e-mail and

15     telephone?

16     A.   I don't remember if I did any e-mails with him.  I know I

17     spoke to him on the phone once or twice at Jonathan's urging.

18     Jonathan would defer to him on certain things.

19     Q.   And, Mr. Musgrave, when you say Jonathan would defer to

12:05PM 20     him, was it your perception that Laborio was the boss?

21     A.   Yes.

22     Q.   And Laborio had ultimate decision-making authority?

23     A.   Regarding Envit, yes.

24     Q.   Yes, sir.  Thank you.  And, sir, is it fair to say that it

25     was not an infrequent occurrence that Mr. Fraiman would tell

1    you I've got to go to Ed on this?

2    A.   I don't know that it was very frequent, but it happened.

3    Q.   All right, sir.

4         MR. SINNOTT:  And, Mr. Flynn, if we could put

5    Exhibit 13 on the screen.

6    Q.   Sir, this was an exhibit that was introduced during your

7    direct testimony.  Do you recognize this e-mail exchange?

8    A.   Yes.

9         MR. SINNOTT:  And, sir, Mr. Flynn, if we could go to

12:06PM 10   the bottom of the page and if you could highlight that message.

11   Thank you.

12   Q.   You were asked about the statement if you are available to

13   discuss coming back to Charles Schwab?

14   A.   Right.

15   Q.   And what was the significance of going back to Schwab,

16   sir?

17   A.   Apparently Envit and Jonathan used Charles Schwab as their

18   investment vehicle or whatever you want to call them.

19   Q.   So Schwab would hold the investments, would they not?

12:07PM 20   A.   That's correct.

21   Q.   And one of the advantages of going back to Schwab is you

22   would be able, theoretically, at least to see how your

23   investments were doing, correct?

24   A.   Correct.

25   Q.   It would provide transparency?

```
 1    A.    That's correct.

 2    Q.    So would you agree with me that that's something an

 3    investment advisor would counsel an investor to do?

 4    A.    Yes.

 5    Q.    To be able to see how their investments are doing?

 6    A.    Uh-hum.

 7    Q.    Thank you, sir.  And, sir, in that same message after

 8    talking about Charles Schwab, Mr. Fraiman writes "establishing

 9    a position of Class A preferred shares which pay a 10 percent

10    dividend through 2011."  Do you see that, sir?

11    A.    Yes.

12    Q.    Now, do you know where Fraiman got this information about

13    the 10 percent share?

14    A.    No, I don't know where he got it.

15    Q.    All right.

16    A.    He was supposedly a vice-president of Envit, so I assumed

17    he was privy to it.

18    Q.    But you knew he worked for Laborio, correct?

19    A.    Yes, I knew that.

20    Q.    And -- strike that.

21          MR. SINNOTT:  Mr. Flynn, if we could go to Exhibit 16,

22    please.

23    Q.    And, sir, do you recall this document that was offered on

24    direct examination?

25    A.    Right.
```

1    Q.   And do you recall that you were asked about the meeting

2    that was discussed between you and Rosalee on the one hand and

3    Edward Laborio and Mr. Fraiman on the other hand, correct?

4    A.   Yes.

5    Q.   And you were asked if they had an office in Lubbock; is

6    that correct, sir?

7    A.   Yes.

8    Q.   And I believe your testimony was you didn't know if it was

9    a permanent office or not, correct?

12:09PM 10   A.   No, I did not.

11   Q.   So, to your knowledge, they didn't claim that it was a

12   permanent office, correct?

13   A.   I don't know what they claimed, all I know is they

14   supposedly had an office.

15   Q.   All right, sir.  Did you also testify in conjunction with

16   that meeting that Laborio had said that money was set aside for

17   dividends to be paid, correct?

18   A.   Yes.

19   Q.   So that information came from the boss?

12:10PM 20   A.   Yes.

21   Q.   Thank you, sir.

22        MR. SINNOTT:  And, Mr. Flynn, if we could go to

23   Exhibit 20, and if you could blow that up just a little bit.

24   That's great, thank you.

25   Q.   And directing your attention to the top e-mail from

1    Fraiman, there's a reference here, sir, to the Board of

2    Directors in the final line.  Do you see that, sir?  "I wish I

3    had something more encouraging on a Friday.  ECGP is still

4    growing, and we plan on issuing a dividend very shortly

5    according to the Board of Directors and Ed."  Do you see that,

6    sir?

7    A.    Yes, I see that.

8    Q.    Sir, once again, Mr. Fraiman is referring to information

9    that he's received from others; is that correct, sir?

12:12PM 10    A.    That's what he says, yes.

11    Q.    And he's telling you he's sorry he couldn't give you

12    better news, correct?

13    A.    Yes.

14    Q.    And I believe on direct examination, Mr. Christofferson

15    asked you whether Fraiman had told you that he had spoken to

16    the Board of Directors, and you replied you didn't know, you

17    didn't even think of that, correct?

18    A.    That's correct, I didn't know.

19    Q.    Okay, sir, thank you.

12:12PM 20         MR. SINNOTT:  And, sir, Mr. Flynn, Exhibit 26, please.

21    Dividends, if we could blow that up a little bit.

22    Q.    And, sir, there's a discussion about midway through this

23    message where you tell Laborio -- and, sir, let me step back a

24    minute.  Why did you send this message to Laborio and not

25    Mr. Fraiman?

1    A.   Laborio was my last effort trying to salvage something out

2    of this investment, and he was supposedly the end of the line,

3    so you go to the end of the line and start there, maybe that's

4    the best thing to do maybe.

5    Q.   You go to the boss?

6    A.   I assumed he was the boss.

7    Q.   Yes, sir.  And, sir, directing your attention to about a

8    third of the way down the page, you say, "I'm not sure what to

9    think your company is all about.  Jon told me when I first met

12:14PM 10   him that he had 100,000 shares or so of Envit.  The last time I

11   talked to him, that figure was 1 million or so declaring that

12   he had a great interest in the success of Envit."  Do you see

13   that, sir?

