1                 UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS

2

3

4 UNITED STATES OF AMERICA,      )
                          )

5               Plaintiff,   )  Criminal Action
                          )

6                           )  No. 12-10238-FDS
  vs.                    )

7                           )
  EDWARD LABORIO and JONATHAN   )

8   FRAIMAN,                 )
                Defendants.

9

10

  BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV

11

12

                  JURY TRIAL DAY 5

13

14

15

     John Joseph Moakley United States Courthouse

16                Courtroom No. 2
              One Courthouse Way

17               Boston, MA 02210

18

             DECEMBER 4, 2015

19                 8:30 a.m.

20

21

22

23             Valerie A. O'Hara
           Official Court Reporter

24    John Joseph Moakley United States Courthouse
      One Courthouse Way, Room 3204

25          Boston, MA 02210
       E-mail: vaohara@gmail.com

1    APPEARANCES:

2    <u>For The United States:</u>

3         United States Attorney's Office, by
     VASSILI THOMADAKIS, ASSISTANT UNITED STATES ATTORNEY, and
4    ERIC P. CHRISTOFFERSON, ASSISTANT UNITED STATES ATTORNEY,
     1 Courthouse Way, Suite 9200, Boston, Massachusetts 02110;
5
     <u>For the Defendant:</u>
6
          Donoghue, Barrett & Singal, by WILLIAM F. SINNOTT, ESQ.
7    and ELIZABETH MCEVOY, ATTORNEY, Suite 1320, One Beacon Street,
     Boston, Massachusetts 02108-3106.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2    Testimony of:           Direct  Cross  Redirect  Recross

3    MATTHEW LAZAR
       by Mr. Thomadakis      5-6            5-142
4      by Mr. Sinnott                5-92              5-149

5

6

7                        E X H I B I T S

8    No.      Description                           In Evd.

9    130, 132, 135, 200                             5-10

10   400 and 401                                    5-103

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

1

2          THE CLERK:  All rise.  Thank you.  You may be seated.

3   Court is now in session in the matter of United States vs.

4   Jonathan Fraiman, Criminal Matter 12-10238.

5          Counsel, would you please identify yourself for the

6   record.

7          MR. THOMADAKIS:  Good morning, your Honor,

8   Vassili Thomadakis on behalf of the United States.

9          THE COURT:  Good morning.

08:31AM 10          MR. CHRISTOFFERSON:  Eric Christofferson for the

11   United States.

12          MR. SINNOTT:  Good morning, your Honor,

13   William Sinnott on behalf of the Defendant Jonathan Fraiman.

14          MS. McEVOY:  Good morning, your Honor,

15   Elizabeth McEvoy on behalf of the defendant.

16          THE COURT:  Good morning, everyone.  Anything else we

17   need to talk about?

18          MR. THOMADAKIS:  One scheduling issue, your Honor, I

19   stated to the Court yesterday after Mr. Lazar, it would be a

08:31AM 20   Ms. Henkel taking the stand.

21          THE COURT:  Yes.

22          MR. THOMADAKIS:  We discussed this with defense

23   counsel last night, but for reasons I won't go into on the

24   record, we've decided not to call Ms. Henkel in this trial.

25          THE COURT:  Okay.

1    MR. THOMADAKIS:  So after Mr. Lazar will be Mr. Munno.

2    It was a bit of a complication with this, Mr. Munno is local,

3    but there were no other people flown in.  I do think probably

4    Mr. Lazar and Mr. Munno will take up most, if not all of the

5    day, and if we do take up all of the day, we'll be ahead of

6    schedule with the absence of Ms. Henkel, so I don't think it's

7    an issue, but I wanted to raise that with the Court.

8    THE COURT:  Thank you.  I appreciate that.  It's not

9    the end of the world if we were to finish a little early,

08:32AM 10    again, as long as we're on track.  Don't pad out your

11    examination to make it fit, but, thank you, I appreciate that.

12    Mr. Sinnott.

13    MR. SINNOTT:  No, we did discuss that last night, your

14    Honor, and I certainly won't pad out my examination, but --

15    THE COURT:  It's one of the problems, by the way, of

16    trying cases all day, every question asked after 3:30 is

17    irrelevant because the lawyers know no one is paying anymore.

18    MR. SINNOTT:  Not my questions.

19    THE COURT:  Not yours, of course not, every lawyer but

08:33AM 20    you.

21    MR. SINNOTT:  That's certainly all fine and

22    appropriate with us, your Honor.

23    THE COURT:  Okay.  Good.  Thank you.  All right.

24    Thank you and see you at about 9:00.

25    THE CLERK:  All rise.

                    MR. THOMADAKIS:  Thank you, your Honor.

                    (A recess was taken.)

                    THE CLERK:  All rise for the jury.

                    (JURORS ENTERED THE COURTROOM.)

                    THE CLERK:  Thank you.  You may be seated.  Court is

now back in session.

                    THE COURT:  Good morning, everyone.  Are you ready to

resume?

                    MR. THOMADAKIS:  Yes, your Honor.

09:01AM   THE COURT:  Where is your witness?

                    MR. THOMADAKIS:  Mr. Lazar.

                    THE COURT:  Mr. Lazar, do you understand you're still

under oath?

                    THE WITNESS:  Yes, your Honor.

                    THE COURT:  All right.  Mr. Thomadakis.

                    MR. THOMADAKIS:  Thank you, your Honor.

                              MATTHEW LAZAR

                    DIRECT EXAMINATION, CONTINUED

BY MR. THOMADAKIS:

09:01AM  Q.   Good morning, Mr. Lazar.

A.   Good morning.

Q.   We finished off yesterday talking about fees from assets

under management and what an investment advisor generally

collects from assets under management and the fees associated

with them; is that right?

1   A.   Yes.

2   Q.   And remind us again if you were to bring over your book of

3   business to Envit what Envit was going to get out of it?

4   A.   They would get 35 percent of the management fee from the

5   client.

6   Q.   Okay.  And with whom did you reach that understanding?

7   A.   With Ed.

8   Q.   Laborio?

9   A.   Yes.

09:02AM 10   Q.   Other than the fees relating to assets under management of

11   which you would keep 65 percent, what was going to be your

12   compensation at Envit?

13   A.   For the first three months, I was going to be on a

14   ancillary draw.

15   Q.   What does that mean?

16   A.   The draw is basically where you're paid a set amount each

17   month for three months, and if you hit certain targets, you

18   then keep that money.

19   Q.   And if you don't?

09:02AM 20   A.   If you don't, then you owe it back, a recoverable draw I

21   think is the full term.

22   Q.   Okay.  So we were still in the portion of the conversation

23   where you were considering this job opportunity, and what

24   caused you to want to work at Envit?

25   A.   It was a new company, it was exciting, it had a hedge fund

1  kind of part to it, which I liked, and just being part of

2  something new.

3  Q.   And you mentioned that by the time you were actually

4  hired, Mr. Munno was gone, I think you said yesterday?

5  A.   Yes.

6  Q.   And so the person who hired you was who?

7  A.   Ed.

8  Q.   So when you started there, from your vantage point, what

9  was the organizational structure at Envit?

09:03AM 10  A.   The only two people I had contact with, Ed, the CEO; and

11  Jonathan, my boss.

12  Q.   And you mentioned those are the only two people you had

13  contact with.  You may not recall, but did you ever have

14  contact with any kind of support staff, an assistant, a

15  secretary, anything like that?

16  A.   I believe I may have talked to a secretary once or twice.

17  I can't remember if it was from Envit or the certificate

18  holding company down in Florida, I don't know.

19  Q.   Okay.  You mentioned your understanding was that

09:04AM 20  Mr. Laborio was the CEO and Mr. Fraiman was your boss.  What

21  did you understand Mr. Fraiman's role to be in Envit?

22  A.   I believe he was the director.

23  Q.   Okay.  What did that mean?

24  A.   For me, that simply meant he was my boss.  I don't know

25  outside of that what that meant.

1   Q.   All right.  Did you have any kind of understanding in

2   terms of what his day-to-day function was within the company as

3   compared to Mr. Laborio?

4   A.   It seemed to me Ed primarily ran the hedge fund itself and

5   Jonathan was more the day-to-day of the investment side.

6   Q.   Okay.  And you said you dealt with those two individuals.

7   Whom did you deal with more during your tenure at Envit?

8   A.   I would say Jonathan.

9   Q.   Okay.  Why was that?

09:04AM 10   A.   Just more day-to-day contact, if I had a problem or

11   something, he would be my contact, and he was kind of my main

12   boss.

13   Q.   How did you communicate with these two gentlemen?

14   A.   E-mails and phone calls.

15   Q.   How many times did you meet with Mr. Laborio in person?

16   A.   None.

17   Q.   How about Mr. Fraiman?

18   A.   None.

19   Q.   And who did you consider to be supervising you?

09:05AM 20   A.   I would say that Jon Fraiman.

21   Q.   But ultimately the top person was Mr. Laborio?

22   A.   Yes.

23   Q.   Whom did you supervise?

24   A.   There was no one there that I was in charge of.

25   Q.   Okay.  And where did you work physically?

1    A.    At an office in Gahanna.

2    Q.    Where is that?

3    A.    Twenty minutes east of Columbus, so it's a suburb.

4    Q.    In Ohio?

5    A.    Yes.

6    Q.    And where was Envit headquartered to your understanding?

7    A.    Here in Boston.

8    Q.    And did you say before that you-- did you testify

9    yesterday that it was your understanding that there were other

09:06AM 10    investment advisors under Envit's umbrella in other places?

11    A.    Uh-hum, yes.

12    Q.    I'd like to just pull up quickly --

13          MR. THOMADAKIS:  Oh, your Honor, in addition to the

14    exhibits introduced yesterday, the government would offer into

15    evidence Exhibits 130, 132, 135 and 200, all of which were

16    previously agreed upon.

17          THE COURT:  Any objection?

18          MR. SINNOTT:  No objection, your Honor.

19          THE COURT:  All right.  They're admitted, 130, 132,

09:06AM 20    135, 200.

21          (Exhibit Nos. 130, 132, 135, 200 were admitted into

22    evidence.)

23          MR. THOMADAKIS:  If we could take a look, Mr. Flynn,

24    at Exhibit 200.

25    Q.    And did you have an understanding, before we look at the

1   exhibit, Mr. Lazar, and you can pull that screen up, tilt it up

2   a little bit.  If you pull the top of it.

3   A.   I got it, that's fine.

4   Q.   Before we take a look at the document closely, did you

5   have an understanding that you would have, other than what you

6   were doing in Ohio, that you would have some role with respect

7   to the other investment advisor offices elsewhere?

8   A.   Yes.

9   Q.   What was that understanding?

09:07AM 10   A.   They were in the process of, I believe, buying a practice

11   down in Texas.  I was supposed to go down there and run

12   seminars and kind of meet with the people down there.  I think

13   they were in the process of buying a practice in Cleveland, so

14   that was it.

15   Q.   Okay.  So this is an e-mail from whom?

16   A.   From Jonathan Fraiman.

17   Q.   To you?

18   A.   Yes.

19   Q.   And the date is January 12th, 2009?

09:07AM 20   A.   Uh-hum, yes.

21   Q.   And he's telling you that He's going to send you a list of

22   names and numbers to call, start calling them and telling them

23   that you were one of the I advisors that has taken over the

24   distressed firm, "and we have offices locally, in Lubbock,

25   Texas; Ohio, Boston, Florida and Tennessee."  Do you see that?

1     A.    Yes.

2     Q.    So you mentioned Texas and Boston and you, yourself, were

3     in Ohio.  Do you recall anything about this firm in Tennessee,

4     anything more than what you see here?

5     A.    No.

6     Q.    All right.  Then he says, "We're growing very quickly and

7     looking to have over 500 million in AUM by the end of the

8     year."  Do you see that?

9     A.    Yes.

09:08AM 10    Q.    And what is AUM?

11    A.    Assets under management.

12    Q.    Okay.  And so he was asking you to do what in the first

13    paragraph that we just looked at, the first few sentences that

14    we just looked at?

15    A.    To begin calling -- calling, let's see, start calling

16    them, so basically call the clients that were in Texas and Ohio

17    and in Boston.

18    Q.    Okay.  And further down, he says, "I've attached a

19    letter --" did you understand that the advisory in Texas had

09:09AM 20    been purchased by Envit, it was an existing one that had been

21    purchased?

22    A.    I believe so, yes.

23    Q.    All right.  And then there's some talk about a referral to

24    a guy by the name of Gristy Tim, but then it says, "Also we

25    have been showing our client 20 to 30 percent on a regular

1    basis."  What did you understand that to mean?

2    A.    That the advisors with Envit were making returns for the

3    clients of 20 to 30 points per year.

4    Q.    The investment advisors were making, were showing returns

5    to their clients at Envit of 20 to 30 percent?

6    A.    Uh-hum, yes.

7         MR. THOMADAKIS:  Thank you, Mr. Flynn.

8    Q.    Okay.  Sir, so you mentioned --

9         MR. THOMADAKIS:  You can take that down, please.

09:09AM 10   Q.    You mentioned that you were hired as an investment advisor

11   to manage clients' money and bring over assets under

12   management, right?

13   A.    Yes.

14   Q.    And at some point did what you were supposed to be doing

15   at Envit change?

16   A.    Yes.

17   Q.    How so?

18   A.    The role changed after I was there for about a month, and

19   there was a conference call, and the entire, I guess, focus

09:10AM 20   changed.

21   Q.    And in what way did it change?

22   A.    It was much less about -- my first couple weeks, it was

23   about business planning, goal planning, bringing over assets

24   and that kind of role, and then it all changed to P.I.P.E.

25   Q.    What is P.I.P.E.?

1   A.   P.I.P.E. is private investment in public equity, I

2   believe.

3   Q.   Okay.  The private investment -- sorry, scratch that.  You

4   mentioned a public equity?

5   A.   Uh-hum.

6   Q.   What was the public equity in question?

7   A.   I believe it were their common shares.

8   Q.   Who's their?

9   A.   Of Envit Capital.

09:11AM 10   Q.   Okay.  And when you say public, at the time was there a

11   portion of Envit that was trading publicly on some exchange?

12   A.   Uh-hum, yes.

13   Q.   Do you remember the tickler symbol?

14   A.   ECGP, I believe.

15   Q.   All right.  And the tickler symbol is just what the

16   publicly-traded stock shows up as on the exchange?

17   A.   Uh-hum, yes.

18   Q.   And in this context, what did private investment mean?

19   A.   It was part of the P.I.P.E. product where a client could

09:11AM 20   buy shares of Envit from the company for a certain rate.  I

21   think it was 80 cents.

22   Q.   So the client was buying directly from the company as

23   opposed to going out and buying them on the open market?

24   A.   Uh-hum, yes.

25   Q.   And how did the notion of you finding people -- and, I'm

1    sorry, you said before that after a few weeks, your role

2    changed to P.I.P.E., and so what did that mean your role

3    changed to P.I.P.E.?  What were you supposed to be doing?

4    A.    Putting client money into that P.I.P.E.

5    Q.    So, in other words, selling Envit to clients?

6    A.    Yes.

7    Q.    And how did this notion of you finding people to invest in

8    the P.I.P.E. come up?

9    A.    I believe it was an e-mail back and forth with Ed, and he

09:12AM 10    had mentioned the P.I.P.E.  I had asked him about it back on an

11    e-mail, and then we had a conference call to talk about it.

12    Q.    All right.  I'd like to -- by the way, you have a bunch of

13    folders in front of you with the exhibits I'm going to be

14    referring to.  You can look at the folders or you can look at

15    the screen, whatever you're more comfortable with.

16         MR. THOMADAKIS:  If you could pull up Exhibit 98,

17    please, which is in evidence on the second page.  Please blow

18    up the portion that is 11:40 a.m.  Thank you, Mr. Flynn.

19    Q.    So this is an e-mail from you to whom?

09:13AM 20    A.    To Ed.

21    Q.    And it's dated September 26th, 2008?

22    A.    Uh-hum.

23    Q.    Is that a yes?

24    A.    Yes.

25    Q.    And what are you asking him for information on?

1   A.   On the hedge fund.

2   Q.   Why were you asking about information for the hedge fund?

3   A.   Mainly I was curious.  It was one of the selling points in

4   coming over to Envit.  I just wanted to get some details on it,

5   what was in it, kind of how it worked, things of that nature.

6   Q.   All right.  "You say I've looked on some third parties

7   sites and can't find it there either."  What was that a

8   reference there to?

9   A.   During my first couple weeks, I really didn't want to

09:13AM 10   bother my bosses with kind getting these details, so I'd go

11   online either on a Morningstar type of site or there was a

12   hedge fund version of Morningstar I found and just try to --

13   just learn more about it, see if it's something that my clients

14   could possibly use.

15   Q.   Okay.  But you weren't able to find any information on it?

16   A.   Right.

17   Q.   So you were asking Mr. Laborio for it?

18   A.   Uh-hum, yes.

19        MR. THOMADAKIS:  If you could back out of that,

09:14AM 20   please.

21   Q.   And the direct response we don't need to blow it up, but

22   it says, "Matt, I got two accounts from you possibly 57K???"

23   Do you see that?

24   A.   Yes.

25   Q.   And did Mr. Laborio answer your question regarding the

1   information about the hedge fund?

2   A.    No.

3         MR. THOMADAKIS:  All right.  Let's go back up, please,

4   to the first page of this.  On the very bottom and coming --

5   the very bottom e-mail and actually going over, spilling over

6   onto the next page.  I guess it doesn't do that.

7   Q.    So you have a response back to Mr. Laborio, and then

8   actually if we could go back to the second page to see the rest

9   of that e-mail.  What did you ask him if you could give him a

09:15AM 10  call about?

11  A.    The hedge fund.

12  Q.    Again, trying to get some information on it?

13  A.    Uh-hum, yes.

14        MR. THOMADAKIS:  All right.  Let's go to the first

15  page now, Mr. Flynn.  Thank you, sir.

16  Q.    And his response is, "We have a 1 MM min right now.  You

17  can work on the P.I.P.E. if you want," right there, do you see

18  that?

19  A.    Uh-hum, yes.

09:15AM 20  Q.    And so what did you understand him to say, "a 1 MM min

21  right now"?

22  A.    That for clients to get into the hedge fund, that was the

23  lowest amount that they could put into it.

24  Q.    And he told you that you can work on what instead?

25  A.    P.I.P.E.

1    Q.   At that point did you have -- did you even know what a

2    P.I.P.E. was?

3    A.   No.

4    Q.   And, in fact, your response: "No idea what P.I.P.E. is.

5    Can you explain when you get a second?" Do you see that?

6    A.   Uh-hum, yes.

7    Q.   And then Mr. Laborio's response is -- does he provide you

8    information about the P.I.P.E.?

9    A.   No.

09:16AM 10    Q.   What did he do instead?

11    A.   Told me to focus on my accounts, was upset there are only

12    $50,000 in out of the 21 million I was bringing over.

13    Q.   What's that 21 million number, by the way?

14    A.   It was my book.

15    Q.   All right. Your overall book of business from Ameriprise?

16    A.   Yes.

17    Q.   All right. So it seems that on this date, September 26th,

18    2008, you didn't have any knowledge of this P.I.P.E. offering;

19    is that right?

09:17AM 20    A.   Yes.

21    Q.   And at some point did that change?

22    A.   Yes.

23    Q.   How did you learn more?

24    A.   After this, Ed, Jonathan and myself had a conference call.

25    Q.   When was that?

1    A.    On October 6th.

2          MR. THOMADAKIS:  You can take that down, please.

3    Q.    What was the subject of the conference call?

4    A.    Just P.I.P.E.

5    Q.    Discussing the P.I.P.E. offering?

6    A.    P.I.P.E., how it works, what it was, those kind of things.

7    Q.    Who was doing the talking for the most part on that call?

8    A.    Jonathan.

9    Q.    And please describe to us what you recall about that call

09:17AM 10   and how Mr. Fraiman and Mr. Laborio described the P.I.P.E.

11   offering to you.

12   A.    There were two parts.  There was the one part.  There was

13   an 8.5 percent kind of fixed part that would always be there,

14   and then there was kind of the second side, kind of the home

15   run side where you had warrants that you could buy shares of

16   Envit from the company for 80 cents, and then you could go out

17   on the open market and sell those.

18   Q.    All right.  So let's take that last part first, the

19   warrants.  So a warrant is what at its most basic?

09:18AM 20   A.    It allows you to buy common shares at a certain price.

21   Q.    In the future?

22   A.    Yes.

23   Q.    And so why would that be a home run?  In what context

24   would that be a home run?

25   A.    In terms of if you're allowed to buy the common shares for

1    80 cents and the actual shares are trading near their 52-week

2    high, which I think was around $5, or if they go up more, you

3    can buy them for 80 cents and sell them on the open market for

4    five to ten dollars per share.

5    Q.   And thereby realize a big profit?

6    A.   Uh-hum.

7    Q.   Is that a yes?

8    A.   Yes.

9    Q.   And the other part of it, the first part you talked about,

09:19AM 10   the fixed part, what was that?

11   A.   It wasn't really clear on the conference call.  There was

12   an 8.5 percent fixed.  They talked how it was guaranteed like a

13   CD, that kind of language.

14   Q.   What wasn't clear?

15   A.   As far as how I guess the whole thing was done, who it was

16   backed by, those kinds of things.

17   Q.   Okay.  So how the money would be set aside in order to pay

18   that fixed rate is what was unclear?

19   A.   Right.

09:19AM 20   Q.   But what was clear about the 8.5?

21   A.   It was fixed, it was safe, it was a guaranteed rate.

22   Q.   And you mentioned like a CD?

23   A.   Yes.

24   Q.   What is a CD?

25   A.   A CD is a certificate of deposit.

1    Q.    And what is your understanding of what -- why was a CD

2    relevant in this context or the comparison to a CD, why was

3    that relevant?

4    A.    I believe because most people would associate a CD with

5    something through a bank that's safe.

