_____
                                    )
UNITED STATES OF AMERICA    )
                                    )          No. 12-cr-10238-FDS
v.                                  )
                                    )          Leave to File Granted on 5/3/16
JONATHAN FRAIMAN           )
_____)

## DEFENDANT JONATHAN FRAIMAN'S MOTION
## FOR BAIL PENDING APPEAL

Defendant Jonathan Fraiman respectfully requests that this Honorable Court order his release pending his appeal to the United States Court of Appeals for the First Circuit. Mr. Fraiman meets the requirements for release pending appeal set forth in 18 U.S.C. §3143(b): (1) he does not present a risk of flight or danger to any person or the community, and (2) his appeal will raise substantial questions which if decided in his favor will likely result in the granting of a new trial.

### LOCAL RULE 7.1(a)(2) STATEMENT

The government objects to the granting of this motion.

### REQUEST FOR ORAL ARGUMENT

The defendant requests oral argument on the within motion.

## I.      THE BAIL PENDING APPEAL STANDARD.

Under 18 U.S.C. §3143(b)(1)(B), a court considering a defendant's request for bail pending appeal must make three determinations: (1) whether there is clear and convincing evidence that, if released pending appeal, the defendant is not likely to flee or pose a danger to any person or the community; (2) whether "the appeal raises[s] a substantial question of law or fact;" and (3) whether, "if the substantial question is determined favorably to defendant on appeal, that decision is likely to result in reversal or an order for a new trial on all counts on which imprisonment has been

imposed." *United States v. Bayko*, 774 F.2d 516, 522 (1st Cir. 1985). A "substantial question" is "a 'close' question or one that very well could be decided the other way." *Bayko*, 774 F.2d at 523. Whether or not the defendant's appeal presents a "close" question is to be decided on a case-by-case basis. *Id.* "[L]ikely to result in reversal or an order for a new trial" requires "that the claimed error not be harmless or unprejudicial." *Id.* The "likely to result" standard is to be applied "flexibly." *United States v. Colon-Munoz*, 292 F.3d 18, 20 (1st Cir. 2002). *See United States v. Powell*, 761 F.2d 1227, 1233 (8th Cir.1985)(in deciding the second part of the standard, the court "must assume that the substantial question presented will go the other way on appeal and then assess the impact of such assumed error on the conviction").

The First Circuit has stressed that bail pending appeal is *not* "contingent on a finding by the district court that it is likely to be reversed." *Bayko*, 774 F.2d at 523. *See, e.g., United States v. Greenberg*, 772 F.2d 340, 341 (7th Cir. 1985)(district court does not have to find that it is more likely to be reversed than affirmed); *Powell*, 761 F.2d at 1232 ("a judge considering the question of bail pending appeal need not hold . . . that he or she has probably made a mistake"); *United States v. Miller*, 753 F.2d 19, 23 (3d Cir.1985)("The federal courts are not to be put in the position of 'bookmakers' who trade on the probability of ultimate outcome"); *United States v. DeSimone*, 424 F.Supp.2d 344, 345 (D.R.I. 2006)(district court is not required to conclude that it is likely to be reversed).

> Thus, in determining whether there is a substantial question, a court must keep in mind that it is not being asked to reverse its position on issues decided at trial, nor is it being asked to grant a new trial. It must decide only that a significant issue exists that merits appellate review and that the issue is critical enough to the defendant's conviction that a contrary appellate ruling would warrant a reversal.

*United States v. Hicks*, 611 F.Supp. 497, 499 (S.D. Fla. 1985). The issues to be raised in Mr. Fraiman's appeal meet this standard.

## II.    MR. FRAIMAN DOES NOT PRESENT A RISK OF FLIGHT OR DANGEROUSNESS.

As the Court is aware from the sentencing proceedings, after the demise of Envit Capital, now almost seven years ago, Mr. Fraiman relocated to San Diego, where he made a new life for himself. He has a two-year-old daughter, A.F.,whom he loves devotedly and about whose welfare he cares deeply and of whom he had sole physical custody until his conviction in this case.  He is currently engaged in a contentious custody dispute with A.F.'s mother and would do nothing to jeopardize A.F.'s welfare or his ability to have a continuing relationship with her. He has also established a close and committed relationship with a woman who lives and works in San Diego, and the two hope to marry. Indeed, the Court noted in the Statement of Reasons that among the reasons for the Court's imposition of a below-guidelines sentence were Mr. Fraiman's community ties and family ties and responsibilities. Doc. 225 at 3. Mr. Fraiman is committed, if permitted to do so, to continue to build a life in San Diego with A.F. and his fiancee and to pursue the appeal from his conviction.

Mr. Fraiman has been on pretrial release since August, 2014. Although there were some initial difficulties, Mr. Fraiman is now regarded by his pretrial services office as a model defendant who has been for some time in full compliance with the terms and conditions of his release. He has faithfully attended all court proceedings in this matter, traveling across the country to do so. Mr. Fraiman is currently released subject to a 9:00 pm to 6:00 am curfew, GPS monitoring, and a $250,000 secured bond.[1] This Court did not detain Mr. Fraiman after sentencing but instead allowed

---

[1] Those conditions were imposed in December, 2015, after A.F.'s mother alleged that  Mr. Fraiman was a flight risk. Mr. Fraiman continues to assert that her allegations were baseless. *See* Defendant Jonathan Fraiman's Response to the Government's Emergency Motion for Hearing on Defendant's Release Status (Doc. 167).

him, without objection by the government, to self-report to his BOP-designated place of incarceration on May 16, 2016. More recently, the Court permitted Mr. Fraiman to travel to Florida to celebrate Passover with his family, again without opposition from the government, a trip from which he returned without incident.[2]

Mr. Fraiman has demonstrated that he presents neither a flight risk nor a danger to the community or anyone in it. The controlling questions are, therefore, whether his appeal will "raise a substantial question of law or fact" which, if determined favorably to him on appeal, "is likely to result in reversal or an order for a new trial on all counts on which imprisonment has been imposed." As addressed in the succeeding sections of this memorandum, Mr. Fraiman's appeal will raise a number of substantial issues which meet this standard and warrant permitting him to remain on release pending the resolution of his appeal. He therefore asks that the Court permit him to remain on release subject to the presently-existing terms and conditions pending the resolution of his appeal by the First Circuit.

