| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JONATHAN FRAIMAN,<br><br>    Defendant. | CRIMINAL NO. 12-CR-10238 (FDS) |

**GOVERNMENT'S OPPOSITION TO THE DEFENDANT'S MOTION FOR BAIL
PENDING APPEAL**

The government respectfully submits this opposition to the defendant's Motion for Bail

Pending Appeal (the "Motion") (Docket Number 236). After a two-week trial ending on

December 14, 2015, the defendant was convicted of one count of conspiracy to commit mail and

wire fraud and one count of mail fraud stemming from his employment in 2008-09 at Envit

Capital LLC and its related entities (collectively, "Envit"). Sentencing was originally set for

March 10, 2016, but, pursuant to the defendant's assented-to motion to postpone the sentencing,

the Court rescheduled the hearing for April 4, 2016. After a second, unsuccessful, motion by the

defendant to further delay the sentencing (Docket Number 194), the Court held the sentencing

hearing on April 4, and imposed a sentence that included 72 months of incarceration. On April

26, 2015, the Court entered its judgment in this case, followed by an amended judgment on May

2, 2016. (Docket Numbers 224, 231.) Fraiman filed a notice of appeal on May 3, 2016 (Docket

Number 232), and the Motion followed on May 4, 2016. In his pursuit of bail pending appeal,

Fraiman raises three issues which he asserts present a substantial question of law or fact likely to

result in a reversal of his conviction. In reality, Fraiman's prospects of success on appeal are

virtually nil, and the Motion appears to be nothing more than another stop on Fraiman's journey

of attempting to avoid (or postpone) the consequences of his criminal behavior. Because he has

failed to meet the applicable standards for bail pending appeal, Fraiman's Motion should be

denied, and he should begin serving his sentence as scheduled.

I.      Applicable Standards.

18 U.S.C. § 3143(b) creates a rebuttable presumption that a convicted defendant who has

been sentenced to a term of imprisonment be incarcerated pending appeal. See 18 U.S.C. §

3143(b); United States v. Chilingirian, 280 F.3d 704, 709 (6th Cir. 2002). Thus, detention under

that subsection is mandatory unless the Court finds that two requirements have been met: (1) that

the defendant has demonstrated by clear and convincing evidence that he is not likely to flee or

pose a danger to the safety of any other person or the community if released; and (2) that the

defendant has demonstrated that the appeal is not for the purpose of delay and raises a substantial

question of law or fact likely to result in reversal, an order for a new trial, a sentence that does

not include a term of imprisonment, or a reduced sentence to a term of imprisonment less than

the total of the time already served plus the expected duration of the appeal process. See 18

U.S.C. §§ 3143(b)(1)(A), (B)(i)-(iv); United States v. Bayko, 774 F.2d 516, 520-22 (1st Cir.

1985).[1] In determining whether an appeal raises a substantial question of law or fact, it is not

enough for a defendant to show that a disputed point of law or fact was "fairly debatable" or that

a "possibility of reversal" exists. Bayko, 774 F.2d at 523 (internal marks omitted) (vacating

district court's order and revoking bail upon finding that the district court erroneously ordered

---

[1] Under the Federal Rules of Appellate Procedure, when issuing an order regarding release after
a judgment of conviction, "the district court must state in writing, or orally on the record, the
reasons for an order regarding the release or detention" of the defendant. Fed. R. App. P. 9(a);
see Fed. R. App. P. 9(b) (order and review of motion for release after conviction is governed by
Fed. R. App. P. 9(a)).

bail when it concluded that there was a "possibility of reversal" on appeal).  Rather, the First

Circuit has stated that the appeal must present a "close question or one that very well could be

decided the other way."  Id. at 523 (internal marks omitted) (citing United States v. Giancola,

754 F.2d 898, 901 (11th Cir. 1985)).  Here, Fraiman has failed to present any such close

question.[2]

