1
2                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
3

4
    UNITED STATES OF AMERICA,          )
5                                      )
                        Plaintiff,     )  Criminal Action
6                                      )
                                       )  No. 12-10238-FDS
7   vs.                                )
                                       )
8   EDWARD LABORIO and JONATHAN        )
    FRAIMAN,                           )
9                       Defendants.

10

11  BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV

12

13                          SENTENCING

14

15

16          John Joseph Moakley United States Courthouse
                          Courtroom No. 2
17                       One Courthouse Way
                         Boston, MA 02210
18

19                        April 4, 2016
                          11:00 a.m.
20

21

22

23                       Valerie A. O'Hara
                      Official Court Reporter
24          John Joseph Moakley United States Courthouse
                   One Courthouse Way, Room 3204
25                       Boston, MA 02210
                   E-mail: vaohara@gmail.com

APPEARANCES:

For The United States:

     United States Attorney's Office, by
VASSILI THOMADAKIS, ASSISTANT UNITED STATES ATTORNEY, and
ERIC P. CHRISTOFFERSON, ASSISTANT UNITED STATES ATTORNEY,
1 Courthouse Way, Suite 9200, Boston, Massachusetts 02110;

For the Defendant:

     Donoghue, Barrett & Singal, by WILLIAM F. SINNOTT, ESQ.
and ELIZABETH MCEVOY, ATTORNEY, Suite 1320, One Beacon Street,
Boston, Massachusetts 02108-3106.

<u>PROCEEDINGS</u>

1

2    THE CLERK:  All rise.  Thank you.  Please be seated.

3    Court is now in session in the matter of the United States vs.

4    Jonathan Fraiman, Criminal Matter Number 12-10238.

5    Will counsel please identify themselves for the

6    record.

7    MR. THOMADAKIS:  Good afternoon, your Honor,

8    Vassili Thomadakis on behalf of the United States.

9    THE COURT:  Good morning.

11:02AM 10    MR. CHRISTOFFERSON:  Eric Christopher also for the

11    United States.  Good morning, your Honor.

12    MR. SINNOTT:  Good morning, your Honor.  For the

13    defendant, Jonathan Fraiman, William Sinnott.

14    THE COURT:  Good morning.

15    MS. McEVOY:  Good morning, your Honor,

16    Elizabeth McEvoy for the defendant.

17    THE COURT:  Good morning.  This is the sentencing of

18    Jonathan Fraiman.  I have received and read the pre-sentence

19    report as revised through March 28th, the defendant's

11:03AM 20    sentencing memorandum filed on March 28th with fairly extensive

21    exhibits, 32 of them, I think, the government's sentencing

22    memorandum, the main one filed on March 28th, there were two

23    supplemental memoranda with a defense response, which itself

24    had attachments, government motion to strike and the defense

25    opposition and just was handed a couple documents from

1    probation concerning Mr. Fraiman's release status.  All of that

2    included, among other things, letters filed on behalf of the

3    defendant and two victim impact statements, which were related

4    to one another.

5         I think that was it, and that was everything that was

6    submitted to the Court.  Is there anything else I should have

7    seen that I have not, Mr. Thomadakis?

8         MR. THOMADAKIS:  I think that's it, your Honor.

9         THE COURT:  Mr. Sinnott.

11:03AM 10    MR. SINNOTT:  Nothing from the defense, your Honor.

11         THE COURT:  All right.  Mr. Sinnott, I know you've

12   gone over the pre-sentence report.  Have you reviewed it with

13   the defendant?

14         MR. SINNOTT:  I have, your Honor.

15         THE COURT:  Is that correct, Mr. Fraiman?

16         THE DEFENDANT:  Yes, yes, your Honor.

17         THE COURT:  All right.  And are there any victims

18   present who wish to be heard in this proceeding?

19         MR. THOMADAKIS:  No, your Honor.

11:04AM 20    THE COURT:  All right.  Let me turn then to the

21   objections to the PSR and the motion to strike and various

22   requests for downward departure, much of which is

23   inter-related.

24         Let me take up the motion to strike first which I can

25   resolve quickly.  I'm going to deny it.  The motion concerns

1    information regarding the mother of defendant's child.  The

2    government points out that there is information in here that is

3    derogatory of the woman and about their relationship and that

4    it can't be tested particularly.  That is true to a large

5    extent.

6          There is, as I'm sure counsel is aware, no limitation

7    on the information I can consider in sentencing.  If I'm

8    relying on it as a guideline matter, there has to be sufficient

9    indicia of reliability for me to accept it under the

11:05AM 10    guidelines.

11          What I am going to do is deny the motion to strike.

12    The information is what it is.  I routinely receive information

13    from defendants concerning family in domestic situations.

14    Routinely it is favorable to the defendant and unfavorable to

15    others, ex-spouses or girlfriends.

16          I take all of that with a grain of salt, as I must.

17    The weight I'm going to ascribe to it here is limited at best.

18    I'm in no position to address this woman's fitness as a mother

19    or mental state.  I'm obviously aware that the defendant has a

11:06AM 20    daughter who is about to turn two, and there are issues

21    concerning that situation, including the adverse impact that

22    sentencing will have on the child, which again is true in many,

23    if not most cases, that I sentence, but the simple answer is

24    I'm going to deny the motion to strike, take the information,

25    I've read it, I'll take it for what it's worth, and to the

 1   extent that it is derogatory, one-sided information about a

 2   person who has not had an opportunity to respond, I'm not going

 3   to give it a significant amount of weight.

 4          So let me turn next to the objections.  Both sides

 5   have submitted substantial objections to the PSR.

 6          MR. THOMADAKIS:  Your Honor --

 7          THE COURT:  Yes.

 8          MR. THOMADAKIS:  Pardon my interruption.

 9          THE COURT:  Yes, on the motion to strike?

11:07AM 10          MR. THOMADAKIS:  No, no.

11          THE COURT:  Go ahead.

12          MR. THOMADAKIS:  One just housekeeping matter.

13          THE COURT:  Yes.

14          MR. THOMADAKIS:  I suppose there is a possibility that

15   one of the parties or the Judge or your Honor may want to hear

16   from Dr. Brower.

17          THE COURT:  Yes.

18          MR. THOMADAKIS:  So if he is in the courtroom, we

19   would ask that he be sequestered until and if he is called to

11:07AM 20   testify.

21          THE COURT:  Mr. Sinnott.

22          MR. SINNOTT:  We have no objection, your Honor.  We've

23   asked Dr. Brower to remain regardless of whether he's called by

24   the prosecution.

25          THE COURT:  All right.  Let me take up one matter, and

1    then let's turn directly to the psychiatric issue so we don't

2    need to sequester him.  Because this I think sweeps away a lot

3    of the objections, not all of them, obviously, but there are

4    disputes about the offense.

5          I've presided obviously over the trial, I've read the

6    government's version of the offense, I've read the defendant's

7    version, I've read the government's objections and so on.  All

8    of those objections are noted.  I'm not going to resolve them.

9    I think I have a good handle on the facts here and have

11:08AM 10   reviewed those issues and don't think I need to resolve them

11   for current purposes except as they address specific issues

12   like calculation of loss or things of that nature.

13         Let's take up the issues concerning the defendant's

14   mental or emotional health and the defendant's request for a

15   diminished capacity downward departure.

16         Mr. Sinnott, do you wish to call a witness?  How do

17   you wish to proceed?

18         MR. SINNOTT:  Well, your Honor, the witness was

19   subpoenaed by the prosecution.

11:08AM 20         THE COURT:  Okay.

21         MR. SINNOTT:  And I would leave it to them to call

22   him.  If they don't, then we will probably stand on the very

23   comprehensive report that Dr. Brower has produced as well, and

24   I hope the Court has had the opportunity to read his

25   supplemental report, which is in letter form.

1          THE COURT:  Yes, I did.

2          MR. SINNOTT:  If he's not called by the government,

3   then we do not intend to call him, however, I've informed him

4   that the Court may wish to ask questions of him, and he should

5   be prepared for that as well, and, of course, he'll remain

6   throughout the proceedings should the Court wish to ask him any

7   questions.

8          THE COURT:  Okay.  Mr. Thomadakis.

9          MR. THOMADAKIS:  Your Honor, we don't intend to call

11:09AM 10   Dr. Brower.  I would note that the supplement that we received

11   of his letter of Friday kind of addresses and acknowledges some

12   of what we were saying with regard to the Zusky report, namely

13   he doesn't find that Mr. Fraiman had an inability to

14   distinguish right from wrong or that he was under a compulsion

15   to act wrongly even if he could distinguish right from wrong,

16   and this is consistent with what was on the Zusky report and I

17   discussed in our second supplemental memorandum, and so, again,

18   we don't think that the factual predicates for departure under

19   5K2.13 have been met here, but we rest on our briefs on that.

11:10AM 20          If the Court wants to hear further argument, we're

21   happy to do it.  If the Court wants to hear from Dr. Brower, we

22   will put questions to him.

23          THE COURT:  Why don't we do this.  Why don't I hear

24   argument.  I don't think I need to have Dr. Brower sequestered.

25   I don't expect to need to hear from him, but I think probably

1    we ought to have at least some brief opportunity to supplement

2    the submissions.

3         Mr. Sinnott, I'll turn to you first, and, again, I've

4    read all of this, the submissions of the parties, including the

5    relevant exhibits.  Some of this were handwritten notes that I

6    fumbled my way through.  I can't say I necessarily understood

7    every word of certain things, but certainly the formal

8    submissions from the parties and the formal reports I've read.

9         Mr. Sinnott.

11:11AM 10         MR. SINNOTT:  Thank you.  I won't insult the Court's

11    intelligence by going through those reports because I know that

12    the Court has read them and given them thoughtful attention,

13    but what I will do is to just try to put this in a frame of

14    reference.

15         This is not contrary to what the government might

16    maintain a case in which defendant has been convicted and out

17    of the blue a diminished capacity defense is created.

18         My client was the subject of a horrific attack, and

19    the government, while not acknowledging the consequences of

11:12AM 20    that horrific episode when he was four years old, acknowledges

21    that it was an extraordinarily traumatic incident, and he has a

22    mental health treatment history that dates back to the time

23    that he was four years old.

24         He was treated by Dr. T. Berry Brazelton, one of the

25    icons of pediatrics and pediatric psychiatric practice.

1    Dr. Brazelton to this day recalls his first encounter with

2    Jonathan Fraiman because it made such an impression on him, and

3    Dr. Brazelton could see even a few months after Mr. Fraiman's

4    own father had tried to kill him that this had had a dramatic

5    and challenging effect on the defendant.

6         Dr. Marcus, who also treated him as a child, had

7    similar observations, and their observations, I think, were

8    those of seasoned practitioners trying to deal with a child

9    that was at risk through no fault of his own, and they did

11:13AM 10    their best, but at a certain period of time, primarily because

11    Mr. Fraiman did not want to acknowledge what had happened that

12    he was in complete denial over what happened, he stopped

13    receiving treatment.

14         Well, the treatment stopped, but the manifestations of

15    that trauma continued, and the manifestations of that trauma

16    intensified, and instead of a broken child, Mr. Fraiman became

17    a broken adult, and unfortunately his initial treatment as an

18    adult was after he had to pull off to the side of the road

19    because of a debilitating panic attack, he went to see a

11:14AM 20    Dr. Zusky, and you've seen the notes from Dr. Zusky, and he

21    complained to Dr. Zusky about his panic attacks, he complained

22    to Dr. Zusky about his depression.  They never talked about

23    this incredibly difficult traumatic incident that happened when

24    he was four years old.  It was never explored.  It was never

25    looked at or examined to see if that was the root or a

1  contributing cause to these manifestations that Dr. Zusky

2  recognized the severe depression, the panic attacks.

3       Unfortunately, instead of becoming the solution,

4  Dr. Zusky became part of the problem because his solution was

5  to medicate Mr. Fraiman and to medicate him without partnering

6  those prescriptions with counseling, with psychiatric treatment

7  to the point where Mr. Fraiman's time at Envit became one big

8  blur because he was taking extraordinarily powerful substances

9  for his depression, for his ADHD, the pressure continued, the

11:16AM 10  panic continued, but he became reliant upon those drugs, he

11  would drink in conjunction with those drugs, and the

12  consequences from a psychological perspective and from a

13  medical perspective were severe.

14       Now, Dr. Brower, a forensic psychiatrist, wonderful

15  reputation in the community, clinical instructor at Harvard

16  Medical School clinics, rich history that is not on the defense

17  side or on the prosecution side.  He testifies as he sees it,

18  he reports as he sees it, and I would submit to the Court that

19  that's what he did in this case.

11:17AM 20       By the way, he has been asked to consult on sentencing

21  by Judge Lasker in this court several years ago.  He did a

22  comprehensive examination, and I know the prosecution says,

23  well, he talked to him for four hours, you know, Zusky talked

24  to him at the time that this happened.

25       Well, it wasn't just talking to him, examining him for

1    four hours.  Before he did that and after he did that, he

2    talked to the defendant's parents, he read all of the materials

3    that were sent to him, including the government's statement of

4    the case, the government's PSR submission, so this wasn't a

5    case where helpful facts were teed up for this practitioner so

6    that they'd come up with an opinion that the defense was

7    seeking, this was a case where everything was provided to him

8    so that he could use his professional judgment and so that he

9    could determine what the defendant's psychological status

11:18AM 10    really was.

11          And the Court has that, the Court has the supplement,

12    but I think if you read what he has in there, there are some

13    very telling things in there, one of which is, and I think this

14    becomes clearer in the supplement than it does in the original

15    report because in the supplement based on the government's

16    objection, we're sensitized to it is there is a veiled

17    allegation that this might be a case of fabrication or

18    malingering, as Dr. Brower and other physicians would refer to

19    the concept.

11:18AM 20          Dr. Brower writes, and Dr. Brower would tell you that

21    based on the history and the consistency of what Mr. Fraiman

22    told him matched up against that long mental health history as

23    observed by several practitioners.  That was a very strong

24    indicator that this wasn't malingering, and the other thing he

25    would tell you, Judge, is that this defendant doesn't even

1    know, hasn't even scratched the surface on just how badly

2    damaged he is because Mr. Fraiman will tell a practitioner, as

3    he did with Dr. Brower, yeah, and I'm doing great, and this is

4    going so well for me, and this is going badly for me, and, you

5    know, I can't believe they're doing this to me, and our client

6    has no idea that things are even worse in his psychological

7    status than he reports based on the training and experience of

8    this extremely reputable psychiatrist.  So I would point that

9    out.

11:20AM 10          I would also point out that, you know, this is not a

11    criminal responsibility standard, as the government would have

12    the Court believe.  The standard here is that the defendant's

13    capacity was impaired, that these problems, these issues, and I

14    don't think anyone can deny that there would be a basis, even

15    by a layman's reckoning that an event like this could have a

16    catechismic impact on the psyche, on the mental health, on the

17    well-being of an individual.

18          His own father tried to set him on fire, staggering,

19    and the defendant had to live with that, and he had to live

11:21AM 20    with the fact that his father, who was sentenced to prison for

21    20 years, got out after three years and then began threatening

22    them.  A voice mail was played so that he would watch out and

23    be careful of the father saying he was going to come and get

24    him.

25          This is what my client has lived with during his life,

1    and to say that these events have significantly impaired his

2    ability to exercise the power of reason from my layman's

3    perspective would seem to be self-evident, but from a

4    practitioner with the credentials and thoughtfulness and the

5    opportunity to investigate this case like Dr. Brower, I think

6    it is very compelling, and I think it's consistent with just

7    the lack of recognition in this case as to what was going on,

8    and I would submit to the Court that Dr. Brower is here, he's

9    happy to testify, he's happy to answer questions from the

11:22AM 10    Court.

11            He played this by the numbers, and he told us that,

12    you know, be careful what you ask for because you never know

13    what I'm going to say because it's going to be based on what I

14    find, what my examination, what the attendant records tell me

15    about your client.

16            So I would just submit to the Court this is a unique

17    case on a lot of levels, but what the defendant has been

18    carrying around, these demons that have been in his mind for

19    almost his entire life, he's 36 years old now, but since the

11:23AM 20    time that he was four years old have to be considered, have to

21    be a powerful factor for the Court in assessing whether he had

22    a diminished capacity to reason during his time at Envit, and

23    you pair that, you couple that with his use of prescription

24    drugs and of alcohol, and that was a recipe for disaster, an

25    18-month disaster, that he's lived with -- if everything that

1    happened before wasn't enough, that he's lived with for the

2    past seven years.  It's ruined his life.  Thank you, Judge.