14   A.   Yes.

15   Q.   And, sir, to your knowledge that's as far as you know a

16   true statement that he did have 1 million shares?

17   A.   I have no reason to doubt that.

18   Q.   Did Laborio ever tell you he had 1 million shares?

19   A.   No.

12:14PM 20   Q.   Laborio never discussed his own share of the company?

21   A.   Never.

22   Q.   Thank you, sir.  Sir, at the bottom of that letter, you

23   write, "I don't know if you will respond to this but hope you

24   do.  Yahoo 's blog does not speak well of Envit.  Perhaps you

25   can also -- perhaps you can, I also sent an e-mail to John

1    yesterday but have no response but, again, prefer hearing from

2    you on the state of your company."  And, once again, sir,

3    you're going to the boss, correct?

4    A.    I assumed he was, yes.

5    Q.    All right.  Thank you, sir.  Sir, there was discussion

6    during your testimony as to Mr. Fraiman's role as a registered

7    investment advisor.  Do you recall that, sir?

8    A.    Yes.

9    Q.    And the subject of him being a fiduciary was brought up in

12:15PM 10   a couple of spots, correct, sir?

11   A.    That's correct.

12         MR. SINNOTT:  Your Honor, if I might just have a

13   moment?

14         THE COURT:  Yes.

15         MR. SINNOTT:  Madam Clerk, could we have the Elmo.

16   Thank you.

17   Q.    Mr. Musgrave, I'm showing you an exhibit that's been --

18         MR. SINNOTT:  Your Honor, I would announce at this

19   point that previous identification Exhibits 396, 397, 398,

12:17PM 20   subject to an agreement between the prosecution and the

21   defense, and 399 are entered as exhibits.

22         THE COURT:  Do I understand that as to 398 only part

23   of it is going to be admitted and you're going to redact it?

24         MR. SINNOTT:  Yes, your Honor.

25         THE COURT:  But not show the part you're going to

1    redact to the jury?

2            MR. SINNOTT:  Yes, your Honor.

3            MR. CHRISTOFFERSON:  Yes, and with that qualification,

4    the government has no objection.

5            THE COURT:  All right.  They're admitted, 396, 397,

6    398 to be redacted and 399.

7            MR. SINNOTT:  Thank you, your Honor.

8            (Exhibit Nos. 396, 397, 398 and 399 were admitted into

9    evidence.)

12:18PM 10        THE COURT:  "Redacted" again is a fancy legal word.

11   It means blocking off part of the document that is not relevant

12   or otherwise not for your eyes.

13   Q.    Mr. Musgrave, can you see that screen clearly?

14   A.    I can see that, yes.

15   Q.    Sir, if I can direct your attention to the bottom, the

16   message that has been highlighted dated November 24th at 9:10,

17   November 24th, 2008 at 9:10 a.m.  I'm sorry.  The message just

18   below that at 8:04 a.m. on that same date, Mr. Fraiman writes

19   you a message and says, do you see the highlighted portion,

12:18PM 20   "Dallas, do you want to lock in a profit today from City?  It's

21   up premarket already by 55 percent and climbing.  Again, I

22   think it goes back to $8, so I would hold especially after the

23   government said it will guarantee $306 billion to the bank."

24   Do you see that, sir?

25   A.    Yes.

1  Q.   And he goes on to say, "You own 3,750 shares at $3.84, if

2  you sell around $6, it would be a quick profit of $81,000," et

3  cetera.  And directing your attention to your response at

4  9:10 a.m., "Your call.  I don't know if it will come back down

5  or not.  Can we watch it today and then decide?  If you think

6  it's more prudent to sell, go ahead.  I think it probably will

7  stay up above $6, but that would make me right for the first

8  time this year."

9       Then just above that, Mr. Fraiman responds at

12:19PM 10  1:56 p.m., "Dallas, we can sell today for a approximately 50

11  percent return or wait and take a larger profit.  I would

12  assume take a profit in this market and either buy something

13  else that is at a low or put it in cash for the time being.

14  Please let me know."

15       Sir, finally on these e-mail thread at 3:28 p.m., you

16  respond:  "It's at 5.95 right now.  If there is a better bet,

17  we should sell.  If you don't know of one, hold it.  It may go

18  to $10, but as long as it doesn't go down, it still has been

19  worth it."

12:20PM 20       Now, sir, is it a fair statement that this exchange

21  was not dealing with Envit stock?

22  A.   That's correct, it was not.

23  Q.   And is it fair to say that your advisor, Mr. Fraiman, was

24  interacting with you in a way that an advisor would be expected

25  to interact?

1   A.   Yes.

2   Q.   He was giving you the positives and negatives of buying or

3   selling dealing with a particular stock that you already owned,

4   correct?

5   A.   Yes, it was.

6   Q.   And, sir, if I could show you what's been entered as

7   Exhibit 397, and, sir, you'd agree that this is an e-mail from

8   you to Mr. Fraiman on June 30th, 2009 at 8:34 a.m., correct?

9   A.   Right.

12:21PM 10   Q.   And, sir, you see it says, "I missed both you and Ed

11   yesterday.  I think I was in the john, anyway I would still

12   like to talk to Ed if he can find the time.  Rosalee said he

13   talked to her about some ideas he had."

14        Now, sir, is it fair to say that this was -- this

15   e-mail was in response to a contact from Laborio and Fraiman on

16   the previous day, correct?

17   A.   Apparently, yes.

18   Q.   So, on that particular day, at least, Mr. Fraiman, your

19   investment advisor, was responsive to a concern that you had,

12:22PM 20   correct?

21   A.   Yes.

22   Q.   All right.  But Mr. Fraiman had also told you

23   that -- strike that.  But you indicated to him that you would

24   also like to speak to Mr. Laborio, the boss, correct?