6    Q.    Okay.  And you mentioned that Mr. Fraiman during this

7    call, this concept of the 8.5 percent was guaranteed or fixed?

8    A.    Uh-hum.

9    Q.    Who told you that?

09:20AM 10    A.    That was from -- that was from Jonathan.

11    Q.    Okay.  And did Mr. Laborio say that as well?

12    A.    I don't remember if he did or not.

13    Q.    Okay.  Did Mr. Fraiman actually use the word "guaranteed"?

14    A.    Uh-hum, yes.

15    Q.    All right.  And what was attractive about all this in

16    terms of the purpose of telling you, giving you information

17    about this offering was what?

18    A.    Was to then go out and sell it.

19    Q.    To whom?

09:21AM 20    A.    To my current clients, to new clients, to whoever.

21    Q.    All right.  And the concept of -- well, what did you think

22    about this when you heard it?

23    A.    I thought it sounded great.

24    Q.    Why?

25    A.    Because at the time it was late 2008, the Dow and the

1   markets were dropping by a couple hundred points per week or

2   per day, and I was talking to a lot of my clients, they were

3   worried and most of their plans for either sending their kids

4   to college or retirement, their plans said that they needed to

5   make seven, eight, nine points per year, and the 8.5 percent

6   side would do that, and then there were some clients that, you

7   know, didn't like the market but didn't want to sell just in

8   case the whole thing came back, so that was the selling point

9   for the warrants.

09:21AM 10   Q.   Okay.  But the guarantee of 8.5 percent, how much of an

11   impact did that have on your thinking in terms of pitching this

12   to your clients?

13   A.   Tons.  It was huge.

14   Q.   And why was that?

15   A.   Just because when you're doing a financial plan for

16   someone and you can look at something and see that something is

17   fixed and at the time wouldn't be subject to the market and

18   everything else dropping, it was just a very nice high yield.

19   Q.   All right.  What were you going to get out of bringing

09:22AM 20   clients?  You talked before that generally you would generate

21   fees from managing assets, but what were you going to get out

22   of bringing clients into this P.I.P.E. investment?

23   A.   I believe it was agreed I would get 4 percent cash bonus

24   and shares of stock.

25   Q.   Okay.  So you stood to also make a financial gain from

1    bringing people in in terms of both a cash bonus and the stock

2    in terms of people, bringing people into the Envit P.I.P.E.?

3    A.    Yes.

4    Q.    And with regard to the cash bonus, did you know whether

5    anyone else at Envit would get a cash bonus for the monies you

6    brought into the Envit P.I.P.E.?

7    A.    No.

8    Q.    By the way, when you were pitching the investment to your

9    clients, did you inform all of them about what you stood to

09:23AM 10    gain from it?

11    A.    No.

12    Q.    Some of them?

13    A.    Yes.

14    Q.    Why did you not inform all of them?

15    A.    It was just kind of -- it would vary per clients.  I had

16    some clients that would always kind of jokingly ask, you know,

17    how much are you making from this or you'll have to take me out

18    to dinner for beers because you're making X on this, so on

19    those, I would tell them.

09:23AM 20    Q.    Okay.  But would you agree that there was -- was there any

21    conflict of interest possibly in you pitching your clients on

22    something that you stood to gain directly monetarily from?

23    A.    Yes.

24    Q.    So should you have informed all your clients of that?

25    A.    Yes.

1    Q.   All right.  At any point -- and was this, this conference

2    call with Mr. Fraiman and Mr. Laborio, was that the only time

3    that you discussed the Envit P.I.P.E. on the phone with

4    someone?

5    A.   No.

6    Q.   Whom did you discuss it with on other occasions?

7    A.   Both Ed and Jonathan.

8    Q.   All right.  And with regard to your conversations on it

9    with Mr. Fraiman, at least to the end of 2008, what did you

09:24AM 10   hear -- what more did you hear about this concept that the

11   return was fixed or guaranteed?

12   A.   It was just the same language each phone call.  It

13   was -- we talked about business then would turn to P.I.P.E. and

14   it was the same thing, it was always fixed, guaranteed.  He

15   would compare it to a CD.

16   Q.   At any point in the process of learning about this

17   offering, what, if any, questions did you pose regarding the

18   size of that 8.5 percent return?  Did it seem high to you?

19   A.   Yes.

09:25AM 20   Q.   What questions did you pose about it?

21   A.   It just seemed like a very high number based on, you know,

22   what our yield curve was at the time.  I think if you put money

23   into most fixed products, you might yield two or three points.

24   Q.   Whom did you ask about that?

25   A.   Jonathan.

1   Q.   And what was his response in terms of the size of that

2   return?

3   A.   That it was mainly for marketing.  Since Envit was a new

4   company, they didn't have the backing of a brand name like a

5   bank, like a J.P. Morgan Chase or Goldman Sachs, so it was

6   basically for sales and marketing.

7   Q.   Okay.  Did Mr. Fraiman on conversations with you compare

8   the Envit P.I.P.E. offering with something that was in the news

9   at the time, some similar type of transaction?

09:26AM 10   A.   Uh-hum, yes.

11   Q.   And what was that?

12   A.   It was a similar P.I.P.E. deal that Warren Buffett was

13   doing with Goldman Sachs.

14   Q.   Okay.  And we've been talking about phone calls, but in

15   what other form of communication did you correspond with

16   Mr. Fraiman or Mr. Laborio other than telephone calls?

17         (Background noise in courtroom.)

18   A.   What was that?

19   Q.   Don't worry about it.  What other form of communication

09:26AM 20   did you correspond with Mr. Fraiman or Mr. Laborio other than

21   telephone calls?

22   A.   Mail.

23   Q.   Mail?

24   A.   Yeah.

25   Q.   As in mail that you put into?

1   A.   No, sorry, my brain is -- on an e-mail, sorry.

2   Q.   Okay.  Could you please pull up Exhibit 99, and with these

3   e-mails we're looking at, they run in kind of reverse

4   chronological order, is that right, the most recent e-mail is

5   at the top, Mr. Lazar?

6   A.   Uh-hum, yes.

7        MR. THOMADAKIS:  If we could turn to the second page,

8   please, Mr. Flynn.

9   Q.   Right at the top, and I guess we should --

09:27AM 10        MR. THOMADAKIS:  I'm sorry, could you back out,

11   please.  The first page, please.

12   Q.   Right at the bottom of this first page, do you see that

13   it's an e-mail from you to Mr. Fraiman on October 10th, 2008?

14   A.   Uh-hum, yes.

15        (Background noise in courtroom.)

16   Q.   I can ask the questions.  I guess I can.

17        THE COURT:  Just give us a moment here.  Go ahead.

18        MR. THOMADAKIS:  Thank you, your Honor.

19   Q.   We just saw you were sending an e-mail to Mr. Fraiman and

09:29AM 20   the bottom of that e-mail is right at the very top of page 2 of

21   Exhibit 99.  What was your question here to Mr. Fraiman?

22   A.   Trying to find the best argument on a deferred sales

23   charge of 4 to 5 points.

24   Q.   The argument is as to what, best argument for what?

25   A.   How to get them to move their money from that into

1    P.I.P.E.

2    Q.    Okay.  And if we could go to the first page of this,

3    there's a big along e-mail in response; is that right?  Do you

4    see that?

5    A.    Uh-hum, yes.

6    Q.    That's from Mr. Fraiman to you?

7    A.    Yes.

8    Q.    All right.  And in this response, the top part here, it

9    says it's costing them money the annuity charge --

10            (Background noise in courtroom.)

11            THE COURT:  Try again.

12   Q.    "They are probably very down on the underlying holdings.

13   This is an opportunity to make a fixed 5 percent return on

14   Envit Preferred with no sales charge or commission."  So what

15   did he say, it's costing them -- what was the response about

16   it's costing them money with an annuity charge?  What did you

17   understand that to mean?

18   A.    That if they kept the money there that they were -- they

19   were being charged more fees.

09:31AM 20   Q.    Okay.  Whereas if they moved it to this Envit P.I.P.E.

21   offering, were there any fees associated with that?

22   A.    No.

23   Q.    And, in addition, it's an opportunity he said to make a

24   fixed 5 percent return, do you see that?

25   A.    Yes.

1   Q.   And do you know why this says 5 whereas you had previously

2   heard 8.5 percent?

3   A.   No.

4   Q.   Okay.  Could just be a typo, but you don't know?

5   A.   I have no idea.

6   Q.   All right.  But the use of the word "fixed," what did that

7   mean to you?

8   A.   It was the same language from the conference call and from

9   other calls, it was fixed.  It was like a CD.

09:32AM 10   Q.   Okay.  And that was consistent with what you had heard,

11   what you described here in the October 6th telephone call; is

12   that right?

13   A.   Uh-hum, yes.

14   Q.   All right.  Let's look down, and, I'm sorry, there in the

15   same offering, in the same paragraph, it says, "They have the

16   ability to convert to the underlying ECGP, which should be

17   trading at a premium anywhere from three to five dollars, they

18   will own it at around 25 cents or 50 depending on the contract

19   we put together."  So, is that part of the warrant we discussed

09:32AM 20   before?

21   A.   Yes.

22         MR. THOMADAKIS:  Let's pull out of that, Mr. Flynn.

23   Q.   And actually before we leave that paragraph, it also says

24   in the parenthetical, "You receive a bonus we discussed."  What

25   is that a reference to?

1   A.   I believe that refers to the P.I.P.E. bonus of 4 percent

2   cash bonus and 4 percent in the common stock.

3   Q.   All right.  And the next section of this e-mail, "Key

4   selling points, ECGP, P.I.P.E. flotation," that whole, all the

5   way down.  What was your understanding of why he was sending

6   you this information?

7   A.   Just as the key selling points for P.I.P.E.

8   Q.   For P.I.P.E. and for Envit itself?

9   A.   Uh-hum, yes.

09:33AM 10   Q.   And it says in the second paragraph, "Envit Capital is in

11   the most profitable industry in the last 50 years."  What

12   industry does it say that is?

13   A.   The hedge fund.

14   Q.   The hedge fund industry?

15   A.   Yes.

16   Q.   And down below, we see other points of information, the

17   last three bullet points, "Growing very fast to have 1 billion

18   AUM in 2010 and 25 offices."  Do you see that?

19   A.   Yes.

09:34AM 20   Q.   That would be $1 billion assets under management?

21   A.   Yes.

22   Q.   And there's some mention of an advisory board, right?

23   A.   Yes.

24   Q.   And that the maiden hedge fund returned on average 40

25   percent since its inception in 2006.  What was your

1  understanding of why he was providing you again with this kind

2  of information?

3  A.   Just ways to sell P.I.P.E., sell the company itself.

4  Q.   All right.  And this John Redford individual who's on the

5  advisory board, do you see in the last sentence of that bullet

6  point what it says what Mr. Fraiman said Mr. Redford's role

7  was?

8  A.   He helps us on the tech. side of all picks and helps

9  oversees all large decisions.

09:34AM 10  Q.   And then below that, it says, "I'll get you more info on

11  this.  Let's work on keeping 500K in cash to place into this

12  offering."  What's that reference to, "keeping 500K in cash"?

13  A.   Move $500,000 in cash of my client's money for the

14  P.I.P.E.

15  Q.   Keep it in cash in their accounts in order to be able to

16  invest in Envit?

17  A.   Yes.

18       MR. THOMADAKIS:  All right.  Let's turn to

19  Exhibit 101, Mr. Flynn, please.  In the middle of page 1 -- in

09:35AM 20  the middle of page 1, we see an e-mail and that's from you to

21  Mr. Laborio, is that right?

22  A.   Yes.

23  Q.   And it's October 14th, 2008?

24  A.   Yes.

25  Q.   And what are you basically requesting Mr. Laborio to do

1   with you?

2   A.   Just to get a better handle on P.I.P.E. and just to make

3   sure that what I heard is what it actually is.

4   Q.   Okay.  And you say that you -- whom do you say you've

5   targeted to get this 500K in ASAP?

6   A.   I've targeted eight clients.

7   Q.   And then what did you ask him in the second paragraph, and

8   then you kind of describe your understanding of it, and in the

9   second paragraph, you ask what are the risks, right?

09:36AM 10   A.   Yes.

11   Q.   And why were you asking that?

12   A.   Just based on how it was told to me how P.I.P.E. worked.

13   There didn't seem to be lots of downside.  The only downside I

14   saw was if for some reason the common shares were, you know, 70

15   cents or lower, then the value of the warrants didn't have any

16   worth.

17   Q.   Okay.  But because there was an 8.5 fixed return, you

18   didn't see much downside overall; is that right?

19   A.   Right.

09:36AM 20   Q.   And what were you asking here?  Why did you need an

21   understanding of what any risks were?

22   A.   Just so I could make sure that I was following what the

23   8.5 was and just how the whole thing worked.

24   Q.   And in order presumably to explain it to whom?

25   A.   To my book of business.

1    Q.    Your clients?

2    A.    Yes.

3    Q.    Okay.  If we could back out of that and look at the top

4    e-mail.  So this is Mr. Laborio's response to you.  What did he

5    instruct you to do in order to get the information you needed?

6    A.    To call Jon.

7    Q.    And who is Jon?

8    A.    Jon Fraiman.

9    Q.    All right.  So let's please look at Exhibit 102.  On the

09:37AM 10    third page of this exhibit at the bottom, there is an e-mail

11    from you to Mr. Fraiman, right?

12    A.    Uh-hum, yes.

13    Q.    October 14th, 2008?

14    A.    Yes.

15    Q.    And is this actually the exact same questions that you

16    were asking Mr. Laborio?

17    A.    Yes.

18         MR. THOMADAKIS:  All right.  If we could back out of

19    that, please.

09:38AM 20    Q.    And on page 2, you see on October 15th, 2008 at 8:50 a.m.,

21    it's a response by Mr. Fraiman?

22    A.    Yes.

23         MR. THOMADAKIS:  And then if you could blow up that

24    one paragraph, Mr. Flynn.

25    Q.    So did he respond to your question about risk here?

1    A.    Yes.

2    Q.    And he says that the risks are the same with any stock,

3    that it could go to zero, right?

4    A.    Yes.

5    Q.    And so what did you understand that portion of the risk

6    to -- you said you kind of described the offering as two parts,

7    the warrants and the fixed rate of return.  What portion of the

8    offering did you understand those risks to relate to?

9    A.    For the part that I just talked about, for the warrant

09:38AM 10    side.

11    Q.    So if it goes to zero, they're not going to make money off

12    the warrants, right?

13    A.    Correct.

14    Q.    Okay.  But then it says, he says, "However, my clients

15    have millions of dollars in this tied up for over a year."  Do

16    you see that?

17    A.    Yes.

18    Q.    And it goes on to say, "It's a growth play with a fixed

19    rate of return, 8.5 percent."  And what part was that dealing

09:39AM 20    with, the fixed rate of return?

21    A.    With the safer side, with the other side.

22          MR. THOMADAKIS:  Okay.  If we could back out of that.

23    Q.    And, by the way, this was -- we saw before in a previous

24    e-mail a reference to 5 percent rate of return, but here we see

25    it was 8.5 rate of return?

1    A.    Yes.

2    Q.    And that is what you recall from the conference call as

3    well?

4    A.    Yes.

5    Q.    And in the second to last paragraph or in the last.

6          MR. THOMADAKIS:  Yes, please, Mr. Flynn.  Thank you.

7    Q.    What was he asking you there?

8    A.    How are we doing on transferring all of the assets and who

9    will I be targeting for P.I.P.E.?

09:40AM 10   Q.    So, in other words, whom you would be marketing the

11   P.I.P.E. to amongst your clients?

12   A.    Yes.

13   Q.    And when will you be doing it, there's a reference to time

14   frame?

15   A.    Yes.

16   Q.    Turning to the next e-mail in this thread on page 1,

17   please, you responded to Mr. Fraiman after some talk about the

18   Ohio State Buckeyes, but in the second paragraph there, do you

19   see that?

09:40AM 20   A.    Yes.

21   Q.    What were you asking Mr. Fraiman about there?

22   A.    Just trying to figure out how the 8.5 yield worked in

23   terms of if the purchase goes to zero, do they lose that 8.5

24   yield?

25   Q.    So, again, you're asking with regard to the 8.5 percent,

1   basically how safe is it; is that right?

2   A.   Yes.

3   Q.   In other words, if the stock price does go to zero, do

4   they still get it; is that what you're asking?

5   A.   Yes.

6   Q.   And let's look at the response, please.  What was the

7   answer as to whether they would lose out on the 8.5 percent?

8   A.   He said, "No, that's the selling point."

9   Q.   And that the 8.5 is paid out under what circumstances?

09:41AM 10   A.   Paid out regardless of if -- regardless of

11   how -- regardless of how the common shares do, sorry.

12   Q.   Okay.  And he said it's like an annuity almost with a

13   fixed return upside of the conversion.  Did you understand the

14   reference to an annuity?

15   A.   It's similar in that an annuity is kind of backed up by

16   the insurance company.  There are some that are fixed, there

17   are some that are variable.

18   Q.   Okay.  But if it's fixed, it's definitely coming to you?

19   A.   Yes.

09:42AM 20   Q.   All right.  And is that what -- so based on his response,

21   under what circumstances did you understand Mr. Fraiman to be

22   saying that the 8.5 percent would not get paid?

23   A.   None.

24   Q.   Okay.  Throughout the fall of 2008, Mr. Lazar, how did

25   Mr. Fraiman's description of the 8.5 percent dividend as fixed

change in these e-mail communications to you?

A.    How did it change?

Q.    Yes, in the fall of 2008, did it change?

A.    As far as the actual number on e-mails, I saw 4, 5 and
8.5.

Q.    Well, we saw the 5 and we saw the 8.5, but in terms of the
context being fixed, was that consistent through the fall of
2008?

A.    Yes.

      MR. THOMADAKIS:  If you could pull up Exhibit 105,
please.

Q.    On the bottom of the page, first paragraph, you say --
this is an e-mail we have just blown up from you to Mr. Fraiman
on November 7th; is that right?

A.    Yes.

Q.    And you say, "A client interested in P.I.P.E. asked how
they can track the preferred stock price.  I know it's tied to
interest rates but couldn't really give them a good website or
resource to track the price."  So what are you basically asking
there?

A.    Just how a client could track P.I.P.E.  Most clients want
to, you know, follow their investments on either a Yahoo or
Morningstar type of website and just trying to find that for
them.

Q.    Okay.  But there was a publicly -- they could see the

1  publicly traded stock, but you were asking about the preferred

2  shares that you were offering privately, right?

3  A.   Yes.

4  Q.   And if we look up above, and, again, this is Mr. Fraiman's

5  response to you, and he says, "Preferred stock price does not

6  move, it's fixed with the standard rate of return at 8.5

7  percent until they convert."  So we see again this concept of

8  fixed; is that right?

9  A.   Yes.

09:44AM 10  Q.   Okay.  And then there is below we see a couple of

11  sentences later, there's a one-year holding period just like a

12  CD.  And, again, what was your understanding of why a CD was

13  being compared to this Envit P.I.P.E.?

14  A.   Just because the CD is commonly known as something that's

15  safe and fixed.

16  Q.   Okay.  And a couple of sentences below that, it says,

17  "I'll call if you want me to.  Give me their number and anyone

18  else who you are having a difficult time with.  Be persistent.

19  Call again.  May want to take them out for dinner and explain

09:45AM 20  where their money is going to.  They are probably moving their

21  money to another relationship.  That's how this industry is."

22       What was your understanding of what he was telling you

23  there?

24  A.   Just to sell the P.I.P.E. more, sell it harder.

25  Q.   Okay.  That's the "be persistent" part?

1   A.   Yes.

2   Q.   And he offers himself to call any of your clients to

3   discuss it?

4   A.   Yes.

5   Q.   All right.  I want to shift for a moment to another topic.

6   Typically, sir, as an investment advisor, what kind of

7   information do you receive from clients in order to gauge what

8   investments may be appropriate for them?

9   A.   Each client has to normally fill out a client profile form

09:46AM 10   and a risk tolerance form that goes over what their goals are,

11   what their current levels of assets are, what their kind of

12   market knowledge is.

13   Q.   Okay.  Typically what's the process of obtaining that

14   information?

15   A.   There's a form that they fill out.

16   Q.   But does it also involve discussions?

17   A.   Yes.

18   Q.   All right.  And with your book of business, the people

19   with whom you were dealing with back from your Ameriprise days,

09:46AM 20   did you have an idea from those, the risk tolerance and so on

21   with your previous dealings with those people?

22   A.   Yes.

23   Q.   Now, you mentioned that there are forms to fill out.  Were

24   there any such documents that you got from Envit?

25   A.   Yes.

1    Q.    What were they to your recollection?

2    A.    Just basic forms, a client profile form that had some

3    basic questions on it, name, address, phone number, type of

4    investment, risk tolerance, those type of questions.

5         MR. THOMADAKIS:  Okay.  If we could look at

6    Exhibit 108, please, Mr. Flynn.

7    Q.    Looking at the second page, please, and you see that this

8    is an e-mail dated November 11th, 2008 from Mr. Fraiman?

9    A.    Yes.

09:47AM 10         MR. THOMADAKIS:  Okay.  Actually, let's back out of

11   that, please.

12   Q.    And he says below, there's a heading, "For P.I.P.E. only."

13   Do you see that?

14   A.    Yes.

15   Q.    And it says, "For non-IRA accounts," and it lists a bunch

16   of documents?

17   A.    Yes.

18   Q.    What is your understanding of what this portion of the

19   e-mail was to you?

09:47AM 20   A.    The forms that a client would need to fill out and/or sign

21   to put money into the P.I.P.E.

22   Q.    And put money into the P.I.P.E. out of what?

23   A.    From a nonqualified funding source.

24   Q.    You say a nonqualified funding source.  What does that

25   mean?

1   A.   There's qualified money and there's nonqualified money.

2   Qualified money means something like your 401k or IRA or things

3   that it's very hard to get to take money out of without

4   penalties and taxes prior to your 59 and a half.  The

5   nonqualified money is like a brokerage account or a savings

6   account that you can take out and not have taxes or fees on.