## III. MR. FRAIMAN'S APPEAL WILL RAISE SUBSTANTIAL QUESTIONS OF LAW OR FACT WHICH, IF DETERMINED FAVORABLY TO HIM ON APPEAL, ARE LIKELY TO RESULT IN AN ORDER FOR A NEW TRIAL ON ALL COUNTS ON WHICH IMPRISONMENT HAS BEEN IMPOSED.

In late 2007, neophyte investment advisor Jonathan Fraiman answered a Craigslist ad for a hedge fund sales trainee position with Envit Capital, a company, unbeknownst to him, owned and controlled by consummate con artist Ed Laborio, who was variously described during trial by witnesses who knew him as "charming," "slick," "charismatic," and having an "aura of success." Tr. 12/2/15 at 91; Tr. 12/3/16 at 40. Fraiman's entire defense at trial rested on a single, overarching

---

[2] During the pendency of this case, the Court also permitted Fraiman to travel to Arizona, Hawaii (Doc. 64, 65), to New Jersey (Doc. 106, 107), and to attend his brother's wedding (Doc. 115, 116). All of this travel was completed by Fraiman without incident.

premise: that he, like so many others, was taken in by Laborio, believed what Laborio told him about the prospects and promises of Envit, and did not therefore knowingly and intentionally defraud anyone or enter into a conspiracy to do so. The government, for its part, strove to portray Fraiman as Laborio's "right-hand man," someone so close to him that he surely had to know that what he was telling potential investors about Envit was not true. Fraiman's relationship to Laborio thus assumed pivotal importance to both Fraiman's defense and the government's case. Several evidentiary errors occurred during the trial of this case which fatally compromised the jury's ability to fully and fairly consider Fraiman's defense: (1) the Court's admission of misleading and prejudicial summary charts; (2) the Court's exclusion of the proffered evidence regarding Laborio; and (3) the improper opinion testimony of Richard Denerstein and Robert Anderson.

### A.    The Government's Summary Charts Were Misleading and Prejudicial.

When the government proposed to introduce summary charts  through its final witness, James Pingree, showing the earnings of Envit employees and the number of investors brought in by Fraiman compared to others at Envit, the defense moved to exclude the charts, Doc. 153, and argued the reasons for their exclusion—the distortions in the presentation, their misleading nature, and the prejudice to Fraiman— to the Court. Tr. 12/9/15 at 4-13. The Court preliminarily denied the motion, indicating that it did not believe the charts to be unduly argumentative or misleading, Tr. 12/9/15 at 13, and the defense renewed its objection as each chart was offered into evidence. Tr. 12/10/15 at 64 (Ex. 188, 189); *id.* at 74 (Ex. 190); *id.* at 79 (Ex. 191); *id.* at 81 (Ex. 192, 193); *id.* at 84 (Ex. 194); *id.* at 85 (Ex. 196); *id.*  at 106 (Ex. 198); *id.* at 112 (Ex. 199).

Fed. R. Evid. 1006 provides, in pertinent part, that "[t]he proponent may use a summary chart or calculation to prove the content of voluminous writings, recordings, and photographs that cannot be conveniently examined in court." There are, however, important limitations on the permissible

uses of Rule 1006 summary charts. Because such charts are introduced into evidence and are likely to be the only evidence before the jury of the contents of the underlying documents, as they were in this case, they "must fairly represent the underlying documents and be 'accurate and nonprejudicial.'" *United States v. Milkiewicz*, 470 F.3d 390, 398 (1st Cir. 2006), *quoting United States v. Bray*, 139 F.3d 1104, 1111 (6th Cir. 1998).

> Care must be taken to ensure that summaries accurately reflect the contents of the underlying documents and do not function as pedagogical devices that unfairly emphasize part of the proponent's proof or create the impression that disputed facts have been conclusively established or that inferences have been directly proved.

*United States v. Sawyer*, 85 F.3d 713, 740 (1st Cir. 1996), *quoting United States v. Drougas*, 748 F.2d 8, 25 (1st Cir. 1984). *See United States v. Citron*, 783 F.2d 307, 316 (2d Cir. 1986)("courts have long required that district courts ascertain that summary charts fairly represent and summarize the evidence upon which they are based," because "[u]nless this requirement is met, the chart is more likely to confuse or mislead the jury than it is to assist it" (internal quotation marks omitted)). Critically, Rule 1006 charts must avoid any element of argumentation because "a summary containing elements of argumentation could very well be the functional equivalent of a mini-summation by the chart's proponent every time the jurors look at it during their deliberations." *Bray*, 139 F.3d at 1110. *See Peat, Inc. v. Vanguard Research, Inc.*, 378 F.3d 1154, 1159-60 (11th Cir. 2004)("because summaries are elevated under Rule 1006 to the position of evidence, care must be taken to omit argumentative matter in their preparation lest the jury believe that such matter is itself evidence"). For these reasons, "summary charts are to be used with caution, due to their potential for abuse," *United States v. Richardson*, 233 F.3d 1285, 1293 (11th Cir. 2000), and the "trial court is charged with grave responsibilities to make certain that an accused is not unjustly convicted in a 'trial by charts.'" *id.*, *quoting Gordon v. United States*, 438 F.2d 858, 876 (5th Cir. 1971).

The government's charts here transgressed these fundamental limitations on the proper use of summary charts. Why this is so is best illustrated by the government's employee earnings charts, in which the underlying data was presented in a fundamentally misleading and incomplete manner so as to create a powerful—and powerfully prejudicial— pictorial representation of government's arguments in summation that Fraiman was "making more money than the next biggest earners at Envit combined," Tr. 12/14/15 at 24, "way more than any person there except his co-conspirator Mr. Laborio." *Id.* at 80.