II.      Exhibits 189, 193 and 199 Were Properly Admitted at Trial.

At trial, the government called as a witness James Pingree, a forensic accountant with the

Federal Bureau of Investigation (the "FBI"), who presented testimony summarizing several

groups of voluminous documents which he had reviewed, including Envit's bank account

records and payroll records.  Among other things, Pingree discussed, on the stand, the

provenance of funds coming into Envit's bank account during the time period that Fraiman

worked at the company, as well as what Fraiman's co-conspirator, Ed Laborio, had done with

that money.  To that end, the government introduced eleven summary charts created by Pingree

into evidence.  (See Trial Exhibits ("Exhs.") 188-196; 198-199.)  Exhibit 188 (a copy of which is

attached hereto as Exhibit A) reflected Pingree's analysis of deposits into the Envit bank

accounts, the bulk of which came from investors; the defense did not object to the introduction of

this exhibit.  (See Docket Number 153; Trial Transcript ("Tr.") Dec. 9, 2015, at 4-15.)  As

Pingree testified, he compiled this chart by reviewing the deposits into Envit's accounts, and

then, based on the evidence at trial and certain other documents, classified those deposits as

---

[2]  This brief will focus on the inquiry under 18 U.S.C. § 3143(b)(1)(B), rather than subsection
(b)(1)(A), because the Court has already heard lengthy argument on the question of risk of flight.
(See, e.g., Docket Numbers 162, 166-68, 170.)  Suffice it to say that whatever concerns existed
regarding Fraiman's potential for flight post-verdict have been amplified after his entreaties for a
probationary sentence were rebuffed and he was sentenced to a 72-month term of incarceration.

coming from Fraiman-allocated investors, non-Fraiman-allocated investors, and miscellaneous

other sources. (See Tr. Dec. 10, 2015 at 62-70.) As "subset[s]" of that exhibit, Pingree also

created Exhibits 189 and 193,[3] which presented the same information, except that they visually

segregated the deposits attributed to one Bernard Berry, whom Fraiman had identified during his

FBI interview (see Exh. 161) as Ed Laborio's biggest client. (See Tr. Dec. 10, 2015 at 71, 81.)

Pingree made clear in his testimony, however, that Berry was a non-Fraiman investor. (See id. at

71.) The defense objected to the admission of Exhibits 189 and 193, and subjected Pingree to

rigorous cross-examination regarding Berry's status as a non-Fraiman investor and Berry's

investments generally. (See Tr. Dec. 11, 2015 at 71-78.)[4]

Exhibit 199,[5] meanwhile, reflected Pingree's review of the outflows from the Envit and

Aetius bank accounts, as well as his analysis of records from the third party that provided payroll

services to Envit. (See Tr. Dec. 10, 2015 at 111-12.) Specifically, Pingree had already testified

regarding monies flowing out of Envit's accounts that went to Envit employees (see id. at 87-88)

and had also testified about how much money Fraiman had earned during his tenure at Envit (see

id. at 104-11); through Exhibit 199, Pingree demonstrated how monies paid out to various

employees compared from the beginning of Fraiman's employment to the end. (See id. at 112-

---

[3] Exhibits 189 and 193 were attached to the Motion as Exhibits 2 and 3, respectively.

[4] While many of defense counsel's questions during this portion of Pingree's testimony focused on Exhibit 192, Exhibit 192 was virtually the same as Exhibit 189, the only difference being that it reflected deposits into both Envit's and Aetius Group LLC's (Envit's successor entity) bank accounts.

[5] Exhibit 199 was attached to the Motion as Exhibit 1.