3              THE COURT:  Okay.  Mr. Thomadakis.

4              MR. THOMADAKIS:  Thank you, your Honor.  There are a

5    couple of things I think that I'd like to address.  You know,

6    Mr. Sinnott just said that Dr. Brower did a full kind of

7    comprehensive psychological evaluation, certainly distinguish

8    that from what happened with Dr. Zusky, and, indeed, in

9    paragraph 2 of the March 31st, 2016 letter, Dr. Brower says,

11:24AM 10  well, Dr. Zusky, you know, he kind of negates the notion that

11   Dr. Zusky did the equivalent of a comprehensive forensic

12   psychiatric evaluation based on extensive examination of the

13   defendant basically suggests that in order to do that, you

14   would have to interview collateral sources and review all

15   available medical, legal and other relevant documents, and he

16   says Dr. Zusky didn't do that, but neither did Dr. Brower and

17   the process here is important.

18             Mr. Sinnott mentions he looked at the government's

19   version of the offense conduct, but he also in that letter says

11:25AM 20  that he looked at the defendant's version of the offense

21   conduct, the one that was submitted to the probation

22   department, and so with that then, and he fully acknowledges

23   that he didn't interview any of the trial witnesses, any of the

24   victims, didn't read any of their testimony, didn't see any of

25   the exhibits from the trial, so without doing that, how could

1    you form a basis for saying that a substantial diminished

2    capacity caused the crimes in question when you don't fully

3    know what the conduct in question is?

4         He has two competing factual recitations, the

5    government's offense conduct, which we submit was based on the

6    trial evidence and the defendant's offense conduct, which I

7    think even any fair reading of which would say that it kind of

8    contradicts what the jury found, and so without doing that,

9    without going back to see those facts, then how could he know

11:26AM 10    that the supposed diminished capacity caused the conduct in

11    question, and I think when one does look at the facts, that is

12    illuminated.

13         You know, the things we've heard at trial that were

14    established, they weren't mere embellishments or half-truths,

15    as Dr. Brower describes.  This isn't a case of, you know, some

16    mealymouthed, half explanation here and there.  Think about the

17    altered figures in that hedge fund two-pager that Mr. Fraiman

18    put together based upon that PowerPoint that Ed Laborio gave

19    him.  Think about the lies to Eric Samuelson about Aetius not

11:26AM 20    having anything to do with Ed Laborio about he couldn't even

21    find Ed Laborio.  Think about receiving a warning from

22    Richard Denerstein about not putting clients' IRA monies into

23    Envit and then within a month telling Lazar to do exactly that.

24         Think about, and I'm going to address some of these in

25    my sentencing argument but the lying time after time to

1    regulators, to FBI agents, submitting a false affidavit to this

2    Court just last summer in support of the motion to suppress.

3         All of these falsities, they inure to the defendant's

4    benefit every time, whether he thinks he's going to get money

5    out of it or get out of trouble.  Are all of these explained by

6    this diminished capacity even to this day?

7         He didn't report $50,000 of Envit income, as we saw at

8    trial in 2009, those two checks that he received in June,

9    July of 2009.  Is that also attributable to this diminished

11:27AM 10  capacity?  I think the issue here is that the facts, the actual

11   facts that were established at trial, just don't square with

12   this conclusion that he can't -- is unable to exercise reason.

13   There's just too much there, it's too persistent, and it goes

14   on for years and years.

15        I'll add something else about that report that struck

16   me.  You know, Dr. Brower said that there was an observation

17   about Mr. Fraiman's compulsively trying to rescue others is the

18   quote.  Not only does this seem somewhat extraneous because I

19   don't think it really explains the crime that occurred here,

11:28AM 20  but I'm also quite certain that Eric Samuelson would be very

21   surprised to hear that Mr. Fraiman was trying to rescue him

22   when he called him about Aetius after Mr. Samuelson had already

23   sunk $600,000 into Envit.

24        George Nugen and Judy Henkel, they probably could have

25   done without such rescuing when Mr. Fraiman pressured and

1  prodded Matt Lazar to put their retirement monies into Envit.

2  That observation alone is so blatantly at odds with what we've

3  heard actually occurred at trial vis-a-vis these victims that

4  it calls into question the reliability of the entire report in

5  our view.

6         And as to Dr. Zusky, well, you know, again, I find it

7  interesting that now there seems to be some blame assigned to

8  him that his misdiagnosis or his inability to see Mr. Fraiman's

9  affliction was some kind of causative factor now of this whole

10  crime.

11         This man, he met with Mr. Fraiman two days before

12  Mr. Fraiman signs his employment agreement with Envit, less

13  than two months before he starts getting on the phone, working

14  the phone and soliciting Rudy Matkovic, amongst others.

15         They actually do talk, Dr. Zusky's report says that

16  the arson, which we certainly don't dispute would be traumatic

17  on anyone, they do talk about it in there, so one would think

18  if Mr. Fraiman was really so impaired that now his memory of

19  his entire time at Envit is in a fog, that level of impairment

20  would be visible to anyone, any person with a modicum of

21  competency in the medical field, and for Dr. Zusky to just miss

22  it completely days before he signed onto Envit, it doesn't --

23  it defies belief, quite frankly, and so I think that

24  Dr. Zusky's report, which was contemporaneous, there was no

25  trial on the horizon, the crime hadn't even been committed yet,

1    but I think the reliability there is fairly obvious, and it

2    would really shock me if he just completely missed this huge

3    Sword of Damocles hang over the head of Mr. Fraiman in the form

4    of this post-traumatic stress disorder that within two months

5    caused him to alter figures in a hedge fund two-pager to send

6    to Rudy Matkovic, and they go from there to every single

7    instance of false representations to these investors and go on

8    false representations to FINRA, to the SEC, to the FBI, to this

9    Court.

11:31AM 10        I think that's why this is similar to the Seventh

11   Circuit case, *Portman,* that we cited in our second supplemental

12   memorandum or one of the reasons that that Court said that, you

13   know, the District Court did not err in not relying on the

14   medical opinion regarding diminished capacity was precisely

15   because it was a report based on the defendant's version of

16   what had occurred as part of the crime and what his conduct had

17   been, and the doctor in that case had not talked to the

18   prosecutors, not interviewed witnesses, had not read trial

19   transcripts, so on and so forth, exactly the case here.

11:31AM 20        I think the process shows that the whole analysis is

21   really flawed.  I think that at the end of the day, your Honor,

22   it's really in terms of as a guidelines issue -- now,

23   obviously, your Honor, can and should consider what occurred to

24   Mr. Fraiman in his childhood as part of a 3553(a)

25   consideration, it's part of his history and characteristics

1   certainly, but in terms of a guidelines argument, specifically

2   diminished capacity argument, which has specified contours, I

3   just don't think that the factual predicate has been

4   established, as is the defendant's burden really, has been

5   established in order for a finding of diminished capacity that

6   caused this crime because the causal link is critical to be

7   made.

8          THE COURT:  All right.  Thank you.  As the government

9   just pointed out, there are two separate although inter-related

11:32AM 10   issues here.  There's a guidelines question whether the

11   defendant qualifies for a two-level reduction for diminished

12   capacity under Section 5K2.13 of the guidelines and how else

13   the defendant's mental health may bear on the sentencing

14   decision.

15          In terms of the guideline question, it seems to me

16   that the defendant does not qualify for a diminished capacity

17   reduction that requires that the defendant commit the offense.

18   To simplify somewhat, while suffering from a significantly

19   reduced medical capacity, and that's defined to mean a

11:33AM 20   significantly impaired ability to understand the wrongfulness

21   of the behavior comprising the offense or to exercise the power

22   of reason or control behavior that the defendant knows is

23   wrongful, and I do not see here whatever mental health issues

24   are going on that that standard has been met.

25          Otherwise the mental health history is what it is, as

1    is so often the case.  It is incomplete and imperfect.  All

2    mental health evaluations are imperfect.  The defendant was

3    treated, at least according to the record or seen, rather, by

4    four different providers at different times, two while as a

5    child, Dr. Zusky in 2007 on the brink of the offense, as the

6    government points out, and then Dr. Brower as a forensic

7    psychiatrist relatively recently.

8         All of those evaluations, if that's the right word,

9    have their limitations.  Dr. Zusky's in terms of the temporal

11:34AM 10   sequence is the most significant, and, again, the level of

11   disorder or mental illness that would have been required for a

12   diminished capacity reduction I think was clearly not there and

13   would have been likely noted.

14        Dr. Brower's evaluation is what it is.  An

15   after-the-fact psychiatrist evaluation obviously has its

16   limitations, as does a short-term evaluation as opposed to over

17   a period of many years, and like all psychiatric evaluations,

18   it depends to a significant extent on the underlying facts,

19   including self-reporting.

11:35AM 20        I also observe, and if it sounds as a matter of fact,

21   maybe that's because it is, the great majority of people that I

22   sentence have some significant mental health issues of some

23   kind, including ones arising from childhood, trauma or neglect,

24   not this specific kinds of trauma or this specific one here but

25   ones that are bad enough under the circumstances.

1          It's part of the sorry catalogue of human behavior,

2     and some of the issues presented here, feelings of inadequacy,

3     self-delusion, denial, impaired judgment, substance issues,

4     anxiety, depression, elements of narcissim, even if they don't

5     rise to the level of narcissistic personality disorder, all of

6     those are kind of the classic elements of a white collar

7     offender.  They're present in some form or another in virtually

8     every case.

9          Again, that doesn't mean that they are irrelevant,

11:37AM 10     that they are part of who the defendant is.  They're

11     informative as far as they go.  They're not dispositive.  It's

12     part of the mix of information that I'm to consider, and that

13     includes everything including the childhood trauma and the

14     consequences of that, but it's not excusing behavior, and it's

15     not sufficient under the guidelines for a diminished capacity

16     reduction, and so that's how I'll handle that.  Again, it's

17     part of the mix of information for me to consider, but I'm not

18     going to make a guidelines adjustment.

19          All right.  In no particular order just because we

11:37AM 20     have a lot of issues to address, why don't we turn to

21     calculation of the loss.  This is an issue potentially at two

22     levels.  One is the guideline calculation, and the other is the

23     restitution calculation.

24          Let me turn to the second one first.  Is the

25     government seeking restitution beyond the specific, whatever it

1    is, 1.8, 1.9 million, Mr. Thomadakis?

2         MR. THOMADAKIS:  We'd seek restitution of the loss

3    amount that the Court finds applicable.

4         THE COURT:  Whatever it is, but I guess put another

5    way, if I find that to be 3.8 million, you're seeking $3.8

6    million restitution?

7         MR. THOMADAKIS:  Yes.

8         THE COURT:  All right.  Basically the pre-sentence

9    report says the loss was roughly 1.9 million, the government

11:38AM 10   says it should be the entire Envit and related loss of 3.8

11   million.  The defendant says it should be $760,000.

12        MR. SINNOTT:  Well, your Honor, let me qualify that.

13        THE COURT:  Yes.

14        MR. SINNOTT:  Preliminarily we would ask, and I know

15   that probation did not accept this, but we think it's very much

16   a valid argument in the context of this case.  Mr. Fraiman's

17   gain in this case was somewhere between $300,000 and $400,000.

18   The government has in its possession and has provided

19   statements which indicate that Mr. Laborio's gain in this case

11:39AM 20   was substantially more.  There's a Barclays statement in there

21   that shows $18 million at one point.

22        Now, we understand that from the perspective of a jury

23   considering a conspiracy case that relative difference is not

24   dispositive, however until calculating the amount of loss, we

25   would ask that the Court consider just those extremes, of that

1    300 plus thousand dollars, somewhere between $75,000 and

2    $100,000, if you look at $50,000 a year of pay being made to

3    Mr. Fraiman, but $75,000 to $100,000 of that was straight pay,

4    it was not commission, so in a case like in this where you've

5    got such incredible gains by Mr. Laborio and no access on the

6    part of Mr. Fraiman to know that Laborio had that kind of money

7    or that it was coming in or facilitating that kind of money and

8    the relatively modest amount that in 18 months came to the

9    defendant, we think it's very valid for the Court to consider

11:41AM 10   Mr. Fraiman's gain in the case rather than the astronomical

11   crazy loss numbers that the government has projected or even

12   the numbers that the probation officer has found be applicable.

13        So that's our first position, and we think that it's

14   very much a worthwhile and valuable one.  The Court was -- and

15   if the Court wishes to address that, I'm happy to.

16        THE COURT:  Let me, if I can just interject, I mean,

17   again, to sort of be technical about this, as I need to be,

18   there are, I think, two separate issues, the guidelines measure

19   loss.  Loss and gain are not always coincident, as you have

11:41AM 20   pointed out, but I think from a guideline standpoint, I need to

21   calculate the loss first, and then the second question is that

22   number for some reason unfair under the circumstances because

23   loss and gain are not sufficiently coincident to make the

24   sentencing decision, but I do, I think, need to come up, not

25   with a precise loss number but to find what bracket it fits,

1    and there is a break point under the guidelines, for example,

2    of 3.5 million.

3        I could find that the loss is substantially more than

4    1.9 million, but if I don't make it all the way up to $3.5

5    million, it doesn't make any difference under the guidelines,

6    so I guess I want to focus first on that loss question, and

7    then we'll turn to gain vs. loss, but I interrupted you,

8    Mr. Sinnott.

9        MR. SINNOTT:  Yes, your Honor.  The Court made

11:42AM 10   reference to what that loss would be by the defense reckoning,

11   and, your Honor, you may recall during the closing arguments,

12   very fine closing argument of Mr. Thomadakis, that he talked

13   about the Denerstein e-mail, Richard Denerstein, who testified

14   here, had written an e-mail to Laborio in which Mr. Fraiman was

15   copied, no indication that Mr. Fraiman saw it, and certainly

16   that he responded, he did not respond to it, and that was on

17   October 27th of 2008.

18       The government argued, well, if he didn't know before,

19   this should have told him because that letter said, "Hey, look,

11:43AM 20   Ed, what you're talking about here is just crazy talk.  This is

21   not a sustainable or valid model that Envit Capital is

22   operating under," and the government argued that if you didn't

23   know before, you should have known then.

24       Well, we would submit that there was no evidence that

25   he knew, but even under that standard that he should have known

1    as of that time, we would submit to the Court, you know,

2    frankly the evidence would be contrary to that.  He was selling

3    Envit to family members, to Mr. Elikann, to his dentist.  He

4    was thrilled that he was getting shares in Envit and was

5    bragging to family members about that.

6         We would submit to the Court that a more valid measure

7    of loss is to take that date, October 27th of 2008, and run

8    that to the end of Envit and say that the $760,000 that

9    according to the James Pingree chart came to the defendant

11:45AM 10    after that time period matched up to those dates would be the

11    better and more accurate determination of what loss should be

12    for this defendant.

13         THE COURT:  Okay.  Mr. Thomadakis.

14         MR. THOMADAKIS:  On that point specifically, your

15    Honor, it's not quite accurate to say that the argument was,

16    well, if you didn't know it was fraud before, he knew then.

17         The Denerstein e-mail is not a fraud demarkation line

18    here, it's just serves to illuminate how egregious

19    Mr. Fraiman's conduct was, but there was plenty of evidence

11:45AM 20    that Mr. Fraiman was engaged in the fraud prior to the receipt

21    of that e-mail.

22         I mentioned it before and I'll mention it again later

23    in the sentencing, but the two-page part of the closing will

24    also demonstrate that that two-pager that Mr. Fraiman admitted

25    that he created and that he said was taken from a PowerPoint

1        that Ed Laborio had given him had an altered figure.  April,

2        2007 rate of return was altered from the PowerPoint of

3        Ed Laborio in order to add up to 43.7 percent.  Now, he sent

4        that chart with the altered figure to Rudy Matkovic in 2008,

5        February of 2008, well before the Denerstein e-mail.

6              Likewise, in that same e-mail to Rudy Matkovic, Trial

7        Exhibit 37, he promised, he said these Envit shares are paying

8        a 5 to 10 percent dividend, they are paying a 5 to 10 percent

9        dividend, February of 2008.