25   A.   Yes.

1    Q.   All right.  Thank you, sir.  Sir, if I could show you this

2    item that's been marked as Exhibit 398, and can you read that,

3    sir, or would you like me to block it out?

4    A.   I can read it.

5    Q.   Your eyesight is better than mine.  Sir, this e-mail at

6    12:19 p.m. on August 5th, 2009 is from you to whom?

7    A.   David London at the SEC.

8    Q.   And do you know what Mr. London's job was with the SEC?

9    A.   They were investigating Envit.

12:23PM 10   Q.   All right, sir.

11   A.   He's an attorney.

12   Q.   He's an attorney with the SEC?

13   A.   Right.

14   Q.   And what prompted this particular message?  Had you

15   contacted him or had SEC contacted you?

16   A.   They originally contacted me, I believe.

17   Q.   All right, sir.  And in this e-mail, you write, "This

18   e-mail only gives you the start time with Envit, just verifies

19   that we did meet here for our investment.  I can say that since

12:24PM 20   then, not everything is as I would have liked, but I can't say

21   that they have ever lied to us, just haven't satisfied our

22   desires as investors.  Ed Laborio has been above board in all

23   my dealings to him and still talks to me about what he hopes

24   for the future of Envit.  His hands are tied with his current

25   dealings with the SEC, but he is optimistic about the

resolution.  We investors would also like to see some

resolution."

So, sir, is it fair to state that on this particular

date, August 5th, 2009, you were stating that you didn't think

that Laborio and Fraiman had lied to you, correct?

A.   At that point in time, I didn't know they had, and I

couldn't state that they had.

Q.   But, sir, it's also fair to state that Laborio had at some

point spoken to you and told you everything was going to be all

right?

A.   I don't remember him talking to me.  I honestly don't.

Q.   All right, sir.  So when you say "he still talks to me

about what he hopes in the future of Envit," do you know if

that was a recent conversation?

A.   I don't remember.

Q.   All right.  And when you see that his hands are tied, that

statement "in current dealings with the SEC," does that refresh

your memory as to whether it would be a recent conversation?

A.   That would have been something they would have told me

from Envit, either Jonathan or Ed Laborio, but I don't remember

talking to Mr. Laborio again.  I may have, but I don't remember

it.

Q.   And the fact that he was optimistic about the resolution,

that tells you that someone, whether it was Fraiman or Laborio,

conveyed that Mr. Laborio was seeking a resolution or hopeful

1    that he could resolve the issue, correct?

2    A.   That's correct.

3    Q.   And, sir, you don't know if that same information was

4    being conveyed to Mr. Fraiman, do you?

5    A.   No.

6         MR. SINNOTT:   I have nothing further, thank you very

7    much, sir.

8         THE COURT:   Redirect.

9         MR. CHRISTOFFERSON:   Just very briefly, your Honor.

12:26PM 10                REDIRECT EXAMINATION

11   BY MR. CHRISTOFFERSON:

12   Q.   Mr. Musgrave, I just have a couple quick questions for

13   you.  Could we have the -- here we go.  This was Exhibit 397

14   that Mr. Sinnott just asked you about.

15   A.   Right.

16   Q.   Do you see here it says, "Don't know why Schwab terminated

17   their agreement with Envit but can guess."  Do you see that?

18   A.   Yes.

19   Q.   What was that about?

12:27PM 20   A.   They no longer wanted to do business with Envit.

21   Q.   And when you say "But I can guess," what did you mean by

22   that?

23   A.   Well, I could guess that something was kind of amiss.

24   Q.   This e-mail, Exhibit 398, you were just looking at with

25   Mr. Sinnott?

1    A.   Right.

2    Q.   And it says, "But I can't say that they have ever lied to

3    us," and you said, "At that point in time I couldn't say that;"

4    is that right?

5    A.   That's correct.

6    Q.   Did your view change about that?

7    A.   It certainly has, yes.

8    Q.   In what way?

9    A.   I had been duped all along in my mind.

12:28PM 10   Q.   Now, when -- we looked at a number of documents, e-mails

11   relating to that dividend and it being paid.  Do you recall

12   that?

13   A.   Yes.

14   Q.   Did you ever get a dividend?

15   A.   No.

16   Q.   Finally, sir, Mr. Sinnott asked you some questions about

17   who the ultimate decision maker at Envit was.  Do you recall

18   those questions?

19   A.   Yes.

12:28PM 20   Q.   And you said who?

21   A.   Ed Laborio.

22   Q.   Who was your investment advisor with a fiduciary duty to

23   look out with your best interests?

24   A.   Jonathan Fraiman.

25        MR. CHRISTOFFERSON:  Nothing further, your Honor.

1          THE COURT:  Recross.

2          MR. SINNOTT:  Very briefly, your Honor.

3                    RECROSS-EXAMINATION

4    BY MR. SINNOTT:

5    Q.   Sir, had you had experience with fiduciaries in the past?

6    A.   I can't hear you.

7    Q.   I'm sorry, I'll speak into the microphone.  Had you had

8    experience with fiduciaries in the past?

9    A.   Yes.

12:29PM 10   Q.   At Clary Asset Management, for example?

11   A.   Yes.

12   Q.   Who was your fiduciary there?

13   A.   Jim Clary.

14   Q.   All right.  Did you always have successful investments

15   with Jim Clary?

16   A.   I didn't have them with anybody, no.

17   Q.   Did you have any bad investments with Jim Clary?

18   A.   Probably, yes.

19   Q.   Did you lose a lot of money?

12:29PM 20   A.   No, I didn't lose a lot of money.

21          MR. CHRISTOFFERSON:  Objection, your Honor.

22          THE COURT:  I'll let it stand, go ahead.

23   Q.   I didn't hear your response.

24   A.   No, I did not that I know of lose a lot of money.

25   Q.   Did you lose a lot of money?

1    A.   Not with Mr. Clary, no.

2    Q.   Did you ever lose a lot of money with other fiduciaries?

3    A.   No, not that I know of.

4    Q.   All right.  But you have lost money in the past?

5    A.   I have lost money.

6    Q.   All right, sir.  Thank you very much.

7         THE COURT:  Thank you, you may step down,

8    Mr. Musgrave.  Mr. Christofferson.

9         MR. CHRISTOFFERSON:  Yes, your Honor, the government

12:30PM 10   calls Rosalee Musgrave to the stand.