7   Q.   Okay.  So if I'm your client and I have money in a

8   brokerage account or a checking account, I would need these

9   documents to invest in Envit is what he's telling you?

10   A.   Yes.

11         MR. THOMADAKIS:  And if we could go down to the next

12   page of the e-mail, please.  Could you blow up that top part.

13   Q.   What is this listing?

14   A.   The list of things you need for a qualified type of

15   account.

16   Q.   So this is for people who were going to invest in Envit

17   out of retirement accounts?

18   A.   Yes.

19   Q.   Okay.  And Number 2 on this list and in the previous list

20   is what?

21   A.   Risk tolerance form and client profile.

22   Q.   So those are the forms you were talking about before,

23   right?

24   A.   Yes.

25         MR. THOMADAKIS:  Okay.  Could we go up.

1    Q.   On the first page of Exhibit 108, do you see your response

2    to Mr. Fraiman in the second paragraph?  You say, "I still owe

3    you that risk tolerance form, client profile and A1 custody

4    agreement for Zelinski."  Do you see that?

5    A.   Yes.

6    Q.   Who is Zelinski?

7    A.   Zelinski were two clients of mine, Brenda and Matt.

8    Q.   And Matt?

9    A.   Yes.

09:49AM 10    Q.   Were you their advisor from Ameriprise?

11    A.   Yes.

12    Q.   How long had you been the Zelinskis' advisor for,

13    approximately?

14    A.   Six or seven years.

15    Q.   Do you recall their background?

16    A.   Brenda was a school teacher, Matt was an engineer.

17    Q.   Okay.  And what would those forms tell you and Mr. Fraiman

18    about the Zelinskis?

19    A.   Just what their background was, their income levels, what

09:50AM 20    investments they had used in the past, how comfortable they are

21    with risk, what their time frame was, those type of things.

22    Q.   Okay.  So were you in the process of talking to them about

23    this P.I.P.E. offering?

24    A.   Yes.

25    Q.   And so you were pointing out that you hadn't received

1   those forms back, you were pointing them out to Mr. Fraiman?

2   A.   Yes.

3        MR. THOMADAKIS:  Let's look at the top e-mail,

4   Mr. Flynn.

5   Q.   Mr. Fraiman's response to you is on November 11th, "The

6   risk tolerance and client profile are for compliance.  You

7   don't need them right now.  Make sure you send them to your

8   clients and have them send them back."

9        So based on that response to you, from your

09:51AM 10  perspective, how important did it seem to be to Mr. Fraiman to

11  get these documents in before Mr. Zelinski was pitched on the

12  P.I.P.E. offering?

13  A.   That it wasn't.

14  Q.   Okay.  And what did he indicate the forms were for then?

15  A.   The forms were for compliance.

16  Q.   What did that mean to you?

17  A.   That they weren't really important, it's just more of a

18  form that has to be filled out and signed.

19  Q.   So it didn't seem that Mr. Fraiman was going to be making

09:51AM 20  a judgment as to the suitability of this offering for the

21  Zelinskis; is that right?

22  A.   Yes.

23  Q.   What was your reaction when you saw this response?

24  A.   Somewhat worried.  I had come from a world where the

25  compliance from your boss' side is very important, so it was

1   definitely something that was a red flag.

2   Q.   Okay.  But notwithstanding that -- well, did that cause

3   you to stop pitching it to the Zelinskis, for instance, stop

4   pitching the P.I.P.E. offering?

5   A.   No.

6   Q.   Why not?

7   A.   It was one sort of red flag, and I was just kind of -- it

8   just wasn't -- how do I say this, it wasn't a major thing that

9   would cause me to leave.

09:52AM 10   Q.   Okay.  And for the Zelinskis and your other clients that

11   you were pitching this to, the forms weren't coming in, but for

12   you personally, did you feel that you had an understanding of

13   their risk tolerance and so on?

14   A.   Yes.

15   Q.   And how was that?

16   A.   Because they had been my clients for five, six, seven

17   years, and they had to fill out these forms, and I had known

18   them for that period of time.

19         MR. THOMADAKIS:  Okay.  We can take that down please,

09:53AM 20   Mr. Flynn.

21   Q.   So we saw before that you, in your e-mails, you said you

22   targeted approximately eight people to pitch that P.I.P.E.

23   investment to, the Envit P.I.P.E.?

24   A.   Uh-hum, yes.

25   Q.   How did you decide which clients to pitch on that?

1   A.   It was probably a combination of things as far as what

2   their goals were and what their kind of level of worry was

3   based on how the markets were performing in the fall of '08.

4   Q.   Okay.  And so when you decided to pitch to a given person,

5   what went into that decision?  What kind of client were you

6   looking for?

7   A.   Just someone that was worried about how the market was

8   doing, was worried that they needed to continue to make 7 to 8

9   points to hit their long term goal of retiring or sending their

09:54AM 10   kid to college.

11   Q.   Okay.  And that was going to be achieved how through this

12   offering?

13   A.   Through the fixed side.

14   Q.   The 8.5 percent fixed rate of return, right?

15   A.   Yes.

16   Q.   And for perhaps clients like the Zelinskis that you were

17   talking about in terms of their risk tolerance, in some ways

18   given the 8.5 percent rate of return, did that contribute to

19   your feeling comfortable with pitching it to them?

09:54AM 20   A.   Yes.

21   Q.   Did you receive any kind of limitations from Mr. Fraiman

22   or Mr. Laborio as to whom you could pitch to put into the

23   P.I.P.E., which of your clients?  Did they tell you don't sell

24   it to these people?

25   A.   No.

1    Q.   All right.  So what did you communicate to your clients

2    about the Envit offering?

3    A.   Just it was more or less when I talked to them on the

4    phone or the e-mail, I'd copy and paste what I learned about

5    the P.I.P.E. from Jonathan and just told them there are two

6    parts, there was the 8.5 percent fixed side, it's like a CD,

7    guaranteed, things of that nature, and then there was the home

8    run side with the common share warrants.

9    Q.   Okay.  And you said copy and paste.  Did you sometimes put

09:55AM 10   it in your own words as well?

11   A.   Yes.

12   Q.   And, obviously, on the phone there's no cutting and

13   pasting, you just say what you were told, right?

14   A.   Yes.

15        MR. THOMADAKIS:  Let's look at Exhibit 107, please,

16   Mr. Flynn, if you could blow up that bottom portion.  Thank

17   you, sir.

18   Q.   Is that an e-mail from you?

19   A.   Yes.

09:55AM 20   Q.   And it's to a Lori Nugen, although in the body of the

21   e-mail, it's addressed to Lori and Allen.  Who are Lori and

22   Allen?

23   A.   Lori and Allen were clients of mine I think at this time

24   for three or four years.

25   Q.   Okay.  What was their background?

1    A.    Lori was an admin. assistant, Allen was in IT with Chase.

2    Q.    That's JPMorgan Chase?

3    A.    Yes.

4    Q.    And in this first part of the e-mail that you've blown up,

5    what are you kind of talking about with them there?

6    A.    Telling them about the allocation model for all of

7    their -- I believe this was their retirement dollars.

8          MR. THOMADAKIS:  Okay.  And then if we could turn to

9    the second page of the e-mail, please, Mr. Flynn, and blow up

09:56AM 10   the bottom part please.  Thank you.

11   Q.    Now, this bottom part where you're talking about preferred

12   stock, why did you write all of this to the Nugents?

13   A.    It was something we hadn't used in the past, and I just

14   copied and pasted it so they knew what it was.

15   Q.    So the reference to preferred stock is preferred stock of

16   what?

17   A.    Of Envit Capital.

18   Q.    Okay.  So this is talking about the Envit offering, right?

19   A.    Correct.

09:57AM 20   Q.    All right.  And where did you get this information in the

21   first paragraph, for instance, just the basic description of

22   preferred stock?  Did you get that from some reference, book or

23   something?

24   A.    I don't remember where it came from, it was just copy and

25   pasted from somewhere, I don't know where it came from.

1  Q.   And the second part, "This is a preferred stock with stock

2  warrants," and then you describe it to the deal Warren Buffett

3  did with Goldman Sachs.  That information, where did you get

4  that from?

5  A.   Some of it came from Jonathan and some of it just from

6  watching CNBC, it was on the news.

7  Q.   Okay.  And in the third part, what did you explain about

8  the potential return with an investment in the Envit P.I.P.E.?

9  A.   I'm not sure.  Oh, that it's good in terms of there's the

09:58AM 10  guaranteed fixed return of 8.5 percent for five years and the

11  higher, the upside of having the ability to buy the common

12  stock at 80 cents.

13  Q.   Okay.  And what did you say the worst case scenario is?

14  A.   That the client would make 8.5 percent each year for five

15  years.

16           MR. THOMADAKIS:  Okay.  And could we turn to the next

17  page, please, Mr. Flynn.  Blow up that top portion.

18  Q.   The bottom of that same e-mail, you say, "Essentially you

19  have a CD growing at 8.5 percent for the next five years but

09:58AM 20  also unlimited growth potential in a stock."  Is that right?

21  A.   Yes.

22  Q.   And where did you get that information from, that

23  comparison of the CD?

24  A.   From Jon Fraiman.

25           MR. THOMADAKIS:  Okay.  Could we look at Exhibit 116,

1  please.  All right.  Mr. Lazar, do you see that this is an

2  e-mail dated December 31st, 2008?

3  A.  Yes.

4  Q.  And it's from you to a Judy Henkel?

5  A.  Yes.

6  Q.  "Subject:  Envit Buys"?

7  A.  Yes.

8  Q.  Who is Judy Henkel?

9  A.  She was a client of mine.  She would have been a client

09:59AM 10  for a couple years.

11  Q.  And what was her background?

12  A.  I believe she was an admin. assistant as well.

13  Q.  Okay.  And in this top e-mail of this thread here, what

14  are you trying to do with regard -- what are you communicating

15  to Ms. Henkel?

16  A.  Talking about her allocation model and talking about

17  P.I.P.E.

18  Q.  Okay.  So you're explaining the Envit P.I.P.E. to her?

19  A.  Yes.

10:00AM 20  Q.  And, again, we see the language about Warren Buffett and

21  GE and Goldman Sachs, "it's fixed with a standard rate of

22  return at 8.5 percent" and so on and so forth; is that right?

23  A.  Yes.

24  Q.  "Security of a guaranteed 8.5 percent each year" in the

25  second last sentence of that paragraph.  In the second

1    paragraph, what did you say the rationale was for having

2    Ms. Henkel invest in the Envit P.I.P.E.?

3    A.   Just the same thing that I had been talking about in terms

4    of I thought the economy and market would be bad throughout

5    most of '09, and this gives a very high fixed rate.

6    Q.   So, again, the selling point here was what?

7    A.   The 8.5 points.

8    Q.   And by that you mean the fixed 8.5 percent fixed rate of

9    return?

10:01AM 10    A.   Yes.

11         MR. THOMADAKIS:   Okay.   Could we look at Exhibit 100,

12    please.

13    Q.   Sir, this is another e-mail, and it's from Mr. Fraiman to

14    you; is that right?

15    A.   Yes.

16    Q.   On October 13th, 2008?

17    A.   Yes.

18    Q.   "Subject:  Preferred P.I.P.E.pdf"?

19    A.   Yes.

10:01AM 20    Q.   And what Mr. Fraiman says is "Let's get --" well, let me

21    back up from that, I'm sorry.   Was there an attachment to this

22    e-mail?   Do you see it says "attached"?

23    A.   Yes.

24    Q.   Okay.   Let's look at the next page.   Let's look at the

25    attachment.   What is that document?

1  A.    The offering memo for P.I.P.E.

2  Q.    When you received this, how carefully did you receive it?

3  How carefully did you review it?

4  A.    Not at all.

5  Q.    Why not?

6  A.    From my days at my previous firm, whenever there was a new

7  kind of product, the wholesaler or your boss would come in with

8  kind of a quick sheet saying this is what it is, this is how it

9  works, and you just kind of treated that as true.

10:02AM 10  Q.    Okay.  And looking at the attached document, I mean, it's

11  in a folder in front of you, but Mr. Flynn can probably pull up

12  the page scroller and scroll all the way down, please,

13  Mr. Flynn.  So this was about 30 pages or so; is that right?

14  A.    I think so, yes.

15      MR. THOMADAKIS:  Okay.  And on page 6 of this exhibit

16  or I think it's page 6 of the exhibit, yes, on page 6 of the

17  exhibit, page 5 of the actual memorandum, if you could blow up

18  that section about dividends, Mr. Flynn.

19  Q.    What did it say there about dividends?

10:03AM 20  A.    That they had to be approved by the board, and as of that

21  date, they had not paid out.

22  Q.    And how consistent was this with what you heard from

23  Mr. Laborio and Mr. Fraiman on that conference call with you

24  about the Envit P.I.P.E.?

25  A.    It was not.

1    Q.   How was it not consistent?

2    A.   The 8.5 percent was always said to be fixed, and it was

3    guaranteed, and this is saying that it has to be approved by

4    the board, and as of that date, they hadn't paid it out yet.

5    Q.   And so it was inconsistent, you just said, with what you

6    had heard on the October 6th conference call.  How consistent

7    was this with the e-mail exhibits we've just been looking at

8    with Mr. Fraiman telling you about this rate of return?

9    A.   That it was not the same thing that I was being told.

10:04AM 10   Q.   Okay.  But did you notice that inconsistency at this point

11   in time?

12   A.   At this point being?

13   Q.   October, whatever.

14        MR. THOMADAKIS:  Could we go back to the first page,

15   please.

16   Q.   October 13th, 2008?

17   A.   No.

18   Q.   Why not?

19   A.   I did not read this.

10:04AM 20   Q.   Okay.  Sitting here today, how do you feel about your

21   decision not to look at this carefully when you received it?

22   A.   Not good.

23   Q.   Why not?

24   A.   Because it was something I was supposed to read over, and

25   I didn't, and I think I might have been able to save some of my

1    people and my family some money that went into the P.I.P.E.

2    Q.   All right.  And in that cover e-mail, what did Mr. Fraiman

3    in the body of the e-mail instruct you to do?

4    A.   Well, let's get working on this as soon as possible.

5    Q.   And that concept of working on the -- and the "this" is

6    what?  What did you understand the "this" to be?

7    A.   P.I.P.E.

8    Q.   And working on P.I.P.E. meant what?

9    A.   Putting client money into P.I.P.E.

10:05AM 10   Q.   So, in this fall of 2008 time period, October, November,

11   how would you describe Mr. Fraiman's approach to you with

12   regard to getting your clients to buy Envit stock through this

13   P.I.P.E. transaction?

14   A.   It was a constant type of conversation.  It would come up

15   a lot.  We'd probably talk on the phone once a week it would

16   come up, and it was always a goal.

17   Q.   Okay.  Would you say that was a main goal in his

18   communications with you?

19   A.   Uh-hum, yes.

10:05AM 20   Q.   Putting people in Envit through this P.I.P.E.?

21   A.   Yes.

22   Q.   And as a more general matter --

23          MR. THOMADAKIS:  We take this down, please.

24   Q.   As a more general matter, how was the tone of interactions

25   different with Mr. Laborio and Mr. Fraiman as time went on in

1  the fall of 2008 as compared to when you first started?

2  A.    Both seemed like good bosses in the first few weeks in

3  terms of there was goal planning, we talked about my practice

4  and how to improve it and how to grow it, then once the

5  conference call happened, it all shifted to P.I.P.E.

6          MR. THOMADAKIS:  Okay.  If we could take a look at

7  Exhibit 104, please.

8  Q.    Sir, do you see that this is an e-mail from Mr. Fraiman to

9  you on October 20th, 2008?

10:06AM 10  A.    Uh-hum, yes.

11  Q.    And on the top first paragraph with the names --

12          MR. THOMADAKIS:  Yes.  Thank you.

13  Q.    What do you understand him to be asking you there when he

14  says, "Also, when are the assets clearing in the following

15  accounts for the P.I.P.E.?"

16  A.    Basically when are these dollar amounts being transferred

17  to P.I.P.E.

18  Q.    All right.  We talked about the Zelinskis that we saw

19  there.  We talked about the Zelinskis that we see here.  Who

10:07AM 20  are the Martinis?

21  A.    Martinis were Jean and Terry.  They were clients of mine

22  for, again, four or five years.

23  Q.    Okay.  Who is Ken Lazar?

24  A.    He is my dad.

25  Q.    And so your father was going to invest in Envit?

1    A.    Yes.

2    Q.    Do you recall whether it was actually -- where that money

3    was coming from, was it your father's money, your mother's

4    money, where it was coming from?

5    A.    I don't remember.  I want to say it was my mom's, but I

6    don't know.

7          MR. THOMADAKIS:  And if we back out of that, please,

8    and look at the last paragraph there of Mr. Fraiman's e-mail.

9    Q.    It says, "You have 100 percent commitment.  We call it

10:08AM 10   closed in this industry."  So what did you understand him to be

11   asking you in this paragraph?

12   A.    Do you have -- are you for sure that this money you've

13   listed will be transferred to P.I.P.E.?

14         MR. THOMADAKIS:  Okay.  Let's look at Exhibit 106,

15   please.

16   Q.    Down below, this is November 7th, 2008, and we see it's an

17   e-mail from you to Mr. Fraiman; is that right?

18   A.    Uh-hum, yes.

19   Q.    And you reference three people, Zelinski, Lazar we talked

10:09AM 20   about, who is Bowen?

21   A.    Bowen is a client group of mine, it was Linda and Jim

22   Bowen.

23   Q.    What was their background?

24   A.    Jim, I don't remember, Linda was in sales.

25   Q.    Okay.  And you say, "I'm having all three call Ameriprise

1    to see if they have all the paperwork to move the money;" is

2    that right?

3    A.    Yes.

4    Q.    Mr. Fraiman's response to you, the first sentence is, "We

5    need to get money in for the P.I.P.E. this week;" is that

6    right?

7    A.    Yes.

8          MR. THOMADAKIS:  All right.  Let's look at

9    Exhibit 111, please.  Down below in the middle of the page,

10:09AM 10   could you blow that up, Mr. Flynn.  Thank you, sir.

11   Q.    This is from you to whom?

12   A.    To Jon Fraiman.

13   Q.    And it's November 26th, 2008; do you see that?

14   A.    Yes.

15   Q.    Okay.  And the first sentence is -- the subject line is

16   "Storer."  Do you see that?

17   A.    Yes.

18   Q.    Who is Storer?

19   A.    Storer is another client group of mine, I believe Joe and

10:10AM 20   Melissa.

21   Q.    When you say client group?

22   A.    I'm sorry, client group, when you're talking about a

23   client group, it means a family or a husband and wife.

24   Q.    Okay.  So in this case the Storers were a husband and

25   wife?

1    A.    Yes.

2    Q.    And so the subject line is:  "Storer," and you say, "With

3    Envit below 40 cents, they are only in for 20K."  Do you see

4    that?

5    A.    Yes.

6    Q.    What were you indicating there?

7    A.    That because the warrants on the one part of P.I.P.E.

8    allowed you to buy it for 80 cents per share from the company,

9    but on the open market, it was currently trading for 40 cents,

10:11AM 10    that component didn't have much value.

11   Q.    Okay.  So what had the Storers committed to nonetheless to

12   the Envit P.I.P.E. offering?

13   A.    They put in 20,000.

14        MR. THOMADAKIS:  Okay.  And if we can look at the

15   response above, please, so Mr. Fraiman's response in the third

16   sentence.

17   Q.    "How are you only able to get Storer for half the amount

18   you stated?  The stock was trading at 4.99, she owns it at

19   60 cents with an 8.5 dividend.  You need to go back to her and

10:11AM 20   explain that the stock trading at 40 cents is no indication

21   where it will be when she converts in two years, and she wished

22   you had been a better advisor and gotten her to buy more

23   shares."

24        And then below that, it says, "If you need me to talk

25   to her, I will, or any other clients.  That's a 1,000 out of

1    your pocket."

2         So how did you interpret this response to your e-mail

3    about the Storers only putting in $20,000?

4    A.   That he was not happy that they only put in that total.

5    Q.   Okay.  He instructs you to do what?

6    A.   Fax the documents to him, and if I want him to talk to

7    her, to call her.

8    Q.   Okay.  And also that you should --

9    A.   Go back and -- go back and try to sell more.

10:12AM 10   Q.   Okay.  Thank you.  We touched on this briefly before,

11   Mr. Lazar.

12         MR. THOMADAKIS:  We take that down, please.

13   Q.   We touched on this briefly before, Mr. Lazar, but when you

14   were an investment advisor, how much did you deal with advising

15   clients with regard to their retirement money?

16   A.   That was the main part of it.

17   Q.   Okay.  And we saw before, we discussed a little bit before

18   the difference between an IRA account and a non-IRA account,

19   right?

10:13AM 20   A.   Yes.

21   Q.   And did any of your clients invest retirement money out of

22   an IRA in the Envit P.I.P.E.?

23   A.   Uh-hum, yes.

24   Q.   How did you know they could do that?

25   A.   Based on the e-mail from Jonathan.

1          MR. THOMADAKIS:  Okay.  Let's look at Exhibit 103,

2    please.

3    Q.   By the way, before we get to Exhibit 103, we saw in your

4    last e-mail you mentioned the Storers didn't want to put in

5    more than $20,000 because Envit stock was trading at less than

6    40 cents a share?

7    A.   Yes.

8    Q.   Does the phrase, does the term "penny stock" mean

9    something to you?

10:13AM 10  A.   Yes.

11   Q.   What is that?

12   A.   It's normally a -- and I haven't been an advisor for a few

13   years, so I don't remember all the details, but it's a company

14   that's listed on the pink sheets that's a very low price per

15   share, I believe it's under two dollars per share.

16   Q.   Okay.  So at this time in the fall of '08, in fact, Envit

17   was trading at less than two dollars per share based on that

18   last e-mail, right?