The employee earnings chart, Exhibit 199, submitted herewith as Exhibit 1, was misleading, inaccurate, and prejudicial in two fundamental respects: (1)it showed only the gross earnings of the employees listed even though almost all had worked at Envit for substantially shorter periods of time, and (2) it vastly understated Laborio's compensation. The result was an unfairly distorted presentation to the jury which showed Fraiman's and Laborio's compensation as far closer in amount than it in fact was, giving a spurious but graphic boost to the government's argument that Fraiman was Laborio's right-hand man, and Fraiman's compensation as towering over the others listed by virtue solely of the fact that he had worked at Envit considerably longer than all except one of those listed. An accurate chart, such as one which showed employee earnings on a pro rata basis (which Pingree intentionally did not do, *see* Tr. 12/11/15 at 84), would have showed Fraiman's compensation considerably less outsize than that of other employees[3] and Laborio's compensation

---

[3] The individual employees whose earnings were represented on the charts worked at Envit for dramatically different time spans. Ryan Sherman worked at Envit for only three months, compared to the more than 18 months that Fraiman worked there. Tr. 12/11/15 at 83. Gauro Cohen worked for four to six months and Jonathan Genovese for eight months. *Id.* at 84. Matthew Lazar worked for five months, *id.* at 85, and Evan Munno for six months. *Id.* at 86. Daniel Kenney began working for Envit in late 2007, and because Pingree selected the starting date of February 1, 2008, for the data included in the charts, the chart did not include all of Kenney's earnings. There was no evidence at all at trial regarding who Dean Mandarino was or how long he worked at Envit.

dwarfing that of Fraiman.[4]

This distorted depiction of Fraiman's place in the Laborio firmament was the only evidence before the jury regarding the relative compensation of Laborio, Fraiman, and other Envit employees. The employee earnings chart is a far cry from the dispassionate compilation contemplated by Rule 1006 but is instead a pictorial embodiment of the government's theory of the case, which accompanied the jury into its deliberations.

The investor charts were similarly unfair and misleading. The charts which broke out Bernard Barry from the other "Non-Fraiman" investors (Exhibits 189, 193, submitted herewith as Exhibits 2, 3) served no conceivable purpose other than to distort the relative values of the "Fraiman" investors and the "Non-Fraiman" investors by making them appear nearly equivalent when in fact Fraiman brought in $1 million *less* than the "Non-Fraiman" investors. *See* Tr. 12/10/15

---

[4] Pingree only cursorily reviewed Laborio's personal bank accounts, and they played no role in his analysis. Tr. 12/11/15 at 37. He also was completely unfamiliar with Laborio's employment agreement with Envit in which Laborio arrogated to himself huge financial benefits from Envit, among other things, a salary of $350,000 a year for 2008 and 2009 (as opposed to the $373,485 shown on the chart for 2008-09), the ability to award himself additional remuneration and bonuses, either a car paid for by Envit (with no limit on the cost) or full payment of all automobile expenses, and reimbursement for all business-related meals and entertainment. *Id.* at 42-56. Thus, substantial sums that Pingree allocated to the business and miscellaneous category should have been included in Laborio's compensation (even Pingree acknowledged that knowledge of Laborio's employment agreement, which was in the government's possession, could have had an impact on his calculations, *id.* at 52-54, 91). Pingree's chart also did not take account of the shares of Envit which Laborio awarded himself, *id.* at 62, 68, 91, which FINRA's Paul Lane testified numbered 100,000,000, Tr. 12/8/15, and which Laborio's brokerage account statement of October 31, 2008, indicated were worth $50 million. Tr. 12/11/15 at 68. While those shares were worthless at the time that Pingree prepared the charts, as he testified, *id.* at 97, they were not worthless in October, 2008. At that time, Envit was a publicly traded company, the stock of which opened at $5 a share, Tr. 12/7/15 at 59, and even when Envit was trading at forty cents a share in late 2008, Tr. 12/4/15 at 58, Laborio's hundred million shares would have had a value of $40,000,000, and even later, in July, 2009, when they were trading at twelve or twenty dollars a share, they would have been worth $12,000,000 to $20,000,000. Thus, an accurate chart would have shown Laborio's compensation looming massively over that of Fraiman, a considerably more accurate depiction of their actual relationship.

at 72, 80. Bernard Barry had no significance in this case; indeed, the government's charts, introduced at the end of the trial, were the first mention of his name in the entire course of the trial. Apparently dissatisfied with the ability of the chart dividing the investor universe into "Fraiman" and "Non-Fraiman" investors (Ex. 188) to convey its argument to the jury, the government employed Barry solely as a mechanism to create a highly misleading presentation which corresponded to its theory of the case.[5] And, not content that one Fraiman/Non-Fraiman/Barry chart would forcefully enough convey its argument, the government presented two – both a pie chart and a bar chart showing precisely the same thing, albeit under different headings (Ex. 189, 193). Moreover, the government's start date for its data compilations, February 1, 2008, resulted in highly skewed figures, as only two days before Barry had made an additional investment of $1,412,917. Had that investment been included, as it should have been to ensure a fair presentation of the underlying documents, which would have resulted in a "Non-Fraiman" investor figure of $4,186,055, a figure far in excess of the $1,771,462 received from "Fraiman" investors.

While the First Circuit has pointed to the availability of cross-examination as to any problematic aspects of summary charts, *see, e.g., Sawyer*, 85 F.3d at 740, there comes a point where the chart is simply too distorted, too misleading, and too prejudicial to be submitted to the jury as evidence. That point was passed in this case.

**B.      The Exclusion of "Reverse 404(b)" Evidence Regarding Laborio Was Prejudicial Error and Violated Fraiman's Right Under the Sixth Amendment to Present a Complete Defense.**

In a pretrial motion *in limine*, Mr. Fraiman moved for the admission of the following documents relative to Laborio: the docket sheets in *United States v. Laborio*, No. 12-10238

---

[5] Barry was an investor brought in by Laborio, Tr. 5/10/15 at 71, but the government made no other effort to separate out other investors brought in by Laborio.