16.)[6]  Again, this was a straightforward mathematical tabulation of monies that had been paid to

specific employees out of the Envit accounts.  Pingree also attributed cash withdrawals to

Laborio, and even allocated withdrawals that postdated the conspiracy period to him.  (See id. at

112.)  On cross-examination, defense counsel pointed out, at some length, that many of the

individuals depicted in Exhibit 199 had not worked at Envit as long as Fraiman did, and that

Pingree had not put together on that exhibit prorated figures to reflect the different length of their

tenures.  (See Tr. Dec. 11, 2015, at 81-88.)[7]  Furthermore, defense counsel also explored the

themes of Laborio granting himself Envit stock and various perks in his employment agreement

during cross-examination.  (See, e.g., id. at 42-49; 52-57; 67-68; 90-91.)

These three exhibits were admitted, over objection, under Fed. R. Evid. 1006, which

states, in pertinent part, that a party "may use a summary, chart, or calculation to prove the

content of voluminous writings . . . that cannot be conveniently examined in court.  The

proponent must make the originals or duplicates available for examination or copying, or both,

by other parties at a reasonable time and place."  Fed. R. Evid. 1006.  The documents which

form the basis for a given summary exhibit need not be admitted at trial.  See, e.g., United States

v. Appolon, 715 F.3d 362, 374 (1st Cir. 2013).  Here, Fraiman does not dispute that the

predicates of Rule 1006 were met—Pingree established that the records he had analyzed were

voluminous and not conducive to efficient analysis on the stand (see, e.g., Tr. Dec. 10, 2015 at

64), and those records had been produced to defense counsel months before trial—but rather

---

[6]  The chart in Exhibit 199 reflected payments made to the top five biggest earners during the relevant time period, as well as several other employees who had either testified or been mentioned at trial.  (See Tr. Dec. 10, 2015 at 112-13.)

[7]  Of course, even if the figures had been prorated, Fraiman would still have ranked second in the listing by a country mile.  (See Tr. Dec. 11, 2015, at 85-88; 102-03.)

complains that the exhibits in question were "misleading and prejudicial" (Motion at 5), and

therefore should never have been admitted. This argument is unavailing.[8]

As an initial matter, Fraiman's prospects of success on appeal on this issue are dim, as the

First Circuit affords wide deference to this Court's discretion in deciding whether summary

charts would be helpful to the jury. See United States v. Milkiewicz, 470 F.3d 390, 398 (1st Cir.

2006) ("It is hard to imagine an issue on which a trial judge enjoys more discretion than as to

whether summary exhibits will be helpful.") (internal marks and citation omitted). Here, the

Court considered the defendant's argument that the charts in question were misleading, and

rejected it. (See at Tr. Dec. 9, 2015 at 13-15.) Indeed, it is hard to discern what is so

"misleading" about these exhibits: Pingree made clear that what he looked at was the investor

monies coming into the account for a given time period, and monies that came out of those same

accounts that went to Envit employees, no more, no less. And that was what his summary charts

showed.

More to the point, to the extent that the defendant took issue with what the charts

depicted—or left out—he had ample opportunity to cross-examine the creator of the charts, an

opportunity which he seized with some relish, and to create charts of his own, which he declined

to do, although defense counsel did introduce exhibits to make counterpoints to Pingree's

testimony. In this regard, this case is on all fours with United States v. Sawyer, 85 F.3d 713 (1st

_____

[8] The First Circuit's treatment of similar objections to summary exhibits is not clear as to
whether an accusation of such "prejudice" falls under the auspices of Rule 1006 itself, or is
really a Rule 403 argument. Compare United States v. McElroy, 587 F.3d 73, 83 (1st Cir. 2009)
(analyzing claims of prejudice inherent in summary evidence under Fed. R. Evid. 403) with
United States v. Milkiewicz, 470 F.3d 390, 398 (1st Cir. 2006) (stating that charts admitted under
Rule 1006 must be "accurate and nonprejudicial") (internal marks and citations omitted). No
matter; whether analyzed under Rule 403 or Rule 1006, Fraiman has virtually no chance of
securing a new trial on this issue after appeal, as discussed below.