11:46AM 10       He's the only one saying anything about dividends at

11       that stage of the testimony from Jon Genovese, for example, was

12       that the other people started pitching preferred shares of

13       dividends in the summer, and he knows Rudy Matkovic has never

14       received that dividend, and yet with the Musgraves in the

15       summer of 2008, Mr. Fraiman goes to them and says guaranteed 10

16       percent dividend if you invest in these preferred shares.  He

17       makes the same false promise to Francis Sears, Albert

18       Rentschler.  All of that is happening in the summer of 2008.

19             Now, by that point, again, Mr. Fraiman is seeing that

11:47AM 20  Envit's business is not going very well.  There was testimony

21       by Mr. Genovese and Mr. Munno not a lot of money coming in in

22       the summer, paychecks were not being paid on time, he knew

23       Rudy Matkovic had never been paid, and so there was no way

24       Envit could guarantee dividends.  He knew that, and he did it

25       anyway, and that was part of the fraud here, so that's a

1     fallacy that there was no evidence that he's engaged in fraud

2     prior to that Denerstein e-mail.

3          What the Denerstein e-mail does is just simply

4     highlight how abhorrent the conduct here is because

5     Mr. Denerstein lays it all out, "You're running a boiler room,

6     you're going to be shut down if you don't stop, don't put

7     people's IRA money in Envit, it's a penny stock, you have no

8     revenues," he says.

9          He goes on and does the same thing that he was doing

11:47AM 10     before, tells Lazar these are fixed dividends, 3.5 percent for

11     the P.I.P.E., tells people we bought Rib World outright for 8.8

12     million, there's no change in the behavior.

13          It's the same behavior as before except we just have

14     the Denerstein e-mail to highlight how egregious it was, and so

15     I think that is an accurate recitation of what happened here in

16     terms of pre-Denerstein and post-Denerstein, therefore, that's

17     why because we start with Rudy Matkovic right at the beginning

18     of February of 2008, and that is why Mr. Pingree's analysis

19     began in terms of who invested and how much in February of 2008

11:48AM 20     and went on.

21          I'm happy to address the overall -- the government's

22     loss theory.  I will take two more notes.  This Edward Laborio

23     gaining $18 million because it's in a Barclays statement

24     somewhere.  For most of the lifetime of Envit, at least the

25     portion of it that was analyzed by Mr. Pingree at trial, they

1    didn't even bring in $3.8 million.  This is similar to the

2    attempt at trial to show that he had $150 million worth of

3    Envit stock.  It just doesn't withstand any scrutiny, and I

4    think anyways gain is really an alternative measure when loss

5    cannot be reasonably calculated.

6         Here the issue is not at all that loss can't be

7    reasonably calculated.  We have the numbers.  It's crystal

8    clear, it's just whether the entirety of the loss is

9    attributable to Mr. Fraiman in our view is the real question,

10   and I'm happy to address that now.

11        THE COURT:  Why don't you address that.

12        MR. THOMADAKIS:  Okay.  So there were several facts

13   that we think bear on that precise issue that came out at

14   trial.  The first is timing.  Mr. Fraiman was Ed Laborio's

15   second employee after Dan Kenney, and he was there until the

16   very end.  He watched the operation grow, but also in terms of

17   timing, again, with regard to the Rudy Matkovic e-mail is that

18   he was really conspiring and in on the fraud from the get-go.

19        The second factor is his position in the company.

20   Notwithstanding the defense's fixation on Evan Munno, the

21   evidence at trial was overwhelming regarding Fraiman's position

22   as Mr. Laborio's Number 2 all the way to the end, and after

23   Edward Laborio, he made the most money.  He certainly brought

24   in the most money of any closer, as we saw in that chart.  You

25   know, the pie chart was almost completely split once you took

out Bernard Berry, and even when you put in Bernard Berry, it was heavily skewed on the amount of money that Mr. Fraiman was bringing in.

In terms of how much he made other than Ed Laborio, just money coming out of the Envit accounts, Mr. Fraiman made more than the next five people combined.  He had a leadership position in the company.  You know, he was director of Envit Private Wealth Management, as we know.  He introduced himself to Mr. Denerstein, Mr. Denerstein testified as Ed Laborio's partner.  Caitlin Murphy thought that they were partners.

He had a stake in the success of the company third. We talk about commissions and how he got 10 percent of the 1.8 he raised, let's call it $180,000, but what Mr. Pingree's analysis showed was that money coming out of the Envit accounts, just the money, just the cash now, that went to Mr. Fraiman either in the form of paychecks or checks was roughly $313,000 in a year and a half, so that's a substantial amount of money, which is not just commission-based.

He's not a traveling salesman out there on his own living off commissions, he is making money from the company in addition to the commissions, and so he has a stake, therefore, in the success of the company.  He has an interest in Envit surviving, and he does further that through his own activities in raising money, but obviously the money that he was getting outside of his commissions is coming from somewhere, and that's

1      the overall success of Envit as an enterprise.

2            Fourth, Mr. Fraiman was right in the mix with others

3      at Envit who were soliciting money.  We heard again testimony

4      regarding kind of the setup of the office, the various offices

5      that they had, big rooms with people on the phones all day.

6      Clearly everyone knew what was going on.

7            There's sales meetings in effect where, for instance,

8      it was described that Mr. Laborio brought in everyone and said

9      now we're doing Aetius, all the employees.  They're using the

11:52AM 10   same scripts.  Mr. Fraiman acknowledged that in his SEC

11     testimony talking about what was Government Trial Exhibit 8,

12     but Mr. Genovese, Mr. Sherman, they all said, yeah, we all got

13     these scripts, you know, we used these and these bullet points

14     in order to every attract investors, so they're working with

15     the same information.  He knows what others are doing in that

16     regard.

17           Mr. Genovese even said there was a board which set

18     forth how much each person was bringing in.  He sees what's

19     going on, and he's the one who is in a position to know these

11:53AM 20   numbers are false.  He's running their private wealth

21     management.  Well, that script has figures about the assets

22     under management that Envit has.  He'd know that.

23           He's told by Denerstein that they have no revenues.

24     The scripts in there are saying Envit has revenues of 1.5 to

25     million a year.  That was I believe Trial Exhibit Number 8.  So

1    he knows that these supposed facts and the scripts are false,

2    and he knows that all the other people are using those supposed

3    facts in their calls, and so I think that overall what we see

4    is way more compelling than the facts that the First Circuit

5    analyzed in *Codarcea* where basically it was a defendant who I

6    guess one would describe this as an ATM skimming scheme, and

7    he's going around several ATMs machines.  He clearly used

8    others, were in the same modus operandi and during the same

9    time span, and so the First Circuit says, well, those are

11:54AM 10   losses that are reasonably attributable to him under a relevant

11   conduct analysis because one can infer that they were a part of

12   the overall agreement, and they were reasonably foreseeable to

13   him because they can't just be occurring out here in a vacuum.

14        Well, here we have much clearer facts about whether

15   these losses were reasonably foreseeable to Mr. Fraiman, and

16   he's been convicted of conspiring with Ed Laborio to raise

17   money under false and fraudulent pretenses.  Well, that's what

18   Mr. Fraiman was doing, and that's what Mr. Laborio was sending

19   out his small army of closers and cold callers to do.

11:54AM 20        And on finishing up on *Codarcea*, the defendant's

21   sentencing memorandum attempts to distinguish that case by

22   saying, well, unlike Mr. Fraiman, unlike the defendant here,

23   and this is on page 38 of the defendant's sentencing memo,

24   Mr. Fraiman and other employees worked -- Mr. Fraiman and other

25   employees worked under the direction of Laborio with no idea

that they were involved in a fraudulent scheme."

So, in other words, the defense's whole basis for distinguishing *Codarcea* is that Mr. Fraiman didn't know that he was in a fraudulent scheme.  The jury found otherwise.  He's guilty of fraud and of knowingly participating with Ed Laborio and conspiring with Ed Laborio to further a scheme to defraud, and so that's no distinction at all.  That's really a nonstarter.

For these reasons, your Honor, we think that the loss here -- and one final note, I think, maybe better reserved for the sentencing argument overall but might as well address it now.   Don't think, you know, the question then may be, well, does the overall -- does attributing the entire loss to Mr. Fraiman overstate his culpability?  In our view, it does not because he was the second in command.  He benefited the most outside of Ed Laborio in this, and as noted previously, part of that benefit derived from the overall success of the enterprise.

He knew more than what other people knew about exactly what was going on at Envit, and, again, that to us is the utility of the Denerstein e-mail.  Genovese wasn't receiving that, Munno didn't receive that, Lazar didn't receive that, Mr. Fraiman did, and he kept doing what he was doing, and he takes it all the way to the end with Aetius, which, again, is as blatant as it gets when he's calling -- Mr. Pingree, by the

1    way, noted that with regard to the Aetius investors that

2    Mr. Fraiman solicited, they were all previously existing Envit

3    investors who he had already got to invest in Envit, so he was

4    returning back to them with this nonsense that Aetius has

5    nothing to do with Ed Laborio, and he knows because Laborio had

6    an office-wide sales meeting about Aetius, he knows that's what

7    everyone else is doing, and so I think overall he was invested

8    in the success of the enterprise, he benefited from it, and

9    given his position in the company and at the side of

11:57AM 10   Ed Laborio, we think that the overall loss not only is a

11   correct calculation under the guidelines and the principles of

12   *Codarcea* but doesn't overstate Mr. Fraiman's culpability.

13              THE COURT:  Mr. Sinnott.

14              MR. SINNOTT:  Thank you, your Honor.  Your Honor, the

15   government conveniently leaves some facts out, but one thing

16   that they insist on saying in their pleadings and today is, and

17   let me focus on the period before the Denerstein letter is the

18   defendant knew because we say he must have known.

19              The defendant must have known that Envit was not

11:57AM 20   paying out dividends without any proof of that, but they say he

21   had to have known that.  They say he was there as the second

22   employee watching this company grow.  What they don't bring up

23   is the fact that the first employee hired was Daniel Kenney,

24   and Daniel Kenney, according to the government, the

25   government's disclosures, was the right-hand man for a

1    substantial period of time.

2           Daniel Kenney worked with Ed Laborio at Chicago

3    Investment Group before Laborio was forced out for misconduct.

4    Evan Munno worked with Edward Laborio at Chicago Investment

5    Group before he was forced out by misconduct, so the government

6    would ascribe knowledge to Mr. Fraiman that it refuses to

7    ascribe to its own witnesses.

8           Kenney was a grand jury witness, and for obvious

9    reasons, they didn't call him in their case in chief.  These

11:58AM 10    individuals were much better situated to know who

11    Edward Laborio was, to know that he was a fraud, to watch this

12    company grow and to do absolutely nothing about it.

13           Dan Kenney according to testimony trained my client.

14    He's the one that Laborio said train him.  Munno is the guy

15    that read everybody the riot act after Laborio said I want you

16    to sit everybody down and tell them not to use these pictures,

17    use these pictures.  All of the witnesses agreed that those

18    scripts weren't made up by Jon Fraiman, those scripts were made

19    up by Ed Laborio.  All of the government witnesses said nobody

11:59AM 20    knew what Laborio was doing with his money, nobody.

21           So to consider Jon Fraiman to be on a par, which they

22    are, with Ed Laborio is complete and utter nonsense, and this

23    business about he changed that two-pager right at the beginning

24    right when he started, in his first month on the job, if you

25    recall the trial testimony, there was a change of I think four

1    one-hundredths of a percent, no evidence that the defendant

2    came up with this on his own, no evidence where this came from,

3    whether this was originally an arithmetic mistake, whether

4    Laborio said I made a mistake, change this to this, but they're

5    perfectly content to speculate on the knowledge, they're

6    perfectly content to consider him to be as guilty as Laborio

7    because that's what they say, it had to be, and I would submit

8    to the Court you can't have it both ways.

9         You don't say that the seminal point in knowledge was

12:00PM 10   the Denerstein letter, he must have known at that point and

11   then say he must have known before, even though we don't have

12   any evidence of it.  They're boot strapping on something that

13   happened after the fact, and for that reason, I would suggest

14   to the Court, I would submit to the Court that that period

15   after October 27th, 2008 is the applicable period and $767,000

16   should be the amount of loss.

17        THE COURT:  Thank you.  Mr. Thomadakis, were there

18   investments solicited by Laborio before Fraiman joined the

19   company?  I don't remember.

12:01PM 20        MR. THOMADAKIS:  There was no evidence presented at

21   trial of that.  There was some -- my understanding is that

22   there was initially some seed money back in 2006, and to be

23   honest, I do not recall.  There was money in there.  I don't

24   recall how much it was.  I don't think it was on the level of

25   $18 million, for sure.  I don't have those figures with me, but

         1    certainly we could --

         2          THE COURT:  Well, whatever it is, it's not part of

         3    your 3.8 million figure?

         4          MR. THOMADAKIS:  No, no, no, no, that money, this was

         5    simply based on Mr. Pingree's testimony was the money that came

         6    in from February of 2008 till the very end of Aetius in

         7    September of '09.

         8          THE COURT:  I'm sorry, Mr. Sinnott, do you want to say

         9    something?

12:02PM 10          MR. SINNOTT:  The amount by my memory that was raised

        11    by Laborio before the defendant started with Envit was $1.8

        12    million.

        13          THE COURT:  But if it's not part of the 3.8, then it's

        14    not part of our calculus.

        15          MR. THOMADAKIS:  Correct, your Honor, it's not part of

        16    the 3.8 nor is the 900,000 for reasons mentioned in the

        17    government's sentencing memo from Bernard Berry, which would

        18    bring it up to I think 4.7, but, in any event, Bernard Berry

        19    has not been included in there.  I'd just like to make a couple

12:02PM 20    of factual notes, please.

        21          THE COURT:  Yes.

        22          MR. THOMADAKIS:  First of all, the assertion that no

        23    one knew what Laborio was doing with that money, actually there

        24    was testimony at trial from both Mr. Genovese and Mr. Munno,

        25    for instance, that they knew that he was trading in oil, risky,

1    I don't know if they said risky, but, in any event, in oil

2    futures and the like, which, of course, was contradictory to

3    the two-pager that Mr. Fraiman put together about investment in

4    commodities, so there was some knowledge in that company of

5    what Mr. Laborio was doing with the money.

6            I don't want to go too far down the road of what

7    Daniel Kenney previously testified to, but since Mr. Sinnott

8    mentioned it, Mr. Sinnott well knows that Mr. Kenney also

9    testified that he had to admonish Mr. Fraiman for guaranteeing

12:03PM 10    things to investors.  He was also quite taken aback by the

11    e-mail that was Exhibit 37 at trial, the Matkovic e-mail saying

12    that, well, that probably explains why he was more successful

13    than all of us.

14           Again, the testimony has not been tested, there was no

15    cross-examination.  I don't want to rely on it, but the door

16    was open, so I wanted to mention that.  I think that is it.  We

17    stand by our previous argument.

18           MR. SINNOTT:  And, your Honor, for the record, and I

19    don't mean to belabor the point, I did not ascribe any

12:04PM 20    statements to Mr. Kenney, but I would note, and I know that

21    this was not relevant for the trial that Count 1 indicates that

22    defendants herein together with others known and unknown to the

23    grand jury knowingly conspired, and you may recall, we wanted

24    to know who the known were.

25           Well, I would suggest to the Court that when you

1    listen to my Brother talk about what Mr. Kenney said,

2    Mr. Kenney was one of the known, and anything that Mr. Kenney

3    said was because he knew that the potential for him to be

4    indicted was very prominent, and he never was, so I would ask

5    anything that my Brother says about what Mr. Kenney told them

6    and the fact that he was not called as a trial witness to give

7    the Court some idea as to the veracity or credibility of

8    anything that Mr. Kenney might say.

9         THE COURT:  All right.  Here's what I'm going to do.

10   As a technical guideline matter, I think the government is

11   correct at least by a preponderance of the evidence standard

12   this is activity that's within the scope of the joint activity,

13   it's in furtherance of it and reasonably foreseeable, even if

14   the precise dollar amount was not, and, therefore, I think the

15   amount of the loss for purposes of 2B1.1 under the guidelines

16   is $3,800,466.  That's only a starting point.

17        Certainly there appears to be a disconnect between the

18   amount that was lost by the victims and the amount gained by

19   Mr. Fraiman, and I properly need to take that into account.  I

20   think the loss here is certainly not a -- it's a proxy for the

21   magnitude of the offense but only to a point beyond which it

22   becomes unreasonable, so I am going to make that finding, and,

23   therefore, the guideline calculation will go up two levels,

24   but, again, that's simply a starting point, and I think the

25   restitution amount then needs to reflect that fact as well.  Is

1      that the number 3,800,466, Mr. Thomadakis?

2                MR. THOMADAKIS:  I believe that's right, your Honor.

3                THE COURT:  All right.  Let's turn next to the issue

4      of obstruction of justice.  The PSR includes a two-level

5      enhancement.  Mr. Sinnott.

6                MR. SINNOTT:  I'm sorry, your Honor, I didn't hear

7      what the Court said.