11        ROSALEE JEAN MUSGRAVE, having been duly sworn by the

12   Clerk, testified as follows:

13                      DIRECT EXAMINATION

14   BY MR. CHRISTOFFERSON:

15   Q.   Good morning, Mrs. Musgrave.

16   A.   Good morning.

17   Q.   Could you please state your name and spell your last name

18   for the court reporter.

19   A.   Rosalee Jean Musgrave, M-u-s-g-r-a-v-e.

12:31PM 20   Q.   Mrs. Musgrave, we're going to try to do this quickly and

21   get you out of here so you can make your flight.

22   Mrs. Musgrave, where do you live?

23   A.   Lubbock, Texas.

24   Q.   And how old are you?

25   A.   Can you speak louder?

1    Q.    How old are you?

2    A.    Seventy-three.

3    Q.    And are you married?

4    A.    Yes.

5    Q.    To whom?

6    A.    Dallas Musgrave.

7    Q.    Do you work?

8    A.    I am a part-time line dance instructor on medical leave

9    right now.

12:32PM 10    Q.    Okay.  Where do you do line dancing instruction?

11    A.    Where do I it?

12    Q.    Yes.

13    A.    University Medical Activities Center.

14    Q.    How long have you worked there?

15    A.    Fourteen years.

16    Q.    Mrs. Musgrave, I'd like to direct your attention to the

17    summer of 2008.  Do you recall meeting with Jonathan Fraiman in

18    the summer of 2008?

19    A.    Yes.

12:32PM 20    Q.    Where was that meeting?

21    A.    It was at the Pyramid Building in Lubbock, Texas.

22    Q.    And who was at the meeting?

23    A.    Mr. Ed Laborio, Jonathan Fraiman, my husband Dallas and

24    myself.

25    Q.    Why were you meeting with them?

A.   They were going to be handling our finances and had

offered us some investment in Envit Capital.

Q.   Okay.  What do you remember about the investment in

Envit Capital and what that was?

A.   We were offered shares of the company, which would get us

10 percent interest payout.

Q.   In interest payout?

A.   Yes.

Q.   And that 10 percent, what did you understand about whether

that would be something you automatically get versus you might

not get it?

A.   I understood we would automatically get it at the end of a

certain amount of time.

Q.   And you mentioned -- I want to get back to that in a

minute.  You said they would also be managing your money; is

that what you said?

A.   Yes.

Q.   And what do you mean by that?

A.   The financial investments that we already had.

Q.   Okay.  Did you understand that Mr. Fraiman was going to

become your investment advisor?

A.   I did.

Q.   And taking over for Mr. Clary?

A.   Yes.

Q.   Now, this payment you said, this 10 percent payment, I

1    believe you called it an interest payment or something.  What

2    did they say about whether it may not be paid?

3    A.    I don't remember them saying it may not be paid.  I

4    remember --

5    Q.    What did you understand?

6    A.    -- that it was supposedly going to be paid.

7    Q.    Did you tell Mr. Fraiman and Mr. Laborio anything during

8    this meeting?

9    A.    I asked them a question.

12:34PM 10    Q.    And what did you ask them?

11    A.    If they were going to abscond with our money or whether it

12    was safe with them.

13    Q.    How did they respond?

14    A.    It was safe, a safe investment and that, of course, they

15    wouldn't abscond with our money.

16    Q.    Now, you mentioned that you were there talking about your

17    money, your husband's and your money.  Were you also there

18    speaking about anyone else's money?

19    A.    Yes, I was concerned about my mother's money.  I was the

12:35PM 20    trustee for her.

21    Q.    And what did you talk about in the meeting relating to

22    that?

23    A.    That I needed to guarantee an income for my mother to keep

24    her in a senior living campus so that she would be comfortable.

25    Q.    And did you talk what else this trust money was?

A.   Yes, it was $100,000 was earmarked for our two sons and

their future.

Q.   Did you have -- did you and your husband ultimately agree

to make this investment in Envit, these shares that came with

this 10 percent payment that you were talking about?

A.   Yes.

Q.   Why did you do that?  Why did you make that decision?

A.   They made it sound perfectly safe and that it was a

guaranteed income back for us and that it could provide a good

future for us.

Q.   So what role did that payment play in your decision to

invest?

A.   It was a very big part of our decision to make that

investment.  If we wouldn't have felt that it was guaranteed,

of course, we wouldn't have made the investment.

Q.   Now, as between Mr. Laborio and Mr. Fraiman, who did you

understand to be your investment advisor?

A.   Jonathan Fraiman.

Q.   Was that also important to you in making the decision to

invest?

A.   Yes.  He seemed like a very trustworthy man.

Q.   How much money did you ultimately invest in Envit between

the money between you and your husband contributed and also the

money of your mother?

A.   In total.

1   Q.   Total?

2   A.   $345,000.

3   Q.   I'm going to show you, Mrs. Musgrave, what's already been

4   admitted as Exhibit 33.  I'll just put it on the screen to

5   speed up the process here.

6        THE COURT:  You can tip that, pull on the top and pull

7   it towards you.  Can you see that okay?

8        THE WITNESS:  Yes, yes.

9   Q.   And do you see this is an e-mail.  Who is it from at the

12:37PM 10   top?