19   A.   Uh-hum, yes.

10:14AM 20  Q.   So you could fairly characterize it as a penny stock?

21   A.   Yes.

22   Q.   All right.  So looking at Exhibit 103.

23          MR. THOMADAKIS:  Could we look at page 2, Mr. Flynn,

24   please.

25   Q.   So on page 2, in the middle of the page, we see a portion

1   of the e-mail we saw before about the 8.5 percent being the

2   selling point.  Do you see that?

3   A.   Yes.

4   Q.   Okay.  And then in this exhibit on the first page in

5   response to that, you asked Mr. Fraiman a question.  Let's look

6   at that.  So the question is:  "Does this have to be

7   nonqualified money or can they do it through an IRA?"  What is

8   the question there?  What are you asking him?

9   A.   Just to find out for the source of the money to put into

10:15AM 10   P.I.P.E. where can it come from.

11   Q.   So the question is can I put my client's retirement money

12   into the P.I.P.E.?

13   A.   Yes.

14   Q.   Okay.  And let's look at the response.  And the response

15   is from Jonathan Fraiman to you on October 15th, 2008; is that

16   right?

17   A.   Yes.

18   Q.   And it says, "No, you can invest through an IRA and," I

19   guess maybe that's a typo, "and IRA or roll over all the

10:15AM 20   holdings into ECGP and hold it inside with IRA," so on the

21   basic question of whether you could invest your client's

22   retirement monies into Envit, what was the response?

23   A.   Yes.

24   Q.   That you could?

25   A.   Yes.

1    Q.   "And the rollover of the holdings," did you understand

2    what that meant?

3    A.   Rollover normally refers to when your employer has a 401k

4    plan and you leave that job, then you normally roll it over to

5    an IRA of some kind.

6         MR. THOMADAKIS:  Okay.  Let's look at Exhibit 112,

7    Mr. Flynn.

8    Q.   On page 3, sir, first of all, this starts with at the

9    bottom, it's an e-mail December 1st, 2008; is that right?

10:16AM 10    A.   Yes.

11   Q.   You say, "There's still nothing in my checking account."

12   What's going on?  Do you see that?

13   A.   Yes.

14   Q.   So what are you asking about there?

15   A.   There were a handful of problems around this time frame.

16   My management fee paychecks were late or didn't show up.

17   Sometimes the P.I.P.E. bonus happened, sometimes it didn't.  I

18   think the rent was late for my office, and that normally came

19   from Ed.  There was -- yeah.

10:17AM 20   Q.   Okay.  And you sent that to Mr. Fraiman; is that right?

21   A.   Yes.

22   Q.   And the response, without reading it in --

23        MR. THOMADAKIS:  If you could below up the response,

24   please, Mr. Flynn.

25   Q.   Without reading the whole thing out loud, what was the

1    basic gist of Mr. Fraiman's response as to your pay that you

2    were asking about?

3    A.    Didn't really care about it and wasn't happy that I wasn't

4    meeting the goals that I should have.

5    Q.    Okay.  By the way, you talked before that --

6          MR. THOMADAKIS:  You can leave that up there for a

7    second.

8    Q.    Do you see in that first paragraph there's a sentence, "We

9    will waive the $16,000 recoverable draw if you reach the

10:18AM 10   $600,000 into the P.I.P.E. or 8 million in AUM."  Do you see

11   that?

12   A.    Yes.

13   Q.    And you talked about this concept of a draw before when

14   you talked about your compensation, right?

15   A.    Yes.

16   Q.    That you got a three-month period where you got money

17   which you could keep if you met certain goals?

18   A.    Right.

19   Q.    And you described those goals previously as goals in

10:18AM 20   meeting assets under management?

21   A.    Right.

22   Q.    What is the part about reaching $600,000 in the P.I.P.E.?

23   What does that have to do with the draw?

24   A.    It was more or less kind of moving the goal post.  The

25   original draw was based on me bringing over my book of business

1    around $20 million.  It says eight here.  I'm not sure why, but

2    then it kind of changed to, well, if that doesn't happen, as

3    long as you get $600,000 into the P.I.P.E., then the draw will

4    be waived.

5    Q.    Okay.  And in the third enumerated paragraph of this

6    e-mail, the second sentence, you see what it says you should be

7    spending all your time doing?

8    A.    Yes.

9    Q.    What is that?

10:19AM 10   A.    Just spend all my time for the next month getting $390,000

11   into P.I.P.E.

12   Q.    Okay.  And, again, there is a mention in the last sentence

13   of that paragraph about what you're getting paid --

14   A.    Yes.

15   Q.    -- for bringing people into the P.I.P.E.?

16   A.    Yes.

17   Q.    And this says 5 percent plus 5 percent ECGP stock, but

18   before you said it was 4 and 4 percent.  Do you recall that?

19   A.    Yes.

10:19AM 20   Q.    So what is the reference to 5 and 5?

21   A.    The total kind of varied.  It was originally, I believe,

22   told to me to be 5 percent.  It changed to 4, and then it was 5

23   again.  It just varied a lot.

24   Q.    Okay.  Let's look at the previous page.  Now you've

25   confused me, the page above that, I think that would be page 2.

1   All right.  Just as a housekeeping matter, at the very bottom

2   of the page the response we were just looking at was from whom?

3   A.   Jon Fraiman.

4   Q.   All right.  And the bottom of this page is a continuation

5   of the e-mail we were just looking at, but you see that at the

6   very top, I'm sorry, the top of this page is a continuation of

7   the next e-mail that we will look at, but do you see it says

8   "Judy Henkel" at the top?

9   A.   Yes.

10:20AM 10  Q.   At the bottom --

11        MR. THOMADAKIS:  Let's blow up the bottom e-mail.

12  Thank you, sir.

13  Q.   So you say -- this is an e-mail from you to Mr. Fraiman on

14  December 1st, 2008; is that right?

15  A.   Yes.

16  Q.   And you say, "300k more on the way."  Then what follows

17  after that?

18  A.   An e-mail I copied and pasted from Judy.

19  Q.   From Ms. Henkel?

10:21AM 20  A.   Yes.

21  Q.   Okay.  And it says, "Big news today.  I got put back on

22  part-time basis here at work, so, first of all, I will move all

23  my 401k monies to you, and, second, I want a full time job."

24  What is that reference to moving all of her 401k monies to you?

25  A.   Just that when you have a 401k, it's not something that an

1    advisor can hold, it's something meaning that because she's

2    being put on a part-time basis that she can roll over her 401k

3    to me.

4    Q.   And the 401k as you testified before is a retirement

5    account?

6    A.   Yes.

7    Q.   All right.  Let's look up the top e-mail.  Mr. Fraiman's

8    response, December 1st, 2008.  His response is, "Good.  Tell

9    him about the P.I.P.E."  Who is the "him" a reference to?

10:22AM 10    A.   I believe it's a typo.

11    Q.   Okay.  So who did you understand this to be referring to?

12    A.   Ms. Henkel.

13    Q.   And it says, "Get 50K out of the 401k.  She won't need

14    access to this for another five years in my guess," I think

15    that's all my typo.  "401k and IRAs are perfect vehicles for

16    this."  What do you understand him to be telling you there?

17    A.   From her rollover, try to put 50,000 into P.I.P.E.

18    Q.   And what did you understand him to be telling you in that

19    highlighted portion, "401k and IRAs are perfect vehicles for

10:22AM 20    this"?

21    A.   Meaning if you roll over something to an IRA, that

22    P.I.P.E. is good for it, it's good long term if you need it for

23    your retirement or things of that nature.

24    Q.   So he was saying to you that this investment in Envit

25    preferred shares was perfect for these retirement accounts?

1  A.    Right.

2         MR. THOMADAKIS:  Could you please pull up Exhibit 171.

3  Could you blow up that e-mail, the header first.

4  Q.    This is an e-mail dated October 27th, 2008.  Do you see

5  that?

6  A.    Yes.

7  Q.    Is this addressed to you?

8  A.    No.

9  Q.    Who is it addressed to?

10:23AM 10  A.    Ed and Jonathan.

11  Q.    And it's from a man named Rich?

12  A.    Yes.

13  Q.    Do you see that?

14  A.    Yes.

15         MR. THOMADAKIS:  Please get out of that, Mr. Flynn.

16  Could you blow up the second paragraph of that Ed Laborio

17  e-mail.

18         MR. SINNOTT:  Objection.

19         THE COURT:  Basis.

10:23AM 20         MR. SINNOTT:  This witness has not testified that he's

21  seen this e-mail before.  He's got no connection with it.

22         THE COURT:  Let's find out.  It's in evidence, you can

23  show it to the witness and we'll see.  Overruled.

24         MR. THOMADAKIS:  Thank you.

25  Q.    Do you see the sentence, "Putting a penny stock in an IRA

1    account is asking for a regulatory problem."  Do you see that?

2    A.   Yes.

3    Q.   And, again, this is an e-mail dated October 27th, 2008.

4    Did Mr. Fraiman share this e-mail with you?  Did you ever see

5    this before?

6    A.   I don't believe so, no.

7         MR. THOMADAKIS:  Okay.  Take it down, please.  Let's

8    look at Exhibit 113.

9    Q.   At the bottom, looking at this e-mail thread, the bottom

10:24AM 10   e-mail there, I'm sorry, at the bottom of the page and

11   continuing onto the next page, at the bottom of this page, it

12   says, "Matt, we need to have a conversation tomorrow via

13   conference call.  At this rate I will be very supersized if you

14   do more than $20 gross for the year.  I was told you had 21 MM

15   in AUM, we now have $750."  Is $750 accurate?

16   A.   I believe he's referring to $750,000.

17   Q.   "I don't want any more e-mails back and forth, we have

18   tried to call you hundreds of times in the office with no

19   response.  Why are we paying for an office?  750K is a joke and

10:25AM 20   I am insulted."  Who was that referring to?

21   A.   It sounds like Ed.

22   Q.   Even though whatever format we're using, we don't see that

23   there, that sounds like Mr. Laborio?

24   A.   Yes.

25   Q.   And then what did you do with that?  Did you respond to

1    him or to someone else?

2    A.    I responded to Jonathan.

3    Q.    Okay.  And what was the -- what did you understand the

4    overall issue that Mr. Laborio was complaining about to be?

5    A.    That the amount of assets I was transferring was not

6    happening at a fast rate.

7    Q.    Okay.  And why did you respond to Mr. Fraiman on this

8    e-mail and not include Mr. Laborio?

9    A.    Well, most of my dealings with Ed were I guess not good.

10:26AM 10    I felt like it was a fight for everything from setting up an

11    office to compensation to details on the hedge fund,

12    everything, and when I would talk to Jonathan, I would normally

13    get some kind of an answer or something, some type of goal met.

14    Q.    Okay.  So if we can look at Mr. Fraiman's response to you.

15    And in the very first sentence, what does he advice you to do

16    to kind of satisfy Mr. Laborio's complaints?

17    A.    Just to work on getting as much money into the P.I.P.E. as

18    possible.

19    Q.    So basically what we saw in the other e-mails, bringing

10:27AM 20    money into this Envit P.I.P.E.?

21    A.    Correct.

22    Q.    So overall with the e-mails we've been looking at --

23          MR. THOMADAKIS:  And we can take this whole thing

24    down, please.

25    Q.    -- how would you characterize Mr. Fraiman's approach in

1    terms of your solicitation of client investments into the Envit

2    offering?

3    A.    To always use P.I.P.E. or use P.I.P.E. as much as

4    possible.

5    Q.    And how else did he communicate that to you other than

6    e-mail?

7    A.    Phone calls.

8    Q.    All right.  And what was the overall result of that?  Did

9    you actually have your clients invest in it?

10:27AM 10   A.    Yes.

11   Q.    Do you remember approximately how many of your clients

12   wound up investing in Envit --

13   A.    Ten.

14   Q.    -- approximately.

15   A.    Ten.

16   Q.    Okay.  And approximately how much money, again,

17   approximate figures, did you wind up raising for Envit through

18   those clients?

19   A.    I believe it was $500,000.

10:28AM 20   Q.    How many of those folks that invested in Envit were ever

21   paid this dividend or the fixed, the supposedly fixed rate of

22   return?

23   A.    Not one of them.

24   Q.    How many of them ever got the principal of their

25   investment back from Envit?

1    A.    Not one of them.

2    Q.    All right.  Let's look at Exhibit --

3          THE COURT:  Is this a good place to break?

4          MR. THOMADAKIS:  Yes.

5          THE CLERK:  All rise.

6          (JURORS EXITED THE COURTROOM.)

7          (A recess was taken.)

8          THE CLERK:  All rise for the jury.

9          (JURORS ENTERED THE COURTROOM.)

10:44AM 10    THE COURT:  Mr. Thomadakis.

11         MR. THOMADAKIS:  Thank you, your Honor.

12         Mr. Flynn, could you pull up Exhibit 115 and blow up

13   the bottom part of that.  Actually all of it, please.  There's

14   a P.S. there that I would like.

15   Q.    While Mr. Flynn is blowing that up, Mr. Lazar, do you see

16   this is an e-mail dated December 17th, 2008?

17   A.    Yes.

18   Q.    And it's from you to whom?

19   A.    To Jon Fraiman.

10:44AM 20   Q.    And in the first paragraph, what are you discussing here?

21   Again, the money issue of you getting paid?

22   A.    Yes.

23   Q.    And in the third paragraph, do you see a P.S.?

24   A.    Yes.

25   Q.    Now, you discussed before that your parents invested in

1    Envit; is that right?

2    A.    Yes.

3    Q.    And you say, "There was a rush on my parents' IRA

4    accounts.  They took a loan for roughly $12,500 each, and

5    Friday is the 60th day (i.e. the last day to replace the money

6    without paying a penalty or tax.)  You told me this wouldn't be

7    a problem, so please take care of it today or tomorrow."  Was

8    there some kind of issue with regard to the Envit investment

9    and your parents having done so out of a retirement account?

10:45AM 10    A.    I don't remember exactly, but I do know that it must have

11    came from a qualified source for the 60-day comment.

12         MR. THOMADAKIS:  Okay.  And if we could look at the

13    first page again, Mr. Fraiman's response, please, and the date

14    again is December 17th, 2008 from Mr. Fraiman to you.

15    Q.    You see the sentence that says, "For the last time,

16    Matt --"

17    A.    Yes.

18    Q.    "-- we will not pay you up front.  I do not get the

19    privileges, and I'm the director," so what was that in response

10:46AM 20    to in terms of what you had been asking him?

21    A.    Just that I will not be paid upfront or have any special

22    things done for me.

23    Q.    And how does he identify himself, as the what?

24    A.    The director of the Private Wealth Management.

25    Q.    Which is also in a signature block down below,

1    "Jonathan Fraiman, Director"?

2    A.    Yes.

3    Q.    "Envit Capital Private Wealth Management, Registered

4    Investment Advisor."  How did Mr. Fraiman address the issue you

5    raised about your parent's loan?  Do you see that, "We are not

6    responsible?"

7    A.    Right, just that it's something that's not on him, it's

8    something that I would need to fix.

9    Q.    Okay.  Mr. Lazar, did you ever receive while you were at

10:47AM 10   Envit an e-mail from Mr. Fraiman asking you not to discuss

11   certain things in writing?

12   A.    Yes.

13         MR. THOMADAKIS:  Let's pull up Exhibit 117, please.

14   Q.    And down below -- you don't need to blow that up,

15   Mr. Flynn.

16   Q.    -- but it just said, "Just got your e-mail, welcome back

17   to the states.  How was your trip?"  This is on January 5th,

18   2009.  What was that trip a reference to?

19   A.    I believe he was going to Mexico.

10:47AM 20         MR. THOMADAKIS:  Could you scroll down to the next

21   page, please.

22   Q.    Then, again, you're asking for "Let me know what I could

23   do for you, and if you could check on the Martini boys

24   P.I.P.E./80K in checks, I received 80K in checks for me on

25   December 21st and I still didn't see them --" sorry, "made out

1    to Charles Schwab, and I still don't see them in their SI

2    accounts."  What were you talking about there?

3    A.    That the Martini boys, who were Tim and I forget the other

4    one's name, but I had sent in checks or transfers to move money

5    to the P.I.P.E., and it wasn't showing up at Charles Schwab

6    yet.

7    Q.    Okay.  What was the relationship with Charles Schwab?

8    A.    They were the holding company, so if a client got some

9    mail or if they were going to go into their accounts and see

10:48AM 10  its progress, they'd log into Charles Schwab.

11   Q.    And when you say holding company, are you suggesting that

12   Schwab was a holding company for Envit, that it owned Envit?

13   A.    No.

14   Q.    You're using it more in terms of a custodian of the

15   account?

16   A.    Yes.

17   Q.    And the issue was that folks had invested but they weren't

18   seeing the certificates or any -- they weren't seeing what they

19   should have been seeing in their Charles Schwab account; is

10:49AM 20  that right?

21   A.    Yes.

22   Q.    Was that a common problem that your clients faced?

23   A.    With P.I.P.E., yes.

24   Q.    With the Envit offering?

25   A.    Yes.

1    Q.   Let's go up to Mr. Fraiman's response.  So this is dated

2    January 5th, 2009.  There's a reference to tequila, and then it

3    says, I will follow up with SI.  What is SI?

4    A.   I believe it's Schwab Institutional.

5    Q.   And then he says, "Moving forward we can't be so detailed

6    in e-mails about payouts and percentages.  Call me or fax me,

7    you run on what is owed to you moving forward."  What did you

8    understand him to be saying there?

9    A.   To not talk about conversation or P.I.P.E., to make sure

10:50AM 10   that if I want to have a conversation about -- conversation

11   about P.I.P.E. to call or fax him.

12   Q.   Okay.  Do you know, did you ever speak to him about why he

13   made that request of you?

14   A.   I don't believe so, no.

15   Q.   Okay.  So you don't know why -- do you know why he was

16   asking you to do that?

17   A.   No.

18   Q.   All right.  Now, Mr. Lazar at some point we're into this

19   e-mail was from January 5th, 2009.  At some point in January of

10:50AM 20   2009, what did you come to find out about whether your

21   understanding from Mr. Fraiman and Mr. Laborio about the fixed

22   aspect of the Envit offering was correct?

23   A.   I found out when I finally read the offering memo after

24   talking about P.I.P.E. with a client.

25   Q.   Okay.  And when you did that, what was inconsistent with

1   what you had been told before?

2   A.   Just that what I was told the entire time was the 8.5

3   percent side would always be paid out, it was fixed, it was

4   guaranteed, it was like a CD, and then when I read the offering

5   memo, it said it was based on the board -- based on the board

6   saying yes to it.

7   Q.   And also that one had never been paid, this is the

8   document we looked at before?

9   A.   Correct.

10:51AM 10   Q.   Okay.  What was your reaction when -- who pointed this out

11   to you in the first instance?

12   A.   My client, Shane Bateman.

13   Q.   Okay.  Who is Mr. Bateman?

14   A.   He was a client for four or five years, he worked at the

15   Animal Vet Hospital at Ohio State and then I believe moved to

16   Canada.

17        MR. THOMADAKIS:  Okay.  And let's look at Exhibit 118,

18   please.

19   Q.   Okay.  At the bottom of the very first page, very, very

10:52AM 20   bottom, it says, "From Matthew Lazar to Jonathan Fraiman,

21   January 16th."  Do you see that?

22   A.   Yes.

23        MR. THOMADAKIS:  And then let's look at the next page

24   and the second paragraph.

25   Q.   Who is Batman?

1   A.    I think that's a typo for Bateman.

2   Q.    Okay.  So this is the client you were referencing,

3   Shane Bateman?

4   A.    Yes.

5   Q.    "Bateman's response to P.I.P.E., In reading through the

6   materials you've sent along, my understanding is that the 8.5

7   percent happens if the Board of Directors approves dividends.

8   It states that no dividends have been delivered so far.  This

9   does not much like a guarantee to me.  In addition, it says

10  very clearly that you could lose everything."  When you got

11  this, this was an e-mail you received from Mr. Bateman which

12  you copied and pasted into this e-mail?

13  A.    Yes.

14  Q.    What was your reaction when you first saw those words from

15  Mr. Bateman?

16  A.    I was I would say scared probably one way to say it, just

17  worried.

18  Q.    Why?

19  A.    Because what I was being told about an investment that I

20  put a lot of my clients' money in was not true.

21  Q.    Okay.  And how did it -- how did it relate to things that

22  you had been thinking generally about Envit?  Had there been

23  issues percolating in your mind prior to seeing this from

24  Mr. Bateman?

25  A.    Yes, it was just a red flag, probably the third or fourth

1   one.

2   Q.    What were the other ones?

3   A.    Rent being late for my office, the issue with the client

4   profile forms not being important, conversation changing,

5   moving, showing up, not showing up, those kind of things.

6   Q.    Was there some issue that you recall with your own forms

7   that you, yourself, had filled out while at Envit?

8   A.    Yes.

9   Q.    What was that?

10  A.    There was a form that I filled out that listed all the

11  assets that I owned, and at the time, I owned shares of Envit I

12  want to say a couple thousand dollars, and I was told by my

13  boss, Jonathan Fraiman, to just leave that off of the form.

14  Q.    Okay.  And had that been something that had also been

15  somewhat of a red flag to you?

16  A.    Yes.

17  Q.    And then you see this, and given all those other issues,

18  what was your reaction?

19  A.    My reaction was that this is a problem and I was trying to

20  figure out what was real.

21        MR. THOMADAKIS:  Okay.  So let's go up to the first

22  page, please.

23  Q.    And the information that Mr. Bateman had been referencing

24  there in terms of what you saw compared to what you were

25  telling him, that came from what, what document, do you know?

1   A.   The offering, the 30-page thing.

2   Q.   So that's the attachment to Exhibit 100 that we looked at

3   before?

4   A.   Yes.

5   Q.   Okay.  And what did you do when you saw that from

6   Mr. Bateman?  Whom did you try to communicate with?

7   A.   I ran back to the office to get the document to read

8   through it.  I believe I called Ed a couple times, two or three

9   times.  I sent some e-mails to Jonathan as well.