(D.Mass.) and *United States v. Laborio*, No. 12-60119 (S.D.Fla.), the information issued against Laborio in No. 12-60119, and Laborio's plea agreement in No. 12-60119. Doc. 133 at 1. The Court initially denied the motion out-of-hand:

> It seems to me that its purpose is to show that Laborio had a propensity to commit fraud, which, while it may certainly be true, I think is not an appropriate matter for this trial, and even if under some theory it's admissible, . . . I think Rule 403 would govern in that this would inevitably lead to minitrials or side issues concerning other criminal or civil charges, so I'm going to deny that motion as well.

Tr. 11/30/15 at 12. Counsel countered that Fraiman was seeking only to introduce documents, not testimony and that therefore the spectre of mini-trials was illusory. *Id.* at 19. He further argued that Laborio's involvement in the fraud charged in Florida had the "special relevance" required under Fed. R. Evid. 404(b) in that it demonstrated that, during the period of the conspiracy charged in this case, Laborio was engaged in another fraud involving Envit stock, in which he did not involve Fraiman. Such evidence would have supported Fraiman's defense that Laborio ran a one-man show and would have undermined the government's theory that Laborio and Fraiman were so close that Fraiman must have known what Laborio was doing. The central component of Fraiman's defense was his lack of knowledge that what he was telling investors was not true because he, as did many other Envit employees, accepted at face value what Laborio told him about Envit, its offerings, its assets, its successes, and its prospects, for which this evidence would have provided important support, while at the same time undermining the government's contention that Fraiman and Laborio entered into the conspiratorial agreement charged. *See id.* at 20, 23-24. He further argued that Laborio's post-offense conduct of duping the government and the courts into thinking that he intended to plead guilty, while all the while stringing them along until he could flee, was essentially Laborio's modus operandi, which he followed in this case, duping others and stringing them along with assurances about what he was going to do, just as Fraiman contended Laborio did with him.

*Id.* at 26. Ultimately, the Court denied the motion without prejudice, although stating its assessment that the proffered evidence "looks and smells" like propensity evidence." *Id.* at 24, 27.

While Rule 404 (b) evidence is most often offered by the government to prove the guilt of the defendant, there is a species of Rule 404(b) evidence in which "other crimes" evidence is offered by the defendant to negative his guilt, which some courts (as well as the government in this case) have dubbed "reverse 404(b)" evidence. When offered by the government against a defendant, Rule 404(b) requires that "the evidence must have 'special relevance' to an issue in the case such as intent or knowledge, and must not include 'bad character or propensity as a necessary link in the inferential chain.'" *United States v. Varoudakis*, 233 F.3d 113, 118 (1st Cir. 2000), *quoting United States v. Frankhauser*, 80 F.3d 641, 648 (1st Cir. 1996).[6] A number of courts have concluded, however, that, when offered by a defendant to negative his guilt, the Rule 404(b) standard should not be as restrictive as it is when the evidence is offered by the government to prove the defendant's guilt. Such a conclusion flows naturally from the underlying purposes of Rule 404(b) and its common law antecedents, namely, the protection of the defendant from conviction based on inferences of bad character and propensity to commit crimes. *See, e.g., Wynne v. Renico*, 606 F.3d 867, 873 (6th Cir. 2010)(Martin, J., concurring)("history makes clear that the policy underlying the rule at common law sought to protect the *criminal defendant*" (emphasis in original)); *United States v. Lucas*, 357 F.3d 599, 611 (6th Cir. 2004)(Rosen, J., concurring)("The policy underlying the common law rule was the protection of the criminal defendant"). As the Second Circuit has explained:

> [W]e believe the standard of admissibility when a criminal defendant offers similar acts evidence as a shield need not be as restrictive as when a prosecutor uses such evidence as

---

[6] Rule 404(b) is a rule of inclusion, and the list of purposes for which evidence may be offered under the rule is not exhaustive. *See, e.g., United States v. Landry*, 631 F.3d 597, 602 (1st Cir. 2011); *United States v. Fields*, 871 F.2d 188, 196 (1st Cir. 1989).

*a sword.* The prosecution, in the Anglo-American tradition, may not ordinarily offer evidence of a defendant's prior wrongdoing for the purpose of persuading the jury that the defendant has a propensity for crime and is therefore likely to have committed the offense for which he stands trial. . . . *However, risks of prejudice are normally absent when the defendant offers similar acts evidence of a third party to prove some fact pertinent to the defense. . . . In such cases the only issue arising under Rule 404(b) is whether the evidence is relevant to the existence or non-existence of some fact pertinent to the defense.*

*United States v. Aboumoussallem*, 726 F.2d 906, 911-12 (2d Cir. 1984)(emphasis added). *See, e.g., United States v. Seals*, 419 F.3d 600, 607 (7th Cir. 2005)("the defense is not held to as rigorous of a standard as the government in introducing reverse 404(b) evidence"); *United States v. Stevens*, 935 F.2d 1380, 1404 (3d Cir. 1991)(lower standard of similarity should govern reverse 404(b) evidence "because prejudice to the defendant is not a factor").[7]

One major reason why the Rule 404(b) standard should be less stringent when the evidence is offered by the defendant lies in the defendant's constitutional right to present a complete defense. *See, e.g., Crane v. Kentucky*, 476 U.S. 683, 690 (1986)("the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense").

[T]he prejudice concern does not apply equally to a defendant and a third party not being tried for a crime. Specifically, a third party not on trial for a crime is in no danger whatsoever that the jury will convict him for being a "bad man." Thus, here and in probably most reverse evidence cases, one of 404(b)'s two justifications would vanish completely. In such a situation, one wonders if, left with only one pillar to support it, the whole structure of 404(b) collapses under the weight of a defendant's constitutional right to present a defense. Most circuits have found that it does. . . . *Given the great weight that our Constitution and society place on the right to present a defense, if the policy reasons driving*

---

[7] It does not appear that the First Circuit has yet spoken on this issue. The Court did note in *United States v. Delgado-Marrero*, 744 F.3d 167, 182 n.18 (1st Cir. 2014), that the government had in the past sanctioned the propriety of reverse 404(b) evidence, citing *Stevens*, 935 F.2d at 1404. In *United States v. Gonzalez-Sanchez*, 825 F.2d 572, 582 n.25 (1st Cir. 1987), in which the defendant challenged the admission of evidence regarding prior crimes of other gang members, the First Circuit stated that "[i]nasmuch as this evidence does not concern past criminal activity of [the defendant], Rule 404(b) is inapplicable." Some jurists have taken this language to mean that, in the First Circuit, Rule 404(b) is inapplicable to the acts of third parties. *See Lucas*, 357 F.3d at 612 (Rosen, J. concurring); *United States v. Duran-Moreno*, 616 F. Supp. 2d 1162, 1167 (D.N.H. 2009).