Cir. 1996), where the defendant, on appeal, argued that summary charts introduced by the government had been "misleading, argumentative and prejudicial." United States v. Sawyer, 85 F.3d 713, 740 (1st Cir. 1996). The First Circuit rejected this argument, observing that, "[o]n the matters to which Sawyer assigns undue prejudice, he had ample opportunity to explore them on cross-examination, which he did. He also could have offered his own contrary evidence, including his own summary (which he did not do)." Id.; see also United States v. Nivica, 887 F.2d 1110, 1126 (1st Cir. 1989); United States v. Katsipis, 598 Fed. App'x 162, 165 (4th Cir. 2015) (*per curiam*) (unpublished op.); United States v. Hays, Nos. 87-5164, 87-5166-68, 1993 WL 515508, at *5 (9th Cir. Dec. 10, 1993) (unpublished op.). It is difficult to imagine the First Circuit reaching a different result here.

III.    The Defendant's Desire to Introduce Evidence of Laborio's Other Bad Acts Does Not Present a Close Question of Law Likely to Lead to a New Trial.

Prior to trial, the defendant filed a motion *in limine* to introduce evidence of various other bad acts by Fraiman's deceased codefendant, Laborio, as part of Fraiman's defense. (Docket Number 133.) The government filed a response, which, in the interests of efficiency, is incorporated by reference here. (the "Response") (Docket Number 139.) The Court, prior to the commencement of trial, provisionally denied the defendant's motion without prejudice (Tr. Nov. 30, 2015, at 24-25; 27-28), noting that the defendant's proffered evidence appeared to be relevant only to showing that Laborio had a propensity to commit fraud—and therefore did not pass muster under Fed. R. Evid. 404(b)—and, in any event, that such evidence would devolve into mini-trials regarding Laborio's other conduct, thereby running afoul of Rule 403 as well. (Id. at 12.) Fraiman did not revisit the introduction of the exhibits that had been the subject of his motion *in limine* during the trial.

As a preliminary matter, Fraiman's assignment of error on this issue will be considered

by the First Circuit under the draconian plain error standard, since he did not endeavor to

introduce the exhibits in question after the provisional denial of his motion.  See United States v.

Powers, 702 F.3d 1, 14 (1st Cir. 2012).  "Review for plain error entails four showings: (1) that an

error occurred (2) which was clear or obvious and which not only (3) affected the defendant's

substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of

judicial proceedings."  United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001) (citations

omitted).  This "exacting" standard "tends to afford relief . . . only for blockbuster errors."

United States v. Rodriguez, 675 F.3d 48, 64 (1st Cir. 2012) (internal marks and citations

omitted).

Here, no error occurred, much less an obvious one that seriously impaired the fairness of

the trial.  For all of the reasons discussed in the Response, the defendant's desire to introduce

other instances of Laborio's malevolence was a transparent attempt to cast him as a serial

fraudster, who, the argument would go, also defrauded Fraiman.  With regard to Laborio's

Florida conviction, contrary to the defendant's current misguided attempts to shoehorn that

conduct into the same category of fraud which was alleged in the Indictment and proven at trial,

the two schemes were sharply different.  The fraud in the instant case was one in which Fraiman

and Laborio went directly to the investing public, brazenly lied through their teeth regarding

Envit, and thereby defrauded dozens of innocent investors, most of whom had been identified

through cold calls.  The Florida undercover sting which led to Laborio's conviction involved his

agreement with a purportedly corrupt pension fund manager to effectively assist that individual

in embezzling client funds by giving him a kickback for his purchase of Envit stock with investor

monies.  The defendant's assertion that these two distinct schemes were "precisely the same"

(Motion at 14) is befuddling, and the differences between them underscore the point that Fraiman wanted Laborio's plea agreement and the Florida Information in evidence simply to hammer home a propensity-for-fraud argument.[9] That, it goes without saying, was an improper purpose for which to seek the introduction of the evidence.