8                THE COURT:  Obstruction of justice.  Let's take up

9      that issue next.  There's a two level enhancement under the

12:07PM 10      PSR, to which the defendant objects, among other things, that

11      FINRA is not a law enforcement agency, et cetera.  Let me hear

12      from you on that.

13                MR. SINNOTT:  Thank you, your Honor.  Yes, FINRA is

14      not a law enforcement agency, and the enhancement specifically

15      requires that it be made to a law enforcement agency, but of

16      even more relevance to that and to the other claims of

17      obstruction, we would submit that these statements were not

18      relevant.

19                These were not statements that were dispositive of the

12:07PM 20      defendant's guilt or ignorance.  The statements that were made

21      as part of the motion to suppress, the Court thoughtfully

22      listened to the testimony.  The different FBI agents that

23      testified had different recollections.  Contrary to what my

24      Brother says, I believe that Mr. Pennebaker, who was riding

25      with Special Agent Soligo in the car, had -- did not hear

1    everything that Soligo said and was not in a position to know

2    whether or not he had asked, Mr. Fraiman had asked for a

3    lawyer.

4         The government would have the Court believe that all

5    this time after the fact that if the defendant's recollection

6    is that his request for a lawyer for Mr. Singal was on the way

7    to the FBI but not on the way from the FBI to the lockup, that

8    that constitutes obstruction of justice.

9         And I would submit to the Court that that may very

12:08PM 10    well constitute different memories or poor memories, fading

11    memories, and I think so many of the other things with respect

12    to that incident that the government talked about are almost

13    absurd, whether one of the agents used the "F" bomb in ordering

14    the or in telling that Mr. Fraiman it didn't matter if his

15    little girl was witnessing this because she's not going to

16    remember it anyway or whether he said she's not going to "F"

17    remember this anyway, I think it's just silly to consider that

18    to be obstructive, to consider that to be something that

19    warrants an enhancement even in part, even being advocated as

12:09PM 20    one of other things, the same thing whether Mr. Fraiman was

21    ordered to the floor as part of his arrest.

22         You've got a highly charged, traumatized event where,

23    for whatever reason, and the Court heard the explanations from

24    the government, the decision was made to make an arrest at O

25    dark 30 in the morning, before 6:00 in the morning, the

1    defendant after a long night out celebrating his salesman of

2    the year recognition at a dinner is woken up, he's got the baby

3    on the couch with him, and he goes to the door that the FBI

4    agents are knocking on, and they place him under arrest, they

5    place him under arrest in front of his girlfriend and his baby,

6    and to expect that his memory, even if his memory was wrong, to

7    expect that a difference in recollection or statements between

8    him and the FBI agents constitutes obstruction I think is

9    completely unreasonable.

12:10PM 10         And, similarly, with respect to SEC, your Honor, or

11   rather his statement to the government that he had admitted to

12   the SEC his role in this, and the government says, well, it was

13   a settlement, so there's no admission of guilt or not guilt.

14   Well, that's a hell of a settlement when you lose your

15   brokerage license forever.  Everybody in the world knows what

16   is happening when you go in for a settlement like that.

17         You know, saying that this was not cooperating with

18   the SEC is once again I think parsing words.  I think it's

19   unreasonable, and I would also submit to the Court that the

12:11PM 20   same goes for statements that were made to the SEC, these were

21   not material.  I would submit that no two-level enhancement for

22   obstruction of adjustment is wanted in this case.

23         THE COURT:  Okay.  Mr. Thomadakis.

24         MR. THOMADAKIS:  Thank you, your Honor.  There are a

25   couple of things here.  First, you know, one of the responses

1     is generally that, well, a lot of these things could be the

2     product of faulty memory, things that happened a long time ago,

3     notwithstanding the fact that the arrest happened less than a

4     year before that affidavit was submitted, but if this were one

5     instance, you know, if the FBI arrested him and he said

6     something about his activities at Envit six years ago, which

7     wasn't true, I could maybe count it, but it's a pattern.

8          He lied to FINRA on the phone while he was engaged in

9     the criminal conduct, as Paul Lane testified, and it wasn't

12:12PM 10  about peanuts, he said I've never sold a private placement in

11    Envit, which is what he was doing every single day he was

12    working there.

13         He goes onto the SEC, to the FBI.  There are numerous

14    misstatements or maybe embellishments, at best, with regards to

15    what he says to the probation department, which we haven't even

16    considered, and with the SEC, it couldn't be more material.  I

17    mean, you know, Mr. London is asking him in testimony, you

18    know, about what he said to Rudy Matkovic, whether he ever, you

19    know, said his investment was safe and so on and so forth, what

12:13PM 20  did he say about guarantees to Mr. Lazar, and Mr. Fraiman is

21    lying through his teeth really, and we saw that because

22    Mr. Matkovic had two recorded calls with him, which Mr. Fraiman

23    did not know about, which directly contradicted those lies.

24         Mr. Lazar had saved those e-mails, and they were

25    introduced at trial, and that was under oath, and, you know,

1    it's one of the many categories which qualify for obstruction

2    of justice, perjury and a related civil proceeding concerning

3    the matters at issue in this case, and that's exactly what was

4    going on there.

5         With respect to the affidavit, you know, if it was one

6    little -- obviously, there were two major aspects here.  Your

7    Honor, I don't need to remind your Honor of this, there were

8    two major aspects of the motion to suppress.  One was the

9    arrest itself coercive, and, two, did he assert his right to

12:13PM 10   counsel on the ride over to the FBI.

11        So, in order for the arrest to be coercive, obviously

12   that's made up of several different facts, and what I would

13   submit is that what was established at the suppression hearing

14   with the testimony of the three agents was that they debunked

15   these myths that had been spun by Mr. Fraiman in his affidavit

16   to try to show that it was a more traumatic episode than it

17   was.

18        One of those things in isolation, maybe it doesn't

19   rise to the level of materiality, but overall it was these

12:14PM 20   details that were presented in a sworn affidavit to try to

21   influence the Court to think that it was a coercive arrest.

22        The second item is could not be more material to a

23   motion to suppress, and, you know, that Mr. Sinnott may not

24   think so, but I think this is on all fours with the

25   United States V. Furman, which we cited from the First Circuit

1    where this wasn't some collateral issue, this was head on one

2    of the issues regarding the motion to suppress' statements, did

3    he arrest his right to counsel?  And the answer is either he

4    did or he didn't.  Special Agent Soligo said he did not,

5    Special Agent Pennebaker said he didn't have a recollection of

6    him doing it, although it's true that he said I'm not sure that

7    I heard everything, but Special Agent Soligo was adamant, and

8    Mr. Fraiman said that he did.

9         Your Honor in ruling against him credited the

12:15PM 10    testimony of Special Agent Soligo I think primarily on this, I

11    don't know about Special Agent Pennebaker, but credited that

12    testimony over the defendant's affidavit.  They are at a

13    loggerheads.  That's it.  They confront each other.

14         And so in that instance, there's no question of

15    materiality because if your Honor had found that he had

16    asserted his rights to counsel, most likely the statements

17    would have been suppressed and not introduced at trial.

18         And so there's no question of materiality, and there's

19    no question that there was a dispute between the witnesses, and

12:15PM 20    Special Agent Soligo was, I would submit, the one who was

21    telling the truth there, and so he qualifies for the

22    obstruction enhancement several times over.

23         THE COURT:  All right.  Again, I think as a guideline

24    matter, the enhancement applies.  The standard is whether the

25    defendant made materially false statements to a law enforcement

1    officer that significantly obstructed or impeded the official

2    investigation.

3         FINRA is not a law enforcement agency.  There is an

4    argument to be made, although I don't think I need to decide it

5    that under the circumstances here FINRA is the leading edge of

6    what is likely to be a law enforcement investigation, but I

7    don't need to make that ruling.

8         I think it's enough based on the SEC and FBI

9    statements alone colored in context by other statements,

12:16PM 10   including ones to the Court.  I think that they were material,

11   they were made to law enforcement and that they did, in fact,

12   obstruct and impede the investigation, so I think the two-level

13   enhancement is again appropriate as a guideline matter.

14        Let me take up a couple other guideline issues I think

15   I can resolve fairly quickly, which guideline manual to use.  I

16   think there are sufficient ex post facto concerns that I think

17   the 2008 manual is the appropriate manual in terms of the

18   victim-related enhancements, so I am ruling in the defendant's

19   favor on that.

12:17PM 20        In terms of criminal history category, the offenses

21   scored under the PSR are his score is a 3, which produces a

22   Criminal History Category II.  The issue is does that overstate

23   the seriousness of his criminal history?  To some extent, yes.

24   I think the shoplifting -- it's technically scored correctly,

25   so there's no guideline issue.  I note that if we take off the

1    shoplifting offense, which is minor and occurred at a

2    relatively young age, he's still in Criminal History Category

3    II, and so, again, as a guideline matter, I think that that's

4    scored appropriately.

5        I'm going to deny the request for a two-level downward

6    reduction as a minor participant based on the papers.  I think

7    that under the circumstances, whether he was Laborio's

8    right-hand man or not, he was certainly actively involved in

9    the management here of this enterprise and actively assisted

12:18PM 10   Laborio in recruiting investors and so on, and I think the

11   two-level reduction is not appropriate.

12       And then in terms of acceptance of responsibility,

13   he's not automatically barred by going to trial, but I think

14   under the circumstances that departure is likewise

15   inappropriate, and, again, these are guidelines rulings that

16   while they are intertwined to some extent with the substantive

17   issues, I think they are primarily important at this stage for

18   the guideline calculation.

19       There's an objection from the government concerning

12:19PM 20   the defendant's drug use, which I have read and noted but don't

21   think I need to rule on, and I think I've addressed the issues

22   concerning the custody dispute, which, again, I've reviewed

23   both sides' submissions, and I don't think as a guidelines

24   matter certainly I need to resolve that.

25       So there are a lot of objections.  I don't want to

 1     miss any, but I think I've hit them.

 2          Mr. Thomadakis, is there --

 3          MR. THOMADAKIS:  Just as a housekeeping matter, I

 4     agree that for guidelines reasons your Honor doesn't need to

 5     reach the objections, for instance, our objections to the

 6     defendant's version of offense conduct.

 7          THE COURT:  Yes.

 8          MR. THOMADAKIS:  I just wanted to for the record

 9     maintain that objection.  One question with regard to the

12:20PM 10   victim-related enhancement then, your Honor, so if the 2008

11     guidelines are applicable, then there is still a question of

12     what the enhancement level is for victims related, for the

13     victim-related enhancement, and that's because it breaks at 50

14     or more victims.

15          THE COURT:  I thought there were 38 victims now.

16          MR. THOMADAKIS:  38 directly attributable to

17     Jonathan Fraiman, however, under the same reasoning that the

18     entire loss is attributable to him, and 38, I will get to that

19     in a second.

12:20PM 20        I think 38 victims is not in our view exactly

21     accurate, but even before we get there, under the same

22     reasoning that applies to the loss, in other words, relevant

23     conduct, the relevant conduct analysis is kind of an

24     overarching theme that is not just directly applicable to the

25     loss, it would also be applicable to the number of victims, and

1    so overall the number of non-Bernard Berry victims in the

2    February 1st, 2008 to September 10th, 2009 time frame is, I

3    believe, 159, so, obviously over 50.

4         Directly -- what the testimony at trial was with

5    regard to Mr. Fraiman, and, again, as I think is customary in

6    such summary evidence at trial, Mr. Pingree gave him every

7    benefit of the doubt was conservative.  In fact, he testified

8    to that, so he said 38 investors is what he called them are

9    attributable to Jonathan Fraiman.  That is, for instance, in

12:21PM 10   trial Exhibit 193, but in doing that, what he basically did was

11   he looked at the source of funds, so a check comes out of the

12   Musgrave joint bank account, he treats that as one investor.

13        THE COURT:  Is the Musgrave family one victim under

14   this?

15        MR. THOMADAKIS:  So, under that scenario, and he

16   testified about this, Alberta Ohm is one victim because it came

17   out of her trust account, and Dallas and Rosalee Musgrave, the

18   rest of the Musgrave family is a second investor, two

19   investors, but I think the guidelines analysis is different in

12:22PM 20   that he wasn't doing a guideline analysis in terms of victims,

21   he was speaking about investors.

22        We kind of saw this in the final version of the PSR

23   and hurriedly put in a very long footnote in our brief,

24   Number 7, but what I think is important here is that under the

25   2008 version of the guidelines, the analysis is that a victim

1    is any person who sustained any part of the total loss, and so

2    our view of that is that, you know, what we have with the

3    Musgraves, and, again, I'll talk about this at more length for

4    the 3553(a) argument purposes, but you've got Dallas Musgrave,

5    Rosalee Musgrave, you've got the two children, who were

6    supposed to get 100,000 of that Alberta Ohm money.

7         Those are two people, so overall these people were

8    each affected both monetarily and otherwise, as is obvious from

9    the victim impact statement, but monetarily they were each

12:23PM 10  affected, and I think the relevant case law on this from our

11   perspective is the Eighth Circuit case of United States vs. --

12   Eleventh Circuit, sorry, of *United States vs. Ellisor*, which we

13   cited in that footnote where basically the Court said if the

14   money comes out of a joint account that affects both

15   accountholders, and there are two victims for this precise

16   purpose of tallying up victims.

17        In addition, again, for the principle of being

18   conservative, Mr. Pingree did not, and he testified about this

19   as well, did not attribute to Mr. Fraiman Mr. Lazar's clients,

12:23PM 20  but when we're looking at the analysis, again, this just isn't

21   relevant conduct, this is direct conduct, the testimony was

22   that Mr. Fraiman was Mr. Lazar's supervisor.

23        We saw the e-mails where Mr. Lazar is keeping him

24   abreast of, you know, which client is investing in Envit.

25   Mr. Fraiman we also saw on the trial exhibits claimed a

1    commission specifically on those investors, and so once we're

2    engaged in this kind of bean counting activity under the

3    guidelines, which I'd rather not, but so be it, what we have is

4    that, you know, we submitted with our sentencing memorandum the

5    chart that Mr. Pingree's 38 investor analysis was based on.

6         Several of those people, you see the money coming out

7    of joint accounts, including the Musgraves.  You have that, you

8    have the two Musgrave children.  You have Lazar's I believe

9    it's 11 victims really because there was 10 investors and then

12:25PM 10   George Allen and Laurie Nugen are two, so even if he doesn't

11   take the entire investors of the Envit scheme, the 159 on his

12   back, it's certainly over 50, which still gets us to a

13   four-level enhancement as opposed to a two-level enhancement,

14   and under the 2008 guidelines, there was no consideration of

15   substantial hardship as there is in the current guidelines, but

16   we've addressed that as well if the current guidelines did

17   apply.

18        THE COURT:  I'm not sure about that victim counting.

19   Part of the problem is, I mean, you know, if you're starting to

12:25PM 20   work through a family, well, it isn't just, you know, certain

21   people who get affected but their spouses, their children.  I

22   mean, this could spread out almost infinitely in terms of the

23   harm that you're creating, but let me hear from Mr. Sinnott.  I

24   do have to come up with a number here.

25        MR. SINNOTT:  Well, your Honor, I would echo that, but

1    I would also note that the government has received three victim

2    impact statements, Dallas Musgrave, Rosalee Musgrave and

3    Brad Cleaves, three of them unless some came in in the last few

4    days, but as of the last PSR submission, that was what the

5    government had received, and these numbers that the government

6    is throwing out there about victims and about substantial harm

7    to those victims just is not documented.  It's not sustainable.

8    They're not numbers that are founded in documented facts, and I

9    would submit to the Court that probation's use of 2008 and

12:26PM 10   probation's numbers are the accurate numbers and are numbers

11   that the Court should adopt.

12         MR. THOMADAKIS:  Just to clarify one thing for the

13   record, your Honor, the victim impact statement we received was

14   from Dallas Musgrave and Rosalee Musgrave, and the reason we

15   asked to provide additional information was precisely because

16   Mr. Sinnott in a motion in limine didn't want them talking

17   about the impact on their family at trial, which is fair.

18   That's why we got an impact statement.

19         As for the impact of other people, Mr. Matkovic was

12:27PM 20   here.  We certainly heard regarding the impact on him.  He has

21   here at trial.

22         THE COURT:  It's not going to turn on whether people

23   filed victim impact statements.  I mean, maybe they didn't

24   think it was worth the 47 cents to mail it at this stage of the

25   game, in terms of the low likelihood that they'll get anything

back.  I'm not sure I know the exact amount what postage is
nowadays, but that's the point anyway.  All right.  Well, I'm
not sure.  There's a 2007 book up here.  I don't have my 2008.
Was it the same language as far as you know?  Well, here we go.