11  A.   It's from me, Rosalee Musgrave.

12  Q.   Is that your e-mail address?

13  A.   It is.

14  Q.   And to whom are you writing?

15  A.   Jonathan Fraiman.

16  Q.   And who was copied?

17  A.   My husband, Dallas Musgrave.

18  Q.   And do you see there the date is October 16th, and it says

19  "Hi, Jonathan, as trustee of the Alberta Ohm accounts, I'm

12:37PM 20   giving my husband, Dallas Musgrave, my spouse, full authority

21  to buy and sell as he deems appropriate to benefit the status

22  of the Alberta Ohm accounts."  Who's Alberta Ohm?

23  A.   Alberta Ohm is my mother.

24  Q.   And you see it says, "Of course, Jonathan, we will depend

25  on your expert judgment to guide us through this process."

```
 1    Were you depending on Mr. Fraiman's judgment?

 2    A.    I was depending upon him to guide us in the correct

 3    direction to make our investments profitable.

 4    Q.    And did that include the investments in your mother's

 5    trust?

 6    A.    It did.

 7    Q.    How old was your mother at the time?

 8    A.    Let me see.  In 2008, she must have been 92.  She passed

 9    away in 2012 when she was 96.

10    Q.    Okay.  I'm sorry for your loss.  Now, if we could look at

11    one more e-mail.  It's Exhibit 35, and do you see the top.  Who

12    is this from?

13    A.    Myself, Rosalee Musgrave.

14    Q.    To Mr. Fraiman?

15    A.    Yes.

16    Q.    On February 2nd.  There's a reference to your mother

17    again, Mrs. Ohm, and a available universal life insurance

18    account.  Do you see that?

19    A.    Yes, I do.

20    Q.    And do you see at the bottom, there's a P.S.  First it

21    looks like you're giving a new e-mail address; is that right?

22    A.    Yes.

23    Q.    "P.S., my mother Alberta is still looking for her dividend

24    check on her preferred shares, and she's not getting any

25    younger."  Do you see that?
```

12:38PM (line 10)

12:39PM (line 20)

A.    I do.

Q.    Did you ever receive a check on your mother's behalf from the investment in Envit?

A.    We never received anything ever.

Q.    You and your husband, did you receive a dividend back from that investment?

A.    Never.

Q.    At any point were you ever able to sell any of the stock that you had purchased from Envit?

A.    No, we were not.

Q.    Did you ever receive any money back from your investment?

A.    No.

Q.    One moment.  Just one last question, Mrs. Musgrave.  Why were you pointing this out to Mr. Fraiman in your P.S.?

A.    I was worried about her money being taken from us and we'll never get anything back.  I was starting to worry a lot.

Q.    Thank you, Mrs. Musgrave.

        MR. CHRISTOFFERSON:  I have no further questions at this time, your Honor.

        THE COURT:  All right.  Cross-examination.

                    CROSS-EXAMINATION

BY MR. SINNOTT:

Q.    Good afternoon, Mrs. Musgrave.

A.    Good afternoon.

Q.    Mrs. Musgrave, during my Brother attorney's questioning,

1    during the questioning by Mr. Christofferson, you indicated

2    that Mr. Fraiman was your investment advisor; is that correct?

3    A.   Yes, that's correct.

4    Q.   And that you had relied on him for advice, correct?

5    A.   Yes, totally.

6    Q.   Had you dealt with investment advisors previously?

7    A.   Yes, before him we had Jim Clary.

8    Q.   All right.  And did you have other investment advisors as

9    well?

12:41PM 10   A.   Yes, we had a gentleman named Tracy Spaeth and I believe

11   A.G. Edwards at one time.

12   Q.   All right.  So you had some experience with investment

13   advisors?

14   A.   Well, actually I didn't have much experience, I trusted my

15   husband to take care of that.

16   Q.   Sure.  Mrs. Musgrave, if I could show you a document on

17   your screen there that's been admitted as Exhibit 399, and I

18   direct your attention, if I might, to the bottom e-mail, and

19   I'll attempt to get that centered.  Can you read that on your

12:42PM 20   screen?

21   A.   Yes.

22   Q.   There's an e-mail from you to Mr. Fraiman dated Saturday,

23   March 14th, 2009 at 3:04 p.m.  "Subject:  Alberta Ohm account."

24   Do you see that?

25   A.   Yes.

Q.   And in that e-mail you have a question about the account,
and you say, "I remember talking to you last week and asking
you to put my personal IRA into something safe before I lose
the rest of it and have received the papers on that.  Thanks.
I also received papers from Alberta's account selling Ivy and
Pioneer Global.  I don't remember discussing those accounts and
asking that they be sold.  I thought Ivy was making money."
Mr. Fraiman responds in the e-mail that's highlighted, I'm
sorry, in the middle e-mail that is dated Monday, March 16th,
2009 at 8:30 a.m., "Rosalee --"

A.   I can't see it.

Q.   I'm sorry.

     MR. THOMADAKIS:  It's just not on the screen.

Q.   Can you see it now, ma'am?

A.   Yes.

Q.   So Mr. Fraiman responds to you that "-- Ivy is down over
36 percent over the past year and Pioneer Global was paying a
nice dividend, however, you wanted security and something less
risky, and the I Shares Aggregate Bond Fund has lost just over
one percent over the last year."

     Now, Mr. Fraiman isn't talking about Envit stock here,
is he?

A.   Not that I can see.

Q.   He's advising you on what he's conveying to you as prudent
moves for other financial interests that you have, correct?

1    A.    Yes.

2    Q.    And that's what investment -- that's what advisors do; is

3    it not?

4    A.    Yes.

5    Q.    And he goes on to say that, "If you want more volatility

6    and higher returns, I will put a portion of those investable

7    assets in something a bit more speculative.  This is

8    government-issued security with the highest rating, AAA, with

9    very little risk and should return around 3 to 5 percent over

12:45PM 10    this year.  Please call me on my direct line if you want to go

11    over the investment more in detail."

12         Now, Mr. Fraiman says to you "if you want more

13    volatility and higher returns," that's language, is it not,

14    that advisors use to tell you that there's some risk to the

15    stock, correct?