10:55AM 10   Q.   Okay.  And were you able to reach Mr. Laborio on the

11   phone?

12   A.   No.

13   Q.   All right.  So you sent this e-mail on January 16th.

14        MR. THOMADAKIS:  And, Mr. Flynn, if we could blow up

15   Mr. Fraiman's response on the same day.

16   Q.   What does he say in his response to you?  What did he say

17   in the first sentence?

18   A.   "Matt, there's nothing in this world that is guaranteed.

19   All dividends that are not part of a publicly-traded company

10:56AM 20   must be approved by the board.  Tell him if you guaranteed the

21   stock, they would arrest you and take you out in handcuffs."

22   Q.   And how did that correspond with what you had previously

23   heard from Mr. Fraiman on all other occasions?

24   A.   It was not even close to the same thing.

25   Q.   Okay.  What was your reaction when you saw that response

1    that nothing is guaranteed and if you guaranteed it, they would

2    arrest you and take you out in handcuffs?

3    A.   Just that it was the opposite of what I was being told the

4    whole time, and it was something that wasn't good because with

5    the other red flags, it began to seem like something wrong was

6    happening.

7    Q.   And then a couple sentences down, it says, "Let me know if

8    I need to speak to him.  People should be buying this stock,

9    not for the dividend, for the price appreciation of five

10:57AM 10   dollars a share over the next few years."  Do you see that?

11   A.   Yes.

12   Q.   How did that comment about why people should be buying

13   this offering correspond with the e-mails we saw previously?

14   A.   It was changing, it was changing just in the same way that

15   P.I.P.E. was told to me that the selling point the entire time

16   was the 8.5, it's fixed, it's like a CD, it's guaranteed, and

17   now the main reason people should be buying it has changed to

18   the warrant side.

19   Q.   And, in fact, did you point that out to him?

10:57AM 20   A.   I believe so, yes.

21        MR. THOMADAKIS:  Let's look at the top e-mail,

22   Mr. Flynn, please.

23   Q.   What did you say to him in response to that?

24   A.   I said, "My problem, it was sold to me by you as a

25   guaranteed return.  In many e-mails, you said guaranteed and

1  even when you didn't say guaranteed, it was said in another

2  way."

3  Q.   And then you gave an example from October, which says,

4  "No, that's the selling point, the 8.5 percent is paid out

5  regardless of what the stock performs at.  It's like an annuity

6  almost with the fixed return and upside of the conversion."

7           MR. THOMADAKIS:  That particular line, if you could

8  pull up Exhibit 102, please.

9  Q.   That particular line you were quoting from the top of this

10:58AM 10  e-mail, right?

11  A.   Right.

12  Q.   Were there more exchanges between you and Mr. Fraiman on

13  this issue?

14  A.   Yes.

15           MR. THOMADAKIS:  Could you please pull up Exhibit 120,

16  Mr. Flynn.  Page 2, please.

17  Q.   And so the last e-mail we were looking at --

18           MR. THOMADAKIS:  Actually, I apologize, Mr. Flynn,

19  page 1.

10:59AM 20  Q.   The last e-mail we were looking at was dated January 16th,

21  2009, and at the very bottom of this page, do you see the date

22  of your e-mail to Mr. Fraiman in this exhibit?

23  A.   Yes.

24  Q.   It's January 19th?

25  A.   Yes.

1  Q.  Which was what day?

2  A.  A Monday.

3  Q.  It says Monday, January 19th, 2009, right?

4  A.  Right.

5      MR. THOMADAKIS:  Okay.  Next page, please.

6  Q.  And you say, "Good afternoon, Jonathan.  Still need ASAP,"

7  and Number 5 is what?

8  A.  Was trying to find out what I was reading was the opposite

9  of what I was being told about P.I.P.E.

10:59AM 10  Q.  Okay.  So that's a reference to the previous e-mail we

11  just looked at, answer my guaranteed question from Friday?

12  A.  Yes.

13      MR. THOMADAKIS:  All right.  Could you go to the first

14  page, please.

15  Q.  And on page 1, he answers your questions in numbers.

16  Number 5, what did he say?

17  A.  "Only death and taxes are guaranteed.  We anticipate

18  paying shortly."

19  Q.  Paying what?

11:00AM 20  A.  A dividend, sorry.

21  Q.  So this e-mail, this response to you it looks like was on

22  what date?

23  A.  Was January 20th.

24  Q.  January 20th, 2009.  What date did you say you left Envit?

25  A.  That same day.

1    Q.    Why did you leave?

2    A.    Because with all the red flags that were going on, and it

3    was becoming more and more clear to me that there was something

4    wrong with P.I.P.E., I didn't want to be part of the company.

5    I wanted to try to get all of the money that was put into

6    P.I.P.E. back was the main reason.

7    Q.    Were there other reasons?

8    A.    Yes.

9    Q.    What were those?

11:01AM 10    A.    Just the ongoing battle with Ed over compensation, how the

11    contracts said one thing, I was being paid something different,

12    how my office rent was late, how he would say that he'd, you

13    know, have a check in my account on a certain day, and it just

14    didn't happen.

15    Q.    And you had described at the beginning of your testimony

16    that you understood your compensation in terms of the

17    percentage of the fees for asset under management that you

18    would get would be 65 percent of the fees, and Envit would get

19    35 percent?

11:01AM 20    A.    Yes.

21    Q.    And had Mr. Laborio specifically done something with those

22    percentages?

23    A.    Changed them.

24    Q.    To what?

25    A.    I believe it flipped, and I was the one that was going to

1    get the 35.

2    Q.    So that played a role in your leaving as well?

3    A.    Part of it, yes.

4    Q.    But what was the main reason you left?

5    A.    P.I.P.E. and what was going on with it.

6    Q.    Okay.  What did you do with your clients when you left

7    Envit?  What did you inform them of?

8    A.    I informed them that I left, I informed my P.I.P.E.

9    clients what I had learned about the P.I.P.E. and wanted to

11:02AM 10    talk to them and wanted to find out what our next move should

11    be.

12          MR. THOMADAKIS:  Okay.  And if we could look at

13    Exhibit 122, please.

14    Q.    This is an e-mail dated February 3rd, 2009 to a

15    Connie Hess.  Do you see that?

16    A.    Yes.

17    Q.    Who is Connie Hess?

18    A.    Connie Hess was another client of mine for four to five

19    years.

11:02AM 20    Q.    Okay.  And what were you --

21          MR. THOMADAKIS:  If you could below up the top e-mail,

22    Mr. Flynn, please.

23    Q.    And basically what were you telling her about why you

24    decided to leave Envit the previous or a couple weeks back?

25    A.    I was telling her the basic reasons, the feeling that I

1  was lied to, the investment, how I was told how it worked was

2  false and my personal pay being cut in half.

3  Q.   Okay.  So these are the things you've talked about just

4  previously?

5  A.   Right.

6  Q.   All right.  And the information about an investment to

7  clients being completely false, what investment is that a

8  reference to?

9  A.   That was P.I.P.E.

11:03AM 10  Q.   Okay.  After you left, do you know whether your clients

11  were contacted by people from Envit?

12  A.   Yes.

13  Q.   How do you know that?

14  A.   I can't remember which clients told me, but they said that

15  Jon Fraiman had contacted them.

16       MR. THOMADAKIS:  Let's look at Exhibit 126, please.

17  Q.   So this is an e-mail dated March 3rd, 2009 to you, right?

18  A.   Yes.

19  Q.   And it's from a person you testified about before,

11:04AM 20  Brenda Zelinski?

21  A.   Yes.

22  Q.   It says, "P.I.P.E. Information" is the subject line?

23  A.   Yes.

24  Q.   All right.  And she's forwarding an e-mail thread to you?

25  A.   Yes.

1    Q.   All right.  At the bottom, you see it's from

2    Brenda Zelinski to Jonathan Fraiman, and the body of the e-mail

3    is on page 2?

4    A.   Yes.

5    Q.   Okay.  And could you blow that part up, please.  What was

6    that e-mail?  What was Ms. Zelinski asking of Mr. Fraiman?

7    A.   Just trying to learn what was going on with P.I.P.E., if

8    the 8.5 percent would be paid out.

9    Q.   Okay.  And looking back at page 1, Mr. Fraiman's response,

11:04AM 10    which was forwarded to you, his response to Ms. Zelinski, that

11    is, says, "The dividend is approved by the Board of Directors

12    and is anticipated to be issued once the offering is completed

13    and there are no more shares being issued to new investors."

14    Do you see that?

15    A.   Yes.

16    Q.   How much -- that information about that the dividend would

17    be issued once the offering is completed and no more shares are

18    being issued, had you heard that one before?

19    A.   No.

11:05AM 20    Q.   And it says, "By law, I could not give a definitive time

21    as I'm traveling from Boston to Florida to relocate to our Boca

22    Raton headquarters."  Do you see that?

23    A.   Yes.

24    Q.   When does he say he could give more detailed information

25    to Ms. Zelinski?

1   A.   Once he talks to the board next week.

2        MR. THOMADAKIS:  Okay.  And the date of this e-mail,

3   if we could back out of that, please.

4   Q.   So the date of this e-mail was March 3rd, 2009.  By the

5   way, does Mr. Fraiman mention he's relocating to Boca Raton in

6   this e-mail?

7   A.   Yes.

8   Q.   And you said -- where did you previously say you

9   understood Envit to be headquartered?

11:06AM 10   A.   That it was here in Boston.

11   Q.   Okay.  Do you know whether there was still an office in

12   Boston at this point in time, if you know?

13   A.   I believe there was.  I remember them being in the process

14   of moving offices.  I don't remember the timeline for that.

15        MR. THOMADAKIS:  Okay.  Let's look at Exhibit 130.

16   Could we turn to the second page, please.

17   Q.   Do you see an e-mail correspondence between you and

18   someone else?

19   A.   Yes.

11:06AM 20   Q.   Sir, who is that someone else?

21   A.   Judy Henkel.

22   Q.   So Ms. Henkel was the one with the 401k whose e-mail we

23   saw before?

24   A.   Yes.

25   Q.   And did some of that 401k money wind up being invested in

1    Envit?

2    A.   Yes.

3         MR. THOMADAKIS:  Okay.  If you could blow up the

4    January 27 th, 2009 e-mail, Mr. Flynn.

5    Q.   All right.  Ms. Henkel is writing to you, "Jonathan called

6    me here at the office, and then I went into a conference room

7    to talk with him."

8         THE COURT:  What exhibit is this?

9         MR. THOMADAKIS:  This is 130, your Honor.

11:07AM 10    THE COURT:  130, okay.

11   Q.   And she says, "I've told him I've known you about seven

12   years and are most concerned as to where Envit/Lazar problems

13   leave me at the moment.  Major is the 45,000 at Envit."  Do you

14   recall that that was the amount or the approximate amount that

15   Ms. Henkel invested in Envit?

16   A.   I would say it sounds right, yeah.

17   Q.   Okay.  Then she says, "I've trusted you to handle my money

18   and am most bothered by cancellation of our meeting to discuss

19   what I consider to be a penny stock purchase of Envit."  Did

11:08AM 20    you -- what do you recall about that?

21   A.   I don't know what meeting she's talking about there.

22   Q.   Okay.  Then below that, next paragraph, it says, "He says

23   my money is safe and is still as $45,000.  Preferred shares,

24   alternative investment, hedge fund stories, et cetera, now he

25   wants me to talk with Ed Laborio, as I am not just comfortable

1  with the song and dance about how wonderful anybody or anything

2  is."  What did you --

3      MR. THOMADAKIS:  If we could go up and look at

4  Mr. Lazar's reply, please.

5  Q.  Your reply is, "I can't apologize to you enough.  I know

6  that I have done nothing wrong but take full responsibility in

7  the mess that Envit had caused you."  What was it -- what did

8  you mean by, "I take full responsibility"?

9  A.  Meaning that Judy and my clients had put money into

11:09AM 10  P.I.P.E. wouldn't have been at that company or put money to

11  P.I.P.E. if I was not their advisor.

12  Q.  If you hadn't been their advisor, they may have never

13  heard of Envit, in other words?

14  A.  Correct.

15  Q.  All right.  Let's -- now, at some point --

16      MR. THOMADAKIS:  We can get out of this e-mail,

17  please.

18  Q.  Now, at some point, did you report Envit to some

19  authority?

11:09AM 20  A.  Yes.

21  Q.  Which authority was that?

22  A.  I reported them or I contacted the SEC in the summer of

23  2009.

24  Q.  Okay.  The SEC where?

25  A.  Here, here in Boston.

1  Q.   Why did you do that?

2  A.   Because from talking to my clients, we had a conference

3  call or two, we tried to find an attorney that could take care

4  of all of us, and that was taking a while, and I just thought

5  the SEC would be the only type of person or group that could

6  help them out.

7       MR. THOMADAKIS:  Okay.  Let's look at Exhibit 127,

8  please.  If you could blow up the top part.  Thank you very

9  much.

11:10AM 10  Q.   This is from you, and who are these people?  You don't

11  have to name them one by one, but generally what group of

12  people is this?

13  A.   People that had used P.I.P.E.

14  Q.   Okay.  People whom you had advised to invest in Envit?

15  A.   Yes.

16  Q.   And had done so?

17  A.   Yes.

18  Q.   Although is your father or mother on this?

19  A.   No.

11:10AM 20  Q.   Okay.  But they were investors in Envit?

21  A.   Yes.

22  Q.   All right.  And the subject is "P.I.P.E. Update," right?

23  A.   Yes.

24  Q.   Okay.  If we could look at the body of it.  So what are

25  you informing the clients whom you had sold the Envit offering

1    to about?

2    A.    Just what was going on.  I tried to keep them in the loop

3    as much as possible, that Envit had canceled a conference call,

4    and I contacted the SEC Boston office to just try to get things

5    moving.

6            MR. THOMADAKIS:  Okay.  Could we go to Exhibit 135,

7    Mr. Flynn.  And, I'm so sorry, could we just look back at the

8    last e-mail really quick, 127.

9    Q.    That e-mail was dated May 26th, 2009, right?

11:11AM 10   A.    Yes.

11   Q.    P.I.P.E. Update.

12            MR. THOMADAKIS:  Now let's look at 135.

13   Q.    So, this is another e-mail from the same date?

14   A.    Yes.

15   Q.    Again, from Ms. Henkel to you?

16   A.    Yes.

17   Q.    And the subject is "P.I.P.E. Dreams"?

18   A.    Yes.

19   Q.    Okay.  And on the second page, please, do you see it's

11:12AM 20   directed to you, and on the second paragraph in that e-mail --

21   A.    Yes.

22   Q.    -- Henkel says, "Also read your P.I.P.E. Update.  Do you

23   actually believe that Envit still has everybody's money?  Of

24   course we know we didn't buy any stocks.  They aren't even

25   registered, and how can they register if they don't even file

1    earnings reports.  This has to be because there aren't any

2    earnings.  Matt, they've gone through everyone's money.  We've

3    been buying their groceries and paying their mortgages for half

4    a year.  I used to work for people like that."

5            And in the fifth paragraph of her e-mail to you, she

6    says, "Do you have anyone helping with you this problem?  I

7    know lawyers are expensive," and so on.

8            What did you understand her to be kind of addressing

9    with you in this e-mail?

11:12AM 10   A.   What she believed was going on with P.I.P.E., that

11   basically when clients put in money, that it was being taken

12   and used by Ed or whoever.

13   Q.   And then she asked if you have anyone helping you with the

14   problem, right?

15   A.   Yes.

16   Q.   And on page 1 in your response, you say, "I'm doing

17   everything I can, including paying the entire legal bill to

18   fight this and contacting the SEC.  I'm not sure what else I

19   could do.  I was mislead completely about this investment, and,

11:13AM 20   in turn, misled some of my clients.  I'm hoping the SEC can

21   take action ASAP."  What legal bill is this a reference to?

22   A.    I don't remember offhand.  I know when we were looking to

23   hire an attorney for all of the P.I.P.E. clients, there are

24   certain fees that were involved, and I think I was trying to

25   pay those for my clients.

1   Q.   Okay.  And going forward, this is from May of 2009, but

2   did you continue to keep your clients in the loop in this time

3   period, summer of 2009, regarding your dealings with the

4   Securities and Exchange Commission?

5   A.   Yes.

6        MR. THOMADAKIS:  Thank you.  We can take that down.

7   Q.   Now, at some point, Mr. Lazar, were you charged by the

8   Securities and Exchange Commission with regard to your

9   activities with regard to Envit?

11:14AM 10   A.   Yes.

11   Q.   And what type of charge, was that a civil charge?

12   A.   Yes.

13   Q.   And what is your understanding at the most basic level

14   about what conduct you were charged with, what in particular

15   about your activity were you charged with?

16   A.   For failing to read the offering, I forget the term, the

17   30-page form that had talked about P.I.P.E.

18   Q.   What you read only after Mr. Bateman pointed it out to

19   you?

11:14AM 20   A.   Correct.

21   Q.   And sitting here today, should you have read that before

22   trying to put your clients in it?

23   A.   Absolutely.

24        MR. THOMADAKIS:  The Court's indulgence.

25   Q.   And you say absolutely you should have read it before you

1    pitched Envit to your clients.  So how do you feel about your

2    decision or about your nonreading of it at the time and how do

3    you feel more generally about having pitched your clients on

4    Envit?

5    A.   I feel terrible.  I think as far as them being at Envit

6    and in P.I.P.E., that was my fault because if they didn't know

7    me, they wouldn't have gone there, so I felt it was my fault.

8    Q.   And how much did your -- even sitting here today, do you

9    know whether any of your clients ever received these dividend

11:15AM 10    payments?

11    A.   None of them.

12    Q.   Do you know whether any of your clients received any of

13    these -- of the principal of their investment back?

14    A.   No.

15         MR. THOMADAKIS:  No further questions.

16         THE COURT:  All right.  Cross-examination,

17    Mr. Sinnott.

18         MR. SINNOTT:  Please, your Honor, thank you.

19                    CROSS-EXAMINATION

11:15AM 20    BY MR. SINNOTT:

21         MR. SINNOTT:  Good morning, folks.

22    Q.   Good morning, sir.

23    A.   Good morning.

24    Q.   Sir, my name is Bill Sinnott, and I represent the

25    defendant, Jonathan Fraiman.  Have you ever met Mr. Fraiman?

```
 1    A.    Face-to-face, no.

 2    Q.    Have you ever met Mr. Laborio?

 3    A.    No.

 4    Q.    And, sir, you started with Envit in September of 2008; is

 5    that accurate?

 6    A.    Yes.

 7    Q.    And how long had you been a broker at that point?

 8    A.    Five, five and a half years.

 9    Q.    So you got your Series 7 five and a half years earlier?

10    A.    Yes.

11    Q.    And were you aware that Mr. Fraiman had obtained his

12    Series 7 about a year and a half before he met you, before he

13    contacted you?

14    A.    No.

15    Q.    But you were a pretty experienced broker, weren't you?

16    A.    In what way?

17    Q.    Well, you had five and a half years of experience?

18    A.    Yes.

19    Q.    You had a number of clients?

20    A.    Yes.

21    Q.    Did you serve those clients well?

22    A.    Yes.

23    Q.    Did you serve them with faithfulness?

24    A.    Yes.

25    Q.    Well, isn't that what a fiduciary is, it's someone who is
```

1    faithful to its clients?

2    A.    Yes.

3    Q.    But, it's true, sir, isn't it, that you had a history of

4    problems based on complaints made to FINRA?

5    A.    I would say I had four or five.

6    Q.    All right, sir.  And those were issues that included

7    issues as to your honesty, correct?

8    A.    My honesty with regard to what?

9    Q.    Well, sir, you testified you were fired from Ameriprise

11:19AM 10   but you didn't know why; is that correct?

11   A.    Yes.

12         MR. SINNOTT:  If I might just have a moment, your

13   Honor.

14   Q.    Sir, do you recall while you were at Ameriprise that some

15   clients alleged that their variable universal life insurance

16   policies were not suitable for their goals at the time of sale

17   and this was a policy purchased in February of 2006?  Do you

18   recall that complaint?

19   A.    Vaguely, yes.

11:19AM 20   Q.    Do you recall paying out $6,325 to settle that complaint?

21   A.    No.

22   Q.    You don't recall that?

23   A.    I believe that was paid out by the company, it wasn't paid

24   from me.

25   Q.    But it was paid out on your behalf?

1   A.   I think what they did was they waived a surrender charge

2   and let the client get their cash value back.  I don't think

3   the company paid them.

4   Q.   But you left it up to the bosses?

5   A.   Left it up to the bosses?

6   Q.   You didn't have any role in that decision to make that

7   settlement payment --

8   A.   No.

9   Q.   -- of over 6,000?

11:20AM 10   A.   Right.

11   Q.   You didn't have any role in it?

12   A.   No.

13   Q.   That was somebody else's job?

14   A.   Yes.

15   Q.   The higherups at Ameriprise?

16   A.   Yes.

17   Q.   Okay.  And, sir, do you recall a complaint received in

18   April of 2008 while you were at Ameriprise where a client

19   signed an affidavit alleging that the signature on a bank

11:21AM 20   authorization systematic payout --

21         PLAINTIFF ATTORNEY:  As opposed to the nature of

22   the --

23         THE COURT:  Let me see counsel at sidebar.

24         (THE FOLLOWING OCCURRED AT SIDEBAR:)

25         THE COURT:  I just want to make sure I know what we're

1    talking about here.  What's the question going to be?

2         MR. SINNOTT:  The question is going to be -- the

3    witness has testified that he doesn't know why he was fired

4    from his employer.

5         THE COURT:  Yes.

6         MR. SINNOTT:  And this second complaint was also at

7    Ameriprise, and it related to him forging a signature which

8    goes to the heart of his honesty.