*404(b) are considerably weakened—as they are in cases of reverse 404(b) evidence—in the majority of circumstances, the constitutional right to present a defense easily trumps the sole remaining 404(b) interest.*

*Wynne*, 606 F.3d at 874 (Martin, J., concurring)(emphasis added). *See United States v. Montelongo*, 420 F.3d 1169, 1175 (10th Cir. 2005)(exclusion of reverse 404(b) evidence on cross-examination of government witness violated defendant's rights under the Confrontation Clause).

### 1. The evidence related to another Envit-related fraud perpetrated by Laborio.

The proffered evidence amply satisfied the special relevance standard of Rule 404(b) and the relevance standard of Rule 401. The proffered evidence relating to Laborio's conviction, based on his guilty plea, of a separate fraud involving the sale of Envit stock during the time period of the conspiracy charged in this case was not simply propensity evidence designed to show, as the government argued, and as the Court appeared to agree, that Laborio was a "serial fraudster." Tr. 11/30/15 at 22. But, as counsel explained, that was not at all the point of the evidence. Instead, it was offered to counter the government's theory, stressed again and again to the jury, that Fraiman was Laborio's "right-hand man" and that they were so close that Fraiman had necessarily to know that what he was telling investors was untrue because Laborio would have let him on the true realities of the Envit operation. The evidence regarding the separate Envit-related fraud committed by Laborio was directly relevant to show that Laborio was a one-man show who did not share the details of his fraudulent activity with Fraiman or others at Envit, thus supporting Fraiman's overarching defense that he did not know that Laborio was committing fraud on Envit's investors and did not enter into a conspiratorial agreement with him to do so.[8] The evidence was, therefore,

---

[8] The government has never suggested that Fraiman had any involvement in or knowledge of this separate Envit fraud committed by Laborio.

plainly relevant and was not solely offered to prove propensity. *See, e.g., Montelongo*, 420 F.3d at 1174-75 (error to exclude reverse 404(b) evidence that was probative of defendant's lack of knowledge); *Aboumoussallem*, 726 F.2d at 911-12 (where defendant contended that he had been duped into transporting drugs by his cousins, it was error to exclude under Rule 404(b) evidence that a few months earlier another individual was duped by these cousins into transporting drugs);[9] *United States v. Letourneau*, 2013 WL 589224 (N.D. Ill. Feb. 14, 2013)(reverse 404(b) evidence admissible where relevant to defendant's defense that he was duped into filing involuntary bankruptcies and lacked the requisite knowledge); *United States v. Duran-Moreno*, 616 F.Supp.2d 1162, 1166-67 (D.N.M. 2009)(reverse 404(b) evidence admissible where supportive of defendant's defense that he was an ignorant and innocent party).

The government also argued that the Florida fraud was not sufficiently similar to the charged fraud to be relevant, *see* Tr. 11/30/15 at 21, although this contention did not appear to play a role in the Court's exclusion of the proffered evidence. As addressed *supra*, similarity requirements should be relaxed when the evidence is offered by the defendant. Whatever standard is applied, however, the Envit fraud charged in Florida involved defrauding an Envit investor—a pension fund—through the payment of kickbacks to a pension fund fiduciary. At bottom, the fraud was precisely the same as that charged here: inducing investors to purchase Envit stock through fraudulent means. In Laborio's plea agreement, one of the documents proffered by Fraiman, Laborio and the government stipulated to the facts of the case as follows:

> Envit Capital Group, Inc. ("ECGP') was a Delaware corporation that served as a holding company for financial entities, investor partnerships, and management subsidiaries. ECGP'S common stock was publicly quoted on the Pink OTC Markets, Inc., an inter-dealer

---

[9] The *Aboumoussallem* Court ultimately concluded, although finding it a close question, that the trial court had not abused its discretion in excluding the evidence under Rule 403. *Id.* at 912.

electronic quotation and trading system in the over-the-counter securities market commonly referred to as the "Pink Sheets." The defendant was the Chairman and Chief Executive Officer of ECGP.

In February 2009, the defendant agreed to participate in a pay-to-play scheme to pay a forty percent (40%) kickback to a purported pension fund fiduciary to induce the pension fund fiduciary to purchase ECGP shares. On February 3, 2009, the defendant met with an undercover FBI agent posing as a friend of a pension fund fiduciary to discuss the unlawful scheme. In this meeting, the defendant agreed to pay and cause to be paid a forty percent (40%) kickback to cause the purported pension fund fiduciary to purchase ECGP shares.

For the first transaction, on February 8, 2009, the defendant received a wire in the amount of $20,000 from the purported pension fund to purchase approximately 100,000 shares of ECGP restricted stock. Two days later, on February 10, 2009, the defendant sent and caused to be sent by wire transfer an $8,000 check to pay an illegal, undisclosed kickback payment to the purported pension fund fiduciary in exchange for purchasing ECGP stock.

For the second transaction, on March 3, 2009, the defendant sent via Federal Express to an address in Coral Springs, Florida, a signed copy of subscription and consulting agreements, and a fraudulent invoice. On March 10, 2009, the defendant received a wire in the amount of $20,000 from the purported pension fund for the purchase of approximately 111,111 shares of ECGP restricted stock. On March 11, 2009, the defendant sent and caused to be sent by wire transfer an $8,000 check to pay an illegal, undisclosed kickback payment to the purported pension fund fiduciary in exchange for purchasing ECGP stock. Prior to the February and March 2009 transactions described above, the defendant used a fraudulent consulting agreement between ECGP and a consulting company to give the false appearance that the kickback payment was made as compensation for consulting services.