Moreover, the Court's assessment that the introduction of such evidence would have "inevitably" led to mini-trials was absolutely correct. (Tr. Nov. 30, 2015 at 12.) While Fraiman magnanimously asserts that he would only have sought to introduce the proffered documents, thereby, in his view, dispensing with any possibility of a mini-trial (Motion at 16), this ignores the fact that, with the door having been opened, the government would have felt the need to provide context for the jury and rebut any unwarranted inferences raised by the defense. That would, in all likelihood, have involved some testimony or other evidence about the Florida sting operation, the circumstances of Laborio's conduct there, and the events leading to the signing of the plea agreement. Given that the evidence had minimal, if any, probative value in the first place, the risk of that value being substantially outweighed by the confusion it would sow was obvious. See United States v. Vazquez-Botet, 532 F.3d 37, 50 (1st Cir. 2008) (defendant's proffered evidence, part of an effort to cast blame for the charged crime on third parties, was not only irrelevant, but also would have resulted in "a confusing and distracting sideshow."). And, in terms of Fraiman's likelihood of success in getting the First Circuit to second guess the Court's Rule 403 determination, it should be noted that "only rarely—and in extraordinarily compelling circumstances—will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair

---

[9] The government also objected to the introduction of these documents on hearsay grounds (see Response at 6 n.2), an issue which the defendant did not address in pretrial argument, and has not addressed here either.

effect." United States v. Habibi, 783 F.3d 1, 4 (1st Cir. 2015) (internal marks and citations omitted).

The second category of proffered evidence that the defense indicated that it might introduce—Laborio's post-conspiracy conduct vis-à-vis the government and the courts, culminating in his flight—was even further afield from the central issue in dispute at trial, which was Fraiman's state of mind. Indeed, even at this stage, defendant barely attempts to dress up this evidence as anything other than propensity evidence. To that end, he readily admits that the only relevance of this evidence was to show a "pattern of conduct by Laborio" in "str[inging] people along . . . ." (Motion at 16-17.) This is practically the very definition of propensity evidence. Moreover, here, too, as noted in the Response, traveling down the path of what occurred after Laborio was charged in an Information by the United States Attorney's Office (and the United States Securities and Exchange Commission (the "SEC")) would inexorably have led to a distracting mini-trial. (Response at 7-9.) As such, it is preposterous to assert that the Court's failure to allow irrelevant, time-consuming, confusing evidence of Laborio's various bad deeds—evidence which was ultimately not actually offered at trial—constituted such plain error as would cause the First Circuit to reverse Fraiman's conviction.

IV.    Richard Denerstein and Robert Anderson Did Not Provide "Improper Lay Testimony."

Fraiman's final asserted basis for his claim that a reversal of his conviction is a likely prospect focuses on the testimony of government witnesses Richard Denerstein and Robert Anderson, each of whom was a percipient witness in this case. Denerstein was an experienced Wall Street executive who had flirted with the idea of joining Envit as a compliance officer, only to be so put off regarding what he learned about Envit that he sent Fraiman and Laborio an e-mail warning them to cease their activities lest they run afoul of regulators. (See Tr. Dec. 2,

2015 at 65-76; Exh. 171.)  Specifically, in his testimony on direct examination, Denerstein, among other things, provided his professional background (see id. at 34-38), and then described his one brief meeting with Fraiman, who introduced himself as Laborio's partner (see id. at 42-43), as well as his various interactions with Laborio and observations he had made of Envit's operations (see id. at 43-46).  Denerstein also discussed and explained the two e-mails he had sent during that time frame expressing his concerns regarding Envit, one to a friend of his who was an attorney (see Exh. 170), and the other to Fraiman and Laborio (see Exh. 171).  Exhibits 170 and 171 were admitted without objection; indeed, not a single objection was lodged during the entirety of Denerstein's direct examination, which includes every single ostensibly objectionable quotation presented in the Motion.  (See Motion at 18-20.)