PROBATION OFFICER:  Your Honor, in the 2008 manual,
it's different language.  The reason I used the 2014 is
precisely because of the loss issue and attributing only the
1.8 million.  Our understanding was that was just involved in
the 38 victims, which would have been brought it less than the
50 victims.

THE COURT:  Okay.

PROBATION OFFICER:  If you find that the entire loss
is attributed to him, and, therefore, there are more than the
38 victims, then you would probably be in the 2015 guidelines
manual, which finds that as long as there's five or more
participants, excuse me, five or more victims that were
substantially harmed, there's a plus four.

THE COURT:  It's a plus four either way, in other
words, if I find there were 51 or more victims in 2008?

PROBATION OFFICER:  Exactly.

THE COURT:  Or I find there were more than --

PROBATION OFFICER:  More than five victims who were
substantially harmed.  I had originally put that in the
pre-sentence report, and I didn't consider actually husband and
wife or anything.  We had Mr. Dallas, Ms. Musgrave,

1    Mr. Matkovic, Mr. Allen and Ms. Nugen and Judith Henkel, who

2    all lost between 27 and 80 percent of their retirement savings.

3         THE COURT:  All right.  I'm going to resolve it that

4    way, that under either version, either there are -- there are

5    more than 50 victims under either version, that would be a

6    four-level enhancement.  I have to say without even having

7    heard the argument, I cannot imagine that this two-level

8    enhancement is going to make a difference since we're starting

9    to ramp up here to the stratosphere, but, again, I have to get

12:29PM 10    it technically right under the guidelines, so that's what I'm

11    going to do.

12         Anything else as a guideline adjustment?

13         MR. THOMADAKIS:  Not from the government, your Honor.

14         THE COURT:  Mr. Sinnott?

15         MR. SINNOTT:  No, your Honor, other than to ask we

16    preserve our objections.

17         THE COURT:  Yes.  With all of that, and, again, this

18    is a starting point only, that means our base offense level is

19    7, there are 18 levels of enhancement based on the loss, four

12:30PM 20    levels for the number of victims, four for the securities

21    violation involving a registered broker-dealer, two for

22    obstruction of justice.  All that adds up to I think a level

23    35.  The criminal history score is III, criminal history

24    Category II, and all of that produces 188- to 235-month

25    guideline range.  The supervised release range, is it still one

1    to three years?

2            PROBATION OFFICER:  Yes, your Honor.

3            THE COURT:  And the fine range is now?

4            PROBATION OFFICER:  The fine range is $20,000 to

5    $200,000.

6            THE COURT:  $20,000 to $200,000?

7            PROBATION OFFICER:  Yes.

8            THE COURT:  And restitution is in the amount indicated

9    if over $3 million, and the special assessment is $200, $100

12:31PM 10    for each count.

11            All right.  Anything further on the guideline

12    calculation, Mr. Christofferson?  I'm sorry, Mr. Thomadakis.

13    I'm already getting tired.

14            MR. THOMADAKIS:  No, I wasn't sure.  I thought

15    maybe -- I don't think it matters in terms of what we will

16    recommend, I thought maybe the fine range was $40,000 to --

17    well, I guess it's twice the gain or loss, but 400,000, 35 to

18    37.  Am I wrong?

19            PROBATION OFFICER:  We determined that he hadn't

12:31PM 20    received enough notice for the fine to be doubled.

21            THE COURT:  All right.  Again, jumping ahead of

22    myself, unless someone persuades me otherwise, to the extent

23    that Mr. Fraiman has financial resources are going to go to

24    restitution.  I don't see -- a fine is a symbolic gesture, and

25    I don't want to be the government to be ahead of any victim in

1    line if it comes to that.

2              Mr. Thomadakis, anything further on that?

3              MR. THOMADAKIS:  No, your Honor, thank you.

4              THE COURT:  Mr. Sinnott.

5              MR. SINNOTT:  No, your Honor.

6              THE COURT:  With that, let me hear the sentencing

7    arguments.  You don't to have repeat.  We've already gone over

8    a lot of ground.  You don't need to repeat it, obviously, but

9    Mr. Thomadakis.

12:32PM 10          MR. THOMADAKIS:  Thank you, your Honor.  The

11   government's recommendation in this case is 192 months of

12   imprisonment.  That would obviously be a sentence of a

13   substantial length, and it's not a recommendation that

14   Mr. Christofferson and I make lightly or reflexively, but we

15   think that when one considers the circumstances here, the

16   conclusion is inescapable that Mr. Fraiman's conduct calls for

17   a punishment most severe in order for justice to be served.

18              The first thing that stands out in this case and

19   demonstrates really just how deplorable the defendant's conduct

12:32PM 20   was here is his treatment of the victims in this crime and the

21   effect of his conduct on them.

22              This was a fraud that was intensely personal for

23   several of those victims.  Mr. Fraiman may have started on them

24   cold for a cold call, but in a steady creep, he got to know

25   them.  He learned about their lives, their finances, their

1    families.

2        Also, he could sell them more of these basically

3    worthless Envit shares.  He wasn't a one-time cold caller, he

4    had conversation after conversation with the likes of

5    Eric Samuelson.  He met with him in Florida.  He developed a

6    relationship with the man.  They had enough of a relationship

7    that Mr. Fraiman himself told the SEC that he considered

8    Mr. Samuelson a "father figure," and time after time what he

9    did with that supposed father figure was he kept using false

12:33PM 10    sales pitch after false sales pitch to get Mr. Samuelson to

11    invest hundred of thousands of dollars, from which Mr. Fraiman,

12    of course, personally gained.

13        The Musgraves, they testified here, and they, as we've

14    noted, submitted victim impact statements.  It's difficult to

15    imagine a more earnest salt of the earth couple than those two.

16    Mr. Fraiman in 2008, he took them out to dinner in Texas, and

17    he had a meeting, sat there with them and Ed Laborio in the

18    summer of 2008.

19        He had numerous communications with Dallas Musgrave,

12:34PM 20    e-mails, I believe phone calls.  He was acting as their

21    investment investor, the person they had entrusted to guide

22    them with their financial decisions at what was really a

23    precarious time.

24        He knew intimate details about their lives.  He knew

25    the circumstances of Mrs. Musgrave's nonagenarian mother, at 92

years old, how there was a trust, conservative trust, which she lived off of, some of which was meant to go, the rest of which was meant to go to her grandchildren.

He knew above all, as Dallas Musgrave testified here, that the Musgraves, they craved stability and security, and what he proposed to them was, of course, the same thing that got him a nice 10 percent cut on every dollar that they invested, Envit preferred shares with a guaranteed dividend that Mr. Fraiman knew full well could not be guaranteed by Envit.

I won't rehash what has already been said about the same thing he said to Rudy Matkovic in February of 2008 that wasn't fulfilled and how Envit wasn't doing well in the summer of 2008.  I think the evidence established that he knew that that guarantee of a dividend was empty completely.

But he still pushed that investment on them and he gleefully accepted the $145,000 that they asked if they could put into Envit from the Alberta Ohm trust, and, of course, he did.  That $145,000 was an extra $14,500 for him, but what did it mean for the Musgraves?  What did it mean for Alberta Ohm?  When she lost that money, she could no longer afford to stay in the facility in which she was, as Rosalee Musgrave's victim impact statement describes.

Mr. Fraiman knew that that was supposed to be paid for by that dividend income, and so what happens to her afterwards?

1    She has to go to a worse facility, several, I think,

2    Medicaid-funded facilities.  She stops eating.  She loses her

3    will to live, and Mrs. Musgrave to this day becomes emotional

4    when she thinks about the impact that that had on her mother.

5         She to this day blames herself, beats herself up over

6    the fact that she feels she caused the deterioration in her

7    mother's health that her mother couldn't live out the end of

8    her life in the happiness and the stability that she knew

9    before Mrs. Musgrave entrusted her money with her investment

12:36PM 10   advisor, Jonathan Fraiman.

11        As for Mr. Musgrave, he had to put his retirement

12   plans on hold because he and Rosalee lost that $200,000, and as

13   the Musgraves, as they describe, as Mrs. Musgrave describes, I

14   believe, also have to financially support one of their sons, a

15   man who suffered a traumatic brain injury several years back,

16   he's not capable of really supporting himself, so Mr. Musgrave

17   is still out there still working, and the Musgraves support

18   that young man, and I would wager to guess that $50,000 he had

19   coming to him from his grandmother would have made a difference

20   in that young man's life.

21        Instead, it went to Envit.  Mr. Fraiman ate off of it,

22   Mr. Laborio ate off of it, but the Musgraves got nothing but

23   twill and heartache.  That is Jonathan Fraiman's legacy here.

24        There are so many other victims which were hurt whom I

25   could discuss here other than, you know, perhaps Mr. Elikann,

1    who got his money back from the Fraiman family and a Mock pen

2    to boot, but in the interest of time, I'll focus on one other

3    person here, Rudolph Matkovic, whom we've touched on.

4         He's a man who's somewhat infirmed, probably beyond

5    his 74 years.  He has a number of ailments, not the least of

6    which is that a few years back, he had spinal surgery and

7    basically consisted of putting 15 nails into his spine.  He has

8    been kind enough to show us the X-rays.

9         Indeed, he suffers from pain every day because of

12:38PM 10   that.  When we went out to Ohio pretrial to meet with him, he

11   wasn't able to drive from Cleveland to Columbus, which is

12   probably less than two hours because of the discomfort he had

13   in his back, so we went up to his house to meet with him, and

14   yet he's out there still working as a pipe fitter, his

15   retirement plans scattered to the winds.

16        Why is that?  Well, he trusted Mr. Fraiman as well.

17   Mr. Fraiman was probably the very first victim or amongst that

18   group, as we mentioned, February of 2008, but, you know, that's

19   when he invested a relatively modest $4,000.  He received that

12:39PM 20   hedge fund through Pager, the e-mail saying that it was paying

21   a 5 to 10 percent dividend.  He puts in $4,000, but that wasn't

22   the end for him.

23        Mr. Fraiman, he went back to Mr. Matkovic.  Now, he

24   knew what Mr. Matkovic did for a living.  He knew how old he

25   was.  Mr. Fraiman acknowledged those facts in his SEC

1    testimony, but he didn't care.  He didn't care about the

2    suitability of the investment.  What he saw were dollar signs.

3    He knew Mr. Matkovic had more, and he targeted him for a bigger

4    hit, and, sure enough, he got him to invest an additional

5    $110,000 in the summer of 2008.

6         Altogether that investment of $114,000, there was a

7    sworn declaration of the SEC by Mr. Matkovic on this, that

8    totaled approximately 75 to 80 percent of the retirement funds

9    that he had available for investment at that time, 75 to 80

12:39PM 10   percent.

11        Now, Mr. Matkovic never saw a dime of that money.

12   Again, he never got a different.  Instead, what he got, as

13   we've heard in those recordings that were played at trial, were

14   various false lulling statements from Mr. Fraiman about how the

15   health, you know, Envit's health in 2009, when in reality the

16   company was pretty much crumbling, an outright fiction that

17   Envit had purchased Rib World for $8.8 million.

18        You know, I would venture to guess that on most days

19   when Rudy Matkovic goes outside in that Ohio cold and feels his

12:40PM 20   back stinging as he goes to his job as a pipe fitter, he'd like

21   to have that $114,000 back, probably wouldn't mind just having

22   the $11,400 that Mr. Fraiman pocketed off of him back, but he

23   got nothing.

24        Those examples, all witnesses who testified at this

25   trial show what Jonathan Fraiman really thought about his

1    victims.  He treated them basically with contempt.  He

2    bloodlessly looked at them as vehicles through which he could

3    put money into this scheme enriching himself in the process and

4    now after he's convicted and facing a sentence, he's

5    interviewed by a psychiatrist, and he claims that he cared

6    about the victims.  Really?

7         Where was that care when he went back to Mr. Samuelson

8    time after time, including right at the final outrageous Aetius

9    stage of this fraud?  Where was the care when he kept

12:41PM 10   guaranteeing dividends after Mr. Denerstein had pointed out

11   that they had no revenues and they had no ability to pay,

12   basically meaning that they had no basically to pay anything

13   out?

14        Where was the care that he exhibited when he's sitting

15   there with the Musgraves listening to Mr. Laborio tell them

16   that, sure, there's money asset aside for the dividend, knowing

17   full well that wasn't true.  You know, we've heard over and

18   again that Mr. Fraiman paid some money back to Peter Elikann.

19   The Fraiman family's criminal defense attorney wrote a letter

12:41PM 20   on his behalf at the SEC and testified here on his behalf at

21   trial.

22        He didn't do anything to get Rudy Matkovic any money

23   back.  He didn't take those suspicious payments of $53,000 in

24   the summer of 2009 and send them to Alberta Ohm.  If he had

25   done that, maybe she would have able to stay in that living

1    facility.  He didn't do that, of course not, because he didn't

2    care about those victims, he cared only about himself and his

3    financial cravings.  The defendant is now paying lip service to

4    these victims when he's facing years in prison, and that's just

5    in our view, just another transparent ploy to evade

6    responsibility for his actions, something that he's been doing

7    all along.

8         What matters here is what the defendant did, not the

9    hollow words that come out now, which we'll surely hear again

12:42PM 10  today with faint sympathy about these people whom he can't even

11   bring himself to admit that he wronged.  That leads me to

12   another kind of remarkable thing about this case and

13   Mr. Fraiman.

14        I don't know that in my experience I've witnessed a

15   criminal defendant who has caused so much harm to people and

16   exhibited so little genuine remorse.  On every occasion that he

17   has addressed his Envit activities, he shifts the blame and

18   casts himself as the victim.

19        In his SEC testimony, in his FBI interview and his

12:43PM 20  interview with the probation department and with Ms. Broquist,

21   his constraint refrain is that this was all Ed Laborio's fault

22   and that he bemoans the loss of his licenses and his inability

23   to work in the financial services industry.

24        Most recently, the defendant submitted a sentencing

25   memorandum that is remarkable really, a 64-page exercise and

1    this exact same excuse-making.  He claims victimization.  We

2    tried to do a little bit of data research.  Mr. Flynn tallied

3    up some figures.  In those 64 pages, there were 11 separate

4    instances where Mr. Fraiman is portrayed as a victim, not only

5    of Mr. Laborio, who supposedly hoodwicked him, but of the

6    government, who he blames for "failing to acknowledge the

7    likelihood that Laborio conned a newly minted broker, like

8    Mr. Fraiman."

9           Statements like that are frankly bewildering because

12:43PM 10   it's as if we didn't just have a two-week trial, as if there's

11   an alternate universe where he wasn't found guilty of

12   conspiring with Ed Laborio, of knowingly participating in a

13   scheme to defraud with Ed Laborio.

14          Mr. Sinnott made these exact same arguments to the

15   jury quite eloquently, I might add, but they square with the

16   facts in the case, with the evidence, and the jury came back

17   and found Mr. Fraiman guilty.  That's where we are, and the

18   facts establish at trial really showed beyond a shadow of a

19   doubt that the defendant's excuses are empty.  Those facts are

12:44PM 20   what tell the true story of the defendant's culpability.

21          You know, on that first day of testimony, I alluded to

22   this before, your Honor, but Eric Samuelson talked about all of

23   his investments, and he talked about how Aetius, by then Envit

24   is pretty much out of business, it's the summer of 2009, and he

25   gets a call from Jonathan Fraiman who tells him I'm at a new

1  company, he has nothing to do with Ed Laborio, I can't even

2  find Ed Laborio.

3          Francis Sears testified that he heard the same thing

4  regarding Aetius.  So how is that Ed Laborio's fault?  Did he

5  force Mr. Fraiman at gun point to pick up the phone and make

6  those misrepresentations about Aetius?  Maybe Mr. Fraiman will

7  address specifically those Aetius lies in his allocution

8  because I'd love to hear what exactly the excuses for those.

9          And while we're at it, again, was it blind trust in

12:45PM 10  Ed Laborio that caused, him which I think the fairest inference

11  is that he altered that two-pager and the numbers in there?

12  Was that just trusting Ed Laborio?  Was he conned by

13  Mr. Laborio to just ignore that Denerstein e-mail and keep

14  telling Lazar, pressuring him to invest retirement monies into

15  Envit after Denerstein said exactly that that is not what they

16  should be doing?  And, of course, it worked.  Lazar followed

17  those instructions.  He put a lot of his clients' retirement

18  monies into Envit, including his own mother.