16    A.    Well, to tell you the absolute truth, I let my husband

17    handle that, and whenever I typed an e-mail to Jonathan, he

18    told me what to type.

19    Q.    Okay.

12:45PM 20    A.    So I really wasn't involved in it that much.

21    Q.    Fair enough.  But you respond in your message, and this

22    time I'll remember to put it where you can actually read it,

23    dated Tuesday, March 17th, at 2009 at 2:11 a.m., you say, "If

24    it goes down again tomorrow, then I will talk to you about

25    something safe like money market.  I can't stand any more

1    signs."

2          So you interact, do you not, here with Mr. Fraiman,

3    you've received his advice and you're giving your input as to

4    what your plans are for the future, correct?

5    A.    Again, I'm going to tell you that my husband handled this,

6    not me.

7    Q.    All right.  And in the past when you and your husband were

8    interacting with other financial advisors, other fiduciaries,

9    you would also rely on him as well?

12:46PM 10   A.    I did.

11   Q.    But is it fair to say that this is kind of a typical

12   exchange that you might have with an advisor?

13          MR. CHRISTOFFERSON:  Objection.

14          THE COURT:  Sustained.

15   Q.    Let me phrase it another way, ma'am.  This back and forth

16   that you had with Mr. Fraiman about non-Envit stocks and his

17   advice as to what would be safe, what would be volatile, is

18   this consistent with what you had experienced in previous

19   discussions with advisors?

12:47PM 20          MR. CHRISTOFFERSON:  Objection.

21   A.    I don't understand.

22          THE COURT:  I'll allow that.

23   A.    Would you explain that a little bit more, please?

24   Q.    Absolutely, ma'am.  Mr. Fraiman in this middle e-mail is

25   providing advice to you based on the question that you raised

1    in your Saturday, March 14th e-mail, correct?

2    A.   That's what it seems to be, yes, and, again, I'll tell you

3    my husband handled this.

4    Q.   Okay.  But is it fair to say that in that middle e-mail,

5    you didn't see anything that alarmed you?

6    A.   Well, of course, I was concerned, yes.

7    Q.   But you were concerned because you wanted to make sure

8    that prudent steps were taken with this particular account,

9    correct?

12:48PM 10    A.   I just wanted to make sure that all of our investments

11    were safe and making money.

12    Q.   All right.  And this particular advice from Mr. Fraiman,

13    is it fair to say, that it has nothing to do with Envit stock?

14    A.   No, however, my husband was concerned that Jonathan would

15    trade or do something without checking with him first.

16    Q.   Sure.  But this particular advice that he did give, did

17    you find this to be reassuring?

18    A.   I don't know because really, again, my husband handled

19    this and I wasn't involved in these e-mails.

12:49PM 20    Q.   Thank you for your honesty, ma'am, and thank you for being

21    here in Boston and for answering these questions.  I appreciate

22    it.

23         THE COURT:  Any redirect?

24         MR. CHRISTOFFERSON:  Very, very briefly.

25

<u>REDIRECT EXAMINATION</u>

BY MR. CHRISTOFFERSON:

Q.   Mrs. Musgrave, I just wanted to ask you you were just

looking at this e-mail with Mr. Sinnott?

A.   Yes.

Q.   All right.  And do you see here he mentioned this language

to you, "This is government-issued security with the highest

rating with very little risk and should return around 3 to 5

percent over this year."  Do you see that?

12:49PM A.   I do.

Q.   Do you recall with the Envit investment there was an

interest payment I think you called it of I think 10 percent,

right?

A.   Yes.

Q.   What was your understanding that it would be paid or would

not be paid?

A.   I understood it would be paid.

Q.   Was that based on discussions with Mr. Fraiman?

A.   Pardon me.

12:50PM Q.   Was that based on your discussions with Mr. Fraiman at

that meeting?

A.   Yes.

       MR. CHRISTOFFERSON:  Nothing further, your Honor.

       THE COURT:  Go ahead.

       MR. CHRISTOFFERSON:  We're all, thank you.

1          MR. SINNOTT:  Just one question, your Honor.

2                    RECROSS-EXAMINATION

3     BY MR. SINNOTT:

4     Q.   And, ma'am, my Brother Attorney asked you if that was

5     based on what Mr. Fraiman had told you, correct?

6     A.   Yes.

7     Q.   The guaranteed dividend?

8     A.   Sorry.

9     Q.   The guaranteed dividend or the interest payment as you

12:50PM 10    described it?

11    A.   The guarantee, is that what you're saying?

12    Q.   Yes, the 10 percent.

13    A.   Yes.

14    Q.   But Mr. Laborio also told you that that was guaranteed,

15    didn't he?

16    A.   Well, they both did, they were both in the meeting and

17    they were assuring us that this was a good investment.

18    Q.   Sure.  Do you know who was the boss between those two?

19    A.   I assumed that Mr. Laborio was president.

12:51PM 20    Q.   All right.  Thank you, ma'am.

21          THE COURT:  Thank you, Mrs. Musgrave, you may step

22    down.

23          THE WITNESS:  Thank you.

24          THE COURT:  We have 10 minutes.  Let's make use of it.

25          MR. THOMADAKIS:  The government calls Matthew Lazar.

1          Your Honor, while Mr. Lazar is taking the stand, the

2     government would offered into evidence agreed upon Exhibits 98

3     through 127.

4          THE COURT:  Any objection?

5          MR. SINNOTT:  No objection, your Honor.

6          THE COURT:  All right.  They're admitted, 98 to 127.

7          (Exhibit Nos. 98 through 127 were admitted into

8     evidence.)

9          MATTHEW LAZAR, having been duly sworn by the Clerk,

12:51PM 10    testified as follows:

11                        DIRECT EXAMINATION

12    BY MR. THOMADAKIS:

13    Q.   Good afternoon, Mr. Lazar.

14    A.   Good afternoon.

15    Q.   Could you please state and spell your name for the record.

16    A.   Matt Lazar, M a-t-t L-a-z-a-r.

17    Q.   What city and state do you live in, sir?

18    A.   Columbus, Ohio.

19    Q.   How are you employed?

12:52PM 20    A.   I run a job search sales consulting firm with my father.