9         MR. THOMADAKIS:  I think Mr. Sinnott can inquire about

11:21AM 10    specific instances that go to truthfulness or untruthfulness,

11    but to read an affidavit saying that that's my issue, he can

12    ask him about, do you recall something about did you forge his

13    signature?

14         THE COURT:  Let's try it without the reference to the

15    affidavit.  If he denies it, maybe you can impeach him or

16    something, but let's try it.

17         MR. THOMADAKIS:  Or refresh his recollection.

18         (SIDEBAR CONFERENCE WAS CONCLUDED)

19         THE COURT:  Let's ask a reframed question.

11:22AM 20         MR. SINNOTT:  I'd be happy to, sir, thank you.

21    Q.   Sir, directing you again to your tenure at Ameriprise

22    Financial Services before you were terminated, do you recall an

23    allegation in April of 2008?

24    A.   Vaguely, yes.

25    Q.   All right.  What was that allegation about, sir?

1    A.   I believe a signature on a form didn't match a signature

2    on another form.

3    Q.   Well, sir, that's not quite correct, is it?

4    A.   I don't remember.

5    Q.   Isn't it true that the allegation was that you forged a

6    signature?

7    A.   I don't know.

8    Q.   You don't know because it's vague?

9    A.   I don't remember what the allegation was.

11:23AM 10   Q.   Well, would it refresh your memory if I were to inform you

11   that the client --

12             MR. THOMADAKIS:  Objection.

13             THE COURT:  You can show him a document.

14             MR. SINNOTT:  I'd be happy to, your Honor, thank you.

15             THE COURT:  If you're refreshing his memory, why don't

16   we do it that way.

17             MR. SINNOTT:  May I approach, your Honor?

18             THE COURT:  Yes.

19             MR. SINNOTT:  If I may inquire, your Honor?

11:24AM 20            THE COURT:  Yes.

21   Q.   Mr. Lazar, do you see this document styled, "Investment

22   Advisor Representative Disclosure Report"?

23   A.   Yes.

24   Q.   And have you seen public disclosure reports in the past?

25   A.   Yes.

1   Q.   And have you seen public disclosure reports on you?

2   A.   Yes.

3   Q.   Because it's important to you to know what allegations are

4   in the record concerning your brokerage history, correct?

5   A.   Part of it, right, yes.

6   Q.   And, sir, with respect to that complaint that I referred

7   to earlier, could you silently read this entry and see if that

8   refreshes your memory as to the allegation?

9   A.   Yes.

11:24AM 10   Q.   All right.  And having read that, sir, what was the

11   allegation?

12   A.   That I forged a signature on a form.

13   Q.   All right, sir.  And do you recall what the outcome was of

14   that particular investigation?

15   A.   I believe that the signature didn't affect the investment,

16   and I forget what happened.

17   Q.   So, it's fair to say that the investigation found that you

18   actually had forged the signature but essentially no harm, no

19   foul, that no money was lost as a result of it?

11:25AM 20   A.   No, I think what it's saying is that the actual client

21   didn't sign it, it isn't saying that I signed it.

22   Q.   Well, sir, the allegation was that you had signed it,

23   correct?  Correct, sir?

24   A.   Yes.

25   Q.   And the finding was that the signature was not the

1  client's, correct?

2  A.   Yes.

3  Q.   Let me ask you today as you sit here under oath, did you

4  forge that signature?

5  A.   No.

6  Q.   Do you know who did?

7  A.   No.

8  Q.   So you would disagree with that particular complaint?

9  A.   Yes.  I mean, I would say at the time I was at Ameriprise

11:26AM 10  for six years, I had over 300 clients.  Each client had to sign

11  and fill out between seven, eight or nine forms each, so you're

12  talking about over 2,000 forms, and they found one where it

13  didn't match.

14  Q.   All right, sir.  So you don't take any responsibility for

15  that?

16  A.   No.

17  Q.   All right.  Sir, let me address your attention to another

18  allegation, and this particular allegation occurred or was made

19  in June of 2008.  Do you recall an allegation being made in

11:27AM 20  that time frame?

21  A.   Yes.

22  Q.   And, sir, what was that allegation?

23  A.   I recall an allegation.  I don't remember the nature.

24        MR. SINNOTT:  May I approach the witness, your Honor?

25        THE COURT:  Yes.

1   Q.   Sir, I'd ask that you read from here silently to here and

2   see if that refreshes your recollection.

3   A.   Okay, yes.

4   Q.   Does that refresh your memory?

5   A.   Yes.

6   Q.   All right, sir.  What was the allegation?

7   A.   That I did not inform a client about a deferred sales

8   charge and something about the suitability.

9   Q.   All right, sir.  And is it fair to state that the

11:28AM 10   investigators found that while the recommendations were

11   suitable, you had not fully informed the client of certain

12   fees, correct?

13   A.   Yes, that's true.  I informed them of the mutual fund fee,

14   meaning the upfront fee and the internal charge, but I did not

15   recall telling him about the back end charge, no.

16   Q.   And as a result, you paid a fee of $930.87?

17   A.   I did not pay a fee.

18   Q.   So the company paid it?

19   A.   I believe, yes.

11:29AM 20   Q.   All right.  So you left it up to the bosses to take care

21   of that?

22   A.   Yes.

23   Q.   All right.  And, sir, I'll come back to that, thank you.

24   So, sir, let me direct your attention to your direct

25   examination, and with Mr. Flynn's terrific assistance, I'd like

1    to ask you a few questions.

2         MR. SINNOTT:  And, Mr. Flynn, if we could put up

3    Exhibit 401, actually that's -- okay.  Not just yet, thank you.

4    Q.   So, sir, you testified that because Mr. Fraiman was a

5    director that he was your boss; is that correct?

6    A.   Yes.

7    Q.   And I believe you testified that to me that meant that he

8    was my boss, it was a title, correct?

9    A.   Yes.

11:30AM 10  Q.   All right.  But, sir, whenever you had anything important,

11   Mr. Laborio was the one that was consulted, either by you or by

12   Mr. Fraiman; is that correct?

13   A.   In some cases, yes, and in some, no.  I'd go to Jonathan

14   was my first contact and Ed would have been right after that.

15   Q.   And, sir, was one of the reasons why Jonathan became your

16   first contact, that you didn't like dealing with Mr. Laborio,

17   did you?

18   A.   I did not, but the main reason was is that Jonathan did

19   more of kind of what I did as far as the advisor business and

11:31AM 20  the day-to-day and was very quick about getting back with some

21   kind of an answer.  Ed would take many, many days, but it was

22   always kind of a fight.

23   Q.   But Jonathan was an investment advisor so he understood

24   and he was accessible, correct?

25   A.   Yes.

1    Q.    And he was easier to get to?

2    A.    Yes.

3    Q.    And he would return your calls, unlike Mr. Laborio who

4    would say stop bothering me?

5    A.    Yes.

6    Q.    And so as a result of your inability to communicate with

7    Mr. Laborio, and you would acknowledge that Mr. Laborio was the

8    big boss, correct?

9    A.    Yes.

11:32AM 10    Q.    You almost by default would go to Jonathan to get any

11    information you needed, correct?

12    A.    Yes.

13    Q.    And being an investment advisor like yourself in some

14    respects, he was your peer?

15    A.    Yes.

16         MR. SINNOTT:  And, your Honor, at this point I would

17    move to introduce three exhibits that have been not previously

18    marked but per consultation with the government my

19    understanding is that there's no objection, and these would be

11:32AM 20    Exhibits 401, styled as an employment agreement; 400, an e-mail

21    from Laborio to Fraiman and Lazar dated December 21st, 2008;

22    and 403, which is an e-mail from Mr. Lazar to Mr. Laborio, and

23    this one may have already been marked as a government exhibit,

24    but I would offer these at this point.

25         THE COURT:  Any objection?

1          MR. THOMADAKIS:  I'm reviewing 403, but no objection

2     to 400, 401.

3          THE COURT:  We'll admit 400 and 401 and come back to

4     403.

5          MR. SINNOTT:  Thank you, your Honor.  If I may

6     inquire.

7          (Exhibit Nos. 400 and 401 were admitted into

8     evidence.)

9     Q.   Mr. Lazar, did you sign an agreement with Envit Capital in

11:34AM 10     order to work for them?

11    A.   Yes.

12    Q.   And who did you sign that agreement with?

13    A.   I believe it was Ed.

14    Q.   All right.  And what was Ed's title?

15    A.   I believe he was CEO.

16    Q.   Okay.  CEO and chairman, does that sound familiar?

17    A.   It does.

18    Q.   All right.  And I believe you also testified that when you

19    had issues resolving around money, you would talk to Ed; is

11:34AM 20     that correct?

21    A.   Yes.

22    Q.   Because Jonathan Fraiman was not involved in your

23    compensation or how much money you should be paid, was he?

24    A.   Not as far as my contract or conversation.  I would talk

25    to Jonathan about compensation and it not showing up, but the

1    main source for that was Ed.

2    Q.   All right.  Because essentially you were commiserating or

3    complaining to Jonathan but Ed was the guy that could get

4    things done, correct?

5    A.   Yes.

6         MR. SINNOTT:  And, Mr. Flynn, if we could go to

7    Exhibit 98.  And is there another page to that?  Okay.  Thank

8    you.

9    Q.   Do you recall being asked about this exhibit during direct

11:35AM 10    examination, sir?

11    A.   Yes.

12    Q.   All right.  And reference was made to your question as

13    halfway down the page appears at the 11:40 a.m. e-mail, "Can

14    you send me anything on the hedge fund?  I've looked on some

15    third party sites and can't find it there either.  I know Evan

16    sent me something saying it did 43 percent last year but

17    nothing else."  Do you see that, sir?

18    A.   Yes.

19    Q.   Do you recall answering questions about that?

11:36AM 20    A.   Yes.

21    Q.   Now, Evan is whom, sir?

22    A.   Was Mr. Munno, my first contact there.

23    Q.   All right.  And he was no longer there when you were

24    actually hired; is that correct?

25    A.   Yes.

1  Q.   And, sir, this figure of 43 percent, do you know where

2  Munno got that figure?

3  A.   No, it was just on a document he sent me that kind of

4  talked about the company and talked about the hedge fund.

5  Q.   All right.  But you took it at face value?

6  A.   Yes.

7  Q.   And the information that Jonathan Fraiman and

8  Edward Laborio provided you during their telephone

9  conversations and e-mail, you took that at face value as well,

11:37AM 10  didn't you?

11  A.   Yes.

12  Q.   You didn't do any independent research?

13  A.   I did some research on the hedge fund as far as going to

14  third-party sites and trying to learn more.  I do some basic

15  things on P.I.P.E. as far as how it worked, but given that they

16  were both brand new to me, I took it at my boss' word as it was

17  true.

18  Q.   So, once again, whatever the bosses told you was fine?

19  A.   Yes.

11:37AM 20  Q.   And you don't know where Mr. Fraiman got the information

21  that he presented, do you?

22  A.   No.

23  Q.   So he may have been taking his boss' word at face value?

24  A.   He may have.  I could only tell you what I heard from

25  Jonathan, but I have no idea what Ed told him.

1   Q.   All right.  Thank you, sir.

2        MR. SINNOTT:  If we could go to the first page, Dan.

3   Q.   Sir, let me direct your attention to your message

4   beginning in the middle of the page where you write directly to

5   Mr. Laborio on September 26th, and you ask him about hedge

6   funds, and you've got some basic questions:  "What's your

7   performance?  When did the fund start?  Fees, minimum holding

8   period," and then you ask if you can talk to his assistant and

9   get some info, and you admit that you have no idea what the

11:39AM 10   P.I.P.E. is.  "Can you explain when you get a second?"

11        And, sir, the response --

12        MR. SINNOTT:  If we could go up to the top of the

13   page, Mr. Flynn.

14   Q.   -- it's not a very cordial one, is it?

15   A.   No.

16   Q.   Mr. Laborio says, "For the last time, I only want you to

17   concentrate on your accounts.  I have $50,000 sitting on my

18   desk, a far cry from 21 million.  Don't make this a problem for

19   me.  I won't say it again, just concentrate on your accounts."

11:39AM 20   What's he referring to with respect to the $21 million?

21   A.   $21 million was my book of business I was trying to move.

22   Q.   All right.  And you had in an attempt to get hired by

23   Laborio tauted that book of business as being potentially

24   lucrative for Laborio as well, hadn't you?

25   A.   I don't know.  I'm trying to think of what you're -- I

1   don't know.

2   Q.   Well, he didn't come up with that $21 million figure, did

3   he?

4   A.   No, that came from when you're being sought after by a

5   firm, they'll try to find out what assets you have from your

6   clients that can be moved so they can kind of guess what will

7   come over.

8   Q.   Well, in effect, it was something you talked about with

9   Laborio, isn't it?

11:40AM 10  A.   Yes.

11  Q.   Because you knew that that was something that might get

12  you hired by this upstart, up and coming company, correct?

13  A.   Yes.

14  Q.   And, sir, you were asked about --

15       MR. SINNOTT:   You can take that off now, Mr. Flynn,

16  thank you.

17  Q.   You were asked about whether you told your clients as you

18  were pitching P.I.P.E. that you stood to get a percentage from

19  this, correct?

11:41AM 20  A.   Yes.

21  Q.   And you indicated that you did not?

22  A.   Not to all of them, no.

23  Q.   Well, you told some of them at this time frame,

24  September and October of 2008 that you were going to get 65

25  percent?

A.   I told when they asked about client management fees and
the percent that I would get from that, I believe I told a few
of them, but mainly when I got questions about compensation, I
think it was around P.I.P.E., not on the asset side.

Q.   Is it fair to say that if somebody didn't ask you, you
didn't tell them?

A.   Yes.

Q.   And you would admit that that's a violation of your
fiduciary duty?

A.   Yes.

Q.   You would admit that that's a conflict of interest?

A.   Yes.

         MR. SINNOTT:  And, Mr. Flynn, if we could go to
Exhibit 101.

Q.   And this is an October 14th, looking at the center of the
page, October 14th, 2008 e-mail that you sent to Laborio,
correct, sir?

A.   Yes.

Q.   And, again, here you're looking for an explanation of the
P.I.P.E., correct?

A.   Yes.

Q.   And you told him that you've targeted eight clients to get
$500,000 in ASAP, correct?

A.   Yes.

Q.   And eventually you did get $500,000 in, didn't you?

1   A.   I believe so.

2   Q.   And every penny of that $500,000 was lost, correct?

3   A.   Yes.

4   Q.   But you never told your clients, at least unless they

5   asked, that you were supposed to be getting a share and a

6   substantial share of the money that was invested, did you?

7   A.   I did not tell them I was supposed to get four to five

8   points off of what they put in, no.

9        MR. SINNOTT:  And if we could go to the upper message,

11:43AM 10   Dan.

11   Q.   And you see here the response from Laborio is pretty

12   terse, isn't it?

13   A.   Yes.

14   Q.   It's pretty concise, isn't it?

15   A.   Yes.

16   Q.   It's almost dismissive; would you agree with me?

17   A.   Yes.

18   Q.   He says, "That's basically it, call Jon today.  He will

19   give you the pitch and also help you with getting that money

11:43AM 20   in," correct?

21   A.   Yes.

22   Q.   And Jon did send you the pitch, didn't he?

23   A.   Yes.

24   Q.   But you don't know who composed that pitch, do you?

25   A.   No.

1    Q.   You don't know where the information that went into that

2    pitch came from, do you?

3    A.   No.

4         MR. SINNOTT:  And, Mr. Flynn, if you could go to

5    Exhibit 108, please, and if you could blow up the upper

6    message.  Thank you.

7    Q.   So you were asked about this on direct examination, sir.

8    Do you recall?

9    A.   Yes.

11:44AM 10    Q.   And this is a message dated November 11th of 2008.

11        MR. SINNOTT:  And, I'm sorry, Dan, if you could go to

12   the brief message right below that.

13   Q.   You ask Fraiman, "Is the subscription document the file

14   you named P.I.P.E. subs?  If so, I still owe you that risk

15   tolerance form, client profile and A1 custody agreement for

16   Zelinski, and all of that plus the A1 letter of instruction for

17   Bowen?"

18   A.   Yes.

19   Q.   And Fraiman responds as follows:  "The risk tolerance and

11:45AM 20   client profile are for compliance.  You don't need them right

21   now.  Make sure you send them to your clients and have them

22   send them back."  And I believe you testified that you were

23   somewhat worried that you saw this was a red flag because you

24   had come from a world where bosses would do the compliance,

25   correct?

1    A.   Yes.

2    Q.   Wasn't watching out for your clients your responsibility?

3    A.   Yes.

4    Q.   And you would agree with me that you failed your clients

5    in this case?

6    A.   As far as P.I.P.E., yeah, I failed them huge.

7    Q.   Huge.  You didn't even read the offering, did you?

8    A.   No, but, I mean, there was so much that was in there that

9    wasn't true, I'm not sure what reading would have done, but I

11:46AM 10   definitely should have read it.

11   Q.   So that's your rationalization, sir?

12   A.   No, P.I.P.E. was -- P.I.P.E. as far as my clients go was

13   my fault.

14   Q.   It was your fault, but reading the offering which made it

15   very clear that there was no guaranteed dividend would not have

16   been a productive exercise; is that your testimony?

17   A.   I'm saying it may have been, but what I've always done as

18   far as training, what you're always taught is when your boss

19   says something, that is true, don't waste time looking at

11:47AM 20   research or anything else, have meetings with clients, call new

21   clients, and that's how I was raised.

22        My parents were, you know, when your elder tells you

23   something, it is true, and that transferred to my teachers and

24   my bosses, so at my previous firm when a wholesaler would come

25   in or your boss come in and said this is how this works, you

1    just thought that's how it worked.

2    Q.    So you didn't have any independent responsibility?

3    A.    I didn't have any independent responsibility, no, what I

4    would say is I did, and I should have read the forms.

5    Q.    Now, all that training that you talked about that you had

6    received, did any of it ever say don't bother reading the

7    offerings, don't bother reading the placement memorandums, none

8    of that stuff really matters, they never said that to you, did

9    they?

11:48AM 10    A.    No.

11    Q.    In fact, they said read every word of that, didn't they?

12    A.    They being?

13    Q.    The trainers.

14    A.    Which trainers?  Who?

15    Q.    You talked about the extensive training that you received

16    in previous employments, correct?

17    A.    Yes.

18    Q.    You're a well-trained financial advisor, aren't you?

19    A.    I was well trained in the areas from my previous firm,

11:48AM 20    very basic things from mutual funds and things of that nature,

21    not put into P.I.P.E.

22    Q.    That's the firm you were fired from?

23    A.    Yes.

24    Q.    Ameriprise?

25    A.    Yes.

1    Q.   And aside from P.I.P.E., I mean, there were documents

2    around which every investment is based, aren't there?

3    A.   Yes.

4    Q.   I mean, it's not just people calling up on the phone and

5    saying send money in, there's a document that's sent to those

6    folks that outlines their responsibilities, correct?

7    A.   I believe so, yes.

8    Q.   And as a financial professional, it's your obligation to

9    read those documents so that you can intelligently advise your

11:49AM 10    clients, isn't it?

11   A.   I would -- yes.

12   Q.   And not reading those documents is really bad, isn't it?

13   A.   Yes.

14   Q.   It's really something that is not tolerable in the

15   business, correct?

16   A.   I would say no, I'd say if you look at the documents that

17   are sent to clients for a mutual fund or things of that nature,

18   most of the advisors I worked with and talked to didn't read

19   them.  Most of the clients that got them didn't read them, so I

11:49AM 20   can't talk about the level of --

21   Q.   Sir, do you take responsibility for anything that goes

22   wrong?

23            MR. THOMADAKIS:  Objection.

24            THE COURT:  Sustained.

25   Q.   Sir, are you testifying that you shouldn't have read the

1   documents because nobody reads them?

2   A.   No, I clearly --

3        MR. THOMADAKIS:  Objection.

4        THE COURT:  I'll allow that.

5   A.   I clearly just said that I should have and I didn't and I

6   failed.

7   Q.   But then you rationalized, didn't you, you said that where

8   I had worked before, nobody read those things, correct?

9   A.   I explained based on my previous work history why I did

11:50AM 10   the things that I did.

11  Q.   So even though you said I should have done it, you had to

12  give us a qualifier as to really I shouldn't have; is that what

13  you're saying?

14       MR. THOMADAKIS:  Objection.  Argumentative.

15       THE COURT:  Well, it is, but I'll allow it.  Go ahead.

16  A.   Can you say that again, I'm sorry.

17  Q.   Even though you told us that you should have read it, you

18  then went on to say but nobody reads it so really what you're

19  telling us is that you shouldn't have read it, correct?

11:50AM 20  A.   No, I'm saying I should have read it and I did not.

21  Q.   All right.

22       MR. SINNOTT:  Mr. Flynn, if you could put up

23  Exhibit 112 and the next page, please.  First page then, thank

24  you.

25  Q.   So, sir, directing your attention to your e-mail to

1  Jonathan Fraiman on December 1st, you tell him that there are

2  $300,000 more are on the way, correct?

3  A.   Yes.

4  Q.   So the red flags that you now claim that you felt in

5  October and November of 2008 didn't stop you from sending more

6  of your clients' money to the P.I.P.E., did it?

7  A.   No.  I mean, there were definitely some red flags.  I

8  didn't know what all of them meant yet.

9  Q.   And in that paragraph that you're responding to, that,

11:52AM 10  "Hi, Matt," was that from Jonathan Fraiman?

11  A.   No.

12  Q.   All right.  Is that from you?

13  A.   No, I believe it's a copy and paste from Judy Henkel.

14  Q.   So Judy Henkel had said, "Good news today.  I got put back

15  on part-time basis here at work.  First of all, I will move all

16  of my 401k monies to you, and, second, I want a full time job,"

17  correct?

18  A.   Yes.

19  Q.   So Ms. Henkel was going back to work, she was putting her

11:52AM 20  savings in your custody, in your hands, and you didn't even

21  think it was appropriate to read the offering?