*United States v. Laborio*, No. 12-60119-KMW (S.D.Fla.), Plea Agreement (Doc. 24) at 6-7, submitted herewith as Exhibit 4.[10] This was the very same man—Laborio—engaging in fraudulent conduct with respect to the same Envit stock—ECGP—that was at issue in this case to cause an investor—the pension fund—to purchase shares of Envit. It would, of course, have been open to the government to argue to the jury that it should not draw the inferences from this evidence that Fraiman urged upon them because of the differences between the two frauds, but those differences

---

[10] The facts set forth in the stipulation largely mirror the allegations of the information against Laborio, another of the documents which Fraiman sought to be admitted. *See United States v. Laborio*, No. 12-60119-KMW (S.D.Fla.), Information (Doc. 1), submitted herewith as Exhibit 5.

were not grounds for excluding the evidence entirely.

The factual stipulation in the plea agreement rendered the prospect that its admission would give rise to the necessity for minitrials entirely chimerical. We know the offense occurred, we know that Laborio committed it, and we know that the Florida fraud involved the fraudulent sale of Envit stock to an investor. The government, in the person of the Southern District of Florida AUSA handling the case, has already stipulated to the facts, and, contrary to the government's argument, Tr. 11/30/15 at 21, they required no more explanation. Fraiman did not seek to introduce anything other than the proffered documents. Under such circumstances, it is impossible to say, as required for exclusion under Rule 403, that the danger of unfair prejudice or confusing the issues or misleading the jury or undue delay or wasting time *substantially* outweighed the probative value of the evidence. *See Seals*, 419 F.3d at 613 (Posner, J., concurring)("preventing a defendant from offering relevant evidence on the basis of vague and implausible concerns with jury confusion and the burden of a longer trial violates Rule 403").

**2.      The docket entries in this case as they pertained to Laborio.**

The docket entries in this case with respect to Laborio would show that the parties appeared before the Court on March 6, 2014, and advised the Court that "negotiations for resolution of the case are ongoing and more time was needed." Doc. 28. A month later, the parties appeared again and advised the Court that the defendant will change his plea "but the agreement needs more time to finalize." Doc. 31. On May 9, 2014, the parties advised the Court that "a change of plea should be ready for May 27." Doc. 37. On May 27, 2014, of course, Laborio did not appear and was thereafter a fugitive until his death.

This evidence was relevant to support Fraiman's defense because, as counsel explained, it demonstrates a pattern of conduct by Laborio similar to that which Fraiman contended ensnared him

in this case: he strung people along—here, even representatives of the government—with promises

regarding what he was going to do—plead guilty and face the consequences—and duped people into

believing what he told them until it was too late and he was ready to flee.

> Laborio [had] a pattern of deceit in dealing with the courts, continuance after
> continuance giving enough so that it looks like he's accepting responsibility for what he
> does, strings it along and then ultimately he disappears, ultimately he does not accept
> responsibility.

> The Court is going to hear evidence that this is exactly how Ed Laborio conducted
> Envit Capital. He would send Fraiman, Kenney, Munno, other individuals, some of whom
> you'll hear from, out there with instructions on what to do, and then when the problems
> started to happen, he'd be tough to find or he'd get with the witnesses and say, "All right, I'll
> take care of it, we're going to put money in your account by next week," and nothing would
> happen.

> That was his history with Mr. Fraiman as well. He'd put him off, he'll say, "I'll take
> care of it, I'll take care of it," and then ultimately he would obfuscate any responsibility. This
> pattern of deceit, of delaying, of playing this game of moving a step ahead and never
> accepting responsibility is what we're trying to show and what we think is probative as to
> whether there was that conspiratorial agreement, that pattern that playing his own game, of
> deceit, of manipulation is relevant to this case because that's what you're going to be hearing
> about on cross-examination, that pattern of deceit that the government may not bring out but
> that Fraiman was as much a victim as others, including their witnesses that are going to
> testify, so there is a special relevance to that . . . .

Tr. 11/30/15 at 25-26. The exclusion of this evidence was prejudicial error as well.[11]

The exclusion of the proffered reverse 404(b) evidence was, under any standard of review,

severely prejudicial to Fraiman's ability to present his defenses to the serious charges against him

and violated his Sixth Amendment right to present a complete defense. *See Holmes v. South

Carolina*, 547 U.S. 319, 324 (2006)("Whether rooted directly in the Due Process Clause of the

Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth

---

[11] It is no bar to the admissibility of evidence under Rule 404(b) that the events at issue
occurred after the end of the conspiracy charged. *See, e.g., United States v. Mensah*, 737 F.3d 789,
813 (1st Cir. 2013).

Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense,'" *quoting Crane v. Kentucky*, 476 U.S. 683, 690 (1986)). Even if the absence of a further effort to introduce the proffered documents during trial was a procedural lapse, the exclusion of this compelling evidence violated Fraiman's Sixth Amendment rights and constituted plain error.

**C.    The Improper Lay Opinion Testimony of Richard Denerstein and Robert Anderson.**

Richard Denerstein, a retired securities compliance officer, had spent much of his 40-year career in the securities industry policing the conduct of securities brokers and investment advisors and, as the government told the jury in its final argument, had "decades of Wall Street experience and a deep history in corporate compliance matters." Tr. 12/14/15 at 29. Denerstein, having seen a Craigslist ad placed by Envit for a compliance officer, met with Laborio two or three times, Tr. 12/2/15, and did extensive research regarding Envit. *Id.* at 48.   The government elicited from Denerstein his assessment that Envit was "a classic boiler room operation" which, while it "scared the heck out of [him], he initially thought that he, as a compliance officer, "could turn it around into something . . . legitimate." *Id.* at 45.[12] He also testified that it was "problematic" that the Envit