Anderson, for his part, was a former professor who had taught, among other things, courses in finance and investments at Tufts University.  (See Tr. Dec. 10, 2015 at 19.)  In April 2009, Anderson received a cold call from an Envit lackey pitching him on Envit's "Rib World" investment (see id. at 23-24), and also received a prospectus describing the offering (see id. at 26-27).  Both Fraiman and Laborio then followed up with calls to Anderson pitching him Envit (see id. at 28; 34-37; 41-42), calls which Anderson characterized as "twisting [his] arm very hard" (id. at 43).  Anderson reported his concerns regarding these calls to the SEC, in an e-mail dated July 10, 2009, which was admitted without objection.  (See Exh. 164.)

Now, the defendant raises, for the first time, an objection that the testimony of Anderson and Denerstein was lay opinion testimony, and further that it was improper.  (See Motion at 22.) To the extent that the former characterization is accurate—a notion that the government does not concede, particularly as Fraiman has not identified with particularity specific statements that he believes were opinion—"the modern trend favors the admission of opinion testimony [from lay

11

witnesses] provided it is well founded on personal knowledge and susceptible to cross-examination." United States v. Vega-Figueroa, 234 F.3d 744, 755 (1st Cir. 2000) (internal marks and citation omitted); see United States v. Rivera-Santiago, 107 F.3d 960, 968 (1st Cir. 1997). Under the Federal Rules of Evidence, a lay witness can offer opinions that are "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701; see, e.g., United States v. Munoz-Franco, 487 F.3d 25, 35 (1st Cir. 2007). Each of these elements was met here.

Unquestionably, and as the defendant concedes (see Motion at 22), Denerstein's and Anderson's testimony was grounded in large part on their perceptions formed while discussing Envit with Laborio and Fraiman and, in Denerstein's case, by visiting Envit's office. The defendant argues that these perceptions were "based in substantial part on hearsay," but does not make clear what supposed hearsay that assertion is based on. (Id.) Indeed, it is difficult to discern what that would be in the case of Denerstein; and while Anderson, without objection, noted that he had seen on the internet—potential hearsay, in theory anyway—that Envit was having issues with the SEC and was a penny stock (see Tr. Dec. 10, 2015 at 29), those facts were established at trial in any event (see, e.g., Exhs. 44, 45, 171; Stipulations of Fact). Moreover, that statement was likely not even hearsay, because it was introduced to explain why Anderson asked (presumably) Fraiman how Envit was dealing with its SEC problems, and to elicit from Anderson Fraiman's response to that question (see Tr. Dec. 10, 2015 at 42). See United States v. Soto, 799 F.3d 68, 89 (1st Cir.) (out-of-court statement offered for the purpose of explaining the listener's actions is not hearsay), cert. denied, 136 S. Ct. 421 (2015); United States v. Meserve, 271 F.3d 314, 320 (1st Cir. 2001) ("the hearsay rule does not apply to statements that are offered

to show what effect they produced on the actions of the listener.") (citation omitted); United

States v. Paredes-Rodriguez, 160 F.3d 49, 57 (1st Cir. 1998) (holding that it was not abuse of

discretion for the trial court to allow testimony of out-of-court statements in order to explain

what prompted the witness to take subsequent action).  In any event, any hearsay present played

a miniscule role in the witnesses' perceptions to which they testified.

The defendant's argument on the second prong of Rule 701 fares no better.  The notion

that the testimony was not helpful to the jury in understanding the witness's testimony or

determining a fact in issue is laughable, particularly as it pertains to Denerstein.  Denerstein sent

the two co-conspirators an e-mail outlining the many problems which he perceived with the way

Envit did business.  Some of those issues went at the heart of the criminal activity that Fraiman

was engaged in, such as Denerstein's admonition that the pair should not invest their clients'