19          Mr. Fraiman got a commission for that.  Was that all

12:45PM 20  Ed Laborio's fault, too?  Was Ed Laborio typing those e-mails

21  to Matt Lazar?  That's not what the evidence show, your Honor.

22          So when the defendant keeps insisting that he was a

23  victim of Laborio, it really starts to defy the jury's verdict,

24  and, frankly, I find it rather insulting to the real victims in

25  this case.  The victims here are the Musgraves and

1    Rudy Matkovic and Eric Samuelson and Albert Rentschler, among

2    others, and they were victimized by Jonathan Fraiman scheming.

3          You know, on that note, we also looked for references

4    to those people in the sentencing memorandum, two total

5    references to the Musgraves, one each for Samuelson and

6    Matkovic, in a footnote, no less.

7          Evan Munno, by contrast, is mentioned 19 times, 19

8    times.  This case and this hearing is about with what Evan

9    Munno did when he was managing the office for six months.  This

12:46PM 10   is about Jonathan Fraiman and how he defrauded numerous

11   individuals out of over $1 million for over year and a half in

12   a most cold-blooded way, and we feel that his persistent

13   refusal to shoulder any responsibility for his actions or

14   display really any remorse demonstrates that he simply has not

15   gotten the message of how destructive his conduct was.

16          So when he stands up today, and maybe he'll go into

17   again all the ways that this has already affected him and the

18   harm that has befallen him based on his employment at Envit,

19   what needs to be remembered is that this was not someone else's

12:47PM 20   fault, this was his fault.  He conspired with Ed Laborio, he

21   caused these injuries to these victims, and he's the cause of

22   whatever consequences flow from those actions.  It's not the

23   government, it's not the SEC, Mr. Fraiman is the person to

24   blame for the harm that befell these people.

25          There's something else that goes hand in hand with the

1    defendant's utter refusal to accept responsibility here, and

2    that is his pattern of obstruction, of lying, of attempting to

3    deceive anyone with a badge of authority that we've seen over

4    and over again.

5         I've touched open it before, but I think it's

6    critically important in kind of assessing the nature and

7    circumstances of the offense and the characteristics of this

8    defendant.  He's lied to FINRA, the SEC in sworn testimony, the

9    FBI, to this Court.

12:47PM 10         The falsity of his statements on all of those

11    occasions demonstrate amply that they weren't a product of

12    mistake, they were intentional, material misrepresentations,

13    and that's what makes it impossible to really swallow any

14    assertion that the conduct of conviction was a one-time error

15    in judgment or a blip or accept the notion of the supposed

16    post-offense rehabilitation.  Over and over again Mr. Fraiman

17    has thumbed his nose at law enforcement and regulators and this

18    proceeding by continuing to attempt to deceive everyone

19    involved in this case.

12:48PM 20         If he's as innocent as he volubly proclaims, why did

21    he lie to FINRA when he was contacted about Envit when he was

22    still working there?  If he was cooperating with the SEC, as he

23    constantly claims, why did he lie under oath on matter after

24    material matter, which we saw was contradicted by the

25    recordings of Matkovic, by the Lazar e-mails?

1          You know, your Honor, David London is here.  He's the

2     gentleman from the Securities and Exchange Commission who took

3     Mr. Fraiman's testimony, and I feel confident in saying that

4     the defendant's assertion that he helpfully cooperated with the

5     SEC would be disagreed with most strenuously by Mr. London who

6     had to sit there for hours and listen to the defendant lie to

7     his face.

8          And if Mr. Fraiman is rehabilitated, why would he

9     nonetheless just a few months back lie to this Court in his

12:49PM 10     sworn affidavit regarding facts supporting his motion to

11     suppress?  What this shows really is a troubling pattern.  When

12     he sees something he wants, whether it be a 10 percent

13     commission that would allow him to pay for a BMW and other

14     traffic to success or trying to get out of trouble with the

15     law, he will say whatever.  He will spin a web of deceit.  He's

16     contemptuous of the truth and simply does not care what

17     institution or individual that may harm.

18          You know, I thought it was quite ironic in the PSR,

19     your Honor, that Mr. Fraiman has a tattoo that's translated to

12:50PM 20     truth and justice given that he has proven himself to be all

21     but allergic to telling the truth, and he has tried to dodge

22     justice at every turn.  Today, your Honor, is a day when that

23     should end.

24          Mr. Fraiman's sentence in order to represent justice,

25     a justice punishment and to address his consistent lack of

1    respect for the law must be a waiting one.

2         As we mentioned previously and in our brief, this is a

3    case where we believe the guidelines enhancements actually do a

4    fair job in measuring the defendant's culpability given all of

5    the facts and circumstances of his conduct.  We've covered most

6    of the defendant's bases for departure or a variance from the

7    guidelines, and we don't believe any of them hold water.

8         I won't reiterate what we think about, for instance,

9    the diminished capacity argument.  Just a couple of notes, the

12:50PM 10  post-offense rehabilitation again we think is belied by his

11   consistent false statements and mendacity anyone to regulators,

12   this Court and law enforcement.

13        Moreover, I would note that it's wholly based on his

14   in the course of duties of his job in servicing folks who are

15   veterans, which is not a surprise, San Diego is a military

16   town, so it would make sense that some of the mortgages he

17   finances, people who come to him are veterans, and he's paid to

18   do that job, and he does it, but I don't think that that rises

19   to the level of what one would consider post-offense

12:51PM 20  rehabilitation.

21        The family circumstances, as your Honor noted,

22   obviously every time someone is sentenced to prison, if they

23   have children, it will affect those children, and that is

24   always unfortunate in every case, however, really what we talk

25   about there is something -- are there circumstances that remove

1  a case from the heartland of those other defendants and what

2  happens to those people's families, and I don't think that

3  anything like that has been established here.

4  　　　　One final thing that I'd like to address, your Honor,

5  is the point of general deterrence.  One thing that I think

6  this case shows, one of many things, is that it's not that

7  difficult to set up a boiler room operation.  It doesn't

8  require some special skill set.

9  　　　　There are these kind of lead cards floating around for

10  sale, as we heard about at trial, and obviously there are

11  people susceptible to investing under these types of

12  circumstances where someone just calls them up on the phone.

13  　　　　Perhaps they make investment decisions that the rest

14  of us would not make, but as we've seen from some of the people

15  who testified at this trial, they're folks, they're not kooks

16  operating at the fringes, they're hard workers like

17  Rudy Matkovic.  They're accomplished business people like

18  Eric Samuelson.  They're aging veterans like Albert Rentschler.

19  They're committed couples looking forward to their retirement

12:53PM 20  like the Musgraves.  They deserve better than to be preyed upon

21  by unscrupulous operators like Mr. Fraiman and Mr. Laborio

22  willing to tell them anything as part of a scheme to get them

23  to part with their money.

24  　　　　And this scheme took a worse turn than many boiler

25  room operations of its ilk because of the investment advisor

1    angle.  It's not something that one sees in all of these boiler

2    room type cases all the time.  That was an aggravating factor

3    because there's an additional level of trust placed and

4    developed by an investment advisor when he's dealing with his

5    clients, as Mr. Fraiman did here, and to manipulate that trust

6    to his and Ed Laborio's own ends was insidious and it was

7    reprehensible, and I'll recommend a sentence of 192 months

8    would send an absolutely crystal clear message that such

9    behavior cannot and will not be tolerated.

12:54PM 10           For all of those reasons, we feel that our proposed

11   sentence of 192 months of incarceration is the appropriate and

12   reasonable sentence here followed by three years of supervised

13   release.  Your Honor has already outlined the restitution

14   amount, and we agree whether he's able or not to pay a fine.  I

15   don't know.

16           Obviously, he has retained counsel, and I take it

17   Choate, Hall and Stuart may have also been recently retained in

18   this case, but any money that he does have should go to

19   restitution certainly and the $200 special assessment.

12:54PM 20   Thank you.

21           THE COURT:  All right.  Thank you.  Mr. Sinnott, I'm

22   sure you -- I don't want to put you in the position of having

23   to argue to a hungry Judge, which you know among lawyers is one

24   of the worst positions you can be in.  It's about seven minutes

25   to one.  What I would like to do is to break.  I have another

1    sentencing at three and some odds and ends between 2 and 3 that

2    can get pushed off, but what I'd like to do is come back as

3    close as possible to 1:30.  I know that's rushed, 1:30, 1:35,

4    1:40, somewhere in there, and we'll start afresh.  I won't make

5    you interrupt your argument or, again, argue to a hungry Judge.

6    Will that work?

7         MR. SINNOTT:  That would, thank you, your Honor.

8         THE COURT:  Why don't we do that.  We'll stand in

9    recess then and get going as soon as we can to 1:30.

12:55PM 10         THE CLERK:  All rise.

11         (A recess was taken.)

12         THE CLERK:  All rise.

13         THE COURT:  All right, Mr. Sinnott, the floor is

14    yours.

15         MR. SINNOTT:  Thank you, your Honor, I appreciate the

16    opportunity to speak.  My client has also with your permission

17    has asked for the opportunity to say a few words before you

18    pronounce sentence.

19         THE COURT:  Yes, of course.

01:39PM 20         MR. SINNOTT:  Your Honor, the Court described the

21    government's recommendation as, well, the numbers that were

22    being couched as stratospheric, and the defense appreciates the

23    fact that in some respects the government must stand in the

24    shoes of the victims, and the United States is fortunate to

25    have two very fine prosecutors.  They're smart, they're

1    knowledgeable, they're ethical.

2         Unfortunately, in this case, your Honor, I think

3    they've lost perspective.  I think they've lost perspective

4    because in a desire to punish the person that Jonathan Fraiman

5    was in 2007 to 2009, they're ignoring Section 3553 and its

6    objectives, they're ignoring the person that Mr. Fraiman has

7    become and instead focusing on the person that he was and the

8    things that he did back then.

9         They're considering statements made by at the

01:40PM 10   recommendation of counsel in PSR comments and objections and

11   sentencing recommendations as demonstrating a lack of

12   recognition or remorse on the part of the defendant when I

13   would submit it's attorneys doing their job and trying to make

14   sure that the government plays fair and that if the government

15   overstates something or misstates something that they're called

16   on it.

17        I would submit to the Court that this is not the same

18   guy that participated in those terrible things back in 2007 to

19   2009, this is not the same guy that was making those phone

01:41PM 20   calls on behalf of Envit during that time period.

21        An awful lot has happened.  This case obviously is

22   something that my client and his role in it will have to live

23   with for the rest of his life, but a lot of time has gone by.

24   There's a lot of water under the bridge, and I understand my

25   Brother advocating on behalf of victims that suffered terrible

loss in this case, and the government at the insistence of our

client never attempted to downgrade or villify any of those

witnesses during the trial.  Those were individuals that came

in here, they testified, they had suffered greatly, and

Mr. Fraiman recognizes that.  So to the extent that there's

discussion in the pre-sentence report about how he suffered,

I'd ask that the Court keep that in context.

The Sentencing Guidelines, as the Court well knows,

are advisory only.  They are just one factor for the Court to

consider under 3553 in passing sentence, and I would submit to

the Court that this case is emblematic of why they should only

be advisory.

The numbers that the prosecution has recommended in

this case are completely out of touch, completely

disproportionate to the role of Jonathan Fraiman in 2007 to

2009.  Recommending over 16 years of confinement on an

investment fraud case for an individual that had just received

his broker's license when he had the misfortunate to answer a

Craigslist ad posted by Ed Laborio is unreasonable and is not

serving the objectives of 3553 or of justice.

I understand that the Court feels that claims of

mental impairment are common, and, of course, they are, and

they are claims that can be fabricated, and they are.  The

world is an ugly place.  A lot of individuals do have mental

health issues that are legitimate.  That may or may not excuse

1    them of responsibility for criminal offenses, and we're not

2    claiming that in this case Mr. Fraiman's impairment of the

3    ability to his exercise the power of reason is an excuse for

4    anything that happened in this case.

5         We are asking for the Court to recognize just how

6    extraordinary, and I say that in a bad way, in the worst way

7    what Mr. Fraiman suffered as a child represented and how in

8    documented fashion in the reports of counselors and

9    psychologists and psychiatrists, in many ways, it made him the

01:45PM 10  person that did those things in 2007 to 2009 that has continued

11   to be tortured, to be racked with anxiety and guilt and

12   insecurity.

13        Just the consistent nature of those reports dating to

14   the time that he was four years old sets this apart from

15   run-of-the-mill cases, and, of course, no one ever thinks their

16   case is run-of-the-mill, but I would submit to the Court that

17   any reasonable person looking at what the defendant has been

18   through in his life has got to feel reasonably that Mr. Fraiman

19   is psychologically damaged, that he is in need of intense help

01:46PM 20  and treatment and hopefully healing that so many of the other

21   manifestations that contributed to his behavior in this case

22   are also related to that trauma and the inability of

23   Mr. Fraiman and of those who loved him to get him the treatment

24   or the help that he needed as an adult and that manifested

25   itself in self-medication, in abuse of prevention drugs, in

1    excessive drinking.  All of these things rendered him a person

2    that didn't think clearly, but, once again, that's not an

3    excuse, but the government hasn't provided perspective, so I

4    think it's important that I provide it on behalf of Mr. Fraiman

5    because this will be my last opportunity to do so.

6         Let's talk about this case, and without relitigating

7    the trial, I would submit to the Court that had Edward Laborio

8    shown up in your courtroom, your Honor, and done what he

9    promised to do, plead guilty and accept the punishment for his

01:48PM 10   enormous, enormous role as the founder of Envit, as the

11   beneficiary of Envit, had he done that, I would submit to the

12   Court that might have been the end of the case, that

13   Mr. Fraiman would not have been indicted, that the hurry up

14   indictment that followed the absconding of Laborio to we think

15   Barcelona, Spain, where he eventually died, would not have

16   taken place, he would have pleaded guilty to that information,

17   he would have been sentenced, and perhaps that would have been

18   the end of it, but there was nothing to indicate in the record

19   that we've received that Mr. Fraiman would have been indicted.

01:49PM 20        So putting it in perspective, Mr. Fraiman testified

21   before the SEC, even though he knew he didn't have to, he gave

22   up his license permanently to be a broker, something he had

23   worked hard to do, and there's nothing heroic about either one

24   of those, and I'm not trying to claim that there is, but what

25   I'm telling you is that he tried to move on, and he tried to be

1    a better person and to live a better life, and other than a

2    reckless driving offense approximately a year ago in

3    California, he avoided any contact with the law.

4    And, of course, as the Court will recall, during that

5    time frame, he was embroiled in a very difficult and protracted

6    domestic custodial battle involving his child, and I know that

7    no Judge wants to get involved unless he or she is a Family

8    Court Judge in domestic affairs, and I know and I understand

9    that sometimes the best course is to defer or to not take

01:50PM 10    sides, but what I do want to convey to the Court is that that

11    child means everything to my client.  That little girl is his

12    reason for wanting to become a better person, maybe not the

13    only reason but probably the biggest reason why he wants to be

14    a better person and why he's tried to be a better person.

15    So he gives up his license, he leaves, he tries to get

16    a job in a brokerage firm, he succeeds, and then, of course, as

17    soon as the SEC investigation comes to light, Merrill Lynch

18    dismisses him, and then he works a series of other jobs working

19    his way to the west coast where he has family, and I'll talk

01:51PM 20    about them in a minute, he has an incredible family, finds a

21    niche in a mortgage company, and notwithstanding what my

22    Brother says, didn't just carve-out a special niche for

23    veterans because there are a lot of veterans in San Diego

24    anyway, he did it because it means something to him.

25    And, frankly, it means something to him because it's

1    his way even as he's working essentially, been working minimum

2    wage financial services jobs and is not in a position to make

3    restitution or was not, he is certainly not now, unless he gets

4    another job, and we hope that he'll have that opportunity, but

5    his way of giving back.

6           And I would submit to the Court of making amends in

7    some respects was to try to do the extras for those veterans,

8    and it wasn't just a matter of refinancing mortgages, it was a

9    matter of learning the things that would help them be

01:53PM 10   financially whole, financially capable knowing what benefits

11   were available, even aside from refinancing options for

12   veterans in Southern California, and the Court probably had the

13   opportunity to see some of those letters and references from

14   those veterans.

15          And I would submit that the tone of those letters, the

16   content of those letters demonstrates that Mr. Fraiman wasn't

17   just doing his job, he was going above and beyond to help those

18   men and women and that it really does constitute

19   post-conviction rehabilitative behavior, it really meant

01:53PM 20   something to him, and I told him that in all probability he

21   would never again work in financial services, and I said what

22   would you do?