21    Q.   What's that called?

22    A.   The Ability Professional Network.

23    Q.   How long have you been doing that?

24    A.   About two years.

25    Q.   And can you walk us backwards from that in your

1   professional career all the way back to college?

2   A.   Sure.  I've been doing that for about the past two years.

3   Before that I ran my own investment firm for three to four

4   years.  Before that I worked in a small investment firm in

5   North Carolina for about a year or two.  Prior to that, I

6   worked at Envit Capital for about four months, and before that

7   I worked at Ameriprise for six years.

8   Q.   All right.  Do you currently hold any professional

9   licenses?

12:53PM 10   A.   No.

11   Q.   Have you ever?

12   A.   Yes.

13   Q.   What were those?

14   A.   Series 7, Series 66 and something called the CRPC.

15   Q.   We've talked about Series 7 or the jury has heard previous

16   testimony on Series 7.  What is Series 66?

17   A.   66 will allow you have to have clients that are outside of

18   basically your home, so if I live in Ohio, and I wanted to have

19   a client in California, you would have to have your Series 66.

12:54PM 20   Q.   What happened to your licenses?

21   A.   They were taken away and banned by the SEC.

22   Q.   What were the circumstances of your leaving Ameriprise?

23   A.   I was fired.

24   Q.   Do you recall why?

25   A.   No.

1   Q.   What were the circumstances of your being fired?  How was

2   it communicated to you?

3   A.   I went into a conference room with my boss's boss, someone

4   from HR, and I walked in and they said you're going to be

5   fired, you have 20 minutes to get your things from your office,

6   and I left.

7   Q.   And so were you employed at the time that you started at

8   Envit?

9   A.   No.

12:54PM 10   Q.   And, sir, while you were at Ameriprise, did you ever have

11   client complaints against you?

12   A.   Yes.

13   Q.   Approximately how many?

14   A.   Four or five.

15   Q.   How did you first become involved in Envit?

16   A.   I got an e-mail from Mr. Munno in August of 2008.

17   Q.   Who is Mr. Munno?

18   A.   He was the hiring manager for Envit Capital.

19   Q.   And how did he come to e-mail you, do you know?

12:55PM 20   A.   I'm not sure.

21   Q.   All right.  So you just received kind of an e-mail out of

22   the blue?

23   A.   Yes.

24   Q.   When did you say this was, approximately?

25   A.   August of 2008.

1    Q.    Okay.  And when did you actually start working at Envit?

2    A.    September 12th.

3    Q.    Of what year?

4    A.    2008.

5    Q.    And until when did you work there?

6    A.    January 20th, 2009.

7    Q.    And before you started working there, what was the process

8    in order for -- in order for you getting hired?  Whom did you

9    speak with?

12:55PM 10    A.    With Mr. Munno and Ed.

11    Q.    Who's Ed?

12    A.    Ed Laborio was CEO.

13    Q.    What information, first of all, did Mr. Munno give you

14    during that process about Envit?

15    A.    Just that it was a new financial company, they had a lot

16    of components from the hedge fund to the private wealth

17    management side and I'd be there to bring over my book of

18    business and manage it.

19    Q.    Where was the company based?

12:56PM 20    A.    Boston, here.

21    Q.    And were there other locations that Mr. Munno apprised you

22    of?

23    A.    Yes.

24    Q.    Where?

25    A.    It was Boston, Boca Raton in Florida and Texas, I'm not

1    sure where.

2    Q.    Okay.  You mentioned that there was a hedge fund component

3    that Mr. Munno discussed with you.  What did you know about

4    that hedge fund component before you started at Envit?

5    A.    Not much.  It was mentioned by Mr. Munno.  It was on a

6    sheet.  It kind of talked about its performance from 2007, and

7    that was about it.

8    Q.    And what did you recall about that performance?

9    A.    I believe it made 40 or 43 percent in 2007.

12:57PM 10    Q.    Okay.  And so it was an operational hedge fund which had

11    been around since 2007 according to what Mr. Munno told you?

12    A.    Yes.

13    Q.    And after you actually started at Envit, did you learn a

14    little bit more about this hedge fund?

15    A.    Yes.

16    Q.    And from whom?

17    A.    From Ed.

18    Q.    Ed Laborio?

19    A.    Uh-hum.

12:57PM 20    Q.    And what more did you learn if you can recall?

21    A.    It was really a lot of vague terms.  It was doing very

22    well.  I tried to learn more about it.  He said the minimum is

23    one million dollars to get in, and that was about it.

24    Q.    Okay.  Now, other than the hedge fund component, what more

25    did you learn about Envit's business after you started working

1    there?  You mentioned the private wealth management arm.  What

2    did you learn about that?

3    A.    That was basically the side that I worked on.  I know they

4    were involved in a lot of things from things I was hearing,

5    movie type of deals, something with Rib World and just various

6    things they were doing.

7    Q.    This is the registry investment side or Envit itself?

8    A.    The whole firm.

9    Q.    Okay.  What was the registered investment advisory

12:58PM 10   business at Envit?

11   A.    It was a bunch of brokers.  You were supposed to bring

12   over your book of business from wherever you were and then grow

13   that by marketing and getting new clients and assets.

14   Q.    Who told you that?

15   A.    Ed, Jonathan and Mr. Munno.

16   Q.    Mr. Munno before you started?

17   A.    Yes.

18   Q.    By the way, who actually hired you?  You talked about you

19   talked with Mr. Munno before getting hired.  Who was the person

12:58PM 20   who hired you?

21   A.    I believe it was Ed.

22   Q.    And what was Mr. Munno's involvement in the process of

23   being hired itself?

24   A.    I talked to him at first for a couple weeks, and then I

25   received a phone call from Ed that he was no longer with the

1    company, and Ed kind of took over from there.