22  A.   No.

23        MR. SINNOTT:  And, Mr. Flynn, Exhibit 113, please.

24  Q.   And, sir, if I could direct your attention to the next

25  page.  I'm sorry, go back.  Sir, I believe you testified that

1    the message at the top was actually from Ed; is that correct?

2    A.    In the purple, at the very top?

3    Q.    Yes, sir.

4    A.    It says from Jonathan Fraiman so I don't know if I

5    testified that this was from Ed.

6    Q.    You don't recall an exchange with Mr. Thomadakis that

7    notwithstanding the signature, you felt that this was a message

8    from Ed?

9         MR. THOMADAKIS:  Objection.  It mischaracterizes the

11:54AM 10    exchange.  The reference was to the bottom e-mail on that page.

11         THE COURT:  I think that was my memory, but let's --

12         MR. SINNOTT:  I'll withdraw it, thank you, your Honor.

13    Your Honor at this time -- strike that.

14    Q.    Sir, you were asked a series of questions about the time

15    period in December and January of -- December of 2008 and

16    January of 2009, and I believe you testified that you were

17    starting to feel some red flags; is that correct, sir?

18    A.    Yes.

19    Q.    And one of these occurred in early January after you spoke

11:55AM 20    with an individual named Bateman; is that correct?

21    A.    Yes.

22    Q.    And Mr. Bateman was a client, correct?

23    A.    Yes.

24    Q.    And the client was the one that pointed out to you the

25    fact that there was no guaranteed dividend in this --

1   A.   Yes.

2   Q.   -- offering memorandum?  That's when you finally read the

3   memo, correct?

4   A.   Yes.

5   Q.   And you were embarrassed?

6   A.   Yeah.

7   Q.   You were scared?

8   A.   Yes.

9   Q.   You knew you had really screwed up, hadn't you?

11:56AM 10   A.   Yes.

11   Q.   But, sir, that was pretty much your practice, wasn't it,

12   that you didn't read these things?

13   A.   These things, meaning the P.I.P.E. sub docs., no, I

14   didn't.

15   Q.   Or other offering memoranda?

16   A.   It's the only one I believe I've ever used or seen.

17   Q.   In your entire career?

18   A.   For an offering memo for a P.I.P.E., yes.

19   Q.   I didn't say for a P.I.P.E., I said for any kind of

11:56AM 20   investment.

21   A.   Yes, those are things that I have not read.

22   Q.   And, sir --

23        MR. SINNOTT:  Dan, if you could put on Exhibit 120.

24   Q.   Do you recall this e-mail wherein you had asked --

25        MR. SINNOTT:  Next page, please, Dan.

1  Q.   You had asked Fraiman that you needed ASAP five pieces of

2  information; is that correct, sir?

3  A.   Yes.

4  Q.   And if we could go to the previous page, Dan.  And this

5  was after Mr. Bateman had read this offering, wasn't it?

6  A.   Yes, it was the following day.

7  Q.   And one of the things you asked is about the guaranteed

8  side of things, correct?

9  A.   Yes.

11:57AM 10  Q.   And Fraiman says to you, "Only death and taxes are

11  guaranteed, we do anticipate paying a dividend shortly,"

12  correct?

13  A.   Yes.

14  Q.   And you indicated that you left the company because of

15  what was going on with the P.I.P.E., correct?

16  A.   That was part of it, yes.

17  Q.   Right.  And other parts of it were the fact that you

18  weren't making the money that you thought you were going to

19  make, were you?

11:58AM 20  A.   No, I'd say it was lower than what I was used to, but it

21  didn't cause any problems with my budget or bills or anything

22  else.

23  Q.   Well, at some point, sir, you told your customers that you

24  were going to foot the bill for legal services, correct, to try

25  to get to the bottom of the P.I.P.E. issue?

1    A.   I believe so, yes.

2    Q.   But, sir, really you hired a lawyer to try to get your

3    money from Laborio, didn't you?

4    A.   That was part of it because when we had a conference call

5    with the attorney, they had said to contact the SEC in Boston,

6    so my logic was the SEC in Boston will handle getting client

7    money back, and I'll have to handle trying to get my own

8    compensation back.

9    Q.   And it was the same lawyer?

11:59AM 10   A.   The same lawyer for?

11   Q.   Doing both tasks?

12   A.   I had a handful of different lawyers.  I don't recall.

13   The initial lawyer I talked to I believe was a referral from a

14   client that we had a conference call with to talk about what to

15   do about P.I.P.E.  I did not hire that one for my own reasons

16   to go after Ed.

17   Q.   Well, is it fair to state that after January 20th when

18   your testimony is that during President Obama's Inauguration

19   you decided to leave the company --

12:00PM 20       MR. THOMADAKIS:  Objection.  I don't remember anything

21   about President Obama.

22       THE COURT:  I don't think he testified about that, so

23   why don't you rephrase.

24       MR. SINNOTT:  Sure.

25   Q.   What was the date that you decided to leave the company?

1    A.    On January 20th, 2009.

2    Q.    All right.  Was there something significant about that

3    date for you?

4    A.    Obama's first day in office.

5    Q.    All right, sir.  And after that January 20th date, you and

6    Mr. Laborio really got into it over money, didn't you?

7    A.    Yes.

8    Q.    And you hired a lawyer in order to go after him for money,

9    didn't you?

12:00PM 10    A.    Yes.

11   Q.    And is it fair to say that you reported to that lawyer

12   that for those four months of working for Envit, you were owed

13   over $84,000?

14   A.    I don't recall the total, but that could be right.

15   Q.    All right.  So that was a lot of money, wasn't it?

16   A.    Yeah.

17   Q.    All right.  So, had you worked for Envit for an entire

18   year, you were talking about a quarter of a million dollars or

19   thereabouts, correct?

12:01PM 20         MR. THOMADAKIS:  Objection.  It calls for speculation,

21   but it would depend on a lot of factors.

22         THE COURT:  I'll let the witness answer that.

23   Overruled.

24   A.    Say it again, please, I'm sorry.

25   Q.    Sure, if that $84,000 figure is accurate for that

1    four-month period, and you were to extend that over the course

2    of the year, was your expectation that you'd be making a

3    quarter of a million dollars a year?

4    A.   No, because so much of that money, the 80,000 was tied to

5    a lot of things that would have happened in the first 90 days

6    as far as bringing over money and assets and everything else,

7    so, no, I did not.

8    Q.   All right.

9              THE COURT:  Whatever is a good place to break.

12:02PM 10          MR. SINNOTT:  Whatever is good for the Court because

11   I've still got some time to go.

12              THE CLERK:  All rise.

13              (JURORS EXITED THE COURTROOM.)

14              (A recess was taken.)

15              THE CLERK:  All rise for the jury.

16              (JURORS ENTERED THE COURTROOM.)

17              THE COURT:  Ladies and gentlemen, a couple questions

18   were passed onto the security officers that I think I can

19   answer.  As I understand it, one of the questions was:  "Who

12:15PM 20   are the people in the back of the courtroom?"

21              Courts are public proceedings.  They're open to the

22   public with very rare expectations.  I don't know who all of

23   the people are or who even the great majority of them are, but

24   typically they would include, for instance, people from

25   Mr. Sinnott's office, people from the U.S. Attorney's Office

1   coming in to watch, case agents who have worked on the case or

2   people from the SEC or the FBI, members of Mr. Fraiman's family

3   or friends, lawyers for the witnesses, just people who want to

4   watch part of a trial sometimes.

5           We don't identify them.  The one group of people, and

6   this ties into the second question, that we don't allow are

7   witnesses typically.  They are sequestered.  They have to sit

8   on those hard wooden benches outside and wait to be called, the

9   idea being that if the witnesses all hear each other's

12:16PM 10  testimony, they'll start to coordinate the story a little bit.

11  I hope that answers the question.

12          Yes, Mr. Thomadakis.

13          MR. THOMADAKIS:  On that note, could the Court note

14  that there is an exemption for one particular witness, a

15  summary witness.

16          THE COURT:  Yes.  Thank you.  We do allow sometimes

17  with Court approval, certain kinds of witnesses actually need

18  to hear the testimony.  They're normally an expert or a summary

19  witness or someone who is sometimes summarizing what the

12:17PM 20  evidence is.  I think there's one such person.

21          All right.  Mr. Sinnott.

22          MR. SINNOTT:  Thank you, your Honor.

23  Q.   Now, sir, I believe when we broke, I was questioning you

24  on why you left Envit, and we had talked about January 20th as

25  being the day that you say you decided to leave, and my

1    Brother, Mr. Thomadakis, had asked you some questions about

2    your reasons for leaving, why did you leave, and I believe you

3    said something like with all the red flags concerning the

4    P.I.P.E. and what was happening with it, I thought it was time

5    to go, and then he asked you were there other reasons, and you

6    said your compensation.  You mentioned that Laborio wouldn't

7    have your checks to you at times, he had changed your contract.

8    That was important, wasn't it?

9    A.    It was part of it, yes.

12:18PM 10    Q.    It was a priority for you, wasn't it?

11    A.    The priority was P.I.P.E., P.I.P.E. and finding out about

12    it was the reason and the timing of why I left.

13    Q.    And I believe you --

14         MR. SINNOTT:  If we could see Exhibit 122, Mr. Flynn.

15    Q.    Approximately two weeks later on February 3rd -- strike

16    that.  On February 2nd, you received an e-mail from Connie, and

17    who is Connie, sir?

18    A.    Connie Hess was a client of mine.

19    Q.    And Ms. Hess says, "What in the world happened?  I

12:18PM 20    received an e-mail from Brenda Zelinski telling some of us you

21    had left.  I was kind of shocked and a little sick to my

22    stomach.  I received a call from Jonathan Fraiman who is trying

23    to persuade me to stay with Envit Capital.  I need to know

24    what's going on."

25         MR. SINNOTT:  If we can go to the message above it.

1    Q.   You respond, "Okay, where to start.  Everything was going

2    fine with Envit until the calendar crossed into 2009,

3    everything from being lied to, information about an investment

4    to clients being completely false, having my personal pay cut

5    in half with knowledge, et cetera."

6         "The good news is that I caught on and resigned

7    immediately, and the fact that I was comfortable going with

8    Envit in the first place was they used Charles Schwab as a

9    clearinghouse.  It gave me the piece of mind that if anything

12:19PM 10   happened to Envit, my clients' accounts were safe at Schwab."

11        Did you ever tell Connie that you never read the

12   offering?

13   A.   No, I don't think Connie was part of the P.I.P.E.

14   Q.   All right.  Well, she wanted to know what happened, but

15   whether she was part of the P.I.P.E. or not, in telling her

16   what happened, you neglected to tell her that you hadn't read

17   the offering; is that correct?

18   A.   Yes, it is.

19   Q.   But you do ascribe the problems to a number of things,

12:20PM 20   including your pay cut, correct?

21   A.   Yes.

22   Q.   That was important to you?

23   A.   It was a factor.

24        MR. SINNOTT:  And, Mr. Flynn, if we could go to

25   Exhibit 130.

1    Q.    And directing your attention to the e-mail at the top, you

2    are responding to Ms. Henkel, and you respond, "Got it, and you

3    will be on the call."

4          MR. SINNOTT:  I'm sorry, Mr. Flynn let's go to the

5    lower message just for full context.

6    Q.    Ms. Henkel sent you a message saying she knows how badly

7    you feel, "The relationships are so very personal, most of our

8    families don't know as much about us and our future plans as

9    our money advisors."  At this point, had you told Ms. Henkel

12:21PM 10   that you never read the offering?

11   A.    No.

12   Q.    So, you allowed her to talk about, sympathizing with how

13   badly you felt, and did you feel guilty at all about the fact

14   that you were keeping this to yourself?

15   A.    I felt guilty that my clients went to Envit and lost money

16   to the P.I.P.E.  I didn't not feel guilty that I didn't tell

17   her I didn't read the form, no.

18         MR. SINNOTT:  And could we go to the upper message,

19   Mr. Flynn.

12:22PM 20   Q.    So you talk about your strategy, "You'll be on the call,

21   we have to send this formal letter to Ed on Friday, give him

22   the weekend to do the right thing and agree to return all the

23   money, and then if he chooses insanity and does not, we will

24   coordinate a conference call with everyone's schedule on

25   Monday."

1        "One of the reasons I feel bad is this whole thing

2  reflects poorly on me.  I know all my clients will come with me

3  to my new firm because they have loved the results and service

4  I have given, but I know in the back of their mind, every time

5  I recommend something, this will be in their head despite

6  consistent reassurances from clients that I did the right thing

7  and was the one in the white hat the whole time, it just kills

8  me to be you all through this mess."

9        It must have been terrible to bear that burden?

12:22PM 10        MR. THOMADAKIS:  Objection.

11        THE COURT:  I'm sorry, the last part, "it must have

12  been terrible"?

13        MR. SINNOTT:  Yes, your Honor, that was my question.

14  I'll allow it, go ahead.  Go ahead.

15  A.   I'm sorry, can you say that again?

16  Q.   Sure.  In this e-mail, you talk about why you feel bad,

17  and apparently none of the things that you talk about

18  that -- strike that.

19        My question was you talk about how this reflects

12:23PM 20  poorly on you and how your clients, "even though they've loved

21  the results and the service you've given, in the back of their

22  mind, they'll question what you're recommending despite

23  consistent reassurance from clients that I did the right thing

24  and was the one in the white hat the whole time, it just kills

25  me to be you all through this mess?"

1  A.    It might have been "to put you all through this mess," I

2  don't know.

3  Q.    Did you really think that you were a victim in this?

4  A.    In terms of -- in terms of P.I.P.E., yes.

5  Q.    Did you really feel like you were wearing a white hat in

6  this whole tragedy?

7  A.    I don't recall what that refers to or what the saying is,

8  so I have no idea.

9  Q.    And when you wrote, "despite consistent reassurances from

12:24PM 10  clients that I did the right thing," did any of those clients

11  that were giving you these reassurances know that you hadn't

12  performed the most basic of fiduciary duties?

13  A.    I would say I have no idea if they know or knew that I

14  read the documents or not, but when I talked to them and told

15  them what went on, they didn't blame me, and most of them moved

16  with me to my new firm.

17  Q.    Well, let's talk about that.

18  A.    Okay.

19  Q.    Because in this very same e-mail, you say, "I know all my

12:25PM 20  clients will come with me to my new firm because they have

21  loved the results and service I have given."  Do you see that,

22  sir?

23  A.    Yes.

24  Q.    Was one of the reasons why you didn't tell them how you

25  had let them down, how you had violated the most basic of

1  fiduciary duties in not reading the offering was because you

2  wanted them to come to your new firm?

3  A.   No, I would say at this time I had left the company for

4  eight days, and I didn't know what I had done right or wrong.

5  Q.   You didn't know what you had done right or wrong?

6  A.   I knew that I did not read the memo, and I should have,

7  and I should have told my clients that, but as far as doing

8  what was best for my clients and giving them good service and

9  results, I think I did a very good job of that for the most

12:26PM 10  part.

11  Q.   You think you did a good job?

12  A.   For most of my clients, yes; for clients in P.I.P.E., no.

13  Q.   And so the fact of the matter is even at this point, eight

14  days after you had left Envit, you're thinking about keeping

15  these clients, correct?

16  A.   Yeah, I mean, these were my clients.  There were a lot of

17  friends, there were a lot of family, and they felt like family

18  to me.

19  Q.   And they had a lot of money, too, didn't they?

12:26PM 20  A.   Some of them did.  I mean, I had clients that had a

21  handful that had a million dollars, I had clients that had

22  $2,000.  It varied a lot.

23  Q.   Well, sir, you testified after that was shown on direct,

24  that particular exhibit, that "At some point I contacted the

25  SEC in 2009."  When did you contact the SEC?

1    A.    I don't recall the date.  It was the summer of '09.

2    Q.    You waited until the summer of '09 to contact the SEC?

3    A.    Yes, because when I dealt with my clients, we had a

4    conference call to talk about what we should do.  I didn't know

5    what should happen next, I had no idea, so we took the time to

6    all meet, talk to attorneys, and then they had said to contact

7    the SEC, and we did.

8    Q.    Sir, isn't it true that over the next several weeks your

9    clients were very upset?

12:27PM 10    A.    Over the next several weeks from here?

11    Q.    Yes, sir.

12    A.    Yes.

13    Q.    Isn't it true that some of your clients accused you of

14    lying to them?

15    A.    One did.

16    Q.    And isn't it true, sir, that you told those clients that

17    you would be the one to go to the SEC through a lawyer, didn't

18    you?

19    A.    I believe so, yes.

12:28PM 20    Q.    And, sir, isn't that because you didn't want your clients

21    going to the SEC because that would have put you in hot water,

22    wouldn't it?

23    A.    No, the entire intent of calling the SEC was to get their

24    money back from P.I.P.E. because if I contacted the SEC, I knew

25    that I would be involved and have to turn over e-mails and

1  testify, and I did all of that, but the main focus was to get

2  back their P.I.P.E. money.

3  Q.   And waiting until the summer of 2009 would make it more

4  likely that these clients could get their money back, correct?

5  A.   I have no clue on the timing.  What I can tell you, we

6  contacted the SEC after we were advised by an attorney to call

7  them.

8  Q.   And meanwhile your clients were out half a million

9  dollars, correct?

12:29PM 10  A.   Yes.

11  Q.   Did they get any of their money back?

12  A.   Not to my knowledge, no.

13       MR. SINNOTT:  Your Honor, I'd direct the Court's

14  attention -- thank you, Dan.  If I could have the Elmo, Madam

15  Clerk, to what has been admitted as Exhibit 400.

16  Q.   Sir, do you recall an e-mail exchange involving you,

17  Mr. Fraiman and Edward Laborio beginning on Friday,

18  December 19th?  Do you see that message, sir?

19  A.   I see part of it.  It's too big for the screen.  There you

12:30PM 20  go.  Yes.

21  Q.   And this is originally a message, as you can see from

22  Mr. Fraiman to Laborio where he says, "I sent this to you three

23  times today and this week and thought it would be in my account

24  before I leave tomorrow.  Ed, please get back to me and tell me

25  what's going on."  This, by all appearances, would be

1    Mr. Fraiman pleading with Mr. Laborio to respond to him,

2    correct?

3    A.    Yes.

4    Q.    And that's something that you could relate to, correct?

5    A.    Yes.

6    Q.    And, sir, the message, the response the following or two

7    days later from Mr. Laborio is very direct, isn't it?

8    A.    Yes.

9    Q.    "We need to all have a call on Monday because I can -- "

12:31PM 10    and I would assume he meant can't "-- put up with this anymore,

11    period.  We just hired 50 brokers in Boca, and I spend more

12    time with you two talking about paychecks and account mistakes

13    than I do putting together a publicly-traded company."  And

14    when he refers to you two, who did you interpret that to mean?

15    A.    Myself and Jonathan Fraiman.

16    Q.    Then he goes on to say, I feel like I'm baby-sitting you

17    two all day.  What's going to happen when I give you the two

18    books, Jon?  I don't even want to think about it.  I really

19    don't think either of you can manage a large book.  You two are

12:31PM 20    so f'n confused with a minimal amount of assets.  We have a set

21    pay day for bonuses like every other financial firm in the

22    world.  It's not pay as you go or pay when Jon's going on

23    vacation or when Matt's rent is due or when Matt has to pay

24    back his parents for money he borrowed.  Are you guys kidding

25    me because if you guys can't control yourself moving forward, I

1    am going to lose it.  I have 50 guys down here that do more

2    gross in a month than you guys do in a year combined.  I'm not

3    going to put up with it anymore.  I need you two to stop acting

4    like this is a bucket shop.  The company is getting very big

5    and quickly, and you two make more mistakes than anyone I have

6    ever seen before and ask for the craziest stuff.  I am in

7    negotiations all day with companies to buy major assets, and

8    I'm getting e-mails about can you send me certs for my parents

9    because I owe them money from my wedding or I have sent you

12:32PM 10   three e-mails about me getting paid on one day, and I shouldn't

11   get paid, or we lost a $128,000 wire.  It's downright childish,

12   and I won't put up with it anymore.  I need professionals,

13   bottom line."

14        "I will get you paid tomorrow, but moving forward,

15   it's the 15th from the preceding month's gross, like every

16   other firm on the street.  Write it down on your hand if you

17   can't remember it, and, Matt, if you want more money, make it,

18   stop asking for a handout."

19        How did you feel when you got this message, sir?

12:33PM 20   A.   It was just Ed being Ed.

21   Q.   Nasty?

22   A.   Yeah.

23   Q.   Condescending?

24   A.   Yeah.

25   Q.   How do you think Mr. Fraiman felt when he got this

1    message?

2         MR. THOMADAKIS:  Objection.

3         THE COURT:  Sustained.

4    Q.   Now, sir, my Brother asked you about your experience with

5    the SEC.  Do you recall that, sir?

6    A.   Yes.

7    Q.   And, first of all, you said that you were in contact --

8    strike that.  A moment ago you said some time in the summer of

9    '09, you contacted the SEC; is that right?

12:34PM 10    A.   Yes.

11         MR. SINNOTT:  And, Mr. Flynn, if we could put up

12    Exhibit 127.

13    Q.   And, sir, directing your attention to this message, this

14    is from you to your group, correct?

15    A.   Yes, to my -- yes, P.I.P.E.

16    Q.   These are your clients at the new group, are they not, at

17    Ebner?

18    A.   I don't know if they had all come over.  I know some of

19    them did not and some of them did later, but May 26th of '09,

12:35PM 20    I'm not sure who were current clients.

21    Q.   But you wanted them to come over to your business, didn't

22    you?

23    A.   Yeah, sure.

24    Q.   And, sir, in this message, you referenced the fact that

25    Envit canceled the conference call, you tried to light a fire

1    under Ed's butt to either make these things tradable or return

2    your money as soon as possible.  You still thought it was

3    salvageable, didn't you?

4    A.   I had hoped it was, yeah.

5    Q.   Even though you had been a broker for approximately six

6    years at this point you still thought Envit was a legitimate

7    offering, didn't you?