_____

[12] Denerstein went on to explain that what he meant by "classic boiler room operation" was "brokers . . . trying to convince somebody to buy something, rather than asking people what they need, they would be on the phone calling leads, a list that they bought of potential investors and call them using high pressure sales tactics to ask the person to buy whatever it was they were pushing." *Id.* at 46.   As generally understood, "the term boiler room refers to an outbound call center selling questionable investments by telephone. It typically refers to a room where salesmen work using unfair, dishonest sales tactics, sometimes selling penny stocks, private placements or committing outright stock fraud. The term carries a negative connotation, and is often used to imply high-pressure sales tactics and, sometimes, poor working conditions." https://en.wikipedia.org/wiki/Boiler_room_(business)(last visited April 30, 2015). *See* http://www.investorwords.com/517/boiler_room.html (defining " boiler room" as "[a]n unflattering term used to describe a fraud scheme in which salespeople are hired to call unsuspecting individuals and push investment opportunities. These high-pressure calls are often used to pitch worthless or

registered investment advisory firm, of which Fraiman was the nominal head, was not registered in Massachusetts. *Id.* at 54. The government went on to introduce Exhibit 170, submitted herewith as Exhibit 6, an email sent by Denerstein seeking the advice of an attorney friend of his. In that email, he told the attorney that the calls he heard were "scary" and that Laborio's plans "scared the hell out of [him]." *Id.* at 62. Asked by the government what "scared the hell out of [him]," Denerstein expounded:

> [F]irst of all, it's very rare that you see a brokerage firm selling their own stock as the only business that they're doing. The stock was worthless. It had no assets, it had no ongoing operations. It was a penny stock, meaning there's very little in reality that you could find out about the company if you're a potential investor. . . . [I]t's really something that you're buying without really knowing what you're buying other than what the person selling it tells you, very little verification of the facts.

*Id.* at 63. Denerstein further told the attorney that Laborio was not lawfully permitted to do what he wanted to do, *i.e.*, sell his own stock to investors through licensed broker/dealers. *Id.* at 63. He ended by telling the lawyer that, much as he needed employment, "this kind of operations is probably not worth risking my licenses for." *Id.* at 64. The government next offered Exhibit 171, submitted herewith as Exhibit 7, the email he sent the next day to the email addresses of Laborio and Fraiman. In that email he said he was not going to risk his license for what was nothing more than a boiler room operation, *id.* at 66-67, and that they had nothing to offer a brokerage firm because they had no revenues. *Id.* at 67-68. When the government asked Laborio what he understood the investors who purchased shares of Envit were investing in, he responded that "[t]hey were investing in a shell company that had nothing, no revenues, no assets, nothing." *Id.* at 68-69. He further stated in the email that "[p]utting a penny stock in an IRA account"—something which the government contended that Fraiman had done—"is asking for a regulatory problem" because "you have an

nonexistent securities")(last visited April 30, 2015).

additional fiduciary responsibility for somebody's retirement account. You want to put it in very safe investments because usually when somebody retire, they can't replace any investments that they lost because they're no longer working, so you definitely wouldn't put a penny stock [*i.e.*, Envit] in a retirement account of any kind." *Id.* at 71. He further stated in the email: "If you continue having people push your own stock using the method they are now, it's only a matter of time before you are shut down, and I don't want to be a part of that." *Id.* at 72.

Toward the end of the trial, just before it called Mr. Pingree to testify regarding his summary charts, the government called Robert Anderson, a man with a PhD in economics who had taught finance and investments at Tufts for six years and was an experienced investor, Tr. 12/10/15 at 19, who happened to be contacted by an Envit employee regarding potential investment in Envit/Rib World. *Id.* at 22-23. After speaking with the employee, Anderson testified that he still had questions, so he spoke to Laborio and Fraiman and also did his own research about Envit. *Id.* at 28-29. After speaking with representatives of Envit, Anderson testified, he

> concluded that this offering was probably some kind of an investment fraud. . . . I've had some experience with some of these in the past, and it certainly looked like that was what was involved here. They were doing things that to my mind, I'm not a lawyer, but to my mind seemed illegal, unethical, and wrong.

*Id.* at 32. Despite an objection and an admonition from the Court to avoid subjective comments about what the witness was thinking, the government elicited testimony from Anderson that he had stated in an email to the SEC (Ex. 164) that the Envit representatives, which included Fraiman, "made blatantly false and illegal representations concerning this offering." *Id.* at 33. His email to the SEC went on to say that the predictions of future stock value were "illegal if for no other reason than there is no market for the securities and there may never be a market for the securities. Further it is not appropriate to state what future market prices for the securities will be, as nobody knows."

*Id.* at 36. He further told the SEC that he "suspect[ed] they plan to offload a portion of unprofitable Envit Capital's portfolio on unwitting shareholders of this offering." *Id.* at 36. When the defense objected to a further question in the same vein, the Court sustained the objection and called counsel to sidebar, where it stated that it had been "very uncomfortable with the whole line of questioning and testimony here,"as "his subjective impressions of whether something was illegal or not seems to me clearly cannot come into evidence under any circumstances." *Id.* at 37. Counsel added that "the incessant opinions and pseudo expert testimony . . . is completely beyond bounds." *Id.* at 40. The Court did give a cautionary instruction:

> [L]et me be clear about something here. The witness, who is not an attorney, testified that he had a communication with the SEC and that he said these things in that communication. *They are at most his personal opinions.* He's not a lawyer. . . . [H]e's not allowed to give expert testimony about what is illegal or not illegal, really no one is. That's for you to decide, and the issue you should focus on with regard to this testimony is his communications with the defendant who's on trial and any alleged coconspirator and what that may bring to bear on the evidence in this case.

*Id.* (emphasis added). Despite the Court's admonition, Anderson went on to testify that he "had discovered problems, apparent problems with the SEC," *id.* at 41, and that persons at retirement age should not be taking on large risks." *Id.* at 43.