IRA monies in Envit stock—an activity in which Fraiman had actively been engaged, and in

which he continued to be engaged after the date of that e-mail.  There could scarcely be stronger

evidence of Fraiman's criminal intent than his brushing off of Denerstein's warnings in favor of

continuing to pursue his and Laborio's criminal enterprise.[10]

Anderson's testimony, while less potent, provided evidence of Fraiman and Laborio, in

virtual tandem, contacting a prospective investor with high pressure sales tactics and apparent

false statements—for instance, statements regarding Envit's revenues which were at odds with

---

[10]  Fraiman argues—as defense counsel did to the jury in closing (see Tr. Dec. 14, 2015 at 73)—
that there was no evidence that Fraiman "opened [Denerstein's] email, let alone read it[,]"
presumably suggesting that this rendered Denerstein's email irrelevant. (Motion at 23 n.14.)  It
is true, alas, that the government was unable to procure a witness who had chaperoned Fraiman
during the week of October 27, 2008, and who could testify that he or she observed him opening
and reading Denerstein's email.  Notwithstanding this glaring hole in the evidentiary record, the
jury was certainly entitled to infer that Fraiman both opened and read an email that was sent to
him at an email address which he was actively using at the time (see, e.g., Exhs. 102-06).

the Rib World prospectus that Anderson had received (see Tr. Dec. 10, 2015 at 34-35)—conduct

which was at the heart of the fraud. Moreover, Anderson raised to Fraiman and Laborio the

various problems which he discerned with the offering and, as with the Denerstein email,

Fraiman nonetheless continued on with his fraudulent conduct after Anderson had pointed out

these issues. This, too, was evidence helpful to the jury to determine the questions of whether

Fraiman acted with fraudulent intent and conspired with Laborio in doing so.

Fraiman also contends that the testimony in question "was opinion testimony on the

ultimate issue in the case" (Motion at 22);[11] again, he fails to identify which specific statements

he is referring to, and, with Denerstein, there was no testimony that Fraiman acted with

fraudulent intent or that he was engaging in illegal activity. As for Anderson, his e-mail to the

SEC, Exhibit 164, did assert that Envit was making "blatantly false and illegal representations"

(Exh. 164), which likely did implicate one of the ultimate issues to be decided by the jury.

However, that portion of his testimony was addressed by the Court's curative instruction—given

at the government's request (see Tr. Dec. 10, 2015 at 39)—that only the jury was to decide

whether the conduct in question was illegal (see id. at 40), which provided a safeguard that the

jury would not be influenced by Anderson's opinion. See United States v. Ayala-Vazquez, 751

F.3d 1, 26 (1st Cir. 2014) ("We have long recognized in this Circuit that within wide margins,

the potential for prejudice stemming from improper testimony or comments can be satisfactorily

---

[11] As the First Circuit has noted, the Rules of Evidence have "remove[d] the common-law bar on 'otherwise admissible' testimony that 'embraces an ultimate issue to be decided by the trier of fact[.]'" Nieves-Villanueva v. Soto-Rivera, 133 F.3d 92, 100 (1st Cir. 1997) (quoting Fed. R. Evid. 704(a)). That being said, the Court of Appeals has also remarked that, while there is no *per se* bar on lay opinion testimony regarding the ultimate issue, it is the rare case where such lay opinion testimony will be helpful to the trier of fact, "since the jury's opinion is as good as the witness's[.]" United States v. Sanabria, 645 F.3d 505, 516 (1st Cir. 2011) (internal marks and citation omitted).

dispelled by appropriate curative instructions.") (internal marks and citations omitted); see also

United States v. Albritton, 135 Fed. App'x 239, 241 (11th Cir. 2005) (unpublished op.) (trial

court's limiting instruction to the jury that they were to decide the ultimate issue about which a

special agent had testified contributed to a holding that reversal was not warranted). Moreover,

Anderson's stated belief in the illegality of Fraiman's conduct was not only covered by the

Court's cautionary instruction, but it was not even raised in passing by the government in its

closing or rebuttal. After two weeks of evidence demonstrating the illegality of Fraiman's

conduct, the fleeting mention of that portion of Anderson's e-mail during testimony—never to be

raised again—would not survive harmless error review, much less meet the plain error standard.