23          And he said, "I think I'd go work for Habitat for

24   Humanity because they build houses, and I'd like to build

25   houses for veterans because I found that that was something

very special to me, that was something that made me feel like my work was meaningful, and I'd like to keep helping veterans," and I think that that's significant, your Honor.

Stunning to me, your Honor, and I've got the greatest respect for both of these terrific attorneys, the shrill, the really almost hyperbolic tone of my Brother's presentation today but also the submissions that have been made to probation.

I submit to you that it's not warranted in this case. I'd submit to you that my Brothers are treating Mr. Fraiman the way they think Mr. Laborio should be treated.  They're making a sentencing recommendation that would probably be considered high even for as conniving and calculating an operator as Ed Laborio, 16 years in prison I would suggest is extreme.

A moment ago I talked about what if he had shown up and would Mr. Fraiman be sitting here before you today, and I submit that it would be reasonable to think that that wouldn't happen, but he is here, and the government, as it can, has had the discretion to charge him, to prosecute him, and now on the heels of guilty verdicts by the jury to make a recommendation, but I would submit to the Court he's not Ed Laborio, he's not a bad man, and, as I said, at the outset, he's a different guy than he was then.

And I know the Court hears that all the time, and I would submit to the Court that in this particular case, there's

1    evidence of that.  To hold him responsible for things that he

2    said back then is certainly the way the system works and

3    certainly understandable and certainly something that the Court

4    has to confront, but I would submit to the Court that his life

5    since Envit is a very accurate barometer of who he is today and

6    why the Court should not feel that the guidelines are anywhere

7    near an adequate barometer of a penalty in this case.

8        Ed Laborio conned a lot of people, and to say that he

9    conned my client is not an excuse for what my client did, but

01:57PM 10   it is a perspective, and it's a perspective that I think may

11   resonate with the Court because the government would have the

12   Court find that Mr. Fraiman should have known, should have

13   discerned things that nobody else in this case should have.

14       You recall at one point after Mr. Genovese testified,

15   we got a jury question, and the jury question was, "Why didn't

16   he go to the authorities?"  And, of course, that was a question

17   that couldn't be answered, but I would submit that fair

18   questions like that could be asked, fair questions about why

19   him?

01:58PM 20       I know the government has said, well, he had an office

21   all to himself for a small portion of this conspiracy, well, he

22   made more money than anybody else, but you recall that

23   Anna Murillo testified he was the first guy in the office, he

24   was the last to leave, he took this job very seriously, and

25   that's not to excuse things that he said to Dallas and

1    Roasalee Musgrave, to Eric Samuelson, to Rudy Matkovic, but

2    that context is very important, and I'd ask that the Court keep

3    that in mind.

4         But in addition to conning a multitude of victims, in

5    addition to taking advantage of a baby broker that had just

6    passed the broker's exam in the summer of 2007, Laborio conned

7    the government.  Mr. Laborio, by all indications, gave multiple

8    proffers to the government in which he admitted to illegal

9    activity.  He also threw dirt at a number of other people.  He

02:00PM 10   was never surrendered, he was never arrested, he was free to

11   roam.

12        He had a case in Florida, and he pleaded guilty and

13   was sentenced in that, retained his recognizance and didn't

14   show up here, and I would suggest to the Court that the

15   government's piling on in this case goes beyond just concern

16   for the victims, and they should be concerned for the victims,

17   but it's also an issue of this isn't going to happen again,

18   we're going to show everyone that we really meant business in

19   this case, and even if a dead guy can't be in this courtroom,

02:01PM 20   we'll take the next best thing, we'll take Jonathan Fraiman.

21        Your Honor, I would submit that this case goes beyond

22   any consideration of the guidelines because it is an

23   extraordinary case.  I would submit to the Court that it is an

24   exceptional case.  I understand the Court has --

25             THE COURT:  They'll be people calling in for

1    conferences.  Sorry about that, go ahead.

2    MR. SINNOTT:  Thank you, your Honor.  I know that the

3    Court has made a determination that under the guidelines from a

4    strict stand-alone perspective, the defendant's diminished

5    capacity in the Court's view does not satisfy the guidelines,

6    but I would suggest to the Court because of the effect, I would

7    suggest to the Court that it's undeniable just how severe and

8    serious this incident was, and I would submit that Dr. Brower's

9    report accurately and cogently lays out the effect that it's

02:02PM 10   had on Mr. Fraiman and on his time at Envit, in particular,

11   where the pressure was so severe, where the anxiety was so

12   substantive and prominent that it's not an excuse, but it's

13   certainly, I submit, should lead the Court to better

14   understanding that he was not thinking straight, that he had a

15   diminished ability, that he had diminished judgment that should

16   be considered, but I don't think that's the end of the story

17   either.

18   I think the Court should also consider in keeping with

19   3553 the defendant's individual circumstances.  Mr. Fraiman

02:03PM 20   comes from an incredible family.  The Court no doubt observed

21   that the defendant's mother and father and fiancee', and

22   usually, and he's here again today along with them, his

23   Uncle Richard were in the courtroom every single moment.

24   The Court has been able to read numerous reference

25   letters from family members, including a couple that are not

1    real close with Doug and Johannah or the defendant as to how

2    much they support him and how he's a changed person and how

3    they support him and they love him, and he means something to

4    them.

5          And I know this Court hears sob stories every day.  I

6    know this Court is sometimes barraged with excuses and

7    rationalizations, but I can't recall a case that I prosecuted

8    or that I represented a defendant in where there was so much

9    family support, and I think that that's important because I

02:05PM 10   think it shows that you've got individuals that care about the

11   defendant, that care about his future and are willing to do

12   whatever it takes to make him whole, to help him get the

13   treatment and the support that he needs to become a productive

14   member of society, the father that he is but that he wants to

15   be in the future that allows him to continue to do good things

16   for his community, whether it's veterans or others, that allows

17   him to improve, that allows him to be a better person, and all

18   of us want that, but this defendant has a family that has stood

19   by him through thick and thin, and they want to help, they want

02:06PM 20   to support, they want to do whatever it takes, and I would

21   submit that that -- and that desire to be a better person that

22   Dr. Brower talked about in his report are exceptional in this

23   case.

24         A little bit more perspective, your Honor.  This was

25   18 months in a 36-year life.  Defendant had been a broker for

1    just a matter of months, and today is just a continuation of

2    his punishment, and that's not said to make him out to be a

3    victim, but it's to remind the Court that he no longer has a

4    brokerage license, he will probably never work in financial

5    services again, and the Court may make that order, I've told my

6    client that, and he understands that.

7        He suffers from debilitating anxiety, stress.  He's

8    humiliated.  His reputation is shattered, perhaps forever or

9    for a long time.  Because of this case, he's at least

02:07PM 10   temporarily lost physical custody of his daughter and is forced

11   to visit her under supervision.

12       Any gain that Mr. Fraiman derived from this case,

13   somewhere between $300,000 and $400,000, pales in comparison to

14   the amounts that the conspiracy brought in and that Ed Laborio

15   brought in.  I mean, the government now has this up to $3.8

16   million, and the Court under the guidelines reasoning has

17   accepted that figure, but that disparity is something that the

18   Court should consider in this case, and, yeah, maybe

19   Jason Miles or one of the other defendants only made $30,000,

02:09PM 20   but they didn't put in the hours, they didn't work as hard as

21   he did.

22       Defendant needs, and I would submit to the Court the

23   record validates this, fundamental, intense mental health

24   treatment.  He needs intense, professional substance abuse

25   treatment, drugs, alcohol.  He needs to be closely monitored to

1    keep him on the straight and narrow that he has been for the

2    past several years, but on the heels of Dr. Brower's forensic

3    report, I can tell you that the defendant's eyes are open, his

4    families' eyes are open.  They never appreciated just the depth

5    of psychic pain, of anxiety that he experienced on a day-to-day

6    basis.

7         Throughout his childhood and adult life, he's been

8    dealing with almost incomprehensible mental health challenges

9    and addictions.  These are well documented, as we've talked

02:10PM 10    about.

11         Your Honor, I would submit that no good would come of

12    incarcerating Mr. Fraiman, and I know that when the Court

13    considers a stratosphere recommendation, it's easy, and I'm not

14    saying this Court would do it, but it's easy to say, well,

15    let's come up with something less than that or something in the

16    middle or something lesser or lower, and, of course, Court has

17    complete discretion to do that, but I would submit to the Court

18    that Jonathan Fraiman is in desperate need of treatment.

19         Mr. Fraiman is in desperate need of mental health,

02:11PM 20    intense supervision and treatment, substance abuse treatment,

21    and a prison setting will not be the most conducive place for

22    that to happen, and I'm not saying that there aren't programs

23    available, but I'm saying that if one of the Court's

24    objectives, as I've submitted, should be under 3553 is to help

25    the defendant become a better person, to get the medical

1   treatment that he needs, prison is not the best place for him.

2   Putting him in prison, I would submit, while it might

3   punish him, while it might send that inescapable message that

4   my Brother talked about out there, I would submit to the Court

5   it's not going to help the victims.

6   Mr. Fraiman's not going to be in a position to make

7   restitution should he have the financial means, should he be

8   able to stay out of prison and get a job that allows him to do

9   that if he's incarcerated, and a little girl is going to grow

02:13PM 10   up without a father.

11   Now, that in and of itself is typically not grounds

12   for a downward departure or for keeping someone out of prison.

13   I know that the standards are very high, but it is something

14   the Court should consider in conjunction and in combination

15   with other factors to include his mental health issues, his

16   family circumstances and support.

17   The sentencing disparity that is between him and

18   Laborio and him and the other conspirators that the government

19   has not identified but that they've alluded to in their

02:14PM 20   indictment and that I think the evidence showed that at least a

21   couple of those individuals, had they been judged by the

22   standard that Mr. Fraiman was, could very well have been tried

23   and be looking for a sentence from the Court.

24   The First Circuit has said that the Sentencing Judge

25   has an awesome responsibility, and I've never had to judge

1    anyone in this way.  I don't envy the Court, and I know we're

2    legal professionals, and I know that we all have jobs to do,

3    but I would submit to the Court that this individual,

4    Jonathan Fraiman, is better placed on probation, and as the

5    Court is aware, if the Court does depart downward and put him

6    in a position of probation, he could be on probation for up to

7    five years, that the Court could order community confinement,

8    which I would submit to the Court would act as a deterrent, it

9    would be a valuable lesson and experience without forcing him

02:15PM 10    to lose his daughter, without putting him in a position where

11    he might not get the help in healing that he needs to become a

12    better person, to become a whole person instead of the

13    tormented, sad individual that he's been through his experience

14    at Envit and right up to the present day.

15         I would ask that the Court consider those objectives,

16    consider the amount of time that has past, consider the

17    disparity with the other potential defendants in this case,

18    and, in particular, with the deceased defendant,

19    Edward Laborio, that it consider the mental health challenges

02:16PM 20    that Mr. Fraiman has faced but that the Court think about his

21    family and just how special he is to them and how helpful they

22    would be to him in keeping him in treatment, in making sure

23    that he's supported and loved and that he deals with those

24    demons that have tormented him for most of his life.  I would

25    submit that that would be an appropriate sentence, that that

1   would be in furtherance of the cause of justice and of

2   Section 3553.  Thank you, your Honor.

3          THE COURT:  All right.  Thank you, Mr. Sinnott.  All

4   right.  Mr. Fraiman, do you wish to address the Court before I

5   impose sentence?

6          THE DEFENDANT:  Thank you, your Honor.  I'm going to

7   keep some notes so I don't forget what I want to say.

8          THE COURT:  Yes.

9          THE DEFENDANT:  Your Honor, I stand here before you

02:18PM 10   with my future in your hands.  This is my only moment to speak

11   to you for you to learn about my mind and soul, and I thank you

12   for your patience at this time.  I understand that my conduct

13   in 2008 and in 2009 has brought us together for this incredibly

14   important and perhaps on your part unwanted decision.

15          I recognize that I'm a flawed individual and imperfect

16   person.  I also believe that good people make bad mistakes,

17   poor decisions.  There isn't a day that goes by that I don't

18   wish I could take back that ad that I applied to, as I told

19   probation, or that I could pay back every single investor.

02:19PM 20          At night, I take prescription medication to sleep

21   because of nightmares, guilt about what happened, the anxiety

22   that they counted on me, and that's something I have to live

23   with.

24          I know that after listening to the government's

25   description of me, you might find it startling when I tell you

1    that I generally cared about Dallas and Rosalee Musgrave, that

2    I did think of Eric Samuelson as a mentor and a grandfather,

3    and Phil Sears as a friend.  Most of the part of the trial was

4    listening to their testimony and feeling that I betrayed them,

5    the empty feeling in my stomach, the ache in my heart that will

6    not leave.

7            I want so much to be able to tell them that I'm sorry,

8    that I made mistakes during my time in Envit, and I deeply

9    regret it.  Your Honor, you may have noticed my mom and dad and

02:20PM 10    my fiancee' Chelsea have been here every day during my trial,

11    excuse me, and have been here for every other event since

12    sitting here today.

13            I want to apologize to my family and apologize to my

14    92-year-old grandfather who wrote a letter but couldn't be here

15    today for letting them all down.

16            Your Honor, if any good has come out of my trial and

17    conviction is that I'm deeply loved by my family and blessed

18    and friends in the way that I never imagined.  Even as my heart

19    breaks, when I see the pain in my mother's eyes, I know I'm

02:22PM 20    blessed in other ways that many people are not.  I did always

21    seek the need to impress people, and I realize now all I wanted

22    to do was to let them love me and love them back.

23            Your Honor, nothing in this world means more to me

24    than my daughter, Ava Mae.  She's a special little girl who

25    gives me unconditional love and hope, and everybody in life has

1    to come up with a why and a purpose.  Excuse me.  And what is

2    your purpose in life?  What makes me wake up every day?  It's

3    my daughter.  She makes me want to be a better person and the

4    father that she deserves.

5        Her happiness, her safety and the love I think about

6    every day and every night, and I've continued to see her and

7    her supervised visitation three days a week every day after

8    this trial, and I hope that you had a chance to read some of

9    the recommendations from Hannah's House about my ability as a

02:24PM 10   father.  The thought of her growing up without me in her life

11   is unbearable.

12       Your Honor, please give me the opportunity to be the

13   person and the father that my daughter so desperately needs.

14   Allow me to build a family and contribute to my community.

15   Please give me the opportunity to deal with the troubles that I

16   haven't faced for 36 years that I've suppressed.  If you're

17   able to do that, you will have allowed me to become a

18   productive and worthwhile contributor to my community, a dad

19   who truly can be an example for his child and a healed and

02:25PM 20   whole person whom you'll never see again or sentence again and

21   make you proud of this decision.  Thank you.

22       THE COURT:  Thank you, Mr. Fraiman.  All right.

23   Sentencing in all cases calls upon the Judge to balance things

24   that cannot be balanced, that calls upon me to consider factors

25   that point in completely opposite directions and that cannot be

1    reconciled.

2         What is good for society or good for victims or good

3    for the system may be quite different from what's good for the

4    defendant or the defendant's family or the defendant's

5    children, and it's among the many things that make this aspect

6    so difficult.  That is typically true as here in cases

7    involving white collar criminal defendants.

8         There is a good argument to be made that someone of

9    Mr. Fraiman's background with a strong supportive family, with

02:27PM 10    intelligence and education and opportunities that most of the

11    people I sentence have never had is more blameworthy, not less

12    blameworthy, and should have a longer sentence rather than a

13    shorter sentence, and there certainly are a lot of people in

14    our society who believe that to be true, and I can't say that

15    they're completely wrong.

16         I think I tip somewhat in the other direction without

17    complete confidence that that's the right answer but that

18    people who are from those backgrounds have farther to fall,

19    more to lose, a harder landing when they fall, they're

02:27PM 20    subjected to things like shame and humiliation that for some

21    people or at least some people seem to be impervious to it,

22    and, of course, they have a greater chance of redeeming

23    themselves and a less chance of being recidivous, and so here,

24    as in any case, I simply have to do the best I can and to try

25    to again balance these factors that are not balanceable.