2    Q.    That Mr. Munno was no longer with the company?

3    A.    Correct.

4    Q.    Now, you mentioned Jonathan in your previous response.

5    Who is Jonathan?

6    A.    Jonathan Fraiman was my boss.

7    Q.    Okay.  And what was his role in the company to your

8    understanding?

9    A.    He was my boss.  He was a director, I guess.

12:59PM 10   Q.    All right.  And in terms of the registered investment

11   advisory side of the business, what was Mr. Fraiman's role?

12   A.    He ran that side of it.

13   Q.    You mentioned that part of you being hired was you

14   bringing over or the purpose, I guess, your understanding of

15   the purpose of your being hired was you were bringing over your

16   book of business?

17   A.    Yes.

18   Q.    What does that mean?

19   A.    It means when you're an advisor or broker, you have lots

01:00PM 20   of clients, and they have all types of accounts from

21   nonqualified accounts to IRAs, things of that nature.  That

22   total amount of dollars is basically your book.

23   Q.    Okay.  Now, you weren't working at the time that you got

24   hired at Envit, right?

25   A.    Correct.

1    Q.   So how did you have a book of business?

2    A.   I had a book from my previous firm from Ameriprise that I

3    worked at for six years.

4    Q.   So those were clients that you had advised while you were

5    at Ameriprise?

6    A.   Yes.

7    Q.   And the thought was that you would go back to them and

8    bring them over to Envit?

9    A.   Yes.

01:00PM 10    Q.   And generally in your experience, how does a financial

11    planner or financial advisor make money from having assets

12    under management?

13    A.   From fees from clients.  There's a management fee.

14    Q.   Okay.  So explain that to us a little bit, you're my

15    investment advisor and you're managing $100,000 of my money.

16    How do you get paid?

17    A.   Well, it varied somewhat, but how I was paid, if you had

18    $100,000, we would talk about your client fee first which would

19    range from .25 points up to 2 percent, and I would make a

01:01PM 20    portion from that.

21    Q.   Okay.  If you brought this book of business over to Envit,

22    what would Envit get out of it?

23    A.   They would get part of the overall fee.  I think I was

24    supposed to get 65 percent and Envit was supposed to get 35.

25    Q.   So in the example we were talking about, if there's

1    $100,000 and you're getting paid a fee of .25 percent, then

2    Envit would get 35 percent of that .25 percent?

3    A.   Yes.

4         THE COURT:  Is this a good break point?

5         MR. THOMADAKIS:  Perfectly fine, thank you.

6         THE COURT:  All right.  We will break there for the

7    day.  Ladies and gentlemen, please remember my caution not to

8    discuss this with each other and with anyone else.  I asked the

9    lawyers at the end of yesterday whether we were on track.  They

01:02PM 10   said yes.  I see a nod from Mr. Sinnott, from the government as

11   well.

12        MR. THOMADAKIS:  Maybe slightly behind at this point,

13   but we're still churning along.

14        THE COURT:  We'll see if we can make that up tomorrow.

15   Thank you for your patience and cooperation, and I'll see you

16   first thing tomorrow morning.

17        THE CLERK:  All rise.

18        (JURORS EXITED THE COURTROOM.)

19        THE COURT:  Just quickly, I had a note was passed from

01:03PM 20   a juror earlier today, juror Number 12, I think she is,

21   Michelle McPherson, asking with regard to Mr. Genovese, why did

22   he not go to the authorities when he left Envit?  Mr. Genovese

23   had already left the stand at that point when we got the note,

24   but I'm passing on that information for what it's worth to

25   counsel in terms of your approach from this point forward.

1      Second, I hope we are only slightly behind, not

2  seriously behind.

3      MR. THOMADAKIS:  I think slightly is fairer.  I had

4  hoped to get through more of Mr. Lazar today.  Certainly our

5  schedule was we would be done with Mr. Lazar and the next

6  witness is Ms. Henkel.  She's from Texas.  She used to be in

7  Ohio.  I expect Mr. Lazar to be long, and I guess Mr. Sinnott

8  has a lot of questions for him.

9      THE COURT:  Let's do that as a goal and you know, if

01:04PM 10  we get close, if we need another 10 minutes or something, I'll

11  ask the jury if they can get through it.  Let's see if we can't

12  get that done, but...

13      MR. THOMADAKIS:  I will also note, your Honor, I think

14  once we get to next week after Lazar and Henkel, the witnesses

15  will become much quicker.  They're much shorter witnesses with

16  the possible exception of the summary witness.

17      THE COURT:  Okay.  Anything else, and, again, I'm

18  leaning on you a little bit, but I'm not setting any boundaries

19  yet.  I do want the case to fit in the time allotted.  Anything

01:04PM 20  else we should talk about before tomorrow morning?

21      MR. THOMADAKIS:  Not from our perspective.

22      MR. SINNOTT:  Nothing from the defense.

23      THE COURT:  Thank you, all, and I'll see you tomorrow

24  at 8:30.

25      THE CLERK:  All rise.

1        (Whereupon, the hearing was adjourned at

2  1:05 p.m.)

3                C E R T I F I C A T E

4

5  UNITED STATES DISTRICT COURT )

6  DISTRICT OF MASSACHUSETTS ) ss.

7  CITY OF BOSTON )

8

9        I do hereby certify that the foregoing transcript,

10  Pages 1 through 160 inclusive, was recorded by me

11  stenographically at the time and place aforesaid in Criminal

12  Action No. 12-10238-FDS, UNITED STATES OF AMERICA vs.

13  EDWARD LABORIO and JONATHAN FRAIMAN and thereafter by me

14  reduced to typewriting and is a true and accurate record of the

15  proceedings.

16        Dated this 27th day of January, 2016.

17

18                      s/s Valerie A. O'Hara

19                      _____

20                      VALERIE A. O'HARA

21                      OFFICIAL COURT REPORTER

22

23

24

25