8    A.   No.  My concern was I wanted to get all of my client put

9    into P.I.P.E money back.  I felt like there was something wrong

12:35PM 10   going at Envit.  I wasn't sure what but we contacted the SEC

11   and I don't know.

12   Q.   Well, sir, this is five months after you quit Envit after

13   all these red flags that you supposedly felt.  And you still

14   thought that you could make these things tradable or get their

15   money returned; is that right?

16   A.   I thought based on what my clients were hearing from Ed

17   that it was possible.

18   Q.   All right.  So, based on how you saw Envit, it was

19   possible, correct?

12:36PM 20        MR. THOMADAKIS:  Objection.

21   A.   What was possible?

22        THE COURT:  I'll let it stand, go ahead.

23   Q.   That their clients would be able to get their money back?

24   A.   Yes.

25   Q.   And or that their shares could be traded?

1    A.    Hopefully, yes.

2    Q.    And then you go on to say, "After that, I contacted SEC

3    Boston Office with the goal to light a fire under Ed's butt."

4    Had you actually contacted the SEC at this point?

5    A.    I believe so, yes.  We contacted them after meeting with

6    the attorneys, and I got -- I ended up having to leave a couple

7    voice mails and got forwarded to somebody who then left for the

8    D.C. office but, yeah, I think this was the time frame.

9    Q.    So your answer is you don't know?

12:37PM 10         MR. THOMADAKIS:  Objection.

11         THE COURT:  Overruled.  Let him answer.

12    A.    I don't know the exact date that I called them, no.

13         MR. SINNOTT:  And, Mr. Flynn, if we could go to

14    Exhibit 135.

15    Q.    Sir, this is an exchange, is it not, between yourself and

16    Judy Henkel?

17    A.    Yes.

18    Q.    And in your message in the second half of this, you

19    indicate, "I'm doing everything I can, including paying the

12:38PM 20    entire legal bill to fight this and contacting the SEC."  Now,

21    when you say contacting the SEC, was this still aspirational,

22    or had you actually spoken to somebody at the SEC?

23         MR. THOMADAKIS:  Objection.  Mischaracterizes the

24    previous testimony as to "still aspirational."

25         THE COURT:  All right, fair enough, rephrase.

1   Q.   Had you actually contacted the SEC at this point, sir?

2   A.   I don't know.  I may have.  I couldn't tell you the exact

3   date from six years ago that I contacted them off the top of my

4   head, no.

5   Q.   And, sir, with respect to the SEC, were you charged at

6   some point?

7   A.   Yes.

8   Q.   And you were charged, I believe Mr. Thomadakis brought

9   out, in a civil matter?

12:39PM 10   A.   Yes.

11   Q.   Who else was charged in the same case?

12   A.   I don't know.

13   Q.   You don't know?

14   A.   I know that I was charged.  I don't know who else was

15   charged.  I don't know if -- I don't know.

16   Q.   Did you ever read the caption in the documents charging

17   you?

18   A.   I did when I got them.  I haven't read them since.

19   Q.   Would it refresh your memory if I were to tell you that it

12:39PM 20   was Edward Laborio and Jonathan Fraiman?

21   A.   Yes.

22   Q.   But you didn't remember that?

23   A.   Off the top of my head from a document, no, I didn't.

24   Q.   And, sir when you say that -- strike that.  What did you

25   admit to with the SEC?

1          MR. THOMADAKIS:  Objection.  Can we approach?

2          THE COURT:  All right.

3          (THE FOLLOWING OCCURRED AT SIDEBAR:)

4          MR. THOMADAKIS:  Your Honor, the government's

5     objection is, obviously, it was brought out, the fact that he

6     was charged by the SEC.  Mr. Sinnott has done that.  Now we're

7     getting into what the result of that proceeding was, which is,

8     again, something that from our view is irrelevant and on a

9     collateral matter which will, especially as to the Defendant

12:40PM 10  Jonathan Fraiman, which will default into a mini trial and a

11    side show and objection under Rule 403.

12         THE COURT:  Well, let's take it a step at a time.  I

13    mean, he's asking him to admit to certain things.  I assume

14    that he admitted to something.  What did he admit to?

15         MR. SINNOTT:  He admitted that he had participated

16    with the defendants, that he had not read his documents, and

17    that he had violated security laws.

18         MR. THOMADAKIS:  If anything, it's cumulative of what

19    he said.  I mean, he admitted to not reading the documents, and

12:41PM 20  that's what he was charged with.

21         THE COURT:  Well, you know, if it's a formal

22    admission, it's I think a Rule --

23         MR. THOMADAKIS:  Where are we getting this from?  What

24    are you going to ask him about, a SEC press release?

25         MR. SINNOTT:  No, I'm just looking at my information

1    to see if there was anything else, but I think those were the

2    two items that I intended to bring out, but I do intend to ask

3    him --

4            THE COURT:  Well, let's finish this topic first.

5            MR. THOMADAKIS:  The securities law issue, I mean, if

6    he violated the security laws, that could be a number of

7    things, obviously, securities fraud, it could be --

8            THE COURT:  All right.  But it's not like a prior bad

9    act, it relates to this actual act, and so I think he's

12:41PM 10    admitting wrongdoing, and I think that's fair.  I mean,

11    arguably it cuts both ways.  If your boss is a criminal and

12    your underling is a criminal, but, you know, it's Mr. Sinnott's

13    strategic decision, and I think admissions to securities

14    violations in this exact matter are okay.

15            I don't think he can comment on what happened or

16    didn't happen with Mr. Fraiman.  I think that's out of bounds.

17    What else were you going to ask him?

18            MR. SINNOTT:  I was going to ask him what the judgment

19    was, what the penalty was.

12:42PM 20            MR. THOMADAKIS:  That we object to.

21            MR. SINNOTT:  Well, he's testified that he's not

22    working as a broker.  I think it's important that the jury know

23    why.

24            THE COURT:  Well, what was the penalty?  I assume he

25    gave up his licenses, and what else?

1          MR. SINNOTT:  He was barred, permitted bar for at

2    least three years, disgorgement of a sum, and I believe that

3    was it.

4          THE COURT:  What's the problem with that?

5          MR. THOMADAKIS:  The licenses we're fine with, the

6    monetary penalty I think is where we take issue with, the

7    amount.

8          MR. SINNOTT:  Why?

9          MR. THOMADAKIS:  Why, because that's not relevant, and

12:42PM 10   it will be confusing to the issues when we start talking about

11   what losses the investors suffered in this case.

12         THE COURT:  Okay.  I think it's fair game, and if the

13   monetary penalty does come out, it's not clear to me that it

14   does need to come out, and I think the way to handle it is with

15   a cautionary and limiting instruction, so we'll handle it that

16   way.

17         MR. THOMADAKIS:  Thank you.

18         (SIDEBAR CONFERENCE WAS CONCLUDED)

19   Q.   Sir, would you like me to restate the question from before

12:43PM 20   the break?

21         THE COURT:  Why don't you put the question to him

22   again.

23         MR. SINNOTT:  I will, thank you, your Honor.

24   Q.   Sir, you had an SEC case, correct?

25   A.   Yes.

1   Q.   And you've testified that you admitted to not reading the

2   offering; is that right?

3   A.   Yes.

4   Q.   Was that the only thing that you admitted to?

5   A.   I don't remember.

6   Q.   All right.  Do you recall admitting to a violation of Ohio

7   security law?

8   A.   Not that I remember.  I remember it was a pretty long

9   document, it talked about the Securities Act of 1934, the

12:44PM 10   Investment Company Act of 19 -- I don't know.

11   Q.   Do you recall admitting to trading in unregistered stock?

12   A.   No.

13   Q.   You don't recall that?

14   A.   Off the top of my head, no.

15   Q.   Do you recall the penalty that you paid for this case?

16   A.   Dollar amount wise, I believe the fine was around 15,000,

17   20,000, and I was barred from trading penny stocks with the

18   option to reply in three years or something like that.

19   Q.   And you're still not a broker, are you?

12:45PM 20   A.   No.

21          THE COURT:  Let me just give the jury an instruction

22   here.  The government, as you probably know, has lots of

23   different components and agencies.  In fact, there's not just

24   one government in this case, we have a state government as

25   well.  They can charge people with crimes, they can charge

1   people with civil penalties, there are lots of different things

2   that they can do.  I am letting you hear this evidence for

3   whatever weight you choose to give it in terms of assessing

4   Mr. Lazar's credibility and his role in the alleged offense.

5          The focus of your decision, of course, is going to be

6   whether the government has proved Mr. Fraiman guilty beyond a

7   reasonable doubt, and in that regard, you're not to consider

8   any penalty that Mr. Fraiman may suffer if he's convicted nor

9   any penalty paid by anyone else.

12:45PM 10          In other words, what you're called upon to decide is

11   whether he is guilty or not guilty beyond a reasonable doubt of

12   the charges in the indictment.

13          MR. SINNOTT:  Thank you, your Honor.

14   Q.   And, sir, beyond the SEC suit, the SEC civil action, were

15   you the defendant in any lawsuits arising out of this matter?

16   A.   Yes.

17   Q.   And who sued you?

18   A.   Mr. Nugent.

19   Q.   And what was the outcome of that suit?

12:46PM 20   A.   I forget the timing of it, but I settled it.  I don't

21   remember the date or time.

22   Q.   Do you remember how much you settled it for?

23   A.   No.

24   Q.   And Mr. Nugent was an individual that you had sold

25   P.I.P.E. to, wasn't he?

1  A.   Yes.

2  Q.   And had he been a previous client of yours at Ameriprise?

3  A.   Yes.

4  Q.   And how long had he been a client for?

5  A.   Probably three or four years.

6  Q.   And how much did he lose, sir?

7  A.   I couldn't tell you off the top of my head.  I don't

8  remember the exact dollar amount.

9  Q.   And, sir, is it fair to say that you want to send

12:47PM 10  Mr. Fraiman to prison?

11           MR. THOMADAKIS:  Objection.

12           THE COURT:  Sustained.

13           MR. SINNOTT:  I have nothing further, your Honor,

14  thank you.

15           THE COURT:  Redirect.

16           MR. THOMADAKIS:  Thank you, your Honor.

17                REDIRECT EXAMINATION

18  BY MR. THOMADAKIS:

19  Q.   Mr. Lazar, Mr. Sinnott asked you at the beginning of his

12:47PM 20  cross-examination some questions about the FINRA complaints

21  that you've had against you?

22  A.   Yes.

23  Q.   And he talked about a couple of them, but you said that

24  there were -- that you had had in your history maybe four or

25  five?

     1    A.    Yes.

     2    Q.    Do you remember a complaint from August, 2008?

     3    A.    I would need to see it again.  No, not off the top of my

     4    head.

     5              MR. THOMADAKIS:  May I approach?

     6              THE COURT:  Yes.

     7              MR. THOMADAKIS:  Your Honor, may I question from here?

     8              THE COURT:  Yes, remember both of you to keep your

     9    voices up.

12:48PM 10              MR. THOMADAKIS:  Yes, your Honor.

    11    Q.    Could you look over this section of the document I'm

    12    showing you?

    13    A.    Yes.

    14    Q.    Sir, does this refresh your recollection about that

    15    complaint?

    16    A.    I vaguely remember the complaint.  I couldn't tell you

    17    what the client's name was.

    18    Q.    Okay.  Regardless of that, the general nature of the

    19    complaint, do you remember it?

12:48PM 20    A.    Yes.

    21    Q.    What was it?

    22    A.    It was involving suitability.

    23    Q.    And what was found ultimately about whether the investment

    24    you had recommended was suitable?

    25    A.    That it was.

1   Q.   That it had been?

2   A.   Yes.

3   Q.   That the complaint was not meritorious?

4   A.   Correct.

5   Q.   Do you remember a complaint from September, 2011?

6   A.   I'd have to see it again.

7   Q.   Okay.  Please read over that.  Let me know when you're

8   done.

9   A.   Yes.

12:49PM 10   Q.   Does that refresh your recollection about that complaint?

11   A.   Somewhat, yeah.

12   Q.   What was the general nature of that complaint?

13   A.   Again, the client was claiming something was not suitable.

14   Q.   Okay.  What was the finding?

15   A.   I didn't read it, I'm sorry.  I didn't read the finding.

16   Q.   What was the response to that?

17   A.   My response to it was when that investment was made, I was

18   not their advisor.

19   Q.   Okay.  Sir, Mr. Sinnott showed you briefly on

12:50PM 20   cross-examination I believe it was Exhibit 120.

21       MR. THOMADAKIS:  Can we pull that up, Mr. Flynn,

22   please.

23   Q.   This is an e-mail from Mr. Fraiman to you on January 20th,

24   2009, right?

25   A.   Yes.

1    Q.    And it says, "Only death and taxes are guaranteed"?

2    A.    Yes.

3    Q.    Okay.  And the date of this was January 20th, 2009?

4    A.    Yes.

5    Q.    And so in relation to Exhibit 117 -- in relation to

6    Exhibit 117, that e-mail with the death and taxes are the only

7    things guaranteed, that came at a point in time after this

8    e-mail on January 5th, 2009; is that right?

9    A.    Yes.

12:50PM 10   Q.    And this was the e-mail where Mr. Fraiman said moving

11   forward we can't be so detailed in e-mails?

12   A.    Yes.

13         MR. THOMADAKIS:  Okay.  Thank you, Mr. Flynn.  Take

14   that down.

15   Q.    Mr. Sinnott asked you questions about --

16         MR. THOMADAKIS:  Oh, I'd like to before I get to that,

17   could we please switch to the document camera, Madam Clerk.

18   Q.    The defense showed you Exhibit 400.  Do you remember

19   questions about this exhibit?

12:51PM 20   A.    Yes.

21   Q.    That, in fact, he read Mr. Laborio's rather rude e-mail

22   out loud?

23   A.    Yes.

24   Q.    But the original e-mail on this thread, are you on it,

25   December 19th, 2008?

1   A.   No.

2   Q.   And it's from Mr. Fraiman to Mr. Laborio, right?

3   A.   Yes.

4   Q.   And it says, "What's up?  I sent this off to you three

5   times today and this week and thought it would be in my account

6   before I leave tomorrow.  Ed, please get me back to me and tell

7   me what's going on."  Do you see that?

8   A.   Yes.

9   Q.   Next to that is a table.  Do you see that?

10   A.   Yes.

11   Q.   And you see there's a bunch of figures in here.  They add

12   up to a total, right?

13   A.   Yes.

14   Q.   And below that, it says "at 10 percent," and it has a

15   figure that is 10 percent of that total?

16   A.   Yes.

17   Q.   Do you have any understanding of what that calculation is?

18   A.   No.

19   Q.   Okay.  But it looks like 10 percent of these monies up

20   top, which are associated with names?

21   A.   Yes.

22   Q.   And some of these names we talked about, Judy Henkel,

23   $45,000.  In fact, that was the amount that Ms. Henkel invested

24   in Envit, right?

25   A.   Yes.

1    Q.   And your own mother, Nancy Lazar is on there, $35,000,

2    right?

3    A.   Yeah.

4    Q.   And that's part of the total at the bottom?

5    A.   Yes.

6    Q.   And then it says, "at 10 percent," and it has that figure,

7    and Mr. Fraiman's e-mail said, "I thought it would be in my

8    account before I leave tomorrow"?

9    A.   Yes.

12:52PM 10   Q.   And your mother's money came out of an IRA?

11   A.   I believe so, yes.

12   Q.   Mr. Lazar, you had some questions from Mr. Sinnott about

13   having responsibility to your clients and that you should have

14   read that PPM document that we looked at, right?

15   A.   Yes.

16   Q.   And you said you should have; isn't that right?

17   A.   Yes.

18   Q.   Because if you had read it, what would it have shown you

19   about what Mr. Fraiman was telling you about the P.I.P.E.?

12:53PM 20   A.   That it simply was not true.

21   Q.   So, it was your responsibility to read that PPM.  What did

22   you think Mr. Fraiman's responsibility was in terms of what he

23   was telling you about the P.I.P.E.?

24   A.   Just that be honest --

25            MR. SINNOTT:  Objection.  Objection.

1        THE COURT:  Sustained.

2   Q.   And Mr. Sinnott asked you some questions about not reading

3   that offering memorandum being "the most basic of fiduciary;

4   duties;" isn't that right?

5   A.   Yes.

6   Q.   What about lying about the terms of the offering, is that

7   a basic fiduciary duty?

8   A.   Yes.

9        THE COURT:  To not lie.

12:54PM 10        MR. THOMADAKIS:  To not lie, right.

11  Q.   Right, not lying?

12  A.   Yes.

13  Q.   Would be also an even more basic fiduciary duty, right?

14  A.   Yes.

15  Q.   And so when Mr. Fraiman told you things about the P.I.P.E.

16  that were simply not true, as you said before, was that

17  consistent with his fiduciary duties?

18        MR. SINNOTT:  Objection.

19        THE COURT:  Sustained.

12:54PM 20  Q.   Mr. Lazar, finally, when you found out that what your boss

21  had been telling you wasn't true, what did you do, January of

22  2009?

23  A.   I left, I quit and contacted my clients and told them what

24  was going on.

25  Q.   Okay.  And how many months into your tenure at Envit was

1    that when you quit?

2    A.    Less than four months.

3    Q.    And you pointed out to Mr. Fraiman what in fact the

4    inconsistencies had been and what he had been telling you,

5    isn't that right, in the e-mails that we had looked at?

6    A.    Yes.

7    Q.    And in response, did Mr. Fraiman tell you that he was also

8    quitting Envit?

9    A.    No.

12:55PM 10    Q.    Did he tell you that he also felt he had been misled?

11    A.    No.

12            MR. THOMADAKIS:    The Court's indulgence.    No further

13    questions.

14            THE COURT:    Recross.

15                        RECROSS-EXAMINATION

16    BY MR. SINNOTT:

17    Q.    Sir, Mr. Thomadakis asked you if Mr. Fraiman told you that

18    he had also been misled.    Do you recall that, sir?

19    A.    Yes.

12:56PM 20    Q.    Do you have any idea whether Mr. Fraiman had been misled?

21    A.    No.

22    Q.    So he very well could have been as far as you know?

23            MR. THOMADAKIS:    Objection.    He has no idea.

24            THE COURT:    I'll allow it.

25    A.    I have no idea.

1        MR. SINNOTT:  Thank you, sir.

2        THE COURT:  All right, thank you.  You may step down.

3    Let me talk to counsel at sidebar about the schedule before we

4    break for the weekend.

5        (THE FOLLOWING OCCURRED AT SIDEBAR:)

6        THE COURT:  So I take it we're at least a little

7    behind, an hour perhaps?

8        MR. THOMADAKIS:  Yes, I would say an hour.  We

9    anticipated being done with Mr. Lazar and Ms. Henkel, and we're

12:56PM 10   contemplating having Mr. Munno, I would say we're behind an

11   hour or less.

12       THE COURT:  You expect to start off with Munno on

13   Monday?

14       MR. THOMADAKIS:  We'll have to caucus with Mr. Sinnis

15   about that.  We have witnesses who are out of town.

16       THE COURT:  I will, too, within reason.  Ballpark,

17   when does the government expect to rest?

18       MR. THOMADAKIS:  Thursday.

19       THE COURT:  Thursday, okay.  I'm not also looking for

12:57PM 20   a binding commitment, and I'm sure you don't know whether the

21   defendant will take the stand, but at this point what are you

22   looking at for a defense case?

23       MR. SINNOTT:  I think we're looking at anywhere from

24   two hours to a day and a half.

25       THE COURT:  Okay.  That's without him testifying?

1          MR. SINNOTT:  No, if he testifies.  With him it's the

2     greater amount, but I take it without him, we're looking at

3     less than a day certainly, but I think just a couple hours.

4          THE COURT:  Okay.  Thank you.

5          (SIDEBAR CONFERENCE WAS CONCLUDED)

6          THE COURT:  All right.  Ladies and gentlemen, it looks

7     like we're on track or if we're off track, it's only by a

8     little bit.  We aren't yet entirely derailed, to stick with the

9     metaphor, so I think we're all right, and the schedule will

12:58PM 10    hold up, so thank you.

11          Again, I know this is sometimes trying of your

12     patience, but I appreciate it, and I hope you have a great

13     weekend.  If my math is right, Christmas is in three weeks, so

14     those of you who celebrate, you'll need to get your shopping

15     started, I know I haven't, and everyone else have a great

16     weekend.  I will see you Monday morning, and if there's any

17     change in schedule, I'll keep asking the lawyers every day so

18     you can keep informed and you can plan accordingly.

19          Again, thank you for your patience and cooperation,

12:58PM 20    and we'll see you on Monday.

21          THE CLERK:  All rise.

22          (JURORS EXITED THE COURTROOM.)

23          THE COURT:  All right.  Anything else before 8:30

24     Monday morning?

25          MR. THOMADAKIS:  Not from the government.

1          MR. SINNOTT:  Nothing from the defense, your Honor.

2          THE COURT:  Okay.  Have a good weekend as well, all of

3     you, and I will see you Monday morning.

4          (Whereupon, the hearing was adjourned at

5     1:00 p.m.)

6                   C E R T I F I C A T E

7

8     UNITED STATES DISTRICT COURT )

9     DISTRICT OF MASSACHUSETTS ) ss.

10    CITY OF BOSTON )

11

12          I do hereby certify that the foregoing transcript,

13    Pages 1 through 152 inclusive, was recorded by me

14    stenographically at the time and place aforesaid in Criminal

15    Action No. 12-10238-FDS, UNITED STATES OF AMERICA vs.

16    EDWARD LABORIO and JONATHAN FRAIMAN and thereafter by me

17    reduced to typewriting and is a true and accurate record of the

18    proceedings.

19          Dated this 29th day of January, 2016.

20

21               s/s Valerie A. O'Hara

22          _____

23               VALERIE A. O'HARA

24               OFFICIAL COURT REPORTER

25