Thus, near the beginning and end of the government's case, the jury heard quasi-expert testimony from two witnesses with extensive knowledge of the securities industry who had conducted their own investigations of Envit that what Fraiman had said and done was fraudulent, illegal, and unethical. They may have also been percipient witnesses, but their primary function was to provide the jury with their opinions of Envit and the conduct of Fraiman and Laborio (whom they lumped together) based on their specialized knowledge and experience. This was expert testimony in percipient witness clothing. However, since the government did not seek to qualify either

Denerstein or Anderson as an expert, the question of the admissibility of their opinion testimony must be analyzed under Fed. R. Evid. 701, *see United States v. Etienne*, 772 F.3d 907, 919 (1st Cir. 2014), which provides: "If a witness is not testifying as an expert, testimony in the form of [opinions or inferences] is limited to [those which are] (a) rationally based on the witness' perception; (b) helpful to clearly understanding the witness' testimony or to determining a fact in issue; and (c) *not based on scientific, technical, or other specialized knowledge within the scope of Rule 702*." *United States v. Valdivia*, 680 F.3d 33, 50 (1st Cir. 2012)(bracketed material and emphasis added by Court). The testimony here transgressed all three requirements.

First, while some of the testimony of these two witnesses was based on their personal perceptions, their opinions were based on a mixture of what they personally perceived and their investigations of Envit. Thus, their opinions were based in substantial part on hearsay and therefore improper. *See United States v. Rodriguez-Adorno*, 695 F.3d 32, 39 (1st Cir. 2012).[13]

Second, their opinions were not helpful to the jury's determination of a fact in issue or to understanding the witness' testimony. Instead, it was opinion testimony on the ultimate issue in the case, which the First Circuit has often said will "seldom . . . meet the test of being helpful to the trier of fact since the jury's opinion is as good as the witness'." *United States v. Sanabria*, 645 F.3d 505, 516 (1st Cir. 2011). *See, e.g., United States v. Diaz-Arias*, 717 F.3d 1, 12 (1st Cir. 2013); *Rodriguez-Adorno*, 695 F.3d at 39; *United States v. Vazquez-Rivera*, 665 F.3d 351, 358 (1st Cir. 2011); *United States v. Meises*, 645 F.3d 5, 17 (1st Cir. 2011); *see also United States v. Reda*, 787 F.3d 625, 629

---

[13]    In this sense, the opinions of these witnesses were somewhat akin to the summary law enforcement testimony based on the investigation as a whole, which the First Circuit has roundly and repeatedly condemned. *See, e.g., United States v. Meises*, 645 F.3d 5, 13-16 (1st Cir. 2011); *United States v. Vazquez-Rivera*, 665 F.3d 351, 357-59 (1st Cir. 2011).

(1st Cir. 2015)(noting that district court sustained objections to agent's testimony that a kickback was a form of bribery and that the deal at issue was "illegitimate finance").[14]

Third, and most importantly, the witnesses' opinions were plainly based on specialized knowledge within the scope of Rule 702. *See First Marblehead Corp. v. House*, 541 F.3d 36, 42 (1st Cir. 2008)(testimony regarding how stock options function and how an investor would think about exercising those options are matters for expert testimony). These witnesses had deep and extensive specialized knowledge of the securities industry far outside the ken of the average layman, and they brought that specialized knowledge to bear to tell the jury that Envit was a sham and, in effect, that Fraiman had committed, and conspired to commit, the fraud charged.

The admission of this testimony was seriously prejudicial to Fraiman as it effectively told the jury, that in the opinion of two securities experts, Fraiman was guilty as charged. While the fact that *Laborio* had engaged in fraudulent conduct toward Envit's investors was not contested, whether Fraiman had knowingly and intentionally done so was at the heart of the case, and the testimony of these witnesses effectively told the jury that he had. The cautionary instruction with respect to

---

[14] The government introduced Exhibit 171, the email from Denerstein to the email addresses of Laborio and Fraiman, and his accompanying opinion commentary, as evidence of wilful blindness on Fraiman's part, as it argued forcefully to the jury over several transcript pages of final argument, referring to Ex. 171 as not a "mere red flag" but a "huge red stop sign." Tr. 12/14/15 at 29-33. The government obtained the email because Denerstein provided it to the SEC. Tr. 12/2/15 at 65. The record is, however, devoid of evidence that Fraiman even opened the email, let alone read it – no evidence that he talked about it, no evidence that he discussed it, and no forensic evidence to show that the email was even opened. "In order for a defendant's ignorance to be deliberate or wilful, the defendant *must have been presented with facts* that put him on notice that criminal activity is probably afoot, and then the defendant must have failed to investigate those facts, therefore deliberately declining to verify or discover the criminal activity." *United States v. Barnhart*, 979 F.2d 647, 652 (8th Cir.1992)(emphasis added). Denerstein's email could not constitute a "flag[] of suspicion that, uninvestigated, suggest[s] wilful blindness," *United States v. Azubike*, 564 F.3d 59, 66 (1st Cir. 2009), *quoting United States v. Epstein*, 426 F.3d 431, 440 (1st Cir. 2005),unless Fraiman knew of its contents. Of this, there was no evidence.

Anderson's testimony, which told the jury that Anderson's testimony was "at most his personal opinions," *see* page 21, *supra*, did little or nothing to ameliorate the prejudice to Fraiman, as that testimony was the personal opinion of an economics PhD who had taught securities and investment at Tufts for six years.

## CONCLUSION

The combination of these errors—even if some will be reviewable on appeal only for plain error— denied Fraiman a fair trial. His appeal will raise substantial questions which, if decided in his favor, would result in an order for a new trial. Accordingly, this Court should permit him to remain on bail pending the resolution of his appeal by the First Circuit on the same terms and conditions as presently apply.

Respectfully submitted,
By his attorney,

**/s/ Kimberly Homan**
Kimberly Homan
20 Park Plaza, Suite 1000
Boston, Massachusetts 02116
tel: (617) 227-8616
fax: (617) 227-9538
homanlaw@aol.com

## CERTIFICATE OF SERVICE

I, Kimberly Homan, hereby certify that on this 4th day of May, 2016, I caused the within Motion for Bail Pending Appeal to be served on all registered participants through its filing with this Court's CM/ECF system.

**/s/ Kimberly Homan**
Kimberly Homan