See United States v. Rodriguez-Adorno, 695 F.3d 32, 39 (1st Cir. 2012) (admission of two

witness statements regarding ultimate issue that were made in passing, and not referred to by the

government in closing argument, was harmless error).

Finally, the Motion argues that Denerstein and Anderson were really providing covert

expert testimony, grounded in "specialized knowledge[,]" which "effectively told the jury . . .

[that] Fraiman was guilty as charged." (Motion at 23.) First, of course, Denerstein and

Anderson told the jury no such thing. Second, Rule 701 does not require witnesses to check their

professional experience at the courtroom door lest they be labeled experts; rather, "'Rule 701 lets

in testimony based on the lay expertise a witness personally acquires through experience, often

on the job.'" Habibi, 783 F.3d at 5 (quoting United States v. George, 761 F.3d 42, 59 (1st Cir.

2014) (other internal marks and citations omitted). Here, Denerstein's and Anderson's

respective professional backgrounds informed their observations of, and reactions to, what

Fraiman and Laborio were up to at Envit.[12]  Indeed, without information as to that background

the jury could have been confused, rather than informed, by the testimony regarding the first-

hand communications that these witnesses had with Fraiman and Laborio.  At its heart,

Denerstein's and Anderson's testimony focused on what they heard from the coconspirators and

observed with regard to Envit, not on some specialized scientific knowledge; as such, to the

extent that it included their opinions, it was nonetheless lay opinion testimony.  See United

States v. Cuti, 720 F.3d 453, 460 (2d Cir. 2013) (although accountants' testimony encompassed

highly technical accounting rules, it was nonetheless lay opinion testimony as the testimony was

"not rooted exclusively in the witness's expertise and did not address the soundness of the

accounting rules.") (internal marks omitted).

V.      Conclusion.

        For a year-and-a-half, Jonathan Fraiman conspired with Ed Laborio to defraud scores of

innocent investors—some elderly and vulnerable—out of millions of dollars.  He was convicted

of all counts against him in the Indictment and now, more than five months later, he continues to

attempt to forestall serving the term of imprisonment which he so richly deserved as a sentence.

It is time for him to face his punishment, and his Motion, on its face, provides him no relief in

that regard, as he has not identified any appellate issues which have a realistic chance of

---

[12]  The fact that Denerstein and Anderson were percipient witnesses providing a first-hand
account that was informed by their professional background serves to distinguish them from the
government agent witnesses in United States v. Vega, 813 F.3d 386 (1st Cir. 2016), who offered
testimony regarding their conclusions that the defendant's company's actions had violated the
anti-kickback statute, which the First Circuit subsequently held to be expert testimony.  See
United States v. Vega, 813 F.3d 386, 393-95 (1st Cir. 2016).  It should also be noted that the
First Circuit ultimately held that the error in not qualifying the two witnesses as experts in Vega
was harmless, given that the defendant's theory of the case had been that she was not aware of
the fraud, which she laid at the feet of another member of the conspiracy, as opposed to denying
that a fraud had occurred.  See id. at 395-96.  As the Motion itself concedes, the fact of
fraudulent conduct at Envit was not contested in this case either.  (Motion at 23.)

resulting in a reversal of his conviction.  For the reasons set forth above, the government

respectfully submits that the Motion should be denied.

Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney

By: */s/ Vassili Thomadakis*
VASSILI THOMADAKIS
ERIC P. CHRISTOFFERSON
Assistant U.S. Attorneys

Dated: May 17, 2016

<u>CERTIFICATE OF SERVICE</u>

      I hereby certify that this document, filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: May 17, 2016

*/s/ Vassili Thomadakis*
VASSILI THOMADAKIS