1          I begin with the crime.  It's a serious crime, very

2     serious crime.  The guidelines reflect that.  It's a

3     significant fraud.  It was a cold-hearted crime, very

4     cold-hearted.  There are few crimes that are quite like it,

5     taking people's life savings is probably morally wrong, even if

6     it was just a risky investment, not an actual fraud, but these

7     people, particularly elderly people, who have worked entire

8     lives to save their money for their own security, for their

9     retirement, to leave something to their children and to their

02:29PM 10     grandchildren and to have someone steal it from them in an act

11     of betrayal is, as I said, cold-hearted, and I don't think the

12     government's description of the crime is hyperbolic in that

13     respect.

14          It's true certainly that there are a lot of people in

15     our society that don't perhaps respect savers, ordinary people,

16     as much as they should compared to big spenders and debtors and

17     so forth, but, again, it's just an awful thing, a terrible

18     thing to take someone's life savings, to steal it.

19          So that's where I start.  It's true, as the defendant

02:30PM 20     has pointed out, that Mr. Laborio is not here, that he's dead,

21     that he engaged in what I think we all could agree was worse

22     behavior at some level.  He may have been a true sociopath.

23          It's not entirely clear to me that that's bad luck for

24     Mr. Fraiman.  I don't know what the charging decisions would

25     have been in a different scenario.  That's not my role.  We

1    live in a country with a division of responsibilities in our

2    government.  I don't decide what charges to bring and when.

3         I don't know what Mr. Laborio's intentions were, what

4    the government's intentions were, but he's not here, but

5    certainly the defendant is here, and he did commit these acts.

6    He was convicted of it.  The evidence certainly was fairly

7    strong, and I think the defendant made it worse in some ways.

8    Not only the length of activity but certainly the activities at

9    the end involving Rib World and Aetius and so forth, when

02:31PM 10    whatever pretense there may have been that this was legitimate

11    was no longer operable, are certainly worthy of our

12    condemnation and there has been as indicated earlier, a pattern

13    of denial, deflection, obstruction, blameshifting and so on.

14         On the other side of the equation, we have the

15    circumstances of the defendant.  I'll start with his childhood

16    trauma.  That's part of the mix.  I have every confidence that

17    it was traumatic to have your biological father try to burn you

18    and your mother to death.  That's part of who the defendant is.

19    Whatever mental health issues he may have, I'm sure that event

02:32PM 20    is part of it.

21         I will add as an aside that I can't say I understand

22    the parole decision of the State of Washington, but it does

23    illustrate how short sentences undermine public confidence in

24    the judicial system under some circumstances, but, in any

25    event, the defendant has the issues that he has.  They arguably

cut both ways.  They are perhaps to some extent a reason to

show mercy, to say he is less blameworthy than he otherwise

might be.  Of course, one might also say that these kinds of

problems are likely to recur, that people with this set of

characteristics are more likely to commit crimes as the

defendant himself did commit crimes.

The defendant has a supportive family and friends.  I

read all of the letters.  They're always hard to read.  I

certainly understand their perspective.  I am a father myself,

and I certainly feel for his parents and the other members of

his family and particularly for his young daughter.  You don't

get to pick your parents in life, and I'm certainly conscious

of whatever sentence I impose here, how it may affect her.

Normally, of course, the time to think about those

issues is before you commit the crime, not afterward, but there

it is.  The defendant's efforts at post-offense rehabilitation

I note.  I'm not sure how much weight I give to them.  I

sentence people from time to time who are truly remorseful from

day one.  I don't think the defendant fits in that category.  I

think it's taken a long time to get to where he is if he is as

remorseful as Mr. Sinnott has suggested but it took time to get

there, and that is part of the mix as well.

And, finally, I guess I want to add that the defendant

is an adult, he's responsible for his actions, as we are all

responsible for our choices in life even when they injure other

1    people or even those that we love, and to me that's an

2    important part of the equation that when you make a serious

3    mistake, you have to live with the consequences of that

4    mistake.

5    The defendant himself put himself in this position.

6    His parents didn't put him here, Mr. Laborio didn't put him

7    here, he's here of his own free will and choice and has to live

8    with the consequences of that.

9    So where does all that take me?  As I had suggested, I

02:36PM 10  think 192 months is much too long a sentence.  I don't see any

11   need for a sentence of that length under the circumstances.  I

12   do think the component of punishment is important here.  Just

13   simple unadorned punishment, even without consider protection

14   of society but simply because there are crimes that people

15   commit that deserve a severe punishment, and I think this is

16   one of those crimes.

17   I do not think in good conscious I can go all the way

18   down to probation or home confinement, as Mr. Sinnott has

19   suggested.  I think that's far too light under the

02:37PM 20  circumstances.  I couldn't metaphorically look the victims in

21   the eye, among other things, with a sentence like that, and so

22   I think a significant sentence is, appropriate including a

23   substantial prison sentence.

24   Between those two poles, there's not that much to

25   guide me, again, except these forces pulling in opposite

1    directions.  I'm supposed to sentence no longer than necessary

2    to achieve the goals of sentencing, which is an important

3    principle but hard to implement in reality.

4         So, with some level of uncertainty, as I'm always

5    uncertain when I'm pronouncing sentence because there are

6    arguments pointing in both directions made by two lawyers who

7    are quite talented and persuasive in their own ways, but with

8    some recognition, I guess, that there are arguments going both

9    ways I'm going to do is this:

02:38PM 10         I'm going to sentence the defendant to a term of 72

11    months in prison, which is a six-year sentence.  With good

12    time, that means he would be out in about five years.  I take

13    no pleasure in doing that.  I recognize the effect on him and

14    his family and his young daughter.

15         I recognize the interests of the government who

16    believe that that's an unduly short sentence under the

17    circumstances, and, again, I think that reflects the

18    appropriate balance here beginning or ending rather where I

19    began with what I view as the cold-hearted nature of the crime,

02:39PM 20    again, taking the savings of innocent people and squandering

21    them and then going back for more once that money had been

22    dissipated.

23         I do that, again, recognizing that the defendant's

24    gain was nowhere near the overall victims' loss, I do that

25    recognizing that Laborio almost certainly engaged in worse

1    behavior, and all of the personal factors of the defendant

2    which have I guess combined for me to take 10 years off the

3    guideline sentence, but I don't think I can take it any further

4    than that.

5           So with that, let me formally state the sentence that

6    I'm going to pronounce after which I'll give counsel a final

7    opportunity to interpose any further objections or corrections

8    to the sentence before I finally make it.

9           Just give me a moment here.  I also want to make sure

02:41PM 10   I have the exact restitution amount.  That's 3,800,466; is that

11   right, Mr. Thomadakis?

12          MR. THOMADAKIS:  Yes, your Honor.

13          THE COURT:  All right.  Would the defendant please

14   stand.  Pursuant to the Sentencing Reform Act of 1984 and

15   having considered the sentencing factors set forth at

16   18 United States Code, Section 3553(a), it is the judgment of

17   the Court that the defendant, Jonathan Fraiman, is hereby

18   committed to the custody of the Bureau of Prisons to be

19   imprisoned for a term of 72 months.  This term consists of 72

02:42PM 20   months on each count to be served concurrently.

21          The Court makes a judicial recommendation that the

22   defendant participate in substance abuse treatment while in the

23   Bureau of Prisons' custody.  The Court makes a further judicial

24   recommendation that the defendant participate in psychological

25   care for his mental health needs, and the Court makes a further

1    judicial recommendation that the defendant be incarcerated at a

2    facility commensurate with security as close as possible to

3    San Diego, California.

4         Upon release from imprisonment, the defendant shall be

5    placed on supervised release for a term of three years.  This

6    term consists of terms of three years on each count, such terms

7    to run concurrently.

8         Within 72 hours of release from the custody of the

9    Bureau of Prisons, the defendant shall report in person to the

02:43PM 10   district to which he is released.

11        It is further ordered that the defendant shall make

12   $3,800,466 in restitution to the identified victims in this

13   case.  Any payment made that is not payment in full shall be

14   divided proportionately among the parties named.  The

15   restitution shall be paid by the defendant jointly and

16   severally with any other person who is or who may be ordered to

17   pay restitution in the future.

18        Payment of restitution shall begin immediately and

19   shall be made according to the requirements of the Federal

02:43PM 20   Bureau of Prisons' inmate financial responsibility program

21   while the defendant is incarcerated and according to a

22   Court-ordered repayment schedule during the term of supervised

23   release.  All restitution payments shall be made to the Clerk,

24   United States District Court for transfer to the identified

25   victims.

1          The defendant shall notify the United States Attorney

2     for this district within 30 days of any change of mailing or

3     residence address while any portion of the restitution remains

4     unpaid.

5          While on supervised release, the defendant shall

6     comply with the femtosecond terms and conditions:

7          The defendant shall not commit another federal, state

8     or local crime and shall not illegally possess a controlled

9     substance.

02:44PM 10          The defendant shall refrain from any unlawful use of a

11     controlled substance.

12          The defendant shall submit to one drug test within 15

13     days of release from imprisonment and at least two periodic

14     drug tests thereafter, not to exceed 104 tests per year as

15     directed by probation.

16          The defendant shall submit to the collection of a DNA

17     sample as directed by probation.

18          The defendant shall comply with the standard

19     conditions that have been adopted by the Court, which are set

02:44PM 20     forth at Section 5D1.3C of the guidelines and which will be set

21     forth in detail in the judgment.

22          The defendant is prohibited from possessing a firearm,

23     destructive device or other dangerous weapon.

24          The defendant is to pay the balance of any restitution

25     imposed according to a Court-ordered repayment schedule.

1          The defendant is prohibited from incurring new credit

2     charges or opening additional lines of credit without the

3     approval of probation while any financial obligations remain

4     outstanding.

5          The defendant is to provide probation access to any

6     requested financial information, which may be shared with the

7     financial litigation unit of the U.S. Attorney's Office.

8          The defendant is not to consume any alcoholic

9     beverages.

02:45PM 10          The defendant shall participate in a program for

11     substance abuse counseling as directed by probation, which

12     program may include testing, not to exceed 104 drug tests per

13     year to determine whether the defendant has reverted to the use

14     of alcohol or drugs.

15          The defendant shall be required to contribute to the

16     costs of services for such treatment based on the availability

17     to pay or availability of third-party payment.

18          The defendant is to participate in a mental health

19     treatment program as directed by probation.

02:45PM 20          The defendant shall be required to contribute to the

21     costs of services for such treatment based on the availability

22     to pay or availability of third-party payment.

23          The defendant shall take all medications directed by

24     his mental health treatment provider, and it is further ordered

25     that the defendant shall pay the United States a special

1    assessment of $200, which shall be due immediately.

2         You may be seated.  In terms of the formal reasons for

3    the sentence, it is a nonguideline sentence imposed under

4    Section 3553(a) for the reasons indicated.  The supervised

5    release term is appropriate to help the defendant adjust and

6    ensure adequate supervision.

7         I'm imposing no fine, as I indicated, even though it

8    is a financial crime to the extent the defendant has available

9    financial resources, they should go to the very substantial

02:46PM 10   restitution order rather than to the federal government, and

11   the special assessment is mandatory.

12        Is there a forfeiture piece of this?

13        MR. THOMADAKIS:  I was going to mention that, your

14   Honor, and I apologize for not mentioning it before.  There was

15   a forfeiture allegation.  I'm not sure if there was a motion

16   for a money judgment that was filed while we've been here.  I

17   know they were working on it.  There was.  So I would ask that

18   the oral pronouncement of sentencing include that forfeiture

19   piece.

02:47PM 20        THE COURT:  If the motion was just filed today, I'll

21   give Mr. Sinnott an opportunity to look at it.

22        MR. SINNOTT:  I've seen it, your Honor.

23        THE COURT:  All right.  If you could notify the clerk

24   if you want to file an opposition or correction or something,

25   otherwise it will be incorporated in the final judgment and

1    order.

2             MR. THOMADAKIS:  Thank you, your Honor.

3             THE COURT:  Other than that, do counsel have any

4    addition or correction or objection to the sentence not

5    previously stated?  And I've said San Diego, I assume that's

6    where he would like to be close to?

7             MR. SINNOTT:  To be respectful, your Honor, the

8    defendant fully expects that the mother of his child is going

9    to take that child back to the East Coast.  We've done some

02:47PM 10   research, and we would ask that the Court recommend the Federal

11   Correctional Institute in Sheridan, Oregon, and there's two

12   reasons for that, one of which is it's relatively close

13   proximity to his mom and dad in Alaska and his sister who lives

14   in Oregon, the two brothers live on the west coast as well,

15   but, most importantly, there's a 500-hour intensive substance

16   abuse program that Sheridan is renowned for, not everybody

17   makes it through it, but we think collectively that that would

18   be a good thing for Mr. Fraiman.

19            THE COURT:  I have no problem with that, but it's

02:48PM 20   simply a recommendation, and if there's no room, there needs to

21   be a default.  He may wind up who knows where.  What would the

22   default be other than Wyoming?

23            MR. SINNOTT:  Oregon, your Honor, Sheridan, Oregon is

24   what we've requested.

25            THE COURT:  Sheridan, Oregon.  All right.  I thought

1    you said Sheridan, Wyoming.

2          MR. SINNOTT:  Sheridan, Oregon.  As far as a

3    default --

4          THE COURT:  I'll make the recommendation then that if

5    he's an appropriate candidate and commensurate with security

6    and other needs of the Bureau of Prisons that he be

7    incarcerated in Sheridan, Oregon, and, if not, as close as

8    possible to Oregon.

9          MR. SINNOTT:  I think that would be good, your Honor.

02:49PM 10          THE COURT:  All right.  I'm happy to do that.

11    Anything else?

12          MR. SINNOTT:  No, your Honor.  I don't know if the

13    government is making a motion on remand.

14          THE COURT:  I'll get to that.  The sentence is hereby

15    imposed as stated.  Let me give Mr. Fraiman his advice of

16    rights.  Mr. Fraiman, you can appeal your conviction if you

17    believe that there has been some fundamental defect in the

18    proceeding.  You may have a right to appeal your conviction

19    under some circumstances, particularly if you think the

02:49PM 20    sentence was contrary to law.

21          If you're unable to pay costs of appeal, you may ask

22    permission to have those costs waived and appeal without pain.

23    You must file any notice of appeal within 14 days after the

24    entry of judgment, and if you request, the clerk will

25    immediately prepare and file a notice of appeal on your behalf.

1          What is the government's view on self-reporting,

2     Mr. Thomadakis?

3          MR. THOMADAKIS:  We're fine with self-reporting, your

4     Honor.

5          THE COURT:  All right.  I will order that -- I never

6     seem to remember, is it six weeks?

7          PROBATION OFFICER:  Six weeks, your Honor.

8          THE COURT:  So what is six weeks from today?  I'll

9     order the defendant to self-surrender at the institution

02:50PM 10     designated by the Bureau of Prisons no later than May 16th,

11     2016.  Until that time, the defendant shall be under the same

12     conditions of release under which he is currently or that have

13     been currently imposed upon him.

14          All right.  Is there anything further, Mr. Thomadakis?

15          MR. THOMADAKIS:  Nothing from the government, your

16     Honor, thank you.

17          THE COURT:  Mr. Sinnott.

18          MR. SINNOTT:  No, your Honor, thank you.

19          THE COURT:  All right.  One, two final comments.

02:51PM 20     Again, I want to reiterate that I do feel for the defendant's

21     family, particularly his young daughter, as I've indicated.  I

22     certainly understand the pain of the family on a variety of

23     levels, and I also want to tell you, Mr. Fraiman, you may not

24     be happy with what I just did, but I do want to indicate that I

25     think your counsel, Mr. Sinnott, has done an excellent job on

1    your behalf both at the trial and at sentencing.  He's someone

2    that I've known for many years and deeply respect, and it may

3    not seem like a short sentence to you, but it's quite a bit

4    shorter than I was expecting to give when I came out on the

5    bench a few hours ago, and that is entirely attributable to his

6    presentation, so I want to note that for the record, and with

7    that, we'll stand in recess.

8                THE CLERK:  All rise.

9                (Whereupon, the hearing was adjourned at

10   1:04 p.m.)

C E R T I F I C A T E

UNITED STATES DISTRICT COURT )

DISTRICT OF MASSACHUSETTS ) ss.

CITY OF BOSTON )

         I do hereby certify that the foregoing transcript,

Pages 1 through 106 inclusive, was recorded by me

stenographically at the time and place aforesaid in Criminal

Action No. 12-10238-FDS, UNITED STATES OF AMERICA vs.

EDWARD LABORIO and JONATHAN FRAIMAN and thereafter by me

reduced to typewriting and is a true and accurate record of the

proceedings.

         Dated this 20th day of May, 2016.


                    s/s Valerie A. O'Hara

              _____

                    VALERIE A. O'HARA

                    OFFICIAL COURT REPORTER